# 20-1099

In the
# United States Court of Appeals
## For the Second Circuit



ANDREW SMALLS,

*Plaintiff-Appellant,*

v.

POLICE OFFICER RICHARD COLLINS and
POLICE OFFICER DAVID TETA,

*Defendants-Appellees,*

- and -

CITY OF NEW YORK, POLICE OFFICER ERIC CABRERA,
POLICE OFFICER JESSICA ALVARADO, SERGEANT BRIAN STAMM
and POLICE OFFICER ALVAREZ,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## JOINT APPENDIX

NEW YORK CITY LAW DEPARTMENT
  APPEALS DIVISION
*Attorneys for Defendants-Appellees*
100 Church Street
New York, New York 10007
(212) 791-5396

LAW OFFICES OF JOEL B. RUDIN
*Attorneys for Plaintiff-Appellant*
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600


LAW OFFICES OF JON L. NORINSBERG
*Attorneys for Plaintiff-Appellant*
225 Broadway, Suite 2700
New York, New York 10007
(212) 689-1113

**i**

# Table of Contents

**Page**

Docket Entries ............................................................... JA-1

*People v. Smalls,* 83 A.D.3d 1103 (2d Dep't 2011) ..................... JA-23

*People v. Smalls,* Slip Op. (N.Y. Sup. Ct. Oct. 5, 2012) .............. JA-25

Transcript of Pre-Trial Conference, Dated February 14, 2019 ..... JA-41

Stipulation Re: Time in Custody, Dated May 9, 2019 ................ JA-55

**<u>Trial Transcripts</u>:**

Trial Transcript, Dated May 13, 2019 ........................................... JA-59

Trial Transcript, Dated May 14, 2019 ........................................... JA-82

Trial Transcript, Dated May 15, 2019 ........................................... JA-145

Trial Transcript, Dated May 16, 2019 (Part-1) ............................. JA-210

Trial Transcript, Dated May 16, 2019 (Part-2) ............................. JA-221

Trial Transcript, Dated May 17, 2019 ........................................... JA-246

**<u>Trial Exhibits</u>:**

Plaintiff's Exhibit 24 -
Andrew Smalls's Prisoner Pedigree Card ................................. JA-251

Plaintiff's Exhibit 37 -
Andrew Smalls's Arrest Photo .................................................. JA-252

Defendants' Exhibit J -
Affirmation of Judah Maltz, for Defendant,
Dated April 4, 2007 .................................................................. JA-253

Verdict Sheet, Dated May 20, 2019 ............................................. JA-259

Transcript of Oral Argument, Dated March 5, 2020 .................... JA-261

Memorandum & Order Granting Judgment as a Matter of Law,
Dated March 16, 2020 ............................................................... JA-276

Judgment, Dated March 17, 2020 ................................................ JA-293

Notice of Appeal, Dated March 27, 2020 .................................... JA-294

Ⓡ Create an Alert for This Case on RECAP

APPEAL,ACO

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CIVIL DOCKET FOR CASE #: 1:14-cv-02326-CBA-RML

Smalls v. City of New York et al                    Date Filed: 04/10/2014
Assigned to: Judge Carol Bagley Amon               Date Terminated: 05/22/2019
Referred to: Magistrate Judge Robert M. Levy       Jury Demand: Plaintiff
Cause: 42:1983 Civil Rights Act                    Nature of Suit: 440 Civil Rights: Other
                                                   Jurisdiction: Federal Question

**Plaintiff**

**Andrew Smalls**                     represented by   **Bennitta L. Joseph**
                                                       Joseph & Norinsberg LLC
                                                       225 Broadway Suite 2700
                                                       New York, NY 10007
                                                       212-227-5700
                                                       Fax: 212-406-6890
                                                       Email: bennittaj@gmail.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jon L. Norinsberg**
                                                       Law Office of Jon L. Norinsberg
                                                       225 Broadway, Suite 2700
                                                       New York, NY 10007
                                                       212-791-5396
                                                       Fax: 212-406-6890
                                                       Email: jon@norinsberglaw.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **John Joseph Meehan**
                                                       Law Offices of John L. Norinsberg
                                                       225 Broadway
                                                       Suite 2700
                                                       New York, NY 10007
                                                       (212)791-5396
                                                       Fax: (212)406-6890
                                                       Email: jmeehan@norinsberglaw.com
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Khalil Kamel El Assaad**
                                                       Lumer & Neville
                                                       225 Broadway
                                                       Suite 2700
                                                       New York, NY 10007
                                                       212-566-5060
                                                       Fax: 212-406-6890

Email: kelassaad@lumerneville.com
*ATTORNEY TO BE NOTICED*

**James C. Neville**
38 Southern Blvd
Suite 3
Nesconset, NY 11767
516-382-2046
Fax: 631-979-9026
Email: jcnevillelaw@gmail.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of New York**                 represented by **Ben Kuruvilla**
*TERMINATED: 03/02/2016*           New York City Law Department
                                   100 Church Street
                                   New York, NY 10007
                                   212-356-3513
                                   Fax: 212-788-9776
                                   Email: bkuruvil@law.nyc.gov
                                   *LEAD ATTORNEY*
                                   *ATTORNEY TO BE NOTICED*

                                   **Patrick Neil Beath**
                                   NYC Law Department
                                   100 Church Street, Room 3-176
                                   New York, NY 10007
                                   (212) 356-2656
                                   Fax: (212)788-9776
                                   Email: pbeath@law.nyc.gov
                                   *TERMINATED: 06/15/2015*
                                   *LEAD ATTORNEY*
                                   *ATTORNEY TO BE NOTICED*

                                   **Elissa Paulette Fudim**
                                   Corporation Counsel of The City of New
                                   York
                                   100 Church Street
                                   New York, NY 10007
                                   212-356-2335
                                   Fax: 212-356-1148
                                   Email: efudim@law.nyc.gov
                                   *ATTORNEY TO BE NOTICED*

**Defendant**

**Police Officer Richard Collins**     represented by **Ben Kuruvilla**
                                   (See above for address)
                                   *LEAD ATTORNEY*
                                   *ATTORNEY TO BE NOTICED*

                                   **Patrick Neil Beath**

(See above for address)
*TERMINATED: 06/15/2015*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian Christopher Francolla**
New York City Law Department
100 Church Street
New York, NY 10007
212-356-3527
Fax: 212-788-9776
Email: bfrancol@law.nyc.gov
*ATTORNEY TO BE NOTICED*

**Elissa Paulette Fudim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Police Officer David Teta**                    represented by    **Ben Kuruvilla**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick Neil Beath**
(See above for address)
*TERMINATED: 06/15/2015*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian Christopher Francolla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elissa Paulette Fudim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Police Officer Eric Cabrera**                    represented by    **Ben Kuruvilla**
*TERMINATED: 03/02/2016*                                            (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick Neil Beath**
(See above for address)
*TERMINATED: 06/15/2015*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Police Officer Jessica Alvarado**
*TERMINATED: 03/02/2016*

**Defendant**

**Sergeant Brian Stamm**
*TERMINATED: 03/02/2016*

**Defendant**

**Police Officer Alvarez**
*TERMINATED: 03/02/2016*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/10/2014 | 1 ℝ | COMPLAINT against All Defendants filing fee $ 400, receipt number 0207-6851997 Disclosure Statement on Civil Cover Sheet completed -yes,, filed by Andrew Smalls. (Attachments: # 1 Civil cover sheet) (Neville, James) (Entered: 04/10/2014) |
| 04/15/2014 | | Case Assigned to Judge Eric N. Vitaliano and Magistrate Judge Robert M. Levy. (Davis, Kimberly) (Entered: 04/15/2014) |
| 04/15/2014 | 2 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that *if* all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link:http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences. Do NOT return or file the consent** underline{**unless all parties have signed the consent.**} (Davis, Kimberly) (Entered: 04/15/2014) |
| 04/15/2014 | | This attorney case opening filing has been checked for quality control. The following corrections were made: Added Title to defendants names. (Davis, Kimberly) (Entered: 04/15/2014) |
| 04/16/2014 | 3 | Summons Issued as to City of New York. (Lee, Tiffany) (Entered: 04/16/2014) |
| 04/17/2014 | 4 | Summons Issued as to Jessica Alvarado, Alvarez, Eric Cabrera, Richard Collins, Brian Stamm, David Teta. (Attachments: # 1 Teta, # 2 Cabrerea, # 3 Alvarado, # 4 Collins, # 5 Stamm) (Lee, Tiffany) (Entered: 04/17/2014) |
| 05/12/2014 | 5 | ORDER: An initial conference has been scheduled for August 15, 2014 at 2:15 p.m., before the Honorable Robert M. Levy, United States Magistrate Judge at 225 Cadman Plaza East, Brooklyn, New York. Parties are directed to check-in with chambers, Room 1223-S, upon arrival. All counsel must be present. Plaintiff(s) counsel is directed to confirm with defendant(s) counsel that all necessary participants are aware of this conference. Ordered by Magistrate Judge Robert M. Levy on 5/12/2014. (Marino, Janine) (Entered: 05/12/2014) |
| 06/12/2014 | 6 | SUMMONS Returned Executed by Andrew Smalls. City of New York served on 6/9/2014, answer due 6/30/2014. (Neville, James) (Entered: 06/12/2014) |
| 06/18/2014 | 7 | SUMMONS Returned Executed by Andrew Smalls. (Neville, James) (Entered: 06/18/2014) |
| 06/20/2014 | 8 | MOTION for Extension of Time to File Answer re 1 ℝ Complaint by City of New York. (Beath, Patrick) (Entered: 06/20/2014) |
| 06/23/2014 | 9 | AFFIDAVIT of Service for Declaration/Affidavit of Service served on P.O. Cabrera on 06/17/2014, filed by Andrew Smalls. (Neville, James) (Entered: 06/23/2014) |

| 06/23/2014 | 10 | AFFIDAVIT of Service for Declaration/Affidavit of Service served on P.O. R. Collins on 06/17/2014, filed by Andrew Smalls. (Neville, James) (Entered: 06/23/2014) |
|---|---|---|
| 06/23/2014 | 11 | AFFIDAVIT of Service for Declaration/Affidavit of Service served on P.O. Teta on 06/18/2014, filed by Andrew Smalls. (Neville, James) (Entered: 06/23/2014) |
| 06/24/2014 | | ORDER granting 8 Motion for Extension of Time to Answer City of New York answer due 8/29/2014. Ordered by Magistrate Judge Robert M. Levy on 6/24/2014. (Marino, Janine) (Entered: 06/24/2014) |
| 06/27/2014 | 12 | SUMMONS Returned Executed by Andrew Smalls. Jessica Alvarado served on 6/18/2014, answer due 7/9/2014. (Neville, James) (Entered: 06/27/2014) |
| 07/28/2014 | 13 | Letter MOTION for Extension of Time to File *affidavits of service as to two-remaining New York City Police defendants*, by Andrew Smalls. (Neville, James) (Entered: 07/28/2014) |
| 07/29/2014 | | ORDER granting 13 Motion for Extension of Time to File. Ordered by Magistrate Judge Robert M. Levy on 7/29/2014. (Levy, Robert) (Entered: 07/29/2014) |
| 08/13/2014 | 14 | Consent MOTION to Adjourn Conference *Presently Scheduled for August 15, 2014* by City of New York. (Beath, Patrick) (Entered: 08/13/2014) |
| 08/14/2014 | | ORDER granting 14 Motion to Adjourn 8/15/14 Initial Conference to 9/18/14 at 5:00 (tel). Ordered by Magistrate Judge Robert M. Levy on 8/14/2014. (Levy, Robert) (Entered: 08/14/2014) |
| 08/28/2014 | 15 | MOTION for pre motion conference by Eric Cabrera, City of New York, Richard Collins, David Teta. (Beath, Patrick) (Entered: 08/28/2014) |
| 08/28/2014 | 16 | Letter MOTION to Continue *plaintiff's response date to defendants' letter-motion to dismiss to Friday, September 5, 2014*, by Andrew Smalls. (Neville, James) (Entered: 08/28/2014) |
| 08/29/2014 | | ORDER granting 16 Motion to Continue. Plaintiff shall respond to defendants' pre-motion conference request by September 5, 2014. Ordered by Judge Eric N. Vitaliano on 8/29/2014. (Oster, John) (Entered: 08/29/2014) |
| 09/05/2014 | 17 | RESPONSE in Opposition re 15 MOTION for pre motion conference filed by Andrew Smalls. (Neville, James) (Entered: 09/05/2014) |
| 09/05/2014 | 18 | SUMMONS Returned Executed by Andrew Smalls. Eric Cabrera served on 6/17/2014, answer due 7/8/2014. (Neville, James) (Entered: 09/05/2014) |
| 09/05/2014 | 19 | SUMMONS Returned Executed by Andrew Smalls. Richard Collins served on 6/17/2014, answer due 7/8/2014. (Neville, James) (Entered: 09/05/2014) |
| 09/05/2014 | 20 | SUMMONS Returned Executed by Andrew Smalls. David Teta served on 6/18/2014, answer due 7/9/2014. (Neville, James) (Entered: 09/05/2014) |
| 09/05/2014 | 21 | RESPONSE in Opposition re 15 MOTION for pre motion conference , *corrected*, filed by Andrew Smalls. (Neville, James) (Entered: 09/05/2014) |
| 09/16/2014 | | ORDER denying 15 Motion for Pre Motion Conference. Defendants' motion for a premotion conference is denied. The Court sets the following briefing schedule for Defendants' motion to dismiss: Defendant to serve moving papers by 10/16/14, Plaintiff to serve opposition papers by 11/17/14, Defendant to serve reply papers, if any, by 12/1/14, and to file fully briefed motion on ECF. The Court directs parties to address the following issues, among all others they deem appropriate: (1)Whether the Court is required to apply the presumption of probable cause, see Cornell v. Kapral |

| | | |
|---|---|---|
| | | 483 F. App'x 590, 592 (2d Cir. 2012), given that the Appellate Division overturned Smalls's conviction on the basis of the absence of probable cause;(2)Since the complaint references the decision of the Appellate Division, whether the record before the Appellate Division is properly before the Court on this motion;(3)Whether Defendants are entitled to Qualified Immunity;(4)Whether the false arrest and unlawful search and seizure claims were tolled. See Covington v. City of New York, 171 F.3d 117 (2d Cir. 1999). Ordered by Judge Eric N. Vitaliano on 9/16/2014. (Elbogen, Amanda) (Entered: 09/16/2014) |
| 09/16/2014 | 22 | MOTION to Adjourn Conference *Currently Scheduled for September 18, 2014, and to Stay Discovery Until Defendants' Rule 12 Motion is Resolved* by Eric Cabrera, City of New York, Richard Collins, David Teta. (Beath, Patrick) (Entered: 09/16/2014) |
| 09/17/2014 | | ORDER granting 22 Motion to Adjourn Conference. Ordered by Magistrate Judge Robert M. Levy on 9/17/2014. (Marino, Janine) (Entered: 09/17/2014) |
| 09/17/2014 | | ORDER: Status Report due by 1/15/2015. Ordered by Magistrate Judge Robert M. Levy on 9/17/2014. (Marino, Janine) (Entered: 09/17/2014) |
| 11/12/2014 | 23 | Letter MOTION to Continue *date to file opposition papers*, by Andrew Smalls. (Neville, James) (Entered: 11/12/2014) |
| 11/24/2014 | 24 | Second MOTION to Continue *filing date for plaintiff's opposition to defendants' Rule 12 motion to dismiss*, by Andrew Smalls. (Neville, James) (Entered: 11/24/2014) |
| 11/25/2014 | | ORDER granting 24 Motion to Continue. Plaintiff to file opposition papers by December 17, 2014. Defendant to file reply, if any, by January 5, 2015. Ordered by Judge Eric N. Vitaliano on 11/25/2014. (Elbogen, Amanda) (Entered: 11/25/2014) |
| 11/25/2014 | | ORDER terminating 23 Motion to Continue as moot. See Court's order granting motion to continue at docket number 24 . Ordered by Judge Eric N. Vitaliano on 11/25/2014.(Elbogen, Amanda) (Entered: 11/25/2014) |
| 12/17/2014 | 25 | MEMORANDUM in Opposition filed by Andrew Smalls. (Neville, James) (Entered: 12/17/2014) |
| 01/05/2015 | 26 | Motion to Dismiss for Failure to State a Claim by Eric Cabrera, City of New York, Richard Collins, David Teta. (Beath, Patrick) (Entered: 01/05/2015) |
| 01/05/2015 | 27 | AFFIDAVIT/DECLARATION in Support re 26 Motion to Dismiss for Failure to State a Claim filed by Eric Cabrera, City of New York, Richard Collins, David Teta. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Beath, Patrick) (Entered: 01/05/2015) |
| 01/05/2015 | 28 | MEMORANDUM in Support re 26 Motion to Dismiss for Failure to State a Claim filed by Eric Cabrera, City of New York, Richard Collins, David Teta. (Beath, Patrick) (Entered: 01/05/2015) |
| 01/05/2015 | 29 | MEMORANDUM in Opposition re 26 Motion to Dismiss for Failure to State a Claim *Filed on Behalf of Plaintiff Andrew Smalls, in Accordance with Judge Vitaliano's Individual Rules of Practice* filed by City of New York. (Beath, Patrick) (Entered: 01/05/2015) |
| 01/05/2015 | 30 | REPLY in Support re 26 Motion to Dismiss for Failure to State a Claim filed by Eric Cabrera, City of New York, Richard Collins, David Teta. (Beath, Patrick) (Entered: 01/05/2015) |
| 01/15/2015 | 31 | STATUS REPORT by Eric Cabrera, City of New York, Richard Collins, David Teta (Beath, Patrick) (Entered: 01/15/2015) |

| | | |
|---|---|---|
| 04/15/2015 | 32 | NOTICE of Appearance by Ben Kuruvilla on behalf of Eric Cabrera, City of New York, Richard Collins, David Teta (aty to be noticed) (Kuruvilla, Ben) (Entered: 04/15/2015) |
| 04/23/2015 | 33 | Letter MOTION to Withdraw as Attorney by Eric Cabrera, City of New York, Richard Collins, David Teta. (Beath, Patrick) (Entered: 04/23/2015) |
| 06/15/2015 | | ORDER granting 33 Motion to Withdraw as Attorney. Attorney Patrick Neil Beath terminated. Ordered by Judge Eric N. Vitaliano on 6/15/2015. (Elbogen, Amanda) (Entered: 06/15/2015) |
| 03/02/2016 | 34 | MEMORANDUM AND ORDER, For the reasons stated herein, defts' 26 Motion to Dismiss for Failure to State a Claim is granted in part and denying in part. Defts' motion to dismiss pltff's fabrication of evidence claim is denied against Officers Collins and Teta, but granted against Officers Cabrera, Alvarez, Alvarado, and Stamm. The motion to dismiss the malicious prosecution charge against Officer Collins is also denied. The balance of the motion to dismiss, that is, the malicious prosecution charge against Officers Teta, Cabrera, Alvarez, Alvarado, and Stamm as well as all claims against the City of NY, is granted. The parties are referred to Magistrate Judge Robert M. Levy for his continued pretrial management of the proceedings as to the remaining defts. (Ordered by Judge Eric N. Vitaliano on 2/22/16) c/m (Galeano, Sonia) (Entered: 03/02/2016) |
| 03/08/2016 | | SCHEDULING ORDER: A telephone conference has been scheduled for March 28, 2016 at 11:00 a.m., before the Hon. Robert M. Levy, USMJ at (718) 613-2340. Plaintiff's counsel is directed to initiate the conference call and confirm with defendants' counsel that all necessary participants are aware of the date and time of scheduled conference. Ordered by Magistrate Judge Robert M. Levy on 3/8/2016. (Marino, Janine) (Entered: 03/08/2016) |
| 04/01/2016 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: James Neville, Ben Kuruvilla. discovery deadline 10/5/16. Next conference 10/5/16 at 10:00 (tel)(final pretrial).Initial Conference Hearing held on 4/1/2016 (Levy, Robert) (Entered: 04/01/2016) |
| 05/02/2016 | 35 | ANSWER to 1 ®️ Complaint by Richard Collins, David Teta. (Kuruvilla, Ben) (Entered: 05/02/2016) |
| 08/03/2016 | 36 | Letter MOTION to Compel *Discovery Demand Responses*, by Andrew Smalls. (Neville, James) (Entered: 08/03/2016) |
| 08/04/2016 | 37 | Letter MOTION to Compel *Discovery Responses of Defendants, with a correction to letter motion filed yesterday, August 3, 2016*, by Andrew Smalls. (Neville, James) (Entered: 08/04/2016) |
| 08/04/2016 | 38 | Letter MOTION to Withdraw 36 Letter MOTION to Compel *Discovery Demand Responses, with apologies to this Honorable Court, and to Mr. Ben Kuruvilla*, by Andrew Smalls. (Neville, James) (Entered: 08/04/2016) |
| 08/05/2016 | | ORDER granting 38 Plaintiff's Motion to Withdraw Motions to Compel (documents 36 and 37 ). Ordered by Magistrate Judge Robert M. Levy on 8/5/2016. (Marino, Janine) |
| 08/05/2016 | | ORDER terminating 36 Motion to Compel. Ordered by Magistrate Judge Robert M. Levy on 8/5/2016. (Marino, Janine) (Entered: 08/05/2016) |
| 08/05/2016 | | ORDER terminating 37 Motion to Compel. Ordered by Magistrate Judge Robert M. Levy on 8/5/2016. (Marino, Janine) (Entered: 08/05/2016) |

| | | |
|---|---|---|
| 09/09/2016 | 39 | STIPULATION *of Confidentiality and Protective Order, jointly submitted for the Court's endorsement* by Richard Collins, David Teta (Kuruvilla, Ben) Modified on 9/21/2016 (Levy, Robert). (Entered: 09/09/2016) |
| 09/21/2016 | | ORDER granting 39 Motion for Protective Order. Ordered by Magistrate Judge Robert M. Levy on 9/21/2016. (Levy, Robert) (Entered: 09/21/2016) |
| 09/24/2016 | 40 | Consent MOTION for Extension of Time to Complete Discovery by Richard Collins, David Teta. (Kuruvilla, Ben) (Entered: 09/24/2016) |
| 10/05/2016 | | ORDER granting 40 Motion for Extension of Time to Complete Discovery. Ordered by Magistrate Judge Robert M. Levy on 10/5/2016. (Marino, Janine) (Entered: 10/05/2016) |
| 10/05/2016 | | ORDER RE 40 Fact Discovery extended to 1/6/2017. Ordered by Magistrate Judge Robert M. Levy on 10/5/2016. (Marino, Janine) (Entered: 10/05/2016) |
| 10/05/2016 | | ORDER RE 40 The final pretrial telephone conference is adjourned to 1/6/2017 at 10:00 AM before Magistrate Judge Robert M. Levy at (718) 613-2340. Ordered by Magistrate Judge Robert M. Levy on 10/5/2016. (Marino, Janine) (Entered: 10/05/2016) |
| 10/07/2016 | 41 | NOTICE of Appearance by Khalil Kamel El Assaad on behalf of Andrew Smalls (aty to be noticed) (El Assaad, Khalil) (Entered: 10/07/2016) |
| 12/06/2016 | 42 | Consent MOTION for Extension of Time to Complete Discovery by Andrew Smalls. (Neville, James) (Entered: 12/06/2016) |
| 12/08/2016 | | ORDER granting 42 Motion for Extension of Time to 3/10/17 to Complete Discovery. Final. The conference scheduled for 1/6/17 is adjourned to 3/21/17 at 11:30 (tel)(close of discovery). Ordered by Magistrate Judge Robert M. Levy on 12/8/2016. (Levy, Robert) (Entered: 12/08/2016) |
| 03/20/2017 | 43 | Letter MOTION for pre motion conference by Andrew Smalls. (Neville, James) (Entered: 03/20/2017) |
| 03/21/2017 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: James Neville, Khalil El Assad; Ben Kuruvilla. (1) Discovery is complete except for the deposition of a nonparty witness disclosed one week ago and a few followup document requests. Accordingly, the discovery deadline is extended to 4/20/17. Next conference 4/20/17 at 3:30 (tel)(close of discovery).Motion Hearing held on 3/21/2017 re 43 Letter MOTION for pre motion conference filed by Andrew Smalls (Levy, Robert) (Entered: 03/21/2017) |
| 03/21/2017 | | ORDER granting 43 . Plaintiff seeks to enforce a subpoena he served on the Queens County District Attorney on June 24, 2016 for production of, inter alia, grand jury minutes pertaining to plaintiff's criminal prosecution. According to plaintiff, the minutes contain the sworn testimony of defendant Police Officer Richard Collins, who subsequently testified at plaintiff's criminal trial. Plaintiff notes that the minutes were produced to plaintiff's former counsel as Rosario material at the trial, but that the minutes cannot be located at this time. On February 27, 2017, plaintiff filed a motion in state court to unseal the grand jury minutes. Although the motion has not yet been decided, plaintiff seeks, as a matter of efficiency, to bring a similar motion in this court. The court agrees that it has jurisdiction to decide plaintiff's anticipated motion to unseal the grand jury minutes without waiting for a decision from the state court. See Bethea v. City of New York, 2017 WL 979030, at *2 (E.D.N.Y. Mar. 13, 2017) ("[I]t is neither efficient nor required to have plaintiffs first seek disclosure of state court grand materials in state court."). Accordingly, plaintiff has leave to bring a motion to unseal |

| | | |
|---|---|---|
| | | in this court. Ordered by Magistrate Judge Robert M. Levy on 3/21/2017. (Levy, Robert) (Entered: 03/21/2017) |
| 03/21/2017 | 44 | Letter MOTION to Compel *production of grand jury minutes* by Andrew Smalls. (Attachments: # 1 Exhibit Supoena, # 2 Exhibit Production Letter, # 3 Exhibit Criminal Trial Excerpts) (Neville, James) (Entered: 03/21/2017) |
| 03/31/2017 | | ORDER granting 44 Unopposed Motion to Compel for the reasons set forth in the motion. Plaintiff shall serve a copy of this Order on Queens ADA Tina Grillo, who was copied on this motion. Ordered by Magistrate Judge Robert M. Levy on 3/31/2017. (Levy, Robert) (Entered: 03/31/2017) |
| 04/18/2017 | 45 | MOTION to Compel *depositions*, MOTION for Extension of Time to Complete Discovery by Richard Collins, David Teta. (Kuruvilla, Ben) (Entered: 04/18/2017) |
| 04/19/2017 | 46 | RESPONSE in Opposition re 45 MOTION to Compel *depositions* MOTION for Extension of Time to Complete Discovery filed by Andrew Smalls. (Attachments: # 1 EXH 1: Initial Disclosures dtd June 7, 2016) (Lumer, Michael) (Entered: 04/19/2017) |
| 04/19/2017 | 47 | REPLY in Support re 45 MOTION to Compel *depositions* MOTION for Extension of Time to Complete Discovery filed by Richard Collins, David Teta. (Attachments: # 1 Exhibit A) (Kuruvilla, Ben) (Entered: 04/19/2017) |
| 04/20/2017 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: James Neville, Ben Kuruvilla. (1) Defendants' motion to compel the depositions of James Nelson and the 3 Davis witnesses is granted without a finding of fault on either side. The discovery deadline is extended to 5/22/17 for the sole purpose of completing these depositions. (2) The motion to compel the deposition of Gquan Lloyd is moot, as plaintiff doesn't intend to call him as a witness at trial. (3) Next conference 5/23/17 at 3:00 (tel)(close of discovery).Motion Hearing held on 4/20/2017 re 45 MOTION to Compel *depositions* MOTION for Extension of Time to Complete Discovery filed by David Teta, Richard Collins (Levy, Robert) (Entered: 04/20/2017) |
| 04/20/2017 | | ORDER granting 45 Motion to Compel, as explained in 4/20/17 minute entry; granting 45 Motion for Extension of Time to Complete Discovery. Ordered by Magistrate Judge Robert M. Levy on 4/20/2017. (Levy, Robert) (Entered: 04/20/2017) |
| 05/23/2017 | 48 | Letter MOTION to Continue *telephone conference from May 23, 2017 at 3:00 p.m., to Thursday, May 25, 2017, at 4:30 p.m.,* by Andrew Smalls. (Neville, James) (Entered: 05/23/2017) |
| 05/24/2017 | | ORDER granting 48 Motion to Continue. Ordered by Magistrate Judge Robert M. Levy on 5/24/2017. (Marino, Janine) (Entered: 05/24/2017) |
| 05/24/2017 | | SCHEDULING ORDER: Telephone Conference set for 5/25/2017 at 4:30 PM before Magistrate Judge Robert M. Levy at (718) 613-2340. Ordered by Magistrate Judge Robert M. Levy on 5/24/2017. (Marino, Janine) (Entered: 05/24/2017) |
| 05/26/2017 | | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: James Neville, Ben Kuruvilla. Discovery complete. Settlement not possible at this time. Subject to Judge Vitaliano's rules, pre-motion conference letters shall be filed by 6/9/17.Status Conference held on 5/25/2017 (Levy, Robert) Modified on 7/27/2017 (Levy, Robert). (Entered: 05/26/2017) |
| 05/26/2017 | | Order Certifying Discovery is complete.. Ordered by Magistrate Judge Robert M. Levy on 5/25/2017. (Levy, Robert) (Entered: 05/26/2017) |
| 06/22/2017 | 49 | Letter *jointly requesting a pre-trial conference* by Richard Collins, David Teta (Kuruvilla, Ben) (Entered: 06/22/2017) |

| 07/20/2017 | | ORDER denying 49 the parties' request for a pre-trial conference. The parties are directed to contact Magistrate Judge Robert M. Levy to make arrangements for the preparation and filing of a joint pre-trial order, in accordance with the Court's individual rules. After the joint pre-trial order has been filed, the parties may renew their request for a pre-trial conference. Ordered by Judge Eric N. Vitaliano on 7/20/2017. (Penny, Matthew) (Entered: 07/20/2017) |
|---|---|---|
| 07/27/2017 | | PRETRIAL ORDER: The parties shall consult Judge Vitaliano's rules and prepare a Joint Pretrial Order (JPTO) according to the following schedule: plaintiff shall serve his draft by 9/1/17; defendants shall serve their draft by 9/ 15/17; plaintiff shall file the JPTO by 9/26/17. Ordered by Magistrate Judge Robert M. Levy on 7/27/2017. (Levy, Robert) (Entered: 07/27/2017) |
| 09/26/2017 | 50 | Exhibit List *and Proposed Joint Pre-Trial Order* by Andrew Smalls., Witness List by Andrew Smalls (Neville, James) (Entered: 09/26/2017) |
| 12/18/2017 | 51 | NOTICE of Change of Telephone number and email addresses of plaintiff's attorney. by James C. Neville (Neville, James) (Entered: 12/18/2017) |
| 05/14/2018 | 52 | NOTICE of Appearance by Jon L. Norinsberg on behalf of Andrew Smalls (aty to be noticed) (Norinsberg, Jon) (Entered: 05/14/2018) |
| 05/14/2018 | 53 | NOTICE of Appearance by John Joseph Meehan on behalf of Andrew Smalls (aty to be noticed) (Meehan, John) (Entered: 05/14/2018) |
| 05/14/2018 | 54 | Letter *Requesting a Pre-trial Conference at the Court's Earliest Convenience* by Andrew Smalls (Meehan, John) (Entered: 05/14/2018) |
| 05/16/2018 | | NOTICE of Hearing: Pretrial Conference set for 6/22/2018 02:30 PM in Courtroom 4C South before Judge Eric N. Vitaliano. (Villanueva, William) (Entered: 05/16/2018) |
| 06/18/2018 | 55 | Consent MOTION to Adjourn Conference by Richard Collins, David Teta. (Kuruvilla, Ben) (Entered: 06/18/2018) |
| 06/19/2018 | 56 | NOTICE of Appearance by Elissa Paulette Fudim on behalf of Richard Collins, David Teta (aty to be noticed) (Fudim, Elissa) (Entered: 06/19/2018) |
| 06/19/2018 | 57 | REPLY in Support re 55 Consent MOTION to Adjourn Conference filed by Andrew Smalls. (Meehan, John) (Entered: 06/19/2018) |
| 06/20/2018 | | ORDER REASSIGNING CASE. Case reassigned to Judge Carol Bagley Amon for all further proceedings. Judge Eric N. Vitaliano no longer assigned to case Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Ordered by Chief Judge Dora Lizette Irizarry on 6/20/2018. (Bowens, Priscilla) (Entered: 06/20/2018) |
| 06/20/2018 | | ORDER granting 55 Motion to Adjourn Conference: A pre-trial conference is set for July 2, 2018 at 3:00 p.m. in Courtroom 10D South before Judge Carol Bagley Amon. The parties shall be prepared to discuss at the conference any objections they have to their opposing parties' exhibits. Plaintiff and Defendants shall each provide the Court with one binder containing all of the exhibits they plan to present at trial on or before June 27, 2018. So Ordered by Judge Carol Bagley Amon on 6/20/2018. (Angelatos, David) (Entered: 06/20/2018) |
| 07/02/2018 | | Minute Entry for Pretrial Conference held before Judge Carol Bagley Amon on July 2, 2018. Appearances: For Plaintiff - Jon Norinsberg and John Meehan. For Defendants - Elissa Fudim. As stated on the record, the parties may file an amended Joint Pretrial Order on or before July 30, 2018. The amended Joint Pretrial Order shall be consistent |

| | | |
|---|---|---|
| | | with the Court's rulings and the parties' representations at today's Pretrial Conference. The parties may also file motions in limine on or before August 6, 2018 and memoranda in opposition to those motions in limine on or before August 20, 2018. The parties shall submit proposed voir dire questions and proposed jury instructions on or before September 17, 2018. A final Pretrial Conference is set for October 1, 2018 at 2:00 p.m. in Courtroom 10D South before Judge Carol Bagley Amon. The parties have consented to jury selection by a magistrate judge on November 13, 2018, and the trial will begin on November 19, 2018. (Court Reporter Lisa Schmid.) (Angelatos, David) (Entered: 07/02/2018) |
| 07/19/2018 | 58 | Joint MOTION for Extension of Time to File *Amended Joint Pre-trial Order* by Andrew Smalls. (Meehan, John) (Entered: 07/19/2018) |
| 07/20/2018 | | ORDER granting 58 Motion for Extension of Time to File: The parties shall file their amended Joint Pre-Trial Order on or before August 30, 2018. So Ordered by Judge Carol Bagley Amon on 7/20/2018. (Angelatos, David) (Entered: 07/20/2018) |
| 08/03/2018 | 59 | Joint MOTION for Extension of Time to File *Motions in Limine* by City of New York, Richard Collins, David Teta. (Fudim, Elissa) (Entered: 08/03/2018) |
| 08/06/2018 | | ORDER granting 59 Motion for Extension of Time to File. On consent, the parties' motions in limine shall be filed on or before September 14, 2018. Any memoranda in opposition shall be filed on or before September 27, 2018. So Ordered by Judge Carol Bagley Amon on 8/6/2018. (Angelatos, David) (Entered: 08/06/2018) |
| 08/07/2018 | 60 | Consent MOTION to Adjourn Conference by City of New York. (Fudim, Elissa) (Entered: 08/07/2018) |
| 08/07/2018 | | ORDER granting 60 Motion to Adjourn Conference: The Pre Trial Conference previously set for October 1, 2018 is adjourned. The Pre Trial Conference is now set for October 24, 2018 at 3:00 p.m. in Courtroom 10D South before Judge Carol Bagley Amon. So Ordered by Judge Carol Bagley Amon on 8/7/2018. (Angelatos, David) (Entered: 08/07/2018) |
| 08/27/2018 | 61 | MOTION to Unseal Document by City of New York, Richard Collins, David Teta. (Fudim, Elissa) (Entered: 08/27/2018) |
| 08/29/2018 | 62 | REPLY in Opposition re 61 MOTION to Unseal Document filed by Andrew Smalls. (Norinsberg, Jon) (Entered: 08/29/2018) |
| 08/30/2018 | 63 Ⓡ | Proposed Pretrial Order *Joint Pre-Trial Order* by Richard Collins, David Teta (Fudim, Elissa) (Entered: 08/30/2018) |
| 09/06/2018 | 64 | ORDER REFERRING MOTION: 61 MOTION to Unseal Document filed by David Teta, Richard Collins, City of New York; This application is respectfully referred to Magistrate Judge Levy to resolve. Ordered by Judge Carol Bagley Amon on 9/6/2018. Motions referred to Robert M. Levy. (Fernandez, Erica) (Entered: 09/06/2018) |
| 09/10/2018 | | ORDER granting 61 Motion to Unseal Document for the limited purpose of determining damages, specifically whether plaintiff was incarcerated on another charge during the period for which he claims damages in this case. The court makes no ruling as to the admissibility of the sealed documents at trial. Ordered by Magistrate Judge Robert M. Levy on 9/10/2018. (Levy, Robert) (Entered: 09/10/2018) |
| 09/11/2018 | 65 | Consent MOTION for Extension of Time to File by Andrew Smalls. (Meehan, John) (Entered: 09/11/2018) |
| 09/11/2018 | | ORDER granting 65 Motion for Extension of Time. On consent of the parties, the deadline for motions in limine papers is extended to September 21, 2018, and the |

| | | deadline for opposition papers is extended to October 17, 2018. So ordered by Judge Carol Bagley Amon on 9/11/2018. (Wu, Michelle) (Entered: 09/11/2018) |
|---|---|---|
| 09/17/2018 | 66 | Proposed Jury Instructions/Verdict Form by Richard Collins, David Teta (Attachments: # 1 Proposed Verdict Sheet) (Fudim, Elissa) (Entered: 09/17/2018) |
| 09/17/2018 | 67 | Proposed Voir Dire by Richard Collins, David Teta (Fudim, Elissa) (Entered: 09/17/2018) |
| 09/17/2018 | 68 | Proposed Findings of Fact by Andrew Smalls (Meehan, John) (Entered: 09/17/2018) |
| 09/17/2018 | 69 | Proposed Voir Dire by Andrew Smalls (Meehan, John) (Entered: 09/17/2018) |
| 09/17/2018 | 70 | Proposed Jury Instructions/Verdict Form by Andrew Smalls (Meehan, John) (Entered: 09/17/2018) |
| 09/18/2018 | | ORDER approving 63 ℝ Proposed Pretrial Order filed by David Teta, Richard Collins.Ordered by Magistrate Judge Robert M. Levy on 9/18/2018. (Levy, Robert) (Entered: 09/18/2018) |
| 09/21/2018 | 71 | MOTION in Limine by Richard Collins, David Teta. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H) (Fudim, Elissa) (Entered: 09/21/2018) |
| 09/21/2018 | 72 | MOTION in Limine *Notice of Motion* by Andrew Smalls. (Meehan, John) (Entered: 09/21/2018) |
| 09/21/2018 | 73 | MEMORANDUM in Support re 72 MOTION in Limine *Notice of Motion* filed by Andrew Smalls. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Meehan, John) (Entered: 09/21/2018) |
| 09/25/2018 | | Scheduling Order: A telephone conference call to discuss rescheduling the current trial date is set for Thursday, September 27, 2018 at 03:00 PM with Judge Carol Bagley Amon. Counsel for Plaintiff is directed to coordinate with all parties and have them on the line prior to calling chambers at (718) 613-2410. So Ordered by Judge Carol Bagley Amon on 9/25/2018. (Wu, Michelle) (Entered: 09/25/2018) |
| 09/26/2018 | 74 | Letter *regaring no favorable termination in light of plaintiff's admissions below* by Richard Collins, David Teta (Attachments: # 1 Exhibit A) (Fudim, Elissa) (Entered: 09/26/2018) |
| 09/27/2018 | | Minute Entry for telephone conference held before Judge Carol Bagley Amon on September 27, 2018. Appearances: John Meehan for Plaintiff; Elissa Fudim for Defendants. There is no change to the trial schedule: jury selection will take place before a magistrate judge on November 13, 2018, and trial will begin on November 19, 2018. Defendants' application for reconsideration, not to exceed ten pages, is due by October 4, 2018. Plaintiff's response, not to exceed ten pages, is due by October 14, 2018. (Court Reporter Michele Nardone.) (Wu, Michelle) (Entered: 09/27/2018) |
| 09/28/2018 | 75 | Joint MOTION for New Trial *Date* by Andrew Smalls. (Meehan, John) (Entered: 09/28/2018) |
| 10/01/2018 | 76 | ORDER granting 75 Motion for New Trial: Application to reschedule granted. Jury Trial and Jury Selection is scheduled for 1/22/2019 at 10:00 AM in Courtroom 10D South before Judge Carol Bagley Amon. Pretrial conference scheduled for 1/9/19 at 10:00 am.Ordered by Judge Carol Bagley Amon on 9/28/2018. (Fernandez, Erica) (Entered: 10/01/2018) |
| 10/01/2018 | | Set/Reset Hearings: Pretrial Conference rescheduled for 1/9/2019 at 10:00 AM in Courtroom 10D South before Judge Carol Bagley Amon as per doc 76 . (Fernandez, |

| | | Erica) (Entered: 10/01/2018) |
|---|---|---|
| 10/05/2018 | 77 | Letter *regarding viability of remaining claims* by Richard Collins, David Teta (Attachments: # 1 Exhibit People v. Smalls decision) (Myrvold, Barry) (Entered: 10/05/2018) |
| 10/15/2018 | 78 | Letter *Plaintiff's Opposition to Defendants' Motion Seeking Reconsideration of March 2, 2016 Order denying Defendants' Motion to Dismiss* by Andrew Smalls (Meehan, John) (Entered: 10/15/2018) |
| 10/15/2018 | 79 | REPLY in Support re 77 Letter filed by Richard Collins, David Teta. (Fudim, Elissa) (Entered: 10/15/2018) |
| 10/16/2018 | 80 | Consent MOTION for Extension of Time to File Response/Reply as to 72 MOTION in Limine *Notice of Motion*, 71 MOTION in Limine by Andrew Smalls. (Meehan, John) (Entered: 10/16/2018) |
| 10/16/2018 | | ORDER granting 80 Motion for Extension of Time to File Response/Reply. On consent of the parties, the deadline for the parties to file their motion in limine opposition papers is extended to November 30, 2018. So ordered by Judge Carol Bagley Amon on 10/16/2018. (Wu, Michelle) (Entered: 10/16/2018) |
| 10/17/2018 | 81 | RESPONSE in Opposition re 72 MOTION in Limine *Notice of Motion* filed by Richard Collins, David Teta. (Fudim, Elissa) (Entered: 10/17/2018) |
| 11/12/2018 | 82 | MEMORANDUM in Opposition re 71 MOTION in Limine filed by Andrew Smalls. (Attachments: # 1 Exhibit A) (Meehan, John) (Entered: 11/12/2018) |
| 11/14/2018 | 83 | Letter *re: recent decision by Second Circuit Court of Appeals relevant to pending motion at D.E. # 77* by Richard Collins, David Teta (Attachments: # 1 Appendix Lanning v. City of Glen Falls) (Fudim, Elissa) (Entered: 11/14/2018) |
| 12/11/2018 | 84 | ORDER: Defendants' submission, not to exceed ten pages, is due on December 19, 2018; Smalls' opposition, not to exceed ten pages, is due on January 4, 2019; any reply by Defendants, not to exceed five pages, is due on January 9, 2019. The pretrial conference, currently scheduled for January 9, 2019 at 10:00 am, is rescheduled for January 16, 2019 at 10:00 am. Ordered by Judge Carol Bagley Amon on 12/11/2018. (Fernandez, Erica) (Entered: 12/11/2018) |
| 12/18/2018 | 85 | Consent MOTION for Extension of Time to File *additional briefing from Dec. 19 to Dec. 21, 2018* by Richard Collins, David Teta. (Fudim, Elissa) (Entered: 12/18/2018) |
| 12/19/2018 | | ORDER granting 85 Motion for Extension of Time to File. On consent of the parties, defendants' submission is now due on December 21, 2018; plaintiff's response is due on January 9, 2019; and defendants' reply is due at noon on January 14, 2019. So ordered by Judge Carol Bagley Amon on 12/19/2018. (Wu, Michelle) (Entered: 12/19/2018) |
| 12/21/2018 | 86 | Joint MOTION for New Trial *Date* by Andrew Smalls. (Meehan, John) (Entered: 12/21/2018) |
| 12/21/2018 | 87 | MOTION to Dismiss for Failure to State a Claim *based upon Second Circuit decision in Lanning (additional briefing as directed by the Court), and motion in limine point on judicial estoppel (as permitted by the Court)* by Richard Collins, David Teta. (Attachments: # 1 Exhibit) (Fudim, Elissa) (Entered: 12/21/2018) |
| 01/03/2019 | | NOTICE of Hearing: This case has been referred to Magistrate Judge Steven M. Gold for jury selection on **January 22, 2019.** Counsel must appear promptly at **9:30 AM** in **Courtroom 10D South.** The parties must submit no later than noon on January 15, |

|  |  |  |
|---|---|---|
|  |  | 2019 the following (to the extent not previously submitted): Proposed questions to ask prospective jurors during voir dire, a short description of the case and a list of the names of all persons, entities, and locations that the party expects may be mentioned during the trial. Only questions specifically addressing the issues to be tried should be submitted; routine background questions are not necessary. (Gillespie, Saudia) (Entered: 01/03/2019) |
| 01/03/2019 |  | ORDER granting 86 Motion for New Trial. Jury Trial and Jury Selection, previously scheduled for January 22, 2019, is rescheduled for March 4, 2019 at 10:00 am in Courtroom 10D South before Judge Carol Bagley Amon. The pretrial conference, currently scheduled for January 16, 2019, is rescheduled for February 14, 2019 at 2:00 pm in Courtroom 10D South. So ordered by Judge Carol Bagley Amon on 1/3/2019. (Wu, Michelle) (Entered: 01/03/2019) |
| 01/08/2019 | 88 | Consent MOTION for Extension of Time to File Response/Reply as to 87 MOTION to Dismiss for Failure to State a Claim *based upon Second Circuit decision in Lanning (additional briefing as directed by the Court), and motion in limine point on judicial estoppel (as permitted by the Court) / Adjourn Trial Date To April, 2019* by Andrew Smalls. (Meehan, John) (Entered: 01/08/2019) |
| 01/09/2019 |  | ORDER granting in part and denying in part 88 Motion for Extension of Time to File Response/Reply and to Adjourn Trial Date. On consent of the parties, the deadline for plaintiff's opposition is extended to January 18, 2019, and the deadline for defendants' reply is extended to February 1, 2019. The request to adjourn the trial date is denied. So ordered by Judge Carol Bagley Amon on 1/9/2019. (Wu, Michelle) (Entered: 01/09/2019) |
| 01/17/2019 | 89 | MEMORANDUM in Opposition re 87 MOTION to Dismiss for Failure to State a Claim *based upon Second Circuit decision in Lanning (additional briefing as directed by the Court), and motion in limine point on judicial estoppel (as permitted by the Court)* filed by Andrew Smalls. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Meehan, John) (Entered: 01/17/2019) |
| 01/17/2019 | 90 | AFFIDAVIT/DECLARATION in Opposition re 87 MOTION to Dismiss for Failure to State a Claim *based upon Second Circuit decision in Lanning (additional briefing as directed by the Court), and motion in limine point on judicial estoppel (as permitted by the Court) Of Plaintiff Andrew Smalls* filed by Andrew Smalls. (Meehan, John) (Entered: 01/17/2019) |
| 01/17/2019 | 91 | AFFIDAVIT/DECLARATION in Opposition re 87 MOTION to Dismiss for Failure to State a Claim *based upon Second Circuit decision in Lanning (additional briefing as directed by the Court), and motion in limine point on judicial estoppel (as permitted by the Court) Of Judah Maltz, Esq.* filed by Andrew Smalls. (Meehan, John) (Entered: 01/17/2019) |
| 01/17/2019 | 92 | AFFIDAVIT/DECLARATION in Opposition re 87 MOTION to Dismiss for Failure to State a Claim *based upon Second Circuit decision in Lanning (additional briefing as directed by the Court), and motion in limine point on judicial estoppel (as permitted by the Court) Of Patrick Megaro, Esq.* filed by Andrew Smalls. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Meehan, John) (Entered: 01/17/2019) |
| 01/17/2019 | 93 | AFFIDAVIT/DECLARATION in Opposition re 87 MOTION to Dismiss for Failure to State a Claim *based upon Second Circuit decision in Lanning (additional briefing as directed by the Court), and motion in limine point on judicial estoppel (as permitted by the Court) Of Judah Maltz, Esq. Corrected* filed by Andrew Smalls. (Meehan, John) (Entered: 01/17/2019) |

| 01/23/2019 | 94 | REPLY to Response to Motion re 87 MOTION to Dismiss for Failure to State a Claim *based upon Second Circuit decision in Lanning (additional briefing as directed by the Court), and motion in limine point on judicial estoppel (as permitted by the Court)* filed by Richard Collins, David Teta. (Attachments: # 1 Exhibit C, # 2 Exhibit D) (Fudim, Elissa) (Entered: 01/23/2019) |
|---|---|---|
| 01/25/2019 | | SCHEDULING ORDER: Oral argument on Defendants' motion to dismiss and motion in limine on judicial estoppel 87 is scheduled for February 4, 2019 at 3:00 pm in Courtroom 10D South before Judge Carol Bagley Amon. Plaintiff is directed to file a response to the arguments raised in Part (c) of Defendants' reply memorandum 94 by February 1, 2019 at 12:00 pm. (Wu, Michelle) (Entered: 01/25/2019) |
| 01/31/2019 | 95 | REPLY in Opposition re 87 MOTION to Dismiss for Failure to State a Claim *based upon Second Circuit decision in Lanning (additional briefing as directed by the Court), and motion in limine point on judicial estoppel (as permitted by the Court)* filed by Andrew Smalls. (Meehan, John) (Entered: 01/31/2019) |
| 02/04/2019 | | MINUTE ENTRY AND ORDER: Oral argument on Defendants' motion to dismiss and motion in limine on judicial estoppel 87 was held before Judge Carol Bagley Amon on February 4, 2019. Appearances: Jon Norinsberg and John Meehan for Plaintiff; Elissa Fudim for Defendants. For the reasons stated on the record, the Court denies Defendants' motion 87 to dismiss Plaintiff's fair trial claim on the grounds of judicial estoppel and the statute of limitations, and denies Motion I of Defendants' motions in limine 71 . Plaintiff is directed to disclose the relevant communications between Plaintiff and his prior attorney, Stephen Drummond, to Defendants. The parties are directed to file a revised joint pre-trial order by February 13, 2019. The pre-trial conference is rescheduled to February 14, 2019 at 3:00 pm in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Anthony Mancuso.) (Wu, Michelle) (Entered: 02/04/2019) |
| 02/06/2019 | 96 | Letter MOTION for Writ of Habeas Corpus ad testificandum by Andrew Smalls. (Attachments: # 1 Proposed Order) (Meehan, John) (Entered: 02/06/2019) |
| 02/13/2019 | 97 | Proposed Pretrial Order *2nd Amended Proposed Joint Pretrial Order* by Andrew Smalls (Meehan, John) (Entered: 02/13/2019) |
| 02/15/2019 | 98 | Joint MOTION for Discovery by Richard Collins, David Teta. (Fudim, Elissa) (Entered: 02/15/2019) |
| 02/15/2019 | | MINUTE ENTRY AND ORDER for pretrial conference and oral argument on the parties' motions in limine 71 , 72 held before Judge Carol Bagley Amon on February 14, 2019.<br><br>The Court ruled as follows with respect to Defendants' motions in limine:<br>- Motion 4: Denied. Pl. Ex. 19 of the 97 Second Amended Joint Pretrial Order is admissible.<br>- Motion 6: Denied.<br><br>The Court ruled as follows with respect to Plaintiff's motions in limine:<br>- Motion 1: Denied. Defendants may inquire within the scope stated on the record.<br>- Motion 2: Denied as to the criminal possession of a forged instrument and assault convictions. Defendants may inquire within the scope stated on the record. Granted as to the criminal possession of a weapon and drug convictions.<br>- Motion 6: Granted in part, as stated on the record.<br><br>The Court adheres to its earlier ruling on the use of the documents submitted in connection with Plaintiff's suppression motion. Pl. Ex. 35 is admissible in part, as |

| | | |
|---|---|---|
| | | stated on the record. (Court Reporter David Roy.) (Wu, Michelle) (Entered: 02/15/2019) |
| 02/15/2019 | 99 | ORDER FOR WRIT OF HABEAS CORPUS AD TESTIFICANDUM for Andrew Smalls, granting 96 Motion for Writ of Habeas Corpus ad testificandum. Ordered by Judge Carol Bagley Amon on 2/14/2019. (Barrett, C) (Entered: 02/19/2019) |
| 02/19/2019 | | JURY SELECTION: This case has been referred to Magistrate Judge Sanket J. Bulsara for selection of a trial jury on **March 04, 2019**. An in person Pre-Trial Conference to discuss proposed questionnaire will be held at **4:00 PM on March 01, 2019 before Magistrate Judge Bulsara in Courtroom 2F North**. Defendant should be present for the Pre-Trial Conference. Counsel must appear promptly at **9:00 AM on March 04, 2019 in Courtroom 10D South** to begin selection. The parties must submit no later than **12:00 Noon on February 27, 2019** the following (to the extent not previously submitted): proposed questions to ask prospective jurors during voir dire, a short description of the case and a list of the names of all persons, entities, and locations that the party expects may be mentioned during the trial. Only questions specifically addressing the issues to be tried should be submitted; routine background questions are not necessary. (Manson, Eddie) (Entered: 02/19/2019) |
| 02/19/2019 | | ORDER granting in part and denying in part 98 Motion to Adjourn Trial and for Discovery. The request for an adjournment of the trial date is denied. The parties may conduct the requested discovery, if they are able to do so before trial. So ordered by Judge Carol Bagley Amon on 2/19/2019. (Wu, Michelle) (Entered: 02/19/2019) |
| 02/19/2019 | 100 | SECOND AMENDED JOINT PRETRIAL ORDER. Ordered by Judge Carol Bagley Amon on 2/14/2019. (Fernandez, Erica) (Entered: 02/19/2019) |
| 02/25/2019 | 101 | Letter *seeking clarification re: Friday's pre-trial conference* by Richard Collins, David Teta (Fudim, Elissa) (Entered: 02/25/2019) |
| 02/25/2019 | 102 | STATUS REPORT *Re: Counsel's Attempts to Secure Plaintiff's Appearance* by Andrew Smalls (Attachments: # 1 Exhibit A, # 2 Proposed Order) (Meehan, John) (Entered: 02/25/2019) |
| 02/25/2019 | | SCHEDULING ORDER: A telephone conference regarding counsel's attempts to secure plaintiff's appearance 102 is scheduled for February 26, 2019 at 11:00 am with Judge Carol Bagley Amon. Counsel for Plaintiff is directed to coordinate with all parties and have them on the line prior to calling chambers at (718) 613-2410. (Wu, Michelle) (Entered: 02/25/2019) |
| 02/25/2019 | 103 | Writ of Habeas Corpus ad Testificandum Issued as to Andrew Smalls: WHEREFORE, I respectfully request that the Clerk of the Court be directed to issue a Writ of Habeas Corpus Ad Testificandum commanding the FRANKLIN CORRECTIONAL FACILITY to produce ANDREW SMALLS at the Metropolitan Detention Center and into the custody of the United States Marshal Service, and that once produced there, that the United States Marshal Service produce ANDREW SMALLS to the UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF NEW YORK on March 4, 2019 and any day thereafter as needed for the proceeding. U.S. Marshals shall return the inmate to DOCCS custody at the conclusion of the trial. So Ordered by Judge Carol Bagley Amon, dated 2/25/19. (Fernandez, Erica) (Entered: 02/25/2019) |
| 02/25/2019 | 104 | NOTICE of Appearance by Brian Christopher Francolla on behalf of Richard Collins, David Teta (aty to be noticed) (Francolla, Brian) (Entered: 02/25/2019) |
| 02/26/2019 | 105 | NOTICE of Appearance by Bennitta L. Joseph on behalf of Andrew Smalls (aty to be noticed) (Joseph, Bennitta) (Entered: 02/26/2019) |

| | | |
|---|---|---|
| 02/26/2019 | | MINUTE ENTRY, ORDER and SCHEDULING ORDER: A telephone conference was held before Judge Carol Bagley Amon on 2/26/2019. Appearances: Jon Norinsberg and John Meehan for Plaintiff; Elissa Fudim and Brian Francolla for Defendants. The Court denies Plaintiff's motion to adjourn the trial date. A telephone conference is scheduled for **February 28, 2019 at 11:30 am** to update the Court on counsel's efforts to secure Plaintiff's appearance. Counsel for Plaintiff is directed to coordinate with all parties and have them on the line prior to calling chambers at (718) 613-2410. The Court also heard the parties' objections to the exhibit list. The Court denies Defendants' motion to exclude Pl. Ex. 23 and made other rulings on the record. (Court Reporter Rivka Teich.) (Wu, Michelle) (Entered: 02/26/2019) |
| 02/26/2019 | | ORDER: Counsel for Defendants is directed to furnish chambers with a copy of their trial exhibits by 5:00 pm on February 28, 2019. (Wu, Michelle) (Entered: 02/26/2019) |
| 02/27/2019 | 106 | Proposed Voir Dire by Andrew Smalls (Meehan, John) (Entered: 02/27/2019) |
| 02/27/2019 | 107 | Letter *in response to the Court's February 19, 2019 Order for jury selection seeking the parties' proposed statements of the case* by Richard Collins, David Teta (Francolla, Brian) (Entered: 02/27/2019) |
| 02/27/2019 | 108 | STATUS REPORT *Regarding Plaintiff's Appearance for March 4, 2019* by Andrew Smalls (Attachments: # 1 Exhibit A) (Meehan, John) (Entered: 02/27/2019) |
| 02/27/2019 | | SCHEDULING ORDER: The Court has received counsel's status report 108 . The telephone status conference will take place as scheduled for February 28, 2019 at 11:30 am. Counsel for Plaintiff is directed to coordinate with all parties and have them on the line prior to calling chambers at (718) 613-2410. (Wu, Michelle) (Entered: 02/27/2019) |
| 02/28/2019 | | MINUTE ENTRY AND SCHEDULING ORDER: A status conference was held before Judge Carol Bagley Amon on 2/28/2019. Appearances: John Meehan and Bennitta Joseph for Plaintiff; Elissa Fudim and Brian Francolla for Defendants. The trial date, currently set for March 4, 2019, is adjourned. Trial will begin on **May 13, 2019**. A final pretrial conference is set for **April 26, 2019 at 10:00 am** in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Michele Lucchese.) (Wu, Michelle) (Entered: 02/28/2019) |
| 02/28/2019 | | ORDER: In light of Judge Amon's electronic ordered dated 2/28/2019, the in person pre-trial conference scheduled for **3/1/2019**, and the jury selection scheduled for **3/4/2019** before Magistrate Judge Sanket J. Bulsara is hereby adjourned. So Ordered by Magistrate Judge Sanket J. Bulsara on 2/28/2019. (Manson, Eddie) (Entered: 02/28/2019) |
| 03/19/2019 | | RESCHEDULING ORDER: Due to a conflict in the Court's calendar, the final pretrial conference, currently scheduled for April 26, 2019, is rescheduled to **April 23, 2019 at 10:00 am** in Courtroom 10D South before Judge Carol Bagley Amon. (Wu, Michelle) (Entered: 03/19/2019) |
| 03/25/2019 | | ORDER: The parties are directed to file a letter updating the Court on the status of the writ by March 28, 2019. So ordered by Judge Carol Bagley Amon on 3/25/2019. (Wu, Michelle) (Entered: 03/25/2019) |
| 03/28/2019 | 109 | STATUS REPORT by Andrew Smalls (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Meehan, John) (Entered: 03/28/2019) |
| 04/09/2019 | | ORDER: Plaintiff's counsel is directed to file a letter updating the Court on the status of the writ by April 12, 2019. So ordered by Judge Carol Bagley Amon on 4/9/2019. (Wu, Michelle) (Entered: 04/09/2019) |

**JA-18**

7/6/2020 Eastern District of New York - LIVE Database 1.3 (Revision 1.3.6)

| 04/12/2019 | <u>110</u> | STATUS REPORT by Andrew Smalls (Meehan, John) (Entered: 04/12/2019) |
|---|---|---|
| 04/23/2019 | | MINUTE ENTRY AND ORDER: The Court scheduled a final pretrial conference for April 23, 2019 at 10:00 am. Brian Francolla, Barry Myrvold, and Elissa Fudim appeared for Defendants. Counsel for Plaintiff failed to appear. The Court has still not received a writ to secure Plaintiff's appearance at trial. Counsel for Plaintiff is directed to file a letter by **April 24, 2019**, (a) explaining counsel's failure to appear and failure to notify the Court or opposing counsel in advance of their non-appearance, and (b) providing an update on the status of the writ. The final pretrial conference is rescheduled for May 1, 2019 at 5:00 pm in Courtroom 10D South before Judge Carol Bagley Amon. So ordered by Judge Carol Bagley Amon on 4/23/2019. (Wu, Michelle) (Entered: 04/23/2019) |
| 04/24/2019 | <u>111</u> | STATUS REPORT by Andrew Smalls (Attachments: # <u>1</u> Proposed Order) (Meehan, John) (Entered: 04/24/2019) |
| 04/25/2019 | <u>112</u> | Writ of Habeas Corpus ad Testificandum Issued as to Andrew Smalls: IT IS FURTHER ORDERED that the ACTING COMMISSIONER of the NEW YORK CITY DEPARTMENT OF CORRECTION, deliver the body of Andrew Smalls, Inmate DIN 18R1074 under safe and secure conduct, from RIKERS CORRECTIONAL CENTER, or other suitable facility within the operation and control of the NEW YORK CITY DEPARTMENT OF CORRECTION, before Magistrate Judge Sanket J. Bulsara in Courtroom 324 N, United States Courthouse, 225 Cadman Plaza East, Brooklyn, N.Y. on May 13, 2019 at 9:00 a.m. there to appear in the above-captioned case for jury selection and for trial before the Honorable Judge Carol Bagley Amon in Courtroom 10D S at 9:00 AM on each succeeding day as may be required to complete the trial in this action (see order for details) (Fernandez, Erica) (Entered: 04/25/2019) |
| 04/25/2019 | | TRIAL MANAGEMENT ORDER: This matter has been referred to me for jury selection. Counsel and the parties shall report to Courtroom 10D South promptly at 8:45 a.m. on May 13, 2019.<br><br>As the parties previously filed their proposed *voir dire* questions and a list of names of all persons, entities, and specific locations that may be mentioned during trial, the Court shall rely on what has been filed. Should the parties wish to file any revisions to their proposed *voir dire* submissions, they must do so by **12:00 p.m. on May 1, 2019**.<br><br>Plaintiff's counsel shall make arrangements to ensure that plaintiff has appropriate court attire for the jury selection. Ordered by Magistrate Judge Lois Bloom on 4/25/2019. (Panjini, Madhura) (Entered: 04/25/2019) |
| 05/01/2019 | | MINUTE ENTRY: A final pretrial conference was held before Judge Carol Bagley Amon on May 1, 2019. Appearances: John Meehan for Plaintiff; Elissa Fudim, Brian Francolla, and Barry Myrvold for Defendants. The parties will file a joint letter addressing the items discussed on the record. (Court Reporter Denise Parisi.) (Wu, Michelle) (Entered: 05/01/2019) |
| 05/07/2019 | <u>113</u> | Consent MOTION to Unseal Document *s From Plaintiff's Co-Defendant's Arrests and Prosecutions* by Andrew Smalls. (Attachments: # <u>1</u> Exhibit A) (Meehan, John) (Entered: 05/07/2019) |
| 05/08/2019 | <u>114</u> | ORDER re <u>113</u> Consent MOTION to Unseal Document *s From Plaintiff's Co-Defendant's Arrests and Prosecutions* : The parties are directed to explain why this application should be made to this Court and not the state court that presumably sealed the documents. Ordered by Judge Carol Bagley Amon on 5/8/2019. (Fernandez, Erica) (Entered: 05/08/2019) |

https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?576998740799845-L_1_1-1 18/22

JA-19

| | | |
|---|---|---|
| 05/08/2019 | 115 Ⓡ | MEMORANDUM in Support re 113 Consent MOTION to Unseal Document s From Plaintiff's Co-Defendant's Arrests and Prosecutions , As Ordered By The Court filed by Andrew Smalls. (Meehan, John) (Entered: 05/08/2019) |
| 05/08/2019 | 116 | ORDER (Redacted) granting 113 Motion to Unseal Document: IT IS HERE BY ORDERED, that the criminal files relating to the arrest of Andrew Small's co-defendants from his May 20, 2006 arrest be unsealed and made available to all the parties in this federal civil rights action. Ordered by Judge Carol Bagley Amon on 5/8/2019. (Fernandez, Erica) (Entered: 05/08/2019) |
| 05/08/2019 | 117 | ORDER re 113 : IT IS HERE BY ORDERED, that the criminal files relating to the arrest of Andrew Small's co-defendants from his May 20, 2006 arrest, Ronnie Smalls, Cedric Smalls, and Jerome Nelson, be unsealed and made available to all the parties in this federal civil rights action. Ordered by Judge Carol Bagley Amon on 5/8/2019. (Fernandez, Erica) (Entered: 05/08/2019) |
| 05/09/2019 | 118 | Letter jointly from the parties with a stipulation pertaining to the relevant time plaintiff spent incarcerated as well as our proposals for how the Court should explain why plaintiff's conviction was overturned by Richard Collins, David Teta (Francolla, Brian) (Entered: 05/09/2019) |
| 05/10/2019 | 119 | DRAFT VERDICT SHEET. (Fernandez, Erica) (Entered: 05/10/2019) |
| 05/10/2019 | 120 Ⓡ | DRAFT Jury Instructions. (Fernandez, Erica) (Entered: 05/10/2019) |
| 05/13/2019 | 121 | Minute Entry for proceedings held before Magistrate Judge Lois Bloom:Jury Selection held on 5/13/2019. Counsel for parties present. Juror Sworn. Jury Trial set for 5/13/2019 before Judge Carol Bagley Amon. (Court Reporter Georgette Betts.) (Fernandez, Erica) (Entered: 05/14/2019) |
| 05/13/2019 | 122 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Jury Trial held on 5/13/2019. Counsel for parties present. Opening Instructions held by the Court; Opening statements heard; Jury Trial 5/14/2019 at 09:30 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Anthony Mancuso.) (Fernandez, Erica) (Entered: 05/17/2019) |
| 05/14/2019 | 123 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Jury Trial held on 5/14/2019. Counsel for parties present. Direct examination of Officer Richard Collins continued. Jury Trial set for 5/15/2019 at 09:30 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Anthony Mancuso.) (Fernandez, Erica) (Entered: 05/17/2019) |
| 05/15/2019 | 124 | Minute Entry for proceedings held before Judge Carol Bagley Amon:Jury Trial held on 5/15/2019. Counsel for parties present. Charging conference held. Jury Trial set for 5/16/2019 at 09:30 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Anthony Mancuso.) (Fernandez, Erica) (Entered: 05/17/2019) |
| 05/16/2019 | 125 | Minute Entry for proceedings held before Judge Carol Bagley Amon:Jury Trial held on 5/16/2019. Counsel for parties present. Jury Trial adjourned to 5/17/2019 at 09:30 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Anthony Mancuso.) (Fernandez, Erica) (Entered: 05/21/2019) |
| 05/17/2019 | 126 | Minute Entry for proceedings held before Judge Carol Bagley Amon:Jury Trial held on 5/17/2019. Counsel for parties present. Deliberations continued. Jury Trial adjourned to 5/20/2019 at 09:00 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Anthony Mancuso.) (Fernandez, Erica) (Entered: 05/21/2019) |

| | | |
|---|---|---|
| 05/20/2019 | 127 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Jury Trial completed on 5/20/2019. Counsel for parties present. Allen Charge read to the jury. Deliberations continued. Verdict rendered as follows: Jury found that dft Collins & Dft Teta deprived pltf of the right to a fair trial by fabricating evidence. Jury found that pltf is entitled to compensatory damages in the amount of $60,000. Jury found that dfts did NOT act with malicious intent to violate the pltf s rights, therefore pltf is NOT entitled to punitive damages.Trial concluded. Dft given 28 days (6/17/19) to move for judgment as a matter of law. (Court Reporter Charleane Heading.) (Fernandez, Erica) (Entered: 05/21/2019) |
| 05/21/2019 | 128 | COURT EXHIBIT #1: Jury Instructions, COURT EXHIBIT #12: Jury Notes. (Attachments: # 1 Jury Note) (Fernandez, Erica) (Entered: 05/21/2019) |
| 05/22/2019 | 129 Ⓡ | COURT EXHIBIT 2: JURY VERDICT SHEET. (Fernandez, Erica) (Entered: 05/22/2019) |
| 05/22/2019 | 130 | CLERK'S JUDGMENT directing that the plaintiff ANDREW SMALLS recover from thedefendants Richard Collins and David Teta, SIXTY THOUSAND dollars ($60,000.00); The action was tried by a jury with Judge Carol Bagley Amon presiding, and the jury has rendered a verdict. Signed by Vanessa Holley, Deputy Clerk, on behalf of Douglas C. Palmer, Clerk of Court on 5/22/2019. (Fernandez, Erica) (Entered: 05/22/2019) |
| 05/24/2019 | 131 🄵 | Consent MOTION for Extension of Time to File *Motion for Attorney's Fees* by Andrew Smalls. (Meehan, John) (Entered: 05/24/2019) |
| 05/30/2019 | | ORDER granting 131 🄵 Motion for Extension of Time to File. On consent of the parties, the deadline for Plaintiff to file his motion for attorneys' fees is extended until 30 days after the Court rules on the parties' post-trial motions. So ordered by Judge Carol Bagley Amon on 5/30/2019. (Wu, Michelle) (Entered: 05/30/2019) |
| 06/18/2019 | 132 | MOTION for New Trial *On Damages Pursuant To Fed. R. Civ. P. 59* by Andrew Smalls. (Meehan, John) (Entered: 06/18/2019) |
| 06/18/2019 | 133 | AFFIDAVIT/DECLARATION in Support re 132 MOTION for New Trial *On Damages Pursuant To Fed. R. Civ. P. 59 Declaration of Jon L. Norinsberg* filed by Andrew Smalls. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Meehan, John) (Entered: 06/18/2019) |
| 06/18/2019 | 134 | MEMORANDUM in Support re 132 MOTION for New Trial *On Damages Pursuant To Fed. R. Civ. P. 59* filed by Andrew Smalls. (Norinsberg, Jon) *(Modified: Main Document has been replaced.) (Latka-Mucha, Wieslawa)* (Entered: 06/18/2019) |
| 06/21/2019 | 135 | MOTION for Judgment as a Matter of Law , MOTION to Set Aside Judgment by Richard Collins, David Teta. (Attachments: # 1 Memorandum in Support, # 2 Appendix Decision in McDonough v. Smith, # 3 Appendix Transcript from preedings on Feb. 4, 2019 (referenced in MOL)) (Fudim, Elissa) (Entered: 06/21/2019) |
| 06/24/2019 | 136 | Joint MOTION for Extension of Time to File *Opposition Briefs to Post-trial Motions* by Andrew Smalls. (Meehan, John) (Entered: 06/24/2019) |
| 06/25/2019 | | ORDER granting 136 Motion for Extension of Time to File. On consent of the parties, the deadline for the parties to respond to each other's post-trial motions is extended until **July 12, 2019**. So ordered by Judge Carol Bagley Amon on 6/25/2019. (Wu, Michelle) (Entered: 06/25/2019) |
| 07/12/2019 | 137 | RESPONSE in Opposition re 132 MOTION for New Trial *On Damages Pursuant To Fed. R. Civ. P. 59* filed by City of New York, Richard Collins, David Teta. |

|  |  | (Attachments: # 1 Appendix transcript from 2.4.19 conference, # 2 Appendix Trial Exhibit 12) (Fudim, Elissa) (Entered: 07/12/2019) |
|---|---|---|
| 07/12/2019 | 138 | MEMORANDUM in Opposition re 135 MOTION for Judgment as a Matter of Law MOTION to Set Aside Judgment filed by Andrew Smalls. (Meehan, John) (Entered: 07/12/2019) |
| 07/17/2019 | 139 | Consent MOTION for Extension of Time to File Response/Reply as to 137 Response in Opposition to Motion, by Andrew Smalls. (Meehan, John) (Entered: 07/17/2019) |
| 07/17/2019 |  | ORDER granting 139 Motion for Extension of Time to File Reply. On consent of the parties, the deadline for the parties to file any reply briefs is extended until **July 26, 2019**. So ordered by Judge Carol Bagley Amon on 7/17/2019. (Wu, Michelle) (Entered: 07/17/2019) |
| 07/17/2019 | 140 | REPLY in Support re 135 MOTION for Judgment as a Matter of Law MOTION to Set Aside Judgment filed by Richard Collins, David Teta. (Fudim, Elissa) (Entered: 07/17/2019) |
| 07/26/2019 | 141 | REPLY in Support re 132 MOTION for New Trial *On Damages Pursuant To Fed. R. Civ. P. 59* filed by Andrew Smalls. (Meehan, John) (Entered: 07/26/2019) |
| 08/09/2019 | 142 🔗 | Letter *Re: Supplmental Caselaw on McDonough v. Smith Arguments Raised By Defendants in Their Post-trial Motion* by Andrew Smalls (Attachments: # 1 Exhibit A) (Meehan, John) (Entered: 08/09/2019) |
| 08/09/2019 | 143 🔗 | REPLY to Response to Motion re 135 MOTION for Judgment as a Matter of Law MOTION to Set Aside Judgment filed by Richard Collins, David Teta. (Fudim, Elissa) (Entered: 08/09/2019) |
| 08/29/2019 | 144 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on May 1, 2019, before Judge Amon. Court Reporter/Transcriber Denise Parisi, Telephone number 718-613-2605. Email address: deniseparisi72@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 9/19/2019. Redacted Transcript Deadline set for 9/30/2019. Release of Transcript Restriction set for 11/27/2019. (Parisi, Denise) (Entered: 08/29/2019) |
| 10/08/2019 | 145 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on February 14, 2019, before Judge Carol Bagley Amon. Court Reporter/Transcriber David R. Roy, Telephone number 7186132609. Email address: drroyofcr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 10/29/2019. Redacted Transcript Deadline set for 11/8/2019. Release of Transcript Restriction set for 1/6/2020. (Roy, David) (Entered: 10/08/2019) |
| 02/07/2020 |  | SCHEDULING ORDER: Oral argument will be held on the parties' post-trial motions 132 and 135 on March 5, 2020 at 2:00 p.m. before Judge Carol Bagley Amon in Courtroom 10D South. Ordered by Judge Carol Bagley Amon on 2/7/2020. (Cohn, Caroline) (Entered: 02/07/2020) |
| 03/05/2020 |  | Minute Entry: Oral argument was held on March 5, 2020, before Judge Carol Bagley Amon, on the parties' post-trial motions: Defendants' Motion for Judgment as a Matter |

| | | |
|---|---|---|
| | | of Law and Motion to Set Aside the Judgment 135 ; and Plaintiff's Motion for a New Trial On Damages 132 . Appearances: For Plaintiff: John Meehan, Esq.; For Defendants: Elissa Fudim, Esq. and Brian Francolla, Esq. The Court reserves judgment on the motions. As discussed on the record, Defendants shall supplement their argument regarding Rule 50(b) by March 13, 2020 (with citations to the trial transcript), or else shall be deemed to have abandoned that argument. The parties are also to advise the Court by March 13, 2020 whether the case has been settled. (Court Reporter Linda Danelczyk.) (Cohn, Caroline) (Entered: 03/05/2020) |
| 03/12/2020 | 146 Ⓡ | *Letter supplementing Rule 50(b) argument with transcript as requested by the court* by Richard Collins, David Teta (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Fudim, Elissa) (Entered: 03/12/2020) |
| 03/16/2020 | 147 | MEMORANDUM AND ORDER: For the reasons set forth above, the Court grants Defendants' motions, vacates the jury verdict, and enters judgment as a matter of law in favor of Defendants. Plaintiff's motion for a new trial on damages is denied as moot. The Clerk of Court is directed to enter judgment accordingly. Ordered by Judge Carol Bagley Amon on 3/13/2020. (fwd for judgment) (Fernandez, Erica) (Entered: 03/16/2020) |
| 03/17/2020 | 148 Ⓡ | CLERK'S JUDGMENT directing that Defendants motions are granted; that the jury verdict is vacated; that judgment is entered as a matter of law in favor of Defendants; and that Plaintiffs motion for a new trial on damages is denied as moot. Signed by Jalitza Poveda, Deputy Clerk on behalf of Douglas C. Palmer, Clerk of Court on 3/17/2020. (Fernandez, Erica) (Entered: 03/17/2020) |
| 03/27/2020 | 149 Ⓡ | NOTICE OF APPEAL as to 147 Order on Motion for New Trial,, Order on Motion for Judgment as a Matter of Law,, Order on Motion to Set Aside Judgment, by Andrew Smalls. Filing fee $ 505, receipt number ANYEDC-12601010. (Norinsberg, Jon) (Entered: 03/27/2020) |
| 03/30/2020 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 149 Ⓡ Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (McGee, Mary Ann) (Entered: 03/30/2020) |
| 04/16/2020 | 150 Ⓡ | BILL OF COSTS by Richard Collins, David Teta (Attachments: # 1 Declaration in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F) (Fudim, Elissa) (Entered: 04/16/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/06/2020 13:15:09 | | |
| **PACER Login:** | jbrudin9935 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:14-cv-02326-CBA-RML |
| **Billable Pages:** | 19 | **Cost:** | 1.90 |

83 A.D.3d 1103, 922 N.Y.S.2d 461, 2011 N.Y. Slip Op. 03639
**(Cite as: 83 A.D.3d 1103, 922 N.Y.S.2d 461)**

and PLUMMER E. LOTT, JJ.

**\*1103** Appeal by the defendant from a judgment of the Supreme Court, Queens County (Aloise, J.), rendered November 12, 2008, convicting him of criminal possession of a weapon in the second degree, criminal possession of a weapon in the third degree, and criminal trespass in the third degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing (Demakos, J.H.O.), of that branch of the defendant's omnibus motion which was to suppress physical evidence.

ORDERED that the judgment is reversed, on the law, that branch of the defendant's omnibus motion which was to suppress physical evidence is granted, the counts of the indictment charging criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree are dismissed (*see People v. Rossi,* 80 N.Y.2d 952, 590 N.Y.S.2d 872, 605 N.E.2d 359), and the matter is remitted to the Supreme Court, Queens County, for a new trial on the count of the indictment charging criminal trespass in the third degree (*see People v. Perkins,* 189 A.D.2d 830, 592 N.Y.S.2d 752).

The following testimony was adduced at the defendant's *Mapp/ Dunaway* hearing (*see Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824). At approximately 1:10 A.M. on May 20, 2006, four uniformed police officers on foot patrol at a New York City public housing project heard a gunshot while inside one of the public housing buildings. They determined that the sound had emanated from the rear of the **\*1104**

building, but the sole officer testifying at **\*\*463** the hearing agreed that he did not know the gunshot's precise location. When the officers went outside and arrived at the back of the building, they saw a group of four male and one female youths. The group members, one of whom was the defendant, were merely walking away from the building at a normal pace. The officers followed the five individuals for three blocks, during which period none of the individuals behaved in a suspicious manner.

Next, the lone female looked back in the direction of the officers and gestured to her male companions, and the four males ran. The police gave chase and followed them inside one of the public housing buildings and up the stairwells to the roof. During the pursuit, the defendant handed a gun to another group member, his brother Ronnie Smalls, in plain sight of an officer, and the gun's magazine fell onto the stairwell. The gun, which was loaded, was later recovered one or two feet away from Ronnie.

[1][2] The branch of the defendant's omnibus motion which was to suppress physical evidence should have been granted. In light of the facts that no group member engaged in suspicious behavior immediately after the shot was heard or during the three-block walk away from the general location of the gunshot, the police lacked reasonable suspicion when they pursued the four males after they fled (*see People v. Holmes,* 81 N.Y.2d 1056, 1057–1058, 601 N.Y.S.2d 459, 619 N.E.2d 396; *People v. Johnson,* 64 N.Y.2d 617, 618, 485 N.Y.S.2d 33, 474 N.E.2d 241; *Matter of Emmanuel O.,* 32 A.D.3d 948, 949–950, 821 N.Y.S.2d 255; *People v. McCullough,* 31 A.D.3d 812, 813–814, 818 N.Y.S.2d 328; *People v. Brogdon,* 8

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

JA-24

83 A.D.3d 1103, 922 N.Y.S.2d 461, 2011 N.Y. Slip Op. 03639
**(Cite as: 83 A.D.3d 1103, 922 N.Y.S.2d 461)**

A.D.3d 290, 291–292, 778 N.Y.S.2d 45; *People v. Hooper,* 245 A.D.2d 1020, 1020–1021, 667 N.Y.S.2d 575; *People v. McFadden,* 136 A.D.2d 934, 934–935, 524 N.Y.S.2d 902). The fact that an officer testified at the hearing that the public housing building into which the males ran had "no trespassing" signs is of no consequence, as the record suggests that the officers' unlawful pursuit began before the males reached this location. In any event, there is no evidence that, during the pursuit, the police had any basis for believing that the defendant and other group members did not in fact live in the public housing complex (*see People v. William II,* 98 N.Y.2d 93, 98, 745 N.Y.S.2d 792, 772 N.E.2d 1150; *People v. McCullough,* 31 A.D.3d at 813–814, 818 N.Y.S.2d 328; *People v. Young,* 202 A.D.2d 1024, 1025–1026, 609 N.Y.S.2d 725; *cf. People v. Caba,* 78 A.D.3d 857, 858, 910 N.Y.S.2d 373). Additionally, the defendant's act of parting with the gun "was a spontaneous reaction to the sudden and unexpected pursuit by the officers," as opposed to "an independent act involving a calculated risk attenuated from the underlying police conduct" ( *People v. McCullough,* 31 A.D.3d at 813–814, 818 N.Y.S.2d 328 [internal quotation marks omitted] ). Accordingly, we reverse the judgment.

**\*1105** In light of our determination, we need not address the defendant's remaining contentions.

N.Y.A.D. 2 Dept.,2011.
People v. Smalls
83 A.D.3d 1103, 922 N.Y.S.2d 461, 2011 N.Y. Slip Op. 03639

END OF DOCUMENT

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS: CRIMINAL TERM, PART K-22
--------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK

                   against                : Indict. No. 0221/2007


ANDREW SMALLS,             Defendant

--------------------------------------------------------------x

Salvatore J. Modica, J.:

      The primary issue presented in this case is whether, following the reversal
by the Appellate Division of the defendant's trial conviction and the order of that
court for a new trial, the trial court, in its discretion, may revisit the issue of
suppression prior to that retrial. Under the circumstances of this case, this Court
concludes that it has such power. Accordingly, the defendant's motion to reopen
the suppression held in this case on February 20, 2008 was granted on August 1,
2012. At that reopened hearing, after giving the People an opportunity to be
heard, the motion to suppress the observations made by the police in this case
regarding the defendant's alleged entry into and presence inside a building was
granted by this Court on August 1, 2012. In light of that ruling, the defendant's
motion to dismiss the remaining count in the indictment charging him with
Criminal Trespass in the Third Degree under Penal Law § 140.10(e) was also
granted on the record, in open court, on August 1, 2012. *See* CPL 210.20 (1)(h).
The following decision constitutes the decision and order of this Court.

      This case was administratively sent to this Court for a jury trial on June 19,
2012 on the charge of Criminal Trespass in the Third Degree under Penal Law
§ 140.10(e), a Class B misdemeanor. This charge was the sole remaining count
in an indictment that had been filed by a Queens County Grand Jury on February
7, 2007 against the defendant and his brother, Ronney Smalls. In addition to the
Class B misdemeanor trespass charge, the indictment had charged the two
brothers with Criminal Possession of a Weapon in the Second Degree [Penal
Law § 265.03(2)], Criminal Possession of a Weapon in the Third Degree [Penal
Law § 265.02(4)], and Reckless Endangerment in the Second Degree [Penal

Law § 120.20].[1]  The indictment also contained a charge of Criminal Possession of a Weapon in the Third Degree [Penal Law § 265.02(5)(ii)]; this count applied solely to Ronny Smalls.

The facts underlying the charges against the defendant and his brother related to an incident that occurred on May 20, 2006, at about 1:00 AM, at the Hammel Houses, located at 81-05 Rockaway Beach Boulevard, Queens County. The defendant was arraigned on the indictment on March 8, 2007 and a suppression hearing was held on February 20, 2008 before a Judicial Hearing Officer [JHO].  Based on the recommendation of that JHO, the motion to suppress a firearm recovered by the police was denied by a Supreme Court Justice.

Following a trial by jury, the defendant was convicted, on June 4, 2008, of Criminal Possession of a Weapon in the Second Degree, Criminal Possession of a Weapon in the Third Degree, and Criminal Trespass in the Third Degree.  With respect to the jury's verdict convicting him of Criminal Possession of a Weapon in the Second Degree, the defendant was sentenced on November 12, 2008 to a determinate term of imprisonment of twelve years, to be followed by a five-year period of post-release supervision.  A determinate prison term of four years, with a three-year period of post-release supervision, was imposed on the defendant as to the conviction of Criminal Possession of a Weapon in the Third Degree. The two prison terms were ordered to run concurrently to one another.  Finally, the defendant was sentenced to time served on the jury's verdict convicting him of Criminal Trespass in the Third Degree.  An appeal ensued to the Appellate Division, Second Department.

On April 26, 2011, after serving approximately four years of that twelve-year sentence, the order of the Supreme Court, which denied the defendant's motion to suppress the firearm recovered by the police in this case, was reversed by the Second Department.  *See People v. Smalls*, 83 AD3d 1103  (2d Dept. 2011).  In its decision, the Second Department made express findings of fact concerning this incident.  It specifically found that on May 20, 2006, at about,

---

[1]  Penal Law § 265.02(4) was repealed in 2006 by the Legislature, which "transferred that crime to the statute defining criminal possession of a weapon in the second degree," as set forth in Penal Law § 265.03. Donnino, 2008 Practice Commentaries, McKinney's Cons Law of NY, Book 39, Penal Law § 265.00, at 413; *see also* Penal Law § 265.03(3); L. 2006, c.742, effective November 1, 2006, as amended by L. 2006, c. 745, effective December 15, 2006; Since the defendant is alleged to have been in possession of a loaded firearm prior to the effective date of the legislative changes, he was charged under the old law.

2

DEF-000746

1:10 AM, four uniformed officers were inside a public housing building when they heard a gunshot. *See People v Smalls, supra* 83 AD3d at 1103. Although the officers were unable to pinpoint the exact location from where the subject weapon had been discharged, they went outside and decided to go to the rear of the building, at which time they observed a female and four males, two of whom were the defendant and his brother. These five individuals had their backs to the officers, "were merely walking away from the building at a normal pace...[and] [t]he officers followed the five individuals for three blocks, during which period none of the individuals behaved in a suspicious manner." *People v Smalls, supra* 83 AD3d at 1103-1104. The circumstances changed, however, when the female in the group noticed the presence of the police officers. This individual notified her male companions of this fact and the four males fled from the officers, who then gave chase. With the officers in hot pursuit, the four males ran "inside one of the public housing buildings and up the stairwells to the roof[,]...[d]uring [which time] the defendant handed a gun to another group member, his brother Ronnie Smalls, in plain sight of an officer, and the gun's magazine fell onto the stairwell." *People v Smalls, supra* 83 AD3d at 1103-1104. The police subsequently recovered a loaded handgun less than two feet from the defendant's brother. *Id.*

Based on these facts, the Second Department concluded that the defendant's motion to suppress the firearm should have been granted. As explained by the Court, "[i]n light of the facts that no group member engaged in suspicious behavior immediately after the shot was heard or during the three-block walk away from the general location of the gunshot, the police lacked reasonable suspicion when they pursued the four males after they fled." *People v Smalls, supra* 83 AD3d at 1105 (*citations omitted*). More important, notwithstanding the testimony at the hearing that the subject building contained "no trespassing" signs, the Court dismissed the obvious argument made by the People that the police had reasonable suspicion to stop the four males forcibly because they were now trespassing in a public housing building. Rejecting that argument, the Appellate Division held that fact to be "of no consequence as the record suggests that the officers' unlawful pursuit began before the males reached this location." *Id* at 1105.

Given that the police had an insufficient predicate to chase the defendant and, in light of the Second Department's additional conclusion, that "the defendant's act of parting with the gun 'was a spontaneous reaction to the sudden and unexpected pursuit by the officers,' as opposed to 'an independent act involving a calculated risk attenuated from the underlying police conduct,'" the defendant's motion to suppress the firearm was granted. *Id* (*citations omitted*). In light of that ruling, the Appellate Division dismissed the two counts of

3

DEF-000747

the indictment charging the defendant with Criminal Possession of a Weapon in the Second and Third Degrees. *Id.* "The matter [was] remitted to the Supreme Court, Queens County, for a new trial on the [remaining] count of the indictment charging criminal trespass in the third degree." *Id.*

The case was sent to this Court for trial and, on June 25, 2012, a *Ventimiglia* hearing was held. *See People v Ventimiglia* 52 NY2d 350 (1981). By this time, the Court had read the court file and studied the decision handed down by the Second Department. It was obvious from that decision that the observations made by the officer concerning the defendant's alleged unlawful entry into the subject building had not been suppressed by the Appellate Division. After a conference with the attorneys, the matter was adjourned for defense counsel to file a motion to reopen the suppression hearing.

On July 2, 2012, defense counsel filed a motion to reopen the hearing and for suppression of the observations made by the police officers of the defendant's entry and presence into the subject housing building. That motion also contained a motion to dismiss the remaining count in the indictment of criminal trespass. The People were given an opportunity to file a response to that motion and the matter was adjourned for the Court's decision. On August 1st, the Court granted the motion to reopen the hearing; upon re-consideration, and after giving the People an opportunity to be heard, the motion to suppress the observations of the police officers in this case was granted. After being informed that the only evidence available to the People in support of the defendant's alleged entry into this location or presence therein, was the testimony of the officers, whose observations were suppressed, the motion to dismiss the charge of criminal trespass was granted.

A court's decision to reopen a suppression hearing, when made by a defendant, rests within the reasonable discretion of a trial court. *See People v Mercado*, 62 NY2d at 867 (1986). [2] For example, reopening is permitted under

---

[2] The Criminal Procedure Law expressly provides a defendant, not the People, with a mechanism to renew a pre-trial determination and denial of a suppression motion. *See eg* CPL 710.40(2); *see also* CPL 710.40(2); CPL 255.20(3). This does not entail that the prosecution is never permitted to revisit a suppression determination. For instance, if the prosecution was not given a full and fair opportunity to present its evidence at the original suppression hearing, a court may reopen that proceeding. *See eg People v Crandall*, 69 NY2d 459 (1987); *see also People v Dodt*, 61 NY2d 408 (1984); *People v. Ayala*, 149 AD2d 519 (2d Dept. 1983); *see also People v Lanier*, 8 Misc3d 1017A (S.Ct. Bx. Co. 2005). But in circumstances in which the prosecution was provided a fair and complete opportunity to establish the lawfulness of police conduct at a suppression hearing and has lost, it will not be

4

DEF-000748

CPL 710.40(4) if a trial court "is satisfied, upon a showing by the defendant, that additional pertinent facts have been discovered by the defendant which he could not have discovered with reasonable diligence before the determination" of his pretrial application. CPL 710.40(4); *see also People v Mercado, supra*, 62 NY2d at 866; *see also People v Clark*, 88 NY2d 552 (1996); *People v Fuentes*, 53 NY2d 892 (1981); *People v Greco*, 230 AD2d 23 (4th Dept. 1997).

In addition, significant inconsistencies or discrepancies between the testimony given by a witness at a suppression hearing and at a subsequent trial, which are dispositive of a suppression issue, will permit the reopening of the hearing. *See eg People v Whaley*, 70 AD3d 570 (1st Dept. 2010); *People v Sylvain*, 33 AD3d 330, 331 (1st Dept. 2006); *People v. Figliolo*, 207 AD2d 679 (1st Dept. 1994). Likewise, reopening will be permitted if the testimony of a witness at a suppression hearing is contradicted to a substantial extent by evidence presented at a subsequent trial or by the trial testimony of a different witness. *See eg People v Brown*, 35 AD3d 322 (1st Dept. 2006); *see also People v Walker*, 282 AD2d 628 (2d Dept. 2001); *People v March*, 271 AD2d 700 (2d Dept. 2000); *People v Sumpter*, 191 AD2d 628 (2d Dept 1993); *People v Villanova*, 179 AD2d 381 (1st Dept. 1992). In other words, if the newly discovered evidence is reasonably likely to result in suppression, then a trial court is permitted to reopen the hearing. *See People v Whaley, supra* 70 AD3d at 570; *see also People v Adams*, 231 AD2d 447 (1st Dept 1996); *People v Denny*, 177 AD2d 589 (2d Dept. 1991). Caselaw also recognizes that a trial court has "discretion to reopen a suppression hearing based on evidence adduced at trial which indicates that substantial rights of the defendant may have been affected by police misconduct." *People v Corso*, 135 AD2d 551, 553 (2d Dept. 1987); *see also People v. Figliolo, supra* 207 AD2d at 681; *People v Sylvain, supra* 33 AD3d at 331. In fact, the power to reopen a suppression hearing may be exercised *sua sponte* by a trial court, which may also revisit and

---

given a second chance to succeed. *See People v Havelka*, 45 NY2d 636 (1978); *see also People v Harris*, 55 AD3d 958 (3d Dept. 2008). Nevertheless, in situations where there is very little chance that evidence, tailored to avoid constitutional objections, will be presented at a rehearing, a court, in the exercise of its discretion, may permit a hearing to be reopened at the request of the prosecution for the purpose of further testimony or evidence. *See eg People v Whitmore*, 12 AD3d 845 (1st Dept. 2003); *see also People v. Widgeon*, 303 AD2d 330 (3d Dept. 2004); *People v Somerville*, 283 AD2d 596 (2d Dept. 2001). It should be noted that the rule set forth above in *Havelka* is, arguably, limited to pretrial suppression hearings. Thus, in *People v Greco*, the Fourth Department, in determining that the trial court did not abuse its discretion in granting the prosecutor's application to reopen a *Frye [Frye v United States*, 293 F 1013 (CADC 1923)] hearing, did not apply the analysis set forth in *Havelka. See People v Greco, supra* 230 AD2d at 29; *see also People v Havelka, supra* 45 NY2d at 636.

5

decide the issue of suppression even though it was not the court that presided over that pretrial hearing. *See eg People v Corso, supra* 135 AD2d at 553; *see also People v. Figliolo, supra* 207 AD2d at 680-681; *People v. Freeman*, 253 AD2d 692 (1st Dept. 1998).

The Court of Appeals has also permitted trial courts to reopen a hearing, or grant a *de novo* one, where there has been a *Rosario* or *Brady* violation. *See eg People v. Williams*, 7 NY3d 15 (2006); *see also People v Feerick*, 93 NY2d 433 (1999); *Brady v Maryland*, 373 US 83 (1963); *People v Rosario*, 9 NY2d 286 (1961); *see also* CPL 710.40(2). And a trial court may reopen a hearing "to entertain a new issue based on a decision announced after the motion to suppress has been denied." *People v Mercado, supra*, 62 NY2d at 867; *People v Grosfeld*, 58 NY2d 887 (1983); *see also People v Cohen*, 87 AD2d 77 (2d Dept. 1982), *affirmed* 58 NY2d 844 (1983); *see also* CPL 710.40(2). In both *Mercado* and *Grosfeld*, given the failure of the defendants to allege facts or offer some proof establishing that the decision in *Payton v New York* was relevant to the circumstances of their respective cases, the decision of each trial court denying the defendants' motions to reopen the suppression hearings did not constitute an abuse of discretion. *See People v Mercado, supra*, 62 NY2d at 867; *see also People v Grosfeld, supra*, 58 NY2d at 888; *see Payton v New York*, 445 US 573 (1980).

In *Cohen*, the Court of Appeals noted that "[t]here was no abuse of discretion in entertaining the motion to suppress for the first time upon remand." *People v Cohen supra* 58 NY2d at 846, n. *, citing *People v Fuentes, supra*, 53 NY2d 892 (1981); *see also* CPL 710.40(2). The defendant in *Cohen* was convicted of murdering her husband, but the judgment was overturned as a result of certain errors committed at her trial and a new trial ordered. *See People v Cohen*, 50 NY2d 908 (1980); *see also People v Cohen, supra* 58 NY2d at 844. Prior to the defendant's retrial, her attorney, for the first time, moved to suppress statements she made to the police and physical evidence recovered from her home. According to the Second Department's decision, the motion had not been made earlier by defense counsel because the defendant's statements "were subject to suppression only under recently announced State law..." *People v Cohen, supra*, 87 AD2d at 78. As to the motion to suppress physical evidence, her attorney argued that the application was not made prior to the first trial as it was "grounded on facts first learned at her trial." *Id.* The motion to suppress, made for the first time in the criminal action, and immediately prior to the defendant's retrial, was then granted by the trial court and, upon an appeal taken by the People from that order, affirmed by both the Appellate Division and the Court of Appeals. *See People v Cohen, supra* 87

6

DEF-000750

AD2d at 79, *affirmed* 58 NY2d at 846.

In the case before this Court, there is no allegation that either a *Brady* or *Rosario* violation was committed when the pretrial suppression hearing was held in 2008 or that the defendant has discovered new facts previously unknown to him at the time of that hearing. Nor is the defendant contending that the evidence or testimony presented at his trial was inconsistent with the pretrial hearing evidence or that there has been a new announcement of law following the 2008 hearing that would now entitle him to suppression. Instead, the defendant simply requests that this Court exercise its discretion, revisit the issue of suppression, and extend the rationale of the Appellate Division's decision suppressing the firearm recovered by the police officers to the observations made by those same officers regarding the defendant's entry into and presence inside the subject public housing building on May 20, 2006. The request is hardly unreasonable.

In that respect, it is significant to point out that the defendant is not requesting permission to relitigate the issue of suppression that was decided adversely against him. *Compare People v Miller*, 65 NY2d 502, 511 (1985)(Hearing court did not commit error in refusing "to consider at the suppression hearing held after reversal of the original conviction based on defendant's plea issues litigated and decided during the first pre-trial suppression hearing and not reversed on appeal...."). There is, of course, absolutely no need to do so as the defendant was victorious in the Appellate Division, the suppression issue having been decided in his favor on that appeal. Thus, neither the law of the case doctrine nor principles of collateral estoppel prevent the relief sought by the defendant. *See eg People v Evans*, 94 NY2d 499 (2000); *see also People v Nieves*, 67 NY2d 125 (1986); *People v Aguilera*, 82 NY2d 23 (1993); *People v Blake*, 35 NY2d 331 (1974); *People v Leon*, 264 AD2d 784 (2d Dept. 1994). [3] This is especially true given that the issue presented to this Court for its determination is whether, in light of the Appellate Division's conclusion that the defendant was illegally seized, the exclusionary rule should be applied to the observations of the officers. That issue, which was not reached by the Second Department on the defendant's appeal, involves "a pure question of law," making it outside the reach of the doctrine of collateral estoppel. *See eg American Home Assur. Co. v International Ins. Co.*, 90 NY2d 433, 440 (1997). But more important, this issue was, in fact, raised in the

---

[3] If the law of the case doctrine applies, exceptional circumstances are required to be shown before a suppression order can be reconsidered. *See eg People v Perilla*, 240 AD2d 313 (1st Dept. 1997); *People v Sharp*, 279 AD2d 429 (1st Dept. 2001).

DEF-000751

defendant's original moving papers that were filed in April 2007, in which his attorney moved "for a pre-trial hearing to...suppress all evidence unlaw[fully] seized." *See eg People v Rossi*, 80 NY2d 952, 953 (1992). The People were, therefore, clearly on notice, that the defendant's suppression request also included the observations of these police officers.

A trial court's power to order a suppression hearing for the first time in a criminal action, or to reopen one that has commenced and concluded, is not limited by the express statutory grant of authority set forth in subdivisions two and four of CPL 710.40. [4] As set forth in CPL 255.20(3), a "court, in the interest of justice, and for good cause shown, may in its discretion, at any time, before sentence, entertain and dispose of the motion on the merits." *See People v Hults*, 76 NY2d 190, 194-195 (1989); *see also People v Sturgis*, 112 AD2d 757 (4th Dept. 1985); *see also* CPL 710.40(1). In exercising that power, however, a court must not abuse its discretion. Essentially, a court abuses its power in either granting or denying a discretionary application when there is no rational basis to support its decision. Based on the express language contained in CPL 255.20(3), the Court, in exercising its discretion in this case, must first decide if good cause has been shown justifying the relief requested. At the very least, this means, that a reasonable explanation must be established for the defendant's delay in making this application. If the Court finds that there is a sufficiently reasonable excuse for the delay, a determination must then be made if the interest of justice warrants judicial reconsideration. In this case, the Court concludes that the defendant has established the necessary good cause for the Court to exercise its discretion. In addition, under the circumstances of this case, the relief sought by the defendant is justified in the interest of justice. Accordingly, the Court concludes that it is both reasonable and rationale to exercise its discretion pursuant to CPL 255.20(3) and revisit the suppression issue.

First, as noted in this opinion, the issue regarding suppression of the officers' observations was, in fact, preserved at the trial level prior to the hearing in 2008. In that respect, the instant request is limited in both purpose and scope; the defendant is simply asking this Court to consider extending the holding and rationale of the Second Department's suppression decision to the observations

---

[4] Whether a trial court has the inherent authority to reopen a suppression hearing in the absence of express statutory authorization is far from clear. See eg *Matter of Kisloff v. Covington*, 73 NY2d 445, 450-52 (1989); *see also Matter of Abe A.*, 56 NY2d 288 (1982). "It is well settled that inherent power is an extremely narrow, carefully circumscribed doctrine." *Matter of Fludd v Goldberg*, 51 AD3d 153,157 (1st Dept. 2008).

8

DEF-000752

made by the police officers on May 20, 2006, evidence that the defendant, in his 2008 moving papers, had originally requested be suppressed. *See eg People v Sylvain, supra* 33 AD3d at 331; *see also People v Leon, supra*, 264 AD2d at 785; *People v Cabreja*, 243 AD2d 387 (1st Dept. 1997); *People v Corso, supra* 135 AD2d at 553; *see also People v. Figliolo, supra* 207 AD2d at 681. In that sense, the defendant's request can hardly be considered to be a late-stage suppression application. Equally important, given that the suppression ruling at the trial level was adverse to the defendant, the first reasonable opportunity for him to move to reopen that hearing was before this Court following the reversal by the Second Department. *See eg People v Cohen; supra*, 87 AD2d at 78, affirmed, supra 58 NY2d at 846; *see also People v Sumpter, supra* 191 AD2d at 629; *see also* CPL 710.40(2); *see also* CPL 710.40(2). Thus, to the extent that the defendant has delayed in making this application, the Court finds that he has offered a good cause explanation justifying his failure to raise it earlier. And in determining the reasonableness of the instant request, the Court note that it has been made prior to the retrial, not during it. *Compare People v Chavez-Flores*, 259 AD2d 984 (4th Dept. 1999). For these reasons, the Court is satisfied that sufficient good cause has been shown to excuse any delay in making the instant application. In addition, under the circumstances of this particular case, the Court concludes that it is in the interest of justice to entertain the instant application.

The Court initially recognizes that this specific suppression issue does not appear to have been raised on the defendant's appeal. Nevertheless, this does not mean that the Appellate Division was not acutely aware of this issue. Under the facts of this case, it was fairer to the People to have this issue litigated at the trial level in order to give them an opportunity to be heard as to the consequences of suppression. Specifically, without the firearm, the People had no case against the defendant regarding the weapon charges. On the other hand, suppression of the observations of the police officers would not necessarily have deprived the People of the ability to present a *prima facie* case. For example, the law might allow a civilian witness to testify to the defendant's unlawful entry into and presence inside the subject building. Accordingly, since the Appellate Division was not in the same position as this Court is in to determine whether or not the People can prove the trespass count without the testimony of the pursuing police officers, it is understandable why it did not reach the issues of suppression and dismissal. Stated another way, the Second Department was unable to determine if, by suppressing the evidence of the observations of the officers, it was excluding "`the only direct link'" between defendant and the [trespass] charge." *People v Perkins*, 189 AD2d 830 (2d Dept. 1992); *see also People v Rossi, supra* 80 NY2d at 952; *People v*

9

*Gonzalez*, 80 NY2d 883 (1992); *People v Giles*, 73 NY2d 666 (1989); *People v Neal*, 205 AD2d 711 (2d Dept. 1994). At the appellate level, "the possibility remains that the People can present other evidence sufficient to... make out a prima facie case." *People v Perkins, supra* 189 AD2d at 830. These factors, accordingly, militate in favor of reopening the hearing in the interest of justice.

In addition, there is no basis upon which to find that the defendant waived, that is, intentionally gave up, his right to seek suppression of the observations of the police officers in this case. But more important, in reading the opinion handed down by the Second Department, this Court finds that the Appellate Division did not deem this issue to be even forfeited or abandoned by the defendant. *Compare United States v Clarke*, 227 F3d 874 (7th Cir. 2000). In fact, contrary to the People's contention that this case was sent back for Supreme Court to conduct a trial and for no other purpose, this Court finds that the Appellate Division, by citing *Rossi, Gonzalez*, as well as its prior decision in *Perkins*, was indicating that the issue regarding the officers' observations should be resolved by the trial court. *See People v Smalls, supra* 83 AD3d at 1105. Thus, in exercising its discretion to revisit the suppression issue, the Court takes into account that invitation by the Second Department.

Even assuming, *arguendo*, that this issue was not raised by the defendant in his moving papers and, thus, not preserved for appellate review, the Court's discretion would be further informed by the fact that, in 2008, it would have been inexplicable for an attorney not to move for suppression of the observations of police officers who subjected a person to an unlawful seizure. When the hearing was held in this case, the law was clear that the observations of a police officer who illegally chased a defendant were subject to suppression. *See eg People v Rossi, supra* 80 NY2d at 952; *see also People v Dory*, 59 NY2d 121 (1983); *People v Young*, 55 NY2d 419 (1982); *People v Howard*, 50 NY2d 583 (1980). Assuming, in this case, that the hearing court found that the police lacked a sufficient predicate for the pursuit of the defendant, suppression would, at the request of the defendant's attorney, have been required for the observations made by the officers at the point of the illegal chase and thereafter. By not requesting suppression of those observations in his moving papers or at the hearing, this issue would not have been preserved for appellate review. *See eg People v Vasquez*, 66 NY2d 968 (1985); *People v Peraira*, 26 NY2d 265 (1970); *People v Gates*, 24 NY2d 666 (1969); *O'Keefe v Murphy*, 38 NY2d 563 (1976); *People v Rogers*, 34 AD3d 504 (2d Dept. 2006); *People v Facey*, 22 AD3d 765 (2d Dept. 2002); *People v Hankins*, 265 AD2d 572 (2d Dept. 1999). Given that suppression of those observations was likely to result not only in dismissal of the charges relating to the firearm, but the trespass count as well,

10

DEF-000754

an attorney's inexplicable failure to request suppression of those observations would be "hard to reconcile with the defendant's constitutional right to effective assistance of counsel." *See People v. Turner*, 5 NY3d 476, 481 (2005). In short, the inexplicable failure of defense counsel to raise such a winning argument would be a rational factor that this Court would consider as militating in favor of reopening the suppression hearing in this case. Accordingly, under the particular circumstances of this case, and whether or not this issue has been preserved for appellate review, the Court concludes that, it should exercise its discretion to reopen the hearing.

Another factor that this Court takes into consideration in deciding whether or not to exercise its discretion and revisit the issue of suppression is that the reopening of that hearing will not require the calling of any witnesses or the presentation of any new evidence. *See eg People v Hults*, 150 AD2d 726 (2d Dept. 1989), *affirmed* 76 NY2d at 190. In that respect, the only issue to be decided by the Court at that reopened hearing is a purely legal one, namely, whether or not the logic and rationale of the Second Department's decision granting suppression of the firearms because the police had an insufficient basis to chase the defendant also extends to the observations made by those pursuing officers. And notwithstanding that over four years have elapsed from when the suppression hearing was held in 2008 to the date that the instant request was made, the Court finds that the People have not been prejudiced by the delay.

In this case, it is clear from the defendant's first trial, the papers submitted by the People in response to the instant motion, and the arguments made by the prosecution in this case, that proof of the defendant's guilt always rested on the testimony of the police officers who illegally chased him. No claim is made that these officers are no longer available or that their memories have faded as a result of the delay and that, for this reason, a trial of the defendant on the trespass charge is no longer possible. *Compare People v Cuadrado*, 9 NY3d 362 (2007). In addition, that the officers who illegally chased the defendant will be prohibited from testifying at trial to the observations they made during that pursuit is simply not the type of prejudice that is properly taken into account in deciding whether or not to grant the instant relief. Had the defendant been successful at the 2008 hearing, the hearing court would have been required to suppress the observations made by the officers. That evidence would, thus, have been excluded from his trial. The People are, accordingly, in the same position today as they would have been in 2008 had suppression been ordered at that time. In sum, given that the delay in seeking suppression is not causally related to the inability to retry the defendant, it cannot reasonably be argued that the People are prejudiced by the defendant's delay in requesting suppression.

11

DEF-000755

*Compare People v Cuadrado, supra,* 9 NY3d at 376-77. This is especially so as the prosecution was clearly on notice in 2008 that the defendant was requesting suppression of the officers' observations. *See People v Rossi, supra* 80 NY2d at 953. Finally, in deciding whether the discretion should be exercised in this case, the Court takes into account that the defendant has spent four years in prison and the retrial involves a Class B misdemeanor and no other charge. These additional factors support the Court's determination that reopening the suppression hearing is in the interest of justice.

Under all of these circumstances, the Court concludes that it has the power to reopen the suppression hearing and that, in this case, the interest of justice warrant an exercise of that discretion in order to revisit this issue. Accordingly, after giving the People an opportunity to be heard, the Court, in its discretion, concludes that the hearing should be reopened solely for the purpose of determining whether or not to apply the exclusionary rule to the observations of the police who chased the defendant on the date in question.

Having reopened the suppression hearing, and after giving the opportunity to be heard, the Court concludes, based on the findings of fact and conclusions of law made by the Appellate Division on the defendant's appeal, that the police had an insufficient predicate to pursue the defendant. As a result, the Court concludes that the observations made by the officers regarding the defendant's entry into and presence inside the subject public housing building, which were made during the illegal chase, are the fruits of an impermissible seizure. *See eg People v Rossi, supra,* 80 NY2d at 952 (1992); *People v Dory, supra* 59 NY2d at 121; *People v Young, supra* 55 NY2d at 419 (1982). Those observations are, accordingly, suppressed.

The People's contention that this Court's suppression ruling is erroneous, as it amounts to "suppressing an arrest" or "suppressing the defendant's person," is, unfortunately, the product of a misunderstanding of the law. As clearly stated in *Young,* "[a]n illegal arrest, without more, has never been envisioned as a bar to prosecution or as a defense to a valid conviction." *People v Young, supra* 55 NY2d at 426. This Court is well aware of this legal principle and recognizes that a defendant, "cannot suppress his presence at trial for the reason that his arrest was illegal." *Id.* But that is not what has taken place in this case. The instant suppression ruling simply excludes evidence from the defendant's trial; it is not a barrier to prosecuting the defendant. In sum, the Court's suppression ruling affects only the admission of evidence at the defendant's retrial; it in no way, prevents the defendant from being retried. To the extent that the People are contending that observations made by a police

12

DEF-000756

officer regarding a defendant, which are acquired following an illegal seizure and which the prosecution seeks to use as evidence-in-chief at a trial, are not subject to suppression, that simply is not the law. Any confusion generated by the Court of Appeals' decision in *People v Young* was expressly laid to rest in both *People v Dory* and *People v Rossi*. *See People v Rossi, supra,* 80 NY2d at 952 (1992); *People v Dory, supra* 59 NY2d at 121; *People v Young, supra* 55 NY2d at 426. As expressly stated in *Dory*, "[w]ere the entry of [the police] into defendant's house illegal, testimony from them concerning physical evidence observed or seized and not attenuated would be inadmissible." *People v Dory, supra* 59 NY2d at 126-127 (*citations omitted*).

The facts in *Rossi* expressly support the decision of this Court. There, the defendant was illegally seized outside an apartment that was the subject of gambling activities. After the arrest, the police brought the defendant into that apartment and directed him to sit in a chair, upon which a jacket was hanging. The defendant took the jacket off of the back of the chair and put it on in the presence of a police officer. At trial, that police officer testified to those observations. The Court of Appeals, in holding that this observation should have been suppressed, made the following statement:

> While the jacket was properly admitted in evidence as the product of the warrant execution...the jacket has no incriminating value against defendant absent evidence connecting defendant to it. The necessary connecting evidence was supplied by the arresting officer's testimony concerning defendant's conduct upon his concededly unlawful arrest and asportation to room 406. This should have been suppressed as it resulted, not from the lawful execution of a valid search warrant, but from defendant's wrongful arrest. Accordingly, defendant's suppression motion should have been granted in part. Because this testimony was the only evidence connecting defendant with the jacket, and the jacket was the only direct link between defendant and the gambling activities, the indictment should have been dismissed.

*See People v Rossi, supra,* 80 NY2d at 954 (*citations omitted*).

In applying the decisions in both *Rossi* and *Dorey* to the facts of this case, it is abundantly clear to this Court that suppression is mandated for those observations made by the police of the defendant following his illegal seizure, including those made of the defendant's entry and presence in the subject housing location. *See People v Rossi, supra,* 80 NY2d at 952; *People v Dory,*

13

DEF-000757

*supra* 59 NY2d at 121.

In closing, the Court would note that the decision in this case is not to be construed as giving an individual license to commit crimes in response to an illegal seizure. A person's conduct in response to an illegal seizure, if egregious enough, will certainly be a factor in deciding if the taint flowing from the illegal seizure has been attenuated. *Compare People v Felton*, 78 NY2d 1063 (1991) *and People v Cantor*, 36 NY2d 106 (1975) *with People v Boodle*, 43 NY2d 398 (1979) *and People v Townes*, 41 NY2d 97 (1976). In this case, however, the Court finds, as did the Appellate Division, that the defendant's conduct in simply running into a building was in direct response to the illegal pursuit by the police. There is no basis for the conclusion that the defendant's conduct or that of his friends constituted <u>an independent act involving a calculated risk</u>. *See People v Boodle, supra* 43 NY2d at 398. Certainly, if, during the chase, the defendant or someone in his group had discharged the firearm at the pursuing officers or had damaged the door to the subject building in order to gain entry, those are factors that would support a finding that the <u>initial taint has been dissipated</u>. *See eg People v Townes, supra* 41 NY2d at 97. In light of the findings of fact and conclusions of law by the Appellate Division, however, it is clear that there is no basis upon which to make that finding. *See People v Smalls, supra* 83 AD3d at 1105.

Based on the Court's suppression ruling, the police officers may not provide evidence at trial for the prosecution as to the defendant's unlawful entry into and presence inside the location in question. And in light of that decision, the Court grants the defendant's additional motion to dismiss under CPL 210.20 (1)(h). As noted, the People were given an opportunity to be heard prior to and after the hearing was reopened in this case. In response to the Court's inquiry, the People did not indicate that they were in possession of any evidence in support of the defendant's unlawful entry into or presence inside the subject housing building, other than, of course, the observations of the subject police officers, which, as noted, may not be used at trial under the exclusionary rule. Evidence that the defendant knowingly entered or remained unlawfully in a building which is used as a public housing project is an essential element of Criminal Trespass in the Third Degree, as defined in Penal Law § 140.10(e). In light of the suppression ruling, it is obvious that the People are no longer able to present any evidence at a trial in support of this necessary element. Since the testimony of these officers is, under the circumstances of this particular case, "the only direct link" between defendant and the [trespass] charge," the defendant's additional motion, pursuant to CPL 210.20 (1)(h), to dismiss the indictment because there is a legal impediment to conviction is granted. *People*

14

DEF-000758

*v Rossi, supra* 80 NY2d at 952; *People v Gonzalez, supra* 80 NY2d at 883; *see also People v Swamp,* 84 NY2d 725 (1995); *Cf People v Winn,* 232 AD2d 438 (2d Dept. 1996).

For the reasons stated in this opinion, the motion to suppress is granted in this case and the indictment against the defendant is, accordingly, dismissed.

This constitutes the decision and order of this Court.

Dated: October 5, 2012

Salvatore J. Modica

15

DEF-000759

JA-40

## Page 1

```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - - - - - - -X
 3   ANDREW SMALLS,                      :   14-CV-2326 (CBA)
 4        Plaintiff,                     :
 5        -against-                      :
 6   THE CITY OF NEW YORK, POLICE        :
     OFFICER RICHARD COLLINS,
 7   POLICE OFFICER DAVID TETA,          :   United States Courthouse
     POLICE OFFICER ERIC CABRERA,            Brooklyn, New York
 8   POLICE OFFICER ALVAREZ,             :
     POLICE OFFICER JESSICA
 9   ALVARADO and SERGEANT BRIAN         :
     STAMM,
10                                       :   Thursday, February 14, 2019
          Defendants.                        3:00 p.m.
11   - - - - - - - - - - - - - - - - - -X
12       TRANSCRIPT OF CIVIL CAUSE FOR PRETRIAL CONFERENCE
13        BEFORE THE HONORABLE CAROL BAGLEY AMON
             UNITED STATES DISTRICT SENIOR JUDGE
14
15              A P P E A R A N C E S :
16   For the Plaintiff:    LAW OFFICE OF JON L. NORINSBERG
                           225 Broadway
17                         Suite 2700
                           New York, New York 10007
18                         BY: JON L. NORINSBERG, ESQ.
                               JOHN J. MEEHAN, ESQ.
19
     For the Defendants:   CITY OF NEW YORK
20                         CORPORATION COUNSEL
                           100 Church Street
21                         New York, New York 10007
                           BY:  ELISSA P. FUDIM, ESQ.
22   Court Reporter:       DAVID R. ROY, RPR
                           225 Cadman Plaza East
23                         Brooklyn, New York 11201
                           drroyofcr@gmail.com
24
     Proceedings recorded by Stenographic machine shorthand,
25   transcript produced by Computer-Assisted Transcription.
```

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Page 2

```
                          Proceedings                          2

 1        (In open court.)
 2        THE COURTROOM DEPUTY:  14-CV-2326 Smalls against
 3   City of New York on for pretrial conference.
 4        THE COURT:  All right.  Would the parties state
 5   their appearances, please.
 6        First for Plaintiff.
 7        MR. NORINSBERG:  Jon Norinsberg on behalf of the
 8   plaintiffs.  Good afternoon, Your Honor.
 9        THE COURT:  Good afternoon.
10        MR. MEEHAN:  John Meehan on behalf of the
11   plaintiffs.  Good afternoon, Your Honor.
12        THE COURT:  Good afternoon.
13        MS. FUDIM:  Good afternoon, Your Honor.  Elissa
14   Fudim for the defendants from Office of Corporation Counsel.
15        THE COURT:  Good afternoon.
16        I take it we have some motions in limine to
17   address.  The first, I guess, deals with some medical forms
18   and the -- just taking them in order doing Defendants'
19   motions first.  I think only two are contested?
20        MR. MEEHAN:  Yes, Your Honor.  I think we've
21   largely been able to resolve that issue.  There were two
22   separate medical prisoner forms.  One was from an arrest in
23   2004.  When we had taken over the case, that was already in
24   the JPO.  It should been taken out back then.  It's been
25   taken out for the second amended JPO that was filed last
```

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Page 3

```
                          Proceedings                          3

 1   night and I don't think that's going to be an issue.  We
 2   have no inclination to offer it in and it's not part of the
 3   case.
 4        THE COURT:  You are not introducing any medical
 5   forms?
 6        MR. MEEHAN:  No, medical -- there were two
 7   medical treatment of prisoner forms that were included in
 8   the original joint and pretrial order.  One from this arrest
 9   that is salient to our case and the second being the one
10   from 2004, so we withdrew the 2004 one.
11        THE COURT:  All right.  I am looking at 21 and 22.
12   Which one are you withdrawing?
13        MR. MEEHAN:  Okay.  The party filed an amended
14   joint pretrial order last night.  I have a copy, Your Honor.
15        THE COURT:  Yes, I think you had that here.  Where
16   is it?
17        MR. MEEHAN:  The current tab now Exhibit 19.
18        THE COURT:  All right.  So this one is still in
19   dispute, correct?
20        MR. MEEHAN:  That's correct, Your Honor.
21        THE COURT:  And the objection is that because
22   there is no excessive force claim here it is not relevant?
23        MS. FUDIM:  Yes, Your Honor, it's not relevant and
24   it's prejudicial.  There's no allegation the cut even came
25   from the officers.  There's no claim that's associated with
```

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Page 4

```
                          Proceedings                          4

 1   it; and therefore, we believe that it should not be
 2   admissible.
 3        THE COURT:  What is the purpose of admitting this?
 4        MR. MEEHAN:  Well, because it's largely consistent
 5   with Plaintiff's version of the events, namely, that he came
 6   downstairs.  He saw his two brothers being arrested.  He got
 7   into an argument with the police officers, and one of the
 8   police officers smashed his head against a wall.  So this, I
 9   think, really backs up Plaintiff's claim.
10        MS. FUDIM:  Your Honor, we would just reiterate
11   that any allegation that an officer bashed his head against
12   the wall is unduly prejudicial and it's not relevant to
13   anything because there's no claim regarding that here.
14   Other than that, we rest on that -- what we put in our paper
15   on this point.
16        MR. MEEHAN:  Your Honor, it directly refutes the
17   officers' claims, namely, that Andrew Smalls was found on
18   the roof and it backs up Plaintiff's claim that he was
19   downstairs and an officer bashed his head against the wall.
20        While we're not claiming any force, we're not
21   claiming any damages as a result, it should be -- it's part
22   of the narrative is how he claims this arrest happened.
23        THE COURT:  So the officers are going to testify
24   that they saw him with a gun, correct?
25        MS. FUDIM:  Yes.
```

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

THE COURT: And what do they say happened?

MS. FUDIM: They saw him outside with a group of other individuals, after hearing a gunshot they followed the group of individuals. When the group of individuals noticed they were being followed by police, they ran. They followed closely behind them into the building. They ran in the building up an internal stairwell. Two of the men stopped on the lower floor, two kept going. Two of the officers stayed with the two who stopped, the other two officers, who are the current defendants, kept going.

While going up the stairs, they saw Plaintiff take out the gun and hand it to his brother. They continued onto the roof of the building. They found the two men on the roof of the building, and they found the gun lying in close proximity to the plaintiff, at which point they were placed under arrest. They were brought downstairs where the other two men had already been arrested on the earlier floor and the four were taken into custody.

THE COURT: And the plaintiff's version is going to be he never went anywhere?

MR. MEEHAN: The plaintiff's version is going to be that he was in his friend's apartment when someone knocked on the door and said your two brothers are being arrested downstairs. He went downstairs. One of his brothers was underage. He starting telling the police

officers, What are you doing? He's 17 years old, you can't arrest him. And that's when the officer -- it came down to an altercation and the officer hit his head against the wall, arrested him. And it wasn't until later that he discovered that he was being charge with a criminal possession of a firearm.

THE COURT: And he will testify that when the officer smacked him up against the wall, he had a cut?

MR. MEEHAN: Yes, Your Honor.

THE COURT: Well, then I will permit it.

Suggesting a dollar amount to a jury. I have permitted that in the past, so I am not going to change course on that. If Plaintiff's counsel wants to suggest an amount, he can.

This reference to social services Hammel Houses. Do you intend to talk about his receiving social services?

MS. FUDIM: No, not phrased as such. The only social service that we would intend to elicit is the fact that for most of his life he lived in that exact building. Not on the date of the incident, and that's relevant in a couple of ways. One, because he was aware -- one of the charges that he had at the time was a trespass charge and he was aware of the fact that he was trespassing. He was aware of the fact of what the trespassing rules of the facility were because he was a longtime resident.

And, two, he knew -- I mean, according to the officers, he ran in, went to an internal stairwell, run up the stairwell and that was the stairwell that led to the roof. And so part of our narrative is that he knew where things were. He had lived in that building for many years.

THE COURT: So you are just going to bring out that he lived in the Hammel House?

MS. FUDIM: That's it. That's it, just that he lived in that building, which happened to be a public housing project.

THE COURT: But is there any need to identify it as a public housing project?

MS. FUDIM: I don't think that -- no, that's the building in which he lived.

THE COURT: All right. I do not see a problem with that.

MR. MEEHAN: As long as it's referenced like that and not that he lived in a housing project, he's lived in the projects his whole life, I'm fine with that.

THE COURT: All right. His prior criminal history. He has a 2018 forgery conviction that you want to cross-examine him about, right?

MS. FUDIM: Yes, among others, but yes, Your Honor.

THE COURT: Why is that not fair game?

MR. MEEHAN: Well, while I understand that it is a felony conviction within the last ten years and it should be admissible for impeachment and that purpose, but I do think that the underlying claim should not be, the underlying charge should not be referenced and the fact that he is currently incarcerated on it should not be referenced, just something you had in -- I believe's it's 2016. He was --

THE COURT: I thought it was '18.

MR. MEEHAN: We have the certificate.

THE COURT: I'm sorry.

MS. FUDIM: I think it's '18.

THE COURT: Is it '18?

MS. FUDIM: I thought it was '18, but...

THE COURT: What exhibit is it?

MS. FUDIM: I'm looking. We have a new binder for you as well with some of the updated exhibits but not sure if it was in the prior one. It would have been in the rap sheet, which I think is one of the exhibits.

MR. MEEHAN: G.

MS. FUDIM: G.

MR. MEEHAN: G as in "gun."

MS. FUDIM: Yeah.

THE COURT: I just appear to have Plaintiffs's exhibits.

Have you given the Court a copy?

## Proceedings 9

1  MS. FUDIM: I'm sorry, the binder is really big.
2  But, yeah.
3  MR. MEEHAN: I believe it's on Page 5.
4  MS. FUDIM: Yes, it says date of the crime is '16.
5  But I believe --
6  MR. MEEHAN: The conviction is '17.
7  MS. FUDIM: Is it '17?
8  MR. MEEHAN: Yeah. Conviction date November 27,
9  2017.
10  THE COURT: Where are you looking?
11  MS. FUDIM: Oh, sentence date is the '18 date I
12  referenced.
13  So if you look at Page 7. The last line of Page 7
14  it says, Sentence date January 10, 2018, 2 to 4 years. So
15  that's what he's currently in on. But I guess the
16  conviction date was the 2017 date Mr. Meehan referenced and
17  the '18 day they had in the paper was the sentence date.
18  THE COURT: Well, when you talk about conviction,
19  are you not supposed to use the day he was sentenced?
20  MS. FUDIM: I thought that was what I used, the
21  date he was sentenced. I could be mistaken.
22  THE COURT: All right. So you want to ask him,
23  Isn't it correct that you were --
24  MS. FUDIM: I think --
25  THE COURT: -- found guilty of forging an

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 10

1  instrument in the second degree on whatever dated, '18,
2  right?
3  MS. FUDIM: Yeah. And you were sentenced on this
4  date. You were sentenced to 2 to 4 years. Normally when
5  we're able to elicit prior convictions that are admissible,
6  it's the name of the charge, the date of the sentence, and
7  the sentence imposed.
8  THE COURT: What is the objection to that?
9  MR. MEEHAN: Well, I think that it's prejudicial
10  on a number --
11  THE COURT: What is prejudicial?
12  MR. MEEHAN: The underlying charge, and the fact
13  that he's currently incarcerated. I think that just -- it
14  could go just as much to his credibility if it said, In
15  2017, you were convicted of a felony; is that true?
16  THE COURT: A felony?
17  MR. MEEHAN: A felony.
18  THE COURT: No. She can ask him what felony he
19  was convicted of.
20  MR. MEEHAN: Okay. Then I also ask that it not be
21  referenced that he's currently incarcerated. It's
22  extraordinarily prejudicial.
23  THE COURT: Why do we need to bring that up?
24  MS. FUDIM: I don't think we would necessarily
25  need to say you're currently incarcerated, but under the

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 11

1  case law that generally allows in convictions, the things
2  that are usually allowed in are the sentence date and what
3  the sentence is and I think what the sentence is, is
4  important because just saying whatever the forged
5  instrument, the jurors might not know what that is and what
6  is the severity of that. So I think we should be entitled
7  to say he was sentenced on January 10, 2018 to a term of 2
8  to 4 years. I don't specifically say, and You're currently
9  incarcerated, but I mean, I think, you know, the jurors can
10  do math and I think that they're entitled to know what the
11  penalty is. This is a not crime that you were sentenced to,
12  you know, two months of community service for. So they have
13  some appreciation of the fact that it was of a serious
14  enough nature that he was sentenced to 2 to 4 years.
15  MR. MEEHAN: I think exactly the reason why
16  Ms. Fundim said it should be in the brief is it should be
17  out. It's very prejudicial. There's no need to go into
18  that, the severity of the crime.
19  THE COURT: Does the law prohibit you from
20  bringing out the sentence he got?
21  MR. MEEHAN: Well, that's at the Court's
22  discretion, Your Honor. I think that the Court should
23  exercise discretion and try to give Mr. Smalls a fair trial
24  as possible. And having Ms. Fundim say, Isn't it true you
25  were charged with criminal possession -- or you were found

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 12

1  guilty of criminal possession in 2016 is more than
2  sufficient to --
3  THE COURT: Criminal possession.
4  MR. MEEHAN: Criminal possession of a forged
5  instrument.
6  THE COURT: All right. You were found guilty of
7  criminal possession of a forged instrument?
8  Why don't you ask him, Isn't it a fact that you
9  were found guilty of criminal possession of a forged
10  instrument in 2017? That was when he was found guilty, and
11  then you can ask him what the sentence is so that it is not
12  that apparent that he is necessarily in jail now.
13  MS. FUDIM: So don't reference the sentence date?
14  THE COURT: No, just say --
15  MS. FUDIM: The conviction date.
16  THE COURT: -- he was found guilty of forgery in
17  possession in 2017 and the sentenced, without necessarily
18  inferring it with that date, but you could say was sentenced
19  to --
20  MS. FUDIM: Two to four years.
21  THE COURT: -- 2 to 4 years.
22  MS. FUDIM: Okay.
23  MR. MEEHAN: Now, Your Honor, while we're on this
24  topic, Mr. Smalls is currently incarcerated. We have --
25  THE COURT: Oh, you have a writ?

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Page 13

Proceedings    13

1       MR. MEEHAN:  That is correct, Your Honor.

2       THE COURT:  Have you touched base with the

3  marshals to pass this by them to make sure that it has

4  everything they need?

5       MR. MEEHAN:  So I was basing this off one we did

6  several years back in front of Judge Weinstein in 2014.  It

7  was my plan that once I had the signed order from you, I

8  would then contact the marshals and as well as contact the

9  facility.  It's a little easier once there's a signed order

10  than beforehand.

11      THE COURT:  Okay.  I mean, it looks all right.  I

12  just didn't want one of these things where you find out a

13  week later that they cannot do it.

14      MR. MEEHAN:  I understand, Your Honor.

15      And I just wanted to ask the Court that when

16  Mr. Smalls is here, that he would be allowed to be in a suit

17  and not his prison attire.

18      THE COURT:  Well, you are going to have to make

19  sure that that suit gets to the institution, and he can

20  dress in it to come over.

21      MR. MEEHAN:  And I will circle back with the

22  marshals to make sure that that's done properly.

23      (Pause in proceedings.)

24      THE COURT:  All right.  You are not obviously

25  going to ask him about his arrest for murder?

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Page 14

Proceedings    14

1       MS. FUDIM:  No, not about the murder, Your Honor.

2  The salience of that is that Plaintiff had said that they

3  were only going to seek damages with respect to

4  postconviction damages and have said that that's a year and

5  a half.  And when we were last here, the Court had allowed

6  us to obtain -- well, Judge Levy actually, the Criminal

7  Certificate of Disposition to see what the actual dates

8  were, and it's actually not right.  We did get the

9  Certificate of Disposition.  I believe it's May 9th or

10  May 10th -- hold on.  I have it with us.  It's one of the

11  exhibits in the binder.  It's going to be the Exhibit N like

12  "Nancy."  And Exhibit N shows a May 14th, 2009 date he was

13  convicted, I believe, on June 12th of 2008 or thereabouts.

14  I might be off by a day or two, but that means that it was

15  almost a year after his conviction that he was still

16  incarcerated on the murder.  And so our position is that

17  that time is not part of the declaration of liberty because

18  he would have been incarcerated on the murder anyway.

19      So getting that out is relevant to damages unless

20  Plaintiff -- if Plaintiff wants to stipulate to the fact

21  that they will concede that he was incarcerated on another

22  charge and that damages start to run on the date that the

23  murder charge was dismissed, in which case I don't think it

24  has relevance anymore.  But if they're not going to

25  stipulate to that, then I think we're entitled to tell the

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Page 15

Proceedings    15

1  jury that for approximately a year of the time that he was

2  in custody postconviction he would have been in custody

3  anyway.  And we can say with respect to another charge, you

4  know, not murder.

5      THE COURT:  Do you want to agree as to when -- to

6  that or --

7      MR. MEEHAN:  You know, Your Honor, I don't think

8  that it really does go -- and let's not forget, this is

9  postconviction.  He had already been sentenced at this

10  point.  He's upstate at this point.  This is not him waiting

11  for, you know, being remanded to custody.  So this

12  depravation of liberty goes solely to.

13      THE COURT:  When do you begin your depravation of

14  liberty claim, at the date of his conviction or when does it

15  start?  This is based on your fabrication of evidence,

16  right?

17      MR. MEEHAN:  That is correct, Your Honor.

18      THE COURT:  So it begins to accrue only upon his

19  conviction, correct?

20      MR. MEEHAN:  Agreed.

21      THE COURT:  So he gets convicted, he gets

22  sentenced.

23      MR. MEEHAN:  I would say, I would argue from the

24  sentence date forward to when he's found -- to when it's

25  reversed by the appellate court.

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Page 16

Proceedings    16

1       THE COURT:  And how long is that?

2      MR. MEEHAN:  About four and a half years.

3      MS. FUDIM:  And our position is that entire --

4  almost that entire first year, Your Honor, he was already in

5  custody.  He was already in custody on a murder.  So the

6  murder he got arrested for and taken into custody prior to

7  his conviction, and he remained in custody until the murder

8  charge was dismissed.  The murder charge was dismissed on

9  May 14th of 2009.  So notwithstanding anything that

10  happened with respect to the gun charge and the gun

11  conviction, he still would have been in custody during that

12  period of time for murder.

13      THE COURT:  So before he began -- was he out on

14  bond when this trial started?

15      MS. FUDIM:  No.  What happened is he was

16  originally picked up, Your Honor, and was in custody for

17  something like two weeks, ballpark, then he got out on bond.

18      THE COURT:  On this case?

19      MS. FUDIM:  On this case.  Then he got out on

20  bond.

21      THE COURT:  Okay.

22      MS. FUDIM:  He was out on bond for a short period

23  of time.  Again, I want to say it's a matter of weeks.  It's

24  not very long.  And that's when he was picked up for the

25  murder and goes back into custody.  He remains in custody on

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings — 17

1  the murder throughout this trial for our case, then for
2  another year after the conviction.  Then the murder
3  charge -- the murder case gets dismissed and --
4       THE COURT:  But he is also serving a sentence
5  during this time period, right?
6       MR. MEEHAN:  Yes, Your Honor.
7       MS. FUDIM:  Yes.  Serving a sentence at a time
8  when he would have also, not withstanding remaining in
9  custody, and we cited case law in our papers that we
10  submitted that as to the depravation of liberty, he would
11  have already been in custody.  So I think it's one or the
12  other.  Neither one can say it's a matter of law that that
13  period of time does not count because he would have been in
14  custody anyway.  So it's not a depravation of liberty that
15  would have not otherwise existed.
16       Or I think the fallback position is that it's at
17  least a very bear minimum, something the jury is entitled to
18  hear about that he would have been in custody anyway when
19  they make an assessment as to damages.  I don't think it's
20  the case where you can just say, well, that's completely
21  irrelevant and the jury doesn't even get to know that, and
22  it doesn't come in and there's no decision as a matter of
23  law that that time would have been served anyway.
24       I unfortunately printed all of our motion
25  in limine papers and appear to have left them on my desk so

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings — 18

1  in terms of the case law we cited, I can't rearticulate it
2  here, but I do know that it was in the papers we filed with
3  the Court.
4       MR. MEEHAN:  Your Honor, he was found guilty and
5  sentenced, so it is our position that that entire time from
6  the sentence to when he was -- until the appellate court
7  overturned this conviction, is attributable solely to the
8  charge.
9       THE COURT:  But it is not attributed solely to the
10  charge because previous to that, he had been remanded for a
11  murder charge and was --
12       MR. MEEHAN:  That was dismissed.
13       THE COURT:  But it was dismissed a year later,
14  right?
15       MR. MEEHAN:  It was dismissed on May 14th of 2009.
16       And I guess there's a causation argument to that,
17  too, because he would have never been remanded if he hadn't
18  already been out on bond.
19       MS. FUDIM:  Your Honor, I don't understand that
20  argument.  I mean, on a murder, one is going to be
21  incarcerated when one is arrested for murder.  And he was in
22  jail for almost two years in connection with the murder
23  charge, about a year of it preceding the conviction in this
24  case and about a year of it coming after the conviction of
25  this case.  So there's just no way that we could say that he

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings — 19

1  was incarcerated and deprived of liberty solely as a result
2  of this gun charge because that's factually just not true.
3  He would have remained in jail notwithstanding on the
4  murder.
5       It's not like bail was revoked in this case
6  because of the murder -- he was picked up and -- he was out
7  at the time that -- he had already been granted bail in our
8  case, and then he was picked up on the murder and remained
9  in custody on the murder until the murder charge was
10  dismissed.  Part of that time overlapped with his
11  conviction, but you simply can't say that he would have not
12  lost his liberty but for the action, the alleged fabrication
13  in this case because that's just factually not true.
14       MR. MEEHAN:  Well, Your Honor, if he's out on bail
15  and he's arrested again, if he were never out on bail in the
16  first place as -- what we're alleging because he did nothing
17  wrong in this case, then it's not entirely certain that he
18  would be just remanded because of a charge.
19       MS. FUDIM:  For murder?
20       MR. MEEHAN:  Yes.  It's not automatically
21  remanded.
22       MS. FUDIM:  Your Honor, I would suggest that on a
23  murder that he would have been remanded notwithstanding the
24  fact that he was out on bail.  We're not talking about a
25  charge for cocaine or marijuana.  He was arrested for

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings — 20

1  first-degree murder.
2       MR. MEEHAN:  Are we sure it was not attempted
3  murder?
4       MS. FUDIM:  I believe it was murder.  I don't want
5  to swear to it, but I believe it was murder.
6       MR. MEEHAN:  The rap sheet only goes up to 2012.
7       MS. FUDIM:  Well, at his deposition he gave his
8  testimony about the murder and spoke about the fact that the
9  person -- about who it was who had died, and he referred to
10  the person as "dead."  So I am assuming it was an actual
11  murder.
12       MR. MEEHAN:  Your Honor, this seems to be more of
13  a backdoor attempt to get in this murder charge.
14       THE COURT:  No, she said she was willing to agree
15  that he was in custody on another charge.
16       MR. MEEHAN:  Nonrelated?
17       THE COURT:  I think it seems to me that the jury
18  should be allowed to know that, assuming you have all your
19  dates right.
20       MR. MEEHAN:  Your Honor, if the Court -- what if
21  we were to start the depravation of liberty from May 15,
22  2009 until when he was -- until that conviction was
23  overturned?
24       THE COURT:  What is --
25       MR. MEEHAN:  The day after he was -- the murder

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 21

1  charge was dismissed.
2  THE COURT: Well, that is fine.
3  MS. FUDIM: That I think is what we were seeking,
4  but I think there has to be some explanation provided to the
5  jury if they're bringing in he was convicted -- the date of
6  his conviction. They're asking some explanation to the jury
7  as to why the damages are going to start at a later date.
8  Otherwise, you know, they may just decide to fill in the
9  blank and say, Well, he was really -- there was additional
10  time.
11  THE COURT: We can handle that with a stipulation
12  or a charge or something like that. We can handle that.
13  MS. FUDIM: So if we --
14  THE COURT: You know, the parties will stipulate
15  that the period of time, you know, if you reach the question
16  of damages that a period of time is only from this date to
17  that date. That will work.
18  All right. I will sign this writ in. You know,
19  if there are any problems with it, you will have to let me
20  know.
21  MR. MEEHAN: Thank you, Your Honor.
22  THE COURT: All right. I guess the other issue we
23  need to deal with is you want to cross-examine about the
24  assault and weapons possession in 2012; is that right?
25  MS. FUDIM: Yes, Your Honor. There's also -- the

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 22

1  plaintiff did not file a motion in limine on it, but there's
2  also -- but I think in fairness, it should be brought up.
3  There's also a conviction from -- a drug conviction.
4  THE COURT: A what?
5  MS. FUDIM: A drug, cocaine conviction two years
6  preceding the incident for -- or the year of the incident in
7  this case, I believe, the underlying incident. I believe it
8  was 2006 that we would also seek to question about.
9  MR. MEEHAN: It is well over ten years,
10  Your Honor, at this point.
11  MS. FUDIM: At this point but not at the time when
12  this incident took place.
13  MR. MEEHAN: It's not a crime that goes to truth
14  or dishonesty. It really has no relevance.
15  THE COURT: It does not have to be.
16  MS. FUDIM: It's a felony conviction within ten
17  years of the incident which was punishable by more than one
18  year. So my understanding is that is admissible short of a
19  403 analysis, which is the same analysis with respect to the
20  assault that you referenced. So I'm just bringing it up
21  that they can all be addressed at once rather than -- I
22  don't want to seek counts at trial without bringing it up in
23  advance, Your Honor.
24  MR. MEEHAN: I believe that's an inaccurate
25  description of the rule. I believe it's from the date of

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 23

1  the trial.
2  THE COURT: Well, more than ten years has passed
3  since the witness's conviction or release from confinement,
4  whichever is later. So is it more than ten years?
5  MR. MEEHAN: Yes. This happened in 2006,
6  Your Honor.
7  MS. FUDIM: It was, Your Honor -- it was 2006,
8  2004 but our incident in this case was a 2006 or '08?
9  MR. MEEHAN: '06.
10  MS. FUDIM: 2006 incident.
11  THE COURT: Where do you measure the time from?
12  If more than ten years has passed since the defendant, his
13  conviction or release from confinement, whichever is later.
14  MR. MEEHAN: Yes. So if he was out to be arrested
15  again in 2006, by definition he would have been released
16  with more than ten years from today. That's, I think, what
17  the rule says. It has to be either a conviction within ten
18  years from today or being released from prison ten years
19  from today.
20  THE COURT: Okay. So when was he released from
21  prison?
22  MR. MEEHAN: I don't think he served any time for
23  the cocaine charge. The arrest was in 2004.
24  THE COURT: How do you believe that that rule
25  means ten years from the date of the incident as opposed to

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 24

1  ten years from the incident to when you are seeking to use
2  it?
3  MS. FUDIM: I'm not sure of the answer to that
4  question, Your Honor.
5  THE COURT: Well, I think it is --
6  MS. FUDIM: I thought it was from the incident. I
7  could be mistaken and off the top of my head, I don't recall
8  what my basis was for thinking that.
9  THE COURT: I think the other reading is more
10  correct.
11  I will preclude it unless you have some case law
12  that says that you measure it from a different time.
13  MS. FUDIM: I would have to look at that when I go
14  back in the office, Your Honor.
15  THE COURT: And the other one is -- the more
16  significant one was the 2012 conviction for criminal
17  possession of a weapon and assault.
18  MS. FUDIM: Yes, Your Honor. That is Exhibit M,
19  like "Mary," the Certificate of Disposition for that.
20  THE COURT: Why is there not a 403 problem with
21  that? Because someone will say, If he had a gun then, he
22  will have a gun now. And so it is prejudicial in that
23  sense, whereas it is not -- that portion of it is not -- is
24  relevant to treat felons, so why would 403 not suggest that
25  the attempted possession -- he could not be cross-examined

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 25

1  on the attempted criminal possession of a weapon?

2      MS. FUDIM:  Well, I think in our papers we

3  conceded that arguably that's the more problematic part.

4  But the same prejudice doesn't exist with respect to the

5  assault, and they were tandem.  They were connected in

6  tandem.

7      THE COURT:  So you want to cross-examine him about

8  the assault and not the weapon?

9      MS. FUDIM:  I mean, we would like to do both,

10  Your Honor.

11      THE COURT:  I think there is a problem with the

12  weapon because -- I will let you cross-examine him about the

13  assault, but not the weapon.

14      MR. MEEHAN:  And just to clarify, when you say

15  "cross-examine" would you just do the scope?

16      THE COURT:  It was a conviction, right?  Were you

17  not convicted of the crime of assault and whatever date he

18  was convicted of it.

19      All right.  Are there any other motions that I

20  have missed?

21      MS. FUDIM:  The gang one, Your Honor.

22      THE COURT:  Oh, the gang.

23      How are you going to prove he was a member of a

24  gang?

25      MS. FUDIM:  Well, for one, he was wearing a

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 26

1  shirt -- sweater with the insignia of the gang.  And --

2      MR. MEEHAN:  That's not true, Your Honor.

3      MS. FUDIM:  That is an issue of fact that can

4  be --

5      THE COURT:  Well, who is going to testify he was a

6  member of the gang?  Are you going to prove it by asking him

7  or are you going to prove it some other way?

8      MS. FUDIM:  The officers will offer testimony

9  regarding the clothing he was wearing and the insignia that

10  was on it and the meaning about the insignia in that

11  neighborhood at that time.  We'll also seek to cross-examine

12  the other witnesses that Plaintiff is calling about it.

13      The fact is that this particular gang was very

14  active in the Rockaways at that period of time in terms of

15  violence of other gangs.  There was a lot of intergang

16  warfare going on, and so it makes sense that someone would

17  have a gun if they were in a gang in that area.  And, in

18  fact, I think that ties back to the 2014 weapon conviction

19  that he had as well because that was a very dangerous area

20  at that time between these gang members.

21      His other brothers who were with him on the date

22  of the incident all died related to gang violence, which

23  we're not going to get into at the trial in terms of we've

24  agreed and they've agreed, we're not going to get into how

25  any of them died: but for the Court's awareness, it was all

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 27

1  in connection with gang-related activity, to the best of my

2  knowledge.

3      And then we've got members of the gang -- the

4  other witnesses that Plaintiff is calling, we believe to be

5  gang-related.  And I think it goes to the fact that two of

6  these men on the stairs stopped to block the police pursuit.

7  Why would they do that?  Why would Plaintiff hand off the

8  gun to someone else?  And for us, it was all part of they

9  were in a gang together.  And it's relevant as to the motive

10  of why someone would have a gang in that neighborhood at

11  that time.  They may dispute what Plaintiff was wearing.

12  They may dispute that he was in a gang.  But I also think it

13  goes to the credibility because --

14      THE COURT:  Who's going to testify that the other

15  people were in the gang with him?

16      MS. FUDIM:  I have to reread their dep.  I don't

17  recall if some of them admitted it or not, or if the

18  officers are going to be able to testify to that,

19  Your Honor.  I just don't remember.  It's been a long time

20  since I've read the depositions in this case.  I would have

21  to reread them, but even as to him, he was wearing -- and

22  under our version of events, he was wearing a sweater with

23  gang insignia.  They're going to dispute that, but a jury

24  may believe us, may believe what he was wearing, and he

25  denied --

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 28

1      THE COURT:  Well, how are you going to draw -- do

2  you want to draw the inference from gang membership that he

3  must have had a gun?

4      MS. FUDIM:  I don't think it goes to must have,

5  but I think it's certainly a factor that it's more likely

6  that he would have.  The gang that he was in was engaged in

7  that period of time.  In or around 2006, 2007 there was all

8  of gang warfare going on in the Rockaways between the gang

9  he was in and other rival gangs.

10      THE COURT:  Who is going testify about that?

11      MS. FUDIM:  The officers.

12      THE COURT:  How do they know that?

13      MS. FUDIM:  Because they were assigned to a

14  precinct in that area, and they were dealing with the

15  repercussions of the gang violence on a daily basis.

16  Someone who is in a gang is more likely to have a gun than

17  someone who is not in a gang.  And that's even more likely

18  if there's currently a lot of violence going on between

19  gangs in that area.  So I think that it is relevant.

20      Is it dispositive?  No, certainly not, but

21  dispositive is not the standard for relevance.

22      MR. MEEHAN:  Your Honor, there is zero evidence

23  anywhere in the record that anyone who is affiliated with

24  any gang.  They're going to lob wild speculative accusations

25  that each and every person Plaintiff calls who is going to

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

1  support Mr. Smalls' contention that he was upstairs in an
2  apartment with nothing to do with anything and call them
3  gangbangers.  This is classic prejudicial evidence and this
4  is going to go nowhere as to what actually happened on
5  May 20, 2006.  They're going to have officers come here and
6  talk about how dangerous, everyone has guns and gangs.  It's
7  ridiculous.  None of this should be in.
8          THE COURT:  Yes.  I'm not inclined to let it in
9  except in the following way:  Assume it were not a gang.
10  Assume it was a fraternity.  Certainly if you were going to
11  question a witness you could say, you are a fraternity
12  brother of his to establish a relationship between them that
13  would suggest that they would favor them.  If it was a real
14  brother you can say, this is your brother.  If you have a
15  good-faith basis to ask a question, you can ask the
16  question.  You know, if you establish that the defendant was
17  a member of this gang without going into the violence or
18  anything else and then you have a good-faith basis to ask
19  the other witnesses, Were you also a member of this same
20  gang that the defendant was a member of, I think that it
21  would be permissible to do that.  But not to go into the
22  violence and the guns or any of that with the gang.  I think
23  it would just go solely to the relationship between the
24  witnesses and whether they would be inclined to testify
25  truthfully or untruthfully about the events that took place.

1          MR. MEEHAN:  Your Honor, there is no good-faith
2  basis.  They were asked point blank in their depositions if
3  they were members of a gang.  Everyone said no.  One of the
4  people lives in Virginia and had no affiliation with the
5  Hammel Houses at this point in his life.  None of these --
6  what they're going to do is they're going to open this
7  prejudicial avenue and be like, Isn't it true you're a
8  gangbanger with Andrew Smalls, and that's all that needs to
9  be done to prejudice that person's testimony in front of the
10  jury when it has nothing to do with a gang.
11          They live in a housing project.  They saw Andrew
12  Smalls' brothers get arrested.  They knock on the door and
13  they say, Your brother's getting arrested and they're going
14  to be accused in federal court of being a gangbanger just so
15  they can try to win their case.
16          THE COURT:  First of all, I am not sure of the
17  phrase "gangbanger."  I suppose there is a gang.
18          What good-faith basis do you have to ask the
19  questions if they have told you no?
20          MS. FUDIM:  I think that there was -- there was
21  definitely one who said no.  But I don't recall that being
22  the case as to all of them, and I believe that we had --
23  there was something I saw whether it was arrest records for
24  them that had a reference to their gang classification, not
25  that we would be bringing that into evidence.

1          THE COURT:  No.  You have got to have a good --
2          MS. FUDIM:  But I have a basis for asking the
3  question, I think that it is fair.  And these are
4  individuals --
5          THE COURT:  You are going to have to show me that
6  you have a good-faith basis to ask the question.
7          MS. FUDIM:  As an officer of the court,
8  Your Honor, I would never ask a question that I didn't
9  believe I had a good-faith basis to.  And right now --
10          THE COURT:  I know, but right now, you are going
11  to have to tell me what that is.
12          MS. FUDIM:  I can't recall with respect to each
13  witness what it was.  I recall at the time months and months
14  ago when we were first looking at the first iteration of the
15  JPTO, I recall seeing documents that gave me a good-faith
16  basis that some of these men were in a gang.  I know there
17  was briefing about it for the criminal court below by the
18  Government and by the defendants as to whether the gang
19  affiliation was going to be let in, into the criminal court
20  and there was argument by the Government as to the fact that
21  these other men were also members of a gang and they
22  discussed what the basis was.  I remember that I read that
23  months ago --
24          THE COURT:  Was it admitted in the criminal case?
25          MR. MEEHAN:  It was not, Your Honor.

1          MS. FUDIM:  I don't recall, but I do recall months
2  ago reading the arguments and a good-faith basis --
3          THE COURT:  Well, I am not going to let you do it.
4          MS. FUDIM:  -- for the question.
5          THE COURT:  I am not going to let you do it unless
6  you advance to me before the trial starts some good-faith
7  basis to ask the question and specifically what that
8  good-faith basis is.  And it would only be on the question
9  of whether they were jointly in a group that they were tied
10  to one another such that you could argue that it is a
11  brotherhood, and they would support the testimony of
12  others -- it will only go to credibility.  I would not let
13  you then argue that they are violent and they are horrible
14  and everybody knows gangs are awful.
15          MS. FUDIM:  But I think that there's another
16  issue, Your Honor, with respect to Plaintiff himself.  At
17  his deposition because his credibility is obviously key to
18  this case.  At his deposition he denied being in a gang.  At
19  the time he was arrested he was wearing a sweater with gang
20  insignia on it.  So I think that that is an issue of
21  credibility.
22          Now, I understand Counsel is jumping to say he
23  wasn't wearing that and there is a dispute about what he was
24  wearing at the time he was arrested, but that's an issue of
25  fact, and we should be able to explore the fact that he was

## Proceedings 33

1  wearing gang insignia --
2          MR. MEEHAN:  When you say --
3          THE COURT:  Let's not interrupt.
4          MR. MEEHAN:  I apologize, Your Honor.
5          THE COURT:  Let her finish.
6          MS. FUDIM:  That he was wearing gang insignia.  I
7  believe it was on his sweater at the time that he was
8  arrested, and that he denied being in a gang.  That's a
9  credibility issue.
10         Now, maybe it doesn't have legs.  Maybe the jury
11 doesn't believe it.  Maybe the jury thinks he was wearing
12 whatever Plaintiff's Counsel thinks he was wearing, but
13 those are issues of fact to the jury.  And credibility is
14 key in this case, and we should be able to ask questions
15 about it.
16         THE COURT:  But you are going one step backwards.
17 You are going to a deposition where it is still disputed.
18 You do not have a --
19         MS. FUDIM:  Well, I would ask the Court --
20         THE COURT:  You do not have a clear false
21 statement in a deposition which would clearly be fair game
22 if he lied under oath at a deposition.  But it is not clear
23 to me that this is a clear false statement at a deposition,
24 nor am I certain that it was necessarily material.  So
25 again, just let me know what other basis you would have to

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 34

1  ask these other people and see where we go from there.
2          MS. FUDIM:  Yes, Your Honor.
3          THE COURT:  Is there anything else left?
4          MR. MEEHAN:  No, Your Honor.
5          There is a couple of things just to continue on
6  this.  So I just want to make sure that on direct with the
7  police officers they're not going to be able to go into all
8  the gang violence that's occurring at the Hammel Houses.
9          THE COURT:  No, none.
10         MS. FUDIM:  Well, Your Honor, may I ask a question
11 for clarification?
12         THE COURT:  Sure.
13         MR. MEEHAN:  Without getting into the idea of gang
14 violence, I think that the officers -- we still want to look
15 at the fact that there was a lot of violence in that area at
16 that time.  Plaintiff might not be --
17         THE COURT:  For what purpose?
18         MS. FUDIM:  Because I think it goes to the motive
19 of why someone would have a gun, because there was a lot of
20 violence going on at that time in that area.  People were
21 getting killed all the time in that area at that time, and
22 so I think it goes to the motive of why somebody would have
23 a gun at night.  This occurred at 1:00 o'clock in the
24 morning, something like that.  Why someone would have a gun,
25 and I think that that is relevant.  I mean, there is a

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 35

1  difference between someone saying I wasn't there.  I didn't
2  have a gun in Greenwich, Connecticut, today where there may
3  not be that much violence or someone [sic] was just found in
4  a suitcase there, I think.  But in an area where it was a
5  known spot of very significant deadly violence going on at
6  that time, it's clearly relevant.
7          THE COURT:  What are they going to say about that?
8  What precisely are they going to say about that?
9          I do not know that this issue was raised in the
10 papers, was it?
11         MS. FUDIM:  I think we've put in our response
12 papers that there was an issue between the Get It in Bricks
13 gang, which is the gang that we believe Plaintiff was
14 affiliated with and the other -- I can't recall what the
15 rival gang was.  I'm forgetting the name of it.
16         But I also know, Your Honor, that in terms of the
17 paperwork from DOC, and this is not, we're not going to put
18 this in as an exhibit, but I think in terms of his own
19 affiliation he has on some of his BOP paperwork in
20 connection with of these incriminations there are notations
21 that he was gang affiliated.  Provided by DOC.
22         THE COURT:  Well, that is --
23         MS. FUDIM:  And they make those kinds of
24 classification for housing and safety issues.
25         THE COURT:  No, that cannot come in.

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 36

1          MS. FUDIM:  We're not seeking to put it in,
2  Your Honor.  I think it goes to the good-faith basis for
3  believing he was in a gang.  And I think we should also --
4          THE COURT:  Well, when you say violence in the
5  area, what specifically would the police officers say?  You
6  have got to tell me what you envision they are testifying
7  to.
8          MS. FUDIM:  That there were shootings that were
9  taking place.
10         THE COURT:  When?
11         MS. FUDIM:  Very regularly.
12         THE COURT:  How close to this?
13         MS. FUDIM:  That they were responding to that area
14 in the Far Rockaway, to these houses, to the Hammel Housing.
15 I won't use the word "projects."  I would say Hammel Houses,
16 I mean, it was a housing complex, that they responding
17 there very regularly for assaults, for shootings, for
18 violence on -- very regularly violence is erupting there.
19 People are getting arrested there.  I think that that is
20 relevant to the fact that Plaintiff and the men I assume he
21 was with had a gun.
22         MR. MEEHAN:  Your Honor, there a sharp factual
23 dispute in this case.  There's no issue with whether or not
24 a gun was recovered.  There was no issue that the police
25 officers were following a man after a firearm was

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

Proceedings                                    37

1   discharged.  The plaintiff is maintaining he had nothing to
2   do with that.  He was upstairs and came down after everyone
3   was arrested and in handcuffs down in the police car.  It is
4   so prejudicial what Ms. Fundim is alleging that these
5   officers are going to testify to, and it's going to nothing
6   to do with their credibility, nothing to do with the
7   plaintiff's credibility, and it's just trying to destroy the
8   plaintiff and make him to be this untruthful gang-affiliated
9   person.
10              THE COURT:  Let me ask you, you are not disputing
11  that someone had a gun, you are just saying it was not your
12  guy?
13              MR. MEEHAN:  Yes, Your Honor.
14              MS. FUDIM:  Your Honor, if I may respond?
15              THE COURT:  Why does it make that any more likely
16  that he was the fellow who had -- the violence in this area,
17  why does it make it any more likely that he had the gun as
18  opposed to some of the other people having the gun?  They
19  are not disputing -- if they were disputing that there was a
20  gun found, maybe it might have some relevance.  But why does
21  it make it any more likely that he was the guy who had the
22  gun?  Not everybody had the gun, right?
23              MS. FUDIM:  I agree.  I don't think it makes it
24  more likely he had it as opposed to the guys.  But, for
25  example, the letter, one of the letters that we just talked

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

---

Proceedings                                    38

1   about the other day the plaintiff submitted that we're now
2   using as an exhibit, that January 9th letter, he is
3   disputing in that letter that a shot was ever fired.
4   Plaintiff's Counsel said there's no dispute that a shot was
5   fired.  Well, according to the letter, Plaintiff was
6   disputing that a shot was ever fired because in his own
7   letter to his attorney he's writing, no shot was ever fired.
8              So I don't know, is that not disputed now?
9   Because according to his letter, that was something he was
10  disputing to his attorney.  And I mean, obviously, it begs
11  the question how he would know that if he claims to not have
12  been there, but be that as it may...
13              MR. MEEHAN:  Again, Your Honor, how does the
14  violence and the gang history of the Hammel Houses have
15  anything to do with whether or not it's more or less likely
16  that Mr. Smalls possessed this firearm?
17              THE COURT:  Yes, I think I agree with that.  So I
18  am not going to submit that evidence.
19              I mean, something that can -- you know, it is
20  entirely likely that something could happen, there could be
21  questioning that could open the door to this.  But right
22  now, I am not inclined to allow that.
23              MS. FUDIM:  Okay.
24              MR. MEEHAN:  Your Honor, I just wanted to bring up
25  something now that Ms. Fundim has referenced this letter

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

---

Proceedings                                    39

1   that the plaintiff wrote to his attorney while he's
2   incarcerated.  In review of the documents now and the
3   witness list, I would renew our application to have any of
4   this stuff that the lawyers made reference to in the
5   suppression hearing be taken out of this case altogether.
6   The Court is right that there is Supreme Court case law that
7   any argument made by a plaintiff in the suppression hearing
8   is inadmissible for any purpose at trial afterwards.  When
9   his attorney made this application, they were doing so under
10  the impression that that would be inadmissible going
11  forward.  It has opened up a Pandora's box.  It doesn't help
12  anyone get to the truth of what really happened here on the
13  this day.  And I just think that under U.S. v. Harris, which
14  was a Supreme Court 1968, the rule could not be more
15  clear -- I'm sorry, it's Simmons v. The United States.  I
16  apologize, Your Honor.  It's, We, therefore, hold that when
17  a defendant testifies in support of a motion to suppress
18  evidence on Fourth Amendment grounds, his testimony may not
19  thereafter be admitted against him at trial on the issue of
20  guilt unless he makes no objection.
21              MS. FUDIM:  This is not an issue of guilt,
22  Your Honor.  That case is not on all fours.  That has to do
23  with whether or not a statement by a defendant who
24  testified.  Here it's not a defendant.  It's counsel.  But
25  even if you say they're one and the same as an agent,

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

---

Proceedings                                    40

1   whether or not those statements can be used in the
2   underlying criminal trial, that goes to guilt.  This is a
3   subsequent civil trial.  It's not the same thing,
4   Your Honor.  The Court already heard argument on this
5   subject.  We were here last week for an hour.  I think it
6   should be fair game.
7              THE COURT:  Let me ask you a question.  Are you
8   putting the lawyers on the stand in your case?  I am asking
9   Plaintiff's Counsel.
10              MR. MEEHAN:  We have to, Your Honor.
11              MR. NORINSBERG:  It's only to respond to that
12  argument.  We have no intention whatsoever, Your Honor, of
13  doing it unless we're forced to because the collateral issue
14  is being introduced.  Otherwise the answer would be no, we
15  wouldn't.
16              MR. MEEHAN:  And we would have no reason to bring
17  in the plaintiff's letter of his attorney while he's
18  incarcerated.
19              THE COURT:  Let me just ask Defense Counsel, just
20  from a pragmatic standpoint, if you are going to put this
21  letter in and then you are going to have all of the lawyers
22  testify, that is not what he said to me, what do you get
23  from that at the end of the day?
24              MS. FUDIM:  The letter for us, Your Honor, is for
25  an entirely different point.  I don't want to reveal our own

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 41

1  strategy, but the letter, we're using the letter for
2  different purposes.  And I think that's a separate issue for
3  us than with respect to the statements made by the attorney.
4  But I think it is --
5       THE COURT:  You are not using it for purposes of
6  an admission that he has a gun?
7       MS. FUDIM:  We're using it for the purposes of --
8  the letter doesn't admit he has a gun.  The letter is to his
9  attorney saying -- this is his own letter saying all the
10 things that he thinks is wrong with the Government's brief.
11 And they filed it, so it's no longer protected by
12 attorney/client privilege.  It is a statement by a party
13 opponent.  We should be entitled to use it for any purpose.
14      I can reveal to the Court in camera ex parte the
15 purpose that I anticipate using it for, but I don't want to
16 do so in open court.
17      I think with respect to the submissions
18 by his attorney, I think it is highly suspect that his
19 attorney, Mr. Maltz, made a declaration under oath, under
20 penalty of perjury that based on conversations with the --
21      THE COURT:  Was it under penalty of perjury?  It
22 is a statement in a brief.
23      MS. FUDIM:  No.  It was in a declaration in
24 support of a brief, yes.  I mean under penalty of perjury
25 that based on conversations with his defendant, the current

## Proceedings 42

1  plaintiff, the criminal defendant that he has -- that he was
2  with the group, had the gun, threw the gun then
3  submitted a declaration to this Court which now that he got
4  the benefit of getting the plaintiff out of jail that now
5  he's making a declaration to this Court that that was never
6  stated to him.  And I think that that should be fair game.
7  That is not the same issue with respect to the letter.  I
8  see the letter as probative of a different point, which I'm
9  happy to reveal to the Court in camera, but I don't think I
10 should have to do so in open court.
11      MR. NORINSBERG:  Just to be clear, Judge, the
12 letter, the affirmation that was written was based also on
13 the felony complaints, and it was based on documents in the
14 lawyer's file.  It was clearly set forth, so to say it was
15 based strictly on what the plaintiff told him is not
16 accurate.
17      MR. MEEHAN:  And let's not forget, Your Honor, he
18 would have never had standing to challenge the firearm
19 unless he did that.  And that's exactly what the
20 Supreme Court is saying.  You cannot have -- you cannot --
21      THE COURT:  No, but that is different.  It is just
22 saying it cannot be used against you in a criminal case.  I
23 mean, it is different I think in the civil context.
24      MR. MEEHAN:  Well, but look at it from Mr. Smalls'
25 perspective.  He would have never been allowed to challenge

## Proceedings 43

1  the suppression, to challenge the firearm if he -- if he
2  didn't say that, so he has to.  His attorney, he would be
3  essentially committing malpractice if they didn't say to try
4  to get suppression hearing in that.
5       MS. FUDIM:  Your Honor --
6       MR. MEEHAN:  So he did what he had to do.
7       MS. FUDIM:  Your Honor, there's no carve out for
8  lying for the purpose of a suppression hearing.
9       THE COURT:  I do not think so either.
10      MR. NORINSBERG:  The question is whether part of
11 this civil rights trial, the one issue in this case is
12 whether he really had the gun or not.  What his lawyers
13 permitted ten years ago in court, it's probably irrelevant.
14 And it's just going to admittedly distract the jury and take
15 us into a trial within a trial that's not necessary to get
16 to the core issue of this case.
17      MS. FUDIM:  Your Honor, in this most basic form
18 his attorney stated in a document, My client told me he had
19 the gun.  That's basically equivalent of what the statement
20 is.
21      MR. NORINSBERG:  That's not --
22      MS. FUDIM:  It's a statement by a party opponent,
23 and we should be able to explore it.  Now, certainly
24 Mr. Norinsberg and Mr. Meehan should be able to rebut that
25 with anything that they want.  It's fair game for them to

## Proceedings 44

1  examine and ask any questions they want, put on any
2  witnesses they want.  But to say that we're not allowed to
3  ask questions about the fact that in order to gain his
4  freedom --
5       THE COURT:  I do not understand if you elicit that,
6  that I'm going to let Mr. Maltz testify to everything which
7  would otherwise be hearsay in this case -- it wouldn't
8  be exculpatory.  He's going to be able to testify to all
9  this other material that's in his affidavit.
10      MS. FUDIM:  Yes, absolutely.  I think that's the
11 right ruling.
12      THE COURT:  Well, that is what I ruled last time
13 so we are going to stick with it.
14      MR. MEEHAN:  But, Your Honor, it would require us
15 to inform the jury about the standing argument and how -- it
16 just goes into so much law it's going to be confusing to the
17 jury, tremendously.
18      THE COURT:  I do not know -- the standing
19 argument -- the law is not that you get to lie to get
20 standing and then -- I mean, that is just not the law.
21      MR. NORINSBERG:  But it's lawyer based -- it's
22 based on the felony complaint, and it's based on documents
23 in his file and based on conversations from the plaintiff.
24      THE COURT:  But that is not what the affidavit
25 said.

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Page 45

1       MR. NORINSBERG: It is what the affirmation --

2       THE COURT: That is what his subsequent

3  affirmation says.

4       MR. NORINSBERG: No, that was his original

5  affirmation. I read it to the Court last time we were here.

6       We have no objection to the letter that counsel

7  wants to admit to use. Where we are trying to suggest the

8  line should be drawn is going into this peripheral issue of

9  attorney submissions, you know, well over a decade ago that

10  are not nearly as clear-cut. It doesn't contain any

11  admission at all. It talks about a review of a felony

12  complaint and records in his file as well as conversations

13  with Plaintiff.

14       MS. FUDIM: Well, Your Honor --

15       THE COURT: So how is the cross-examination

16  going to be on that? Isn't it true you told your lawyer X?

17  I mean, this is not -- this is not what this trial is about.

18       MS. FUDIM: Your Honor, I see you're reading, but

19  if you want me to wait, I'll wait a second.

20       THE COURT: I mean, this does not suggest that he

21  got this statement from any report. It says, The defendant

22  maintains he has standing to move for this hearing since the

23  defendant felt compelled to drop the weapon --

24       MR. NORINSBERG: Look at the --

25       THE COURT: -- as a result of the unlawful action.

## Page 46

1       MR. NORINSBERG: Look at the first page, Judge.

2  It says --

3       THE COURT: I know what it says. But here he is

4  not saying the defendant felt compelled. That's not

5  something he got from a police report.

6       MR. NORINSBERG: Why can't he make that argument

7  based on what officers are saying?

8       THE COURT: Well, he could if he had said, based

9  on their own account, you know, he could have made that

10  argument. But that's not what he said there. So I am going

11  to have to change my ruling. But, you know, we are also

12  going to have to let Mr. Maltz -- I do not know how much you

13  ultimately gain from it because Mr. Maltz is going to come

14  in here and say that he never told him any of these things

15  and backup the defendants' -- the plaintiff's story, which

16  he otherwise would not have been able to do.

17       MS. FUDIM: Yeah, and I don't know exactly how

18  it's going to come out, and I haven't written my

19  cross-examination yet. I don't even know who my trial

20  partner is yet, Your Honor, but I don't want to be precluded

21  from doing something before we, you know, even started

22  drafting any of this yet, you know. Maybe it's a question.

23  Maybe it's two questions. Maybe it's ten questions, I don't

24  know. Maybe it's no questions. But until we started to put

25  together for the case --

## Page 47

1       THE COURT: Well, are you seeking to introduce the

2  affirmation -- I thought you were seeking to introduce the

3  affirmation as an exhibit?

4       MS. FUDIM: We are. I'm looking at the binder

5  that I just redid, and I'm looking to see if I messed up by

6  not putting it in because it definitely was supposed to have

7  been added. I'm wondering if I goofed when I just stuck in

8  his current --

9       THE COURT: When is this trial, March 4th?

10       MS. FUDIM: March 4th, Your Honor.

11       I know I put in his -- I think what I did that was

12  wrong, I see what it was. I put in his -- in the actual

13  binder his declaration that Plaintiff's Counsel submitted in

14  support of the motion. I meant to put in as Exhibit J

15  instead of putting in the declaration that was just admitted

16  in support of the motion, I meant to put in the binder the

17  declaration that was submitted to the Court before.

18       THE COURT: Just take a minute and get your

19  exhibits straightened out and also give me an index, too,

20  both sides. I do not know if it is Plaintiff's or not, but

21  I need an index to the exhibits.

22       MR. MEEHAN: In the beginning is the joint

23  pretrial order.

24       THE COURT: Maybe you have one.

25       MS. FUDIM: So if everyone will give me back their

## Page 48

1  binder and when we come to court, I'll bring it back with

2  the corrected. Or do you want me just to print the document

3  and hand it to you?

4       THE COURT: You can take your binder back.

5       MS. FUDIM: I'll bring it back when I come and get

6  you something else that's smaller.

7       THE COURT: Is there anything else that is

8  unresolved? I am talking about unresolved not re-resolved.

9  I do not want to go back over arguments that we have already

10  had.

11       Is there anything that is left that we have not

12  resolved?

13       MR. MEEHAN: I'm just going through the bullet

14  points now, Your Honor.

15       THE COURT: Okay.

16       MR. MEEHAN: Oh, we moved in limine to preclude

17  reference to the fact that at some point Mr. Smalls

18  sustained a gunshot wound as unduly prejudicial.

19       THE COURT: When did he receive a gunshot wound?

20       MR. MEEHAN: I don't have the deposition testimony

21  in front of me.

22       THE COURT: I guess it is not relevant unless it

23  was self-inflicted, right?

24       MR. MEEHAN: That's correct, Your Honor, and it

25  wasn't -- didn't have anything to do with this incident.

## Proceedings 49

1  THE COURT:  Are you --

2  MS. FUDIM:  No.  I think it was subsequent to the

3 incident.  We have no intention of eliciting that.  I think

4 what we said in our motion papers is, you know, unless the

5 door is opened in some way that it becomes relevant.  We

6 have no intention of eliciting it, and I'm not sure what

7 that way would be, but unless that happens...

8  (Pause in proceedings.)

9  MR. MEEHAN:  Oh, there is one reference on -- just

10 one document that claims to a firearm recovered that day

11 might have been used in another shooting, and I just ask

12 that we be allowed to redact that from the firearm report.

13  THE COURT:  That seems reasonable.

14  MS. FUDIM:  I think that's fine.

15  THE COURT:  Okay.

16  MS. FUDIM:  I guess one more thing, and I don't

17 know if we should address it now or at the time of trial

18 regarding objections, but Plaintiff added an exhibit which

19 I'm seeing for the first time this morning, or this

20 afternoon when he gave it to me, 35, which appears to be

21 like high school photos, family photos, a little league

22 baseball photo of Plaintiff.  We would object to this as

23 being not relevant and a host of other reasons.  I mean,

24 it's coming to trial.  I don't know why we have a little

25 league photo here.

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 50

1  THE COURT:  Yes.  I do not --

2  MS. FUDIM:  It doesn't seem like character of this

3 to me, would that open the door to a lot of other character

4 evidence on the other side.

5  THE COURT:  What are these pictures for?

6  MR. MEEHAN:  Your Honor, for the same strategy

7 reasons that Ms. Fudim refused to explain why she wanted to

8 use the letter, we would respectfully request that --

9 they're part of our case theory, and we would like to use

10 them at trial.

11  MS. FUDIM:  Your Honor, if they are putting in a

12 little league photo, then we're going to seek to put in all

13 the arrests that he had at or about the time he was in

14 little league, which would otherwise, I would concede be

15 completely not appropriate to do.

16  THE COURT:  Is there some reason we have to be so

17 secretive here?  I mean, I do not see resolving these

18 things in front of a jury.  Is there really some need -- I

19 cannot understand some mystical reason that you would be

20 putting these in, other than to have him recite his life

21 before the jury.

22  MR. MEEHAN:  Well, we don't need the little league

23 photo.

24  MS. FUDIM:  I don't see how the others bear any

25 more relevance than his little league photo.  You've got the

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 51

1 high school photo.  He's coming to testify.  The jury is

2 going to know what he looks like.

3  THE COURT:  Unless you can tell me --

4  MR. MEEHAN:  It goes to the issue of identity of

5 Mr. Smalls compared with whoever else who was on the scene

6 at that time.

7  THE COURT:  Okay.  But that high school photo

8 could be totally irrelevant for that.  Is it a photo at the

9 age that he was at the time?

10  MR. MEEHAN:  He was 19.

11  MR. NORINSBERG:  He was 19.

12  THE COURT:  He does not look 19 in this photo.

13 The first one?  It looks like an eighth-grade photo or

14 something.  Is that a photo taken at or about the time?

15  MR. MEEHAN:  I'm unsure of the date of that photo,

16 Your Honor.

17  THE COURT:  I mean, the second photo could be of

18 someone who was older, but not the first photo.  That photo

19 looks, you know, like somewhere between 10 and 13.  It's a

20 very nice photo.  I do not know what it has to do with

21 anything.  The second photo looks like it could be a photo

22 of him at that age.

23  MR. MEEHAN:  The younger photos we would have no

24 problem excluding, Your Honor.

25  THE COURT:  So it is just that second photo.

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

## Proceedings 52

1  MR. MEEHAN:  There's more.  There's one with --

2  THE COURT:  Oh, okay.

3  MR. MEEHAN:  -- after the little league photo.

4  THE COURT:  This goes to --

5  MR. MEEHAN:  That's Ronnie and his two brothers.

6  THE COURT:  Oh, I see.

7  MR. MEEHAN:  Cedric.  That's said Cedric, Ronnie,

8 and Andrew.

9  THE COURT:  Who is the plaintiff?

10  MR. MEEHAN:  As to who is who in the photograph,

11 I'm not sure.

12  MR. NORINSBERG:  He's incarcerated.  He can't

13 exactly tell us which one is which.

14  THE COURT:  But how do you know it is a photo of

15 him at all?

16  MR. MEEHAN:  It was provided to us by -- we asked

17 for something specific, and he had one family member give it

18 to us.

19  THE COURT:  So this has something to do with

20 distinguishing him between his brothers?

21  MR. NORINSBERG:  Yes.

22  THE COURT:  Okay.

23  MS. FUDIM:  I would say on that basis, we would

24 not object to a photo of him with his brothers, other than

25 there appears to be some lines through one of the brother's

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

---

Proceedings    53

1  eyes.  But the last page, which is, again, the first picture
2  again.  And then two other photos of him in his house, we
3  would object to those.  The purpose is distinguishing -- the
4  argument that somehow the police were unable to distinguish
5  him or incorrectly distinguish him between his brothers, I
6  would withdraw the objection to the one with his brothers.
7  But as to the rest, I would maintain an objection.
8        THE COURT:  The way they are listed, you can put
9  in assuming that it is for this purpose and not some other
10  purpose, he can put in the second photograph because that
11  appears to be a photograph.
12        What is that, a rosary around his neck?
13        MR. MEEHAN:  I'm not sure, Your Honor.
14        THE COURT:  I mean, if you are going to say -- if
15  you make a good-faith proffer that you are going to say this
16  has something to do with whether he was identified as the
17  correct person, that photograph can come in.  The second one
18  and then the one of him and his brothers and then it's not
19  the little boy picture, but the other two on the last
20  page -- is that him on the last page?
21        MR. MEEHAN:  I believe that is Cedric or Ronnie.
22        THE COURT:  The brother?
23        MR. MEEHAN:  Yes.  Cedric, because one of them has
24  a date of death.
25        THE COURT:  A date of death?

---

Proceedings    54

1        MR. MEEHAN:  Yeah.  On the last page it says
2  6/7/88 to 12/15/06.
3        THE COURT:  Was he killed in the projects?
4        MR. MEEHAN:  Both Ronnie and Cedric are deceased.
5  I think Counsel and I both came to the agreement that we're
6  not going to reference one was killed in gang gunfire and
7  one was killed by police, so we're not going to touch either
8  of those.
9        However, these two people, you know, are missing
10  from his trial, so we would ask for the Court to put some
11  sort of instruction that for reasons unrelated to this case,
12  that Ronnie and Cedric are deceased and not able to testify.
13        THE COURT:  Well, wait.  They were there on the
14  day of this incident?
15        MR. MEEHAN:  They were arrested along with
16  Mr. Smalls.  It's Mr. Smalls' contention that he was alerted
17  to the fact that his brothers Cedric and Ronnie were
18  arrested, and that's why he came to the scene.  One of whom
19  was underage, and that's how he got into the altercation
20  with the police officer telling him, That's my younger
21  brother.  He's underage.  Let him go.
22        THE COURT:  And these two would presumably have
23  been able to corroborate his story?
24        MR. MEEHAN:  That he was not part of their group,
25  yes.

---

Proceedings    55

1        THE COURT:  Well, instead of telling them that
2  they are dead, why don't I just tell them that these two
3  witnesses are not available to either party.
4        MR. NORINSBERG:  But, Judge, they're his brothers.
5  I mean, the logical assumption of the jury would be they're
6  his brothers, they would be here to testify.  They'll either
7  assume, you know, they're in jail or they're not willing to
8  corroborate him.  It is going to be a negative inference,
9  whereas if you just tell the actual truth, they're deceased,
10  it has nothing to do with this case, you are not to
11  speculate about that and that's that, it puts an end to it.
12        MS. FUDIM:  I don't have any problem with that.  I
13  don't think we need an instruction.  I think when he's on
14  the witness stand the question can be asked, His brothers
15  have since passed away?  Answer, yes.  Now you don't need an
16  instruction.  Now the jury knows they deceased.
17        THE COURT:  Okay.
18        MS. FUDIM:  But I still don't think we need
19  pictures of them.
20        THE COURT:  I do not know if it has something to
21  do with whether they look alike.  They can come in.
22        MS. FUDIM:  Whom are these pictures of?
23        MR. MEEHAN:  That's either Cedric or Ronnie.
24        THE COURT:  Well, you have got to tell Counsel
25  before the trial starts.

---

Proceedings    56

1        MR. MEEHAN:  It's difficult because he is
2  incarcerated, so I will -- I will try the best I can to find
3  out.  And once Mr. Smalls is down in New York and we can
4  prep, I will absolutely come to an answer, but I will try to
5  find out earlier from his family as to who is who, and I
6  will let Ms. Fundim know.
7        THE COURT:  So I guess that wraps it up, right?
8  Lady and gentlemen, right?
9        MR. MEEHAN:  Yes.
10        MR. NORINSBERG:  Yes.
11        THE COURT:  Okay.
12        MR. MEEHAN:  Thank you, Judge.
13        THE COURT:  Thank you.
14        (Matter concluded.)
15              --oo0oo--
16
17
18
19
20  *I (we) certify that the foregoing is a correct transcript*
21  *from the record of proceedings in the above-entitled matter.*
22  */s/ David R. Roy*        *February 19, 2014*
     *DAVID R. ROY*          *Date*
23
24
25



THE CITY OF NEW YORK

**LAW DEPARTMENT**

ZACHARY W. CARTER
*Corporation Counsel*

100 CHURCH STREET
NEW YORK, NY 10007

BRIAN FRANCOLLA
Senior Counsel
Phone: (212) 356-3527
Fax: (212) 356-3509
bfrancol@law.nyc.gov

May 9, 2019

**BY ECF**
Honorable Carol Bagley Amon
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   **Andrew Smalls v. The City of New York, et al.**
**14-CV-2326 (CBA)(RML)**

Your Honor:

I am Senior Counsel in the office of Zachary W. Carter, Corporation Counsel of the City of New York, and one of the attorneys representing defendants Richard Collins and David Teta in the above-referenced matter. I write jointly with plaintiff's counsel to address two outstanding issues with the Court.

First, the parties have conferred and resolved the relevant amount of time plaintiff spent incarcerated. Our agreed upon stipulation is set forth below.

"The parties have stipulated that Mr. Smalls served a total of 2 years and 1 month and 14 days in jail as a result of being charged with criminal possession of a gun."

Second, the parties disagree over how the Court should address with the jury the manner in which plaintiff's conviction was overturned. Our respective proposals are set forth below.

Plaintiff's Proposal:

"On April 26, 2011, Plaintiff's conviction for criminal possession of a weapon was overturned by the Appellate Division. The reasons for the appellate court's reversal of plaintiff's conviction are not relevant to this case, and you should not speculate as to the reasons why Plaintiff's conviction was reversed by the higher court. The only thing that matters for purposes of your consideration is that the gun charges were ultimately dismissed and that as a result, Mr. Smalls was released from jail. The parties have

stipulated that Mr. Smalls served a total of 2 years and 1 month and 14 days in jail as a result of being charged with criminal possession of a gun."

Plaintiff's proposed instruction  is neutral, and avoids informing the jury of any of the facts and circumstances surrounding the reversal of Plaintiff's conviction.    By contrast, however, Defendants ask the Court to present the jury with an instruction that is both misleading and prejudicial.  The Appellate Division's opinion was based solely on the *officer's version* of events. People v. Smalls, 83 A.D.3d 1103, 1103, 922 N.Y.S.2d 461, 462 (2d Dep't 2011) ("The following testimony was adduced at the defendant's Mapp/Dunaway hearing").  It was not based upon, nor did it even consider, Plaintiff's version of events.  To suggest otherwise, as Defendants now do, is simply disingenuous.

Moreover, as Judge Weinstein has made clear, judicial opinions constitute inadmissible hearsay and should not be presented to a jury. See Blue Cross & Blue Shield of New Jersey, Inc. v Philip Morris, Inc., 141 F Supp 2d 320, 323 (E.D.N.Y. 2001) ("Judicial findings in other cases proffered as evidence are generally characterized as inadmissible hearsay.").  Indeed, there is no hearsay exception for judicial opinions in the Federal Rules of Evidence. See Fed. R. Evid. 803 (listing specific exceptions); United States v. Jones, 29 F.3d 1549, 1554 (11th Cir. 1994) (denying exception for government documents under Rule 803(8)(C)); Nipper v. Snipes, 7 F.3d 415, 417-418 (4th Cir. 1993) (same); Zenith Radio Corp v. Matsushita Elec. Indus. Co., 505 F. Supp. 1125, 1185 (E.D. Pa. 1980) ("[A] review of the advisory committee note makes it clear that judicial findings are not encompassed; not only is there not the remotest reference to judicial findings, but there is a specific reference on the findings of officials and agencies within the executive branch."), *rev'd on other grounds sub nom.* In Re Japanese Electrict Products Antitrust Litigation, 723 F.2d 238 (3rd Cir. 1983), *rev'd,* 475 U.S. 574 (1986).

Further, at the February 4, 2019 conference, this Court already ruled that the Appellate Division's opinion is inadmissible.  In fact, following this conference, Defendants actually removed the opinion form their exhibit list.  Now, on the eve of trial, Defendants effectively seek to do an end-run around the Court's prior ruling.  However, this ruling is now law of the case and should be followed.

Lastly, defendants proposed language opens a "Pandora's box" relating to the procedural issues surrounding the suppression of the firearm; the initial suppression motion, the suppression hearing itself, the appellate arguments relating to the suppression, and the appellate court's decision itself. Therefore, the Court should abide by its original inclination on this issue, and tell the jury that the reasons for the dismissal have nothing to do with this case. See May 1, 2019 transcript at 4. ("I suggest just saying in the instructions that the case was dismissed on such and such a date for reasons not relevant to this proceeding.").

Defendants' Proposal:

"After plaintiff was convicted, an appellate court found that the police lacked a sufficient legal basis to initially pursue plaintiff and the three other men who fled. Accordingly, the loaded firearm that was recovered was deemed inadmissible and the conviction was overturned."

The jury is entitled to know why plaintiff's conviction was overturned. Should the Court simply tell the jury that the conviction was dismissed and they should not speculate as to the reason (as plaintiff proposes), the jury may infer that plaintiff was proven innocent or that defendants fabricated evidence - the very issues the jury must decide in this case.

Additionally, the reason plaintiff's conviction was overturned is an established fact not capable of debate. Facts are admissible if relevant, and not otherwise unduly prejudicial under Rule 403. Here, the reason plaintiff's conviction was overturned is relevant, as it goes directly to plaintiff's credibility and that of one of plaintiff's witness's, Mr. Maltz (plaintiff's criminal defense attorney), in that Mr. Matlz, as plaintiff's agent, represented to a tribunal, that plaintiff ran from police, possessed the gun and discarded it in response to being chased by police. Plaintiff will deny making that admission to his attorney and Mr. Matlz will claim, as he did in his affidavit previously submitted to the Court, that "that argument should never have been made". The jury is entitled to know why that argument was made - i.e. to secure plaintiff's freedom at a time when it was in jeopardy - as that goes directly to the jury's assessment of plaintiff's and Mr. Maltz's credibility in now denying those very assertions.

Should the Court adopt defendants' proposal or language similar, plaintiff would not be prejudiced in any way - let alone unduly so, as would be necessary to preclude this fact under Rule 403.

In response to plaintiff's argument above, the Court did not previously deem the judicial opinion inadmissible at the February 4, 2019 conference[12]. Defendants listed the appellate opinion as an exhibit on the JPTO but removed it after the parties' February 28, 2019 telephone conference, when we discussed coming to a stipulation that would appropriately explain why the charges were dismissed.[3] This was again discussed during the May 1, 2019 in-person conference. _See_ May 1, 2019 transcript at 12-26. At the close of that discussion, Your Honor indicated that you would consider the issue and let us know. _Id._ at p. 26. Thus, defendants are not seeking an end run around a prior decision of this Court but instead, are providing the Court with our proposed stipulation, which has been contemplated since the February 28, 2019 conference.

Furthermore, plaintiff's argument that the Appellate Division's opinion was based solely on the officer's version of events ignores as the fundamental law concerning standing. To have standing to seeking the preclusion of evidence, a criminal defendant must affirmatively make his position known to the Court, and _he_ bears the burden of establishing that he has standing to assert that his actual, not hypothetical, constitutional rights were violated. Garvey v. Duncan, 485 F.3d 709, 715 (2d Cir. 2007) ("New York courts have explained that to preserve a claim of error

---

[1] In fact, there was no discussion of it at that conference.

[2] Defendants further note that the cases cited by plaintiff concern both different factual and legal scenario and thus are not applicable herein.

[3] Unfortunately, we do not have the minutes from the February 28, 2019 telephone conference.

in the admission of evidence at trial under § 470.05(2) a defendant must make his or her position known to the court....A general objection is not sufficient to preserve an issue since such would not alert the court to defendant's position. Instead New York's highest courts uniformly instruct that to preserve a particular issue for appeal, defendant must specifically focus on the alleged error....This rule applies with respect to motions to suppress as it does in every other context.") (internal citations omitted); United States v. Padilla, 508 U.S. 77, 81 (1993) ("It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* fourth Amendment rights were violated by the challenged [conduct].") (emphasis in original) (citations omitted); United States v. Johnson, No. 15-CR-98G, 2017 U.S. Dist. LEXIS 195411, at *5 (W.D.N.Y. Nov. 3, 2017) ("The party moving to suppress bears the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." (citing Rakas v. Illinois, 439 U.S. 128, 131 n. 1 (1978). Indeed, at the May 1, 2019 conference, plaintiff's counsel conceded that had plaintiff's counsel not affirmatively represented that plaintiff was part of the group being chased, he would not have had standing to argue for suppression. See May 1, 2019 transcript at 24 ("THE COURT: The Court decided he was among the people that -- he wouldn't have had standing had he been in the guy's room the way he claims now, right? MR. MEEHAN: Correct. He would not have had standing to challenge -- THE COURT: Right. MR. MEEHAN: -- for even a suppression hearing at all. THE COURT: Right."); see also United States v. Lipscomb, 2011 U.S. Dist. LEXIS 20060 (Dist. R.I. Feb. 28, 2011) (plaintiff lacked standing to challenge admissibility of gun and drugs following alleged illegal chase because he denied having gun and drugs, notwithstanding officer's version of events).

We thank the Court for its consideration.

Respectfully submitted,

/s/
Brian Francolla
Senior Counsel
Special Federal Litigation Division

cc: all counsel for plaintiff

1

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
 2
 3   - - - - - - - - - - - - - - - - X
                                  :    14-CV-02326
 4   ANDREW SMALLS,
                                  :
 5
 6                 Plaintiff,:
 7                                :
         v.                            U.S. Courthouse
 8                                     Brooklyn, New York
     CITY OF NEW YORK,
 9                                :
10
11                 Defendant.  :
12                                     May 13, 2019
                                       9:30 o'clock a.m.
13                                :
14   - - - - - - - - - - - - - - - - X
15                TRANSCRIPT OF TRIAL
              BEFORE THE HONORABLE CAROL B. AMON
16            UNITED STATES DISTRICT JUDGE and a jury
17   APPEARANCES:
18
19   For the Plaintiff:       JON NORINSBERG, ESQ.
                              JOHN MEEHAN, ESQ.
20
21   For the Defendant:       ELISSA FUDIM, ACC
                              BRIAN FRANCOLLA, ACC
22
23   Court Reporter:          Anthony M. Mancuso
                              (718) 260-2419
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by CAT.
```

2

```
 1        (Jury selection recorded, not transcribed.)
 2        (In open court; jury not present.)
 3        MR. NORINSBERG:  Jon Norinsberg on behalf of
 4   plaintiff.
 5        MS. JOSEPH:  Bennitta on behalf of plaintiff.
 6        MR. MEEHAN:  John Meehan on behalf of plaintiff.
 7        THE COURT:  That's Mr. Smalls.
 8        MR. SMALLS:  Yes, your Honor.
 9        MS. FUDIM:  Good afternoon, Elissa Fudim.
10        MR. FRANCOLLA:  Brian Francolla on behalf of the
11   defendants Collins and Teta.
12        THE COURT:  All right.  I understand we have
13   completed jury selection, is that correct?
14        MR. NORINSBERG:  Yes, your Honor.
15        THE COURT:  Is the jury satisfactory to the
16   plaintiff?
17        MR. NORINSBERG:  Yes, it is.
18        THE COURT:  And to the defendant?
19        MS. FUDIM:  Yes, your Honor.
20        THE COURT:  What I am going to do right now is bring
21   the jury out, swear them in and send them out for lunch.  They
22   have had a long morning and I have a couple of things that I
23   will discuss with you before you go to lunch:  I'll ask in
24   front of the jury if the jury is satisfactory to each of you.
25        (Jury present.)
```

3

```
 1        THE COURT:  Good afternoon, ladies and gentlemen.
 2   I'm Judge Amon.  I will be presiding over the trial.  Before I
 3   excuse you for the luncheon recess I'm going to have my
 4   courtroom deputy swear you in as jurors.  First let me ask is
 5   the jury satisfactory to the plaintiff?
 6        MR. NORINSBERG:  Yes, your Honor.
 7        THE COURT:  And to the defendants?
 8        MS. FUDIM:  Yes, your Honor.
 9        THE COURT:  If you'll swear the jury in, please.
10        (A jury of six and two alternates were duly sworn.)
11        THE COURT:  Ms. Holley, are you going to talk to
12   them for a while?
13        THE CLERK:  Yes, your Honor.
14        THE COURT:  Ladies and gentlemen, I'm going to send
15   you back to the jury room.  Ms. Holley will give you a few
16   instructions about how to conduct yourself.  When we return
17   after the luncheon recess I'll give you some introductory
18   instructions on how the trial will proceed and then we'll
19   begin.  So you are excused to talk to Ms. Holley for a while
20   and to go to lunch.  We will resume at ten of two.  Be back in
21   the jury room by ten of two.  See you then.
22        (Jury excused.)
23        THE COURT:  I just have a couple of things I wanted
24   to talk about before we begin the trial.  Ms. Fudim, was it
25   your intention to raise in your opening statement in any way
```

4

```
 1   the statement made by plaintiff's lawyer that he possessed the
 2   gun?
 3        MS. FUDIM:  My colleague Mr. Francolla will answer.
 4        MR. FRANCOLLA:  Yes, your Honor.
 5        THE COURT:  What do you intend to say about it?
 6        MR. FRANCOLLA:  Essentially that the plaintiff
 7   through his attorney represented that he was in possession of
 8   the weapon and discarded it while in the midst of a chase from
 9   police.
10        THE COURT:  You're not going to go into the context
11   of what kind of proceeding it was or anything else?
12        MR. FRANCOLLA:  The way I had it phrased, just
13   generally in the criminal proceeding to make it clear that it
14   was a different proceeding than what we're here for, but not
15   suppression or anything.
16        THE COURT:  Mr. Norinsberg, we had discussed at one
17   point -- I found this was admissible as an attorney admission.
18   At one point there had been some suggestion about just
19   cross-examining defendant about -- limiting it to it was a
20   prior proceeding and not getting involved with the fact that
21   it was a suppression hearing.  Perhaps Mr. Meehan was the
22   person who was here for that discussion.  I'll consider that
23   application.  The only problem I have with that, if you call
24   Mr. Maltz I believe it was, isn't it going to come out exactly
25   the nature of the proceeding?  I mean I wonder how we really
```

1  or practically are going to eliminate the context in which the
2  statement was made.
3      MR. NORINSBERG:  I do understand the court's
4  concern.  I believe Mr. Maltz could testify it was just a
5  pretrial proceeding in the criminal case and this issue came
6  up in that context without going into the word suppression and
7  that whole concept what that opens the door to.  I do believe
8  there's a way to do it on our end.  We wouldn't be going into
9  further contexts about the need for that proceeding.
10     THE COURT:  Well, do the defendants want to be
11 heard?
12     MS. FUDIM:  I think everything salient that we have
13 to say about it we put in our papers.
14     THE COURT:  At this point I'm inclined to direct the
15 defendants to cross-examine defendant about isn't it a fact
16 that in a prior proceeding your attorney on your behalf made
17 this statement and not get into the confusing element about
18 the suppression hearing and all of that.
19         I know you had said that you wanted to cross-examine
20 about when it was in his interest in the suppression hearing
21 he did this but when it came to another proceeding he didn't
22 do that.  Subjectively, that might be true.  It's not clear
23 the court -- I've done some research on this -- that in order
24 to get a suppression hearing he had to claim he had the gun.
25 Because I think the suppression was all based on what the

Anthony M. Mancuso, CSR    Official Court Reporter

1  police officer's account itself was.  Where there is not a
2  search warrant it is generally the government's burden to
3  prove that there was a lawful seizure in the absence of a
4  search warrant and there is at least one Appellate Division
5  case that says that where the defendant is relying solely on
6  the police officer's account of what happened to move to
7  suppress, that he doesn't have to file an affidavit.
8      Now, I know he did and I know you can -- that
9  subjectively he may have thought he had to.  It's possible
10 that something that Mr. Maltz said could raise this issue.  I
11 think at this point in time I would be inclined, in view of
12 the cross-examination of the defendant, to limit it to isn't
13 it a fact that your attorney in a prior proceeding claims --
14 whatever you want to say about it.  This whole idea of whether
15 he had to make that statement, subjectively he may have
16 thought he had to make it.  I'm not sure he did.  It's just
17 such a mess.
18     MS. FUDIM:  I think, your Honor, it's two points.
19 One is that I don't know that we would be crossing him -- I
20 would say we wouldn't be crossing him on whether he had to
21 make it or not.  I would imagine that Mr. Smalls probably
22 doesn't know the answer to that question in the first place.
23 I think it's more relevant with respect to the instruction
24 just to be given to the jury about --
25     THE COURT:  All right.  With regard to that, I think

Anthony M. Mancuso, CSR    Official Court Reporter

1  that what I had thought about saying was that plaintiff's
2  state court conviction was reversed by a higher court called
3  the Appellate Division based on a finding that the police
4  acted unlawfully in seizing the gun.  That decision did not
5  resolve or even address the issue before you, namely, whether
6  plaintiff has shown by a preponderance of the evidence that
7  the defendant officers fabricated that he possessed the gun
8  and I think that takes care of it.
9      MS. FUDIM:  If I can speak stream of consciousness,
10 your Honor?  I'm just not -- is that completely accurate, a
11 finding that they acted illegally in seizing the gun?
12     THE COURT:  I can say based on the finding that they
13 unlawfully seized the gun as opposed to acted, because of the
14 chase.  I think that's probably inaccurate.  I'll type it up
15 and show it to you.  Is there anything else we need to address
16 before opening statements?
17     MR. NORINSBERG:  Just to close out the point the
18 court had made, we do have case law that does make clear from
19 the court of the appeals and Appellate Division that you can
20 in fact challenge the legality of a search based solely on
21 what the police officers say.  We do have copies of the cases
22 for the court and counsel.  It's Court of Appeals in People v.
23 --
24     THE COURT:  Is there some reason you have not
25 shared them before now?

Anthony M. Mancuso, CSR    Official Court Reporter

1      MR. NORINSBERG:  I literally found the case law
2  yesterday.
3      THE COURT:  People vs. Sutton is one case?
4      MR. NORINSBERG:  That is correct.  People vs. Sutton,
5  a first department case.  People vs. Burden.
6      THE COURT:  I don't think it's an issue.  The
7  defendants have said they are not going to get into that issue
8  with the lawyers.  I'll type up this and show it to the
9  parties.
10     MR. NORINSBERG:  Just in terms of logistics, if we
11 could have maybe a few moments access to the court equipment
12 to make sure everything works with the Elmo and the screen.
13     THE COURT:  Sure.
14     MR. NORINSBERG:  And the audio.
15     MR. FRANCOLLA:  Your Honor, just to tie up the issue
16 of what we would go into on cross-examination regarding the
17 prior statement, I think we did envision going into the
18 statements that are contained in the affidavit, the factual
19 statements.  Some of those statements do also include some of
20 the legal language.  I don't think we intended on making any
21 arguments about the standing issue per se.  I know for example
22 there's one factual assertion that includes that, that that's
23 part of the statement.  Would we be permitted to use the
24 contents of the statement without going further into what
25 those terms mean?

Anthony M. Mancuso, CSR    Official Court Reporter

1    THE COURT:  Yes.  You can use the contents of the
2    statements.  That's okay.
3    MR. MEEHAN:  When you say the content of the
4    statement, are you referring to the physical affirmation that
5    was filed?
6    THE COURT:  He's talking about what was said in the
7    affidavit that he possessed -- I don't know if there is a way
8    to --
9    MR. MEEHAN:  I guess our only concern would be
10   putting it in as an exhibit, a memorandum of law.
11   MR. FRANCOLLA:  Your Honor, I envisioned asking --
12   establishing that those statements are in there.  I do
13   envision asking the plaintiff about that.
14   THE COURT:  Which statements are we referring to,
15   specifically, so we know what we're talking about?
16   (Pause.)
17   THE COURT:  Are you talking about the statement the
18   defendant maintains he has standing to move to this hearing
19   since the defendant felt compelled to drop the weapon as a
20   result of the unlawful conduct -- of the unlawful action
21   conducted by the police.
22   MR. FRANCOLLA:  Yes, your Honor.  It goes on.
23   THE COURT:  The defendant maintains he did not
24   voluntarily abandoned the gun but his act of throwing the gun
25   to the ground was a spontaneous reaction to the sudden and

1    unexpected pursuit of the officers?
2    MR. FRANCOLLA:  Yes, your Honor.  If I recall, I
3    think there's one other statement just past that regarding --
4    THE COURT:  The defendant maintains that he is
5    entitled to a suppression hearing to raise issues that the
6    police seized him after an extended chase inside the building.
7    MR. FRANCOLLA:  Yes.  The troubling aspect of the
8    statements I don't care about.  It's more the factual
9    components to them.  I'm open to, however -- to do that.  I
10   don't need to introduce the entire document.  I could
11   introduce that page if I had to.  I envisioned asking the
12   plaintiff about it.  I would imagine he's going to need it in
13   front of him to answer questions.  So I'm open to even if it's
14   just a redaction of everything.
15   THE COURT:  You have what you admitted into evidence
16   and what questions you ask him?
17   MR. FRANCOLLA:  Yes.  The concern would be if he
18   doesn't know what's in it.
19   THE COURT:  If he doesn't know what's in it, that's
20   the end of it.  If he doesn't, you might be able to bring out
21   from Mr. Maltz that the statements were made.  But if he says
22   I don't know what's in it -- I mean you can introduce these
23   portions of the document in your case, if you want to, even if
24   he denies, that he doesn't know what's in it.
25   MR. FRANCOLLA:  We would be able to do that without

1    a witness at that point.
2    THE COURT:  Mr. Maltz is going to testify, isn't he?
3    MR. NORINSBERG:  He's scheduled right now.  It does
4    depends on how this issue plays out.  He may or may not come
5    in.
6    MR. FRANCOLLA:  Since these statements are made by
7    an agent acting in that scope, even if he doesn't know, we can
8    ask him about it.  He's free to say he doesn't know, I never
9    said that.
10   THE COURT:  Is there going to be denial, any claim
11   of foundation that would -- that your argument would preclude
12   the defendants from admitting portions of this document into
13   evidence?  Do they need Mr. Maltz here to do that because if
14   you do then they are entitled to have him here to do that, if
15   that's going to be your position.
16   MR. NORINSBERG:  I don't think that's going to be
17   the position.  The question is going to be whether they raised
18   issues that require a witness to come in to testify or not,
19   the admissibility of those particular statements versus the
20   admissibility of the entire document, which is something we
21   might want in context.  That's what is on the table, not
22   talking about authenticating.
23   THE COURT:  You are not saying that the government
24   can't introduce these statements -- I'm sorry -- the
25   defendants -- because there's no foundation for this document?

1    MR. NORINSBERG:  We won't make that objection.
2    THE COURT:  Okay.  Then what portion of this
3    document are you going to introduce -- a redacted portion of
4    the document?
5    MR. FRANCOLLA:  I can do that.
6    THE COURT:  Are the plaintiffs seeking that the
7    document be redacted or not?
8    MR. NORINSBERG:  I think we would consider and we
9    really want to confer in more detail, but consider the whole
10   document going in subject to redaction.
11   THE COURT:  Okay.
12   MR. FRANCOLLA:  I think -- plaintiffs can correct me
13   if I'm wrong -- I don't think the expectation is that
14   Mr. Smalls will testify to that, in which case we'll have an
15   opportunity to work out the language and make clear with the
16   court if there's any disagreement.
17   THE COURT:  That's not your first witness?
18   MR. NORINSBERG:  Counsel is correct.
19   THE COURT:  Is there anything further we need to
20   address before we begin?  I'll give the opening instructions
21   and then we'll go to the plaintiff's opening statement and
22   defendant's opening statement.
23   Okay.  I'll see you at ten of two.
24   (Lunch recess taken.)
25

13

```
1          AFTERNOON SESSION
2          (In open court; jury not present.)
3          THE COURT:  All right.  I'll ask Ms. Holley
4  to bring the jury in.
5          Mr. Norinsberg, are you doing the opening?
6          MR. NORINSBERG:  Yes, your Honor.
7          THE COURT:  Mr. Francolla, are you opening?
8          MR. FRANCOLLA:  I am, your Honor.
9          (Jury present.)
10         THE COURT:  All right.  Everyone please be
11 seated.  As I mentioned before, ladies and gentlemen,
12 I'm Judge Amon and I'll be presiding over the trial of
13 the civil action which you heard something about during
14 the course of jury selection.  As I'm sure you were
15 told, Andrew Smalls is the plaintiff.  In this action it
16 is the plaintiff who sues to recover for what he
17 contends is a violation of his constitutional right to a
18 fair trial.
19         The parties against whom the suit is brought
20 are called the defendants.  In this action the
21 defendants are Police Officers Richard Collins and David
22 Teta.
23         What I want to do to begin with is to give
24 you some opening instructions and the most important
25 instruction I have to give is that you are not to
```

14

```
1  discuss the case with anyone.  This includes discussing
2  the case with others in person, in writing, by phone,
3  electronic means, text messaging, e-mail, Twitter,
4  FaceBook, Instagram, SnapChat, blogging, chat rooms,
5  websites, any of the ways that people communicate with
6  each other.  You are not to discuss the case until you
7  retire to deliberate.  You must not discuss the case
8  with anyone, even your fellow jurors.  And the reason
9  for that is it is important that you hear all of the
10 evidence, the summations and my instructions on the law
11 before you begin to start discussing the case and the
12 start deliberating.
13         Now, if you have to tell someone such as
14 your spouse or significant other that you are serving on
15 a jury and approximately how long the case is going to
16 last, that of course is fine.  Inevitably somebody may
17 ask you, well, tell me what the case is about.  Please
18 tell them that you are under instructions from the court
19 not to discuss the case.  The reason for this I think is
20 obvious to all of you.  We want you to decide the case
21 based solely on the evidence presented in the courtroom
22 and not on the basis of what anyone else has heard or
23 seen or thinks about the case.  If you are asked or
24 approached in any way about your jury service or
25 anything else about the case, you can should respond
```

15

```
1  that you have been ordered by the judge not to discuss
2  it.  If someone does contact you about the case you need
3  to report that to the court as soon as possible.  But do
4  not discuss that fact with any of your fellow jurors
5  because if something were to happen that would affect
6  the ability of one juror to serve fairly and
7  impartially, we don't want to have that spread to the
8  rest of the jurors.
9          Along these same lines you should not try to
10 access any information about the case or do any
11 independent research on any issues that arise from the
12 case from any source.  You should not consult
13 dictionaries or reference books or anything on the
14 internet or Google about the parties.  I know it's a
15 temptation for people to do that.  Please, don't do it.
16 You as jurors must decide the case based solely on the
17 evidence presented within the four walls of this
18 courtroom and it's extremely important that you make
19 your determination in this case based only on the
20 evidence that you hear in this courtroom and the
21 instructions that I give you on the law and not anything
22 else.
23         Let me tell you a bit about how the trial
24 will proceed.  The lawyers are going to make opening
25 statements.  In the opening statements the attorneys
```

16

```
1  will give you an overview of the case and what they
2  think the evidence will show.  You should understand
3  that what is said in these opening statements is not
4  itself evidence.  The evidence will come from the
5  witness stand and any exhibits that are received in
6  evidence.  The lawyers are just going to review with you
7  what they think the evidence will show.  Again, remember
8  that these opening statements don't themselves
9  constitute evidence.
10         After the opening statements the plaintiff
11 will proceed with the introduction of evidence.  After
12 the plaintiff has completed the introduction of all of
13 his evidence, the defendant may present witnesses and
14 exhibits to establish his defense.  If the defendant
15 does present evidence, plaintiff is then permitted, if
16 he wishes, to offer additional evidence to rebut the
17 defendant's evidence.  Each witness by whomever is
18 called is first examined by the party who called them to
19 testify and then the opposing party is permitted to
20 cross-examine that witness.
21         The evidence in this case will consist of
22 the following:  The sworn testimony of any witness no
23 matter who called the witness.  All exhibits received
24 into evidence regardless of who may have introduced the
25 exhibit.  Facts that the parties have stipulated to.
```

1  It's possible that depositions may also be received into
2  evidence.  Depositions are sworn testimony, with the
3  lawyers for each side being entitled to ask questions.
4  Deposition testimony may be accepted by you subject to
5  the same instructions that apply to witnesses testifying
6  in open court.  Statements and arguments of the lawyers
7  are not evidence in the case.  A stipulation is an
8  agreement between the parties that certain facts are
9  true.  When lawyers for both sides stipulate or agree to
10 the existence of a fact you must, unless otherwise
11 instructed, accept the stipulation as to the evidence
12 and regard that fact as true.
13         Upon completion of the introduction of
14 evidence the attorneys will make closing statements or
15 summations.  In summing up the attorneys will tell you
16 what they say the evidence has shown, the inferences
17 they believe you should draw from the evidence and what
18 conclusions they believe you should reach.  What the
19 attorneys again -- what they say is not evidence.  The
20 plaintiff sums up first, followed by the defense and
21 then the plaintiff.  Because the plaintiff has the
22 burden of proof, the plaintiff may have the opportunity
23 to make a brief rebuttal.
24         It's your job in this case to determine what
25 the facts are.  It's a very important role that you

1  have.  As judge I don't have any role at all in your
2  determination of the facts.  After summations are
3  concluded I will instruct you as to the applicable law
4  and you will then retire to begin your deliberations.
5  Your function as jurors is to determine what the facts
6  are and apply the rules of law that I give you to the
7  facts as you determine them to be and then the
8  conclusion you reach will be your verdict.  You will
9  determine what the facts are only from the testimony and
10 the exhibits.
11         You are the sole and exclusive judges of the
12 facts.  I do not intend to express any opinion
13 concerning the facts.  If I say anything that gives you
14 the impression that I have some opinion as to the facts,
15 please, disregard it.  On the other hand, you are bound
16 to certain rules of law as I state them.  If you
17 perceive that the law as stated by the lawyers is
18 different from the law as I stated by me, it is my
19 instruction on the law that you have to follow.
20         At times during the trial an attorney may
21 stand up and object to evidence or a question and what
22 they are asking me to do is make a ruling of law on the
23 admissibility of the evidence.  Arguments in connection
24 with objections or motions are sometimes made outside
25 the presence of the jury.  We may go to the sidebar and

1  discuss it.  If I sustain an objection it means that I
2  think the law does not permit the evidence in question
3  and you are to disregard the question asked and you
4  can't speculate about how it might have been answered.
5  You simply have no evidence before you on the subject.
6  If I sustain an objection after an answer is given, I
7  might strike the answer, meaning that you are not to
8  consider it at all in your deliberations.  You are to
9  act as if that answer has never been given.  If I
10 overrule an objection it means that I find the law
11 allows the evidence to come before you.  You should not,
12 however, attach any special weight to the evidence that
13 comes in over objections.  You just consider it together
14 with all the other evidence.
15         Any ruling I make upon such objections or
16 motions would be based on the law.  You may not infer
17 from any ruling or anything I say during the course of
18 the trial that I have any view as to the facts for or
19 against any parties to the lawsuit.  I might ask a
20 question of a witness.  But I do so solely to bring out
21 matters that I think ought to be brought out and not to
22 indicate any opinion to you about the facts or the
23 weight you should give the testimony of that witness.
24 Again you base your verdict only on what you see and
25 hear in the courtroom.  Please, as I mentioned earlier,

1  don't discuss the case among yourselves until all the
2  evidence has been presented, I have instructed you on
3  the law and directed you to begin your deliberations.
4         As sole judges of the facts you must
5  consider which of the witnesses you believe, what
6  portion of the testimony you accept and what weight you
7  attach to it.  The law does not require you to accept
8  all evidence admitted in determining what evidence you
9  will accept.  You must evaluate the testimony of each of
10 the witnesses and determine the weight to give it and
11 there's no magic formula with which to evaluate
12 testimony.  You bring with you all the experience and
13 backgrounds of your lives.  In your everyday affairs you
14 determine for yourselves the reliability or
15 unreliability of statements made to you by others.  The
16 same tests that you use in your every day dealings are
17 the tests that you should apply here:  The interest or
18 lack of interest of any witness in the outcome of the
19 case; the bias or prejudice of a witness, if there is
20 any; the experience, the manner in which the witness
21 gives his or testimony on the stand; the opportunity
22 witness had to observe the facts concerning which he or
23 she testifies; the probability or improbability of the
24 witness' testimony when viewed in light of all the
25 evidence in the case are all items to be taken into your

1  consideration in determining the weight, if any, you
2  will give to a witness' testimony.
3          Finally, let me make plain to you that you
4  cannot have any discussion at all with the attorneys or
5  the parties or witnesses in the case.  By this I mean
6  not only not to talk about the case but not to speak at
7  all even to say hello.  It's very important that we
8  maintain the appearance of propriety and if someone saw
9  a juror talking to one of the parties or one of the
10  lawyers they might think that something improper was
11  being discussed.  So to avoid that possibility don't
12  have any conversation.  I can tell you that the lawyers
13  as officers of the court are particularly sensitive to
14  this.  If you see them downstairs, somewhere in the
15  courthouse, and they turn around and walk the other way,
16  they don't mean to be rude.  They know how important
17  this rule is.  Having qualified this by way of a few
18  opening instructions we will now turn to the opening
19  statements by plaintiff's counsel.
20          MR. NORINSBERG:  Good afternoon, folks:  The
21  case you are about to hear is an important case and is a
22  very disturbing case.  This is a case about two police
23  officers who fabricated evidence and sent an innocent
24  man to jail and it's about two police officers who were
25  rookies, made a mistake and then lied about it.  It's

1  about the consequence of those lies, it's about a young
2  man who was 19 years old at the time who wound up doing
3  two years in prison until eventually his conviction was
4  dismissed and he was released.  That's what this case is
5  about.
6          Now, what happened?  Let me go back in time.
7  This incident took place back in 2006, May 20.  At that
8  time Andrew Smalls was visiting a friend of his, Lindsey
9  Johnson.  He was in Mr. Johnson's apartment for a few
10  hours.  They were watching TV, just hanging out, nothing
11  much going on there.  All of a sudden a big knock on the
12  door, somebody is there.  What's going on?  He wanted to
13  know.  Something is happening.  And it's a man named
14  William Davis.  Comes in and tell Andrew, look, your
15  brothers are getting arrested by the police.  He had two
16  brothers, a brother named Andrew and a brother named
17  Cedric.  They were getting arrested by the police.  So
18  Andrew immediately bolted out of there and wanted to
19  know what exactly is going on, why are his two brothers
20  getting arrested.  So he went downstairs to investigate
21  to see what's going on.  Sure enough his brothers are in
22  a police car, the two brothers are there and he didn't
23  know it at the time, they were being charged with
24  possession of a gun and supposedly had led the police on
25  a chase and that why they were there.  Anyway, Andrew

1  doesn't know any of this.  He sees his two brothers in a
2  police car.  He's upset.  He starts jawing with the
3  officers, starts questioning them, why are these two
4  guys getting arrested, what's going on.  The officers
5  were not too happy about it.  They told him get the fuck
6  out of here, mind your own business.  He's going at it a
7  little bit.  He's still not certain.  He basically at
8  some point with the officers one of them on the set just
9  grabs him and throws him against a brick wall, putting a
10  mark on his eye, winding up bleeding and winding up
11  getting arrested.  We're not here about that.  That's
12  not what the case is about.  It's what happened
13  afterwards.  As far as Andrew knows, he's taken into
14  custody.  Whatever is happening is going to get
15  straightened out, not a big deal.  Obviously he's
16  interested in finding out what's going on with his
17  brothers.  What happens?  At the precinct, you know,
18  three of the Smalls brothers are at the precinct and a
19  fourth individual, Jerome Nelson, but you have three
20  Smalls brothers at the precinct and what happens at some
21  point while they are in the precinct the officers, two
22  rookie officers, one is a month out of the academy, the
23  other one is a few months out, the first gun arrest,
24  they messed things up.  They start getting confused.
25  You're going to see not because we're saying it, the

1  paperwork documented at the time will show you how they
2  got the brothers mixed up.  They got the charges mixed
3  up and the charges mixed up then and there at the time.
4          At some point these officers are back in the
5  precinct.  They are not sure which Smalls brother is
6  really the one who was involved and which one was not.
7  So they had to make a choice.  And the choice is simply
8  this, ladies and gentlemen:  The choice is do they tell
9  the truth to their supervisor and admit that they simply
10  made a mistake, they didn't keep track of who is who,
11  they are not sure which brother did what and risk having
12  these gun charges thrown out completely or do they come
13  up with a story, a story that somehow can now work the
14  third brother into this whole event and justify the
15  charges that were against him as well.
16          The reason we're here today, ladies and
17  gentlemen, is these two defendants chose the path of
18  dishonesty and deception.  That's why we are here today.
19  Wait until you hear the story they came up with.  I want
20  to tell you right now the theory has changed many, many
21  times, many different facts have changed, so many
22  inconsistencies, but the essence of the story that you
23  are going to hear is that these two officers, the
24  defendants in this case, were doing patrol at Hammel
25  houses and they were in a building called 8110, the rec

1  room.  They heard a gunshot.  They went out and they saw
2  four men walking along, originally they said two but
3  change to four.
4      Okay.  There's four men walking along and
5  they started to follow the men and Andrew Smalls is one
6  of these people.  They go into the building 8105 and the
7  men start running into this building and a number of
8  things happen on the way up the stairwell, which we'll
9  get to later on.  But the essence of the story of why
10  we're here is Officer Collins says, while he's looking
11  up at the 7th floor landing, all of a sudden two of the
12  brothers involved, Andrew and his brother Ronnie, Andrew
13  is running and Andrew stops and takes a gun out right in
14  the plain view of the officer and basically hands it
15  over to his brother while they are trying to get away
16  supposedly and to the roof and this officer swears
17  that's what happened.
18      Then they go up onto the roof and this
19  officer swears that he's able to arrest Ronnie and
20  Andrew on the roof and this actually -- he saw Ronnie on
21  the stairwell rooftop, which you'll see in the pictures,
22  and then he was trying to get up to Ronnie and all of a
23  sudden he walked into him.  He was going to use what he
24  thought was an a black box he sees on the ground to get
25  up and that black box turned out to be Andrew Smalls.

1  He was about to step on this human being that he thinks
2  is a box and that's how he realized Andrew is there and
3  that's how Andrew gets arrested in this case.  That's
4  the story in a nutshell.
5      Here is what the proof is going to show:
6  The proof in this case is going to show that's an
7  outright complete fabrication.  We're going to prove it
8  to you in three different ways.  One, you're going to
9  hear from eyewitness testimony.  Two, you're going to
10  hear about forensic evidence or the complete lack of
11  evidence connecting Andrew to this gun at all.  And
12  we're also going to talk about the officers themselves.
13  You're going to hear the testimony they gave, the
14  changing stories, and that's a third way you're going to
15  learn about the lies that have taken place in this case.
16      Let's start first with the eyewitnesses.
17  You are going to learn, ladies and gentlemen, there are
18  multiple eyewitnesses.  They are under subpoena.  We are
19  getting them to show up in court.  They fill in the gaps
20  of what happened that night.  The upshot of what these
21  witnesses will testify to is was Ronnie and Cedric who
22  were running from the police.  Ronnie and Cedric were
23  the two brothers who entered into the building.  They
24  were the ones who were arrested and brought down.  They
25  were the ones who were brought in the car.  You'll hear

1  from an eyewitness Lindsey Johnson who will testify he
2  was with Andrew at the moment the knock came on the
3  door.  The proof will show Andrew couldn't possibly have
4  been involved with this.  It's not unlikely.  It's
5  impossible.  You are going to learn, ladies and
6  gentlemen, that these pieces together clearly will show
7  that the two brothers who were involved with this were
8  Ronnie and Cedric and not Andrew.  Yes.  That's what the
9  eyewitness testimony will show.
10      Now, as to the forensic evidence, here is
11  what you are going to learn, ladies and gentlemen:
12  There's not one shred, not one shred of forensic
13  evidence to tie Andrew to this gun.  There's no
14  fingerprints.  There's no DNA.  There's no gun powder
15  residue.  I'll talk a little bit about each one and what
16  I expect the proof to show.  With respect to the
17  fingerprints you'll learn they did remove five prints
18  from this gun, at least two of which were suitable for
19  use.  Andrew's prints are nowhere on that gun.  They are
20  not on the trigger, not on barrel, they are not on the
21  grip, they are nowhere.
22      You are also going to see -- and you'll see
23  a photo of the gun -- there's something called a
24  magazine, which holds the bullets.  As you put the
25  magazine into the gun, the bottom of the gun, you are

1  going to see that comes out it holds six bullets.  His
2  fingerprints are nowhere on that magazine.  You're going
3  to learn there's seven bullets altogether that can be
4  loaded into this particular gun.  His fingerprints are
5  nowhere on these bullets either.  There's zero
6  fingerprint evidence connecting Andrew to this.  You are
7  also going to learn, ladies and gentlemen, there's no
8  DNA evidence.  Supposedly remember the officer sees
9  Andrew running and he's going up a flight of stairs,
10  presumably sweating and transferring it to the gun, not
11  a shred of DNA evidence connecting him to this.
12      You'll also hear in this case there's not a
13  shred of gunpowder residue.  You'll learn, ladies and
14  gentlemen, when you fire a weapon there's gunpowder
15  residue that comes out that can be detected on a
16  person's hands or clothing.  When these tests were done
17  we don't know.  We know one thing, there's zero evidence
18  of it connecting to Andrew.  You put it all together, no
19  fingerprint evidence, no DNA, no gunpowder residue and
20  you have multiple eyewitnesses saying that he is not the
21  person that was involved with the interaction with the
22  police.
23      Then we get to the third part.  What I think
24  the most powerful compelling evidence you are going to
25  hear about how these officers have lied will come out

1  through their own testimony. It will come through their
2  own testimony and records. And you are going to learn,
3  ladies and gentlemen, that this story has changed over
4  and over and over again. And some of you might say,
5  well, it was a long time ago. No. The proof is going
6  to show the story started changing literally that night.
7  You'll see documents that are crossed out. You'll see
8  changes. You'll see each time there was an opportunity
9  to tell the story it changed again and again. Key facts
10  from the pretrial hearings to the grand jury to the
11  trial, to the depositions. Key facts.

12       You're going to learn, ladies and gentlemen,
13  in particular with Officer Collins, there's certain
14  things that he's changed facts where it's not simply a
15  variation of what he said before. It's the complete
16  opposite. It was one thing in the pretrial proceeding
17  or in a sworn document and then he said something else
18  in a police record and then changed it at a later time.

19       Let me just give you a sneak preview of some
20  of the things I expect you are going to hear. You'll
21  learn Officer Collins says his very first accounting of
22  this incident is there are two people running after he
23  heard the gunshot. The two people, yes, that makes
24  sense. And it was Ronnie and Cedric running. But
25  anyway all of a sudden that changes from two. You'll

1  see it went from two people then he crossed that out and
2  changed it to four people were walking, right there in
3  the paperwork. Then he goes to the grand jury and
4  wouldn't you know it then becomes five people. There's
5  a fifth person never mentioned in any of the police
6  paperwork. There's now a woman who was supposedly
7  acting as a lookout with this group. We go from two to
8  four to five.

9       And that's just the tip of the iceberg.
10  You're going to see with Andrew the story about Andrew,
11  remember what we just covered before, he saw Andrew on
12  the stairs running with a gun and handing it over to his
13  brother. Well, that was one version and another version
14  come to think of it, actually, no, what I saw was
15  Ronnie, the brother pull his gun out. Ronnie was the
16  one holding it and Ronnie handed it to Andrew. That's
17  what I saw. Same thing. One version, the magazine, I
18  saw the magazine drop when Andrew was transferring the
19  gun. Another version, actually, come to think of it,
20  no, it came out when Ronnie was doing it. Another
21  version, he talked about how he got to the roof.
22  Remember you get to the top of this roof -- there's
23  seven floors -- then when you get to the top there's
24  another elevated structure ten feet high that covers the
25  stairwell.

1       Officer Collins says in one version, I'm the
2  one that found the gun. What I did was I went up to
3  that ten foot structure, I got on top of the structure
4  and found the gun next to Ronnie. Another version,
5  actually, come to think of it, no, I never did go on
6  that structure. I didn't get to the top of it. I
7  didn't see the gun. Another version, where is the gun
8  found? One version, I found it right next to Ronnie on
9  top of the structure. It was a foot or two away.
10  Another version, come to think of it, it was not up
11  there, it was down on the ground a foot away from
12  Andrew, that's where I found it.

13       Another story, I'm the one who arrested
14  Andrew. It was me. I'm the one who got him and subdued
15  him. Another version, actually, no, come to think of
16  it, it was not me, my partner is the one who arrested
17  him and subdued him. One story after another, one
18  change after another. The proof, ladies and gentlemen,
19  will be what happened. This officer has told so many
20  different stories about what happened, literally, can't
21  keep anything straight any more. He has one story after
22  another, has changed completely opposite and the proof
23  will be for a simple reason, he's lying. He has lied
24  repeatedly trying to justify the only story of getting
25  Andrew involved with this.

1       You'll learn also something vital that it's
2  not just PO Collins, PO Teta has very serious
3  credibility issues also. You'll learn these two
4  officers also contradicted each other on key things.
5  They can't seem to make up their minds. Officer
6  Collins, I'm the one who found the gun. Officer Teta,
7  actually, no, you didn't, it was someone else who found
8  it not on the stairwell roof, up way above on another
9  structure on the elevator roof. Officer Collins, I'm
10  the one who found the magazine. Officer Teta, no, you
11  weren't. Someone else found the magazine. Officer
12  Collins, I'm the one who made the arrest. Officer Teta,
13  you know, I don't think so. But I don't remember
14  exactly who made the arrest.

15       You're going to learn these things, these
16  stories, were told at the time. It's not because it's
17  now thirteen years later. These inconsistencies
18  happened then and there. The most glaring thing you are
19  going to see a real clear example where you can actually
20  visually see the lies in writing. Remember I mentioned
21  a fourth person arrested, a Jerome Nelson. The police
22  story was Jerome Nelson was part of this group of four
23  men. Officer Collins, according to him, he saw this
24  with his own eyes. Jerome Nelson is running up on the
25  third floor and turns around and decides to block the

1  police officers from coming up the stairs.  Officer Teta
2  says actually, actually, no, that never happened.  This
3  is a sworn document that Officer Collins swore to that
4  Officer Teta says Jerome Nelson never blocked me.
5  Jerome Nelson never tried to stop me from doing the
6  arrest.  I was not trying to arrest him.  Someone else
7  was arguing with him.  You will see with your own eyes
8  an example of a sworn document that's completely false,
9  under oath, that was submitted to the court in
10 connection with this case.  Not only will you see in
11 this trial inconsistency and lies and changes in stories
12 between the officers, you are going to see it in the
13 police paperwork.  The officers claim one thing, then
14 something is completely contrary in their own paperwork.
15      For example, the officers claim they
16 arrested Andrew on the roof.  That's their claim, right.
17 Remember the black box.  They arrested Andrew on the
18 roof.  You're going to learn that's not what their
19 paperwork says.  You are going to see a document which
20 says in plain English, black and white, Andrew was not
21 arrested on the roof.  The two people who were arrested
22 on the roof according to the police's own documents were
23 his two brothers.  Ronnie, his paperwork says arrested
24 on the roof.  Cedric, his paperwork says arrested on the
25 roof.  Not Andrew's paperwork.  His paperwork is just

1  somewhere in the building downstairs, which is where he
2  really was arrested.
3      You're going to learn also Officer Collins,
4  remember I mentioned that, he thought Andrew was a black
5  box.  He was about to step on him.  He thought that was
6  because he was wearing all black.  No.  You're going to
7  learn he was not wearing all black.  He was wearing a
8  gray hoodie.  You're going to see a mug shot photo of a
9  gray hoodie.  Another photograph taken, gray hoodie.
10 Prison movement slip, gray hoodie.  He was not wearing
11 black.  Just a complete fabrication.  He was not wearing
12 black.  The one person who was wearing black, in his mug
13 shot photo, is Cedric.
14      The proof will be in this case the officers
15 mixed these two up is what happened.  You're going to
16 see also once they realized the mix up, there's a card,
17 a reference that describes Andrew's clothing.  What did
18 they do when they realized they messed up?  They cross
19 out the gray hoodie and they write over a new version
20 black jacket.  Just another blatant fabrication that's
21 going to be part of this case.
22      Another thing in the police records, you
23 will learn the police say, oh, when we brought Andrew in
24 we charged him right away with gun possession.  No.
25 You'll learn that's not what happened.  You'll learn

1  that there's actually a document on his mug shot which
2  shows that his actual top charge at that point was
3  resisting arrest, not gun possession, which you will
4  learn in this trial is consistent with what Andrew said
5  all along.  He was jawing with the cops and got roped
6  into this and taken in.  That's what it says, resisting
7  arrest, top charge.  The police come to court telling
8  you one thing.  The documents that were prepared that
9  night will tell you a different story altogether.
10      So you put it all together, you have the
11 stories from Officer Collins saying one thing, directly
12 contradicting himself, you have the two officers
13 completely contradicting each other, you have the two
14 officers saying things that their own records completely
15 contradict, you put it all together, the proof will be
16 the reason this is happening is they are lying about it.
17 They are simply not telling the truth.
18      Now, what do the officer have to say?  We're
19 going to find out very soon.  We're going to call these
20 officers right away.  We're going to call Officer
21 Collins, the first officer in this case.  We're not
22 going to waste time.  We're going to get right down to
23 business.  We're going to call him to the stand and if
24 you imagine this incident on a video, which it's not, if
25 you imagine that it were, we're going to go frame by

1  frame by frame through this story he has told and
2  together we're going to dissect the story and expose
3  this man's dishonesty and the lies that have been told.
4  We're going to expose illogical claims and impossible
5  claims.  But for those of you who are expecting a
6  dramatic moment in court, where the officers take the
7  stand and at one moment in time say, yes, we admit it,
8  it's true, we made a mistake, Andrew wasn't part of the
9  group, we admit that.  For those of you who are
10 expecting that, I can tell you right now that will never
11 happen.  I expect these officers to take the stand,
12 swear under oath to tell the truth and look you directly
13 in the eye and tell you the same lies they have told
14 throughout these proceedings.
15      Your job will not be easy.  It will be hard.
16 I can tell you when we get to the closing arguments in
17 this case we're going to tie up all the loose ends.
18 There will be no doubt about what happened in this case
19 and how Andrew Smalls wound up spending two years in
20 jail.
21      A few other things I wanted to address with
22 you.  Another important piece of evidence you are going
23 to hear, basically, an audio recording of events in real
24 time, what was actually happening as the officers are
25 posting and you're going to realize the importance of

37

1  that audio.  Even though it's ten minutes long and there
2  are long gaps where you think it's over, it's not,
3  there's a little more, the importance of it.  This whole
4  story about the officers chasing four people is nowhere
5  to be found on that audio.  The only thing that has been
6  described repeatedly, one man stopped on the sixth
7  floor, Cedric.  One man who is on the roof, a man with a
8  gun.  That's Ronnie.  That's what you are going to hear.
9  One man on the roof with a gun.  One man stopped on the
10  sixth floor and that man who is on the sixth floor
11  Cedric is brought to the seventh floor and brought up to
12  the roof to join his other brother.  Those two brothers
13  are the ones that are actually involved in the chase
14  with the police and the ones that were actually arrested
15  and should have been, Ronnie and Cedric.
16          You are going to also hear not just about
17  what is in this case and evidence that I just described,
18  another thing that's going to be important is what you
19  are not going to hear.  You are not going to hear, you
20  are not going to learn there were at least seven other
21  police on the roof with Officer Collins, according to
22  his own testimony, seven.  Not one officer is going to
23  come to this courtroom and back up the claim that he's
24  making.  You will not hear one of those officers take
25  that stand and say it's true, Andrew was on the roof.

38

1  Not one of them will tell you it's true Andrew was the
2  one that had the gun next to him.  Not one of those
3  other officers will back that up.  Not only will you not
4  hear from those officers, you're going to learn there's
5  one other key piece of evidence that's missing from the
6  case, there's one piece of evidence that's missing,
7  you'll learn all of the mug shots have a frontal face
8  view where you can see clearly who is who except for one
9  person, Cedric.
10          MR. FRANCOLLA:  Objection, your Honor.
11          THE COURT:  Overruled.  We'll take it up at
12  the sidebar.
13          MR. NORINSBERG:  You'll learn, ladies and
14  gentlemen, in this case, that there is no picture
15  somehow of Cedric that you could see side by side,
16  Cedric and Andrew at this time to compare.  Where is it?
17  We'll ask the officers.  No one seemed to know.  So
18  you'll learn and you'll put it together how important
19  this is and the key piece of evidence showing how these
20  officers in this case mixed up the brothers and then
21  lost Cedric's picture.
22          Now, I'm almost finished and I expect you're
23  going to be hearing from defense counsel soon and I
24  expect among other things you are going to hear about
25  some statement that his lawyer made in some papers back

39

1  in 2006.  The only thing I can tell you on that, ladies
2  and gentlemen, Andrew Smalls himself, not his lawyer,
3  Andrew Smalls himself has repeatedly, consistently
4  always from day one protested his innocence, that he
5  didn't have a gun, that he was not involved with this.
6  He has never wavered from that from day one.  You'll
7  draw whatever conclusions you want from that.
8          I expect also that you are going to hear
9  things about Andrew, attacking his character, his
10  credibility.  No one is here saying Andrew is a saint.
11  We are not saying that.  He's had a run-in with the
12  criminal justice system.  We are not saying otherwise.
13  But what we are saying in this particular case he wound
14  up doing two years in time for not any good reason
15  because these officers put him there through their lies.
16          The bottom line is, ladies and gentlemen,
17  this man never should have been charged with gun
18  possession.  These were fabricated charges.  They mixed
19  up the brothers.  And they refused to own up to their
20  mistakes.  As a result this man spent two years in jail.
21  It's not any one thing that you will hear in this trial.
22  It's the total of everything, the false police records,
23  the contradictions, the lack of evidence, the
24  eyewitnesses, it's the missing pictures, it's everything
25  together will lead you to this conclusion.  We brought

40

1  this lawsuit because what happened back in 2006 was an
2  injustice.  And we're here now finally to rectify that.
3  It is burned on in time and, yes, it's thirteen years
4  later but it matters more than anything that you get the
5  right result here.  For the last 13 years these officers
6  have denied, denied, denied.  They have refused to
7  accept accountability, refused to accept responsibility
8  for what they did to this young man.  At this time now
9  at long last if you listen carefully to the evidence in
10  this case and you follow the court's instructions you
11  will hold these officers accountable, at long last, for
12  what they did to Andrew Smalls back on May 20, 2006.
13          Thank you, ladies and gentlemen.
14          THE COURT:  All right.  Mr. Francolla.
15          MR. FRANCOLLA:  Thank you, your Honor.
16          Good afternoon, ladies and gentlemen.
17  Counsel in his opening remarks told you he was not going
18  to waste any time.  He was going to call these two
19  defendants first.  That's good to hear.  You'll hear
20  what actually happened rather than what his client is
21  going to tell you.
22          On May 20, 2006, Andrew Smalls, the
23  plaintiff in this action, was running around a public
24  housing development in Rockaway Beach at one a.m. with a
25  loaded gun. .380 caliber.  He was caught by police and

1  arrested.  He was indicted by a grand jury for
2  possession of a weapon and criminal trespass.  The case
3  went to trial and a jury found him guilty on all of the
4  charges before them.  Hearing all of that, you may
5  actually be wondering what it is that we're doing here.
6  All of that, sometime later, the conviction, as counsel
7  mentioned, got overturned due to an issue with the
8  manner in which the gun was seized.

9      You'll also hear that during the criminal
10  proceeding plaintiff through his attorney at that time
11  claimed one version of events.  Now, through a new
12  lawyer, plaintiff is saying a completely different
13  version of events seeking money.  That is, here,
14  plaintiff will say to you, as his counsel just repeated,
15  I had no gun.  I didn't run.  I wasn't there.  That's
16  what he's going to say in an effort to try and get
17  money.

18      But back in the criminal case plaintiff's
19  claim was, again through his lawyer and it was not in a
20  conversation that was overheard, it was in a sworn legal
21  document with the court, his claim was, well, although I
22  did run, while in possession of a gun, the seizure of
23  that gun was improper and that argument was successful
24  on appeal and as a result the higher court overturned
25  the conviction.  You are going to hear two versions from

1  the plaintiff of how he got arrested.  At the criminal
2  proceeding it was the gun was improperly seized.  Here,
3  it's no gun, no chase, I was not even there, therefore,
4  give me money.  To be clear, the fact that plaintiff's
5  conviction was overturned doesn't mean he didn't commit
6  the crime, the evidence will show he did.  So let me
7  tell you what the evidence will show what actually
8  happened that night.

9      Detective David Teta, who was a police
10  officer at the time, and Officer Richard Collins, were
11  on foot patrol inside of a housing development called
12  Hammel houses.  This is out by the water in Rockaway
13  beach.  They were nearing the end of their tour when all
14  of a sudden they hear a gunshot, just one.  And the
15  number one is important.  From where they are, they
16  immediately look in the direction of the shot and see
17  five people, four men and one woman, walking away from
18  where the officers are.  The plaintiff was among this
19  group and the officers don't see anyone else around.
20  The officers don't know anything more than what I've
21  told you.  They haven't seen a gun, at least not yet, so
22  they decide to follow the group and investigate further.
23  They do so for a bit when they noticed the woman in the
24  group look back in their direction, the two of them are
25  in full traditional police uniforms, so seeing them

1  prompts the woman to say something to the other members
2  of the group that they're being followed by the police.
3  The four men in the group take a right at the end of the
4  building.  Officer Collins and Detective Teta see this.
5  So they take off in pursuit.  A bit behind them are two
6  other officers who are not a party to this lawsuit.
7  Plaintiff and the other three men run into an apartment
8  building taking off up the stairs.  The officers follow
9  them into the building with Officer Collins in front,
10  Detective Teta just behind him and the other two
11  officers a bit further back from them.  The chase gets
12  to the third floor when one of the four men being chased
13  suddenly stops in the officer's path, basically, he ends
14  up serving as a blocker of sorts to try and slow up the
15  officers hoping to allow the other three to get away
16  with the loaded gun.

17      The officers push by this individual
18  continuing their pursuit.  The individual subsequently
19  gets arrested by other officers who arrive on the scene
20  thereafter.  The chase gets to the sixth floor.  Another
21  of the now three men being chased gets in the officers'
22  way so his friends can either escape with the loaded gun
23  or get rid of it, only he's more aggressive.  He tries
24  to get big by spreading his arms and legs.  Officer
25  Collins pushes through blocker two and hands him back to

1  Detective Teta who holds him there, restrained, waiting
2  for backup, back up Officer Collins had called for in
3  the midst of the chase.  Officer Collins continues up to
4  the seventh floor landing.  His goal at that point was
5  to get up there so he could keep eyes on Detective Teta
6  to make sure he's safe, and get eyes on the other
7  stairwell in the building.  The reason for that, the
8  building you'll learn has two stairwells, A and B.  Each
9  has its own entrance and exit, so one could enter the
10  building, go up stairwell A to the top and then go back
11  down stairwell B and come out from a different door than
12  they came in from.

13      Back to the chase.  As Officer Collins
14  starts from up from the sixth floor to the seventh he
15  stumbles, falls down on his hand and knees for a second
16  only to look up and that's when he sees the silver .380
17  automatic.  He sees this gun while he's defenseless,
18  struggling to get back to his feet.  He sees the gun as
19  one of the men removes it from his waistband and gives
20  it to the other man who is ahead of him heading up
21  towards the roof.  The man who Officer Collins first
22  sees remove the gun is Andrew Smalls, the plaintiff.
23  The man plaintiff hands the gun to, his older brother
24  Ronnie Smalls.  Counsel may have misspoke in mentioning
25  his client's name.  The brothers who are involved in

1 this other than Andrew are Ronnie and Cedric.  Now for
2 the full picture, blocker number one on the third, the
3 individual on the third floor, that's Jerome Nelson.
4 The blocker number two is Cedric, the other Smalls
5 brother.
6           Back to the chase.  Plaintiff and his
7 brother Ronnie make it up to the roof.  Officer Collins
8 stops on the seventh floor landing.  He keeps his eyes
9 on Detective Teta while making sure the Smalls brothers
10 don't escape down the other stairwell.  Backup arrives
11 quickly.  Once it does, another officer takes custody of
12 Cedric Smalls on the sixth floor.  The Officer Collins
13 and Detective Teta then proceed to the roof with a bunch
14 of other officers who arrive on the scene, all with guns
15 drawn.  Not knowing that at least one of the two is
16 armed with a loaded weapon.  Once they get on the roof,
17 someone spots plaintiff's brother Ronnie.  He's on the
18 roof of the elevator room, basically just the room that
19 houses the parts for the elevator, the machinery that
20 holds the equipment.  Ronnie is spotted on top of that
21 structure.
22           The police start telling him to get down,
23 but he refuses.  At this point Officer Collins tries to
24 climb up after him.  You're going to see pictures of the
25 elevator room.  It's a high, typical sort of structure

1 on the roof.  To get up there you need assistance
2 essentially.  So Detective Teta is trying to help
3 Officer Collins get up there.  You'll learn the roofs of
4 these buildings typically were cluttered with all sorts
5 of debris and things like that.  You have Officer
6 Collins trying to have some leverage as well when he
7 steps on what he believes to be a box which turns out to
8 be the plaintiff.  They struggle a little bit.
9 Plaintiff is restrained and put in handcuffs.  Ronnie,
10 plaintiff's brother, comes down from the top of the roof
11 shortly thereafter and he's handcuffed as well.
12           Remember it's one a.m., no lights on the
13 roof other than flashlights.  Once the threat is over,
14 the gun is recovered and it's the same gun Officer
15 Collins had seen transferred from plaintiff to his
16 brother Ronnie.  The gun is later tested after its
17 recovered.  It's operable, meaning simply it works.
18 It's also still loaded.
19           Now, remember how I mentioned the officer
20 heard one shot fired.  Guess how many bullets were
21 missing from the gun?  One.  One bullet missing.
22 Testing further revealed the gun had been fired.  So now
23 we have one bullet fired, which is not a coincidence.
24 The remaining bullets are not simply in the magazine.
25 One round is actually in the chamber.  The owner had

1 nothing to do other than pull the trigger.  When Officer
2 Collins observed it it was a live round in the chamber.
3           Fast forward to the plaintiff getting
4 indicted by a grand jury and getting convicted at trial
5 to the question of why the conviction later got thrown
6 out.  Plaintiff through his criminal defense counsel
7 challenged the manner in which the gun was seized.  That
8 was successful with the with the Court of Appeals and
9 the conviction was overturned.  We certainly do not take
10 that type of a violation lightly.  It's important to
11 know, however, plaintiff's conviction was not thrown out
12 because he somehow proved he was innocent.
13           MR. NORINSBERG:  Objection.
14           THE COURT:  I'll sustain the objection.
15           MR. FRANCOLLA:  The evidence will show
16 plaintiff was not innocent.  The evidence will show the
17 officers didn't lie.  And while the higher court found
18 issues with the seizure of the gun there is no claim for
19 that in this case.  The claim from plaintiff is that
20 these defendants fabricated evidence, that they made
21 everything up.  So his story goes from gun, but bad
22 seizure of it to no gun and no chase, I was not even
23 present.  Keep that in mind as you hear the evidence.
24           At the end of this case you'll be left with
25 only two choices.  Choice one, plaintiff fled from the

1 police while in possession of a loaded gun before being
2 arrested, indicted and convicted by a jury only to have
3 that conviction thrown out due to what was later found
4 to have been an improper seizure of the gun.  That will
5 be the defendants' version.
6           Choice two, these two defendants
7 orchestrated an elaborate conspiracy to frame plaintiff
8 for a crime he wasn't even present for, a crime for
9 which three others had already been lawfully arrested,
10 all because plaintiff showed up after the fact and made
11 complaints about his brothers being arrested to some
12 random police officers.  It's one or the other and the
13 evidence will show it's clearly choice number one.
14           Now, just a couple of brief things that were
15 mentioned by plaintiff's counsel to look out for as you
16 listen to the evidence and weigh that choice.  He has
17 already gone on at length about the mistakes that
18 appears in Officer Collins' paperwork.  We expect there
19 are some.  Some might be lawyers' tricks.  When things
20 go back and forth the officers have an opportunity to
21 explain what's written where.  We expect plaintiff's
22 counsel will focus on the errors in the paperwork.
23 There are a few.  Paperwork errors are not the basis for
24 finding a constitutional violation.  That is especially
25 true when you consider what plaintiff is actually

49

1 claiming here, that he was framed.  A few mistakes here
2 and there obviously don't equal evidence of an elaborate
3 conspiracy to frame a person.  There was some mention of
4 fingerprints and the lack of plaintiff's on the gun.
5 Plaintiff will argue that his prints weren't found on
6 the gun so obviously he didn't touch it, which means
7 that they are lying.
8          And counsel gave you a bit of a picture but
9 not the full one.  He said that there were two prints
10 that were suitable for comparison found on the gun.
11 He's correct.  These prints did not belong to the
12 plaintiff.  They also did not belong to his brothers,
13 Cedric or Ronnie, or the officer who picked it up.  What
14 was left out is that there were three partial prints
15 found on the gun that weren't sufficient to be compared
16 to anybody.
17          In sum plaintiff despite being in possession
18 of a loaded gun, managed to get his conviction
19 overturned and was rewarded with his freedom.  Now,
20 having completely changed his story he's looking to be
21 rewarded with money.  After hearing all the evidence,
22 with your verdict, show him that his luck has run out.
23          Thank you.
24          THE COURT:  Call your first witness.
25          MR. NORINSBERG:  At this time plaintiff

50

1 calls Officer Collins to the stand.
2 RICHARD COLLINS,
3    called as a witness, having been duly
4    sworn, was examined and testified as follows:
5          THE COURT:  State your name for the record
6 and spell it.
7          THE WITNESS:  Officer Richard Collins, R I C
8 H A R D, C O L L I N S.
9 DIRECT EXAMINATION
10 BY MR. NORINSBERG:
11  Q.  Good afternoon, officer.
12  A.  Good afternoon.
13  Q.  You are here pursuant to a subpoena, is that
14 correct?
15  A.  I apologize.
16  Q.  You are here pursuant to a subpoena, correct?
17          MS. FUDIM:  Objection, your Honor.
18          THE COURT:  I think he's here because he's a
19 party.
20  Q.  You are a named defendant in this case, correct?
21  A.  Yes.  As part of my job I'm here.
22  Q.  You have given prior testimony, is that right,
23 Officer Collins?
24  A.  Yes.
25  Q.  You testified during the criminal proceedings

51

1 three different times, correct?
2  A.  Yes.
3  Q.  You testified in the grand jury, correct?
4  A.  Yes.
5  Q.  You testified at a pretrial hearing against
6 Andrew Smalls, correct?
7  A.  Yes.
8  Q.  And then you testified at a criminal trial,
9 correct?
10  A.  Yes.
11  Q.  And you also testified at a deposition in the
12 civil case, correct?
13  A.  Yes.
14  Q.  Each time that you testified about what happened
15 you swore to tell the truth, the whole truth and nothing
16 but the truth, right?
17  A.  Yes.
18  Q.  And you reviewed all of your prior testimony to
19 make sure you were familiar with that testimony before
20 you came here, correct?
21  A.  Yes.
22  Q.  Now, directing your attention to May 20, 2006,
23 you recall arresting Andrew Smalls that day, correct?
24  A.  Yes.
25  Q.  And you actually have an independent memory of

52

1 that, right, sir?
2  A.  Yes.
3  Q.  So you and Officer Teta that night made a
4 decision as to who was going to be the arresting officer
5 for Andrew Smalls, correct?
6  A.  Yes.
7  Q.  As you sit here now, officer, you don't know why
8 you were the arresting officer in that case, right?
9          MS. FUDIM:  Objection, your Honor.
10          THE COURT:  I don't think the question is
11 clear.  I'll sustain the objection.
12  Q.  You know there were multiple officers who were on
13 the scene that night, correct, sir?
14  A.  Yes.
15  Q.  But you don't know the reason why you were chosen
16 as the arresting officer as opposed to any other
17 officer, is that correct?
18  A.  No.
19  Q.  Referring to your deposition, page eight, line
20 eleven, do you recall being asked the following question
21 and giving the following answer:
22    "QUESTION:  Why were you the arresting officer,
23 why not one of the other officers that were on the
24 scene?
25    "ANSWER:  I don't know the answer to that.  It

1   was a choice between all the officers there."
2         Do you remember being asked that question and
3   giving that answer?
4   A.  Not off the top of my head, no.
5   Q.  Can we agree as of the date of your deposition
6   you didn't know why you were the arresting officer
7   rather than the other officers on the scene?  Isn't that
8   what you testified to under oath?
9         MS. FUDIM:  Objection.
10        THE COURT:  Under oath where?
11        MR. NORINSBERG:  At his deposition.
12        THE COURT:  I'll allow him to answer that
13  question.
14  A.  Can you read it again?  I'm sorry.
15  Q.  As recently as your deposition in this civil case
16  you testified under oath that you did not know why you
17  were the arresting officer in this case as opposed to
18  any other officer who was on the scene, is that correct?
19  A.  Correct.
20  Q.  Now, directing your attention to May 20, actually
21  the date of May 19, 2006, you started your tour of duty
22  that day?
23  A.  October 19, yes.
24  Q.  It was 5:30 p.m. when I started your tour,
25  correct?

1   A.  Yes.
2   Q.  You were assigned to a foot post in the Hammel
3   Houses, is that correct?
4   A.  Yes.
5   Q.  So you started at the local precinct, 100
6   precinct, correct?
7   A.  Yes.
8   Q.  You left that precinct and you went out on foot
9   patrol, correct?
10  A.  Yes.
11  Q.  Then you went to the Hammel Houses, correct?
12  A.  Yes.
13  Q.  It was not you by yourself, you had three other
14  officers with you, is that correct?
15  A.  Yes.
16  Q.  You had Officer Teta, your partner, with you,
17  correct?
18  A.  Yes.
19  Q.  You had Officer Cabrera with you, correct?
20  A.  They were on adjoining posts, yes.
21  Q.  You had Officer Alvarado with you?
22  A.  Also on adjoining post, yes.
23  Q.  You had three other officers besides you,
24  correct?
25  A.  They were on adjoining posts.  We were together

1   the entire night.
2   Q.  At the time about one a.m. you hear a gunshot, is
3   that correct?
4   A.  Approximately, yes.
5   Q.  At that point you have all four officers together
6   at that point?
7   A.  At one a.m., yes.
8   Q.  You were actually inside a building there, 8410
9   Rockaway Beach Boulevard, right?
10  A.  That's correct.
11  Q.  That's part of the Hammel Houses, correct?
12  A.  Yes.
13  Q.  You were inside what's called the rec room at
14  that time, correct?
15  A.  Yes.
16  Q.  You exited the building when you heard the shot,
17  correct?
18  A.  Yes.
19  Q.  And you didn't look out the window before you
20  exited, right?
21  A.  No, I did not.
22  Q.  You just walked right out, correct?
23  A.  Yes.
24        MR. NORINSBERG:  Your Honor, the parties
25  have stipulated to Plaintiff's Exhibit two in evidence.

1   It's a diagram of the Hammel Houses.
2         THE COURT:  All right.  Plaintiff's Exhibit
3   2 is received in evidence.
4         (So marked.)
5   Q.  So we get our bearings straight, you are in this
6   building 8410, is that correct?
7   A.  Yes.
8   Q.  And then you hear a gunshot and you exit in a
9   northerly direction, correct?
10  A.  Yes.
11  Q.  And then you move in an easterly direction, is
12  that right?
13  A.  Yes.
14  Q.  And you claim, Officer Collins, that at that time
15  you saw five people in a group walking along the path,
16  is that correct?
17  A.  Yes.
18  Q.  In fact, sir, you only saw two people walking on
19  that path, didn't you?  Yes or no.
20  A.  No.  I saw five.
21  Q.  Do you recall making some notes, officer, before
22  you put together your police paperwork that night?
23  A.  I made a lot of notes, yes.
24        MR. NORINSBERG:  I would like to show this
25  to the officer.  May I approach the witness?

1       THE COURT: Yes. Does it have an exhibit

2  number?

3       MR. NORINSBERG: Yes, Exhibit 41.

4   Q.  Do you recognize that document, sir?

5   A.  Yes.

6   Q.  That's your handwriting, correct?

7   A.  Yes, it is.

8   Q.  You prepared this as part of a draft for your

9  police report that you were going to write that night,

10  right?

11   A.  Yes.

12       MR. NORINSBERG: I offer Plaintiff's Exhibit

13  41 into evidence.

14       MS. FUDIM: No objection.

15       THE COURT: It's received.

16       (So marked.)

17       MS. FUDIM: One question, your Honor: 41 is

18  a two-page exhibit.

19       MR. NORINSBERG: This is the first page is

20  what we are questioning.

21       MS. FUDIM: We also want the full document

22  into evidence, not just one page. No objection provided

23  the entire document is put into evidence.

24       MR. NORINSBERG: One second, please.

25       (Pause.)

1   Q.  I'm going to show you now Plaintiff's Exhibit 41.

2  Directing your attention to --

3       THE COURT: Is this both pages?

4       MR. NORINSBERG: Both pages. I'm just

5  questioning now on the first page.

6   Q.  Let's see if we could read this together,

7  officer. Do you see the top of the page, the

8  cross-outs?

9   A.  Yes.

10   Q.  It says, AO, that's arresting officer, correct?

11   A.  Correct.

12   Q.  And that refers to you, correct?

13   A.  Yes.

14   Q.  It says, AO, arresting officer, observed perp one

15  and two and then it says running, but that's crossed

16  out, walking away from location. Do you see that?

17   A.  Yes.

18   Q.  So according to the very first rendition of what

19  you wrote here you saw two perps running from the

20  location? Yes you did or no you didn't?

21   A.  No.

22   Q.  Isn't that what you wrote here? Yes or no, sir.

23   A.  That's incomplete.

24   Q.  You crossed out perps one and two, didn't you?

25   A.  It was incomplete.

1   Q.  You crossed it out and you also crossed out the

2  word running, didn't you?

3   A.  It was incomplete and I restarted writing.

4   Q.  When you first wrote this account of what

5  happened, you wrote that there were two perpetrators

6  that you observed, isn't that true, sir? Yes or no.

7       MS. FUDIM: Objection. The document speaks

8  for itself, your Honor.

9       THE COURT: I'll sustain the objection as

10  being asked and answered.

11   Q.  Do you know the difference between two

12  perpetrators and four perpetrators, right?

13   A.  Of course.

14   Q.  The very first version you had two perpetrators,

15  right?

16   A.  No.

17   Q.  And then a few lines later the two became four

18  perps, is that correct?

19   A.  That's not what it says. It's listing what a

20  specific person did.

21   Q.  I'm directing your attention --

22   A.  I'm sorry.

23   Q.  -- to the first line. Do you see that, sir?

24   A.  Yes.

25   Q.  So it went from two to four in your second

1  version, is that correct?

2   A.  No.

3   Q.  It went from running to walking; do you agree

4  with that?

5   A.  That was trying to get the narrative correct.

6   Q.  Do you agree that the number of perpetrators

7  doubled from the very first version up here that's

8  crossed out and the next version has four; do you agree

9  with that?

10       MS. FUDIM: Objection, asked and answered.

11       THE COURT: Sustained.

12   Q.  Do you agree that the reason why you added four

13  people was you realized you needed to account for all

14  four people who had been arrested that night? Yes or

15  no.

16   A.  I didn't change anything.

17   Q.  Well, you were the arresting officer not just for

18  Andrew Smalls, right? You were the arresting officer

19  for four people, correct?

20   A.  Yes.

21   Q.  You were the arresting officer for Andrew,

22  correct?

23   A.  Yes.

24   Q.  For Ronnie, correct?

25   A.  Yes.

1    Q.   For Cedric, correct?

2    A.   Yes.

3    Q.   And for Jerome Nelson also, right?

4    A.   Yes.

5    Q.   So when you wrote four apprehended perps you were

6 accounting in that version for all four of those people

7 who you arrested, isn't that true?

8    A.   Yes.

9    Q.   Let's see if we can agree there's no mention in

10 your account here of a fifth person, a woman who is

11 acting as the lookout?

12   A.   She was not apprehended.

13   Q.   Is there any mention of a woman, a fifth person

14 that you observed?  Yes or no.

15   A.   Here, no.

16   Q.   What's that?

17   A.   No.

18   Q.   Then in February 2007 you testified before a

19 grand jury, correct?

20   A.   I don't know the date.  Yes, I did testify.

21   Q.   When you testified before the grand jury you told

22 them that there was a fifth person, a female who was

23 involved in this group?  Yes or no.

24   A.   Yes.

25   Q.   And when you gave that testimony to the grand

1 jury that was the first time that you ever mentioned

2 that there was a fifth person that was part of this

3 group, isn't that true?  Yes or no.

4    A.   I believe so.

5    Q.   There's no mention, sir, in any of your police

6 paperwork of this mysterious woman, the fifth person?

7         THE COURT:  I'll sustain the objection to

8 the form of the question.

9    Q.   Is there any mention of a fifth person in any of

10 your police paperwork?

11        MS. FUDIM:  Objection your Honor.

12        THE COURT:  Yes.  I'll sustain the objection

13 to the question.

14   Q.   Now, according to your version of events you

15 started following these five individuals, correct?

16   A.   Yes.

17   Q.   You wanted to ask them if they had heard

18 anything, right?

19   A.   Yes.

20   Q.   So you were walking behind these four males and a

21 female, right?

22   A.   Yes.

23   Q.   And you didn't know any of these individuals at

24 that time, correct?

25   A.   Yes, I did not.

1    Q.   In fact, you were only following two individuals,

2 weren't you?  Yes or no.

3         MS. FUDIM:  Objection.

4         THE COURT:  Overruled.  He can answer.

5    A.   No.

6    Q.   Would you agree that when you were following the

7 closest you ever got was 40 to 50 feet, right?

8    A.   No.

9    Q.   Do you recall testifying at your pretrial

10 hearing, page 34, line ten:

11   *QUESTION:   --

12        MS. FUDIM:  Can you wait, please.

13        (Pause.)

14   Q.   *QUESTION:  What was the closest distance between

15 you and these individuals when you were following them

16 for the three blocks?

17   *ANSWER:  Like I said, roughly, I don't know

18 exactly, roughly 40, 50 feet."

19        MS. FUDIM:  Objection.

20   Q.   Do you recall being asked that question and

21 giving that answer?

22        MS. FUDIM:  Objection.  It's not the

23 question he posed to the witness.  Improper impeachment,

24 your Honor.

25        THE COURT:  Overruled.

1    A.   Can you say it again?

2         THE COURT:  Go ahead.

3    Q.   Sir, you followed this group for approximately

4 three blocks, correct?

5    A.   Approximately, yes.

6    Q.   And according to your testimony at the pretrial

7 hearing the closest that you ever got to this group was

8 40 to 50 feet away, is that correct?

9         MS. FUDIM:  Same objection, your Honor.

10        THE COURT:  That he's misstating the

11 pretrial hearing testimony?

12        MS. FUDIM:  Your Honor wants me to speak?  A

13 speaking objection, your Honor?

14        THE COURT:  No.  Go ahead.

15   Q.   Do you recall giving that testimony, sir?

16   A.   I don't remember the exact words, no.

17   Q.   I just read you your testimony.  Do you want me

18 to read it again?

19   A.   No.  That's stating when we were walking that was

20 the approximate distance, approximately.

21   Q.   When you were walking during that three block

22 area you never got closer than 40 to 50 feet away?

23   A.   I said approximately.

24   Q.   You're looking at them from behind, is that

25 correct?

1   A.   Yes.

2   Q.   Whoever is in front of you, not seeing their

3   faces, 40 to 50 feet away?

4   A.   No.

5   Q.   You've been to the Hammel Houses development

6   many, many times?

7   A.   Yes.

8   Q.   You've been there hundreds of times, correct, as

9   of May, correct?

10   A.   Yes.

11   Q.   Putting up Plaintiff's Exhibit 2.  Now, you told

12   us you were starting out at 8410, is that right?

13   A.   Yes.

14   Q.   And you were following this group and eventually

15   you get to 8105, is that correct?

16   A.   Yes.

17   Q.   This is the three blocks or so we're talking

18   about?

19   A.   Yes.  It's approximately what you would consider

20   three city blocks.

21   Q.   You agree with me for that three block area you

22   never got closer than 40 to 50 feet in that walk between

23   those two buildings, right?

24   A.   I said approximately.  I didn't have a tape

25   measure with me.

1   Q.   Now, you claim, officer, that as you were going

2   up to that building the female in this group looked back

3   at you and saw you, is that correct?

4   A.   Yes.

5   Q.   You claim that the female made a gesture to the

6   rest of the group, right?

7   A.   Correct.

8   Q.   Then you saw all four males start running into

9   this building, correct?

10   A.   Correct.

11   Q.   So they all ran into the building twelve which is

12   also 8105, is that correct?

13   A.   Correct.

14   Q.   In fact, officer, it was just two men who ran

15   into that building, isn't that true?

16   MS. FUDIM:  Objection.

17   THE COURT:  Are you making reference to the

18   same document you made reference to before?

19   MR. NORINSBERG:  Different location, judge.

20   THE COURT:  Overruled.

21   A.   No.

22   Q.   I want to focus on this building right here.

23   A.   Yes.

24   Q.   Isn't it true, officer, that when you went into

25   that building there were two men in that group who

1   entered that building before you?  Yes or no.

2   A.   No.

3   Q.   Now, you enter this building and you chase this

4   group up a stairwell, is that correct?

5   A.   Yes.

6   Q.   And you were the lead officer, right?

7   A.   Yes.

8   Q.   Officer Teta was behind you, correct?

9   A.   Yes.

10   Q.   And you claim that the other two officers were

11   also behind you, right?

12   A.   Yes.

13   Q.   So in other words you and all of the other

14   officers ran after these four males, correct?

15   A.   Correct, yes.

16   Q.   In fact, Officer Cabrera and Officer Alvarado

17   were not with you when you entered into that building,

18   were they?

19   A.   I was not watching them.

20   Q.   The other two officers actually went around to

21   the back door of the building, didn't they?

22   A.   They were behind me.  I don't know how they

23   entered.  I know they came into the building.

24   Q.   Referring to your pretrial hearing, page 41, line

25   11:

1   *QUESTION:   What about the two other officers?

2   *ANSWER:   At that time we ran into the building

3   they went around to the back door.*

4   Do you recall being asked that question and

5   giving that answer?

6   A.   I obviously did.  Like I said I was not watching

7   them.

8   Q.   So it's just you and Officer Teta chasing this

9   group, is that correct?

10   THE COURT:  You mean are you pinpointing the

11   time when they entered the building?

12   MR. NORINSBERG:  Yes, your Honor.

13   A.   Into the front door.  I know Officer Teta was

14   behind me.  That's as far as I know.  He was behind me.

15   Q.   At the time that you gave that hearing testimony,

16   you knew the other two officers had gone around the back

17   of the building?

18   A.   Correct.

19   Q.   You knew they were not behind you when you went

20   into the building chasing the four men, right?

21   A.   No.  I learned that after.

22   THE COURT:  Let me clarify:  Are you saying

23   that you learned that they entered the rear of the

24   building after this was all over with?

25   THE WITNESS:  After the events, correct.

1    Q.    Now, you claim that of this group of four that
2    somebody, one of the men broke off from the group, is
3    that correct?
4    A.    While in the building, yes.
5    Q.    You later learned the name of that person to be
6    Jerome Nelson, correct?
7    A.    Yes.
8    Q.    It's your claim under oath that Jerome Nelson
9    broke off from the group and tried to stop you and
10   Officer Teta from going up the stairs; is that your
11   claim, sir?
12   A.    Correct.
13   Q.    Your claim is Jerome Nelson stopped on the
14   stairwell, turned around and tried to block you from
15   continuing up the stairs, right?
16   A.    Yes.
17   Q.    You claim that he put his hand up and blocked
18   you, correct?
19   A.    He got in the way.
20   Q.    After this incident you signed a criminal
21   complaint relating to Jerome Nelson, correct?
22   A.    Yes.
23         MR. NORINSBERG:  Your Honor, the parties
24   have stipulated to the admissibility of Plaintiff's
25   Exhibit 14.  It's the criminal complaint for Jerome

1    Nelson.
2          THE COURT:  All right.  Plaintiff's Exhibit
3    14 is in evidence.
4          (So marked.)
5    Q.    Do you recognize this document, sir?
6    A.    Yes.  If I could see the top?  Okay.
7    Q.    According to this document, you personally
8    observed Jerome Nelson standing in the middle of the
9    third floor stairwell in the above mentioned location
10   with his legs spread open and one of his arms on the
11   other side of the wall of said stairwell in order to
12   prevent the deponent, which is you, from walking up said
13   stairwell in pursuit of others?
14   A.    Yes.
15   Q.    You saw Jerome Nelson standing in the middle of
16   the third floor and spreading his legs and arms open
17   blocking you and other officers from going up?
18   A.    No, that's not it.
19   Q.    Didn't you prepare this document?
20   A.    No.
21   Q.    That's your signature?
22   A.    Yes.
23   Q.    You signed this document under penalty of
24   perjury?
25   A.    Correct.

1    Q.    You reviewed this document before you signed it,
2    didn't you?
3    A.    I did.
4    Q.    You are telling us that you signed a document
5    under penalty of perjury with facts in here that are not
6    accurate, is that your testimony?
7    A.    Yes.  Later I noticed the inconsistencies and
8    corrected them immediately.
9    Q.    Your partner actually testified that none of the
10   things you allege in here happened?
11         MS. FUDIM:  Objection.
12         THE COURT:  I'll sustain the objection.
13   Q.    In your criminal complaint you wrote that you
14   "observed your partner -- observed Police Officer David
15   Teta attempt to place the defendant in handcuffs.  You
16   observed the defendant flail his arms to prevent being
17   handcuffed.  Do you see that?
18   A.    Yes.
19   Q.    None of that ever happened, did it, officer?  Yes
20   or no.
21   A.    That happened, just with a different defendant.
22   Q.    You wrote something in your complaint report for
23   Jerome Nelson and swore to it under penalty of perjury
24   even though it never happened?
25         MS. FUDIM:  Objection to the word wrote.  He

1    keeps repeating you wrote.
2          THE COURT:  I'll sustain the objection to
3    that.
4    Q.    When you signed this document, you understood
5    that you were attesting to the truth of what's in this
6    document, correct?
7    A.    Yes.
8    Q.    Would you agree with me now, Officer Collins, you
9    never saw your partner trying to handcuff Jerome Nelson,
10   did you?  Yes or no.
11   A.    No.  Like I said it was a different defendant.
12   Q.    The answer to my question would be no, you never
13   saw him, correct?
14         MS. FUDIM:  Objection, asked and answered.
15         THE COURT:  Yes.  I'm sustaining the
16   objection.
17   Q.    In fact, Jerome Nelson wasn't even in the same
18   stairwell that you were in at that time, isn't that
19   true, sir?  Yes or no.
20   A.    I'm sorry.
21   Q.    Jerome Nelson wasn't even in the same stairwell
22   that you were in while you were going up the flight of
23   stairs?  Yes or no.
24   A.    Yes, he was.
25   Q.    You were in stairwell A and he was in stairwell

1  B, isn't that true?

2  A.  Incorrect.

3  Q.  You were not even present when Jerome Nelson was

4  arrested, were you officer?  Yes or no.

5  A.  When he was handcuffed, no.

6  Q.  He was actually apprehended by Officers Cabrera

7  and Alvarado, wasn't he?

8  A.  Correct.

9  Q.  This had nothing to do with your partner, did it?

10      MS. FUDIM:  Objection.

11      THE COURT:  I'll sustain the objection to

12  the form of the question.

13  Q.  Neither you nor Officer Teta had anything to do

14  with placing Jerome Nelson under arrest?  Yes or no.

15  A.  No.  We did not place him in handcuffs.

16  Q.  And you had nothing to do with trying to place

17  him in handcuffs, did you, sir?  Yes or no.

18  A.  Correct, we did not.

19  Q.  Would you agree that not one of the facts that

20  you allege in this criminal complaint is actually true?

21  Would you agree with that, sir?

22      MS. FUDIM:  Objection.

23      THE COURT:  Yes.  I'll sustain the objection

24  to the form of the question.

25  Q.  Is there anything in this document when you talk

1  about the incident with Jerome Nelson that you state in

2  this courtroom is actually true?

3      MS. FUDIM:  Same objection, your Honor.

4      THE COURT:  Yes.  I'll sustain the objection

5  to the form of the question.

6  Q.  Do you agree that even though Jerome Nelson,

7  according to your testimony, tried to block you, you

8  were able to run right past him, weren't you, sir?

9  A.  Yes.

10  Q.  You ran past Jerome and continued following the

11  other individuals, right?

12  A.  Yes.

13  Q.  You then continued on to stairwell B, chasing the

14  other three individuals, right?

15  A.  Yes.

16  Q.  And then you claim that you got to the sixth

17  floor and another person in this group tried to block

18  you; that's your claim, right, sir?

19  A.  Correct.

20  Q.  And the other person that tried to block you

21  turned out to be Cedric Smalls, correct?

22  A.  Yes.

23  Q.  And according to your sworn testimony, sir,

24  Cedric Smalls did the same exact thing that Jerome

25  Nelson did, right, he turned around and tried to block

1  you in the stairwell, is that correct?

2  A.  Yes.

3      MR. NORINSBERG:  Your Honor, the parties

4  have stipulated to the admissibility of Plaintiff's

5  Exhibit 13.  It's the criminal complaint for Cedric

6  Smalls.

7      THE COURT:  Plaintiff's Exhibit 13 is

8  received.

9      (So marked.)

10  Q.  Now, do you recognize this document, sir?

11  A.  Yes.

12  Q.  This is the criminal complaint for Cedric Smalls,

13  correct?

14  A.  Yes.

15  Q.  You are the one at the top, you are the one

16  attesting to the truth of what's in this document,

17  correct?

18  A.  That's correct.

19  Q.  What you wrote in this document, what you

20  attested to in this document is literally word for word

21  the exact same thing you wrote for Jerome Nelson?  Yes

22  or no.

23  A.  I did not write this document.

24  Q.  You attested to it under penalty of perjury,

25  didn't you, sir?

1  A.  Correct.

2  Q.  I would like to take a look at them side by side.

3  Looking first at the one we have just looked at,

4  Cedric's, do you see it on the left-hand side?

5  A.  Yes.

6  Q.  And you talk about him in this document, how you

7  saw Cedric with his legs spread open and one of arms on

8  the each of the walls of the said stairwell in order to

9  prevent you and your partner from going up, right?

10  A.  Correct.

11  Q.  Then we look at 14, which is the one we looked at

12  for Jerome Nelson, what does it say here, sir, saw

13  Jerome Nelson also -- his legs spread open and one of

14  his arms on each of the walls of the stairwell to

15  prevent you and your partner from going up, correct?

16  That's what's written here, correct?

17  A.  Correct.

18  Q.  In fact, these documents are literally verbatim

19  word for word the same exact allegations made against

20  Cedric Nelson -- made against Cedric Smalls were made

21  against Jerome Nelson, correct?

22      MS. FUDIM:  Objection.  The documents speak

23  for themselves.

24      THE COURT:  Overruled.

25  A.  They are not exactly the same and I did not

1  prepare them.

2    Q.  The only difference between those two documents

3  is you claim you observed something happen in one

4  document on the third and then in the other document on

5  the sixth floor, that's the only difference in the

6  account that you gave?  Isn't that true, sir?

7    A.  No.  I explained what happened to the district

8  attorney and they prepared it and they wrote it.  I

9  didn't catch the error until later on.

10    Q.  So it's the district attorney's fault that you

11  attested to under oath these complaints that you wrote

12  here, that are signed here?

13    A.  No, not at all.

14          MS. FUDIM:  Objection.

15          THE COURT:  Overruled.

16    Q.  Would you agree that as a police officer you have

17  a duty to review a complaint report to make sure the

18  facts in the report are accurate, correct?

19    A.  Yes.

20    Q.  And you have a duty to review that report

21  carefully to make sure that if there are any mistakes in

22  the report you correct those mistakes, true or not true?

23    A.  Yes.

24    Q.  And you have a duty to inform the district

25  attorney if there are mistakes so that it could be

1  corrected?

2    A.  Yes.

3    Q.  You never did that in this case?

4    A.  Yes, I did.

5    Q.  You actually told the district attorney the exact

6  same story for Cedric that you told for Jerome; isn't

7  that true?

8    A.  No.

9    Q.  The district attorney interviewed you relating to

10  these arrests, correct?

11    A.  Yes.

12    Q.  And then the district attorney sends over a draft

13  complaint for you to review, correct?

14    A.  Yes.

15    Q.  What the district attorney sent over to you was

16  based on your own words, isn't that true, sir?  Yes or

17  no.

18    A.  Of course.

19    Q.  Now, your claim is, Officer Collins, that even

20  though Cedric was trying to block the stairwell somehow

21  you were able to get right past him also, right?

22    A.  Not easily, but yes.

23    Q.  You grabbed him, right?

24    A.  Yes.

25    Q.  But you can't say exactly how you did grab him,

1  can you, officer?

2    A.  No.

3    Q.  You have no memory of how you grabbed him, do

4  you?

5    A.  I moved him out of the way.

6    Q.  You don't know exactly how you were grabbing him,

7  right?

8    A.  I don't know what you are getting at.

9    Q.  What part of his body did you grab to get past

10  him?

11    A.  I don't know specifically, no.

12    Q.  I just want to make sure I understand this.

13  These guys are running away from you trying to get away

14  from the police, correct?

15    A.  Yes.

16    Q.  So now you have the second person stopping,

17  turning around and trying to block the police, right?

18    A.  Yes.

19    Q.  And Cedric now is on a higher stairwell than you

20  are, isn't he?

21    A.  He's on the first step.

22    Q.  So he's on one step that's above the ground that

23  you are on, is that correct?

24    A.  Yes.

25    Q.  So you reach up to Cedric.  You would have to

1  reach up to grab him, right?

2    A.  Depending on how I grabbed him.  I don't

3  remember.

4    Q.  He was holding the rails on both sides, right?

5    A.  I don't remember independently.

6    Q.  Even though he was on a higher level and he's

7  holding the rails on both sides somehow you were able to

8  just grab him and throw him out of the way; is that your

9  testimony?

10          MS. FUDIM:  Objection, mischaracterizing the

11  testimony.

12          THE COURT:  Yes.  I'll sustain the

13  objection.

14    Q.  Even though he was on a higher level than you and

15  even though he was grabbing both rails you were able to

16  just push him aside, isn't that true?

17          MS. FUDIM:  The same objection.

18          THE COURT:  Overruled.

19    A.  I don't remember if he was holding the rails at

20  all.

21          THE COURT:  Why don't you tell us what you

22  remember about that specific incident.  What do you

23  remember happening?

24          THE WITNESS:  As I came up, it was the turn

25  from onto the landing and continuing up.  He was there.

1  In one motion I took his hand and grabbed him, threw him

2  against the back wall of that landing, which is right as

3  my partner came up and he held him and I continued.

4          THE COURT:  You kept going?

5          THE WITNESS:  Yes.

6          THE COURT:  Okay.

7     Q.  You threw him with one hand or two hands?

8     A.  Like I said I don't know specifically.  I did

9  something either one handed or two and threw him into

10  the wall.

11    Q.  What part of his body did you grab?

12    A.  If I had to guess, the middle part of his body.

13  I don't know specifically.  I really don't.

14    Q.  The truth is, officer, Cedric Smalls never

15  stopped, turned around and blocked the stairwell, did

16  he?  Yes or no.

17    A.  Yes.

18    Q.  You made up that story, didn't you, sir?

19    A.  No.

20    Q.  Just in the same way you made up the story about

21  Jerome blocking the stairwell, you made up the same

22  exact claim for Cedric, didn't you?  Yes or no.

23    A.  No.

24    Q.  After you grabbed Cedric you passed him on to

25  your partner, right?

1     A.  Correct.

2     Q.  And then you claim at that point you slipped on

3  the stairwell, right?

4     A.  I fell, yes.

5     Q.  You fell down?

6     A.  Yes.

7     Q.  And in that moment when you fall you see Ronnie

8  and Andrew at the top of the stairs; that's your claim,

9  correct?

10    A.  Correct.

11    Q.  At that moment, officer, you see with your own

12  eyes -- you see Andrew Smalls pulling out a gun and

13  handing it to his brother; that's your testimony, right,

14  sir?

15    A.  Correct.

16    Q.  In fact, sir, isn't it true that you swore in

17  another document that you saw Ronnie pulling out the gun

18  and handing it to Andrew; isn't that true?  Yes or no.

19  That's what happened?

20    A.  No.

21          THE COURT:  I'm not sure of the answer to

22  the question.  The question was did you swear in another

23  document that it happened the other way around?

24          THE WITNESS:  You would have to show me the

25  document.  I don't know.

1          MR. NORINSBERG:  May I approach the witness?

2          THE COURT:  Yes.

3          THE WITNESS:  I apologize.

4     Q.  Is that your signature on the back, sir?

5     A.  Yes.

6     Q.  Do you recognize this document?

7     A.  Yes .

8          THE COURT:  What Exhibit did you show the

9  witness?

10          MR. NORINSBERG:  Exhibit 12.  I'm going to

11  offer Exhibit 12 into evidence .

12          MS. FUDIM:  No objection.

13          THE COURT:  Plaintiff's Exhibit 12 is

14  received.

15          (So marked.)

16    Q.  The criminal complaint that you drafted, you

17  signed, is that correct?

18    A.  I signed, yes.

19    Q.  So this is a criminal complaint, it's against

20  Andrew and Ronnie Smalls, correct?

21    A.  Yes.

22    Q.  Again, so you are the one who is swearing to the

23  allegations in the report, is that correct?

24    A.  Yes.

25    Q.  I'm going to direct your attention to the bottom

1  paragraph, the main paragraph near the bottom.  Do you

2  see it, sir?

3     A.  Yes.

4     Q.  Deponent further states, that's you, correct?

5     A.  Yes.

6     Q.  Deponent further states that he observed

7  defendant Ronnie Smalls holding a silver .38 caliber

8  pistol in his hand.  I'm going to stop there.

9          Do you see that, sir?

10    A.  Yes, I do.

11    Q.  So according to this sworn document it was not

12  Andrew who you saw with the gun, it was Ronnie with the

13  gun, right?

14    A.  According to this, yes.

15    Q.  You attested to the truth of this document under

16  penalty of perjury, didn't you, sir?

17    A.  Yes.

18    Q.  Moving on you wrote that you also observed him

19  drop a magazine on the ground.  That's referring to

20  Ronnie Smalls, correct?

21    A.  It's all about Ronnie Smalls.

22    Q.  Next sentence, deponent further states that he

23  observed defendant Ronnie Smalls hand said pistol to

24  defendant Andrew Smalls before both defendants ran onto

25  the roof of said building.

1  Do you see that?

2  A.  Yes.

3  Q.  So according to what you attested to in this

4  document Ronnie Smalls is the one with the gun, Ronnie

5  Smalls is the one pulling it out, Ronnie Smalls is the

6  one handing it to Andrew, according to your sworn

7  documents?  Yes or no.

8  MS. FUDIM:  Objection.

9  THE COURT:  What's the basis of the

10  objection, a multiple question?

11  MS. FUDIM:  A multiple question and asked

12  and answered and the document speaks for itself.

13  THE COURT:  I'll sustain the objection on

14  the basis that it's a compound question.

15  Q.  According to this document, we'll break it down,

16  according to this document you swore that Ronnie was the

17  one with the gun?  Yes or no.

18  A.  According to this, yes.

19  Q.  You swore that Ronnie pulled out the gun?  Yes or

20  no.

21  A.  According to this, yes.

22  Q.  You swore that Ronnie then handed the gun to

23  Andrew?  Yes or no.

24  A.  Yes, according to this.

25  Q.  According to this, this is what you swore to,

1  isn't it?

2  A.  I did not catch the error that day.  When I did I

3  immediately corrected it.

4  Q.  This is completely the opposite of what you

5  testified to in this case, isn't it, sir?

6  MS. FUDIM:  Objection.

7  THE COURT:  I'll sustain the objection to

8  what he testified to in this case.  I'm not sure he's

9  testified to anything about this in this case.

10  Q.  Didn't you just tell us a moment ago, sir, that

11  you saw Andrew pull out a gun and hand it to Ronnie?

12  A.  Yes.

13  Q.  Didn't you tell us that?

14  A.  Yes.

15  Q.  What you wrote in this sworn document is the

16  exact opposite of that, isn't it, sir?

17  A.  I did not write this document.

18  Q.  What you attested to under penalty of perjury is

19  the exact opposite?

20  A.  Yes.

21  Q.  Again, as a police officer you know this is very

22  serious what you attested to in these complaints, right?

23  A.  Yes.

24  Q.  You understand that somebody could be charged and

25  prosecuted based on what you attested to, correct?

1  A.  Yes.

2  Q.  You understand that you can lose -- somebody can

3  lose their liberty based on what you write in these

4  sworn complaints, right?

5  A.  Yes.

6  Q.  Can you please tell the members of the jury which

7  version of this event is true, what you told us a few

8  moments ago that you saw Andrew pull out the gun and

9  hand it to his brother or what you swore to in the

10  criminal complaint when you said it was Jerome who

11  pulled out the gun and handed it to his brother Andrew,

12  which version is true?

13  A.  What I told you is correct.  Just like I told you

14  when I saw this error I corrected it immediately.

15  Q.  It's just an error?

16  A.  That I did not make.

17  Q.  This is the DA's fault again?

18  A.  They produced this document, not me.

19  Q.  You reviewed it and signed it after they produced

20  it, right?

21  A.  When I caught the error I fixed it immediately.

22  Q.  Where is that fixed document, sir?  Do you have

23  an amended criminal complaint?

24  A.  It was before the grand jury.

25  Q.  Did you amend this criminal complaint to fix it

1  like you just told us?

2  A.  That's outside the scope.  I do not create these

3  documents.

4  Q.  Did you call the district attorneys office and

5  say, hey, fellows, you got it wrong, I need to correct

6  what I swore to, give me a new document, amended version

7  of it?

8  A.  When I met with the district attorney we

9  corrected it.

10  Q.  The first time you corrected it was a month later

11  in front of a grand jury?

12  A.  No.

13  Q.  You just told us corrected it in the grand jury,

14  didn't you?

15  A.  I corrected it with the district attorney.  How

16  they do that I don't know.

17  Q.  Can we agree, sir, there's no amended version of

18  this document that you signed under penalty of perjury,

19  the criminal complaint, is there?

20  A.  No.  I never signed a new one.

21  Q.  Now, you told us a few moments ago you saw that

22  Andrew had a gun in his hand, is that right?

23  A.  Yes.

24  Q.  Tell the members of this jury which hand did

25  Andrew have the gun in?

1    A.   At this moment I believe it was his right hand.
2    Q.   Referring to your deposition, page 59, line 22:
3         *QUESTION:   --
4              MS. FUDIM:  Objection.  Can you give me a
5    moment and let me know what page number so I can follow
6    along?
7              MR. NORINSBERG:  59, 22.
8              MS. FUDIM:  Where will you be ending?
9              MR. NORINSBERG:  The question and answer
10   right there.
11   *QUESTION:   You testified today as to which hand
12   Andrew Smalls used to hold the silver handgun and pass
13   it to Ronnie Smalls?
14        *ANSWER:   No, I couldn't.*
15        Do you recall being asked that question and
16   giving that answer, sir?
17   A.   If it's in the deposition, yes.
18   Q.   According to your sworn testimony at the
19   deposition you couldn't say which hand, whether it was
20   the right hand or the left hand, could you?
21   A.   At that time, no.
22   Q.   Is your memory better today than when you gave
23   your deposition?
24   A.   I reviewed a lot of my paperwork in preparation
25   for today.

1    Q.   At your deposition didn't you testify that you
2    couldn't recall which hand Andrew was holding the gun
3    in?
4    A.   Correct.
5    Q.   And is it your testimony now that your memory got
6    better preparing for trial and now you remember?
7    A.   I didn't say that.
8    Q.   Is that your testimony?
9    A.   I said I reviewed my paperwork in preparation for
10   today.
11   Q.   Didn't you review your paperwork in preparation
12   for the deposition?
13   A.   In part, not as much as I did for today.
14   Q.   You wanted to be prepared when you testified
15   under oath at your deposition?
16   A.   Of course.
17   Q.   You went through all your paperwork at that time,
18   didn't you?
19   A.   Yes.
20   Q.   So your memory wasn't refreshed when you prepared
21   for the deposition but now for trial you got better
22   after you looked at those same documents?
23   A.   When a question came up at deposition that I did
24   not review, I reviewed it in preparation for today.
25   Q.   That rang a bell and all of a sudden you

1    remembered it's his right hand, correct?
2    A.   No.
3    Q.   And you can't tell us, sir, where Andrew Smalls
4    pulled the gun from in his waist area, can you?
5    A.   It was in his waist area.
6    Q.   You can't say whether it was his right side or
7    left side, can you, sir?
8    A.   No.
9    Q.   And you also can't even say how the gun was
10   transferred from one brother to the other, can you, sir?
11   A.   By his hands.
12   Q.   Referring to your deposition, page 62, line four.
13             MS. FUDIM:  Can you tell me what line you're
14   reading to?
15             MR. NORINSBERG:  One question and one
16   answer.
17   *QUESTION:   How did Andrew Smalls hand the
18   silver pistol to Ronnie Smalls?  How was he holding it?
19   What did you see?
20        *ANSWER:   I still don't remember how it was
21   handed to him.*
22        Do you recall being asked that question and
23   giving that answer, sir?
24   A.   Yes.
25             MS. FUDIM:  Objection, your Honor.

1              THE COURT:  What's the basis?
2              MS. FUDIM:  There's been no inconsistent
3    testimony, your Honor.  Improper impeachment.
4              THE COURT:  Yes.  I'll sustain the
5    objection.
6    Q.   Would you agree at your deposition you had no
7    memory as to how Andrew Smalls handed this gun to his
8    brother?  Would you agree with that?
9    A.   No.
10   Q.   So what I have just read to you when you say I
11   still don't remember how it was handed to him, was that
12   not true testimony?
13             MS. FUDIM:  Objection.
14             THE COURT:  I'll sustain the objection to
15   the form of the question.
16   Q.   Isn't it true, sir, the reason why you don't
17   remember the details about Andrew passing the gun to his
18   brother is because it never happened, isn't that true?
19   Yes or no.
20   A.   No.
21   Q.   You never actually saw Andrew hand the gun, did
22   you, sir?
23   A.   Yes, I did.
24   Q.   You made up that story because you wanted to be
25   able to claim that the gun belonged to both brothers,

93

```
1   not just Ronnie Smalls, isn't that true?  Yes or no.
2        A.   No.
3        Q.   I just want to make sure I understand your
4   testimony, sir.  Here you have two guys that you have
5   been following a group for three blocks, you have the
6   people start running inside the building trying to get
7   away from you, right?  Are you with me so far?
8        A.   How many people did you say?
9        Q.   You testified the group of four men running into
10  the building?
11       A.   Yes.
12       Q.   You get in the building and you are going all the
13  way up to the top of the building where they are almost
14  at the rooftop of the building, correct?  Is that right?
15       A.   Yes.  There's more to it.
16       Q.   The two brothers you say you saw at the top of
17  the stairwell, that seventh stairwell is next to the
18  roof of the building?
19       A.   It's the flight below, yes.
20       Q.   Then just about when they are at that flight
21  where they are at the door where they could throw the
22  gun away, they decided to hand the gun off in front of
23  you so you can see?  Is that your testimony?
24       A.   No.  They were a floor below.
25       Q.   They were on the seventh floor?
```

94

```
1        A.   Yes, seventh floor.
2        Q.   It leads out to the roof area, doesn't it?
3        A.   No.  There's another flight of stairs up to the
4   roof.
5        Q.   Would you agree, sir, that in order for them to
6   transfer this gun from one from one brother to the other
7   they would have to slow down a little, wouldn't they?
8        A.   I would assume so.
9                  *************
```

1

```
1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK
2
3   - - - - - - - - - - - - - - X
4   ANDREW SMALLS,                   14-CV-2326 (CBA)
5                               :
6            Plaintiff,:
7        V.                       U.S. Courthouse
8   POLICE OFFICER RICHARD COLLINS   Brooklyn, New York
9   and POLICE OFFICER DAVID TETA,
                                 :
10
11           Defendants.  :
12                              May 14, 2019
                                 9:30 o'clock a.m.
13                           :
14  - - - - - - - - - - - - - - X
15               TRANSCRIPT OF TRIAL
                 BEFORE THE HONORABLE CAROL B. AMON
16               UNITED STATES DISTRICT JUDGE and a jury.
17
    APPEARANCES:
18
    For the Plaintiff:       JOHN MEEHAN, ESQ.
19                           JON NORINSBERG, ESQ.
                             BENITTA JOSEPH, ESQ.
20
21
    For the Defendants:      ELISSA FUDIM, ACC
22                           BRIAN FRANCOLLA, ACC
23
    Court Reporter:          Anthony M. Mancuso
24                           (718) 260-2419
25  Proceedings recorded by mechanical stenography, transcript
    produced by CAT.
```

Anthony M. Mancuso, CSR   Official Court Reporter

2

```
1        (Trial resumed.)
2        (In open court; jury not present.)
3        THE COURT:  Counsel, I understand that plaintiff's
4   counsel had an application.  I know that plaintiff is not up
5   yet.  Is it something that we need to wait for limb for?
6        MR. MEEHAN:  No, not at all.  It's just coming up in
7   one of the last exhibits from yesterday, which was Cedric
8   Smalls' mug shot photograph.
9        So the arrest number on this mug shot corresponds to
10  the arrest on the date of the arrest.  There is not an arrest
11  date on this and we were getting from counsel something a
12  little bit of a push back that we don't know whether or not
13  this was from the exact date of the arrest.  I want to put
14  this issue to bed.  We specifically requested that the mug
15  shot be provided from that date.  It's the same arrest number.
16  We would like to make the argument that this is Cedric on that
17  date.
18       MR. FRANCOLLA:  It was not necessarily push back.
19  The way this played out was as the court knows it was there
20  was an unsealing order that came down in the middle of last
21  week.  We forwarded that to the police department, got what we
22  produced in response.  We have no reason to believe those mug
23  shot pedigrees were not generated as a result of the arrest at
24  issue.  The problem I think is that we don't know that that
25  picture necessarily comes from that date.  The only reason we
```

Anthony M. Mancuso, CSR   Official Court Reporter

3

1  have some question in our minds is that the other two mug shot
2  pedigrees that were produced in response to that order for
3  Jerome Nelson and Ronnie Smalls are dated. That photograph
4  which is odd in other ways since he's not facing forward, is
5  not. We don't know why that would be and what that means.
6  We're in the process of trying to get an explanation that we
7  have not gotten. The way it was phrased to us if we could
8  stipulate that photograph itself is what he was wearing that
9  night. We are unable to do that. We have no basis to dispute
10  it as we sit here today. We're trying to find out if there is
11  one. The way it was phrased whether we can say definitively
12  that's what he was wearing that night and we can't do that.
13      THE COURT:  Did he have a prior arrest?
14      MR. FRANCOLLA:  I think he did. That's the concern,
15  and he's also a juvenile and didn't go to Rikers Island unlike
16  the others. His circumstances differed from the other
17  individuals. That may not mean anything but it might. We
18  just don't know.
19      THE COURT:  When do you think you'll get the answer?
20      MR. FRANCOLLA:  Our boss is following up. We have
21  sought it on Friday. We've been back and forth with counsel
22  related to why that photo is frontal and that started on
23  Friday. Along with that we are now following up on this
24  additional issue which only came up yesterday. These things
25  came down in the middle of last week. Both sides are trying

Anthony M. Mancuso, CSR    Official Court Reporter

4

1  to figure it out.
2      THE COURT:  The case isn't over yet. We'll see if
3  we can get a resolution on this. If not, then I think you can
4  -- I suppose that you have an argument that that's what he was
5  wearing that night because the photo applies to that arrest.
6  Is the practice to take separate mug shots every time somebody
7  is arrested? What's the process? Obviously you can take a
8  juvenile's. The photograph is there.
9      MR. FRANCOLLA:  Generally, your Honor, my
10  understanding is that each arrest there would be a specific
11  photo for an arrest. Also generally we would expect the
12  person to be looking forward. The circumstances of his
13  photograph are just I think odd to everybody.
14      THE COURT:  Don't they do arrest photos front and
15  sideways?
16      MR. FRANCOLLA:  They do. The police photographs we
17  were provided were all that there was or what was introduced
18  yesterday was a side profile.
19      THE COURT:  I don't remember the others. Were they
20  front and side on the same?
21      MR. FRANCOLLA:  They were, what everyone would
22  expect, the traditional mug shot. That's why his photo is
23  just odd in a lot of different ways. That's the only reason
24  we even think there could be another explanation. We don't
25  have it. We don't know if there would be. Generally speaking

Anthony M. Mancuso, CSR    Official Court Reporter

5

1  and I think our experience -- and I imagine counsel would
2  agree with this -- it would be a straight photo and it would
3  be a side photo and it would be a photo that was taken later
4  on in the processing that corresponds to that arrest.
5      MR. MEEHAN:  Your Honor, it's conceded that the
6  arrest date is not on this. However, the arrest numbers
7  match. The precinct matches and it says source live. It
8  could be the drop down menu with picking the arrest date is
9  what was missed. Now they have -- they don't even say they
10  have a good-faith reason to say it's not him that night.
11  Because that is missing on this, there's no reason to believe
12  that is anything but him that night. We should be able to
13  make the argument that it is him and we should be able to --
14  unrefuted. I don't understand how they can be refuting this
15  is him that night.
16      THE COURT:  Let's see if we can get a resolution by
17  their finding out further information. You don't need to make
18  the argument right now. It's only your first witness.
19      MR. MEEHAN:  Correct. It's part of the
20  cross-examination of him.
21      THE COURT:  I think you already cross-examined him
22  about it or Mr. Norinsberg did.
23      MR. FRANCOLLA:  One other practical issue. I think
24  counsel is likely to use a recording of the Sprint call that
25  Officer Collins is on -- with Officer Collins. We have the

Anthony M. Mancuso, CSR    Official Court Reporter

6

1  same recording but our office had taken steps in an attempt to
2  try and remove background noise to make it clear. We
3  conferred with counsel. They have their setup so they are
4  going to play the original call. We would like to play what
5  we believe is an a slightly clearer version. We want to let
6  the court know it's only going to be brief, that there may be
7  two separate recordings of the same call, one of which is
8  slightly modified.
9      MR. MEEHAN:  Your Honor, we had already had versions
10  of Plaintiff's Exhibit 8. This has been part of the case for
11  years.
12      THE COURT:  I know. Have you listened to the other
13  one?
14      MR. MEEHAN:  I certainly haven't listened to side by
15  side. Each one is an hour and twelve minutes. We have
16  reduced part of ours to the eleven minutes that's relevant to
17  the arrest. To the extent they want to play the new version
18  they can do it on their case in chief. We should not be
19  forced to play two different versions of the same arrest.
20      THE COURT:  Is it difficult for you to play the
21  version that eliminated some of the background noise.
22      MR. MEEHAN:  Yes. I did not bring it as part of my
23  exhibits.
24      THE COURT:  All right. Fine.
25      MR. MEEHAN:  And it's not substantively different.

Anthony M. Mancuso, CSR    Official Court Reporter

1   Counsel would agree it's not better.
2        THE COURT:  The jurors are here.  If Officer Collins
3   could resume the stand.
4   RICHARD COLLINS, resumed.
5        (Jury present.)
6        THE COURT:  Good morning, ladies and gentlemen,
7   please be seated.  We're ready to begin.
8        Mr. Norinsberg.
9        MR. NORINSBERG:  Thank you, your Honor.
10  DIRECT EXAMINATION
11  BY MR. NORINSBERG:  (Continued)
12  Q    Good morning, Officer Collins.
13  A    Good morning.
14  Q    Now, you told us yesterday that you were trying to get on
15  top of that stairwell roof, is that correct?
16  A    Yes.
17  Q    And so after you placed Andrew under arrest, Jerome
18  Smalls was still on that roof?
19  A    Yes.
20  Q    You still hadn't recovered any gun yet, right?
21  A    Not at that point, no.
22  Q    So you started giving Jerome orders to come down, is that
23  correct?
24  A    Yes.
25  Q    But he didn't come down right away, right?

1   A    No.
2   Q    So at that point officer you decided to jump on top of
3   the roof, is that correct?
4   A    I attempted to hoist myself with assistance up to that
5   roof.
6        THE COURT:  What exhibit do you have on the screen,
7   counselor?
8        MR. NORINSBERG:  Plaintiff's Exhibit 43.
9   Q    This is the wall you were attempting to go up, is that
10  correct?
11  A    Yes.
12  Q    This is approximately ten feet high, is that correct?
13  A    I don't know.  I didn't measure it.
14  Q    Referring to your trial transcript, page 43, line 22:
15       "QUESTION:   Approximately how tall is that
16  structure?
17       "ANSWER:   The staircase roof is about ten feet off
18  the main roof."
19       Do you recall being asked that question and a giving
20  that answer, sir?
21  A    Okay, yes, at trial you testified this is approximately
22  ten feet high, correct.
23  A    Approximately.
24  Q    And you are approximately five foot eight, is that
25  correct?

1   A    Yes.
2   Q    So even though you're five foot eight, this roof
3   structure is approximately ten feet tall, you claim that you
4   actually got to the top of this roof, is that correct?
5   A    With assistance, yes.
6   Q    I want to be clear so there's no misunderstanding what
7   we're talking about.  Your testimony to this jury is you
8   physically were on top that roof, yes?
9   A    No.  I was hoisted up and as I was being hoisted up he
10  was getting assisted down the other side.
11  Q    You told the grand jury that you went on top of this
12  roof, didn't you, sir?
13       MS. FUDIM:  Objection.
14       THE COURT:  Overruled.
15  A    I don't know exactly what I told them.  I know what I
16  did.
17  Q    Referring to your grand jury testimony, page eleven, line
18  one:
19       "QUESTION:   Now, with regard to Jerome Smalls, what
20  did you do with regard to Jerome Smalls?
21       "ANSWER:   Once I took care of Andrew Smalls, I went
22  onto the roof and got him to come down.  He slid down off that
23  lower roof and I arrested him and on that roof directly next
24  to where he was laying was a silver firearm that I saw."
25       Do you recall being asked that question and giving

1   that answer, sir?
2   A    Yes.
3   Q    So you told the grand jury "I went onto the roof,"
4   correct?
5   A    Yes.
6   Q    But in fact, Officer Collins, you never made it onto that
7   roof, did you?
8   A    Not fully, no.  I was able to get up --
9   Q    You never got onto this roof, did you, sir, yes or no?
10  A    I got up to the roof.  I was hoisted up.  I was about
11  halfway.  I was able to reach the firearm as he was getting
12  pulled down the other side.
13  Q    Referring to your deposition, -- referring to trial
14  transcript, page 184 line 8:
15       "QUESTION:  Do you never actually made it to the
16  roof, up to the roof that night?
17       "ANSWER:  Not that night, no."  Do you recall being
18  asked that he question and giving that answer?
19  A    Yes.
20  Q    So you told the grand jury that you went onto the roof
21  but you testified at the criminal trial that you never
22  actually made it onto the roof, is that correct?
23  A    I believe that was referring to me physically standing on
24  that roof.  No, I did not.
25  Q    You told the grand jury that you went onto the roof.  You

1  were testifying under oath that you were actually physically
2  on this roof, isn't that true?
3          MS. FUDIM:  Objection.
4          THE COURT:  Overruled.
5  A   No.  That's not what I was referring to when I testified.
6  Q   Could you tell us right here now in this courtroom were
7  you ever standing on top of that roof?
8  A   That night, no.
9  Q   You said you got hoisted up there?
10 A   Yes.
11 Q   Who hoisted you up there, sir?
12 A   One of the other officers.
13 Q   What's the officer's name?
14 A   I don't know.
15 Q   The first name?
16 A   I'm sorry.
17 Q   The officer's first name?
18 A   I don't know.
19 Q   Last name?
20 A   I will still would not know.
21 Q   Was it a man or a woman?
22 A   I don't know who helped hoist me up there.
23 Q   What was the race of the person?
24         MS. FUDIM:  Objection.
25         THE COURT:  Sustained.

1  Q   Tell us exactly how this person hoisted you up on to that
2  area.
3  A   By their hand and my feet in their hand and helped hoist
4  me up.
5  Q   One person lifting you, is that your testimony, sir?
6  A   I don't remember exactly how I was assisted up.  There
7  was a lot going on.
8  Q   Now, you claim that you saw a silver and gun lying next
9  to Ronnie Smalls on the roof, is that correct?
10 A   Yes.
11 Q   You don't have your gun out at this point, do you?
12 A   I don't believe so, no.
13 Q   So someone is lifting you up?  Right now you still
14 haven't recovered a gun yet, right?
15 A   Correct.
16 Q   Someone is lifting you up and you're halfway up and you
17 can see that there's a gun there while Jerome is on the roof
18 with that gun?
19 A   Yes.
20 Q   You don't have your gun out, is that your testimony, sir?
21 A   Correct.
22 Q   You are going straight up into the area where the man on
23 the roof has a gun, is that what you are doing?
24 A   Yes.
25 Q   And then you claim that you found the gun at that point

1  on the roof next to Jerome?
2  A   Yes.
3  Q   And it was you were approximately one to two feet away
4  from him, is that correct?
5  A   Approximately.
6  Q   You also claim that you found the gun one foot away from
7  Andrew Smalls, too, right?
8  A   I explained it was one to two feet away.  But on the
9  level above him, yes.
10 Q   Referring to your testimony at the pretrial hearing on
11 February 20, 2008, page 15, line 14:
12         "QUESTION:  And where is that in relationship to
13 where Andrew Smalls was?
14         "ANSWER:  Just right on the roof, just a foot above
15 him."
16         Do you recall being asked that question and giving
17 that answer?
18 A   Yes.
19 Q   So Andrew is here, right?  That's according to the
20 document that you marked yesterday, right?
21 A   Yes.
22 Q   The gun is up on the top of the roof, correct?
23 A   Correct.
24 Q   And it's a foot or two away from Jerome, correct?
25 A   Yes.

1  Q   And yet you testified that it's also just one foot above
2  Andrew, right?
3  A   Correct.
4  Q   So at the same time, the same gun is one to two feet away
5  from Jerome and just a foot above Andrew, is that your
6  testimony, sir?
7  A   No.  It was on the roof level above him.
8  Q   When you testified at the pretrial hearing you testified
9  it was a foot above him, didn't you?
10 A   It should have been a foot away, but above him.
11 Q   You told us before the wall is approximately ten feet
12 high, didn't you?
13 A   Correct.
14 Q   Couldn't possibly be a foot away from him, could it?
15 A   I said a level above him, a foot away.
16 Q   You didn't say a level above him when you testified at
17 the pretrial hearing, did you?
18 A   No, I guess I did not.
19 Q   You told us yesterday that Andrew was crouched in a fetal
20 position here, right?
21 A   Yes.
22 Q   If Andrew is crouched in a fetal position here you could
23 not possibly have found a gun one foot away from him, could
24 you?
25         MS. FUDIM:  Objection.

1    THE COURT:  Sustained.
2  Q   When you testified under oath at the pretrial hearing
3  that you found the gun one foot away from Andrew, that
4  testimony is false, wasn't it, sir?
5    MS. FUDIM:  Objection.
6    THE COURT:  Overruled.
7  A   It was incorrect.  It was not false.
8  Q   So there's a difference between giving incorrect
9  testimony under oath and giving false testimony under oath?
10 A   Yes.
11 Q   What you testified to was in fact not true, correct?
12   MS. FUDIM:  Objection.
13   THE COURT:  Yes.  I will sustain.
14 Q   You understood when you gave that testimony at the
15 pretrial hearing that you were required to tell the truth, the
16 whole truth and nothing but the truth, correct, sir?
17 A   Yes.
18 Q   But you didn't do that, did you?
19   MS. FUDIM:  Objection.
20   THE COURT:  Sustained.
21 Q   Now, where you marked the gun that's on top of the
22 stairwell roof, correct, the G?
23 A   Yes.
24 Q   So we can agree this would be the ground level of the
25 roof, is that correct?

1  A   Okay, yes.
2  Q   This is the rooftop of the stairwell, correct?
3  A   Yes.
4  Q   We can agree you found the gun up here on the rooftop
5  level of the stairwell, not on the ground level of the roof,
6  correct?
7  A   Yes.
8  Q   And yet in your criminal complaint, Officer Collins, you
9  swore that you found the gun on the ground level right next to
10 Andrew, didn't you, sir?
11 A   I have to look at it again.
12   THE COURT:  Counsel, what exhibit is this?
13   MR. NORINSBERG:  Exhibit 12.
14 Q   According to your statement in this complaint, which you
15 attested to as true, you recovered the gun from the ground of
16 the roof, near the location where defendant Andrew Smalls was
17 standing.  That's what you attested to, is that correct, sir?
18 A   Yes.
19 Q   The ground of the roof is here, not on top of the
20 stairwell roof?
21 A   If you could move it down a little.
22 Q   What you testified to in your criminal complaint is you
23 found the gun on the ground of the roof, isn't that what you
24 testified to in that complaint?
25 A   That complaint does not differentiate between the two.

1  Q   It is the ground of the roof and that's different than
2  the at that stairwell roof, isn't it, sir?
3  A   No.
4  Q   When you say Andrew Smalls was standing, your sworn
5  statement in the criminal complaint is he was standing right
6  here and you found the gun on the ground right next to him;
7  isn't that what you testified to, sir?
8  A   No.
9  Q   Now, you claim that after you found the gun you grabbed
10 it with two fingers and put it inside of your hat?
11 A   I don't know exactly how I lifted it.  But I did place it
12 in my hat, yes.
13 Q   Referring to your deposition, page 73, line 13:
14   "QUESTION:  How did you pick it up?
15   "ANSWER:  In an effort to preserve evidence, just
16 grabbing it with two fingers and putting it my hat."  Do you
17 recall being asked that question and giving that answer?
18 A   Yes.
19 Q   In fact, officer, you never picked this gun up, did you?
20 A   Yes, I did.
21 Q   Referring to your trial transcript, page 179, line 7:
22   "QUESTION:  You're the one who recovered the gun
23 here?
24   "ANSWER:  I did not pick it up, no."  Do you recall
25 being asked that question and giving that answer?

1  A   Not off the top of my head, no.
2  Q   So at your deposition you said you were the one who
3  picked it up with two fingers and put it in your hat.  At the
4  trial testimony you testified that you did not pick it up, is
5  that correct?
6  A   If that's what you have.
7  Q   What I have is your sworn testimony, sir.
8  A   I understand that.
9  Q   What you testified to at the deposition was different
10 than what you testified to at the criminal trial, is that
11 correct?
12 A   I don't know.  I guess so yes.
13 Q   And you claim you then jumped down from the stairwell
14 roof, is that correct?
15 A   I'm sorry.
16 Q   You claim that you then jumped down from the stairwell
17 roof, is that correct?
18 A   When was that?
19 Q   You tell me.  Didn't you jump down from the stairwell
20 roof at any time?
21 A   After I retrieved the firearm, yes, I got back down.
22 Q   You actually testified at your deposition that you jumped
23 down from the top of the roof, didn't you, sir?
24 A   I don't know.
25 Q   Referring to your deposition, page 74, line 10:

1        "QUESTION:  And you jumped down from the stairwell

2  roof?

3        "ANSWER:  Yes."  Do you recall being asked that

4  question and giving that answer?

5  A    No, I don't recall.  But if it's there, I did.

6  Q    Can you explain something to the jury now?  You told us

7  before you were hoisted up by a fellow police officer?

8  A    Yes.

9  Q    Yet at your deposition you said you jumped down from the

10 roof?

11 A    Two different things.

12 Q    Those are two completely different things, right?

13 A    Being hoisted up and getting back down are two different

14 actions.

15 Q    You testified at your deposition you actually jumped down

16 from the roof, didn't you, sir?

17 A    What I just tried to explain to you is I was hoisted up,

18 I was about halfway up, about my waist leaning on the roof and

19 I recovered the firearm.  At that point I got back down, which

20 may have been a jumping action to get back down.

21 Q    You actually testified at your deposition that you jumped

22 from the roof itself, didn't you, sir?

23 A    Like I said, I don't remember exactly what I said.

24 Q    Okay.  But I just read it to you.  You agree that was

25 your testimony, correct?

1  A    Yes.  And I explained what it meant.

2  Q    Just so we're clear and on the same page:  What you are

3  saying is when you said you jumped down from the stairwell

4  roof you meant you just jumped down in where this officer was

5  holding you down to the ground?  That's what you mean, sir?

6  A    I'm explaining to you what I did.

7  Q    And when you were jumping down you had the gun in your

8  hat, is that correct?

9  A    The firearm was in my hat, yes.

10 Q    And yet you don't know exactly how you were able to hold

11 the gun in your hand and jump down, right, sir?

12 A    I didn't say that I did that.

13 Q    When you were asked that question at your deposition you

14 said you don't know how you did it, right?

15       MS. FUDIM:  Objection.

16       THE COURT:  Yes.  I'll sustain the objection to the

17 form of the question.

18 Q    Did you ever testify at any prior proceeding that you got

19 to the top of the stairwell roof?

20       THE COURT:  I'm sorry.  I didn't hear it.

21 Q    Did you ever testify at any prior proceeding that you got

22 to the top of this roof?

23       MS. FUDIM:  Objection.

24       THE COURT:  I'll allow it.

25 A    I don't know.

1  Q    Referring to your deposition, page 71, line 24:

2        "QUESTION:  You actually got to the top of that

3  roof?

4        "ANSWER:  I believe so, yes."  Do you recall being

5  asked that question and giving that answer?

6        MS. FUDIM:  Objection.

7        THE COURT:  Yes.  If the objection is it's not

8  inconsistent, I'll sustain the objection.

9  Q    Now, you told us earlier that as you were going up Jerome

10 was coming down, is that correct?

11 A    Yes.

12 Q    Yet when you testified before the grand jury you told

13 them that you were able to get him to come down yourself,

14 right?

15       MS. FUDIM:  Objection.

16       THE COURT:  Overruled.

17 A    I don't remember exactly what I said.

18 Q    You testified at the grand jury as follows, page 11, line

19 1:

20       "QUESTION:  Now, with regard to Ronnie Smalls, what

21 did you do with regard to Ronnie Smalls?

22       "ANSWER:  Once I took care of Andrew Smalls, I went

23 onto the roof and got him to come down, arrested him on that

24 roof, directly next to where he was laying --

25       MS. FUDIM:  Objection.  There are sentences skipped.

1        MR. NORINSBERG:  I'll read it again.

2  Q    "QUESTION:  Now, with regard to Ronnie Smalls, what

3  did you do with regard to Ronnie Smalls?

4        "ANSWER:  Once I took care of Andrew Smalls, I went

5  onto the roof and got him to come down.  He slid down off that

6  lower roof and I arrested him and on that roof directly next

7  to where he was laying was a silver firearm that I saw."  Do

8  you recall being asked that question and giving that answer?

9  A    Yes.

10 Q    So your testimony to the grand jury was that Jerome slid

11 down that roof?

12       MS. FUDIM:  Objection.  It's the same testimony,

13 your Honor.

14       THE COURT:  I overrule the objection.

15 A    What's the question, sir?

16 Q    You told the grand jury that Jerome slid down off that

17 roof?

18 A    Yes.

19 Q    It's a ten-foot-high roof, right?

20 A    Correct.

21 Q    How could he possibly slide down that roof, sir?

22       MS. FUDIM:  Objection.

23       THE COURT:  Overruled.

24 A    From my view he was going down the other side.  I saw him

25 slowly descend down the other side.  How that happened I don't

1    know.  From my view he was sliding down off the roof that I
2    was looking at.
3    Q    Did you see him actually sliding off the roof?
4    A    Yes.
5    Q    But you don't know how he actually slid off the roof,
6    that's your testimony?
7    A    I was up at the same level he was and he was being
8    assisted down by other officers on the other side.
9    Q    You were on this side where Andrew is, right?
10   A    Correct.
11   Q    And you told us when you first saw this area where Andrew
12   is that was the box you were going to use to step up onto this
13   roof?
14   A    Yes.
15   Q    What were you going to use to hold on to get up to the
16   roof once you stepped on that box?
17   A    I'm sorry.
18   Q    What were you actually going to hold on to once you
19   stepped on this box to get yourself onto the roof?
20   A    The ledge of the roof there.
21   Q    This roof is ten-feet high you were going to step on box
22   and that was going to allow you to touch the ledge of the
23   roof?
24   A    I was going to attempt.
25   Q    Now, there's also an elevator roof shown on this picture,

1    right?
2    A    Yes.
3    Q    So we have a stairwell roof here where you have the R and
4    G and then there's the elevator roof also shown, correct?
5    A    Yes.
6    Q    And that elevator roof is considerably higher than where
7    the stairwell roof is, right?
8    A    Correct.
9    Q    At least another ten feet higher, would you say, officer?
10   A    Could be, yes.
11   Q    When you found Jerome he definitely wasn't on the
12   elevator roof, right?
13   A    Correct.
14   Q    Yet in your complaint report you stated that you found
15   Jerome on the ton of the elevator roof, didn't you, sir?
16   A    I don't know.
17        MR. NORINSBERG:  Your Honor, the parties have
18   stipulated to the admissibility of Plaintiff's Exhibit 29,
19   which is the complaint report for Ronnie Smalls.
20        THE COURT:  Plaintiff's Exhibit 29 will be received.
21        (So marked.)
22   Q    Do you recognize this document, sir?
23   A    Yes.
24   Q    We're looking at a complaint report that you prepared, is
25   that correct?

1    A    Yes.
2    Q    At the bottom of the report there's a narrative section,
3    right?
4    A    Yes.
5        MS. FUDIM:  Objection, your Honor, in terms of
6    allowing the witness to see the full document so that he can
7    answer the question as to whether he prepared this report.
8    When it was shown to him he was only shown the top section.
9        THE COURT:  Do you want to scroll down?
10       MS. FUDIM:  Allow the witness to see the full
11   document.
12       THE COURT:  Show him the bottom on the screen.
13       MS. FUDIM:  Also, for clarity, you said this is a
14   complaint report of Ronnie Smalls -- this is a complaint
15   report for all four individuals who were arrested, correct?
16   Q    Is that correct, officer?
17   A    Yes, this is one complaint --
18   Q    It's not just Jerome, it's for all four defendants, is
19   that correct?
20   A    Yes.
21       THE COURT:  Is there a part on this roof that
22   indicates to you --
23       THE WITNESS:  The second page.
24       THE COURT:  Let's get to the second page.
25   A    Can you zoom out a little bit?  There you go.  Okay.

1        THE COURT:  Was this report prepared by you?
2        THE WITNESS:  This was prepared by me but not
3    entered in the computer by me.
4        THE COURT:  But it was prepared by you?
5        THE WITNESS:  Yes.  This was not.  This was what we
6    call a scratch report that was prepared by me, a handwritten
7    version of this.
8        THE COURT:  And then what happens?  You hand the
9    written version to someone?
10       THE WITNESS:  Into the desk, the supervisors and
11   someone else enters it on the computer.
12       THE COURT:  Someone types it up?
13       THE WITNESS:  In this case the supervisor entered it
14   themselves.
15       THE COURT:  They enter it on the computer?
16       THE WITNESS:  Exactly.
17       THE COURT:  They type up what you wrote?
18       THE WITNESS:  Correct.
19       MS. FUDIM:  I would like to voir dire one question
20   on this point.
21       THE COURT:  It's already in evidence.  You can ask
22   the question on cross-examination.
23       MS. FUDIM:  Respectfully, it will be very misleading
24   without this one question being asked.
25       THE COURT:  Go ahead.

1     MS. FUDIM:  In this case, when the complaint report
2  was entered by your supervisor into the computer, did it
3  actually match what you wrote by hand on the complaint report?
4     THE WITNESS:  No, it did not.
5  Q  Officer, we have your handwritten complaint report here,
6  it's Exhibit 31?
7     MS. FUDIM:  No objection.
8     THE COURT:  Why don't you show it to the witness.
9     What are you asking him?
10  Q  Is this your handwritten report?
11  A  Yes.  Yes.
12     MR. NORINSBERG:  I offer Plaintiff's Exhibit 31 into
13  evidence.
14     MS. FUDIM:  No objection.
15     THE COURT:  Plaintiff's Exhibit 31 is received.
16     (So marked.)
17  Q  Now, first let's look at the typewritten report, where it
18  says perps were apprehended.
19  A  Yes.
20  Q  It says perp four apprehended on top of elevator room.
21  Do you see tat?
22  A  Yes.
23  Q  That's actually your own words that you wrote in the
24  report that you prepared, your handwritten copy, isn't that
25  true?  You said on elevator room in your report, isn't that

Anthony M. Mancuso, CSR    Official Court Reporter

1  true?
2  A  Yes.
3     THE COURT:  I'm sorry.  Just point to the line there
4  where it says elevator room.
5  Q  So perp two was apprehended on roof of elevator room, is
6  that correct?
7  A  Correct.
8  Q  So according to your handwritten report and the official
9  police record Ronnie Smalls was apprehended on top of the
10  elevator roof, right?
11  A  That's not correct.  That's what was written, yes.
12  Q  This is your handwriting, isn't it, officer?
13  A  Yes.
14  Q  You wrote that you apprehended perp two on top of this
15  elevator room, didn't you, sir?
16  A  That's what I wrote, yes.
17  Q  Was that another mistake, sir?
18  A  No.  That's me not knowing what the structures were
19  called at the time because I had just started working there.
20  Q  Did you testify, sir, that you had been on duty in that
21  post working every single day for several months?
22  A  Approximately, five months, yes.
23  Q  We can agree when you wrote elevator room in that report
24  that is incorrect?
25  A  Yes.

Anthony M. Mancuso, CSR    Official Court Reporter

1  Q  Now, you claim that you arrested both Jerome and Andrew
2  on top of the roof, is that correct?
3  A  Yes.
4  Q  In fact, Officer Collins, the two people that you
5  actually arrested on that rooftop were Jerome and Cedric
6  Smalls, isn't that true?
7     MS. FUDIM:  Objection.
8     THE COURT:  Overruled.
9  A  No.
10  Q  I'm going to show you Plaintiff's Exhibit 32 in evidence.
11  This is a prisoner pedigree card that we looked at yesterday
12  for Cedric Smalls, correct?
13  A  Yes.
14  Q  On this report it says "location of arrest."  Do you see
15  that, sir?
16  A  Yes.
17  Q  And what's written in here is rooftop, 8105; do you see
18  that sir?
19  A  That's not my handwriting.
20  Q  I didn't ask you whether it's your handwriting.
21  A  Okay.
22  Q  Do you see on this prisoner pedigree report of Cedric
23  Smalls the location of the arrest is the rooftop?
24  A  Yes.
25  Q  Of 8105?

Anthony M. Mancuso, CSR    Official Court Reporter

1  A  Yes.
2  Q  Now, I would like to show you Plaintiff's Exhibit 26.
3  This is the pedigree prepared for Ronnie Smalls, is that
4  correct?
5  A  Yes.
6  Q  Take a look again at the section where it says location
7  of arrest; do you see that, sir?
8  A  Yes.
9  Q  Once again it says "rooftop 8105", correct?
10  A  It says rooftop, yes.
11  Q  So according to the two pedigree cards that we just
12  looked at, Jerome was arrested on rooftop of 8105 and Cedric
13  was arrested on the rooftop of 8105, correct?
14  A  According to that, yes.
15  Q  Well, you were the arresting officer, right, sir?
16  A  Yes.
17  Q  These are official police documents, correct?
18  A  I did not prepare them.
19  Q  These documents specifically indicate where the suspects
20  were arrested, don't they?
21  A  Yes.
22  Q  What these documents indicate is that the two
23  perpetrators were arrested on the rooftop were Jerome and
24  Cedric, true or not true?
25     MS. FUDIM:  Objection.

Anthony M. Mancuso, CSR    Official Court Reporter

1          THE COURT:  Sustained.
2  Q    So on Andrew's card -- Andrew's pedigree card, right?
3  A    Yes.
4  Q    You reviewed that, right?
5          Do you recall we talked about yesterday where the
6  location was for Andrew's pedigree card?
7  A    I don't remember exactly what was said yesterday.
8  Q    Let me show you Plaintiff's Exhibit 24 in evidence.  Do
9  you see this is Andrew's pedigree card?
10  A    Yes.
11  Q    Location of arrest, do you see that?
12  A    Yes.
13  Q    It says RBB-8105; do you see that?
14  A    Yes.
15  Q    Andrew's card doesn't say rooftop 8105, does it?
16  A    No.  I believe further down on paper it does.
17          MS. FUDIM:  Can you zoom out, please?
18  A    There it is.
19  Q    That's what you wrote afterwards, right, sir?
20  A    Yes.
21  Q    You told us yesterday you were the one who crossed this
22  out, you were the one who wrote black jacket and you were the
23  one who circled black jacket and wrote down the word roof?
24  A    Yes.
25  Q    It doesn't say rooftop?

1  A    That's also written by me.
2  Q    This is the original location of Andrew's arrest was
3  downstairs lobby of the RBB 8105?
4          MS. FUDIM:  Objection.
5          THE COURT:  Sustained.
6          THE COURT:  What does RBB mean?
7  A    That refers to Rockaway Beach Boulevard.  It's
8  abbreviated.
9          THE COURT:  The top is a card that doesn't have a
10  specific location at that address?
11          THE WITNESS:  Correct.
12  Q    You originally just wrote the building address when you
13  filled out this card, is that correct?
14  A    Yes.
15  Q    Then later on that night you wrote in the word roof,
16  correct?
17  A    Yes.
18  Q    What time did you write that word in, sir?
19  A    I don't know.
20  Q    How much time had passed from the time of the arrest
21  until the time when you wrote in that word roof?
22  A    I don't know.
23  Q    Could have been a few hours?
24  A    I will not guess.  I have no idea.
25  Q    If Andrew had actually been arrested on the rooftop of

1  that building that's what this card should say, yes or no?
2          MS. FUDIM:  Objection.
3          THE COURT:  I'll sustain the objection to the form
4  of the question.
5  Q    Isn't it true, Officer Collins, Andrew was actually
6  arrested downstairs after his two brothers had already been
7  arrested?
8  A    No.
9  Q    Isn't it true, sir, that Andrew came downstairs to
10  complain to the police about his brothers being arrested?
11  A    No.
12  Q    Isn't it true, sir, that after -- it was only after
13  Andrew complained about his two brothers being arrested that
14  he was placed under arrest, isn't that true?
15  A    Absolutely not.
16  Q    So you claim that when you arrested Andrew you
17  immediately charged him with criminal possession of a weapon,
18  is that correct?
19  A    During that day, yes.
20  Q    I'm showing you Plaintiff's Exhibit 37, which is in
21  evidence.  This is Andrew's mug shot, is that correct?
22  A    Yes.
23  Q    According to this document, it lists the top charge; do
24  you see that?
25  A    Yes.

1  Q    The top charge listed on this document is resisting
2  arrest; do you see that, sir?
3  A    Yes.
4  Q    There's no mention here of criminal possession of a
5  weapon on this document, is there, sir?
6  A    This document does not list all the charges.
7  Q    It lists the top charge, correct, sir?
8  A    That's what it states.
9  Q    The top charge, if he had been charged with criminal
10  possession of a weapon, would be the criminal possession of a
11  weapon charge, right?
12          MS. FUDIM:  Objection.
13          THE COURT:  Overruled.
14  A    Not for this document, no.
15  Q    The top charge should say criminal possession of a weapon
16  if, in fact, he had been arrested for that charge; isn't that
17  true?
18  A    Not for this document, no.
19  Q    The reason why it says resisting arrest here, sir, is
20  because that's actually the top charge for which Andrew was
21  originally arrested, isn't that true?
22  A    No.
23  Q    When he was jawing with the police officers, got into it
24  with them, they took him in and that was the top charge,
25  resisting arrest at that time, wasn't it?

1 A   No.

2 Q   One of the officers who was downstairs actually pushed

3 Andrew into a building wall after he complained, isn't that

4 true?

5 A   No.

6 Q   Are you familiar with what's known as the medical

7 treatment of prisoner form?

8 A   Yes.

9 Q   Tell us what that is, sir?

10 A   It's a form that's filled out for any prisoner that comes

11 into your custody with an injury or sickness.

12       MR. NORINSBERG:  At this time, your Honor, plaintiff

13 offers Plaintiff's Exhibit 19 into evidence.  This is a

14 medical treatment of prisoner form for Andrew Smalls.

15       THE COURT:  All right.  It will be received.

16       (So marked.)

17       MR. NORINSBERG:  Stipulated.

18       THE COURT:  It will be received.

19 Q   This is the medical treatment of prisoner form for Andrew

20 Smalls, is that correct?

21 A   Yes.

22 Q   And here it says as TPO, that means time and place of

23 occurrence, correct?

24 A   Yes.

25 Q   Defendant had small cut above right eye.  Do you see

1 that?

2 A   Yes.

3 Q   Defendant refused medical aid from EMS at the command; do

4 you see that?

5 A   Yes.

6 Q   Above nature of illness injury, cut on right eyebrow; do

7 you see that?

8 A   Yes.

9 Q   Now, you have previously claimed that you slammed Andrew

10 to the ground and that's what caused his injury?

11 A   I don't believe I used that word.

12 Q   Referring to your trial transcript testimony, page 81,

13 line 11:

14       "QUESTION:  Yesterday you told us that you had to

15 slam Andrew to the ground and he supposedly sustained injuries

16 yesterday.  Do you remember telling us that?  Then the court

17 asked you:  Is that what you testified to?  And you answered

18 yes.

19       Do you recall being asked that question and giving

20 that answer at the criminal trial?

21       MS. FUDIM:  Objection.

22       THE COURT:  What's the basis for the objection?

23       MS. FUDIM:  To the extent it refers to trial

24 testimony that was given during that trial, we would have that

25 prior testimony and then he can use that --

1       THE COURT:  Overruled.  It's a subject for

2 cross-examination.

3 Q   Do you recall giving that testimony, sir?

4 A   I answered the question, yes.  I did not use the

5 terminology, yes, we went to the ground.

6 Q   In the question, the lawyer asked you, had you testified

7 in the previous day that you had slammed Andrew to the ground

8 and the court asked you is that what you testified to and you

9 said yes, correct?

10 A   Like I said, yes.

11 Q   And yet when you testified before the grand jury you said

12 that Andrew immediately put his hands up and you handcuffed

13 him, right?

14 A   I would have to review.

15 Q   Referring to your testimony before the grand jury, page

16 ten, line 21:

17       "QUESTION:  What happened to Andrew Smalls right at

18 that point?

19       "ANSWER:  At that point I was six inches from

20 stepping on him.  I flinched.  So I saw who he was.  Then he

21 put his hands up and I arrested him."  Do you recall being

22 asked that question and giving that answer?

23 A   Yes.

24 Q   So according to what you told the grand jury, Andrew put

25 his hands up and you arrested him and according to what you

1 testified at the criminal trial you actually slammed him down

2 to the ground to place him under arrest, that is correct?

3       MS. FUDIM:  Objection.

4       THE COURT:  Overruled.

5 A   The --

6 Q   Is that correct, sir?

7       MS. FUDIM:  Objection.

8       THE COURT:  He can answer it.

9 A   The grand jury didn't go into detail on how he was

10 arrested.

11 Q   You told the grand jury under oath --

12 A   That he put his hands up, we took him to the ground and

13 arrested him.

14 Q   You just added a new section that's not in your

15 testimony?

16 A   It was not asked, sir.

17 Q   You were asked what happened to Andrew Smalls at that

18 point and you said "at that point I was six inches from

19 stepping on him.  He flinched.  So I saw who he was.  Then he

20 put his hands up and I arrested him."  Is that what you

21 testified to at the grand jury?

22 A   Yes.

23 Q   You didn't mention anything about having to take him down

24 to the ground, did you?

25 A   No, I didn't.

1  Q   When you gave the testimony about slamming him down to
2  the ground at the criminal trial you gave that testimony so
3  you could account for how he got the cut above his eye, isn't
4  that true?
5  A   I explained what happened.
6  Q   Now, could we agree, Officer Collins, that you yourself
7  never sustained any injuries during this incident?  Can we
8  agree with that?
9  A   I don't believe I did, no.
10 Q   Yet on your police report, the arrest report that you
11 filled out for Andrew Smalls, you represented that you were
12 injured; isn't that true?
13 A   I don't believe so.
14     MR. NORINSBERG:  Plaintiff's Exhibit 4.  Do you have
15 an objection?
16     MS. FUDIM:  It's not clear.  We ask that you use the
17 clear and legible version, I think it's 31.  We have it in
18 there twice.
19     MR. NORINSBERG:  That's the one that we are offering
20 into evidence right knew.
21     MS. FUDIM:  Which one --
22     MR. NORINSBERG:  Four.
23     MS. FUDIM:  Four is blurry.  I have an objection
24 that there is a clear one and you can read that one and we
25 don't have an objection to that.

Anthony M. Mancuso, CSR    Official Court Reporter

1      MR. NORINSBERG:  I would like to show it to the
2  witness.  If he can't read it because it's too blurry, we can
3  revisit it.
4      THE COURT:  Do you have a clear copy?  You can use
5  number 27 is clear copy.
6      THE COURT:  Is it the same exhibit?
7      MS. FUDIM:  Yes.
8      THE COURT:  Do you have two exhibits with the same
9  document in them?  Is 27 and 4 the same thing?
10     MR. NORINSBERG:  One is redacted with information
11 and the other is not.
12     MS. FUDIM:  No objection to redacting that
13 information so the witness can't see it.
14     MR. MEEHAN:  Again, there's nothing unclear about
15 Exhibit 4.
16     THE COURT:  Why do we have two exhibits of the same
17 thing?  Can anyone answer that?  Is the redaction relevant to
18 something?
19     MR. MEEHAN:  Yes.
20     THE COURT:  And is four the unredacted version?
21     MR. NORINSBERG:  Four has the appropriate redaction on
22 it.
23     THE COURT:  And 27 is the complete copy that for
24 some reason you don't want to show?
25     MR. MEEHAN:  No.  It's a duplicate, your Honor.

Anthony M. Mancuso, CSR    Official Court Reporter

1      THE COURT:  Show him the one that's clearer.
2      MR. MEEHAN:  Again, they are duplicates.
3      THE COURT:  Please, just show him the one we all
4  agree is clearer to read it if it's the same document.  I don't
5  know why we're spending this much time talking about this.  If
6  it's not the same document, I understand your concern.
7      MR. NORINSBERG:  The level of clearness is
8  identical.  If counsel wants us to use the other one, there's
9  no problem.
10     THE COURT:  You are showing the witness Exhibit 27.
11     MR. NORINSBERG:  So I am going to offer 27 into
12 evidence.
13     THE COURT:  Okay, Plaintiff's Exhibit 27 is
14 received.
15     (So marked.)
16 BY MR. NORINSBERG:
17 Q   This is an arrest report, is that correct, sir?
18 A   Yes.
19 Q   This relates to Ronnie Smalls, is that correct?
20 A   Yes.
21 Q   You prepared this document, correct, sir?
22 A   I prepared the handwritten version of it.  I did not
23 enter it into the computer.
24 Q   You prepared this document, correct?
25     MS. FUDIM:  Objection.  He just answered that.

Anthony M. Mancuso, CSR    Official Court Reporter

1      THE COURT:  Sustained.
2  Q   The information on this document comes from, right?
3  A   Handwritten version that I wrote.
4  Q   You are the arresting officer that provides the
5  information that gets entered into the computer, correct?
6  A   Correct.
7  Q   On this form it says officer injured and you wrote yes;
8  is that correct?
9  A   I did not, no.
10 Q   That's what it says on your arrest report, doesn't it,
11 sir?
12 A   Like I explained, this would be a computer copy.
13 Q   Someone else made a mistake entering this in?
14 A   They must have, yes.
15 Q   Who might that someone be?
16 A   That would be Sergeant Hennessy who entered this form.
17 Q   Sergeant Hennessy made a mistake entering this
18 information, is that correct?
19 A   Yes.
20 Q   Would you agree there is absolutely no officer that was
21 injured at all during this incident?  Would you agree with
22 that?
23 A   I don't know.
24     MR. NORINSBERG:  Play the recording.  What number is
25 the audio?

Anthony M. Mancuso, CSR    Official Court Reporter

1          MR. MEEHAN:  Eight.

2          MR. NORINSBERG:  At this time, I offer Plaintiff

3    Exhibit 8, which is the audio recording of this incident, into

4    evidence, on stipulation of the parties.

5          THE COURT:  All right.

6          (So marked.)

7          MR. NORINSBERG:  We're going to play one excerpt

8    right now.

9          (Tape plays.)

10          (Tape stops.)

11   Q    Now, MOS stands for police officer, member of service,

12   right?

13   A    Stands for member of service.

14   Q    Member of service means police officer, right?

15   A    Yes.

16   Q    The radio transmission, the dispatcher asked are there

17   any injuries to MOS and then there's a statement on there

18   saying no injuries to any member of service, right?

19   A    This statement was no injuries to MOS at this time.

20   Q    And that's recorded in real time when this was happening,

21   correct?

22   A    Yes.

23   Q    And since that time you've never learned of any officer

24   who was injured at the scene, did you?

25   A    Not that I know of, no.

1    Q    So there would be no reason to write on an arrest report

2    that an officer was injured, correct?

3    A    Correct.

4    Q    Now, you mentioned yesterday that you first made the

5    radio transmission as you were going up the stairs, is that

6    correct?

7    A    I'm sorry.  I believe I made my first transmission as I

8    was entering the building.

9    Q    As you were entering the building?

10   A    Yes.

11   Q    So you were entering the building chasing these four

12   males, correct?

13   A    Yes.

14   Q    Then you are making a radio transmission as you are

15   entering the building following them, right?

16   A    Yes.

17   Q    And yet there's no reference anywhere on the recording of

18   your following four males, is there?

19   A    I don't believe so, no.

20   Q    You heard that recording, right?

21   A    Yes.

22   Q    You heard it before you came to trial to testify,

23   correct?

24   A    Yes.

25   Q    You agree there is no reference that you made in that

1    radio transmission of following four men into the building,

2    correct?

3    A    Correct.

4    Q    Now, you testified yesterday about where you saw the gun

5    on the stairwell, correct?

6    A    Yes.

7    Q    And first I would like to have you take a look at the

8    gun.

9          MS. FUDIM:  No objection.

10          MR. NORINSBERG:  Plaintiff offers Plaintiff's

11   Exhibit 4 into evidence, a photograph of the gun and a

12   magazine.

13          THE COURT:  All right.  It's received.

14          (So marked.)

15   Q    Do you recognize this, officer?

16   A    Yes.

17   Q    What are we looking at here?

18   A    The firearm.

19   Q    And that's the firearm that was recovered that night,

20   correct?

21   A    Yes.

22   Q    And what we see here -- we see the gun itself here,

23   right?

24   A    Yes.

25   Q    And next to it is the magazine, is that correct?

1    A    Yes.

2    Q    And your claim is that magazine fell out while Andrew was

3    passing it to Jerome, is that correct?

4    A    Correct.

5    Q    Can you tell us exactly where that magazine fell out?

6    A    While in the stairwell.

7    Q    Where did it land?

8    A    On the step, the first step above the seventh floor

9    landing.

10          MR. NORINSBERG:  Your Honor, the parties have

11   stipulated to Plaintiff's Exhibits 43 A and B going into

12   evidence, photographers of the stairwell.

13          THE COURT:  What Exhibit numbers?

14          MR. NORINSBERG:  43 A and B.

15          THE COURT:  All right.  43 A and B will be received.

16          (So marked.)

17          MR. NORINSBERG:  May I approach the witness, your

18   Honor?  Let me show the photograph and then we'll follow up

19   with questions.

20   Q    Do you recognize what's shown in that photograph?

21   A    Yes.

22   Q    What is shown in that photograph?

23   A    The one to the right is the stairwell leading up to the

24   roof.

25   Q    Were you on this stairwell when you saw Andrew Smalls

1  hand the gun to Jerome?

2  A   No.

3  Q   Which stairwell were you on?

4  A   The one level below this.

5  Q   I'm going to show you 43 B.  That's the level below, is

6  that correct, sir?

7  A   The picture to the left looking at the level below.

8  Q   Do you see on that picture the location of where you were

9  when you were looking up the stairwell?

10  A   Sort of.  It's cut off at the end of the picture.

11  Q   The one on the right is actually the same stairwell,

12  isn't it, sir, just going up?

13  A   No.

14  Q   The first part going up and this continues going up,

15  isn't that true?

16  A   No.

17  Q   Do you see on this photograph where you actually saw the

18  transfer take place?

19  A   No.  It's not on this picture.

20  Q   It' not on the sixth floor picture I showed you or on the

21  seventh floor picture, is that right?

22  A   That's not right, sir.

23  Q   Do you see it on any of the photographs that I just

24  showed you?

25  A   No.  It was not depicted, my angle of where it took

1  place, no.

2  Q   Then just tell us verbally how many steps were you in

3  this stairwell -- were you on when you observed this?

4  A   I explained I was midway on the staircase between the

5  sixth and seventh floor.

6  Q   And your testimony is that's not shown in that

7  photograph, is that correct?

8       THE COURT:  Which photograph for the record?

9       MR. NORINSBERG:  41 B.

10       THE COURT:  41 B.

11       MR. NORINSBERG:  I'm sorry.  43 B.

12  A   The one to the right?  Which picture?

13  Q   The one to the right.

14  A   That picture is taken on the seventh floor landing up

15  towards the roof.  That's between seven and the roof, not

16  between six and seven.

17  Q   The one on the left, can you tell where you were in that

18  one?

19  A   The picture to the left is on the seventh floor landing

20  looking down towards six.  That does not show my angle.  It

21  shows their angle of what they saw.

22  Q   These are the pictures used at the criminal trial,

23  weren't they, sir?

24       MS. FUDIM:  Objection.

25       THE COURT:  Sustained.

1  Q   Do you know of any other pictures that we have not shown

2  you that shows the area where you were when you saw the gun?

3       MS. FUDIM:  Objection.

4       THE COURT:  Sustained.

5  Q   Showing you again 45.  The evidence collection team was

6  called to the scene, is that correct?

7  A   No.

8  Q   Was there a request that you made to have this gun

9  analyzed for forensic evidence?

10  A   Yes.

11  Q   When did you make that request?

12  A   From the precinct.

13  Q   When you got back to the precinct did you ask the

14  evidence team to do a DNA test on this gun?

15  A   I don't remember.  I don't know.

16  Q   There's no documentation that you ever asked, right, sir?

17  A   I don't believe so, no.

18  Q   Now, did you ask the evidence team to do a gun residue

19  test on Andrew?

20  A   No.

21  Q   You're familiar with gunshot residue, correct?

22  A   Yes.

23  Q   When somebody fires a gun there will be gun powder

24  residue that's ejected, correct?

25       MS. FUDIM:  Objection.

1       THE COURT:  Overruled.  You can answer.

2  A   I don't know exactly how it takes place.  I'm not an

3  expert in this field.

4  Q   You have been a police officer thirteen years now, right?

5  A   Yes.

6  Q   You know that when a gun is fired it ejects gun powder,

7  right?

8  A   Of course.

9  Q   And that powder lands on somebody's hands or clothing,

10  right?

11       MS. FUDIM:  Objection.

12       THE COURT:  Overruled.

13  A   I don't know where.  I've never tested it for such.

14  Q   You never learned as part of your training that you can

15  determine whether somebody fired a gun by looking at whether

16  or not there's gunshot residue on their body?

17       MS. FUDIM:  Objection.

18       THE COURT:  Overruled.

19  A   No.

20  Q   Now, you testified earlier that you saw this magazine

21  drop on stairwell, right?

22  A   Yes.

23  Q   In fact, the magazine never fell out of that gun, did it,

24  sir?

25  A   Yes, it did.

1  Q    When you found this gun, the gun was still loaded with
2  the magazine, isn't that true?
3  A    No.
4  Q    Do you recall giving the following testimony at the
5  pretrial hearing, February 20, 2008:
6       "QUESTION: --
7       MS. FUDIM:  Page and line number.
8       MR. NORINSBERG:  Page 15, line 23.
9       THE COURT:  Where are you reading from?
10      MR. NORINSBERG:  The pretrial hearing.
11      MS. FUDIM:  I would object, that the testimony be
12 read from line 18.
13      MR. NORINSBERG:  You can do it on cross-examination.
14      MS. FUDIM:  Under 104 I'm entitled to have all the
15 relevant testimony read now.
16      THE COURT:  Does someone have a copy of the
17 transcript?
18      MS. FUDIM:  I gave it to you yesterday, your Honor.
19      THE COURT:  I have grand jury, trial, deposition,
20 suppression.  Pretrial hearing?
21      MS. FUDIM:  The suppression, your Honor.
22      (Pause.)
23      THE COURT:  I think you should read from line 18.
24 BY MR. NORINSBERG:
25 Q    Referring to your testimony at the pretrial hearing,

1  starting with line 18.
2       "QUESTION:  Now, with regard to the magazine that
3  you found in the stairwell, what condition was the magazine
4  in?
5       "ANSWER:  That was loaded with six rounds."
6       Do you recall being asked that question and giving
7  that answer?
8  A    Yes.
9  Q    Now, the very next question:  And how about the silver
10 gun that was found on the roof, on the roof of the stairwell?
11      "ANSWER:  That was also loaded with one magazine,
12 one round in the chamber."  Do you recall being asked that
13 question and giving that answer?
14 A    Yes.
15 Q    So in the first question we read you testified you found
16 the something on the stairwell, and in the very next question
17 you said you found the magazine inside the gun that you
18 recovered, is that correct?
19      MS. FUDIM:  Objection.
20      THE COURT:  Yes.  I'll sustain the objection.
21      Was there one magazine or two magazines that you
22 found?
23      THE WITNESS:  One magazine.
24 Q    The magazine can't be at two places at the same time,
25 right, officer?

1  A    Correct.
2  Q    It's either inside of the gun or it's on the stairwell,
3  right?
4  A    It was on the stairwell.
5  Q    So when you testified that you actually found the
6  magazine -- that you actually found the gun loaded with one
7  magazine, were you incorrect about that?
8       MS. FUDIM:  Objection.
9       THE COURT:  Overruled.
10 A    It was loaded with one round.
11 Q    You testified "loaded with one magazine."
12      THE COURT:  No.  That's not the end of the quote.
13 Q    One round in the chamber?
14 A    One round in the chamber, yes.
15 Q    I'm asking about the first part.  Did you testify it was
16 loaded with one magazine?
17 A    That was incorrect, yes.
18 Q    Did the court reporter get it down wrong?
19      MS. FUDIM:  Objection.
20      THE COURT:  Overruled.
21 A    I don't know.
22 Q    But that was another mistake, sir?
23 A    Yes.  That's a mistake.
24 Q    Now, you told us here that the magazine dropped when
25 Andrew was transferring it to Jerome, right?

1  A    Yes.
2  Q    So did gun did not come out when Jerome actually took the
3  magazine out?
4  A    I'm sorry.
5  Q    The magazine didn't come out when Jerome actually
6  physically removed it from the gun?
7       MS. FUDIM:  Objection.
8       THE COURT:  Yes.  I'll sustain the objection to the
9  form of the question.
10 Q    Did you ever see Jerome take the magazine out of the gun?
11 A    It fell as it was being transferred.
12 Q    Referring to your grand jury testimony, page eight, line
13 seven:
14      "QUESTION:  What did Ronnie Smalls do when Andrew
15 Smalls handed him this particular item?
16      "ANSWER:  He took it and took the magazine out of it
17 and then all I saw was them going up the stairs."
18      MS. FUDIM:  Objection.  I would ask that it be read
19 until line 13, your Honor.
20      THE COURT:  Yes.  I think you need a complete
21 reading there.
22 Q    Starting with line seven, which I read before, down to
23 thirteen.  Page eight, line 7:
24      "QUESTION:  What did Ronnie Smalls do when Andrew
25 Smalls handed him this particular item?

1          "ANSWER:  He took it and took the magazine out of it
2  and then all I saw was them going up the stairs."
3          Do you recall giving that question and that answer
4  where I read the next question and answer -- do you recall
5  that part?
6          MS. FUDIM:  Same objection.  I think it has to be
7  read together is the court ruling.
8          THE COURT:  Read it all.
9  Q    "QUESTION:  Let me stop you there.  You said the
10  magazine fell out of the firearm at this point?
11          "ANSWER:  Yes."  Do you recall being asked that
12  question and that answer?
13  A    Yes.
14  Q    Again, back to back questions, your first answer you said
15  Jerome took the magazine out of the gun, the second answer is
16  the magazine fell out, is that correct?
17  A    I answered what was asked.
18  Q    I'm asking you, sir, did you say that Jerome "took the
19  magazine out of it"?
20  A    I explained that at the trial.
21  Q    Did you give that testimony?
22  A    Yes.  I gave that testimony.
23          MS. FUDIM:  I would also ask
24  that page seven, lines 14 to 23 be read.
25          MR. NORINSBERG:  I object, your Honor.

1          MS. FUDIM:  Is that same portion, your Honor, for
2  completeness and fairness, to the jury?
3          (Pause.)
4          THE COURT:  Yes.  I'll direct that they be read.
5          MS. FUDIM:  May I read it, your Honor?
6          THE COURT:  No.  Counsel can read it.  Line 14, what
7  are you requesting be read, line 14 to?
8          MS. FUDIM:  23, your Honor.
9          THE COURT:  Okay.
10          MS. FUDIM:  On page seven, the page before.
11          THE COURT:  Do you have the portion, counsel?
12          MR. NORINSBERG:  Yes.
13          MR. NORINSBERG:  Seven, line fourteen, right?
14          THE COURT:  Yes.
15  Q    "QUESTION:  What did you do when you chased after
16  them going from the sixth floor to the seventh floor?
17          "ANSWER:  After I pushed Cedric out of the way I
18  continued upstairs to the seventh floor.  I stumbled a little
19  on the stairs and I saw Andrew retrieve what appears to be a
20  silver firearm from his waist area, take his right hand up to
21  his brother Ronnie Smalls.  At that point I saw a magazine
22  drop out of the bottom of the firearm, landing on the stairs
23  and I continued going up the stairs."
24          MR. NORINSBERG:  Is there anything more?
25          MS. FUDIM:  No.

1  Q    Do you recall giving that testimony, sir?
2  A    Yes.
3  Q    So according to that grand jury testimony you saw the
4  magazine drop, is that right?
5  A    Yes.
6  Q    Did you ever write in any of your reports that you saw
7  Jerome attempt to discard the firearm?
8  A    Did I?  I believe so.
9  Q    You did or didn't?
10  A    I would have to look at what you are referring to.
11  Q    As we sit here now, sir, did Ronnie Smalls ever attempt
12  to discard the firearm when you were chasing him?
13  A    He had pushed it away from him and I believe he was in an
14  attempt when we found him.
15  Q    I'm sorry.  I didn't hear your answer.
16  A    He had it next to him and he was in an attempt to discard
17  it when we found him.
18  Q    Did he actually attempt to discard it?
19  A    I believe he was in route to do that.
20  Q    Is there a difference in your mind between a magazine
21  dropping to the ground on the one hand and somebody attempting
22  to discard it on the other?
23          MS. FUDIM:  Objection, your Honor.
24          THE COURT:  Overruled.
25  A    In regard to the firearm or magazine, sir?

1  Q    The magazine.
2  A    The magazine was discarded.
3  Q    So in your mind the words -- describing the magazine
4  dropping it's the same thing as being discarded?
5  A    Yes, they left it behind.
6          MS. FUDIM:  You can lay a foundation.  I'm not
7  stipulating to this.
8          MR. NORINSBERG:  Okay.
9          May I have this document just shown to the witness
10  for a moment, please?
11  Q    Do you recognize this document?
12  A    Yes.
13  Q    This is your handwriting, correct?
14  A    No.
15  Q    Do you recognize who wrote these notes?
16  A    No.
17  Q    Someone else wrote a description of the events other than
18  yourself?
19  A    Yes.
20  Q    Would that be your partner, Officer Teta?
21  A    I don't know.
22  Q    You are the arresting officer in this case, right?
23  A    Yes.
24  Q    You're responsible for generating all the reports in this
25  case, right?

1  A    Yes.

2  Q    You are the one who wrote the draft notes to put into the

3  reports, correct?

4  A    Yes.

5  Q    But it's your testimony you have no idea who wrote this

6  note relating to this incident?

7         MS. FUDIM:  Objection.

8         THE COURT:  I'll sustain the objection to the form

9  of the question.

10 Q    As you sit here now, can you think of anyone else besides

11 your partner who would have wrote this particular note in

12 Plaintiff's Exhibit 20 for identification?

13        MS. FUDIM:  Objection.

14        THE COURT:  Yes.  I'll sustain the objection to the

15 form of the question.

16 Q    To your knowledge, did Officer Teta write any documents

17 or draft any documents?

18 A    I don't know.

19 Q    I would like to go back to the record that we made

20 reference to before.  We're going to go through the recording

21 and I'm going to ask you some follow-up questions.

22        MS. FUDIM:  Your Honor, depending on how much longer

23 Mr. Norinsberg has, would it be possible to take a few minutes

24 for a bathroom break?

25        THE COURT:  Ladies and gentlemen, I'll excuse you to

1  the jury room, we'll take a ten-minute break.

2         MS. FUDIM:  Thank you, your Honor.

3         (Jury excused.)

4         THE COURT:  Counsel, how much longer are you going

5  to be?

6         MR. NORINSBERG:  I believe within a half hour we

7  should be wrapped up.

8         THE COURT:  How long do you believe you're going to

9  be?

10        MS. FUDIM:  Awhile, an hour and a half, probably.

11        THE COURT:  How could this event generate this much

12 testimony?  This happened in five minutes and we've been here

13 for a day and a half.

14        We'll resume in ten minutes.

15        (Recess taken.)

16        (In open court; jury not present.)

17        THE COURT:  Please ask the jury to come in.

18        (Jury present.)

19        THE COURT:  Please be seated.  Counsel, you may

20 continue.

21        MR. NORINSBERG:  Judge, we're now going to play the

22 audio, Plaintiff's Exhibit 8, stipulated into evidence.

23        (Tape plays.)

24        (Tape stops.)

25        THE COURT:  Are we waiting for more of the radio run

1  to be played?

2         MR. NORINSBERG:  Yes.  There are gaps and then it

3  will pick up again.  It's approximately ten minutes to be

4  played.

5         THE COURT:  How much silence do we have to listen

6  to?

7         MR. NORINSBERG:  It might be a minute or two more.

8         (Tape plays.)

9         (Tape stops.)

10        MR. NORINSBERG:  Your Honor, we're finished with the

11 audio.

12        THE COURT:  All right.

13 Q    Officer Collins, do you hear your voice on that audio?

14 A    Yes.

15 Q    You're the one who makes the transmission at the

16 beginning that there's a guy on the roof, right?

17 A    Yes.

18 Q    So we can agree that you don't say anything about

19 following four men into a building on this, do you?

20 A    No.

21 Q    And in fact the only time we hear about four people is at

22 the very end of that recording when it says four under,

23 correct?

24 A    Yes.

25 Q    Now, your very first transmission that's on this audio

1  that we just listened to, you say "got a guy on the roof."

2         MS. FUDIM:  Objection.

3  Q    Do you recall hearing that?

4         THE COURT:  Overruled.  He can answer.

5  A    That's not my first transmission.

6  Q    Did you hear that transmission, the first description of

7  somebody on the roof it says "got a guy on the roof?"  Did

8  you hear that?

9         THE COURT:  Is your question directed to the first

10 time there was a mention of someone arrested?

11        MR. NORINSBERG:  The first time there's a mention of

12 somebody being on the roof, your Honor.

13 A    I believe that was part of it, yes.

14 Q    So my question is:  Was it you who said "got a guy on the

15 roof"?

16 A    That's part of the transmission.

17 Q    I understand.  Did you those those words?

18 A    Yes.

19 Q    Then shortly afterwards you said "there's two on the

20 roof."  Do you recall that?

21 A    Yes.

22 Q    And then immediately after that, you clarified and said

23 "we got one stuck in the stairs on six.  We got one on the

24 roof armed."  Do you recall that?

25 A    I believe it was stopped on the stairs on six.

1  Q    Okay.  You said we got one stopped on the stairs on six
2  and we got one on the roof armed, right?
3  A    Yes.
4  Q    Then the next transmission that you made, according to
5  what we just listened to, you said "got a male on the roof
6  with a gun and we got one stopped in the hall there on sixth
7  floor."  Correct?
8  A    Yes.
9  Q    And then the next transmission you said "you got one
10 -- on the sixth floor in the hallway.  We got a male with a
11 gun on the roof."  Do you recall hearing that, sir?
12 A    I only said all that once.  I think you repeated it.
13 Q    We'll play it later on in separate clips during this
14 trial.  From what you just heard, do you recall hearing that?
15 A    Yes.
16       MS. FUDIM:  Objection.
17       THE COURT:  I'm sorry.  It's just not clear.
18 Hearing what?
19 Q    Do you recall hearing "you got one on -- on the sixth
20 floor in that hallway, you got a male with gun on the roof?"
21 A    I believe I said there was one stopped on the sixth floor
22 stairwell and one on the roof.
23 Q    You heard the dispatcher confirm that, repeat it back to
24 you to make sure it was correct?
25 A    She repeated it, yes.

1  Q    And then shortly after you transmitted "we got one man
2  stopped on the rooftop."  Correct?
3  A    I don't believe that was me.
4  Q    Somebody transmitted that, correct?
5  A    Yes.
6  Q    Now, there was also mention by the dispatcher two
7  plainclothes units on the rooftop; do you recall that?
8  A    Yes.
9  Q    And how many members of those two plainclothes units were
10 on the rooftop?
11 A    I don't know.
12 Q    Can we agree, Officer Collins, that the man stopped in
13 the hallway on the sixth floor was Cedric Smalls?
14 A    Yes.
15 Q    And I would like to put on 43.B.
16       THE COURT:  Are you sure that's 43, counsel, or 42?
17       MS. FUDIM:  He's right.  I think it is 43.
18       THE COURT:  There's something different behind 43 in
19 the book.
20       MR. NORINSBERG:  Defense counsel and I agreed these
21 are part of 43.  This would be B.
22       THE COURT:  You got to figure out at some point
23 later what you put in as 43.  All right.  Go ahead.
24 Q    Do you see the area where Cedric Smalls was stopped in
25 either the left photo or the right photo?

1  A    The left photo.
2  Q    Can you identify with a marker -- I'll give it to you in
3  a minute -- can you identify with a marker where Cedric Smalls
4  was stopped?
5  A    Yes.
6       MR. NORINSBERG:  If I could approach the witness?
7  Q    Could you please mark with a C where Cedric is and could
8  you please mark with a T where Officer Teta is?
9  A    This here.
10 Q    So when we hear repeated reference to a man stopped on
11 the sixth floor, we know we're talking about Cedric Smalls in
12 that area you designated with a C, is that correct?
13 A    Yes.
14 Q    And then later in the audio we hear that this man is
15 brought to the seventh floor and then out onto the roof,
16 correct?
17       MS. FUDIM:  Objection.
18       THE COURT:  Overruled.  Is that what we heard?
19       THE WITNESS:  No.  No.
20 Q    Isn't that what happened, Officer Teta stayed with Cedric
21 Smalls until the backup units arrived and when the backup
22 units arrived they brought Cedric up to the roof where all the
23 other police officers were; isn't that what happened?
24 A    No.
25 Q    Now, when you got back to the precinct you started doing

1  your paperwork, is that correct?
2  A    Yes.
3  Q    And there were four different suspects who had been
4  arrested, correct?
5  A    Yes.
6  Q    You had to do paperwork for all of them, correct?
7  A    Yes.
8  Q    When you started doing the paperwork for these different
9  suspects you started to get confused as to who did what, isn't
10 that true?
11 A    No.
12 Q    I show you what's been marked in evidence as Plaintiff's
13 Exhibit 33.  This is Jerome Nelson's pedigree card, is that
14 correct?
15 A    Yes.
16 Q    Do you see that, sir?
17 A    Yes.
18 Q    Now, directing your attention, do you see where it says
19 primary charge?
20 A    Yes.
21 Q    You wrote CPW?
22 A    Correct.
23 Q    So for Jerome Nelson you wrote that he was being charged
24 with criminal possession of a weapon?
25 A    Yes.

1  Q     You never saw Jerome Nelson in possession of a weapon
2  that night, did you, sir?
3  A     No.
4  Q     He was stopped and arrested on the third floor, wasn't
5  he?
6  A     Correct.
7  Q     He was stopped and arrested by Officer Cabrera and
8  Officer Alvarado, correct?
9  A     Correct.
10 Q     He never even made it up to the roof that night, did he?
11 A     No, he did not.
12 Q     When you wrote CPW for Jerome that was a mistake, wasn't
13 it, sir?
14 A     No.
15 Q     He wasn't actually charged with criminal possession of a
16 weapon at any time, was he, sir?
17 A     No.
18 Q     If he wasn't actually charged with that, the fact that it
19 lists primary charge as criminal possession of a weapon is a
20 mistake, isn't it?
21 A     This form was filled out immediately when they walked
22 into the precinct.
23 Q     It's a mistake what is written there, isn't it?
24 A     If I could explain why.
25 Q     I'm asking you a simple question.  Is it a mistake or

1  not?
2  A     It's incorrect.
3        MS. FUDIM:  Objection.  The witness should be
4  allowed to finish his answer.
5        THE COURT:  What is your response?
6        THE WITNESS:  This is before I understood the law
7  of what I actually charged the individual with.  After I
8  filled this out, when they walked in the precinct I read the
9  law and then charged him accordingly.  I did not know the law
10 at the time.
11 Q     You didn't know the law at the time you arrested these
12 four suspects?
13 A     Did not know the context of who would be charged with
14 what.
15 Q     So you thought that somebody who had been arrested on the
16 third floor by two other police officers and had no connection
17 with that gun could be charged with criminal possession of a
18 weapon?  Is that what your testimony is?
19 A     I'm trying to explain that everyone arrested in one event
20 I thought would be charged in concert with.  Then I clarified
21 and charged accordingly.
22 Q     So you didn't know the law before you made the arrest but
23 afterwards you looked it up and found out what the law was?
24       MS. FUDIM:  Objection.
25       THE COURT:  Sustained.

1  Q     You got these guys mixed up and confused with each other,
2  didn't you, officer?
3  A     No.
4  Q     At the beginning on the top of the same document you see
5  there's a two there?
6  A     Yes.
7  Q     And then it's crossed out and there's a four?
8  A     Yes.
9  Q     The two stands for perp number two, right?
10 A     Yes.
11 Q     Perp number two, that would be one of the two defendants
12 who had the gun with them, right?
13 A     No.
14 Q     And then you crossed that out and you made your own perp
15 number four; isn't that what happened?
16 A     I did not reference what you just said.
17 Q     Did you cross out the two write a four?
18 A     Yes.
19 Q     You realize that he was not actually the one with the
20 gun, is that correct?
21 A     No.
22 Q     I'm going to show you now 32, which is Cedric's pedigree.
23 Down on the bottom of this document, you see there's a one
24 written there?
25 A     Yes.

1  Q     And that one means perp number one, doesn't it?
2  A     Yes.
3  Q     Then you crossed out perp number one and you wrote three,
4  correct?
5  A     Yes.
6  Q     So you had them confused, you thought Cedric was one of
7  the guys as number one and you changed it to three, is that
8  right?
9  A     I'm sorry.
10 Q     Were you confused as to what role Cedric played in this?
11 A     Absolutely not.
12 Q     So you changed the number from one to three.  Why did you
13 do that, sir?
14 A     Part of getting organized and getting everything in the
15 right order.
16 Q     So at some point you realized that things were not in the
17 right order and you wanted to fix that, correct?
18 A     As far as the paperwork on the desk sitting in front of
19 me, yes.
20 Q     I'm going to show you -- do you see the notation that
21 Cedric was wearing a gray hoodie?
22 A     Yes.
23 Q     I show you 48.  That is the mug shot photo of Cedric,
24 right?
25 A     Yes.

1  Q   He's not wearing a gray hoodie here, is he, sir?

2  A   No.

3  Q   Now, you also took Polaroids that night, correct?

4  A   Yes.

5          MS. FUDIM:  Objection to the word also.

6          THE COURT:  Did you take the mug shots?

7          THE WITNESS:  No, I did not.

8  Q   You took Polaroid photos that night, correct?

9  A   Yes, I did.

10 Q   You took photos of all of the four defendants, correct?

11 A   Yes, I did.

12 Q   There should be a photo of Cedric as well, correct?

13 A   Yes.

14 Q   That would be kept as part of your police records on this

15 case, correct?

16 A   Yes.

17 Q   But you don't have that photo, do you, sir?

18         MS. FUDIM:  Objection.

19         THE COURT:  Yes.  I'll sustain the objection.

20 Q   Where is the Polaroid photograph that you took of Cedric?

21         MS. FUDIM:  Objection.

22         THE COURT:  Sustained.

23 Q   Do you have any knowledge --

24         THE COURT:  Can I see you at sidebar, please?

25         (Sidebar.)

1          THE COURT:  This was the sealed juvenile record, is

2  that correct?

3          MR. NORINSBERG:  This is unsealed per court order.

4  The court unsealed it.

5          THE COURT:  I understand that.  That's not my

6  problem.  These were records forwarded as a result of that

7  order, correct?

8          MR. NORINSBERG:  Right.  And there's a missing

9  document, judge.

10         THE COURT:  Now are you arguing that he's

11 responsible for the missing document?

12         MR. NORINSBERG:  He just testified that photo should

13 be part of his file.  He didn't say it shouldn't be.  Why

14 can't I develop a record to establish a missing document?  Why

15 am I precluded from that?  I don't understand that.  He said

16 he took the picture.  It should be part of the file.  I should

17 be able to ask the question.

18         THE COURT:  You did ask the question.

19         MR. NORINSBERG:  No.  I got stopped immediately.

20         MS. FUDIM:  I think that it's completely unfair.

21 The documents that were subpoenaed with the unsealing were

22 documents related to the arrest that were processing documents

23 that were subpoenaed from NYPD.  He's now asking about

24 Polaroid photos that could have been kept in this witness'

25 personell file.  We don't have a personell --

1          THE COURT:  What do you mean this witness's

2  personell file?

3          MS. FUDIM:  With regard to Mr. Smalls's answer,

4  which is the subject of this lawsuit.  The file that he would

5  have maintained for this witness was produced many years ago

6  when this litigation started and presumably, perhaps, there

7  was a file that would not have been the same file for

8  Mr. Smalls because these are individuals.  It wouldn't have

9  been a file for Mr. Cedric Smalls and that document could have

10 been in it or could not have been in it.  We don't know.

11 That's not the documents they asked us to unseal.  The

12 documents they asked us to unseal are the mug shot pedigree

13 and we did not even though the request was six years too late.

14 There has not been a request for us to get back and pull

15 documents for the underlying police photo documents for Cedric

16 Smalls who was a juvenile and his arrest was sealed.  The

17 implication that this witness somehow did something nefarious

18 with this document is completely out of hand.  There's just no

19 foundation for that.

20         THE COURT:  Do you mean this officer's folder, the

21 Polaroids that he kept, would have been under seal as well?

22         MS. FUDIM:  Any document pertaining to someone who

23 is arrested under seal would be sealed.  It wouldn't

24 necessarily be the same folder that -- we arrested four

25 different people in one night and the police department keeps

1  records for each one of them.  They are each entitled to their

2  own confidentiality of the under seal provisions.  The idea

3  that these folders would have been sitting in Andrew Smalls's

4  is a presumption that's unfair.

5          THE COURT:  Are you saying they would have been kept

6  in a separate file that was asked for or subpoenaed?

7          MS. FUDIM:  We have no idea where they are kept.

8  That was not the documents they asked us to produce last week.

9  They asked to us produce the mug shots last week.  We asked

10 for an unsealing order and we produced the documents they

11 requested.  I have no idea where these Polaroids are kept.

12 The implication that he didn't produce it is unfair.

13         THE COURT:  That is a problem if you didn't ask for

14 it.

15         MR. NORINSBERG:  Polaroids for the others were

16 produced.

17         THE COURT:  They were not juveniles.  They were not

18 sealed.  Presumably everything about a juvenile is supposed to

19 be sealed.  If your request didn't encompass these Polaroids,

20 then it's not fair to act like there's some missing document.

21         MR. NORINSBERG:  We asked for mug shot photos of

22 Cedric and we were given not a single one that shows his face.

23 I'm asking open-ended questions where would it be.  Why can't

24 I establish a record and then the court can rule later on if

25 I'm entitled to the charge.  Why can't I ask a question if

1  he knows where it would be.
2        THE COURT:  You can ask him where Polaroids would be
3  kept.  I'll allow you to ask him that question.  But you did
4  not request that those be produced and I don't think it's fair
5  for you to argue to the jury that they are missing when you
6  didn't ask for them to be produced.
7        MR. MEEHAN:  Your Honor, if I can interject with
8  this.  Ms. Fudim told me yesterday the reason Polaroids were
9  taken was because the photo machine at the precinct was
10  broken.  These were taken in lieu of the mug shots.  These are
11  the mug shots.
12        MS. FUDIM:  If we want to he elicit from this
13  witness he took the photo on the Polaroid camera because the
14  digital camera was broken, that's fine.  That doesn't make
15  these the mug shot photos.  We have the mug shot photos that
16  were taken on the sheet that says mug shot.
17        THE COURT:  You can ask him did he take Polaroids of
18  Cedric.  I don't want you to suggest to this jury, based on
19  what I am hearing here at sidebar, that this is something that
20  he is somehow shielding from you.  These are juvenile records
21  and you had to subpoena them.  You did it at the last minute.
22  You didn't request these Polaroids.  I don't think it's fair
23  to argue that somehow this witness it's keeping these
24  photographs from the jury.  That's just not fair.
25        MR. MEEHAN:  How could we have known the Polaroids

1  were taken in lieu of the mug shots until today?
2        THE COURT:  Who said the Polaroids were taken in
3  lieu of the mug shots?
4        MS. FUDIM:  I didn't say they were taken in lieu of
5  mug shots.
6        THE COURT:  They have a mug shot.
7        MR. MEEHAN:  Those were taken at central booking.
8  These are the ones at the precinct.
9        THE COURT:  You can inquire about the photographs.
10  I don't want your question to suggest that he has shielded you
11  from getting these.
12        MR. NORINSBERG:  Did you get to take Polaroid
13  photographs?  Do you mean where were they maintained?
14        MS. FUDIM:  Can we ask that the witness answer that
15  one question at sidebar?
16        THE COURT:  No.
17        (In open court.)
18  BY MR. NORINSBERG:
19  Q    Officer Collins, did you take a Polaroid photograph of
20  Cedric Smalls?
21  A    The night of his arrest.
22  Q    I believe I did, yes.
23  Q    To your knowledge, officer, where would that Polaroid
24  photographs be maintained?
25  A    Most likely in my records.

1        (Pause.)
2        MS. FUDIM:  Your Honor, I don't have a copy of this
3  document because it was not on the JPTO or in their binder.
4  They don't have a spare document.  May we have your clerk or
5  someone make a copy?  I don't have this document.  It was not
6  conveyed to me that it was this was being added to the list.
7        THE COURT:  What exhibit number are you referring
8  to?  Do you have this marked as an exhibit, counsel?
9        MR. MEEHAN:  Yes.  Exhibit 49, your Honor.
10        MS. FUDIM:  I have no objection to the document.  I
11  just want a copy of it.
12        THE COURT:  Is this an arrest report?
13        MR. NORINSBERG:  Yes.
14        MS. FUDIM:  Thank you, your Honor.
15  Q    Can we agree, Officer Collins, that what we are
16  looking at right now was the mug shot picture of Cedric
17  following his arrest in this incident?  Can he we agree with
18  that?
19        MS. FUDIM:  Objection.
20        THE COURT:  Overruled.  He can answer it.
21  A    I don't know.
22  Q    Sir, I would like you to compare the arrest ID numbers on
23  Plaintiff's Exhibit 49 and Plaintiff's Exhibit 48.
24  A    Yes.
25  Q    Now, having compared the arrest ID numbers from the

1  arrest report with that photograph, can you tell the jury was
2  that picture taken of Cedric Smalls on the night of his
3  arrest?
4        MS. FUDIM:  Objection.
5        THE COURT:  Overruled.
6  A    I don't know.
7  Q    The numbers match exactly, don't they?
8  A    The numbers match, yes.
9  Q    The arrest number matches with the mug shot.  It tells
10  you that mug shot was in connection with this arrest, doesn't
11  it?
12  A    No.
13  Q    So it could be some other arrest even though the ID
14  number is exactly the same?
15  A    I don't know.  I did not prepare that.
16  Q    Now, after this arrest you had conversations with the
17  Assistant District Attorney while you were at the precinct, is
18  that correct?
19  A    Yes.
20  Q    As the arresting officer, you had the obligation to give
21  information to the DA's office about what happened, correct?
22  A    Yes.
23  Q    And you knew that the DA's office would rely on the
24  information that you gave them regarding this arrest, correct?
25  A    Correct.

1  Q    And you are aware as you sit here today that the district
2  attorney did in fact rely on what you represented to them,
3  right?
4  A    Yes.
5  Q    Now, you also sent your police paperwork to the DA's
6  office, correct?
7  A    Yes.
8  Q    And you knew that the DA's office would rely on your
9  reports in order to formalize charges against the defendants,
10 correct?
11 A    Yes.
12 Q    Now, you also spoke to an Assistant District Attorney
13 prior to when you testified in the grand jury, correct?
14 A    Yes.
15 Q    You spoke to ADA Brovner, correct?
16 A    I believe so.
17 Q    You told ADA Brovner you saw Andrew remove a gun from his
18 waist and hand it to his brother, correct?
19 A    I believe so.
20 Q    You told ADA Brovner that you saw Andrew holding a gun in
21 his hand, correct?
22 A    I believe so, yes.
23 Q    You told ADA Brovner that you found Andrew on the roof,
24 is that correct?
25 A    Yes, I believe so.

1  Q    And you told him that you were the one who arrested him
2  on the roof, correct?
3  A    I believe so, yes.
4  Q    Now, are you familiar with what's known as a memo book?
5  A    Yes.
6  Q    What's a memo book, officer?
7  A    It's a record that we keep of every incident that we go
8  to.
9  Q    You made a memo book entry relating to this incident,
10 correct?
11 A    Yes.
12      MR. NORINSBERG:  Plaintiff's Exhibit 10.
13      MS. FUDIM:  No objection.
14      MR. NORINSBERG:  Plaintiff offers Exhibit 10 into
15 evidence on stipulation of the parties.
16      THE COURT:  It will be received.
17      (So marked.)
18 Q    That's the cover page of your memo book, is that correct,
19 sir?
20 A    Yes.
21 Q    Can you please read into the record the first part of
22 this memo book entry?
23 A    Friday, 5-19-06.  Can you zoom in?  I'm having difficulty
24 reading it.
25 Q    Sure.

1  A    Thank you.
2       1730 by 205, time, 100 precinct.  I don't know what
3  it says after that.  White, return date, 7-13-06.  1730
4  present for duty, muster -- I can't read the rest -- post ten.
5  I think it says 2100 meal.
6  Q    Then going to the second part of this exhibit, starting
7  at 110 a.m., can you read into the record what it says
8  relating to this incident?
9  A    0110 one shot fired rear of 8110 RBB.  0110 foot pursuit.
10 85 up, 8105 RBB.  0124, 92 C, which is Charley times four.
11 0124 transport to -- I don't know what that says.  0130, 83,
12 08-05 start day tour.  I'm not sure what that says and
13 sometime end of tour.
14 Q    Would you agree what's written here is the entire account
15 of the incident in your own memo book, is that correct?
16 A    Yes.
17 Q    Now, you didn't mention anything in the memo book about
18 seeing Andrew Smalls handing off a gun to his brother in the
19 stairwell, did you?
20 A    No.
21 Q    You didn't mention anything about seeing Andrew Smalls
22 holding a gun, did you?
23 A    No.
24 Q    Did you mention anything about where you arrested the
25 individuals you arrested?

1  A    No.
2  Q    There are no other entries in your memo book relating to
3  this incident, correct?
4  A    Correct.
5  Q    Now, you are actually friends with Officer Teta?
6  A    I'm sorry.
7  Q    Are you friend with Detective Teta?
8  A    We are friends.
9  Q    Are you still friends?
10 A    I have not spoken to him in awhile.
11 Q    When was the last time you spoke to him?
12 A    Besides yesterday, a couple of years ago.
13 Q    So Detective Teta doesn't work where you work, does he?
14 A    No, no longer.
15 Q    When was the last time you worked together?
16 A    I don't remember.
17 Q    But you still stayed in touch with him after you weren't
18 working together, right?
19 A    No.
20 Q    Didn't you say you spoke to him around two years ago?
21 A    I said a few years ago.
22 Q    When was that, sir?
23 A    I don't know.
24 Q    You have actually socialized with him six months before
25 you testified in your deposition, didn't you?

1  A    Not that I remember.
2  Q    Now, at the time of this arrest you were still a rookie
3  police officer, correct?
4  A    Yes.
5  Q    You had actually graduated from the academy in January of
6  2006, correct?
7  A    July of 2005.  I'm sorry.  December of 2005 I graduated.
8  Q    You completed your training at the police academy in
9  January of 2006, correct?
10 A    I graduated December I believe 28, 2005.
11 Q    Would you agree that at the time of this incident you had
12 been a police officer for just about five months?  Would you
13 agree with that, sir?
14 A    Yes.
15       MR. NORINSBERG:  Thank you, Officer Collins.  I have
16 nothing further.
17       THE COURT:  Counsel.
18       MS. FUDIM:  Yes, your Honor.  Can I have a minute to
19 move stuff?
20       THE COURT:  Yes.
21       MS. FUDIM:  Thank you, your Honor.
22       (Pause.)
23
24 CROSS-EXAMINATION
25 BY MS. FUDIM:

1  Q    Good afternoon, Officer Collins.
2  A    Good afternoon.
3  Q    On his examination plaintiff's counsel asked you about a
4  lot of different documents.  We're going to get to that.  I
5  want to start with one in particular.  Do you recall being
6  asked questions about the arrest report of Ronnie Smalls?
7  A    Yes.
8  Q    And that came into evidence as Exhibit 27.  Do you
9  recognize that as the arrest report of Ronnie Smalls that you
10 were asked about on your direct examination?
11 A    Yes.
12 Q    And one of the things that you were asked about with
13 respect to this document was whether or not there was a box
14 marked officer injured; do you recall that?
15 A    Yes.
16 Q    And your response was that you didn't prepare this
17 document?
18 A    Correct.
19 Q    And that you actually prepared a handwritten version of
20 it?
21 A    Yes.
22 Q    What was the word you called the handwritten version?
23 A    A scratch report.
24 Q    Plaintiff's counsel didn't show you that, correct?
25 A    Correct.

1  Q    I would like to do so.
2        MS. FUDIM:  This is Plaintiff's Exhibit 21.  Would
3  counsel stipulate?
4        MR. NORINSBERG:  We thought that was in evidence.
5        MS. FUDIM:  You didn't put it in evidence now.
6        MR. NORINSBERG:  I think this is the complaint
7  report and draft complaint report.
8        MS. FUDIM:  This is for Ronnie Smalls.
9        MR. NORINSBERG:  We don't object.
10       THE COURT:  This is Plaintiff's Exhibit what?
11       MS. FUDIM:  It was premarked as Plaintiff's Exhibit
12 21.  Plaintiff did not enter it.  I can relabel it with a
13 Defendant's Exhibit.
14       THE COURT:  You can call it plaintiff's.
15       MS. FUDIM:  Yes, your Honor.
16 Q    Officer, do you recognize this document?
17 A    Yes.
18 Q    And is this --
19       MR. NORINSBERG:  What is the post-it?
20       MS. FUDIM:  It's the line I'm going to point out.
21 Q    Do you recognize this as the document you were referring
22 to when you said that you created a handwritten draft of the
23 document that someone else entered into the system?
24 A    Yes.
25 Q    And it's several pages, is that right?

1  A    Yes.
2  Q    Whose handwriting is on the page of this document?
3  A    That's mine.
4  Q    I'm going to point --
5        THE COURT:  So you have offered Plaintiff's Exhibit
6  21 in evidence.  It will be received.
7        (So marked.)
8  Q    Do you see what I am pointing at?
9  A    Yes.
10 Q    Can you read that to the court?
11 A    Arresting officer injured, yes or no, and no is checked
12 off.
13 Q    When you testified earlier that the individual who copied
14 your information and put it into a typewritten arrest report
15 must have entered it incorrectly, that was true, correct?
16       MR. NORINSBERG:  Objection.
17       THE COURT:  Overruled.
18 A    Correct.
19 Q    We'll come back to some of the other documents.  Let me
20 ask you this now.  How many years have you been working for
21 the police department currently?
22 A    Approximately thirteen.
23 Q    And have you been in the same precinct the whole time?
24 A    Yes.
25 Q    What precinct is that?

1   A    100 precinct.
2   Q    What geographic area does that cover?
3   A    Rockaway Park, Rockaway and Arverne area.
4   Q    Do you currently have any specific role with respect to
5   your duties and responsibilities?
6   A    I'm currently a field training officer.
7   Q    Can you tell the jury what that is?
8   A    I work with the officers right after they graduate the
9   academy.  I work with them for about six months showing them
10  how to implement what they do, from what they learn to what to
11  actually implement their tactics and learn what we do.
12  Q    You said that program is about six months?
13  A    Yes, six months after they graduate until they go into
14  their own sectors and such.
15  Q    Mr. Norinsberg asked you about the fact that that you
16  were out of the academy about five months when this incident
17  took place, is that correct?
18  A    Yes.
19  Q    Were you part of the field training program as a
20  participant at that time?
21  A    Yes.
22  Q    On the night of the incident do you know what your tour
23  was, meaning your schedule, the hours you would be working?
24  A    Yes.  I was scheduled as six to two which was a 5:30 to
25  two a.m.

1   Q    Right before your tour ended, where were you?
2   A    I was walking into 8410 Rockaway Beach Boulevard.
3   Q    Why were you walking into that building?
4   A    We were meeting up with the other posts and I using the
5   bathroom before we went back to the precinct.
6   Q    Was there a specific room that you were going into?
7   A    The rec room inside that building.  It's a former
8   apartment that we use as an office there.
9   Q    You said you were meeting up with the other posts, who
10  were you referring to?
11  A    Officer Cabrera and Alvarado.
12  Q    Anyone else with you?
13  A    My partner Officer Teta.
14  Q    Can you tell the jury in your own words what happened
15  while were in the rec room at 1:30 in the morning?
16  A    We heard a gunshot right outside the windows to the
17  building.
18  Q    What did you do?
19  A    I immediately went outside.  I was close to the entrance
20  of the building, to the room.  I immediately went outside and
21  started walking around to the rear where I heard that gunshot.
22  Q    Why did you do that?
23  A    To investigate what it was to see if anybody was back
24  there, to see if anything was going on, basically just to
25  start the investigation to see what I can find out.

1   Q    Can you tell the jury what you saw when you went outside?
2   A    Once I got around to the side of the building I saw five
3   individuals walking from the rear of the building in an
4   eastward direction.
5   Q    And how many of the individuals were men?
6   A    It was four males and one female.
7   Q    At that time did you know who any of these people were?
8   A    No.
9   Q    But you later came to learn the identity of some of them?
10  A    Yes.
11  Q    Who were the four that you came to learn the identity of?
12  A    I learned the four names were Andrew Smalls, Ronnie
13  Smalls, Cedric Smalls and Jerome Nelson.
14  Q    What about the woman?
15  A    I never learned her name.  We didn't stop her.
16  Q    To be clear, did you ever see the woman do anything
17  illegal?
18  A    No.
19  Q    And you said she was never stopped.  Would it be fair to
20  say she was never arrested?
21  A    Correct.
22  Q    Plaintiff's counsel asked you questions about why her
23  name or a description of her doesn't appear in any of your
24  police paperwork.  Do you want to explain that to the jury?
25  A    At the time I ran right past her.  So I did not have time

1   to acquire that.
2   Q    Would you typically put information about a person in an
3   arrest report who you didn't see do anything illegal?
4   A    Absolutely not.
5   Q    Now, when you first saw the four men, what were they
6   wearing?
7   A    Wearing jackets, a black jacket, a red jacket, gray
8   hoodie and a blue jacket.
9   Q    Can you tell me who was wearing what when you first saw
10  them?
11  A    Andrew was wearing the black jacket, Jerome the red
12  jacket, Cedric the gray hoodie and Jerome the blue jacket.
13  Q    We'll come back to the clothing.  Yesterday when you were
14  asked by Mr. Norinsberg -- there was a question about what
15  plaintiff Andrew Smalls was wearing, you said something to the
16  effect of he was wearing both, what did you mean he was
17  wearing both?
18  A    He was wearing a black jacket and underneath the black
19  jacket was a gray hoodie.
20  Q    There were some mug shots shown to you of these various
21  individuals.  We'll get to that.  Do you recall seeing a mug
22  shot photo of plaintiff Andrew Smalls?
23  A    Yes.
24  Q    You pointed out he was wearing a gray hoodie?
25  A    I'm sorry.

1  Q   Do you recall seeing a mug shot photo of Mr. Smalls in
2  which he was wearing a gray hoodie?
3  A   Yes.
4  Q   Do you know why he wouldn't have been photographed
5  wearing a black jacket?
6  A   Yes.  He -- once he comes into the precinct we remove the
7  outer garments before they go into the cells.  Generally they
8  contain ropes and like strings.  We don't allow them to have
9  them in the cells and they do not get that back until they get
10 transported to central booking.
11 Q   Generally are mug shot photos taken with individuals
12 wearing their jackets?
13 A   No.  They are also cumbersome and protrude above the
14 shoulder and interfere with the pictures.
15 Q   Now, going back to the event in question in terms of
16 chronology, after you saw these men, what was the next thing
17 that you did?
18 A   Proceeded to follow them.  They were the only ones that
19 we saw anywhere behind the building.  So we just started to
20 follow them, trying to get closer and see if we can see
21 anything and understand what happened.
22 Q   Now, you were asked questions about the distance you were
23 originally to them and there was some prior testimony that was
24 read in where you said approximately 40 to 50 feet and then
25 you qualified on the stand that you didn't have a tape

1  measure.  Looking at the courtroom as a frame of reference,
2  can you approximate for us a visual site somewhere in this
3  courtroom how far they were initially from you?
4  A   Initially they were approximately from me to you.
5  Q   Tell me what happened as you started to follow them.
6  A   We continued.  They were just walking through the
7  pathways of the park and we just tried to walk a little bit
8  faster and gain some distance between them.
9  Q   Originally you were walking and they were walking?
10 A   Correct.
11 Q   Did there come a point time when anyone was running?
12 A   At some point we were close the corner of the building of
13 8105 and the female that was walking with them turned back
14 towards us and made some type of motion to them and all four
15 men ran into 8150.
16 Q   What were you wearing that day?
17 A   My uniform.
18 Q   What was your partner wearing that day?
19 A   His uniform.
20 Q   I'm going to show you what has been entered into evidence
21 as Plaintiff's Exhibit 2.  You were mentioning buildings?
22 A   Yes.
23 Q   Just so we can refresh everyone's recollection.  Maybe
24 you can just show us if you use your finger and show us the
25 path?

1  A   So we started approximately this area and then we walked
2  through here.  They are all walkways here.  To about here and
3  then into that building.
4  Q   What happened after you started following the men?
5  A   Like I said, they started running at the corner of 8105
6  and we ran right into the lobby of that building.
7  Q   From the time you started following them until they ran
8  into 8105 did you ever lose sight of the group?
9  A   No.
10 Q   Now, at that time how would you describe your strength as
11 a runner?
12 A   Pretty good.  I just graduated the academy, running
13 anywhere from three to five miles a day.
14 Q   What about steps, did you have any experience running up
15 stairs?
16 A   Yes.
17 Q   What was that experience?
18 A   In my other life, my role as a fireman where we do a lot
19 of stair climbing with equipment and I had been doing that for
20 quite a long time.
21 Q   You were asked questions about various lighting
22 conditions in different places.  Let's start with outside.
23 What was the lighting conditions like outside when you were
24 following these men?
25 A   Dimly lit.  There was some street lights but not all were

1  working.
2  Q   What about when you got into the stairwell?
3  A   Dimly lit.  Some of the landings had lights that were
4  working, some did not.
5  Q   There was also a question about surveillance cameras and
6  I believe you testified that those were installed a couple of
7  years ago?
8  A   Yes.
9  Q   To be clear, were there security cameras at the time back
10 in 2006?
11 A   No.
12 Q   I'm going to show you what is part of Plaintiff's Exhibit
13 2.  Plaintiff's counsel did not put this page into evidence.
14      MR. NORINSBERG:  Objection to the commentary.
15      THE COURT:  I'll sustain the objection.  Do you want
16 to move two into evidence?
17      MS. FUDIM:  I was trying to ask if there was an
18 agreement that we could put the last page of Plaintiff's
19 Exhibit 2 into evidence.
20      MR. NORINSBERG:  I put the diagram into evidence.
21      THE COURT:  It's your Exhibit two.
22      MR. NORINSBERG:  My Exhibit two existed of a single
23 document.  I offered the map.
24      THE COURT:  It may be what you offered in.  The
25 Exhibit two that is in my book has more pages.  Do you want to

1  offer all three pages?

2      MS. FUDIM:  I want to point out something on the

3  fourth page.

4      THE COURT:  Do you want to offer it?

5      MS. FUDIM:  Yes.

6      THE COURT:  So you are offering the entire exhibit?

7      MS. FUDIM:  Sure.

8      THE COURT:  Plaintiff's Exhibit 2 will be received.

9      (So marked.)

10     THE COURT:  I would ask that if only a portion of an

11 exhibit is being offered that counsel make that plain so that

12 I have a record of what's coming in.

13     MR. NORINSBERG:  Yes, your Honor.

14     THE COURT:  So you'll offer the entirety of what was

15 marked as Plaintiff's Exhibit 2, correct?

16     MS. FUDIM:  Yes.

17     THE COURT:  So two is received in its entirety.

18 Q    Just putting up the fourth page.  Can you see that,

19 officer?

20 A    Yes.

21 Q    Do you see the year that this purports to be from?

22 A    2017.

23 Q    I'm going to draw your attention to the very last line

24 with it says CCWB?

25 A    Yes.

---

1  Q    Do you know what that is?

2  A    A surveillance camera.

3  Q    Is this consistent with your recollection that the

4  surveillance cameras were installed approximately two years

5  ago?

6  A    Yes.

7  Q    You told us there were more than one stairwell in the

8  building.  Which stairwell did the men go into, if you know?

9  A    Originally entered stairwell A from the lobby.

10 Q    In terms of the just that portion of the two

11 stairwells --

12 A    They intertwine.  They zigzag back and forth between each

13 other.  You enter stairwell A from the lobby.  Stairwell B is

14 from the back door of the building and they zigzag back and

15 forth hitting every floor on opposite sides.

16 Q    Do they both open up to the roof?

17 A    Yes.

18     THE COURT:  I'm not sure.  When you say zigzag back

19 and forth, do they join each other or are they on opposite

20 sides going up to the same location?

21     THE WITNESS:  They are intertwined in each other.

22 One is going up, the other one is going down underneath it, if

23 it makes any sense.

24     THE COURT:  If you are on floor six of stairwell A,

25 can you walk to stairwell B?

---

1      THE WITNESS:  Yes.  It's the next door over.

2  Stairwell B goes -- hard to describe.

3  Q    Would it be fair to say that one when stairwell is going

4  up like this, the other one is right below it on an opposite

5  angle?

6  A    Yes.

7  Q    Did the four men continue up -- did they go the entire

8  time up the same stairwell?

9  A    No.

10 Q    They switched?

11 A    At the fourth floor they exited out into the hallway and

12 continued up stairwell B, all but Jerome.

13 Q    Is that Mr. Nelson?

14 A    Yes.

15 Q    What happened with respect to Mr. Nelson on the third

16 floor?

17 A    He stopped when we were existing onto the third floor in

18 an attempt to stop us.  I pushed past him and continued into

19 stairwell B and continued up.

20 Q    What happened next?

21 A    Continued up to the sixth floor where Cedric turned

22 around and again tried to stop us.  That's where I threw him

23 out of the way and continued up to the seventh floor.  At that

24 point is where I fell.

25 Q    Let's pause for a second.  When you said you threw

---

1  Mr. Nelson out of the way, what did you do exactly?

2  A    I grabbed him --

3      THE COURT:  Wait a minute.  I guess it's Nelson or

4  Cedric that you threw out of the way?

5      THE WITNESS:  On the sixth floor it's Cedric Smalls.

6  Q    I'm talking about the third floor.

7  A    I'm sorry.

8  Q    Mr. Nelson.

9  A    Okay.

10 Q    On the sixth floor, tell us what happened with Cedric?

11 A    On the sixth floor as we were making the turn to continue

12 up to the seventh floor he had stopped, put his hands and legs

13 against the walls and tried to brace himself to stop us from

14 continuing up.  I grabbed him at some point and threw him

15 behind into my partner for him to secure him.

16 Q    What did you do next?

17 A    That's where I attempted to continue up that staircase

18 and I lost my footing, transferring from dealing with Cedric

19 to continuing up the stairs and fell on those stairs.

20 Q    What happened when you fell?  What did you see?

21 A    As I fell I looked up to see where the other two were, to

22 see what I was dealing with and that's when I saw Andrew and

23 Jerome at the top of that staircase, the seventh floor landing

24 and that's when I saw Andrew produce the firearm and hand it

25 to Jerome.

1  Q    Where did he produce the firearm from?

2  A    From his waist area.

3  Q    How did Ronnie Smalls grab it?

4  A    Appeared like the barrel, the end of the gun, he grabbed

5  it and at that point they started moving.  They were moving

6  and the magazine had fallen as they were moving and they

7  continued up out of my view onto the roof.

8  Q    What were you thinking at that time?

9  A    I was, to be honest, extremely scared and worried, was

10  kind of an oh shit moment if you pardon me.  I had no defense

11  at that point.  I was on my hands and knees.  If they wanted

12  to they could have shot me.

13  Q    At that point in time in your career as a police officer

14  had you ever seen a gun other than your own or your partner's?

15  A    No.

16  Q    You said the magazine fell out.  And just so we're all

17  clear, can you explain to the jury what a magazine is?

18  A    That's the device or piece of the gun that holds the

19  extra ammunition.

20  Q    What happened after you saw the two individuals, Andrew

21  and Jerome, go onto the roof?

22  A    I made my way up to that landing onto the seventh floor

23  so I can make sure that they didn't double back and go down

24  the other stairwell to further elude us.

25  Q    And did you follow them up onto the roof right away?

1  A    No.

2  Q    Why not?

3  A    At this point now I'm by myself.  My partner is with

4  Cedric on the sixth floor and one it's not safe to go on the

5  roof yourself and I called for back up and covered the other

6  stairwell to make sure they didn't come back.

7  Q    In terms of calling for backup, was that the first time

8  that you placed a call for backup?

9  A    As I entered the building I just put over where I was,

10  which is as much as I could get over at the time and then once

11  I got upstairs I put further details, where we were and what

12  we needed.

13  Q    In terms of saying when you first entered and put over

14  where you were, what do you mean by that, an address or

15  something?

16  A    I just said the address.  Whenever we call for help if

17  all you can get over is the address that's what you do.

18  Q    There were questions about whether or not you ever

19  explained over the radio that you were pursuing four men.  Why

20  didn't you explain all that?

21  A    There was no time.

22  Q    Now, when you called the dispatcher again when you said

23  you were standing on seventh floor landing, what did you say

24  that time?

25  A    I said that there was two on the roof and one had a

1  firearm and there was one on the sixth floor.

2  Q    Now, after you made that transmission did you sit around

3  listening to the dispatcher's subsequent broadcasts?

4  A    No.

5  Q    Why not?

6  A    I was calling down to my partner to make sure that he was

7  okay and telling him where I was and what I was covering.

8  Q    Why was it important that there was one armed on the

9  roof?

10  A    That's when everyone who is coming needs to know that

11  there's someone with a gun on the roof is the most important

12  thing.

13  Q    There were not two people armed on the roof, is that

14  accurate?

15  A    Correct.  There was only one.

16  Q    Two people on roof and one armed?

17  A    Yes.

18  Q    You saw the magazine drop to the floor.  Did you still

19  have any concern that the gun that was up there was capable of

20  firing a shot?

21  A    Yes.

22  Q    Why did you have a concern about that?

23  A    Because there's still one in the chamber.

24  Q    Did you ever come to learn there was still one in the

25  chamber?

1  A    Yes, there was.

2  Q    When you said backup arrived?

3  A    Yes.

4  Q    Why don't you tell is what happened when backup arrived?

5  A    Once backup arrived we discussed and split up and both

6  stairwells were used and we both ascended onto the roof.

7  Q    When you say both, who are you referring to?

8  A    Both stairwells.  It was a number of officers all

9  traveled up to the roof to make sure that we could cover all

10  angles as we exit onto the roof at the same time.

11  Q    When you get to the roof what do you do?

12  A    When I open the door to the roof.  Immediately I see

13  nothing.  There was nothing in front of me.  I exit out and

14  look above me on to the roof of the stairwell, which is where

15  we were exiting from and I immediately see the red jacket

16  laying down on that roof.

17  Q    I'm going to show you what's been entered into evidence

18  as Plaintiff's Exhibit 43.  First of all, do any of these

19  photos show the door that you exited when you came out on to

20  the roof?

21  A    The photo on the right.

22  Q    Let me turn to that for you then.  Do you want to show

23  the jury what you are talking about?

24  A    This door is where I exited from.

25  Q    And walk us through with the photo to what you did and

1 saw.

2 A    As I came out and I looked in front of us, in front of

3 me, sawing nothing.  I came out and looked above me and that's

4 where I saw the red jacket, which was Jerome laying on the

5 roof.

6          THE COURT:  I'm sorry.  Was he in the jacket?

7          THE WITNESS:  Yes.  Yes.  He was laying -- the red

8 jacket was laying down and Jerome was still wearing it, yes.

9 Q    And the photo that's here, can you explain to us what the

10 juxtaposition of this photo is with respect to one we just

11 looked at?

12 A    So the picture to the right is from over in this

13 direction looking -- looking to the right.  So it's looking --

14 this roof is the same as that roof, if that makes sense.

15 Q    This here is the same as the back side here?

16 A    Yes, correct.

17 Q    Did there come a point in time where you came around to

18 the other side?

19 A    Yes.  Other officers were covering Jerome on the roof.  I

20 was trying to find another way to get up.  He was laying with

21 his head facing us.  So I was trying to go back around behind

22 him to come up behind him, not facing him, to get a little

23 safer way to get up on to that roof.  So I came around this

24 side and was trying to come up behind him in order to get up

25 on to that roof without giving him the advantage on us.

1 Q    You were asked questions about the lighting conditions on

2 the roof.  What were they like that night?

3 A    They were very dark.

4 Q    And the light that's right there, was that light working

5 or not working?

6 A    No, that was not.

7 Q    You had mentioned at a prior deposition that there were

8 some stairwell lights that were working?

9 A    Yes.

10 Q    Where were those lights located, on which side?

11 A    On opposite side of the structure.

12 Q    Were these inside or outside the stairwell?

13 A    One was right inside the stairwell.

14 Q    You go around to the other side.  You are back here?

15 A    Yes.

16 Q    Do you have your flashlight out at that point in time?

17 A    At this point I put it away because I was trying to get

18 up on to this roof.  I would need both hands for this.

19 Q    If someone were alone on this roof, would someone have a

20 way to get up to this roof I am pointing to?

21 A    Yes.

22 Q    You were not able to get up on your own?

23 A    No.

24 Q    What did you do next?

25 A    In trying to figure a way up there.  I see something in

1 the corner, appeared to be a box.  I saw an opportunity to get

2 a little height to get up onto that elevated roof and I went

3 to step on that and that's when that box that I thought was a

4 box moved and it turned out to be Jerome -- Andrew.  I'm

5 sorry.

6 Q    Let me stop you right there for a second.  Had you ever

7 been on the roof before?

8 A    Very few times.

9 Q    When you had been up on the roof had you seen boxes or

10 any type of debris up there?

11 A    There was always stuff.  There was air conditioners,

12 bikes, televisions.  There was always stuff up there.

13 Q    So tell us in your own words what happens next?

14 A    Then I went over to try to step on what I thought was a

15 box and it moved, which startled me.  Andrew jumped up and I

16 started giving commands and placed him under arrest.  We ended

17 up taking him to the ground, put cuffs on him.

18 Q    What was the ground made of on the roof?

19 A    The ground at the time was rocks and sea shells.

20 Q    Do you know why sea shells were on the roof?

21 A    The seagulls and birds would pick up shells there from

22 the ocean or bay and drop them on the roof to break them open.

23 Q    How far or close was this building from the sea?

24 A    About a block from the ocean and a block from the bay.

25 Q    So it was made of gravel and sea shells?

1 A    Yes.

2 Q    You said you took Mr. Smalls to the ground?

3 A    Yes.

4 Q    Did you see if Mr. Smalls's face ever hit the ground with

5 the sea shells and the gravel?

6 A    Yes, I believe it did.

7 Q    Do you have any belief as to if Mr. Smalls was injured in

8 that process?

9 A    Yes.  He had a cut right above his eye.

10 Q    There was questions asked of you about whether plaintiff

11 sustained that injury in the lobby of the building.  Do you

12 recall that?

13 A    Correct.

14 Q    Did you see any officer throw Mr. Smalls against the hall

15 wall in the lobby of the building?

16 A    Absolutely not.

17 Q    Did you ever throw Mr. Smalls against the wall in the

18 lobby of the building?

19 A    Absolutely not.

20 Q    Now, there was questions asked of you regarding the words

21 that you used about taking him to the ground and whether or

22 not you -- do you recall the word that plaintiff's counsel

23 suggested you used to take him to the ground, slammed?

24 A    Slammed, yes.

25 Q    You said that you hadn't used the word slammed.  Do you

1  recall that?

2  A    Yes.

3  Q    Then testimony was read from your grand jury testimony

4  where the question itself said didn't you tell us earlier that

5  you were slammed to the ground or something to that effect.

6  Do you recall that?

7  A    Yes.

8  Q    Reading from the witness' grand jury testimony, the

9  earlier portion that was referred to.

10       MR. NORINSBERG:  Objection.  The quote slammed to

11  the ground comes from the criminal trial.

12       MS. FUDIM:  I stand corrected.  It's the criminal

13  trial.  Thank you.

14  Q    Page 47, lines 9 to 10 in your original testimony:

15       "QUESTION:  How did you receive that cut?

16       "ANSWER:  I think when I threw him on to the

17  ground."

18       Would it be correct then that you never used the

19  word slammed?

20  A    Correct.

21  Q    When you said that in this courtroom you were being

22  honest?

23  A    Correct.

24  Q    Now, you got this chase and now you are on the roof.  Can

25  you tell us at what point your gun was or was not drawn?

1  A    It was originally drawn when we came out on to the roof

2  and then I holstered it when other officers were covering

3  Jerome on the roof as I attempted to figure out a way up on to

4  that little roof.

5  Q    Now, there was also some questions about the terminology

6  in terms of stairwell roof, elevator roof.  As of today, how

7  many times have you been up onto the roof, approximately, if

8  you know, of these buildings?

9  A    I don't know.  A lot.

10  Q    And how familiar are you today with these buildings?

11  A    Very well.

12  Q    At that time how often had you been up onto the top roof

13  of that building?

14  A    Not that often at all.

15  Q    Did you have an understanding at that time as to what

16  portion of this structure was the elevator roof versus what

17  portion of this structure was the stairwell roof?

18  A    No.

19  Q    At all times were you always consistent that this was the

20  area --

21       MS. FUDIM:  Objection.

22       THE COURT:  I'll sustain the objection to the

23  question.

24  Q    Have you ever testified or told anybody at any point in

25  time that Mr. Smalls was all the way up here where my finger

1  is?

2       MS. FUDIM:  Objection.

3  A    No.

4       MS. FUDIM:  I object to the question, your Honor.

5       THE COURT:  Which was the question you objected to?

6  I sustained one of your objections.

7       MS. FUDIM:  He answered the next question, your

8  Honor.

9       THE COURT:  Which was what?

10       MS. FUDIM:  Had he ever told anybody that Ronnie

11  Smalls was found on the top of the elevator of this portion

12  of the roof and he answered no.

13       THE COURT:  I'll allow that question to stand.

14  Q    After you arrested Andrew Smalls and you saw Ronnie

15  Smalls on the top of what I guess is the staircase roof, what

16  did you do?

17  A    I again attempted to make my way up to that roof with

18  assistance from other officers.

19  Q    There were questions about whether you were standing on

20  that roof or partially on that roof or fully on that roof.

21  Can you tell the jury how much of your body got on to that

22  roof?

23  A    It was about half of my body.  My torso was leaning up

24  there.  As I was up there Jerome was getting assisted down the

25  other side where his face was facing where we originally saw

1  him and I recovered the firearm from there.

2  Q    How did you recover the firearm?

3  A    I placed it in my hat.

4  Q    With what, with your hand?

5  A    Yes.

6  Q    Were you wearing gloves?

7  A    No.

8  Q    This is in 2006?

9  A    Yes.

10  Q    Today, if this occurred, is that how you would recover

11  the firearm?

12  A    No.

13       MR. NORINSBERG:  Objection.

14       THE COURT:  Overruled.

15  Q    What would happen today?

16  A    Today we would call evidence collection to the scene and

17  they would process it and bag it on the scene.

18  Q    But that's not what you did at that time?

19  A    No.

20  Q    What about the magazine?  You told us that fell in the

21  stairwell?

22  A    Yes.

23  Q    Do you know how that was recovered?

24  A    I also placed that in my hat.

25  Q    Did you do that with your hands?

1   A    Yes.

2   Q    Did you have gloves on at that point?

3   A    No.

4   Q    Now, at the time that Jerome was on the roof and you were

5   hoisting yourself up, were you also giving commands to Ronnie

6   Smalls verbally?

7   Q    What were those commands?

8   A    It was to show us his hands.  Don't move.  We were trying

9   to tell him to come down and he was refusing.

10  Q    Eventually he did though?

11  A    Yes.

12  Q    And would you characterize yourself as assisting with

13  getting him to come down through verbal instructions?

14        MR. NORINSBERG:  Objection.

15        THE COURT:  Overruled.

16  A    Yes.

17  Q    Was Jerome placed in handcuffs?

18  A    Yes.

19  Q    Do you know who cuffed him?

20  A    I don't.

21  Q    I want to go to this idea of an arresting officer.  Can

22  you be someone arresting officer if you are not the person who

23  handcuffed them?

24  A    Yes.

25  Q    What does it mean to be an arresting officer?

1   A    You're the officer who handles all paperwork and fills

2   out everything at the precinct.

3   Q    The fact that you were Jerome's arresting officer doesn't

4   say anything one way or the other about you were physically

5   the one who cuffed him?

6   A    Correct.

7   Q    Now, tell us what happened after Jerome's cuffed.  What

8   is the next thing that happened that you recall?

9   A    After he's cuffed we were all making our way back

10  downstairs.

11  Q    Then what?

12  A    They were all transported back to the precinct and they

13  would be in processing at the precinct.

14  Q    You were shown a document that was a medical treatment of

15  prisoner form that documented the laceration to Mr. Smalls

16  above his eye.  Do you recall that?

17  A    Yes.

18  Q    Was an ambulance called for Mr. Smalls?

19  A    Yes.

20  Q    Do you know who made that call?

21  A    I don't.  It was either myself or maybe the desk officer.

22  Q    That was at the precinct?

23  A    At the precinct, yes.

24  Q    Did he go to the hospital that you are aware of?

25  A    No.

1   Q    Do you know if the gun was dusted for fingerprints?

2   A    It was.

3   Q    Who did that?

4   A    I believe it was Officer Feldman.

5   Q    Who was Officer Feldman?

6   A    He's another officer that works at the 100 precinct.

7   Q    As a part of the ECT, the evidence collection team?

8   A    No.

9   Q    Did you have to do any paperwork with respect to the fact

10  that you recovered a gun?

11  A    Yes.

12  Q    What paperwork was that?

13  A    A property voucher.

14  Q    What's a property voucher?

15  A    It's a form we fill out when we take any evidence into

16  custody for it to be sent to either the property clerk or the

17  lab.

18        MS. FUDIM:  I would like to admit what has been

19  marked as Plaintiff's Exhibit 15, agreed?

20        MR. NORINSBERG:  No objection.

21        THE COURT:  Plaintiff's Exhibit 15 will be received.

22        (So marked.)

23  Q    Do you recognize this document, officer?

24  A    Yes.

25  Q    What is it?

1   A    The property clerk's voucher.

2   Q    This is the document that you prepared?

3   A    Yes.

4   Q    Now, when you voucher a gun, do you voucher it with

5   bullets in it?

6   A    No.

7   Q    Why not?

8   A    Because it's not safe, not safe to transport, not safe to

9   handle.

10  Q    So what do you do?

11  A    Unload the firearm and secure the firearm.

12  Q    Did you do that in this case?

13  A    Yes.

14  Q    And to do that what did you actually do?

15  A    Unloaded the magazine and unloaded the round that was

16  still in the chamber.

17  Q    Did you determine how many bullets were in the magazine

18  when you unloaded it?

19  A    Yes.  There were six.

20  Q    Did you document that on this report?

21  A    Yes.

22  Q    Where?

23  A    Right there.

24  Q    Okay.  And you said there were six in the magazine and

25  one in the chamber, just in case anyone doesn't know what that

1   means, can you tell us what one in the chamber means?
2   A    One is in the firearm ready for it to be fired.
3   Q    This magazine, what was its capacity, how many could it
4   hold?
5   A    Seven.
6   Q    So would it be correct that the gun in total with the
7   magazine in it, holding eight bullets, seven in the magazine
8   and one in the chamber?
9   A    Yes.
10  Q    How many were missing from this gun?
11  A    One.
12  Q    What, if anything, does that tell you?
13  A    One round had been fired from it.
14  Q    Did you ever receive any other type of confirmation that
15  one had been fired from the gun?
16  A    Yes.
17  Q    What was that?
18  A    It was from the lab, the firearm analysis.
19       MS. FUDIM:  I want to enter what has been premarked
20  as Plaintiff's Exhibit 16.
21       MR. NORINSBERG:  No objection.
22       THE COURT:  Plaintiff's Exhibit 16 is received.
23       (So marked.)
24  Q    Is this the document you were just referring to?
25  A    Yes.

1   Q    What is it?  Just give the jury a couple of words about
2   what this is.
3   A    This is what we received back from the laboratory after
4   they examined the gun.
5   Q    And drawing your attention to where I'm pointing, can you
6   read that to the jury?
7   A    Number of chambers with evidence of discharge, one.
8   Q    Now, you were asked questions about DNA.  Do you recall
9   that?
10  A    Yes.
11  Q    Do you know if guns are tested -- withdrawn.
12       Do you know if guns are tested for DNA when an
13  officer sees a person holding a gun?
14       MR. NORINSBERG:  Objection.
15       THE COURT:  You can ask him what his practice is or
16  if there's any routine practice.
17  Q    Is there any routine practice with respect to when you
18  test and when you do not test for DNA?  I'm talking about back
19  in 2006, not today.
20  A    Yes.
21  Q    Can you tell the jury what that practice is?
22  A    If we find a firearm on the ground with no one with it,
23  we would send it to the lab for DNA.  If we find the firearm
24  with any individual, we do not send or test for DNA.
25  Q    That's the general practice?

1   A    Yes.  That was procedure then.
2   Q    Now, there were questions about gunshots, residue
3   testing; do you recall that?
4   A    Yes.
5   Q    Whether there was any testing to see if Mr. Andrew Smalls
6   fired the gun, do you recall that?
7   A    Yes.
8   Q    Did you ever charge Mr. Andrew Smalls with firing the
9   gun?
10  A    No.
11  Q    And would you typically test for gunshot residue -- what
12  were the routines and practices back in 2006 for testing for
13  gunshot residue?
14  A    We would test if either someone got shot or we observed
15  somebody shooting a firearm.
16  Q    Did that happen in this case?
17  A    No.
18  Q    Again, there was never a charge for firing a gun,
19  correct?
20  A    Correct.
21  Q    Is there a separate charge for that?  Does one exist?
22  A    Yes.
23       THE COURT:  At this point, ladies and gentlemen,
24  we'll take our luncheon recess and we'll resume promptly at
25  two.

1        You are excused for lunch.
2        (Jury excused.)
3        (Lunch recess taken. )

1    AFTERNOON SESSION
2         (In open court; jury not present.)
3         MS. FUDIM:  Judge, before the jury comes out,
4    earlier during the examination we were talking about
5    Plaintiff's Exhibit 4 and 27 and I had said that one was a
6    clearer version than the other.  I was mistaken.  One was an
7    arrest report for Ronnie Smalls and one was an arrest report
8    for Andrew Smalls.  But the piece of information that he was
9    pointing out was identical between the two.  As to that point
10   I don't know if there's an issues.  We can stipulate that the
11   other one is deemed admitted into evidence in fairness to
12   counsel.  I realized it over the lunch hour and I want to be
13   forthright with the court.
14        THE COURT:  What other exhibit are we admitting?
15        MS. FUDIM:  Plaintiff's Exhibit 4.
16        THE COURT:  All right.
17        MR. NORINSBERG:  Shouldn't the jury be told at least
18   there was some discussion about four being a duplicate of 27
19   and they are actually different documents that have been put
20   into evidence.
21        THE COURT:  Sure.  Plaintiff's Exhibit 4 is
22   received.
23        (So marked.)
24        THE COURT:  I also need to talk to you at the end of
25   the day.  Exhibit 43 somehow is still -- I think we have three

1    Exhibit 43s which we need to straighten out.  I don't want to
2    take the jury's time to do it.
3         MS. FUDIM:  The reason I said that, there were two
4    that are the same.  There are two documents that are the same.
5    It was the complaint report that is in the binder twice.  I
6    was mistaken.
7         (Jury present.)
8    Richard Collins, resumed.
9         THE COURT:  Please be seated.
10        Ladies and gentlemen, there was a discussion earlier
11   about Exhibit 4 and Exhibit 27 being the same document.  It
12   turns out they are not the same document.  So in addition to
13   27 being admitted into evidence, four is also admitted into
14   evidence.
15        MS. FUDIM:  Thank you, your Honor.
16        THE COURT:  You can continue.
17        MS. FUDIM:  Thank you, your Honor.
18   CROSS-EXAMINATION
19   BY MS. FUDIM:  (Continued)
20   Q    Welcome back, Officer Collins.
21   A    Hello.
22   Q    Hi.
23        Do you recall when you were being questioned by
24   Mr. Norinsberg there were a series of questions regarding the
25   fact that you said some things at trial that you hadn't

1    included at grand jury?
2    A    Yes.
3    Q    And you said, well, I was responding in sum and
4    substance.  I was responding to the question that I was asked.
5    Do you recall that?
6    A    Yes.
7         MS. FUDIM:  Permission to approach the witness, your
8    Honor?
9         THE COURT:  Yes.
10   Q    I'm handing you a binder that contains your grand jury
11   testimony and your trial testimony.  And if you could just
12   tell the jury how many pages were the questions of grand jury
13   testimony .
14        MR. NORINSBERG:  Objection.
15        THE COURT:  Overruled.  He can answer.
16   A    20.
17   Q    And what about your trial testimony?
18   A    219.
19   Q    Thank you.
20        MS. FUDIM:  May I retrieve it, your Honor?
21        THE COURT:  Yes.
22   Q    Would it be fair to say, officer, that there were details
23   -- there were further details supplied at trial that were not
24   supplied to the grand jury?
25   A    Yes.

1    Q    Now, you got back to the precinct.  I think that's where
2    we left off.  Tell us what happens when you get back to the
3    precinct with the four people under arrest.
4    A    They are first processed at the desk, fill out the
5    pedigree.  Whoever transported them starts filling out the
6    pedigree card and processes them into the cell where they
7    search them, take off anything with laces or strings.
8    Q    Let me stop you right there.  Let's focus on pedigree.
9    A    Okay.
10   Q    I'm showing you -- these are all in evidence.  They are
11   Plaintiff's Exhibit 24, 36, 32 and 33 in evidence.  This one
12   appears to be Ronnie Smalls.  Is this what you meant by a
13   prisoner pedigree?
14   A    Yes.
15   Q    To be clear, who fills out the prisoner pedigree?
16   A    Whatever officer transports the individual back in or the
17   arresting officer, whoever it might be.
18   Q    If more than one individual is brought in in connection
19   with an arrest, when they first walk in the door, are they
20   given numbers?
21   A    Yes.
22   Q    Is that in the order of who walks in the door first?
23   A    Generally, yes.
24   Q    Looking first at this one, can you tell us which parts,
25   if any, you filled in?

1    THE COURT:  Do you want to tell us what exhibit this
2  is?
3    MS. FUDIM:  I believe this is the first one which
4  would be 24, if I'm not mistaken.
5    MR. NORINSBERG:  I think 24 is Andrew Smalls's.
6    MS. FUDIM:  The first one is Exhibit 26, your Honor.
7  Q    So returning to my question, Officer Collins, do you want
8  to show us what, if any, writing on this one is yours?
9  A    Just the bottom section.
10 Q    So nothing above here is what you wrote?
11 A    No.
12 Q    What, if anything, would you conclude from that about
13 whether you brought Ronnie Smalls physically into the
14 precinct?
15 A    That I didn't.
16 Q    The number that's crossed out, what number do you see
17 below the cross-out?
18 A    Three.
19 Q    That would mean he was presumably the third person who
20 came in?
21 A    Yes.
22 Q    There's another number two here?
23 A    Yes.
24 Q    Does that correspond to something else you did later in
25 this case?

1  A    Yes.
2  Q    What was that?
3  A    The order in which they were detailed on the complaint
4  report.
5  Q    We'll get back to that in one second.  Let's go to the
6  next one.  Now we have the one for Andrew Smalls, which is 24,
7  Plaintiff's Exhibit 24?
8  A    Yes.
9  Q    And on this one can you tell us what, if anything, you
10 filled out?
11 A    Most of that is mine.
12 Q    Is there anything that's not?
13 A    I believe that's all mine.
14 Q    Now, the one that's there, would that mean that he was
15 the first one that was brought into the precinct?
16 A    Yes, most likely.
17 Q    Now, there were questions asked of you regarding the
18 cross-out of the gray hoodie and the circling of the black
19 jacket, do you recall that?
20 A    Yes.
21 Q    First of all, what does that refer to?
22 A    He's now wearing a gray hoodie in the precinct.
23 Q    Can you tell us why you crossed off gray hoodie, circled
24 black jacket and the word roof next to it?
25 A    That's what he was wearing when he was on the roof.

1  Q    Which one?
2  A    I'm sorry.
3  Q    What was he wearing?
4  A    He was wearing a black jacket on roof.  That's why I
5  circled it and indicated it.
6  Q    What does the word now refer to?
7  A    Now in the precinct he's wearing a gray hoodie.
8  Q    Showing you the next one which is Jerome Nelson.  This
9  was Exhibit -- Jerome Nelson would be 33, your Honor.
10      Can you tell us what, if anything, you wrote on
11 here?
12 A    Most of it I filled out, but not all.
13 Q    What didn't you fill out?
14 A    Where it says blue jacket, Cabrera, I did not fill that
15 out.
16 Q    Everything else you wrote though?
17 A    Yes.
18 Q    Do you know in terms of the numbers, the fact that it
19 says two and that's crossed out, what would that indicate to
20 you?
21 A    He came in second to the precinct.
22 Q    And then showing you the last one for Mr. Cedric Smalls,
23 the same question:  What, if anything, did you fill out?
24      THE COURT:  What number is this, please?
25      MS. FUDIM:  This is 31.  I apologize.  32.  Excuse

1  me.  I think it's 32, your Honor.
2  A    This one post is not mine.  I believe just I wrote my
3  name.
4  Q    So the only thing on here, the handwriting you recognize
5  is where it says Richard Collins?
6  A    Correct.
7  Q    Again, number one is scratched out and number three is
8  written in?
9  A    Yes.
10 Q    And also on Andrew Smalls the number one is also written
11 in.  Would you have any knowledge as to why that was the one
12 there?
13 A    Yes.
14 Q    The only one you put there was the one on Andrew Smalls?
15 A    Yes.
16 Q    With respect to these numbers you said they corresponded
17 to another document?
18 A    Yes.
19 Q    What was that document?
20 A    The scratch complaint report that I wrote.
21 Q    Can you tell us what a scratch is?
22 A    That's my handwritten version of the actual report.
23 Q    So I'm going to show you what's been marked in evidence
24 as Plaintiff's Exhibit 31:  Do you recognize this document?
25 A    Yes.

1 Q    What is it?

2 A    That's the scratch complaint report.

3 Q    Whose handwriting is in that?

4 A    Mine.

5 Q    Does that mean you wrote it?

6 A    Yes.

7 Q    I'm going to zoom in to part of it.  In the narrative

8 section, why don't you read to us what you wrote.  If you see

9 abbreviations you can read them as full words.  Read it slowly

10 so we can follow along with you, please.

11 A    It says another TPO, which is time and place of

12 occurrence, AO, which is arresting officer, observed four

13 apprehended perps in rear of 8410 RBB, which is Rockaway Beach

14 Boulevard.  AO heard gunshot and observed perps walking from

15 location.  AO began to follow perps.  Perps ran into 8105 RBB.

16 Perp four apprehended on third floor staircase landing.

17 Q    I'm going to stop you right there for one second and

18 we'll continue.  You can put a finger where you are up to.

19        I'll put back on the screen the prisoner pedigree

20 card you had out for Jerome Nelson which was number 33.  What

21 number did you write on here?

22 A    Number four.

23 Q    Does that correspond with the four that you have there?

24 A    Yes.

25 Q    Keep reading for us, please?

1 A    Perp three attempted to block a path and did resist an

2 arrest by flailing arms.

3 Q    Who was that?

4 A    Cedric.

5 Q    Putting back the one we just looked at a moment ago, what

6 number did you put on this?

7 A    Number three.

8 Q    Go ahead.  You can keep reading.

9 A    Perps one and two did run on roof of location.  AO did

10 observe perp one drop one magazine containing six live 380

11 rounds in stairway B on roof landing.  Perp one did pass

12 silver handgun to perp two at top of stairs.  Perp one

13 apprehended hiding in corner of rooftop.  Perp two apprehended

14 on roof of elevator room with gun on ground approximately two

15 feet away.  Five latent prints lifted by PO Feldman.  Evidence

16 search negative results conducted by ESU truck nine, Detective

17 Rizzola I believe.  Detective Roberts from I believe it's

18 Queens night watch notified and responded.

19 Q    Referring to perp one and two, based on your and a

20 narrative, who is perp one and who is perp two?

21 A    Perp one would be Andrew; perp two would be Jerome.

22 Q    Those correspond to the numbers that you wrote on the

23 pedigree card for Andrew Smalls?

24 A    Yes.

25 Q    Showing you again pedigree card for Ronnie Smalls.

1 A    Yes.

2 Q    Now, we're on the one for Ronnie Smalls and I see again

3 that there's some handwriting here, red hoodie, now white

4 T-shirt, can you tell us what that means?

5 A    When he was observed in the building he was wearing a red

6 hoodie.  That's how we identified him on the roof.  He is now

7 currently in the precinct wearing a white T-shirt.

8 Q    I want to return to that again in one second.  Before I

9 do, with respect to the scratch report you told us on direct

10 examination that after you prepared this someone else entered

11 it into the computer system?

12 A    Yes.

13 Q    And I'm going to show you what's been entered as Exhibit

14 29.  Would this be one that was entered into the system?

15 A    Yes.

16 Q    You told us that you weren't the one that entered it,

17 correct?

18 A    Correct.

19 Q    Looking at the second page, does it list here, can you

20 show us, if you can see who entered it?

21 A    Yes, Sergeant Hennessy.

22 Q    You gave testimony on direct examination or there were

23 questions asked of you to the effect we're supposed to believe

24 that someone entered this incorrectly; do you recall that?

25 A    Yes.

1 Q    I'm going to ask you to look at the narrative now.  And

2 what I'm going to do is put the other narrative if I can --

3 can you see that?

4 A    Yes.

5 Q    Looking at the two side by side, you can take a minute if

6 you need to, are the perp numbers the same in each?

7 A    No.

8 Q    Show us the mistakes you see in terms of how it's entered

9 based on what he wrote?

10 A    They have in the second line perp two apprehended on

11 third floor staircase landing which is wrong.  They have perp

12 one apprehended, which is incorrect.  Then here they have perp

13 three and four did run on roof which is incorrect.  And where

14 they list perp three here is incorrect.  And perp four here,

15 all the numbers are backwards.

16 Q    Sitting here today, do you have any knowledge as to why

17 Sergeant Hennessy got this information confused?

18 A    No, I do not.

19 Q    The one that you filled out is correct and corresponds to

20 the prisoner pedigree card?

21 A    Yes.

22 Q    Now I'm also going to show you -- this was a Defendant's

23 Exhibit.  Plaintiff entered it.  I'm not sure what number they

24 used.

25        MS. FUDIM:  Counsel, this is the handwritten notes.

1  Does anyone know what number you gave it to?

2          MR. NORINSBERG:  41.

3  Q    I'm showing you what's been entered as Plaintiff's

4  Exhibit 41.  It's a two-page document.  I believe plaintiff's

5  counsel showed you one page.  Do you recognize those two

6  pages?

7  A    Yes.

8  Q    What do you recognize them to be?

9  A    Notes I made prior to filling out the scratch complaint.

10 Q    When you say prior to, what does that mean?

11 A    Before.

12 Q    How much before?

13 A    Probably right before I guess.

14 Q    If you can read to us again, in case anyone can't make

15 out your land writing, why don't you go ahead and read to us

16 what you wrote.

17 A    At TPO, which is time and place of occurrence, AO

18 observed four apprehended perps in the rear of 8410 RBB.  AO

19 heard one gunshot and observed perps walking from location.

20 AO began to follow perps.  Perps ran into 8105 RBB.  Perp four

21 apprehended on third floor staircase landing.  Perp three

22 attempted to block AO's path and did resist arrest by flailing

23 arms.  Perp one and two did run to roof of location.  AO did

24 observe perp one drop one magazine containing six live 380

25 rounds in stairwell B on roof landing.  Perp one did pass

1  silver handgun to perp two at top of stairs.  Perp one

2  apprehended hiding in corner of rooftop.  Perp two apprehended

3  in roof of elevator room with gun on ground approximately two

4  feet away.  Five latent prints lifted by AO Feldman.  Evidence

5  search negative results conducted by ESU truck Detective

6  Rizzola, Detective Roberts from Queens and respond.

7  Q    What is ESU?

8  A    Emergency Services Unit.

9  Q    Do you know what they were searching for?

10 A    Any additional evidence, including the shell casings.

11 Q    Where it says no results found that would indicate they

12 were unsuccessful?

13 A    Correct.

14 Q    Looking at the second page, again there's numbers and we

15 see some things.  Tell us what we're looking at here.

16 A    This is corresponding the number -- numbers on the

17 defendants and the charges that they were to be charged with.

18 Q    It seems like you grouped together perp one and two as

19 the two that went to the roof and then you have three and four

20 that you stopped earlier?

21 A    Yes.

22 Q    Mr. Norinsberg asked you about what you crossed off at

23 the top.  Do you recall that?

24 A    Yes.

25 Q    First of all, how much time elapsed between when you

1  wrote there crossed off and started on the next line?

2  A    Probably right after.

3  Q    And why did you cross off what you started writing?

4  A    Because I needed to start from the beginning of incident

5  and spell it out clearly and I didn't.

6  Q    When you do a complaint report -- when you arrest four

7  people they each have their own arrest report?

8  A    Yes.

9  Q    But the complaint report, would that be one document?

10 A    Yes.

11 Q    Now, there were questions about what you ultimately

12 charged Mr. Andrew Smalls with.  First of all, what would

13 Andrew Smalls -- his number was what in your narrative as you

14 wrote it?

15 A    Number one.

16 Q    Would that be the number one here?

17 A    Correct.

18 Q    And read to us the draft charges that you wrote down.

19 A    CPW.  Criminal possession of a weapon.  Criminal

20 trespass, tampering with physical evidence and resisting.

21 Q    Now, I'm going to Plaintiff's Exhibit 37, the mug shot

22 pedigree.  And it says top charge and you were asked some

23 questions about that.  Do you recall that?

24 A    Yes.

25 Q    Do you fill in what the top charge is on a mug shot

1  pedigree document?

2  A    No.

3  Q    How does that get generated?

4  A    It's automatically generated by the computer.

5  Q    Do you have any knowledge as to when or why resisting

6  arrest appears as the top charge?

7  A    Yes.

8  Q    Can you explain that to the jury?

9  A    This pedigree card, this paper is used for when the

10 prisoners are transported.  So resisting arrest will always

11 take the top charge on this paper, so the transporting

12 officers know that they have resisted arrest or attempted

13 escape.

14 Q    Is that true regardless of what the highest crime charged

15 is with respect to this piece of paper?

16 A    Yes.

17 Q    With respect to what you actually charged Mr. Smalls

18 with, I'm now showing you what has been entered into evidence

19 as Plaintiff's Exhibit 4, which is his arrest report.  Where

20 it says top charge, can you tell us what that says?

21 A    Criminal possession of a loaded firearm, second degree.

22 Q    Just to be clear, time-wise, what would be created first,

23 the mug shot information that we saw in Plaintiff's Exhibit 37

24 or the arrest report that we're looking at now, which is

25 Plaintiff's Exhibit 4.

1  A    The arrest report.
2  Q    Plaintiff's counsel asked you isn't it true that the
3  first time you documented this down you wrote top charge
4  resisting arrest, is that true?
5  A    No.
6  Q    I notice on Plaintiff's Exhibit 4 that there's a criminal
7  trespass with possession of a weapon.  Do you see that?
8  A    Yes.
9  Q    Why did you charge him with criminal trespass?
10  A    Because he was found on the roof of the building.
11  Q    Is that allowed, not allowed?
12  A    No.  No one is allowed on the roof of these buildings,
13  ever.
14  Q    Are there signs posted to that effect?
15  A    Yes.
16  Q    Where are the signs posted?
17  A    In the lobby as you enter the building and on most of the
18  floors, but they are also posted on the door existing onto the
19  roof.
20  Q    I'm going to show you what has been marked as Defendant's
21  Exhibit B.  We can call it B sub 1.
22        MS. FUDIM:  Any objection?
23        MR. NORINSBERG:  No objection.
24  Q    Do you recognize the photo that I am showing you?
25  A    Yes.

1  Q    Tell the jury what it is, please.
2  A    This is a sign that's located inside the building in the
3  lobby stating no trespassing or loitering.
4  Q    Is that the type of sign that you were just referring to
5  a moment ago?
6  A    Yes.
7        THE COURT:  Plaintiff's Exhibit B 1 is received in
8  evidence.
9        (So marked.)
10  Q    There were questions earlier about the fact that when
11  these prisoners' pedigree cards, the ones that were filled out
12  when someone comes into the precinct, that they say CPW for
13  everybody.  Do you recall those questions?
14  A    Yes.
15  Q    Can you explain to us why they all say CPW?
16  A    Because when they are brought in, either myself or the
17  transporting officers knew that there was a firearm recovered
18  and assumed everyone was being charged with it.
19  Q    That wasn't what ultimately happened?
20  A    No.
21  Q    For example, I'm showing you Plaintiff's Exhibit 49,
22  which went into evidence, as the arrest report for Cedric
23  Smalls.  Can you tell us what the first charge he was charged
24  with was?
25  A    Criminal trespass with possession of a weapon.

1  Q    Is that different than just regular criminal trespass?
2  A    Yes.
3  Q    There was some charge reflecting the fact that he was
4  seen with a group with a weapon?
5  A    Yes.
6  Q    Now, I want to return to the photos, the mug shot photos.
7  Let's look again at plaintiff's.  There were a lot of
8  questions about the clothing individual's were wearing.  What
9  plaintiff is wearing in this photo, do you recall that?
10  A    Yes.
11  Q    Did you take these photos?
12  A    No.
13  Q    Do you know where these photos were taken?
14  A    Central booking.
15  Q    What leads you to say that?
16  A    The background and the format that the pictures were
17  taken.
18  Q    What about the background leads you to say that?
19  A    The wall that we take pictures against in the precinct is
20  a differ color and has markings on it that would stand out.
21  Q    What about it there was a second thing you mentioned?
22  A    The format.  We only took front-facing pictures at the
23  precinct at that time.
24  Q    When does an individual go to central booking in the
25  process?

1  A    Once everything is done being processed and he's ready to
2  see the judge.
3  Q    Let's back up even further.  Can you tell us what central
4  booking is?
5  A    Central booking is in Queens.  It's in the ground level
6  of the courthouse where prisoners are transported, they are
7  processed, they are photographed and fingerprints are checked
8  and then they get in line to see the judge.
9  Q    Would it be fair to say first an individual who has been
10  arrested goes to the precinct, then some spend some period of
11  time at the precinct in a cell and then is transported to
12  central booking?
13  A    Yes.
14  Q    Were you the officer who transferred these four
15  individuals who were arrested to central booking?
16  A    No.
17  Q    When someone comes into the precinct you mentioned on
18  direct something about doing something with their clothing or
19  jackets or the strings.  Can you clear that up for us, tell us
20  what you do?
21  A    Yes.  We either remove the clothing that has any strings
22  or laces or take the strings out themselves or just take the
23  clothing out when they are in the cell and they get it back
24  when they leave the precinct.
25  Q    What's the purpose of that?

1   A   So they don't injure another prisoner or themselves.
2   Q   Was that done in this case?
3   A   Yes.
4   Q   And after that's done at some point the clothing is given
5   back to the individuals?
6   A   The officers that transport them to central booking give
7   whatever clothing is sitting outside the cell back to them.
8   Q   Do you have any way of knowing if they are given back the
9   correct items?
10  A   No, I do not.
11  Q   Do you have any way of knowing if each one puts on the
12  same thing he had before?
13  A   No.
14  Q   Now I want to also -- these are -- plaintiff has this on
15  their newer exhibit list.
16      THE COURT:   These are Plaintiff's Exhibit X and Y,
17  the mug shot photos of Mr. Nelson is received into evidence.
18      (So marked.)
19  Q   Do you see that photo?
20  A   Yes.
21  Q   Is that Ronnie Smalls?
22  A   Yes.
23  Q   And I'm showing you Y.  Do you recognize that to be
24  Mr. Nelson?
25  A   Yes.

1   Q   Now, there were questions asked about conversations you
2   had with the district attorney.  Do you recall that?
3   A   Yes.
4   Q   So after a you get back to the precinct and prepare
5   various paperwork for these individuals, how much longer was
6   it before you could speak to the district attorney?
7   A   It was much later that day, like afternoon time.
8   Q   What day would that be?
9   A   It was the 20th.
10  Q   And was that conversation by phone, in person, something
11  else?
12  A   By phone.
13  Q   And at that point in time how long had you been on duty?
14  A   Probably over 20 hours at that point.
15  Q   Was this your first felony arrest?
16  A   Yes, I believe so.
17  Q   And the district attorney sent you various paperwork to
18  sign?
19  A   Yes.
20  Q   And you reviewed that paperwork?
21  A   Yes.
22  Q   Now, you told us and we saw during direct examination
23  that there were mistakes on some of that paperwork.  Do you
24  recall that?
25  A   Yes.

1   Q   Did you notice those mistakes at the time?
2   A   No.
3   Q   And had you noticed those mistakes at the time would you
4   have signed the document?
5   A   No.
6   Q   After you had that conversation with the district
7   attorney on May 20, when was the next time that you spoke to
8   or otherwise interacted with the district attorney prosecuting
9   the case?
10  A   I don't know exactly.
11  Q   You spoke to the district attorney and you sent them
12  paperwork, is that correct?
13  A   Yes.
14  Q   After you sent them copies of your paperwork or letter,
15  I'm not sure, and after you spoke to that individual, did you
16  again speak to the district attorney at or about the time that
17  you gave the grand jury testimony?
18  A   Yes.
19  Q   And did you tell the district -- you mentioned on direct
20  examination that you sought to correct the mistakes that you
21  noticed.  Can you tell the jury what you did?
22  A   I went and met with the district and prepped for grand
23  jury and immediately made corrections to what was in the
24  document.
25  Q   Was that done orally, that you told him what was

1   accurate?
2   A   Yes.
3   Q   Now, one of the mistakes that we see on the paperwork was
4   that Mr. Nelson on the third floor was handcuffed by Detective
5   Teta.  Was that accurate?
6   A   No.
7   Q   Who handcuffed Mr. Nelson?
8   A   Officer Cabrera and Alvarado.
9   Q   How certain are you of that?
10  A   From what they told me.
11  Q   That was something you didn't see, correct?
12  A   Correct.
13  Q   Now, in terms of the criminal court complaint of Cedric
14  Smalls and Jerome Nelson counsel put them both up on the
15  screen at the same time and noted they were virtually
16  identical.  Do you recall that?
17  A   Yes.  There was one difference.  Yes.
18  Q   That was what floor they were on?
19  A   Yes.
20  Q   What floor was Jerome Nelson on?
21  A   Third.
22  Q   And what floor did you stop Cedric Smalls on?
23  A   The sixth.
24  Q   And with respect to the criminal court complaint for
25  plaintiff -- first of all, can you explain to us why they are

1   on the same criminal court complaint?

2   A   I believe because they were both on roof and they were

3   both being charged with the firearm.

4   Q   Whether Andrew handed the gun to Jerome or Jerome handed

5   the gun to Andrew, would the charges be the same either way?

6   A   Yes.

7   Q   Why is that?

8   A   They were both seen in possession of the firearm.

9   Q   And in terms of this document, counsel pointed out the

10  fact --

11       THE COURT:  What document?

12       MS. FUDIM:  I apologize, your Honor.  That's

13  Plaintiff's Exhibit 12.  My mistake.

14  Q   I'm showing you what's been entered into evidence as

15  Plaintiff's Exhibit 12 in evidence.  Counsel pointed out that

16  there is an error that it says that he observed defendant

17  Ronnie Smalls -- deponent further states that he observed

18  defendant Ronnie Smalls hand said pistol to defendant Andrew

19  Smalls before both defendant ran on to roof of said building.

20  Do you see that?

21  A   Yes.

22  Q   You would agree that's not accurate?

23  A   Correct.

24  Q   And how certain are you sitting here today that the

25  person you saw handing the gun was Andrew Smalls?

1   A   Absolutely.

2   Q   And that the person receiving the gun was Ronnie Smalls?

3   A   Absolutely.

4   Q   Have you ever testified the other way around?

5   A   No.

6       MS. FUDIM:  One moment, your Honor.

7       (Pause.)

8       MS. FUDIM:  I have nothing further at this time,

9   your Honor.

10       THE COURT:  Redirected will be limited to the

11  questions asked on cross-examination, correct?

12       MR. NORINSBERG:  Yes, your Honor.

13  REDIRECT EXAMINATION

14  BY MR. NORINSBERG:

15  Q   Good afternoon, officer.

16  A   Good afternoon.

17  Q   You just testified with counsel that Ronnie Smalls was

18  wearing a red jacket that night, is that correct?

19  A   Yes.

20  Q   You were shown Defendant's Exhibit X, correct?

21  A   Which was that?  Yes.

22  Q   He's not wearing a red jacket in that photo, is he, sir?

23  A   No.

24  Q   In your pedigree report you had he was wearing a white

25  T-shirt now, right?

1   A   Yes.

2   Q   He's not wearing a white T-shirt now, he's wearing what

3   looks to be a dark gray sweatshirt, is that correct?

4   A   Over a white T-shirt.

5   Q   Did you clarify that he was wearing a gray T-shirt -- a

6   gray sweatshirt in your pedigree form that you wrote on?

7   A   I detailed when he was in my cell at the precinct he was

8   wearing a white T-shirt.

9   Q   Can we agree, sir, you never crossed out any other

10  pedigree card except Andrew Smalls?  Can we agree with that?

11  A   We have minor cross-outs in there.

12  Q   The only clothing you crossed out was the gray hoodie

13  from Andrew, right?

14  A   Yes.

15  Q   We looked at three separate photographs of Andrew that

16  were taken over a 14-hour period.  Do you recall that?

17  A   I believe so, yes.

18  Q   Not one of those photographs shows him in black, correct?

19  A   Correct.

20  Q   The only evidence in this case that he was wearing a

21  black jacket that night comes from what you wrote on this

22  document, isn't that true, sir?

23  A   Yes.

24  Q   There's no other evidence at all except what you wrote,

25  right?

1   A   My testimony.

2   Q   That's the only evidence in this case, correct?

3       MS. FUDIM:  Objection, asked and answered.

4       THE COURT:  I'll sustain the objection.

5   Q   You were asked questions about the security camera that

6   was put in.  You were shown a document, Plaintiff's Exhibit 2,

7   that suggested that this was put in in 2017.  Do you remember

8   being asked that question?

9   A   Yes.

10  Q   In fact, this document, sir, relates to repairs that are

11  being made after Hurricane Sandy, doesn't it?

12  A   I honestly never seen this form before today.

13  Q   You had no problem answering it when counsel was asking

14  you questions, right?

15       MS. FUDIM:  Objection.

16       THE COURT:  I sustain the objection as

17  argumentative.

18  Q   Look at the top right part of this document.  Sandy

19  Recovery Program, do you see that, sir?

20  A   Yes.

21  Q   Permanent repairs, do you see that?

22  A   Yes.

23  Q   One of the repairs is the security camera system at the

24  bottom, is that correct?

25  A   That's what it states.

1  Q   So it was not put in for the first time in 2017, was it?
2  A   Yes, it was.
3  Q   The fact that you have a whole list of repairs on this
4  document talks about things that were damaged during Hurricane
5  Sandy and then were scheduled to be repaired, isn't that true?
6  A   No.
7  Q   For example, when he says repair and restore doors,
8  frames and hardware, common areas damaged by flooding, that's
9  not a repair?
10 A   The line above says new electrical equipment.
11 Q   To replace damaged electrical equipment from a hurricane,
12 is that correct?
13 A   That's not what I read.  I'm reading this for the first
14 time, sir.  I'm sorry.
15 Q   Now, you were also shown a document Plaintiff's Exhibit
16 15 about removing a magazine from the gun.  Do you remember
17 being shown that document, sir?
18 A   Yes.
19 Q   And then right here we have on the second line, magazine
20 removed from firearm.  Do you see that?
21 A   Yes.
22 Q   I thought the magazine already had been removed from the
23 firearm when it dropped on the stairs?
24 A   Yes.
25 Q   So let me get this straight.  You collected separately on

1  the stairs and then you put it back in the gun?
2  A   No.
3  Q   When you wrote -- you put in this error the magazine was
4  being removed, it was being removed for the first time, wasn't
5  it?
6  A   No, not what that states.
7  Q   You told us, sir, that you had collected this magazine on
8  your way out on the stairwell, is that correct?
9  A   Yes.
10 Q   And you told us that you collected it separately from
11 when you had collected the gun, correct?
12 A   Yes.
13 Q   So according to your testimony there's two separate
14 events taking place, one you are collecting the gun on the
15 roof, two, you are collecting the magazine from the stairs.
16 Correct?
17 A   Yes.
18 Q   So if there are two separate events taking place how did
19 that magazine get back inside of the gun to make it to a point
20 where you have to remove it?
21 A   I never said I did.
22 Q   You wrote this report, didn't you, sir?
23 A   I typed it, yes.
24 Q   And you actually have a handwritten version of this same
25 report, Plaintiff's Exhibit 17, which I'm going to offer into

1  evidence, pending counsel's review.
2      MS. FUDIM:  No objection.
3      THE COURT:  Plaintiff's Exhibit 17 is received.
4      (So marked.)
5  Q   Do you see that second line there, sir?
6  A   Yes.
7  Q   That's your handwriting, right?
8  A   No, it's not.
9  Q   Do you see this report indicating the magazine was
10 removed?
11 A   Yes.
12 Q   Did you not remove the magazine from this gun?
13 A   No, I did not.
14 Q   Can you tell us, sir, when was that magazine removed the
15 second time?
16     MS. FUDIM:  Objection.
17     THE COURT:  Sustained.
18 Q   When was it removed?
19     THE COURT:  Sustained.
20 Q   You're the arresting officer on the case, correct?
21 A   Yes.
22 Q   Your name is up here, correct?
23 A   Yes.
24 Q   You provided this information for this report to be
25 generated, didn't you, sir?

1  A   Yes.
2  Q   Now, you had testified earlier that you went up on the
3  roof a number of times before this incident, correct?
4  A   I'm sorry.
5  Q   You testified earlier that you had been up to this
6  rooftop before a number of times, correct?
7      MS. FUDIM:  Objection to a number of times.
8      THE COURT:  Overruled.
9  A   Yes.  I had been on the roof before.
10 Q   How many times had you been there before the date of this
11 event?
12 A   On this particular rooftop, I do not know.
13 Q   Didn't you tell us before that you saw garbage strewn
14 about, you saw air-conditioning units, bikes and TVs?  Didn't
15 you tell us that?
16     MS. FUDIM:  Objection to TVs.
17     THE COURT:  No.  He can answer.
18 A   I believe I said the roofs of these buildings had items.
19 Q   I'm going to show you Plaintiff's Exhibit 43.  We're
20 looking at a rooftop of this building, 8105.  Do you see that,
21 sir?
22 A   Yes.
23 Q   Do you see any bikes on that unit?
24     THE COURT:  Can we have a stipulation as to when
25 this photograph was taken?

1       MR. NORINSBERG:  2006, your Honor, as represented by
2   defense counsel when they produced it to us.
3       MS. FUDIM:  We never represented the time period.
4   It was used at the criminal trial.  So presumably sometime
5   prior to 2008.
6       THE COURT:  Okay.
7   Q   Do you see any type of debris strewn about this roof?
8   A   No.
9   Q   Do you see any bikes there?
10  A   No.
11  Q   Do you see any air-conditioning units?
12  A   No.
13  Q   Do you see any TVs?
14  A   No.
15  Q   You told is before people aren't allowed on the roof,
16  right?
17  A   Correct.
18  Q   Yet when you went up there you expected there to be some
19  type of debris that you could step on.  That was your
20  testimony, right, sir?
21      MS. FUDIM:  Objection.
22      THE COURT:  I'll sustain the objection.
23  Q   Now, you were asked questions about Andrew being charged
24  with resisting arrest; do you remember that?
25  A   Yes.

1   Q   Didn't you tell the grand jury that he immediately put
2   his hands up and you may have had him under arrest, didn't you
3   tell them that?
4       MS. FUDIM:  Objection.
5       THE COURT:  Overruled.
6   A   Yes.
7   Q   He was not resisting arrest, was he, sir?
8   A   He did.
9   Q   According to what you told the grand jury he wasn't,
10  was he?
11  A   He did.
12  Q   Was that something that you expanded on also at the
13  criminal trial?
14  A   Yes.
15  Q   Now, you were also asked questions about the trespassing
16  charge; do you recall that?
17  A   Yes.
18  Q   If Andrew Smalls was visiting a friend in the building,
19  Lindsey Johnson, that wouldn't be trespassing, would it
20  officer?
21  A   No, it would not.
22  Q   If his friend invited him over and he went to watch TV
23  with his friend, that wouldn't be trespassing, right?
24  A   Correct.
25  Q   Now, you were asked questions about DNA and the

1   procedures back in 2006?
2   A   Yes.
3   Q   I asked you the same questions.  I asked you whether or
4   not you had made a request for DNA and when I asked you the
5   question the first response you gave me was you didn't know.
6   Is that correct?
7   A   I don't know.
8   Q   You never said anything about a policy back in 2006 when
9   I asked you the question, did you?
10      MS. FUDIM:  Objection.
11      THE COURT:  I'll sustain the objection.
12  Q   Now, you told us, sir, this was your very first felony
13  arrest in your career as a police officer, correct?
14  A   I believe so.  I don't have a record.
15  Q   Would you agree, Officer Collins, the only evidence tying
16  Andrew Smalls to possession of a gun comes from you?  Would
17  you agree with that, sir?
18      MS. FUDIM:  Objection.
19      THE COURT:  Overruled.  He can answer.
20  A   Yes.
21  Q   Without your testimony that you saw with your own eyes
22  Andrew have a gun on the stairwell, there's no evidence
23  connecting Andrew to that gun, is there?
24      MS. FUDIM:  Objection.
25      THE COURT:  He can answer it.

1   A   No, there's not.
2       MR. NORINSBERG:  Thank you.  I have nothing further.
3       MS. FUDIM:  Briefly, your Honor.
4   RECROSS-EXAMINATION
5   BY MS. FUDIM:
6   Q   When did Andrew Smalls resist arrest?
7   A   On the rooftop.
8   Q   Was that before or after he put his hands up in the air?
9   A   He momentarily put his hands up and then started to give
10  us a hard time and that's when we took him to the ground.
11  Q   With respect to the vouchers that you were shown,
12  Plaintiff's Exhibit 15 is the typed report.  You told us you
13  typed this into the system.  Is that accurate?
14  A   Yes.
15  Q   Plaintiff's counsel also showed you a second version
16  which is handwritten and that was Plaintiff's Exhibit 17.  Is
17  that your handwriting?
18  A   No, it is not.
19  Q   Were you typing up what someone else wrote?
20  A   Yes.
21  Q   And just to be clear, you though were the one that
22  prepared the actual gun and magazine for vouchering?
23  A   Yes.
24  Q   Did you remove the magazine from the gun?
25  A   No.

1  Q   But you vouchered them separately?
2  A   Yes.
3  Q   And did you touch them with your hands at that time?
4  A   Yes.
5      MS. FUDIM:  Nothing further, your Honor.
6      THE COURT:  All right.  Thank you.
7      You can step down.
8      (Witness excused.)
9      THE COURT:  Would you call your next witness.
10     MS. JOSEPH:  Yes, your Honor.  At this time the
plaintiff calls Mr. Lindsey Johnson to the stand.
12 LINDSEY NELSON JOHNSON,
13     called as a witness, having been duly
14     sworn, was examined and testified as follows:
15     THE COURT:  Please be seated and state your name for
16 the record.
17     THE WITNESS:  The name is Lindsey Darnell Johnson,
18 Junior.
19     THE COURT:  You may inquire.
20 DIRECT EXAMINATION
21 BY MS. JOSEPH:
22 Q   Mr. Johnson, good afternoon.
23 A   How are you doing?
24 Q   Have you ever testified in court before?
25 A   No.

1  Q   This is your first time?
2  A   Yes.
3  Q   You're here pursuant to a subpoena?
4  A   Yes.
5  Q   Where do you currently live?
6  A   In Richmond, Virginia.
7  Q   And how long have you lived in Richmond, Virginia?
8  A   Almost ten years now.
9  Q   Are you employed?
10 A   Yes.
11 Q   Where do you work?
12 A   I work for a company called Cinveo.  It's a print
13 company.
14     THE COURT:  That's in Richmond?
15     THE WITNESS:  Yes.
16 Q   And what is your position there?
17 A   I'm a forklift operator.
18 Q   How long have you been working for this company?
19 A   Almost two years.
20 Q   Where were you working before then?
21 A   I was working for a janitorial company called GCA.
22 Q   How long were you working there?
23 A   Seven years.
24 Q   Was that also in Virginia?
25 A   Yes.

1  Q   Now, who do you live with in Virginia?
2  A   My girlfriend and my two kids.
3  Q   What do you have a boy, girl?
4      MR. FRANCOLLA:  Objection, your Honor, relevance.
5      THE COURT:  I'll allow this last answer.  You can
6  answer.
7  A   I have a daughter and son and one on the way.
8      THE COURT:  I'm sorry.  How many kids do you have?
9      THE WITNESS:  Two.
10     THE COURT:  Are you counting the one on the way?
11     THE WITNESS:  No.
12     THE COURT:  You have two children and a third?
13     THE WITNESS:  Expecting a third.
14     THE COURT:  Got it.
15 BY MS. JOSEPH:
16 Q   How far did you go in school?
17 A   To the eleventh grade and ended up getting my GED.
18 Q   When did you get your GED?
19     MR. FRANCOLLA:  Objection, your Honor.
20     THE COURT:  He can answer.
21 A   I think about five years ago.
22 Q   Why did you get your GED?
23     MR. FRANCOLLA:  Objection.
24     THE COURT:  I'll sustain the objection as to why.
25 It's appropriate to establish a witness' academic background.

1  Why don't you move on to something more relevant.
2  Q   Mr. Johnson, are you being compensated in any way for
3  your testimony today?
4  A   Yes.  I had to omit work for one day.  I'm being
5  compensated for one day of work.
6  Q   Any other compensation?
7  A   No.
8  Q   Directing your attention to May 20 of 2006, are you aware
9  of an incident that took place with the police on that night?
10 A   Yes.
11 Q   Where did the incident take place?
12 A   In my building.  This is Queens, New York, Far Rockaway,
13 Queens.  That's where I was living at the time.  A project
14 called Hammels.  My building is 8105.  I was living on the
15 third floor, apartment three E.
16 Q   Approximately what time did that incident take place?
17 A   Sometime after 1:00 o'clock in the morning.  Sometime
18 after 1:00 o'clock in the morning.
19 Q   Now, back on May 20 of 2006, were you living with anyone?
20 A   No.
21 Q   Do you know the plaintiff in this case, Andrew Smalls?
22 A   Yes.
23 Q   How do you know him?
24 A   He's a good friend of mine.  We grew up together.
25 Q   About how long have you known him?

## Page 159

1  A    I'm older than him.  I pretty much known him all his
2  life.
3  Q    Did you see Andrew Smalls on May 20 of 2006?
4  A    Yes.
5  Q    Where did you see him?
6  A    We were together that day.
7  Q    When you say we were together that day, let's go back to
8  the day before, May 19.  Were you with Andrew Smalls on May
9  19?
10 A    Yes.  We was together most of the 19th going into the
11 20th.
12 Q    Where were the two of you when you say you were together?
13 A    In my apartment.
14 Q    What were you doing?
15 A    Pretty much just hanging out, playing cards.
16 Q    Focusing your attention to around one a.m. now on May 20,
17 what were you doing at approximately that time?
18 A    We were still playing cards and then we got a knock at
19 the door.  We got a knock at the door.  He got up and answered
20 the door and when he opened the door somebody was like they
21 are locking your brother up downstairs.
22 Q    Were you able to tell who this person was?
23 A    No.
24 Q    Where were you when there was a knock at the door?
25 A    We were sitting in the living room.  From where I was

## Page 160

1  sitting I couldn't see the person.  I could only hear them.
2  Q    And after this person made -- were you able to tell who
3  the person was?
4  A    I assumed that it was Jerome.  For a long time I thought
5  it was Jerome until I recently asked him.  I said nah, that
6  was Junior.
7       MR. FRANCOLLA:  Objection, move to strike.
8       THE COURT:  I'll grant your motion to strike.
9  That's all hearsay.
10 Q    After you heard this person at the door, what, if
11 anything, happened next?
12 A    After he ran out of the house, I got up and looked out
13 the window.
14 Q    When you say he, who are you referring to?
15 A    Andrew.
16 Q    Did you see where Mr. Smalls went?
17 A    No.
18 Q    Now, you say you looked out the window.  Why did you do
19 that?
20 A    To see if the police was down there.
21 Q    Did you go downstairs?
22 A    Oh, no.
23 Q    Why not?
24 A    I wouldn't do that.  It ain't like I could help the
25 situation.

## Page 161

1  Q    Now, that day when Andrew was in your apartment, do you
2  recall if he was wearing any outside jacket or a coat?
3  A    No, not to my knowledge.  No.
4  Q    Before he ran out of your apartment, did he put on a
5  coat?
6  A    No.
7  Q    Sir, why are you here testifying today?
8       MR. FRANCOLLA:  Objection.
9       THE COURT:  I'll sustain the objection.
10      MS. JOSEPH:  Nothing further, your Honor.
11      MR. FRANCOLLA:  May I inquire, your Honor?
12      THE COURT:  Yes.
13      MR. FRANCOLLA:  Just in case it's necessary, I have
14 a binder for the court with the witness' testimony, if I need
15 to refer to it, that I could hand up to your Honor's staff.
16 CROSS-EXAMINATION
17 BY MR. FRANCOLLA:
18 Q    Good afternoon, Mr. Johnson.
19 A    Good afternoon.
20 Q    Now, you testified on direct examination that this is the
21 first time you have testified?
22 A    Yes.
23      MS. JOSEPH:  Objection, your Honor.  I asked in
24 court.
25 A    Are you talking about the disposition?

## Page 162

1  Q    I'll get to that.  Have you testified under oath prior to
2  today?
3  A    Oh, yes, the disposition.  Yes, deposition, whatever you
4  call it.
5  Q    Prior to coming here today, as part of this lawsuit, you
6  gave sworn testimony in what's called a deposition, correct?
7  A    Yes.
8  Q    And that was on September 6 of 2016?
9  A    I don't remember the date.
10      MR. FRANCOLLA:  Your Honor, I can hand the witness a
11 copy of the transcript.
12      THE COURT:  Or you could show him.  Put it on the
13 Elmo.
14      MR. FRANCOLLA:  I can do that as well.
15 Q    Mr. Johnson, I'm going to ask you to look at the screen
16 to your left and take a look at the page I'm showing you and
17 when you are done let me know if this refreshes your
18 recollection as to when your deposition occurred.
19 A    I know I did it.  I did a deposition.
20      THE COURT:  The question is when.  Does looking at
21 that document refresh your recollection as to when you
22 testified?
23      THE WITNESS:  No.  I wouldn't be able to tell.
24      THE COURT:  Do you see a date?
25      THE WITNESS:  I see the date.

1    THE COURT:  That doesn't refresh your recollection?
2    THE WITNESS:  All right.  Yeah.
3    THE COURT:  It either does or doesn't.
4    THE WITNESS:  I know I did it like a couple of years
5  ago.  So, yeah, yeah.
6  Q    You have no reason to think that the cover of your
7  deposition transcript reflects an date other than when you
8  gave the testimony, right?
9  A    It don't really matter to me.  You know, I did it.
10  Q    Okay.
11       Now, you said on direct examination that -- yes or
12  no -- the person who came to the door --
13    THE COURT:  We're not doing yes or nos; remember?
14    MR. FRANCOLLA:  Okay.  My apologies, your Honor.
15  Q    You testified on direct examination that the person who
16  came to your door was not Jerome Nelson, correct?
17  A    Just now?
18  Q    You just testified on direct examination that you did not
19  know who came to the door, fair?
20  A    Yes.
21  Q    Now --
22  A    I testified that I assume that it was Jerome pretty much.
23  Q    I'm going to refer the court and plaintiff's counsel to
24  the witness' testimony, specifically beginning on page 49,
25  line 21 to 50, line 16.

1    MS. JOSEPH:  I'm sorry, counsel.
2    MR. FRANCOLLA:  49, 21 to 50, 16.
3    MS. JOSEPH:  Your Honor, may we approach?
4    THE COURT:  Pardon me?
5    MS. JOSEPH:  May we approach.
6    THE COURT:  No.  He can go ahead and ask.
7  Q    Mr. Johnson, referring to your deposition transcript,
8  were you asked these questions under oath and did you give
9  these answers under oath:
10    "QUESTION:  So at some point Jerome Nelson comes to
11  your door, does he knock on your door?
12    "ANSWER:  Aha.
13    "QUESTION:  Okay.  What did he say specifically that
14  you remember?
15    "ANSWER:  He said, he said, yo, he said yo, they
16  locked your brothers --  your brother is downstairs getting
17  locked up.
18    "QUESTION:  Okay.  Were those his exact words or are
19  you paraphrasing?
20    "ANSWER:  There's no way.  I can't remember
21  everything what he said.
22    "QUESTION:  Exactly?
23    "ANSWER:  And he told Andrew that they were getting
24  locked up.
25    "QUESTION:  What sort of state was he in?  Was he

1  panicked about, panicked or was he calm?  I'm talking about
2  Jerome Nelson.
3    "ANSWER:  He, mean he could have been, he could have
4  been a little excited.  Yes.  He could have been a little
5  excited."
6       Were you asked those questions and did you give
7  those answers?
8  A    Yes.
9  Q    The portion I just read, you didn't say that you assumed
10  it was Jerome Nelson but weren't sure, right?
11  A    Okay, yes.  Yes.
12  Q    In fact, the portion I just read you actually reflects on
13  the state of Jerome Nelson on the evening of the incident,
14  correct?
15  A    I could hear him.
16  Q    Now, you also said on direct examination that Andrew
17  Smalls was not wearing a jacket when he left your apartment,
18  correct?
19  A    Not to my knowledge.
20  Q    What does that mean?
21  A    That means I don't know.
22  Q    So --
23  A    I mean I don't remember him wearing a black jacket.  I
24  mean I don't remember him wearing a jacket period.
25  Q    Would it be fair to say that you don't remember one way

1  or the other whether he was wearing any jacket at all?
2  A    Yes.
3  Q    Now, you testified on direct examination that you are
4  being compensated a day's work to be here today?
5  A    Yes.  And that's a day's work that would typically occur
6  in Virginia, correct?
7  A    Yes.
8  Q    How did you get up here?
9  A    They sent me a car.
10  Q    They being who?
11  A    The lawyers.
12  Q    They sent a car.  Was it one of them or did they send a
13  car service?
14  A    I guess it was a car service.
15  Q    That they sent to pick you up in Richmond Virginia?
16  A    Yes.
17  Q    And a drive you up here?
18  A    Yes.
19  Q    When did that occur?
20  A    That was this morning.
21  Q    Are you going back tonight or are you saying over?
22  A    Yes.
23  Q    Which one?
24  A    I'm staying over.
25  Q    Did they -- are they taking care of your accommodations

1   or are you taking care of it yourself?

2   A    They taking care of the.

3   Q    Where with you staying?

4   A    I don't know.  They had a hotel that's close to the

5   courts.

6   Q    As far as you know, counsel is taking care of the cost of

7   that hotel that you will be staying at tonight?

8   A    Yes.

9   Q    And then presumably fair to assume they will pay for your

10  transport back down to Virginia tomorrow?

11  A    Yes.

12  Q    Now, you also mentioned on direct examination that you

13  and Mr. Smalls were playing cards at the moment somebody

14  knocked on the door.

15  A    Yes.

16  Q    Are you certain you were playing cards or are you

17  assuming that?

18  A    No.  I'm pretty sure we was playing cards.

19  Q    I would like to now just refer the court and plaintiff's

20  counsel to page 16 of the transcript and that would be lines 6

21  through 16 -- excuse me, 4 through 16.  I apologize.

22       THE COURT:  Do you have a question?

23       MR. FRANCOLLA:  I was going to read that portion.

24       THE COURT:  Okay.

25  Q    Mr. Johnson, were you asked these questions and did you

1   give these answers, again referring to the 2016 deposition:

2        "QUESTION:  So tell us what you were doing and just

3   give us a description of what was happening?

4        "ANSWER:  Well, we was just basically just sitting

5   there watching TV and a friend of mine came and knocked on the

6   door.

7        "QUESTION:  Do you know that person's name?

8        "ANSWER:  Jerome.  Jerome came and knocked on the

9   door and he told Andrew he was, like yo, your brother's

10  downstairs getting locked up.

11       "QUESTION:  Now, do you know Jerome's last name?

12       "ANSWER:  No, no.

13       "QUESTION:  Could his last name --

14       "ANSWER:  It might be Nelson; it might be Nelson."

15       Were you asked those questions and did you give

16  those answers?

17  A    Yes.

18  Q    When you testified in 2016 you testified you were

19  watching TV at the time?

20  A    The TV was on.  You can't play cards and watch TV at the

21  same time.

22  Q    You can.  I'm asking what you were doing.

23  A    Yes.

24  Q    It's your testimony that you were playing cards while the

25  TV was on?

1   A    Yes.

2   Q    Now, you didn't know -- strike that.  You spoke with

3   Andrew Smalls before you gave the testimony in 2016, correct?

4   A    Yes.

5   Q    A couple of days before, right?

6   A    Yes.

7   Q    After that deposition took place in Virginia?

8   A    Yes.

9   Q    And it was arranged by a different attorney but one that

10  was representing Mr. Smalls at the time, correct?

11  A    Yes.

12  Q    And that attorney picked you up for that deposition,

13  correct?

14  A    I believe so.  I believe so, yes.  Yes.

15  Q    Now, referring back to the night or early morning

16  Mr. Smalls was arrested, you don't remember how long he had

17  been in your apartment that night, right?

18  A    No.

19  Q    And there was nobody else in the apartment at the time

20  you claim someone knocked on the door other than you and him,

21  according to you?

22  A    Yes.

23  Q    And as you mentioned you have known Andrew Smalls since

24  he was in kindergarten a long time?

25  A    Yes.

1   Q    You have actually similarly known Jerome Nelson since he

2   was in kindergarten, right?

3   A    Yes.

4   Q    Now, you mentioned how after you claim Mr. Smalls left

5   your apartment you briefly looked out the window to see if you

6   saw anything going on outside?

7   A    Yes.

8   Q    But you didn't?

9   A    Didn't see anything?

10  Q    Correct, yes.

11  A    Yes.

12  Q    After that you went back to the couch and went to sleep?

13  A    Yes.  I didn't go back to sleep.  I didn't say I went to

14  sleep.  I don't really remember exactly what I did after I

15  looked out the window.  You know I could have started watching

16  TV before I went to sleep, if I went asleep.  I don't remember

17  exactly what I did.

18  Q    Fair to say you were in your apartment and didn't go

19  anywhere?

20  A    No.

21  Q    Didn't do anything of note that you can remember?

22  A    Yes.

23  Q    So you didn't actually see Mr. Smalls get arrested,

24  correct?

25  A    No, no.

1  Q   You didn't see his brother Ronnie Smalls get arrested,
2  correct?
3  A   I didn't see anyone get arrested.
4  Q   And you don't know when Andrew Smalls was arrested?
5  A   No.
6          MR. FRANCOLLA:  Your Honor, I may have one last
7  question.  I just want to confer with my colleague.
8          THE COURT:  Okay.
9          (Pause.)
10 Q   Mr. Johnson, I think we've established that this is the
11 first time you've ever testified in open court before,
12 correct?
13 A   Yes.
14 Q   So fair to say you did not testify as a witness at
15 Mr. Smalls's criminal trial?
16 A   Yes.
17 Q   You did not?
18 A   I did not, he yes.
19         MR. FRANCOLLA:  I have nothing further, your Honor.
20 Thank you, Mr. Johnson.
21         THE COURT:  Do you have anything further?
22         MS. JOSEPH:  Yes, your Honor, briefly.
23 REDIRECT EXAMINATION
24 BY MS. JOSEPH:
25 Q   Opposing counsel just asked you questions about whether

1  you testified at Mr. Smalls's criminal trial.  Do you recall
2  those questions?
3  A   Yes.
4  Q   Were you prepared to testify at his criminal trial?
5  A   Yes.
6  Q   And why didn't you?
7  A   I think it was dismissed or something.  They didn't need
8  me.
9  Q   When you say they, who did you understand them to be?
10 A   The lawyers.
11 Q   Mr. Smalls's criminal attorney?
12 A   Yes.
13 Q   And you testified or opposing counsel was asking you some
14 questions about a knock you heard at the door that night?
15 A   Yes.
16 Q   Regardless of whether it was Jerome or Mr. Davis, are you
17 certain you heard a knock at the door?
18         THE COURT:  A Mr. Davis?
19         THE WITNESS:  Yes.
20         THE COURT:  I'm not sure the basis for that
21 question.  I don't know that there has been any testimony
22 about anyone named Davis.
23         MS. JOSEPH:  Mr. Davis, William Davis.
24         THE COURT:  I think that assumes a fact not in
25 evidence.  I don't know anyone who said anything about that.

1          MS. JOSEPH:  I'll rephrase, your Honor.
2  Q   Are you certain you heard a knock at the door that night?
3  A   Yes.
4  Q   Who answered the knock at your door?
5  A   Andrew.
6  Q   Do you have any doubt in your mind it was Andrew Smalls?
7  A   No.
8          MS. JOSEPH:  Nothing further.
9          MR. FRANCOLLA:  Very briefly, your Honor.
10 RECROSS-EXAMINATION
11 BY MR. FRANCOLLA:
12 Q   Mr. Johnson, you said that the reason you believe you
13 didn't testify at the criminal trial because the charges got
14 dismissed and they didn't need you?
15         MS. JOSEPH:  Objection.
16         THE COURT:  No.  Well, I thought you withdrew the
17 fact that they were dismissed.
18 A   I don't know what happened with the case and he just said
19 he didn't need me.
20 Q   Considering that you are as close as you testified to,
21 surely you know he was convicted at that trial, right?
22 A   I didn't now that.
23         MR. FRANCOLLA:  Nothing further.
24         THE COURT:  Okay.  Thank you.  You can step down.
25         (Witness excused.)

1          MS. JOSEPH:  The plaintiff calls Officer Teta to the
2  stand.
3  DAVID TETA,
4          called as a witness, having been duly
5          sworn, was examined and testified as follows:
6          THE COURT:  State and spell your name for the
7  record.
8          THE WITNESS:  Thank you.  Good afternoon, your
9  Honor.
10         MR. FRANCOLLA:  I advise the court this witness's
11 prior testimony is also in the binder that contained
12 Mr. Johnson, to the extent needed.
13         THE COURT:  Okay.
14         THE WITNESS:  Good afternoon.  My name is detective
15 David Teta, D A V I D, T E T A.
16 DIRECT EXAMINATION
17 BY MS. JOSEPH:
18 Q   Good afternoon, detective, and I apologize for calling
19 you officer earlier.
20 A   Good afternoon.
21 Q   Now, you are a named defendant in this case, correct?
22 A   Correct.
23 Q   You were Officer Collins' partner on May 20 of 2006,
24 correct?
25 A   I was Officer Collins' adjoining foot post.

1  Q   You worked with him on May 20 of 2006, yes?
2  A   I worked alongside him, yes.
3  Q   And you took part in Andrew Smalls's May 20 arrest,
4  correct?
5  A   Yes, I did.
6  Q   Now, you previously gave sworn testimony relating to
7  Andrew Smalls' arrest on May 20, 2006, correct?
8  A   Yes, ma'am.
9  Q   You testified at his criminal trial, yes?
10  A   Yes, I did.
11  Q   And that was on June 2 of 2008?
12  A   Yes, it was.
13  Q   And you also testified at a deposition in the civil case?
14  A   Correct.
15  Q   And your deposition testimony was on February 28 of 2017,
16  yes?
17  A   I believe so.
18  Q   And before you testified at Mr. Smalls's criminal trial
19  you took an oath to tell the truth, yes?
20  A   Yes, I did.
21  Q   And before you testified at the deposition in the civil
22  case you also took an oath to the tell the truth, yes?
23  A   Yes, I did.
24  Q   And that was the same oath you took before this jury
25  right now, right?

1  A   Correct.
2  Q   And before you came here today you made sure to review
3  the police paperwork created that a day?
4  A   Yes.
5  Q   You made sure to review your prior testimony, correct?
6  A   Yes.
7  Q   What documents did you review?
8  A   Specifically what documents I reviewed?
9  Q   Yes.
10  A   I think I reviewed my criminal court testimony as well as
11  my deposition testimony.
12  Q   What about the police paperwork?
13  A   The police paperwork isn't mine.
14  Q   You didn't review any of the police paperwork?
15  A   Not to my recollection, no.
16  Q   Detective Teta, we can agree that as an officer you
17  cannot knowingly put false information in a criminal
18  complaint, yes?
19       MR. FRANCOLLA:  Objection.
20       THE COURT:  Overruled.
21  A   Yes, that's correct.
22  Q   You must not knowingly put false information in police
23  paperwork either, correct?
24  A   That's correct.
25  Q   And as an officer if you are aware that false information

1  is going into a criminal complaint you should vocalize that,
2  yes?
3  A   Yes.
4  Q   You shouldn't remain silent, right?
5  A   No, you should not.
6  Q   Now, you had conversations with an ADA from Queens
7  regarding Andrew Smalls's arrest, correct?
8  A   Yes.
9  Q   And the ADA name was Michael Brovner, yes?
10  A   Yes, Michael Brovner.
11  Q   You relayed the facts and circumstances to ADA Brovner
12  about the arrest of Andrew Smalls, correct?
13  A   Yes, I did.
14  Q   And you understood when you gave ADA Brovner this
15  information that the ADA wasn't out in the field with you and
16  Officer Collins when Mr. Smalls was arrested, correct?
17  A   Yes, I understand.
18  Q   You understood that the ADA did not witness any of the
19  events that took place with Mr. Smalls' arrest, correct?
20  A   Yes. I'm aware of that.
21  Q   You knew that the ADA was relying on your statements to
22  decide if to charge Mr. Smalls, correct?
23  A   That's incorrect.
24  Q   You did not believe the ADA was relying on anything you
25  said?

1  A   No.  I do not believe that the ADA was relying on
2  anything that I said in regards to trying anybody criminally,
3  no.
4  Q   What about Officer Collins, did you believe the ADA was
5  relying on anything that Officer Collins said?
6       MR. FRANCOLLA:  Objection.
7       THE COURT:  Yes.  I'm sustain the objection.
8  Q   In your experience as a police officer is it your
9  understanding that an ADA will rely on what an arresting
10  officer tells them in order to bring charges?
11       MR. FRANCOLLA:  Objection.
12       THE COURT:  Overruled.  He can answer.
13  A   Yes.  An arresting officer's information to the ADA will
14  help and decide whether or not an ADA is going to bring
15  criminal charges against somebody.
16  Q   Would it be fair to say that any officer the ADA speaks
17  to that's involved in the case, the ADA could rely on what
18  that officer says?
19       MR. FRANCOLLA:  Objection, calls for speculation.
20       THE COURT:  I'll sustain the objection to the form
21  of that question.
22  Q   You are aware that Andrew Smalls was charged with
23  criminal possession of a weapon in the second degree, yes?
24  A   Yes, I am.
25  Q   That's a felony, right?

```
1    A    Yes.
2    Q    Class C felony?
3    A    Yes, I believe so.
4    Q    You are aware it has a mandatory minimum sentence?
5    A    I'm aware that it does.  I don't know what it is off the
6    top of my head.
7    Q    You understand mandatory minimum means the person has to
8    be incarcerated without exception, correct?
9         MR. FRANCOLLA:  Objection.
10        THE COURT:  I'll sustain the objection.
11   Q    Turning your attention to May 20 of 2016, you testified
12   that you were working alongside Officer Collins that day,
13   correct?
14   A    Correct.
15   Q    And shortly before that back on April 7 of 2006 you had
16   just graduated from the police academy, correct?
17   A    Correct.
18   Q    So by May 20 of 2006 you had only been out of the academy
19   for a little over a month, yes?
20   A    Yes.
21   Q    So Andrew Smalls's arrest on May 20 of 2006 was your
22   first gun charge, correct?
23   A    It was not my arrest at all, ma'am.  That's incorrect.
24   Q    It was the first gun case that you had been involved in,
25   yes?
```

```
1    A    That is correct.
2    Q    And you're right, you were not the arresting officer,
3    yes?
4    A    Yes.
5    Q    That was Collins, right?
6    A    Yes, it was.
7    Q    Now, you were in court yesterday when Officer Collins
8    claimed he didn't know why he was made the arresting officer;
9    do you recall that testimony?
10        MR. FRANCOLLA:  Objection.
11        THE COURT:  Yes.  I'll sustain the objection.
12   Q    You are aware Officer Collins claimed to have witnessed
13   Andrew Smalls in possession of a gun on May 20, correct?
14   A    Yes, I'm aware.
15   Q    And it's your understanding Officer Collins was made the
16   arresting officer because he claimed that he observed the gun
17   being transferred from one individual to another?
18   A    Correct.
19   Q    Let's talk about the gun transfer that night.  You never
20   saw Andrew Smalls transfer a gun to anyone that night,
21   correct?
22   A    No, I did not.
23   Q    You never saw Andrew Smalls holding a gun at any time
24   that night, correct?
25   A    No, I did not.
```

```
1    Q    And at some point you claim that you searched Andrew
2    Smalls on the roof, right?
3    A    I don't believe so.
4    Q    Referring to your trial testimony, page 65, line five
5    through eight:
6         "QUESTION:  At any point did you search him?
7         "ANSWER:  Yes.
8         "QUESTION:  When was that?
9         "ANSWER:  On the roof."
10        That's what your trial testimony says, yes?
11   A    Okay, yes.
12   Q    You searched Andrew Smalls on the roof, right?
13   A    Yes.
14        THE COURT:  Where were you reading from?
15        MS. JOSEPH:  The trial transcript.
16        THE COURT:  Are you saying that that refers to
17   Andrew Smalls?
18        MS. JOSEPH:  Yes.
19        THE COURT:  Look at the prior page.
20   I'm sorry.  Okay.  I'm sorry.  Go ahead.
21        MS. JOSEPH:  Yes, the defendant, your Honor.
22        THE COURT:  I see.  Maybe you need to start earlier
23   in the questioning.
24   Q    We can agree that you searched Andrew Smalls that night,
25   yes?
```

```
1    A    Yes, that's what it says.
2    Q    And when you searched Andrew Smalls that night you did
3    not find a gun on him, right?
4    A    No, I did not.
5    Q    Now, we've heard some testimony in this case about the
6    gun being tested for fingerprints, yes?
7    A    Yes.
8    Q    You're aware that no fingerprints of Andrew Smalls was
9    found on the gun, yes?
10   A    Yes.
11   Q    And we also heard some testimony about DNA evidence, yes?
12   A    Yes.
13   Q    You are aware that none of Andrew Smalls's DNA was found
14   on the gun, yes?
15   A    That is correct.
16   Q    We also heard --
17        THE COURT:  I'm sorry.  Do you know if it was tested
18   for DNA?
19        THE WITNESS:  I'm not aware if it was tested for
20   DNA.
21        THE COURT:  You don't know whether it was tested or
22   not tested?
23        THE WITNESS:  I don't believe it was, no.
24   Q    There was not a request made to have the gun tested for
25   DNA, correct?
```

1     MR. FRANCOLLA: Objection.
2     THE COURT: He can answer that if he knows.
3 A   No. There was no request made. If Officer Collins is
4 saying that he saw somebody in possession of the firearm, that
5 firearm does not have to mandatorily be tested for DNA or
6 swabbed for DNA because of the sworn testimony of the officer
7 saying he saw that individual in possession of it. That's
8 since changed. That was the policy back in 2006.
9 Q   So back in 2006 officers knew that if they said they
10 observed someone in possession of a gun, the gun would not be
11 tested for DNA? That was the understanding, right?
12    MR. FRANCOLLA: Objection.
13    THE COURT: Overruled. He can answer.
14 A  I can't speculate as to what all officers knew. I can
15 tell you being a month out of the academy, I knew that if you
16 find somebody in possession of a firearm or with a firearm on
17 their person, whether it be in their waistband or someplace
18 else on their person, you didn't check off the yes for DNA on
19 the request for laboratory information form.
20 Q  You are aware that Officer Collins was also recently out
21 of the academy as well?
22 A  Yes, he was.
23 Q  You understood if you said I saw this person in
24 possession of a gun there was no mandatory requirement for a
25 DNA test, yes.

1 A  That was my understanding, correct.
2 Q  So you heard shots being fired that night, yes?
3 A  Yes, ma'am.
4 Q  And you heard some testimony about gunpowder residue in
5 this case, yes?
6 A  Yes, ma'am.
7 Q  And you are familiar with what that is?
8 A  Yes, I am.
9 Q  And you are aware that as an experienced police officer
10 if you fire a gunpowder residue can be left on your hand, yes?
11 A  That's not entirely true.
12 Q  It's true in a lot of cases?
13 A  I can't speculate as to how many cases equal a lot. I'm
14 telling you it's not in every case.
15 Q  Is it helpful in order to determine if there's gunpowder
16 residue to actually conduct a gunpowder residue test?
17 A  The New York City Police Department doesn't conduct
18 gunshot residue tests on a lot of defendants who have been
19 found in possession of firearms. The only time the New York
20 City Police Department conducts gunshot residue tests is to
21 determine muzzle distance from a victim.
22 Q  Again, you knew back in 2006 that no gunpowder residue
23 tests would be performed if an officer said that they saw the
24 gun in the possession of a suspect?
25    MR. FRANCOLLA: Objection.

1     THE COURT: I'll sustain the objection to that.
2 That doesn't fairly state the testimony.
3 Q   You understood the policy back in 2006 that gunpowder
4 residue tests would be performed in certain circumstances,
5 yes?
6     MR. FRANCOLLA: Objection.
7     THE COURT: I'll sustain the objection.
8 Q   So Officer Collins I just want to be clear. When this
9 gun was passed between these two individuals --
10    THE COURT: Did you see that? Did you see it passed
11 between the two individuals?
12    THE WITNESS: No, ma'am, I did not. You also
13 started this question with Officer Collins. I don't know if
14 you are referencing Officer Collins or you are calling me
15 Officer Collins.
16 Q   I'm sorry. Detective Teta.
17 A   That's all right.
18 Q   To your knowledge, there are no other witnesses to the
19 gun being passed between Andrew Smalls and Ronnie Smalls other
20 than Officer Collins, correct?
21    MR. FRANCOLLA: Objection.
22    THE COURT: Sustained.
23 Q   You are not aware of any other witnesses to this gun
24 being passed that night, correct?
25    MR. FRANCOLLA: Objection.

1     THE COURT: Sustained.
2 Q   Let's go to the moment just before this gun was passed:
3 You were in the sixth floor stairwell, yes?
4 A   Yes, ma'am.
5 Q   Now, you claim you stopped Cedric and -- you claim Cedric
6 stopped and tried to prevent you and Officer Collins from
7 going up the stairwell, yes?
8 A   Yes, ma'am.
9 Q   Officer Collins was in front of you, right?
10 A  Yes, he was.
11 Q  Officer Collins grabbed Cedric and handed him down to
12 you, yes?
13 A  Yes, he did.
14 Q  And then you put Cedric up against the wall, yes?
15 A  Yes.
16 Q  And you and Cedric were on the sixth floor landing, yes?
17 A  Correct.
18 Q  So are you aware that you were in this courtroom when
19 Officer Collins testified that he slipped shortly after that?
20    MR. FRANCOLLA: Objection.
21    THE COURT: I'll allow him to answer that, if
22 there's a second questioned related to this witness.
23 A  I guess the question whether or not I heard Officer
24 Collins say that he slipped?
25 Q  Shortly after he gives you Cedric he's going up the sixth

1  floor stairwell, he slipped at that point, yes?
2  A    Yes.
3  Q    And he was about five steps up the stairs at that point?
4  A    I don't remember how far ahead of me he was.  That's a
5  good estimate of about five steps.
6  Q    And then shortly after that you're aware he said the gun
7  was passed between Jerome and Cedric on seventh floor landing?
8  A    Yes.
9  Q    So as you're holding Cedric up against the wall you can
10  see Officer Collins, correct?
11  A    Yes.
12  Q    In fact, you had your body turned to the side so you
13  could actually keep your eye on Collins, right?
14  A    Absolutely.
15  Q    So you observed Officer Collins tripping as he goes up to
16  the seventh floor, right?
17  A    I don't believe I ever said that I observed Officer
18  Collins slipping.  What I said was I heard Officer Collins say
19  that he slipped earlier in the courtroom during his testimony.
20  Q    I'm asking you now when you look back on that day, yes or
21  no, did you observe Officer Collins slip on the stairwell?
22  A    I don't recall seeing it, no.
23  Q    Referring to your trial transcript, page 57, lines 23
24  through page 58, line one:
25      "QUESTION:  What was he doing?

Anthony M. Mancuso, CSR    Official Court Reporter

1      "ANSWER:   He was actually attempting to get up it
2  seemed.  He slipped going up the sixth floor stairs up to the
3  seventh floor."  That was your testimony, yes?
4  A    Yes, ma'am.
5  Q    So at the criminal trial you testified that Officer
6  Collins slipped going up the seventh floor, correct?
7  A    I would have -- you would have to read it back to me so I
8  could refresh my recollection.
9  Q    I'll read it again:
10      "QUESTION:  What was he doing?
11      "ANSWER:   He was actually attempting to get up it
12  seemed.  He slipped going up the sixth floor stairs up to the
13  seventh floor."
14      Yes?
15  A    I said that.  The question you just asked my though was
16  whether or not I saw him slip on the seventh floor stairwell.
17  Q    I'll rephrase it.  You observed Officer Collins slip
18  going up the sixth floor stairwell, correct?
19  A    Yes.  If that's what my testimony says, that's what I
20  saw.
21  Q    But when your partner that day slipped on the sixth floor
22  stairwell, you couldn't see Andrew Smalls and Ronnie Smalls,
23  could you?
24  A    I don't remember if I saw them or not.
25  Q    Well, isn't it true you couldn't see them because when

Anthony M. Mancuso, CSR    Official Court Reporter

1  Officer Collins slipped on the sixth floor stairwell, Andrew
2  Smalls and Ronnie Smalls were out of your view?
3  A    If that's the case.  If I said that in a prior testimony,
4  then that's what I said.  But I'm not saying that here today,
5  because I don't recall, nor can I state where they were when
6  Officer Collins fell.  When you're involved in your first gun
7  arrest and you believe there to be a firearm involved and your
8  partner slips and falls on the stairs you tend to focus on the
9  well-being of your partner and not to where the people are who
10  are ahead of him.
11  Q    Directing your attention to your trial transcript, page
12  57, line 23 to page 58, line four:
13      "QUESTION:  What was he -- referring to Officer
14  Collins -- doing?
15      "ANSWER:  He was actually attempting to get up it
16  seemed.  He slipped going up the sixth floor stairs to the
17  seventh floor.
18      "QUESTION:  At that point could you see where the
19  defendant and Ronnie Smalls were?
20      "ANSWER:  They were out of my view."  That was what
21  you testified in criminal court, yes?
22      MR. FRANCOLLA:  Objection, your Honor.  There was
23  two words missing from the last.
24      THE COURT:  I don't think you read the entire
25  answer.

Anthony M. Mancuso, CSR    Official Court Reporter

1      MR. FRANCOLLA:  The last answer.
2  Q    They were out of my sight of view, correct?
3  A    As I said earlier, if that I testified to prior,
4  then that's what I saw.  We're also now thirteen years later.
5  So my memory is a little bit foggy.  So you'll have to excuse
6  me.
7  Q    But that's what you testified to under oath in criminal
8  court, yes?
9  A    Absolutely.  That's what I just agreed to.
10  Q    You didn't say that you were focusing on the safety of
11  your partner at that point, yes?
12  A    No, I didn't, because nobody asked me the follow-up
13  question.
14  Q    They specifically asked you -- at that point could you
15  see where the defendant and Ronnie Smalls were, yes?
16  A    Yes.
17  Q    And in response to that question you had an opportunity
18  to explain what you could and couldn't see, right?
19  A    Yes.
20  Q    And you specifically said they were out of my sight of
21  view, correct?
22  A    Correct.
23  Q    And from where you stood on the sixth floor landing you
24  could see the seventh floor landing, couldn't you?
25  A    I could.

Anthony M. Mancuso, CSR    Official Court Reporter

1 Q    So at that point with your ability to see the seventh
2 floor landing you would have been able to see both Andrew
3 Smalls and Ronnie Smalls there, correct?
4 A    No, that's incorrect.
5 Q    I just want to make sure.  When you were standing on the
6 sixth floor landing, could you see the seventh floor landing
7 from where you stood?
8 A    I'll be more specific.  You can see half of the seventh
9 floor landing, yes.  The other half of the floor landing that
10 has the stairwell that proceeds up to the rooftop, that's a
11 part of the stairwell that you cannot see because of the angle
12 of being downstairs and the wall being in the way.
13 Q    So you are saying you could see a portion of the seventh
14 floor landing?
15 A    Correct.
16 Q    At any point after Officer Collins slipped did you see
17 Jerome or Andrew on the portion of the seventh floor landing
18 that you can see?
19 A    No, ma'am.
20       THE COURT:  What do you mean no?
21       THE WITNESS:  No, I did not see them.
22 Q    And the lighting in the stairwell was good that day,
23 correct?
24 A    I believe it was, yes.
25 Q    Now, you're also aware that a magazine was dropped that

1 day, yes?
2 A    Yes, ma'am.
3       THE COURT:  Did you see that yourself?
4       THE WITNESS:  Did I see it get dropped?
5       THE COURT:  Yes.
6       THE WITNESS:  No, ma'am.
7 Q    Referring to your -- you just testified that you did not
8 see the magazine get dropped.  Referring to your deposition,
9 page 12, beginning at line 16:
10       "QUESTION:  Did you see Andrew Smalls, sir, drop a
11 gun magazine on the stairway at the Hammels Houses?
12       "ANSWER:  I saw a magazine get dropped.  I can't
13 tell you who dropped it."
14       Yes?
15 A    If that's what it says in the testimony then yes.
16 Q    A moment ago her honor asked you if you saw the magazine
17 get dropped and you told the judge and this jury that you did
18 not see a magazine get dropped, correct?
19 A    You are correct.  I also said a moment ago that it was
20 thirteen years ago and certain instances can be a little
21 foggy.
22 Q    You also said that you reviewed your testimony before
23 appearing in court today, yes?
24 A    Yes, ma'am.
25 Q    But now you say that you actually did see the magazine

1 get dropped, correct?
2 A    If that's what I said in my testimony then, then, yes
3 that's what I saw.
4 Q    When you saw this magazine get dropped you were still
5 holding Cedric on the sixth floor landing, correct?
6 A    Correct.
7 Q    From where you were standing on that sixth floor landing,
8 where exactly did you see the magazine get dropped?  About how
9 many stairs up would you say?
10 A    I couldn't tell you.
11 Q    Was it halfway up the stairway?
12 A    I couldn't tell and I'm not going to wager a guess.
13 Q    It was on the stairway?
14 A    Yes.
15 Q    The stairway right in front of you?
16 A    I believe it to be.
17 Q    Now, we can agree that from the sixth floor stairway you
18 cannot see the seventh floor hallway, right?
19 A    Can you define hallway?
20 Q    What's your understanding of hallway, sir?
21 A    I'm sure there are several definitions for hallway.  I'm
22 trying to figure out which part of the building you are
23 speaking of.
24 Q    I'm speaking about the seventh floor hallway in the
25 Hammels Houses?

1 A    The hallway that is off the stairwell and contains the
2 entrances and doors to apartments?
3 Q    Yes, sir.
4 A    No, you cannot see it.
5 Q    So from the sixth floor landing tell the jury what you
6 would have to do to get to the seventh floor hallway?
7 A    You would have to ascend the stairs in front of you to
8 the seventh floor landing and open the door.
9 Q    Sir, wasn't this magazine that you say you saw dropped in
10 the sixth floor stairway, wasn't it recovered in the seventh
11 floor hallway?
12 A    I believe it to have been recovered on the stairway.
13 Q    Referring to what's been admitted as Plaintiff's Exhibit
14 5.
15       MR. FRANCOLLA:  I object, your Honor, to the extent
16 she's showing the witness a criminal court complaint from
17 somebody else.
18       MS. JOSEPH:  I believe this is the criminal court
19 case in the case he was involved in.
20       THE COURT:  You can ask him if it refreshes his
21 recollection.  If it's not a report that he wrote, it's not
22 appropriate for impeachment purposes.
23 Q    Sir, here it says deponent further states -- and that
24 would be Officer Collins -- that he recovered the
25 above-mentioned magazine from the floor of the seventh floor

1  hallway where he observed defendant.
2       Do you see that?
3  A    I do see that.
4  Q    After reading that, does that refresh your recollection
5  that the magazine was recovered in the hallway?
6  A    No.  There's a mistake in this criminal court complaint.
7  Q    Where it says it was recovered from the seventh floor
8  hallway, that is incorrect?
9  A    As far as I'm concerned, yes.
10 Q    It would be impossible to recover the magazine from the
11 hallway if it were dropped in the sixth floor stairwell,
12 correct?
13      MR. FRANCOLLA:  I object.
14      THE COURT:  I'll sustain the objection.
15 Q    Now, you learned in your training as a police officer
16 that there's nothing more dangerous to your safety than
17 someone armed with a gun, correct?
18 A    Correct.
19 Q    So when you were on the sixth floor landing holding
20 Cedric at any point after Officer Collins slipped did you hear
21 him yell man with a gun?
22 A    No, I did not.
23 Q    Did you hear him yell police, don't shoot?
24 A    No, I did not.
25 Q    Did you observe Officer Collins ducking at any point?

1  A    No, I did not.
2  Q    And you're aware that Officer Collins says on the sixth
3  floor stairwell is where he observed this gun being passed?
4       MR. FRANCOLLA:  Objection.
5       THE COURT:  I'll sustain the objection to that
6  question.
7  Q    When you were on that sixth floor landing, after Collins
8  slipped, you never saw him run back down the stairwell towards
9  you, correct?
10 A    No.
11 Q    Now, at some point after entering the stairwell you did
12 radio for backup, yes?
13 A    No, I did not.
14 Q    Referring to your deposition, page 81, line 14 through
15 22:
16      "QUESTION:  What happened next?
17      "ANSWER:  At some point, if I may go back for a
18 minute, at some point between entering the stairwell and
19 ending up on the sixth floor, I -- I can only speak for myself
20 -- I can't speak for Officer Collins -- made a radio
21 transmission giving out the address of where we were."
22      That's what you testified to at your deposition,
23 yes?
24 A    Correct.
25 Q    The deposition that you took in 2017, correct?

1  A    Yes.
2  Q    At your deposition you testified that you did make a
3  radio call, yes?
4  A    Your original question was whether or not I made a call
5  for help.
6  Q    No, sir.  It was whether you radioed for backup.
7  A    Right.  Which is not the same as giving the address of
8  something.
9  Q    So you are saying when you radioed and gave the address
10 it wasn't for backup?
11 A    It was to let people know where I was.
12 Q    Sir, yes or no:  When you radioed that day to let your
13 fellow officers know where you were, wasn't that for backup?
14      MR. FRANCOLLA:  Objection to the yes or no.
15      THE COURT:  He can explain the answer.
16 A    There are two radio codes in the NYPD, 1085, which is
17 officer needs assistance and 1013 which is officer needs
18 assistance emergency.  The latter is seldom used and is only
19 used for incidents of shooting and a MOS being shot or a MOS
20 being involved in a shooting or a violent car accident or
21 something to that effect.
22 A    I did not at any point make a radio transmission of 85 or
23 1013.  I simply put over an address so responding officers if
24 they were to come would know where we were.
25 Q    What you are telling this jury when you radioed that day,

1  it was just optional as to whether officers could come or not?
2       MR. FRANCOLLA:  Objection.
3       THE COURT:  I'll sustain the objection to the form
4  of the question.
5  Q    Your purpose in radioing that day was -- you're telling
6  this jury -- not to have officers come to the scene?
7       MR. FRANCOLLA:  Objection, to the form of the
8  question.
9       THE COURT:  Overruled.  He can answer.
10 A    The radio -- I used the radio to let people know where I
11 was.  Yes, it is an option whether or not you want to go to
12 that radio run.
13 Q    Sir, you were radioing to let officers know where you
14 were for backup?
15 A    I was radioing to let central know where we were in case
16 something went wrong and they needed to know where two foot
17 posts were inside the Hammels Houses.
18 Q    So you were not expecting any officers to come toe your
19 aid at all?
20      MR. FRANCOLLA:  Objection.
21      THE COURT:  In that radio run, did you ask for
22 backup?
23      THE WITNESS:  No, ma'am.
24 Q    So when you made that radio run you were just doing it to
25 let officers know where you were?

1  A    Correct.

2  Q    Well, you made a radio call before that day, at any other

point that day?

4  A    That day?

5  Q    Yes.

6  A    I'm sure I did.

7  Q    You don't know for certain?

8  A    No.

9  Q    Now, you testified that you did not call for backup.

10 Reading from page 53, line 23 through 25 and page 54, line 1

11 of your deposition.

12       "QUESTION:  And what happened as they ran up these

13 stairwells?

14       "ANSWER:  We followed them up the stairwell and

15 called for backup."

16       That was your testimony, yes?

17       MR. FRANCOLLA:  What's the page?

18       THE COURT:  I'm sorry.  I didn't get it.

19       MS. JOSEPH:  Page 53.

20       MR. FRANCOLLA:  The deposition?

21       MS. JOSEPH:  Yes.

22       MR. FRANCOLLA:  What's the line?

23       MS. JOSEPH:  Excuse me.  The trial transcript.

24 Q    Page 53 of your criminal court testimony, line 23 through

25 25 and page 54, line one:

Anthony M. Mancuso, CSR     Official Court Reporter

1       "QUESTION:  And what happened as they -- the

2  individuals you were chasing -- ran up these stairwells?

3       "ANSWER:  We followed them up the stairwell and

4  called for backup."

5       That's what you testified to?

6  A    Yes.

7  Q    You said we called for backup?

8  A    Yes.

9  Q    You didn't say I called for backup?

10 A    I said we did.  As a matter of fact, if you let me

11 finish, Officer Collins had my radio at that point because

12 Officer Collins had dropped his outside and since Officer

13 Collins was a more experienced officer and he was the head of

14 this whole pursuit, I gave Officer Collins my radio to make

15 said radio transmission.

16       MR. FRANCOLLA:  The portion that was read can go to

17 the next two lines which I think provide the context of what

18 the testimony is referring to.

19       MS. JOSEPH:  Your Honor, I object.

20       THE COURT:  What lines and what page?

21       MR. FRANCOLLA:  Counsel I believe read 53 line 23 to

22 55 line one.  It would make sense to read to line 3.

23 Q    Did you reach the third floor question, answer, yes we

24 did.

25       So your testimony now is when you said we called for

Anthony M. Mancuso, CSR     Official Court Reporter

1  backup, you meant just Officer Collins called for backup, yes?

2  A    Yes.

3  Q    So when you said we called for backup in the criminal

4  court trial, that was not true, correct?  It was just Officer

5  Collins, yes?

6       MR. FRANCOLLA:  Objection.

7       THE COURT:  Sustained.

8       THE COURT:  Why don't we take a five-minute recess

9  at this time.

10       (Jury excused.)

11       (Recess taken.)

12       (In open court; jury not present.)

13       THE COURT:  Please ask the jury to come in.

14       (Jury present.)

15       THE COURT:  Please be seated.

16       Counsel.

17       MS. JOSEPH:  Thank you, your Honor.

18 BY MS. JOSEPH:

19 Q    Detective Teta, I am showing you now what has been

20 admitted into evidence as Plaintiff's Exhibit 7.  This is the

21 criminal complaint against Jerome Nelson.  Do you see it?

22 A    Yes.

23 Q    Now, in your experience as a police officer this criminal

24 complaint is what gets submitted to the court, yes?

25 A    Yes.

Anthony M. Mancuso, CSR     Official Court Reporter

1  Q    And you're familiar with the fact that this is a sworn

2  statement, yes?

3  A    Yes, I am.

4  Q    All statements made in this document are punishable as a

5  class A misdemeanor pursuant to Section 210.25 --

6       THE COURT:  I don't think 7 is in evidence yet.  Is

7  that what you are showing him, 7?

8       MS. JOSEPH:  Yes.

9       THE COURT:  I don't think it's in evidence.

10       MS. JOSEPH:  I'm referring to the Jerome Nelson.

11       THE COURT:  7 in evidence?

12       MS. JOSEPH:  Yes, I believe.

13       MR. NORINSBERG:  We have 14.  It's the same exact

14 document.

15       MS. JOSEPH:  I apologize.  Your Honor.  Plaintiff's

16 Exhibit 14, Jerome Nelson criminal complaint.

17       THE COURT:  Okay.

18 Q    And you're familiar with this phrase false statements

19 made in this document are punishable as a class A misdemeanor

20 pursuant to Section 210.25 of the penal law, yes?

21 A    Yes.

22 Q    Now, --

23       THE COURT:  Did you sign this document?

24       THE WITNESS:  No, your Honor, I did not.

25 Q    It says here that deponent, Officer Collins, states that

Anthony M. Mancuso, CSR     Official Court Reporter

1  at the above-mentioned date, time and location of occurrence
2  he observed the defendant, Jerome Nelson, run into the
3  above-mentioned location with the apprehended others.  Do you
4  see that?
5  A   Yes, I do.
6         MR. FRANCOLLA:  I object again, your Honor, to
7  counsel --
8         THE COURT:  I don't know.  What's the question that
9  follows?
10         MS. JOSEPH:  I'm laying a foundation.
11         THE COURT:  To ask him about something that he
12  observed?
13         MS. JOSEPH:  Ultimately, yes.
14         THE COURT:  Go ahead.
15  Q   Deponent further states that he observed the defendant
16  standing in the middle of the third floor stairwell in the
17  above-mentioned location with his legs spread open and one of
18  his arms on each of the walls of that stairwell in order to
19  prevent the deponent from walking up the stairwell.
20         Now, officer, excuse me, detective, when you were
21  chasing Jerome Nelson that day could you demonstrate for the
22  jury how he blocked you?
23  A   He didn't block me in the fashion that it says in that
24  criminal court complaint.
25  Q   How did he block you?

1  A   He essentially just stopped running and just stood there
2  as an obstacle more than anything else.
3  Q   So when it says he spread his legs and one of his arms on
4  each of the walls of said stairwell, that is not what you
5  remember happening that day, correct?
6  A   No, that's incorrect.
7  Q   And he did not try to block you at all, correct?
8  A   I believe him stopping in the middle of the pursuit and
9  creating an obstacle for us was an attempt to slow us down.
10  Q   Reading from your trial transcript, page 85, line 24:
11         "QUESTION:  Is it not a fact that at no point did
12  Jerome Nelson try to put his hand in the stairway and block
13  you and Officer Collins from going up?
14         "ANSWER:  He didn't try to block me, no."
15         MR. FRANCOLLA:  I object.  It's not inconsistent.
16         MS. JOSEPH:  Your Honor, the witness just testified
17  he didn't try to block me.
18         THE COURT:  You thought he was trying to slow you
19  down you said?
20         THE WITNESS:  Yes, your Honor.
21         THE COURT:  All right.
22  Q   At no point in this answer do you say you knelt Jerome
23  Nelson was trying to slow you down, correct?
24  A   That is correct.
25  Q   What you testified under oath in front of a criminal jury

1  was he didn't try to block me period, correct?
2         MR. FRANCOLLA:  I object.
3         THE COURT:  I'll sustain the objection to the form
4  of that question.
5  Q   "QUESTION:  Now, is it not a fact that at no point
6  did Jerome Nelson try to put his hand in the stairway and
7  block you and Officer Collins from going up."
8         So the question was whether he put his hand in the
9  stairway, correct?
10  A   Yes.
11  Q   But you answered more broadly?  You answered:  He didn't
12  try to block me, no, correct?
13  A   Correct.
14  Q   You didn't say he didn't try to just put his hand up?
15  A   That's right.
16  Q   You chose to say he didn't try to block me at all?
17  A   Correct.
18  Q   And you didn't see him block Officer Collins, did you?
19  A   No, I didn't.
20  Q   You saw Officer Collins run right past Jerome Nelson,
21  correct?
22  A   Yes.
23  Q   You do not ever recall Jerome Nelson blocking the
24  stairwell with one hand on the wall and his feet blocking the
25  doorway, correct?

1  A   That's correct.
2  Q   So this entire section that we just read is inaccurate?
3         MR. FRANCOLLA:  Objection.
4         THE COURT:  Overruled.
5  A   I stated earlier that that entire section was incorrect.
6  Q   Well let me ask you this:  Is there any portion from
7  where you see my finger to deponent to apprehended others --
8  is there any portion of this that is correct?
9         MR. FRANCOLLA:  I object again.
10         THE COURT:  I'll sustain the objection.
11  Q   Sir, based on what you actually observed Jerome Nelson do
12  that night, what in your view made him guilty of obstruction
13  of justice?
14         MR. FRANCOLLA:  Objection, relevance.
15         THE COURT:  Who are you asking about?
16         MS. JOSEPH:  Jerome Nelson, he was charged with
17  obstruction of justice.
18         THE COURT:  Did you make the determination of what
19  he was to be charged with?
20         THE WITNESS:  No, your Honor, I did not.
21         THE COURT:  I'll sustain the objection.
22  Q   Sir, you were not the arresting officer but you were the
23  assisting officer, correct?
24  A   One of, yes.
25  Q   There were other assisting officers?

1  A   Yes, there were.

2  Q   Who were the other assisting officers?

3  A   I don't know by name who else but I'm sure being two

4  extremely new officers, one with a little bit more time than

5  the other, whoever was available to help us out through the

6  night helped us out.

7  Q   I just want to understand you clearly:  You don't know

8  specifically who else assisted with this arrest, you just know

9  there must have been an assisting -- other assisting officers,

10  correct?

11  A   Correct.

12  Q   You cannot give me any names, correct?

13  A   No, ma'am.

14  Q   So you are guessing, correct?

15  A   No, I am not guessing.

16  Q   There's nothing that you can specifically point to that

17  lists other assisting officers, yes?

18      MR. FRANCOLLA:  Objection.

19      THE COURT:  Overruled.

20  A   I can point to the fact that Sergeant Hennessy helped us

21  enter the complaint report.  I can also say that as per

22  Officer Collins' testimony he said some of the handwriting

23  wasn't his and it's certainly not mine.  That means there's

24  yet another person who was there assisting us.  With those two

25  facts I can say there were at least two other people assisting

1  us throughout the night.

2  Q   Other than your supervisor, Sergeant Hennessy -- he was

3  your supervisor, correct?

4  A   He was not my supervisor, no.

5  Q   The sergeant wasn't supervising this arrest?

6  A   He was a supervisor.  He was not my direct supervisor,

7  no.

8  Q   He was above you?

9  A   Yes.

10  Q   You cannot identify any other officer that was assisting

11  in this arrest?

12  A   No, ma'am, I cannot.

13  Q   But you specifically were assigned to assist Officer

14  Collins, correct?

15  A   No, I was not.

16  Q   Referring to your deposition, page 17, lines 10 through

17  16:

18      'QUESTION:  What was your role once Andrew Smalls

19  was placed under arrest?

20      'ANSWER:  I was partnering officer with Rich that

21  evening.  As he's assigned the arresting officer, I'm assigned

22  to assist him in helping him with his paperwork and his

23  vouchering and those sort of things.'  That was the answer you

24  gave at deposition, correct?

25      MR. FRANCOLLA:  I object to the extent we're talking

1  about different people being arrested.

2      THE COURT:  Overruled.

3  A   Yes.  If that's what I said, then I misspoke.  And Yes, I

4  was assigned to assist Officer Collins.

5  Q   And earlier when you said --

6      THE COURT:  Let me clarify:  Was that after you got

7  back to the station or during the entire event?

8      THE WITNESS:  No.  It would be after we got back to

9  the station, your Honor.

10      THE COURT:  You were assigned to help with the

11  paperwork when you got back?

12      THE WITNESS:  Correct.

13  Q   Earlier before the break you told this jury that you were

14  not partnering with Officer Collins that evening, correct?

15  A   Correct.

16  Q   But in your answer you state -- let me read it again:

17      'QUESTION:  What was your role when Andrew Smalls

18  was placed under arrest?

19      'ANSWER:  As I was partnering officer with Rich that

20  evening, as he's assigned the arresting officer, I'm assigned

21  to assist him and helping him with his paperwork and his

22  vouchering and those sorts of things.'  So you told this jury

23  you weren't partnering with Officer Collins that evening but

24  you were partners with Officer Collins that evening, weren't

25  you?

1  A   Yes.  Part of the night, yes.  Not for the entire

2  evening, no.

3  Q   In your answer you didn't say a portion of the evening,

4  correct?

5  A   You're right.

6  Q   You said that evening, right?

7  A   Correct.

8  Q   You could have said a portion of the evening but you

9  chose not to?

10  A   I could have.

11  Q   So as you assist Officer Collins with the arrest, you

12  helped with the paperwork, what paperwork did you help with?

13  A   I don't remember.

14  Q   Not one thing?

15  A   No.

16  Q   This is your first gun arrest, Detective Teta, do you

17  remember what paperwork you filled out?

18  A   Actually it was not my first gun arrest.  It was not my

19  arrest at all.

20  Q   This is the first gun case you were involved with.  I

21  misspoke.  You don't recall what paperwork you filled out?

22  A   No, I don't.

23  Q   Because you were assisting Officer Collins that evening

24  you actually received overtime, correct?

25  A   I don't know what time I left that night.

1    Q    But you received overtime, correct?
2    A    Well, if I don't remember what time I left that night I
3    can't tell you if I received overtime that night.
4    Q    You didn't go past your tour that evening?
5    A    Again, I don't know what time I left that night.
6    Q    As a police officer you keep a memo book, correct?
7    A    Yes, I do.
8    Q    What's the purpose of the memo book?
9    A    The memo book is to keep track of your daily activities
10   as a police officer.
11   Q    You wrote an entry about this case in your memo book,
12   correct?
13   A    Yes, I did.
14   Q    And the entry you wrote is about four lines long?
15   A    I don't recall how long it is.
16   Q    Referring to your trial transcript testimony, page 74,
17   line four through seven.  Before I ask you this, other than
18   the notes you took on your memo book you didn't take any other
19   notes?
20   A    I don't recall taking any other notes but I could have.
21   Q    Just to be certain, referring to your trial transcript
22   testimony in the criminal case, page 74, lines four through
23   seven:  And other than a one page memo book entry with about
24   four lines, would it be fair to say you took no other notes
25   relative to this case?

1    "ANSWER:  Correct."  That's what you testified to in
2    the criminal case, yes?
3    A    Yes.
4    Q    So you didn't write down what anyone else was wearing
5    that night?
6         THE COURT:  Where are you referring to?
7         MS. JOSEPH:  What I just read from.
8         THE COURT:  You said page 74?
9         MS. JOSEPH:  Yes, of the trial transcript testimony.
10        THE COURT:  Line what?
11        MS. JOSEPH:  Starting at line four.
12        THE COURT:  Okay.  Go ahead.  I'm sorry.
13   Q    And you never wrote down what anybody was wearing that
14   night, correct?
15   A    As I said prior, I could have written something down.  I
16   don't recall writing anything down.
17   Q    Referring to your trial transcript, page 74, lines 8
18   through 10:
19        "QUESTION:  In fact, you didn't write down what
20   anybody was wearing?
21        "ANSWER:  Correct."  That's what you testified to in
22   criminal court, yes?
23   A    Correct.
24   Q    You took no notes, you didn't write down what anybody
25   was wearing that night, right?

1    A    I don't remember doing so, no.
2    Q    You didn't document any of the events as they occurred
3    that night, correct?
4    A    To my recollection, I did not.
5    Q    So you were going completely from memory?
6         MR. FRANCOLLA:  Objection.
7         THE COURT:  Yes.  I'll sustain an objection to the
8    form of that question.
9    Q    So before the criminal trial, you hadn't taken any notes,
10   you didn't write down what anybody was wearing.  In order to
11   prepare for your testimony didn't you go to Officer Collins
12   and discuss the case with him?
13   A    No.  I don't believe I did.
14   Q    You and Officer Collins are friends, correct?
15   A    Correct.
16   Q    You maintain a friendship, correct?
17   A    I actually haven't seen or spoken to Officer Collins
18   since he left the 100 precinct in about 2013 up until
19   yesterday.
20   Q    But at the time of the criminal trial back in 2008 you
21   saw Officer Collins on a daily basis, correct?
22   A    Yes.
23   Q    In fact, you refer to him as Rich, right?
24   A    Yes.
25   Q    But it's your position that prior to your testimony in

1    the criminal trial you never went to your friend Rich and
2    said, let's go over our testimony?
3         MR. FRANCOLLA:  Objection.
4         THE COURT:  Overruled.  He may answer.
5    A    No.  I never went to Officer Collins and said let's go
6    over our testimony.
7    Q    You never went to your friend Rich and said, can I borrow
8    the notes that you took that night?
9    A    No, ma'am.  Like I just said, I never went to Officer
10   Collins and said let's discuss our testimony.  We had no
11   conversations about --
12   Q    My question was did you ever go to him and ask can I
13   borrow your notes.
14   A    And I said no.
15   Q    You never once went to your friend Rich before the
16   criminal trial and said can I borrow the case file?
17   A    No, ma'am.
18   Q    And in this civil case you are one of the defendants,
19   correct?
20   A    Yes, I am.
21   Q    And you are saying before you testified today you never
22   called up Officer Collins and said let's go back over what
23   happened in 2006?
24   A    No, ma'am.
25   Q    No communications whatsoever, correct?

1   A    No, not since I left the precinct in February of 2013.
2   Q    So you're aware in the civil case Andrew Smalls maintains
3   that he never had a gun that night, correct?  You are aware of
4   that?
5   A    Yes, I am.
6   Q    You are aware that he says he never passed the gun to his
7   friend that night, correct?
8           MR. FRANCOLLA:  Objection.  He hasn't testified yet.
9           THE COURT:  Pardon.
10          MR. FRANCOLLA:  He hasn't testified.
11  Q    You are aware -- if you don't know you can say you don't
12  know.  You are aware that in the civil case Andrew Smalls has
13  maintained he never passed the gun to his friend that night?
14  A    No.  I'm not aware of that.
15  Q    You have no idea one way or the other?
16  A    No.
17  Q    A case where you are being sued?
18          MR. FRANCOLLA:  Objection.  This calls for attorney
19  client communications.  There's no foundation.
20          THE COURT:  I'll sustain the objection to the last
21  question as argumentative.
22  Q    Going back Plaintiff's Exhibit 14, which is the Jerome
23  Nelson criminal complaint, on the top of the page it says
24  deponent states that when he observed Police Officer David
25  Teta, that's you, correct?

1   A    Yes, it is.
2   Q    When he observed police officer David Teta attempt to
3   place the defendant in handcuffs he observed the defendant
4   flail his arms to prevent being handcuffed.  Do you see that?
5   A    I do.
6   Q    Sir, isn't it true that Jerome Nelson never resisted
7   arrest from you, correct?
8   A    That's 100 percent true.
9           THE COURT:  That's what?
10          THE WITNESS:  It's 100 percent true.  He did not.
11  Q    This portion where it says he observed defendant flail
12  his arms to prevent being handcuffed, that is incorrect,
13  right?
14  A    That's incorrect.
15  Q    In fact, sir, you never even tried to arrest Jerome
16  Nelson, right?
17  A    True.
18  Q    So in your view was there anything that Jerome Nelson did
19  that day that equaled resisting arrest?
20          MR. FRANCOLLA:  Same objection as earlier to this
21  line of questioning and I believe it was sustained.
22          THE COURT:  Overruled.  Is there anything that you
23  personally saw Jerome Nelson do?
24          THE WITNESS:  No, your Honor.
25  Q    Is there anything that you are aware of that Jerome

1   Nelson did that equaled resisting arrest?
2           MR. FRANCOLLA:  Objection.
3           THE COURT:  I'll sustain the objection to aware of.
4   It calls for hearsay.
5   Q    Now, showing you what's been admitted as Plaintiff's
6   Exhibit 13.  This is the complaint against Cedric Smalls.
7   Now, it says here that deponent observed the defendant
8   standing in the middle of the sixth floor stairwell in the
9   above-mentioned location with his legs spread open and one of
10  his arms on each of the walls of said stairwell in order to
11  prevent the deponent from walking up said stairwell in pursuit
12  of said apprehended others.  Do you see where it says that?
13  A    Yes, I do.
14  Q    Is it fair to say that's similar to what was said
15  regarding Jerome Nelson, correct?
16  A    I believe it to be the same exact thing.
17  Q    The same exact thing?
18  A    Yes, ma'am.
19  Q    But we agree that Jerome Nelson did not do this, right?
20  A    Yes, we do.
21  Q    But you are saying in Cedric's case he did block you,
22  yes?
23          MR. FRANCOLLA:  I object.  Again this is not a
24  document he prepared.
25          MS. JOSEPH:  Independent question, your Honor.

1           THE COURT:  Are you asking him whether what's in
2   this document is accurate with respect to Cedric Smalls?
3           MS. JOSEPH:  Right now I'm asking him an independent
4   question.
5   Q    It's your position that Cedric did block you that day,
6   correct?
7           THE COURT:  Go ahead.  You can answer.
8   A    He blocked Officer Collins, yes.
9   Q    So he blocked Officer Collins but didn't block you?
10  A    Well, I was right behind Officer Collins.  So Officer
11  Collins comes first, I come second.  If something is in the
12  way I believe it's blocking both of us.
13  Q    Other than that you've -- take a look hat Plaintiff's
14  Exhibit 13.  Other than that, go to the second page, other
15  than that is this complaint accurate as far as what you recall
16  happening that day?
17          THE COURT:  Other than what?
18  Q    Let me rephrase.
19          In your view, is this complaint accurate as to what
20  you recall happening that day?
21          MR. FRANCOLLA:  Objection.
22          THE COURT:  Sustained.
23  Q    Going to the second page, the first paragraph, your name
24  is mentioned in that paragraph, correct?
25  A    Correct.

1  Q    It says deponent states that when he observed Police
2  Officer David Teta attempt to place the defendant in handcuffs
3  he observed the defendant flail his arms to prevent being
4  handcuffed.  Do you see that?
5  A    Yes, I do.
6  Q    Let me ask:  Did you put Cedric Smalls in handcuffs that
7  day?
8  A    Yes, I did.
9  Q    Referring to your trial transcript, page 58, line 11
10 through 15:
11      "QUESTION:  Where did you go after someone came to
12 assist you?
13      "ANSWER:  Somebody came up, put the handcuffs on
14 Cedric and then I went up to meet with Rich on the seventh
15 floor."  That was your testimony, correct?
16 A    Correct.
17 Q    A moment ago when you said you did put the handcuffs on
18 Cedric before this jury that was not true, right?
19 A    No.  It is true.
20 Q    So when you testified in the criminal case -- let me
21 reread:
22      "QUESTION:  Did you go -- where did you go after
23 someone came to assist you?
24      "ANSWER:  Somebody came up, put handcuffs on Cedric
25 and then I went up to meet Rich on the seventh floor.

1       That part is not true, correct?
2  A    No.  It's true.  I don't believe it specifically states
3  who put handcuffs on Cedric Smalls.
4  Q    I just want to understand this, detective.  You are
5  saying when you testified somebody came up, put the handcuffs
6  on Cedric --
7       THE COURT:  It doesn't have the part in there.  Read
8  exactly what's written.
9       MS. JOSEPH:  Yes, your Honor.
10 Q       "ANSWER:  Somebody came up, put handcuffs on
11 Cedric."  You were referring to yourself?
12 A    I imagine so because I'm the one who handcuffed Cedric.
13 Q    So, again, in this instance when you said somebody came
14 up, put handcuffs on Cedric, and then I went up to meet Rich
15 on the seventh floor, you were actually the somebody you were
16 talking about?
17      MR. FRANCOLLA:  Objection.
18      THE COURT:  Sustained.
19 Q    When you said somebody in that response, you weren't
20 referring to another officer, correct?
21 A    I'm referring to another officer when I say somebody came
22 up, yes.  And then it says he put handcuffs on Cedric Smalls.
23 I'm telling you as I sit here today that somebody is me.
24 Q    So we can agree you didn't say somebody came up and I put
25 handcuffs on Cedric Smalls?  You didn't say that, correct?

1       MR. FRANCOLLA:  Objection, your Honor.
2       THE COURT:  Sustained.
3  Q    You said somebody came up, put handcuffs on Cedric and
4  then I went up to meet with Rich on the seventh floor, right?
5       MR. FRANCOLLA:  Objection.  I think it's asked and
6  answered repeatedly.
7       THE COURT:  Sustained.
8  Q    Sir, isn't it true you don't even know who put handcuffs
9  on Cedric?
10 A    I believe I answered that when I had I put handcuffs on
11 Cedric.  So, no, I don't think that's true.
12 Q    You are aware Cedric was charged with resisting arrest?
13 A    Yes, I am.
14 Q    But you never saw him struggle with -- he didn't struggle
15 with you, did he?
16 A    No, he did.
17 Q    He did struggle with you?
18 A    To understand resisting arrest you have to understand
19 exactly what resisting arrest is.  It doesn't necessarily mean
20 there's a violent fight or some sort of wild altercation.  You
21 can passively resist arrest as well by refusing to give
22 somebody your hand.  Even by saying give me your hand and the
23 person putting his hand out here.  It doesn't have to be a
24 violent altercation to resist.  Somebody can resist passively.
25 Q    So you are saying that Cedric Smalls resisted arrest that

1  day, right?
2  A    In an attempt to handcuff him, yes, he refused to give me
3  his hand when verbally asked to.
4  Q    You didn't see him struggle with Officer Collins,
5  correct?
6  A    No.  I saw him like I said stand in between the hallways
7  of the stairway on the way up and Officer Collins pushed him
8  out of the way and down towards me.
9  Q    Detective, isn't it true that Jerome was arrested on roof
10 that night?
11 A    Yes, that is true.
12 Q    And Cedric was stopped in the stairwell, yes?
13 A    That's true.
14 Q    And then he was transferred to the roof and arrested,
15 isn't that right?
16      THE COURT:  Who was transferred?
17 Q    And Cedric was transferred to the roof and arrested,
18 right?
19 A    No.  That's a fabrication.
20 Q    That's a fabrication?
21 A    Correct.
22 Q    And Andrew was arrested inside of 8105 RBB, correct?
23 A    Yes.  He was arrested inside 8105 RBB.  If you consider
24 the roof to be inside of or part of that building, yes.
25 Q    Well, I'm asking you.  Let's look at the pedigree sheet.

1  I'm showing you the prisoner pedigree card that was pertaining
2  to defendant Cedric Smalls.  Do you see that?
3          THE COURT:  What exhibit number is that?
4          MS. JOSEPH:  That's been admitted as Plaintiff's
5  Exhibit 32, your Honor.
6  Q   Do you see that?
7  A   Yes.
8  Q   Now, it says here that the location of his arrest was a
9  rooftop, correct?
10          MR. FRANCOLLA:  I object.
11          THE COURT:  Did you fill this out?
12          THE WITNESS:  No, ma'am.
13          THE COURT:  Then I'll sustain the objection.
14          MS. JOSEPH:  I was asking the witness if he sees
15  that it's the rooftop.
16          THE COURT:  I don't care what he sees.  He didn't
17  fill the document out.
18  Q   Sir, you have never seen this document before?
19  A   Not before today.
20  Q   You've seen pedigree cards before, correct?
21  A   I have.
22  Q   And you're aware that in the pedigree cards it is a
23  misdemeanor to submit false information, correct?
24  A   I believe what you are referencing is a misdemeanor to
25  knowingly misrepresent your actual name, date of birth or

1  address to a police officer and that's what is read to the
2  perpetrator in front of the desk.
3  Q   Correct.  So in a pedigree card, the person you are
4  arresting is obligated to provide you accurate information as
5  a police officer, right?
6  A   Yes.
7  Q   But you're saying the police are not also required to put
8  accurate information in the pedigree card?
9          MR. FRANCOLLA:  Objection.
10          THE COURT:  I'll sustain the objection.
11  Q   Sir, do you have any reason to know why an officer would
12  have put false information in Cedric's pedigree card at the
13  time of his arrest?
14          THE COURT:  Sustained.
15  Q   Do you know who filled out Cedric's pedigree card?
16  A   No, I don't.
17  Q   No idea?
18  A   No idea.
19  Q   Was it one of the assisting officers you couldn't
20  remember earlier?
21          MR. FRANCOLLA:  Objection.
22          THE COURT:  Sustained.
23  Q   Are you aware that in Andrew's pedigree card it says he
24  was arrested inside of 8105 RBB?
25          MR. FRANCOLLA:  I object.

1          THE COURT:  Yes.  Sustained.
2  Q   Are you aware that nowhere on Andrew's pedigree card --
3          THE COURT:  Did you fill out Andrew's pedigree card?
4          THE WITNESS:  No, ma'am.  I didn't fill out any of
5  the pedigree cards.
6          THE COURT:  I'll sustain the objection.
7  Q   Are you aware of who filled out Andrew's pedigree card?
8  A   No.
9  Q   What about Jerome's pedigree card?
10  A   No.
11  Q   So at some point that evening you and Officer Collins
12  ended up on the roof of 8105 RBB, correct?
13  A   Yes, that's correct.
14  Q   And you say it was dark on the roof, right?
15  A   Yes, ma'am.
16  Q   You say the lighting was bad, correct?
17  A   Yes, ma'am.
18  Q   And from the entrance to the roof the only place you
19  recall the lighting being bad was on the roof, correct?
20  A   Yes, ma'am.
21  Q   Now, that night your supervisor had told you to go up on
22  the roof in a coordinated effort, correct?
23  A   No, ma'am.
24  Q   Referring to your deposition, page 85, line 167 through
25  19:

1          "QUESTION:  What happened after that?
2          "ANSWER:  At that point a supervisor said we can go
3  up onto the roof in a coordinated effort from both entrances."
4  That's what you testified to under oath at your deposition?
5  A   Yes.
6  Q   A moment ago when you said before this jury your
7  supervisor had not told you to go up in a coordinated effort,
8  that was not true, was it?
9  A   My question was with the -- it was not my supervisor.
10  Q   The supervisor?
11  A   A supervisor.
12  Q   Told you to go up on the roof in a coordinated effort,
13  correct?
14  A   Yes.
15  Q   So you did not go out onto the roof alone, right?
16  A   No.
17  Q   You did not go out onto the roof with just Officer
18  Collins, correct?
19  A   I believe I entered the roof with just Officer Collins,
20  but I believe there were other officers on the roof that came
21  up stairwell B.
22  Q   You proceed up to the roof with Officer Collins and other
23  officers, correct?
24  A   I proceeded up the stairwell with Officer Collins.
25  Q   And other officers, correct?

1   A    I don't believe there were any other officers in that
2   stairwell, although I could be mistaken.  I do, however,
3   remember officers coming up the other stairwell in an effort
4   to make sure nobody went down that stairwell after crossing
5   over on the roof.
6   Q    My question was very specific:  You proceeded up to the
7   roof with Officer Collins and other officers, correct?
8               MR. FRANCOLLA:  I object.
9               THE COURT:  I'll sustain the objection.
10  Q    Referring to your deposition, page 85, line 20 through
11  23?
12              MR. FRANCOLLA:  Objection.
13              THE COURT:  I think in light of how the testimony
14  has proceeded, I don't think it is impeachment.
15              MS. JOSEPH:  Your Honor --
16              THE COURT:  You are saying other people came up the
17  other stairwell, correct?
18              THE WITNESS:  Yes, your Honor.
19              THE COURT:  Was there other people in the stairwell
20  with you and Officer Collins that came up?
21              THE WITNESS:  I don't remember.
22              THE COURT:  Okay.
23  Q    You don't remember the names much any of these other
24  officers?
25              MR. FRANCOLLA:  Objection.

1               THE COURT:  You don't remember -- I'll sustain the
2   objection.
3   Q    Do you recall who any of these officers were that went up
4   on the roof with you that day?
5   A    No.  No.  That's not true.  I apologize.  I misspoke.  I
6   do remember Sergeant Komorsky being up on the roof with us.
7   He was the crime sergeant at the time.
8   Q    Anyone else?
9   A    Not off the top of my head, no.
10  Q    So you and Officer Collins went up on the roof at the
11  same time, correct?
12  A    Yes.
13  Q    While you were up on the roof, this is when Officer
14  Collins mistook -- you claim he mistook Mr. Smalls for a box,
15  correct?
16  A    Yes.
17  Q    And although it was dark on the roof you were able to see
18  Officer Collins when you got up on the roof, correct?
19  A    Absolutely.
20  Q    In this darkness you could actually see Officer Collins
21  struggle to find a way up onto the roof of the elevator room,
22  correct?
23  A    Yes.
24  Q    And you are aware of what the elevator room is, aren't
25  you?

1   A    Yes.  I am aware of what the elevator room is, correct.
2   Q    Showing you what's been admitted into evidence as
3   Plaintiff's Exhibit 43.  This is the elevator room, correct?
4   A    Yes, ma'am.
5   Q    So you saw Officer Collins struggle in the darkness to
6   get up here, correct?
7   A    No, ma'am.
8   Q    A moment ago I asked you if you knew what the elevator
9   room was, yes?
10  A    Yes.
11  Q    And referring to your trial transcript, starting at page
12  62:
13          "QUESTION:  Now, during that time what was Officer
14  Collins doing?
15          "ANSWER:  He was looking for a way to get up onto
16  the roof of the elevator room."  That's what you recall,
17  right?
18  A    Yes.
19  Q    And then after that you saw him struggling to get up on
20  the elevator room, correct?
21  A    Yes.
22  Q    Right here?
23  A    No.  I actually only became aware that that's actually
24  the elevator room through this trial, even through my whole
25  career until I left the 100 precinct in 2013 I always

1   referenced the smaller roof as the elevator room.  It was my
2   mistake.
3   Q    So when you testified at your deposition it was the
4   elevator room that was inaccurate, correct?
5   A    Well, it was my -- it was what I knew the elevator room
6   to be was inaccurate.
7   Q    So what do you now know the elevator room to be?
8   A    The taller of the two roofs.
9   Q    What roof did you see Officer Collins attempt to struggle
10  on?
11  A    This one here.  I don't know to do this.  Where
12  Officer Collins was, right here, which I believe is now being
13  referenced as the stairwell roof.
14  Q    So in this darkness you could actually see Officer
15  Collins step on something, correct?
16  A    I saw him attempting to get up onto the roof, yes.
17  Q    You saw him step on something, correct?
18  A    I saw him attempt to step on something, yes.
19  Q    Referring to your deposition, page 87, lines 21 through
20  24:
21          "QUESTION:  When you observed Officer Collins
22  stepping on something, which turned out to be Andrew Smalls,
23  correct?
24  A    Yes.
25  Q    That's what you testified to under oath, right?

1  A    Yes.

2  Q    You didn't stay attempt in this question and answer,

3  correct?

4  A    You are correct.

5  Q    And you see there's a light here on this roof?

6  A    I do see that.

7  Q    And do you have any -- do you know whether it was working

8  are not?

9  A    No.  It definitely was not working that evening.

10 Q    You have an independent recollection that it was not

11 working that evening, correct?

12 A    Absolutely.  It wouldn't have been as dark as I remember

13 it being had that light been working.

14 Q    You do remember that the officers that you were with that

15 night carried flashlights, correct?

16 A    Yes, ma'am.

17          MR. FRANCOLLA:  Your Honor, I'm sorry, going back to

18 the last portion, I had an opportunity to look.  For

19 completeness I would ask that a question and answer be read in

20 that I think would fairly --

21          THE COURT:  I don't know where you are.

22          MR. FRANCOLLA:  It's 86 of the deposition of

23 Detective Teta, line 22 to 87, line five.

24          MS. JOSEPH:  Your Honor, I object.

25          THE COURT:  Are you at the deposition testimony?

---

1          MR. FRANCOLLA:  Yes, your Honor.

2          THE COURT:  Page 86.

3          MR. FRANCOLLA:  Correct, beginning on 22 and going

4  to the following page, to line five.

5          (Pause.)

6          THE COURT:  Yes.  I think in fairness that ought to

7  be read.

8          MS. JOSEPH:  Are you saying 86, line 22?

9          MR. FRANCOLLA:  Yes, to 87 line five.

10 Q    I'll just read both sections again.

11          "QUESTION:  So you are saying that Officer Collins

12 stood on someone but didn't realize he was standing on a human

13 being?

14          "ANSWER:  He went to take a step to stand on

15 something.  It turned out to be a human being.  He never

16 actually stood on top of the human."  That was your answer.

17 And then later on, page 87, line 21 through 24, you are asked:

18 Well, you observed Officer Collins stepping on something which

19 turned out to be Andrew Smalls?

20          "ANSWER:  Correct."

21          That was your testimony, right?

22 A    Yes, it was.

23 Q    So you were asked twice about whether you observed

24 Officer Collins stepping on Andrew that night, correct?

25 A    Hmm, yes.

---

1  Q    And you ultimately said that he did step on Andrew,

2  correct?

3  A    Correct.

4  Q    Now, going back to being on the roof that night, it was

5  dark, but the officers that you were with had flashlights,

6  correct?

7  A    Yes.

8  Q    And you had a flashlight, correct?

9  A    Yes.

10 Q    And Officer Collins had a flashlight, correct?

11 A    I believe so, yes.

12 Q    And you were all looking around on the roof with your

13 flashlights, correct?

14 A    No.  I don't think I had my flashlight out.

15 Q    You observed other officers -- excuse me.

16          You're going onto the roof to look for a man with a

17 gun, correct?

18 A    Yes, ma'am.

19 Q    It's dark on this roof, correct?

20 A    Yes, ma'am.

21 Q    You have a flashlight to help you see this man with the

22 gun, correct?

23 A    Yes, ma'am.

24 Q    But it's your testimony you didn't use it, right?

25 A    That's my testimony, yes.

---

1  Q    But you did see other officers using their flashlights,

2  correct?

3  A    Yes.

4  Q    And Officer Collins is the only officer that you are

5  aware of who claims to have accidentally stepped on Andrew

6  Smalls that night, correct?

7          MR. FRANCOLLA:  Objection.

8          THE COURT:  Yes.  I'll sustain the objection.

9  Q    You are not aware of any other officers accidentally

10 stepping on Andrew Smalls that night, are you, sir?

11          MR. FRANCOLLA:  Objection.

12          THE COURT:  He can answer that.

13 A    No, I am not.

14 Q    So after Officer Collins almost or stepped on Andrew that

15 night you say that Andrew Smalls jumped up, correct?

16 A    I believe so, yes.

17 Q    And then Collins took Andrew to the ground, correct?

18 A    I believe so, yes.

19 Q    And that's how you -- Andrew got injured?

20 A    I can't speak to how Andrew got injured.

21 Q    You have no idea how Andrew got the cut on his forehead?

22 A    No, I don't.

23 Q    Sir, isn't it true you don't remember who physically

24 subdued Andrew that night?

25 A    I just said that Officer Collins did.

1  Q    Turning to your deposition, page 87, lines 15 through 20:
2       "QUESTION:  So it was Officer Collins who arrested
3  or physically subdued Andrew Smalls?
4       "ANSWER:  I don't remember exactly who did it."
5  That's what you testified to at your deposition, right?
6  A    Correct.
7  Q    A moment ago in front of this jury you said Officer
8  Collins was the one that subdued Andrew that night, correct?
9  A    Correct.
10 Q    So which is true?  Do you not remember it was Officer
11 Collins who subdued Andrew Smalls that night or was it?
12 A    Which is true.
13 Q    Did do you not know who subdued Andrew night or was it
14 Officer Collins?
15 A    I believe they are both true.  At the time of the
16 deposition I did not recall.  Now having been given a chance
17 to read over the criminal court testimony, looking at 61's,
18 which are complaint reports and arrest reports, that they can
19 both be true.
20 Q    Didn't you testify that you reviewed your paperwork, the
21 61s before you gave your deposition testimony?
22 A    I don't know if I said that or not.
23 Q    Did you?
24 A    I don't think I did, no.
25 Q    In the case where you are being sued and deposed, you

1  didn't review the complaint reports before you gave that
2  testimony?
3       MR. FRANCOLLA:  Objection.
4       THE COURT:  Overruled.  He can answer.
5  A    No, ma'am, I didn't.  This case has been going on for me
6  for quite sometime.
7  Q    And your memory today is better than when you gave your
8  testimony at your deposition in 2017?
9  A    I believe so, yes.
10 Q    It's improving over time?
11 A    No.  It's improving as the night is recalled.
12 Q    You didn't recall the night before your deposition?
13 A    I was not immersed in it the night before my deposition.
14 Q    You also claim that you saw Andrew Smalls resist arrest,
15 correct?
16 A    Yes.
17 Q    You saw him struggle, correct?
18 A    Yes.
19 Q    You saw Andrew refuse to be handcuffed, right?
20 A    I'm pretty sure, if I remember correctly, again, it was
21 more of a passive resistance than a violent resistance.
22 Q    When you say passive resistance, what did you observe?
23 A    Just a general refusal to give your hand.  If I say put
24 your hand behind your back as a police officer it's a lawful
25 command.  You are to do that.  If you don't in an arrest

1  situation it's considered resisting arrest.
2  Q    You told Andrew Smalls put your hand behind your back and
3  he resisted?
4  A    I didn't tell Andrew Smalls that at all.  I didn't arrest
5  Andrew Smalls.
6  Q    You don't know who did?
7  A    I just repeated I believe Officer Collins did.
8  Q    Referring to your deposition, page 87, line 25:
9       "QUESTION:  What did you see immediately after?
10      "ANSWER:  I saw Andrew Smalls get handcuffed.  Who
11 handcuffed him I cannot speak to."  That was your testimony,
12 correct?
13      MR. FRANCOLLA:  Objection.
14      THE COURT:  Overruled.
15 A    I'll go back and say exactly what I said earlier.  Yes.
16 I believe both can be true.  I believe at the time of the
17 deposition I was not entirely sure.  I believe now after
18 reviewing paperwork that I believe it to be Officer Collins
19 who arrested Andrew Smalls.
20      THE COURT:  Do you have anything further?
21      MS. JOSEPH:  Yes, your Honor, we can pick up
22 tomorrow morning.
23      THE COURT:  I don't want to pick up later.  I want
24 to complete the examination.
25 Q    You also noticed Ronnie Smalls shortly after you got onto

1  the roof, correct?
2  A    I don't recall noticing him.  I'm sure at some point it
3  was pointed out that he was up on what is now known as the
4  stairwell roof, what I once thought was the elevator roof.
5  Q    And you never saw Ronnie Smalls lying face down on the
6  roof, correct?
7  A    I don't believe I did.  I believe if my memory serves me
8  properly, I saw Ronnie Smalls the first time once he was
9  ordered to sit up and show his hands.
10 Q    I just want to be clear, yes or no:  Did you see Ronnie
11 Smalls at any point lying down on the roof?
12      MR. FRANCOLLA:  Objection.
13      THE COURT:  Overruled.  He can answer.
14 A    I don't remember.
15 Q    Referring to your trial testimony, page 61, line 24
16 through 25:  The court asked you:  Did you see him, referring
17 to Ronnie Smalls, lying down?  You answer no.
18      Do you recall being asked by the court and telling
19 the court, no, I did not see Ronnie Smalls lying down?
20 A    I do now, yes.
21 Q    And you don't know which officer found Ronnie Smalls
22 crouched on the elevator room, do you?
23 A    No, not to my recollection.
24 Q    So looking at Plaintiff's Exhibit 43 could you indicate
25 for the jury where Andrew Smalls was that night?

1      THE COURT:  What exhibit are you referring to?

2      MS. JOSEPH:  43.

3      THE COURT:  Now, I think 43 has a number of

4  different numbers.

5      MS. JOSEPH:  I'll get a clean copy.

6      THE COURT:  I think just 43 is an another exhibit as

7  well.  The exhibit that you are referring to, so the record is

8  clear, as 43 now is three different pictures of the location,

9  two of the roof and one of the bottom, is that correct?

10      MS. JOSEPH:  Yes, your Honor.  I believe 43 may have

11  been identified as 43 B, the one that was written on.  I would

12  like to have this exhibit, which is Bates stamped defendant

13  000948 marked as 43 C for identification purposes and admitted

14  into evidence.  The it's the same picture.  It's just a clean

15  copy.

16      THE COURT:  What picture do you have there?

17      MS. JOSEPH:  The one you identified, your Honor.  It

18  has the picture of the roof.  May I approach?  I can hand the

19  court my copy.

20      THE COURT:  Yes.  It's not what I have for 43.

21      Just so there's no confusion later, why don't you

22  mark this as 43 A.

23      MS. JOSEPH:  Can I mark this as 43 B, this is a

24  clean copy that I am going to ask the witness to write on.

25  It's the same photo.

1      THE COURT:  This one already has marks on it.  43 A

2  already has marks on it.  It's already been written on.

3      MS. JOSEPH:  Correct.

4      THE COURT:  In your exhibit book the document that

5  you have in your hand that you have marked 43 is part of 42.

6  In any event, you're giving him a copy of -- a clean version

7  of what has now been marked 43 A, which is in the exhibit book

8  part of 42.  Go ahead, mark that 43 B and ask him to do

9  whatever it is you want him to do.

10      MS. JOSEPH:  Thank you, your Honor.

11      MS. JOSEPH:  Your Honor, I'm offering what's been

12  marked for identification purposes as Plaintiff's Exhibit 43 B

13  into evidence.

14  Q   Officer Teta, do you recognize these photos?

15  A   I do.

16  Q   And this is -- these are photos of the roof?

17  A   Yes.

18  Q   And you see the photo in the top left-hand-corner?

19  A   Yes.

20  Q   Could you mark with a A 1 where you observed Andrew that

21  night?

22  A   Okay.

23  Q   And you testified that you observed Jerome on the roof as

24  well?

25  A   Yes.

1  Q   Could you mark with an R 1 where you observed Jerome that

2  night?

3      THE COURT:  Do you want this to be on the screen so

4  the jury can see it?

5      MS. JOSEPH:  As soon as he marks it I'll publish it

6  to the jury.

7  A   Okay.

8  Q   And were you aware of where the gun was found?

9  A   No, ma'am.

10  Q   Can you mark with a T where you were standing when you

11  observed Officer Collins almost step on Andrew Smalls?

12      MS. JOSEPH:  Your Honor, may I approach the witness?

13      THE COURT:  Yes.

14  Q   This is where Andrew was, correct?

15  A   Yes, I believe so.

16  Q   And you were standing right here, yes?

17  A   In the general vicinity of there, yes.  I mean I can't be

18  specific to where I was standing.  It was right about there,

19  yes.

20  Q   This is where Jerome was, correct?

21  A   Yes.

22  Q   And you have no knowledge of where the gun was found,

23  correct?

24  A   No, ma'am.

25  Q   Now, you say Andrew Smalls was wearing a black jacket

1  that night.

2  A   Yes, ma'am.

3  Q   And you're certain that he was the only one wearing a

4  black jacket that night, correct?

5  A   Yes, ma'am.

6  Q   And the only way you really recall Andrew or was able to

7  identify Andrew was the black jacket he wore that night,

8  correct?

9  A   Can you explain to me what you mean by how -- what I

10  identify him as?

11  Q   The way you describe Andrew, what stood out to you was

12  that he was wearing this black jacket, correct?

13  A   Yes.

14  Q   So we can agree that if Andrew Smalls was not wearing the

15  black jacket that night, he was not on the roof, correct?

16  A   Yes.

17  Q   Now, you have seen Andrew Smalls's arrest photo, correct?

18  A   Yes, I have.

19  Q   You have seen in the arrest photo he was not wearing a

20  black jacket?

21  A   Yes.

22  Q   You have seen in the Polaroid photo he was not wearing a

23  black jacket?

24  A   Yes, ma'am.

25  Q   You have seen in his prisoner movement card he was not

1   wearing a black jacket?
2   A   Yes, ma'am.
3   Q   And in his arrest photo he's wearing a gray hoodie?
4   A   Yes, ma'am.
5   Q   In his prisoner movement card he's wearing a gray hoodie?
6   A   Yes, ma'am.
7   Q   In the Polaroid photo he's wearing a gray hoodie?
8   A   Correct.
9   Q   Now, the individual that you stopped on the roof you
10  searched him on the roof, correct?
11  A   Yes, ma'am.
12  Q   And this individual had no weapons, right?
13  A   That's correct.
14  Q   No cellphone, right?
15  A   I don't remember.  2006.  I mean cellphones weren't as
16  popular as they are now.
17  Q   Do you recall that you found money on this individual,
18  correct?
19  A   No, I don't recall.
20  Q   Referring to your transcript, your trial transcript, page
21  65, line 11 through 12:  Did he have any money on him?
22          "ANSWER:  I believe he had some money."  Do you
23  recall that?
24  A   Yes, now that you read it to me.
25  Q   One of the things that's indicated on the prisoner

1   pedigree sheet is whether a suspect has money when they are
2   arrested, correct?
3   A   Correct.
4   Q   You see here no funds for Andrew Smalls?
5   A   No.  I believe that's no funds for Cedric Smalls, if you
6   look at the pedigree on that piece of paper you just showed
7   me.
8   Q   Excuse me.
9          THE COURT:  Who was the person that you stopped and
10  searched on the roof?  Who was that?
11          THE WITNESS:  Andrew Smalls.
12          Actually I think, if I may, that I believe Andrew
13  Smalls had -- if I read reading the pedigree card that was on
14  the screen earlier, it was like 72 or 73 dollars.
15          THE COURT:  All right.
16          Ladies and gentlemen, at this point we'll conclude
17  for the day.  I'll excuse you with the admonition not to
18  discuss the case with anyone and we'll resume promptly at 9:30
19  tomorrow morning.
20          Have a nice evening.
21          (Jury excused.)
22          THE COURT:  You can down.
23          THE WITNESS:  Thank you, your Honor.
24          THE COURT:  How much longer do you believe you have
25  with this witness?

1          MS. JOSEPH:  I'm just going through my notes, your
2   Honor.  I would say about fifteen minutes.
3          THE COURT:  Who are the witnesses tomorrow?  Who is
4   going to be called tomorrow?  Am I talking to myself?  Who are
5   you calling tomorrow?
6          MR. MEEHAN:  Tomorrow is going to be William Davis,
7   Sabrina Davis, Jerome Nelson and the plaintiff as well.
8          THE COURT:  How long do you envision that the
9   Davises and Mr. Nelson will be?
10          MR. MEEHAN:  About as brief as Mr. Johnson.
11          THE COURT:  And you also have on the list Patrick
12  Megaro.
13          MR. MEEHAN:  That will be for Thursday.
14          THE COURT:  Who is that?
15          MR. MEEHAN:  Patrick Megaro is one of the attorneys.
16          THE COURT:  One of his trial attorneys?
17          MR. NORINSBERG:  The appellate attorney.  He's the
18  appellate attorney.
19          THE COURT:  What does he have to add?
20          MR. NORINSBERG:  He has to add this issue that's
21  been raised by defense counsel in opening statements and so
22  what statements were allegedly made by Andrew, what admissions
23  were allegedly made by Andrew to his counsel.
24          THE COURT:  The only counsel that they are putting
25  in an admission from is Maltz.  Why do we need anyone other

1   than Maltz?
2          MR. MEEHAN:  That is not true.  There's another
3   exhibit they plan on using in cross-examination on Mr. Smalls
4   is a letter he wrote to Mr. Megaro.  If that letter is not
5   coming in, Mr. Megaro doesn't have to come in.  That's fine.
6          THE COURT:  I don't know that that letter comes in
7   in your case.  Are the defendants seeking to admit that letter
8   into evidence?
9          MR. FRANCOLLA:  With the plaintiff?  It's going to
10  depend on what he says about the affirmation.  My
11  understanding from the affidavit he filed in response to the
12  motion practice the parties had on this issue was that that
13  letter was proof of why he never said this.  I expect he might
14  say something along those lines on cross-examination and so we
15  may ask him questions about what's in this letter to the
16  extent that he volunteered as evidence that he never said
17  anything.  I don't know what that has to do with Megaro.
18          THE COURT:  You are talking about using the letter
19  he wrote to Megaro?
20          MR. FRANCOLLA:  Correct.  From Megaro's affidavit, I
21  think he's going to say the same thing as Maltz.  We are not
22  dealing with the issue of standing which I initially
23  envisioned Megaro the one to recollect to the extent Megaro
24  got into it with Smalls but it's not going to be part of
25  anything.

1    MR. NORINSBERG:  If that letter is going to be used

2  by the defense, we have the right to explain and give context

3  to that letter and we can't do that without Megaro.

4        THE COURT:  I take it we can determine that after

5  Mr. Smalls testifies.

6        MR. NORINSBERG:  We could.  We could.

7        THE COURT:  Who is Douglas Carter?

8        MR. MEEHAN:  Douglas Carter is the fingerprint

9  retired detective we had the sidebar about yesterday, which he

10  still has not responded to the subpoena.

11        MS. FUDIM:  Just for the record though, counsel is

12  talking about he hasn't responded to the subpoena.  He hasn't

13  been subpoenaed at his home or place of business.  They

14  subpoenaed latent prints for his address and counsel told me

15  this morning he contacted him via FaceBook.

16        MS. FUDIM:  They subpoenaed pension for this

17  gentlemen's address.  I want the record to be clear when he

18  said he hasn't responded to the subpoena.  He hasn't been

19  served a subpoena.  I just want the record to be clear.

20        THE COURT:  Who is it that you said that you didn't

21  have coming until Thursday?

22        MR. MEEHAN:  Patrick Megaro and Judah Maltz.

23        THE COURT:  The defendant, are you calling any

24  additional witnesses, other than the witnesses that we have

25  had here?

Anthony M. Mancuso, CSR    Official Court Reporter

1    MR. FRANCOLLA:  Barring anything unusual that comes

2  up going forward that we may need to rebut, no.

3        THE COURT:  I just want in a make it plain to

4  everyone, this case has to be finished this week.  I start a

5  criminal case on Monday that I have to start on Monday.

6  Everyone keep that in mind in terms of the length of your

7  questioning and everything else.  This case has to finish this

8  week because I have already selected a jury in the criminal

9  case to go forward on Monday and I'm going to have to go

10  forward on Monday in the criminal case.

11        MR. NORINSBERG:  We're very much on schedule for

12  that.

13        THE COURT:  That means we're going to have

14  everything done by Friday.

15        MR. FRANCOLLA:  Your Honor, can I offer one idea to

16  make sure that -- since the court provided the charge and the

17  verdict sheet, would it be helpful to have the parties -- I

18  don't imagine anything is going to change about the law --

19  have the parties weigh in by letter just to simplify the

20  charge conference process.

21        THE COURT:  I don't think that would simplify

22  it.  It is much better done in person, exchanging ideas and

23  going back and forth.  Frankly looking at the charges and

24  verdict sheet, they look very much standard of what we would

25  expect for this type of case.

Anthony M. Mancuso, CSR    Official Court Reporter

1    THE COURT:  So you have no objection?

2        MR. NORINSBERG:  We might well have no objections.

3  It seems to me very clean and clear.

4        MS. FUDIM:  We're of the same mindset.

5        THE COURT:  After I send the jury back we can

6  discuss any issues you may have with the jury instructions.

7  Would it be necessary to have plaintiff here for that?

8        MR. NORINSBERG:  For the charge conference, no.

9        THE COURT:  So then plaintiff can be returned now

10  and as I say we'll begin first thing 9:30.

11        MR. NORINSBERG:  Can I just confer with him for two

12  minutes?

13        MS. FUDIM:  In terms of our boxes, where would you

14  like us to leave them overnight?

15        THE COURT:  There's a closet there.

16        (Pause.)

17        THE COURT:  We have -- the record is completely

18  unclear with regard to 43 A and B.  We have been calling a

19  number of Exhibits 43 A and 43 B.  So we need to straighten

20  that out and the record needs to be made plain.  First of all,

21  in my book for some reason behind tab 43 is not any

22  photographs.  It's the movement slip pertaining to Andrew

23  Smalls.

24        MR. MEEHAN:  If I can address that, your Honor.  Our

25  paralegal added exhibits 38 through 50 and brought them into

Anthony M. Mancuso, CSR    Official Court Reporter

1  court this morning.  It's possible we put them in the binder

2  in error, really quickly this morning.  I will make sure

3  tomorrow you have the -- everything is just one off.

4        THE COURT:  The other problem is that something that

5  was marked -- there is a part in our book, in my part, a part

6  of Exhibit 42, the last page, which is stairwell 6 B and then

7  the stairwell going up to the roof and then a picture of the

8  housing project from the outside.  Was referred to in this

9  court as 43 A and B when you were examined about it.  Now, we

10  have a new 43 A and B, which were the photographs of the roof.

11        MR. NORINSBERG:  We can call those 42 A and B.

12        THE COURT:  What is 42 A and B?

13        MR. NORINSBERG:  The photographs of the stairwell of

14  six and seven.

15        THE COURT:  We can call it that now.  What are we to

16  do about the record?

17        MR. NORINSBERG:  Well --

18        THE COURT:  When the witness was shown the record,

19  it was referred to as 43 A and 43 B.

20        MR. NORINSBERG:  I don't think either side when we

21  are summing up or using these records again would need to

22  refer to it as 43.  We can refer to it as the correct number,

23  42 A and B.  No one would know the difference.

24        THE COURT:  Until they ask for a readback.

25        MS. FUDIM:  Why don't we make all four of the photos

Anthony M. Mancuso, CSR    Official Court Reporter

1  the court is referring to 43, since they are already admitted

2  and they can all be part of the Exhibit 43. If I understand

3  the court correctly they all photos.

4       MR. NORINSBERG: You have two 43 As and Bs.

5       MS. FUDIM: If that's how it came into the record,

6  that might be the clearest thing. I actually didn't catch the

7  error at the time. They can all just be 43.

8       MR. NORINSBERG: Maybe the last ones that we just

9  did this afternoon as A and B we make them C and D.

10      THE COURT: But A is the subject of prior testimony

11  by Officer Collins and I don't know what you were referring to

12  that exhibit as when Officer Collins talked about it and put

13  markings on it.

14      MR. MEEHAN: That was initially 43. The physical

15  exhibit of 43 is the one that he then marked. We can leave it

16  43.

17      MS. FUDIM: That's fine.

18      THE COURT: Good night all.

19      (Case adjourned to Wednesday, May 15, 2019 at 9:30

20  a.m.)

21

22

23

24

25

Anthony M. Mancuso, CSR    Official Court Reporter

1

2  RICHARD COLLINS                          7

3  DIRECT EXAMINATION                       7

4  REDIRECT EXAMINATION                     144

5  RECROSS-EXAMINATION                      154

6  LINDSEY NELSON JOHNSON                   155

7  DIRECT EXAMINATION                       155

8  CROSS-EXAMINATION                        161

9  REDIRECT EXAMINATION                     171

10  RECROSS-EXAMINATION                     173

11  DAVID TETA                              174

12

13

14  Plaintiff's Exhibit 29                   24

15  Plaintiff's Exhibit 31                   27

16  Plaintiff's Exhibit 19                   35

17  Plaintiff's Exhibit 27                   41

18  Plaintiff Exhibit 8                      43

19  Plaintiff's Exhibits 43 A and B          46

20  Plaintiff's Exhibit 10                   80

21  CROSS-EXAMINATION                        83

22  Plaintiff's Exhibit 21                   86

23  Plaintiff's Exhibit 2                    95

24  Plaintiff's Exhibit 15                   113

25  Plaintiff's Exhibit 16                   115

Anthony M. Mancuso, CSR    Official Court Reporter

1  Plaintiff's Exhibit 4                    119

2  Plaintiff's Exhibit B 1                  136

3  Plaintiff's Exhibit X and Y              139

4  Plaintiff's Exhibit 17                   149

5  Plaintiff's Exhibit 43 B                 240

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Anthony M. Mancuso, CSR    Official Court Reporter

1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
2

3  - - - - - - - - - - - - - - X

4                              :    14-CV-2326 CBA
   ANDREW SMALLS,

5                              :

6           Plaintiff,:

7       V.                    :    U.S. Courthouse

8                                  Brooklyn, New York
   POLICE OFFICER RICHARD COLLINS

9  and POLICE OFFICER DAVID TETA, :

10                             :

11         Defendants.  :

12                             :    May 15, 2019
                                    9:30 o'clock a.m.
13                             :

14  - - - - - - - - - - - - - - X

15           TRANSCRIPT OF TRIAL
             BEFORE THE HONORABLE CAROL B. AMON
16           UNITED STATES DISTRICT JUDGE and a jury.

17  APPEARANCES:

18  For the Plaintiff:         JOHN MEEHAN, ESQ.

19                             JON NORINSBERG, ESQ.
                               BENITTA JOSEPH, ESQ.

20

21

22  For the Defendant:         ELISSA FUDIM, ACC

23                             BRIAN FRANCOLLA, ACC

24  Court Reporter:            Anthony M. Mancuso
                               (718) 260-2419
25  Proceedings recorded by mechanical stenography, transcript
   produced by CAT.

Anthony M. Mancuso, CSR    Official Court Reporter

1            (Trial resumed.)

2            (In open court; jury not present.)

3            THE COURT:  We're ready to go.  Bring the jury in.

4            MR. FRANCOLLA:  I did have two issues I wanted to

5    raise.

6            THE COURT:  Did we need to raise them at this point?

7            MR. FRANCOLLA:  It pertains to the plaintiff's

8    testimony.  I don't know when he's going to go.  It needs to

9    be before that.

10           THE COURT:  He's not your next witness, is he?

11           MR. MEEHAN:  The plaintiff is not the next witness,

12   no, your Honor.

13           THE COURT:  Okay.

14           (Jury present.)

15           THE COURT:  Good morning, ladies and gentlemen.

16   Please be seated.

17           Counsel, you may continue.

18   DAVID TETA,

19           called as a witness, having been previously duly

20           sworn, was examined and testified as follows:

21   DIRECT EXAMINATION

22   BY MS. JOSEPH:  (Continued)

23   Q    Good morning, Detective Teta.

24   A    Good morning, Ms. Joseph.

25   Q    Yesterday I asked you some questions about who arrested

1    Cedric Smalls.  Do you recall those questions?

2    A    Yes.

3    Q    And you testified that you arrested Cedric Smalls,

4    correct?

5    A    Correct.

6    Q    And I directed your attention to your criminal trial

7    testimony where you said someone else came but you maintain

8    that you still arrested Cedric Smalls, correct?

9    A    Yes, ma'am.

10   Q    Now, directing your attention to your deposition

11   testimony, page 83, line 15 through 18:

12        "QUESTION:  What happened after that?

13        "ANSWER:  Somebody who I don't know, don't

14   remember, took custody of Cedric Smalls and I proceeded up the

15   stairwell to meet Officer Collins."

16        You testified to that under oath at your deposition,

17   correct?

18   A    Correct.

19        MR. FRANCOLLA:  Objection, your Honor.  It's not

20   inconsistent.

21        THE COURT:  Overruled.

22   Q    So at your trial testimony you said somebody came but you

23   handcuffed Cedric Smalls.  At your deposition you said

24   somebody who I don't know, don't remember, took custody of

25   Cedric Smalls, but I arrested them and you are still telling

1    this jury you arrested Cedric Smalls?

2    A    I am, because handcuffing, arresting, taking custody of

3    somebody are all different things.  So, yes, I still maintain

4    that I'm the one who put Cedric into handcuffs and when I say

5    that somebody took custody of him, they took control over him

6    physically while making sure that he didn't attempt to run

7    away or escape while I proceeded up to go meet Officer

8    Collins.

9    Q    So we're clear:  Somebody who you don't know took custody

10   of Cedric Smalls on the stairwell, correct?

11   A    Yes, ma'am.

12   Q    And then you went up to go meet Officer Collins on the

13   roof, correct?

14   A    That's correct.

15   Q    When did you see that somebody again?

16   A    I can't tell you when I saw them again if I don't know

17   who they are.

18   Q    Now, I also asked you some questions yesterday about your

19   calling for backup, correct?  Do you remember those questions?

20   A    Yes.

21   Q    And I asked you some questions about why you made that

22   radio call; do you recall that?

23   A    I do.

24   Q    And you said it was just to give out our location, yes?

25   A    That's correct.

1    Q    Detective Teta, isn't it true you made that radio call so

2    that other officers could come to the scene?

3    A    No, ma'am.  As I explained yesterday, we were told and

4    taught that if you think something's going to be awry or a

5    possibility of going awry and becoming violent or unsafe, you

6    put over an address.  It's not indicative that all officers

7    need to respond to that address to help you, but they know

8    somebody's there and they know that's where you are in case

9    you can't get a radio transmission over again.

10   Q    Directing your attention to your deposition, page 81,

11   line 23 through 25 and page 82, lines two through nine:

12        "QUESTION:  I'm sorry.  I had a distracted mental

13   moment.  Could you repeat your answer?  Your answer:  At some

14   point between entering the stairwell and ending up on the

15   sixth floor I made the radio transmission of the address we

16   were running into.

17        "QUESTION:  And why did you make that transmission?

18   What was your purpose?

19        "ANSWER:  To get more people there, to get cops

20   there."

21        That was your answer under oath in your deposition,

22   correct?

23   A    Yes, it was.

24   Q    And you just told this jury no, ma'am, getting other

25   officers to the location was not the reason I made that radio

1 call?

2 A   I believe I said it wasn't -- it's not a radio call for

3 help.

4 Q   I didn't ask you that, sir.  I asked you specifically:

5 Isn't it true the reason you made that call was to get other

6 cops to the scene, you answered no, yes?

7 A   Yes, that's what I answered.

8 Q   But at your deposition under oath you answered it was to

9 get more people there, to get other cops there, yes?

10 A   That's what I said, yes.

11 Q   And then at your deposition, page 83, lines five through

12 twelve:

13        "QUESTION:  So what happened next after you made the

14 call for backup?

15        At some point going up the stairs and then we get to

16 the point where we were pinning Cedric Smalls.

17        What happened next?

18        "ANSWER:   At that point responding officers --

19 officers are also coming up the stairs behind us.

20        MR. FRANCOLLA:   Objection.

21        THE COURT:   I'll sustain the objection.  I don't

22 know that that's inconsistent with testimony.

23 Q   Well, detective, yesterday you said you didn't call for

24 backup, yes?

25 A   That's what I said.

1 Q   And I just want to clarify something.  I asked you

2 yesterday if as the assisting officer helping Collins with the

3 arrest you worked past your tour, didn't you?

4 A   As I said yesterday, I don't remember what time I signed

5 off that day.

6 Q   I didn't ask you what time you signed off.  I'm asking

7 you whether you recall working past your tour.

8 A   If I don't remember what time I signed off, which means I

9 don't remember what time my tour ended, Which means I don't

10 remember if I worked until my tour was over.

11 Q   Directing your attention to your deposition, page 17,

12 five through nine:

13        "QUESTION:  Did you finish your tour at the

14 appointed time at two a.m. or so or did you do overtime after

15 the Andrew Smalls arrest?

16        "ANSWER:  No.  There was overtime."

17        Do you recall being asked that question and a giving

18 that answer?

19 A   If that's a what you are reading to me, that's what I

20 said.

21 Q   That's exactly what's written, sir.

22 A   Okay.  Then that's what I said.

23 Q   So that day all four individuals that were arrested were

24 charged with trespassing, correct?

25 A   I believe so.

1 Q   And as one of the officers on the scene you didn't do

2 anything to verify whether Cedric had permission to be at the

3 location, correct?

4        MR. FRANCOLLA:   Objection.

5        THE COURT:  Yes.  I'll sustain the objection without

6 a foundation for that question.

7 Q   Sir, did you ask Cedric if he had permission to be at the

8 location, Cedric Smalls?

9        MR. FRANCOLLA:   Objection.

10        THE COURT:  Did you arrest Cedric and did you make

11 the determination to charge him with trespassing?

12        THE WITNESS:  No, ma'am, I did not.

13        THE COURT:  I'll sustain the objection.

14 Q   Are you aware of any officer on the scene that day asking

15 whether any of these individuals had permission to be on the

16 premises?

17        MR. FRANCOLLA:   Objection.

18        THE COURT:  Sustained.

19 Q   Detective Teta, I want to just focus on how the evening

20 began, when you first became aware of these individuals.

21        Now, when you first saw them that evening you were

22 not paying attention to any specific individual, correct?

23 A   That is correct.

24 Q   You were watching them as a group, yes?

25 A   Yes, ma'am.

1 Q   And then you heard -- you also say you heard a gunshot,

2 yes?

3 A   Yes.  I heard the gunshot before seeing the group.

4 Q   And you started following these individuals, yes?

5 A   Yes.

6 Q   Now, when you first saw this group you were about 30 feet

7 away?

8 A   Somewhere in the vicinity of, yes, anywhere between 25

9 and 35 feet away.

10 Q   And a you started following these individuals you said,

11 yes?

12 A   Yes.

13 Q   And as you're following them they had their backs to you,

14 right?

15 A   Yes.

16 Q   At no point did you get a frontal view of any of these

17 individuals, right?

18 A   That's correct.

19        MS. JOSEPH:  Thank you, detective.  Nothing further.

20        MR. FRANCOLLA:   Permission to inquire, your Honor

21        THE COURT:  Yes.

22 CROSS-EXAMINATION

23 BY MR. FRANCOLLA:

24 Q   Good morning, Detective Teta.

25 A   Good morning, Mr. Francolla.

1  Q    You were asked yesterday on direct examination by
2  plaintiff's counsel about prior testimony indicating you found
3  money on Andrew Smalls when you searched him; do you remember
4  that?
5  A    Yes, I do.
6  Q    And you were shown an a prisoner pedigree card in
7  connection with that question, correct?
8  A    Yes, I was.
9        MR. FRANCOLLA:  Your Honor, at this time I would
10 like to publish to the jury what's in evidence as Plaintiff's
11 Exhibit 32.
12       THE COURT:  Okay.
13 Q    Now, Detective Teta, you were shown this document and
14 asked briefly about the fact that according to it the
15 individual associated with this card had no money on him; do
16 you remember that?
17 A    Yes.
18 Q    And then I believe you pointed out who the individual
19 associated with this pedigree card is, correct?
20 A    Yes.
21 Q    Can you tell the jury who that is?
22 A    Cedric Smalls.
23 Q    And how are you able to tell them that?
24 A    It's listed under defendant's name, Smalls, Cedric.
25 Q    After that occurs, I think you volunteered a recollection

1  that you saw another document which indicated Andrew Smalls
2  did in fact have some currency on him?
3  A    Yes, sir.
4        MR. FRANCOLLA:  Your Honor, now I will like to show
5  the jury what's in evidence as Plaintiff's Exhibit 24.
6  Q    Who is the name on this document, Detective Teta?
7  A    Smalls, Andrew.
8  Q    To the extent it indicates whether or not Mr. Smalls had
9  funds on him, can you tell the jury what the document
10 indicates?
11 A    It indicates here that he had 40 dollars on him and that
12 40 dollars was returned to him.
13 Q    To be clear you were not in fact shown this document in
14 connection with the questioning on direct examination about
15 whether or not Andrew Smalls did in fact have money on him
16 when he was arrested?
17 A    No.
18 Q    Now, you were also asked some questions on direct
19 examination about the fact that the only article of clothing
20 you recall any of the individuals wearing was a black jacket
21 that you said Andrew Smalls was wearing; do you remember that?
22 A    Yes.
23 Q    Can you tell the jury how it is that you recall that
24 specific item and nothing else?
25 A    I actually own a jacket that he was wearing.

1  Q    Can you describe for the jury the jacket?
2  A    It's a black nylon MMA one alpha flight jacket.  It's an
3  Air Force jacket.  It's nylon black on the outside and nylon
4  florescent orange on the inside.  A very specific looking
5  article of clothing.
6  Q    When you say you own it, now, then?
7  A    I have actually had one, not the same one, but I have had
8  one since I was 16 years old and still have one today.
9        MR. FRANCOLLA:  Your Honor, I would like to just
10 approach -- I would like to show a document to the witness.
11 It's not in evidence and I could give a copy to counsel and
12 your Honor since it's not something that was in the binder.
13 If I can do that.  It's marked for identification as
14 Defendant's Exhibit Z.
15       MS. JOSEPH:  Your Honor, can we have a sidebar,
16 please, regarding this exhibit?
17       THE COURT:  Have you seen the document yet?
18       MS. JOSEPH:  Yes.
19       THE COURT:  Do we need to do this now or can you
20 move on for a bit?
21       MR. FRANCOLLA:  It won't take us likely into a
22 break.  It might be a brief.
23       THE COURT:  All right.
24       (Sidebar.)
25       THE COURT:  Yes.

1        MS. JOSEPH:  This is the first time I'm seeing this
2  exhibit.  It was not listed on JPTO.  It was not exchanged in
3  discovery.  This is the first time I'm seeing it.
4        MR. FRANCOLLA:  First of all, I'm using it as a
5  demonstrative, number one.  Number two, this can only came up
6  once we got the mug shot for another individual, Jerome
7  Nelson, in response to the court's order, where you can see
8  he's wearing the exact same jackets the detective described
9  owning.
10       THE COURT:  Who is wearing this jacket.
11       MR. FRANCOLLA:  He is, Detective Teta.  This picture
12 was taken three days ago and I was going to lay a foundation
13 just to show that he does in fact own it and we compare the
14 two and it's not entirely clear from the document that what
15 he's talking about, since obviously it is the jacket that's
16 shown in a photograph of one of the individuals who was
17 arrested.
18       MS. JOSEPH:  I don't know that this specific jacket
19 is shown in any photo.
20       To take a step back, this case has been going on for
21 over a decade.  This is the first time that this evidence has
22 existed in connection with this case.  This is the first time
23 we were shown this evidence while the witness is on the stand
24 getting ready to ask questions about it.  That's extremely
25 prejudicial.  We would not be allowed to do that.

1    THE COURT:  Back up a minute.  This is a picture of
2 this defendant with the jacket on?
3        MR. FRANCOLLA:  Yes.
4    THE COURT:  This witness with the jacket?
5        MR. FRANCOLLA:  Correct.
6    THE COURT:  What about Jerome Nelson?
7        MR. FRANCOLLA:  I'm going to connect it, yes.
8    THE COURT: What do you mean?
9        MR. FRANCOLLA:  The mug shot photo.  You can see
10 this portion of it.  That's exactly the same.  That wouldn't
11 be clear -- it all fits together.  I can say yes this was
12 produced a few days ago in response to documents that we
13 produced a few days before that they requested a week before
14 trial.  So there's no prejudice.  It is demonstrative.  They
15 are obviously going to challenge -- absent this, I would
16 expect they are going to be -- it's quite self-serving and
17 they are going to challenge it.  I'm going to lay a
18 foundation.  He'll say I took this photo and it was in
19 response to seeing the exact same jacket in a photograph I'm
20 going to slow him immediately thereafter that Jerome Nelson
21 has hanging off the side of his shirt in a mug shot.
22    THE COURT:  Did he arrest Jerome Nelson?
23        MR. FRANCOLLA:  He was involved in the arrest of
24 all of them.
25    THE COURT:  Are you saying Jerome Nelson had a black

1 jacket that was the same one the defendant had on -- I mean
2 the plaintiff had on?
3        MR. FRANCOLLA:  The jacket he saw plaintiff wearing
4 is on Jerome Nelson's shoulder in his mug shot photo later
5 that night.  What we are saying, one, the jacket at issue was
6 there that night and, two, for some reason Jerome Nelson is
7 wearing it.
8        MS. JOSEPH:  Your Honor, this is a surprise.  We've
9 never seen this jacket before and the fact that now he's
10 saying Andrew Smalls was not even wearing the jacket but
11 Jerome Nelson.  The whole line of questioning was based on
12 what Andrew Smalls was wearing.  We have never contested what
13 Andrew Smalls was wearing.  They are trying to suggest, make
14 another leap with no foundation that Andrew gave Jerome the
15 jacket.  This is extremely prejudicial.
16        MR. FRANCOLLA:  Subject to connection for further
17 witnesses.  They have made a big deal about these photo and
18 how the cloth don't match the pedigree card.  There will be an
19 explanation for that.  Part of it, it's not just Jerome Nelson
20 wearing different clothing than is depicted on the pedigree
21 cards.
22        MS. JOSEPH:  Are there other photographs you now
23 have that we have not seen?
24        MR. FRANCOLLA:  No.
25        MS. JOSEPH:  Focus on this photograph.

1    THE COURT:  When was this taken?
2        MS. JOSEPH:  Seven days ago you said.
3        MR. FRANCOLLA:  I think I got it this weekend.
4        MS. JOSEPH:  They could have given it to you and we
5 could have dealt with it.
6    THE COURT:  Why is it a big deal to deal with this
7 issue?
8        MR. NORINSBERG:  It should have been part of
9 discovery disclosure where he could have been asked about it
10 at his deposition.  He never testified about it at the
11 deposition.
12    THE COURT:  You can bring that out.
13        MR. NORINSBERG:  This is putting us in a position
14 where we have done the cross-examination and now we can only
15 address this newly raised issue on a recross-examination.
16    THE COURT:  Why is this being shown on
17 cross-examination?  If you had this before, why didn't you
18 show them this before they examined the witness?
19        MR. FRANCOLLA:  First of all, I didn't know they
20 were going to make an issue out of all the clothing that's
21 come out.
22    THE COURT:  You knew by the time they called this
23 witness they were making that argument.
24        MR. FRANCOLLA:  I didn't think they were going to
25 ask questions about how it is he remembered only one article

1 of clothing.  They set up a summation that says obviously --
2    THE COURT:  I'm going to keep this photo out.  If
3 you have the photo of Jerome Nelson, you can ask him if that
4 looks like the type of the jacket that he has.  I'm concerned
5 about bringing this out at this point in time after they have
6 done direct examination.  If you had it since Monday, you
7 should have given it to them on Monday.
8        MR. NORINSBERG:  Lastly, the line of questioning now
9 really there should be a curative instruction.  It suggests
10 that Andrew was the one wearing this.  The witness is now
11 going to testify he saw it on Jerome and he can't connect it
12 with Jerome.
13    THE COURT:  So what.
14        MR. NORINSBERG:  It's the wrong defendant.  He
15 didn't arrest Jerome.
16    THE COURT:  He can testify to whatever he
17 remembers.  He doesn't have to testify to every single thing
18 we've heard before.  There's no requirement they tell you
19 everything that a witness is going to say.
20        MR. NORINSBERG:  I understand.  The testimony up to
21 this point suggests he knew that Andrew Smalls was wearing the
22 jacket because he has the same jacket when there was no
23 evidence that Andrew Smalls was wearing that jacket.
24    THE COURT:  That's the evidence.  Are you saying
25 that I should preclude him from testifying to that?

1    MR. NORINSBERG:  There should be a good-faith basis

2  for doing that, not sandbagging us after opening.

3    THE COURT:  You didn't know he was going to testify

4  to that?

5    MR. NORINSBERG:  Of course not.  This is the first

6  time we're hearing it.

7    THE COURT:  I don't know that you have to know every

8  single thing a witness is going to say.  Why do you claim you

9  are entitled to know that?

10    MR. FRANCOLLA:  They could have asked him at his

11  deposition.

12    THE COURT:  I'm keeping the picture out.  You're

13  lucky I'm doing that.

14    (In open court.)

15    MR. FRANCOLLA:  May I proceed, your Honor?

16    THE COURT:  Yes.

17  BY MR. FRANCOLLA:

18  Q    Detective Teta, now, I want to show you -- Let me stop a

19  second.

20    Can you describe the jacket that you observed Andrew

21  Smalls wearing that you also own?

22  A    As I said, it a black waist length jacket.  They come in

23  different colors.  It happens to be black.  The inside is

24  fluorescent orange.  It has a gold metal zipper on it that

25  stands out from the black and it's got no collar.  It lays

1  flat on your clavicle or collar bone because it's an Air Force

2  jacket.  So it's made to accommodate wearing head gear in a

3  plane.

4  Q    Have you any photographs of the individuals arrested that

5  night?  Have you seen this jacket?

6  A    Yes, I have.

7  Q    Whose photograph?

8  A    I believe it's Jerome Nelson.

9  Q    Now, I want to show what's in evidence as Defendant's

10  Exhibit Y.

11    Can you just direct the jury to the jacket that you

12  own?

13  A    This here is the jacket.  As you can see it's got no

14  collar and this flap overlaps another flap.  The other side

15  isn't on Mr. Nelson's so you only see the one side of it.  But

16  it's very specific looking.

17  Q    You testified that you observed Andrew Smalls wearing

18  that jacket when you encountered him on the roof of 8105,

19  correct?

20  A    Yes, sir.

21  Q    How do you explain its presence in this photo?

22  A    Well, during transport, like I said, all the outer layers

23  of clothing unless they are completely necessary are taken

24  from the prisoners once they are in the precinct holding cell.

25  That can include jackets, hooded sweatshirts and the like.

1  Hooded sweatshirts will be given back to somebody once the

2  strings are removed from the -- the draw strings to pull the

3  hood closed.  Jackets are seldom given back because they have

4  metal on them and the nature of the zipper.  That being said,

5  everything's kind of put to the side on a table in the arrest

6  processing room which is also where our holding cells are in

7  the 100 precinct.  The next morning or the next day or a

8  couple of hours later, depending on the situation, when the

9  two officers, three officers, four officers, whoever is doing

10  the transport for the prisoners, will just literally give

11  whomever whatever happens to be on the table.  There's no

12  specific rhyme or reason to how it's done.  If there's one

13  person they get one jacket back.  If it's four people, it

14  could be you get this jacket, you get that jacket and they'll

15  let them sort it out.

16    THE COURT:  At what point in time does this happen?

17    THE WITNESS:  This is hours later.  I don't know

18  what time these four individuals were transported, your Honor.

19  But normally the arrest process takes several hours and being

20  that this arrest took place at approximately 1:20 in the

21  morning I would say they probably weren't transported until

22  the day tours come in which is 0700.

23    THE COURT:  Where are they transported to?

24    THE WITNESS:  They are transported to in this case

25  Queens central booking.

1  Q    And where would this photograph have been taken if you

2  know?

3  A    Queens central booking.

4  Q    Detective Teta, you were asked several questions about

5  gunshot residue on direct examination.  Do you recall that?

6  A    I do.

7  Q    You were asked about the policy and procedure as you

8  understand it pertaining to requesting DNA testing; do you

9  recall that?

10  A    Yes, I do.

11  Q    You were asked some questions about your understanding of

12  fingerprint analysis, correct?

13  A    Yes.

14  Q    Do you have any expertise as you sit here today in the

15  issues that you were asked about?

16  A    Yes, I do.

17  Q    Can you tell the jury about it?

18  A    Yes.  I'm a firearms expert and worked in the firearms

19  analysis section of the police laboratory for four years.

20  Q    Now, you were asked regarding the fingerprints.  You were

21  asked about your awareness of the fact that Andrew Smalls's

22  fingerprints were not identified on the weapon that was

23  recovered.  Do you recall that?

24  A    Yes.

25  Q    Are you aware of whether any prints that were unsuitable

1  for comparison were found on the weapon that was recovered?

2  A  Yes.

3          MS. JOSEPH:  Objection.

4          THE COURT:  What's the basis of the objection?

5          MS. JOSEPH:  Hearsay.

6          THE COURT:  This was not inquired into on direct?

7          MS. JOSEPH:  No.

8          MR. FRANCOLLA:  She did ask if he was aware that no

9  fingerprints were found.  I'm just completing.

10          THE COURT:  Just move on to something else and we'll

11 address this in a moment.

12          MR. FRANCOLLA:  Understood, your Honor.

13 Q  Now, yesterday there were several instances where you

14 were read portions of your prior testimony and it said

15 something to the effect of if it says that there then I said

16 it.  Do you recall that?

17 A  Yes.

18 Q  As you sit here today, how would you describe your

19 independent recollection of the incidents that occurred that

20 night?

21 A  Not great.

22 Q  And I just want to, if I can, just show the witness a

23 copy of his transcripts from his prior testimony and ask him a

24 brief question -- excuse me -- to see if that refreshes his

25 recollection as to when that testimony occurred.

1          THE COURT:  All right.

2          MR. FRANCOLLA:  Thank you, your Honor.

3  Q  Detective Teta, I'm just going to ask you to yourself to

4  review the front page of the tab that refers to your criminal

5  trial as well as the front page that refers to your deposition

6  testimony.  See if those pages refresh your recollection as to

7  the dates of those respective testimonies.

8  A  Yes.

9  Q  When was your testimony in the criminal trial?

10 A  2008.

11 Q  What about your deposition?

12 A  2017.

13          MR. FRANCOLLA:  Your Honor, I'm going to approach

14 the witness to retrieve my binder.

15 Q  You were asked about any memo book entries you had

16 pertaining to that incident yesterday; do you recall that?

17 A  I do.

18 Q  What happened to that memo book?

19 A  It was lost in Sandy, super storm Sandy, excuse me.

20 Q  For purposes of the record, when did that occur?

21 A  That was I believe October 30 or 31 of 2012.

22 Q  At that time where were you assigned?

23 A  To the 100 precinct.

24 Q  How long had you been assigned to the 100 precinct at

25 that time?

1  A  A little over six years.

2  Q  How long did you remain in the 100 precinct after Sandy,

3  approximately?

4  A  That was October 2012.  I was transferred in February of

5  2013.

6  Q  To what unit?

7  A  To the firearms analysis section of the police

8  laboratory.

9  Q  You mentioned that earlier.  Just so the jury understands

10 what that assignment entails, can you give them a brief

11 description?

12 A  The firearms analysis section is tasked duties and

13 responsibilities, the identification and operability of

14 firearms.  Those firearms are any firearms that come into

15 custody of the New York City Police Department, whether that

16 be by criminal means, seized property or found firearms.  We

17 conduct microscopic comparisons on evidence to determine

18 suitability for use in trial.

19 Q  How long did you remain in that unit?

20 A  Four years.

21 Q  Where did you go next?

22 A  I went to the gun violence suppression division, violence

23 reduction task force.

24 Q  Can you give a brief description of what assignment

25 entails?

1  A  It's major case firearms and gang task force and we're

2  tasked to suppressing gun violence across all five boroughs.

3  Q  When did you get promoted to detective?

4  A  In 2014.

5  Q  I want to refer now to May 20 of 2006.  You testified on

6  direct that at some point you heard a gunshot?

7  A  That's correct.

8  Q  Tell the jury what happened.

9  A  I was in what I believe to be 8840.  I'm not good with

10 numbers.  You'll have to excuse me.  I was with Officer

11 Collins, Cabrera and Alvarado in the rec room preparing to

12 walk back to the 100 precinct to go end the tour when I heard

13 one single gunshot.  I went to the window of the rec room

14 which faces the rear of the building and also a path, concrete

15 path that cuts across the housing development and I saw five

16 individuals outside the window.

17 Q  When you heard the gunshot, what level of certainty did

18 you have at that time that it was in fact a gunshot and not

19 something else?

20 A  A very high level of certainty.

21 Q  Based on what?

22 A  Well, I was assigned to the police academy in 2004.  I

23 got injured while I was in the academy and required two

24 separate surgeries.  While I was undergoing those surgeries

25 and medical issues I finished my time in the police academy as

1  far as academics and that went and I was transferred
2  downstairs to the gun range in order to do -- wait there and
3  work with them until my time was ready, my medical release was
4  up. So on a daily basis I was involved with the ins and outs
5  of the firearm range in the basement of the police academy.
6  Q    When you exited the building what you believe to be 8105?
7  A    8410.
8  Q    Or 8410, what did you do?
9  A    I went around the back of the building with Officer
10  Collins, Cabrera and Alvarado.
11  Q    Running walking?
12  A    Walking.
13  Q    Why were you walking and not running?
14  A    Because it was all new to me, to be 100 percent honest
15  with you.
16  Q    What was new to you?
17  A    The entire experience.
18  Q    What happened after you exited the building?
19  A    Went around to the back of the building with the three
20  people that I was with that I mentioned earlier and saw the
21  same five individuals that I had seen out the window of the
22  rec room.
23  Q    Did you proceed after them?
24  A    We followed them, yes.
25  Q    What did you observe?

1  A    I observed four males and one female.
2  Q    How long generally would you say you were behind them
3  for?
4  A    It was maybe time-wise a minute, a minute-and-a-half
5  walk. It was not very long.
6  Q    At some point did you observe anything that you found to
7  be suspicious?
8  A    The female turned around and looked behind her. I don't
9  know if she was alerted by the radio going off or just the
10  sound of our footsteps. Whatever it was she turned around.
11  She looked and saw the four of us and then she turned to the
12  four individuals she was walking with and said something to
13  them. What she said to them I don't know.
14  Q    How if at all did those individuals respond to that
15  interaction that you observed?
16  A    They too turned around to see who was behind them.
17  Q    What happened next?
18  A    We continued look at the path back towards the northeast
19  side of the housing development which is where the building
20  8105 is and once we reached -- so off this path that we were
21  on, a separate path that goes to separate buildings within the
22  housing development. Once they reached the turning point to
23  the small pathway that goes as to the front entrance of 8105
24  the four males started to run.
25  Q    What did you do?

1  A    I followed with Officer Collins into the building, into
2  the lobby of the building.
3  Q    How did you follow them?
4  A    Running behind them.
5  Q    What happened when you got into Jerome Nelson basically
6  just stopped running, kind of stood in the way. Officer
7  Collins kind of just pushed him out of the way and continued
8  into stairwell B. I followed Officer Collins into stairwell B
9  and ascended up to the sixth floor landing. Once we got to
10  the sixth floor landing to go up to the seventh floor and from
11  the seventh floor there's a stairway to the roof. On the
12  sixth floor while in between the sixth floor landing and the
13  seventh floor landing an individual who came to be known to me
14  as Cedric Smalls stopped and kind of created a barrier up the
15  stairs in the form of I guess you can just say two hands
16  against the wall and his feet kind of spread out to the base
17  of the stairs as well.
18       Officer Collins took Mr. Smalls and kind of pushed
19  him out of the way and down the stairs into me. I took
20  Mr. Smalls, put him up against the wall, searched him for my
21  safety and for the safety of Officer Collins and put
22  Mr. Smalls in handcuffs and waited with him on the wall.
23  Q    Now at some point you testified on direct examination
24  additional officers you are unaware of came up and took
25  control of Mr. Smalls from you?

1  A    Correct.
2  Q    What did you do at that point?
3  A    At that point I ascended up the stairwell to meet Officer
4  Collins on the seventh floor landing and the two of us
5  proceeded to ascend the final stairwell out onto the roof.
6  Q    What happened when you got to the roof?
7  A    When we got to the roof other responding officers had
8  come up the B stairwell. The way things are done in a housing
9  development, when there's something going on, officers will go
10  in both stairwells, A and B. If there's more, some have C and
11  D, depending on the size of the building. That's to make sure
12  nobody's crossed over and gone down another stairwell and out
13  a separate entrance, exit. We went up and met with other
14  officers.
15  Q    What did you observe when you got up to the roof?
16  A    When I got up to the roof there was just a ton of people.
17  I can't be specific as to how many, flashlights, plainclothes,
18  uniformed, supervisors and everybody was doing the same thing,
19  which was looking for the two individuals that we had seen go
20  onto the roof.
21  Q    When you described a ton ever people, are you referring
22  to police personnel?
23  A    Yes.
24  Q    At the time you were up there did you know any officers
25  that were up there that you remember?

1  A   No.  I had been assigned to the precinct less than -- a
2  little bit -- just about a month I had been assigned to the
3  precinct.  Names and faces weren't really clear to me.  We
4  were with what's called the field training officers, Officers
5  Collins, Alvarado, Cabrera and myself.  We kind of all stuck
6  together as far as that went.
7  A   You didn't see the other officers.  You were not in
8  sectors with them.  We were doing foot posts.  When you were
9  not doing foot posts you were riding with the training
10 sergeant.  Names and faces become more familiar as you go on,
11 but they don't become familiar quickly because you really
12 truly don't see them.
13 Q   You mentioned officers from your precinct were there.  To
14 your knowledge were officers from other precincts there?
15 A   Yes.  There were officers from the 101 precinct as well.
16 Q   Had you ever worked in the 101?
17 A   No.
18 Q   Now, at some point you testified on direct examination
19 you became aware of the Smalls brothers, Jerome and Andrew on
20 the roof.  Can you walk the jury through how that occurred?
21 A   I don't really recall how I became aware that Ronnie
22 Smalls was on the roof, what I was then referring to as the
23 elevator room and have now learned is actually the stairwell
24 room.  I imagine it's just because everybody was shouting
25 commands on that roof.  I became aware of Andrew Smalls being

1  on the roof because as Officer Collins was attempting to get
2  up onto the roof and he went to step on what I believe he said
3  he thought was a box or something to gain leverage to get up
4  onto the roof and I went to help him, typical basket fashion,
5  put your hands together, somebody puts their foot in it, kind
6  of push them up and let them get leverage.  He realized that
7  was not actually an item or a box.  It was Mr. Smalls.
8  Q   Now, did you speak with anyone from the district
9  attorney's office that evening?
10 A   No.
11 Q   Do you know when it was that you spoke to a -- someone in
12 the district attorney's office in connection with Mr. Smalls's
13 arrest?
14 A   I don't know when it was, but it was quite sometime
15 later.
16 Q   Do you know what this was in connection with?
17 A   It was in connection with the criminal trial.
18 Q   Did you testify during before this proceeding?
19 A   No, I didn't.
20 Q   Other than testifying here and in the criminal trial, did
21 you testify at any other time as part of this case?
22 A   Just the deposition.
23        MR. FRANCOLLA:  Your Honor, can I take a moment to
24 confer with my colleague?  I may be finished.
25        THE COURT:  Yes.

1        MR. FRANCOLLA:  Thank you.
2        (Pause.)
3        MR. FRANCOLLA:  Your Honor, I have no further
4  questions.  Thank you, Detective Teta.
5        THE COURT:  Let me see the parties briefly.
6        (Sidebar.)
7        THE COURT:  We still haven't resolved this
8  fingerprint issue.  You elicited, which was an objection to
9  the hearsay, earlier that there were no prints on the gun.  I
10 said that unless there was some type of an agreement that
11 there were other prints that couldn't be identified, which I
12 guess is what the report says, that I would have to strike
13 that.  You objected to this witness saying that -- from the
14 report there were other prints that couldn't be identified.
15 What are we doing here?
16       MR. NORINSBERG:  We're not going to agree to a
17 stipulation.  If the court wants to strike that previous
18 testimony, you can do so.  This is rank hearsay talking about
19 what someone else said.  There's no evidence about what
20 happened.  The only thing is all parties agree -- in this
21 trial there's been no evidence of fingerprints matching
22 Andrew.  They argue whatever they want.  We can argue that.
23 That's the only fact that has been established.  What happened
24 with the rest of the prints, -- judge, we subpoenaed the
25 witness.  They didn't want to produce this witness

1  voluntarily.  They would not accept the subpoena.  We wanted a
2  live witness.  That apparently is not going to happen.  We are
3  not going to stipulate on the other issue.
4        MS. FUDIM:  If I may respond to all of that.  First
5  of all, with the last point that we didn't want to produce
6  this witness, that was so plainly untrue.  This witness has
7  been retired from the police department for approximately five
8  years.  As a matter of law we cannot accept service of a
9  subpoena for an individual who is not an employee of the city
10 without obtaining their consent.  We reached out to him at his
11 last known address and it's no longer the current information
12 which means pension has the last known address.  We told
13 counsel they would have to subpoena pension just like we would
14 because it's an independent agency.  It's not true we refused
15 to produce this person.  It's completely unfair.  We now
16 conveniently elicited the facts we want, and now you can
17 strike it.  Let's unring that bell but not let you unring your
18 bell.
19       Mr. Meehan represented if his witness couldn't be
20 produced that we would agree to the stipulation that was
21 entered into at the criminal court.  If we need to order the
22 transcript to pull up that exact statement, we will do so.
23 That was what was represented before your Honor.  If they are
24 now saying that they are not going to be able to produce this
25 witness, we would absolutely move the court that the exact

1  stipulation that was entered into at the criminal trial be
2  entered into in this case.  It was a balanced stipulation
3  which is that there was five prints taken off the gun and two
4  were impaired and three did not match the witness plaintiff
5  and they did not match the three other individuals or any
6  officer of the New York City Police Department and there were
7  three prints that were suitable for comparison.  For them to
8  have gamesmanship where they elicited the fact that they want
9  it can't be stricken, that the jury has heard it.  We
10  cannot elicit what has been testified to in the criminal
11  court.  It's prejudicial under Rule 403.  It's what 403 was
12  designed to avoid.
13          MR. NORINSBERG:  The opening statement by defense
14  counsel -- he opened on these facts.  There was no agreement
15  about what the fingerprint analysis was going to show.  We
16  hadn't even addressed these stipulations.  All we told them,
17  when we asked us about the stipulation, we're subpoening
18  Detective Carter.  He took the chance.  He opened on it.  They
19  can't back up what you said to us the last time.  We have a
20  choice.  We either stipulate or you're going to strike that
21  answer.  We have made the choice.  We ask the court strike the
22  answer.  It's not part of the record and we'll live with that.
23          MS. FUDIM:  Your Honor, we opened on the
24  fingerprints because plaintiff's counsel, who opened first,
25  opened on the fact that the evidence was going to show that

1  there were prints taken off the gun and none of the prints
2  matched the plaintiff.  The jury has heard that more than
3  once.  They elicited that from Officer Collins when there was
4  a hearsay objection and they elicited that from Teta when
5  there was a hearsay objection.  They have that out in front of
6  the jury twice as well as in the opening statement.  To say
7  now after they have previously agreed that they would go with
8  the stipulation, it's so unfair when we have been precluded on
9  both cases when we have tried to make the record balanced, to
10  elicit the fact that there were three prints that were
11  unsuitable for comparison.  It is unduly prejudicial and would
12  throw any potential verdict into question in this case.
13          MR. NORINSBERG:  How is it unduly prejudicial?  Both
14  sides have mentioned the same facts.  There is no new facts we
15  are adding.  The court is striking testimony on one answer.
16  Everything else is the same as it was.  Nothing else is
17  changing.
18          THE COURT:  Not one answer.  You asked the question
19  more than once.
20          MR. NORINSBERG:  I asked him the one question which
21  was by the way not objected to when I asked the question and
22  counsel admitted it was a proper question.  The answer was
23  improper.  It went beyond the scope of my question and counsel
24  admitted it was a proper question.  There was one question
25  that was objected to belatedly and then the court said, strike

1  it, strike it.  He has identified himself improperly as a
2  firearms expert and they are trying to get it in through the
3  back door.
4          THE COURT:  Firearms expert doesn't have anything
5  to do with this issue.
6          MR. NORINSBERG:  Now he's going to talk about what
7  he was told by someone else.
8          THE COURT:  I'm sorry.  Didn't Ms. Joseph ask him
9  whether there were prints on this gun?
10          MS. FUDIM:  She did.
11          MS. JOSEPH:  The question is whether he was aware.
12          THE COURT:  Twice you asked the question.
13          MR. NORINSBERG:  Did they object to that question?
14  There's two separate issues.  Whether his prints were found on
15  the gun is one issue.  The second issue is what's the
16  explanation from the forensic standpoint of the five prints
17  lifted only two are suitable for comparison.  That's a
18  separate issue.  That's where we're going where this witness
19  is getting in hearsay which is completely improper.
20          MS. FUDIM:  As a offer of proof we're not going to
21  get into why they were unsuitable for comparison.  Ms. Joseph
22  asked the question were you aware and Mr. Francolla used the
23  exact same language, were there any prints on the gun that
24  were unsuitable for comparison.  Ms. Joseph objected.  The
25  court asked Ms. Joseph the basis and she said hearsay.  They

1  were parallel questions and it's completely unfair for them to
2  get one set out and for us to be doing the same thing.  The
3  stipulation that was entered into in the criminal court was
4  based on the document where the judge would never have allowed
5  the stipulation to come in in the criminal court.  Both
6  defense counsel and the prosecutor agreed to the stipulation
7  based on the document which existed at the time and there was
8  no prejudice to either party from entering the same
9  stipulation now.  We can provide word for word what that
10  stipulation was that was approved by the court and read into
11  the court in the record below.  What's going on here is
12  trickery and prejudicial and based on unfairness.
13          MR. NORINSBERG:  Trickery?  Defense counsel opened on
14  facts that he had no basis could be proven.  He knew we were
15  trying to subpoena Detective Carter.  He didn't think we would
16  be able to.  They asked us and we told them we were not going
17  to do it.  We want a live witness.  That's the way this issue
18  was left.  Nonetheless he chose to inject that issue in front
19  of the jury.
20          THE COURT:  Didn't you in your opening statement
21  refer to the fact that there were no fingerprints found on the
22  gun?
23          MR. NORINSBERG:  Yes.  Everyone agrees.
24          THE COURT:  Everyone agrees.  Everyone also agrees
25  that according to the report there were latent prints.  I would

1   imagine in my experience having worked for the city for five
2   years there should be a multiple paper reports showing all the
3   tests that were done and the results of the each test.  That
4   report is missing.  We cannot be compelled in this litigation
5   to be entering into a stipulation.  It has to be voluntarily
6   on both sides.  We're not entering into it.  The court told us
7   if we are not entering into it, the court is going to strike
8   that.  The court can do that.  The answer is stricken and
9   that's where the issues should end.
10      MS. FUDIM:  I have emails from Mr. Meehan when it
11  first came to our attention that the report was missing pages
12  which I would note is something I brought to their attention.
13  Rather than sabotaging them and having them at trial put in a
14  report that didn't have what I knew they needed.  I brought it
15  to their attention which was the right and fair thing to do.
16  Mr. Meehan's response to me was if we would agree to the
17  stipulation from the criminal court.  Initially we said our
18  preference was to try to get a live witness or get the report
19  and make an effort to do so.  When we were not able to do, I
20  said we would enter into a stipulation.
21      In addition, when we were standing here the other
22  day, Mr. Meehan represented on the record, the city will get
23  the transcript if we need to, in which he agreed he would
24  stipulate if this witness couldn't come in.  Now they are
25  saying they changed their mind.

1       THE COURT:  I'm not sure that is accurate.  They
2   said they would agree they would not challenge it being
3   stricken.
4       MS. FUDIM:  We can order the transcript.
5       THE COURT:  You cold do that.
6       (In open court.)
7       MS. JOSEPH:  Brief redirect examination, your Honor.
8       THE COURT:  Okay.
9   REDIRECT EXAMINATION
10  BY MS. JOSEPH:
11  Q   Detective Teta, you testified a moment ago on redirect
12  that you recognize the jacket because it belonged to you, the
13  black jacket?
14  A   No.  That jacket didn't belong to me.  I own the same
15  style of jacket.
16  Q   You own the same style jacket?
17  A   Yes.
18  Q   This case has been going on since 2006?
19  A   Correct.
20  Q   This is the very first time you stated anywhere that this
21  is -- that jacket, the black jacket, was a jacket similar to
22  what you own, correct?
23      MR. FRANCOLLA:  Objection, your Honor.
24      THE COURT:  Overruled.
25  A   It never came up.

1   Q   Yes or no, this is the very first time since this case
2   started that you testified that that black jacket was similar
3   to the one you own, yes or no?
4       MR. FRANCOLLA:  Objection to the yes or no form.
5   That's been discouraged.
6       THE COURT:  Overruled.
7   A   Yes.  It's the first time.
8       MS. JOSEPH:  Nothing further.
9       MR. FRANCOLLA:  Very brief, your Honor.
10  RECROSS-EXAMINATION
11  BY MR. FRANCOLLA:
12  Q   Did anyone ever ask you why it was you remembered
13  plaintiff wearing the black jacket that you happen to own?
14  A   No.
15  Q   Did anyone ask you in fact whether you own that jacket?
16  A   No, sir.
17  Q   Did Mr. Smalls's attorneys question you in a deposition?
18  A   Yes, sir.
19  Q   His criminal defense attorneys questioned you during his
20  criminal trial?
21  A   Yes.
22  Q   Did any of them during that questioning challenge your
23  assertion that you recalled Andrew Smalls wearing a black
24  jacket?
25  A   No, sir.

1       MR. FRANCOLLA:  Nothing further.
2       MS. JOSEPH:  Nothing further.
3       THE COURT:  All right.  You are excused.
4       THE WITNESS:  Thank you, your Honor.
5       (Witness excused.)
6       THE COURT:  Would you call your next witness.
7       MR. MEEHAN:  Yes, your Honor.  At this time the
8   plaintiff calls William Davis.  I believe he's outside.  I'll
9   just grab him.
10      THE COURT:  Okay.
11  WILLIAM LAMONT DAVIS,
12      called as a witness, having been duly
13      sworn, was examined and testified as follows:
14      THE COURT:  State your name for the record.
15      THE WITNESS:  William Davis.  W I L L I A M, L A M O
16  N T, D A V I S.
17      THE COURT:  Counsel, you can inquire.
18      MR. MEEHAN:  Thank you, your Honor.
19  DIRECT EXAMINATION
20  BY MR. MEEHAN:
21  Q   Good morning, Mr. Davis.
22  A   Good morning.
23  Q   You are here pursuant to a subpoena, correct?
24  A   Yes.
25  Q   And where do you currently live?

1    A    Ozone Park, 77-16 101 Avenue, Ozone Park, New York,
2    11416.
3    Q    Mr. Davis, I would like to direct your attention to May
4    20 of 2006.  Okay?
5    A    Yes.
6    Q    Did you observe an incident with the police that day?
7    A    Yes.
8    Q    Where did that incident take place?
9    A    In Hammels Houses.
10   Q    What time of day did that incident take place?
11   A    It was nighttime.  I don't remember the time.
12   Q    So let's go back to earlier that night; all right?
13   A    Yes.
14   Q    By the way, where did you live in May of 2006?
15   A    I lived in 8110 Rockaway Beach Boulevard.
16   Q    Is that part of the Hammels Houses?
17   A    Yes.
18   Q    Who did you live with?
19   A    My family.
20   Q    Who is your family?
21   A    My sister, my dad, my mom and brother and Andrew Smalls
22   from time to time.
23   Q    How old were you in May of 2006?
24   A    20 years old.
25   Q    Getting back to the night, which was earlier that night,

1    which was May 19 of the 2006, correct?
2    A    Yes.
3    Q    What were you doing that night?
4    A    I was hanging out with my girlfriend.
5    Q    What was your girlfriend names?
6    A    She still living there, Vanavia Crawford.
7    Q    Where did Vanavia live?
8    A    8103 Hammels Boulevard.
9    Q    Were you hanging out that night?
10   A    I was hanging out in front of her building 8103.
11   Q    I would like to show the witness what has been marked in
12   evidence as Plaintiff's Exhibit 102.  This is a map of the
13   Hammels Houses, correct, Mr. Davis?
14   A    It's missing one building.  I see it.  Okay, yes.
15   Q    Right here is 8103, correct?
16   A    Yes.
17   Q    And you said you were hanging out in the front?
18   A    Yes.
19   Q    Do you see that little marker right here?
20   A    Yes.
21   Q    Does that indicate where the front of the building is?
22   A    Yes.
23   Q    You were hanging out where that triangle is, right?
24   A    Correct.
25   Q    So you and the Vanavia are hanging out.  Tell us what

1    happened then?
2    A    She went upstairs for a while.
3         THE COURT:  I can't hear you.  Can you speak up,
4    please.
5    A    She had went upstairs.  I was still sitting in front of
6    the building and then I seen Cedric and Ronnie Smalls come
7    running from the path.
8    Q    When you say the path, your screen is a touch screen.
9    Can you show us the path you're talking about?
10        So you saw Andrew Smalls -- I'm sorry.  So you saw
11   Jerome and Cedric Smalls running from the middle of this map
12   this way?
13   A    This is a straight path, so I could see all the way down.
14   It's like a daycare center down there.
15   Q    So you see Jerome and Cedric Smalls running at this
16   point.  When you see them running did you see Andrew Smalls
17   running?
18   A    No.  He wasn't outside.  I didn't see him.
19   Q    Tell us what happens next?
20   A    They come running and then after I see them come running
21   then I see Jerome Nelson running.  I don't know if he was with
22   them.
23   Q    About how far behind Jerome and Cedric was Andrew?
24   A    I can't recall, but it was like a good amount of
25   distance.

1    Q    So let me ask it a different way.  Were they in the same
2    group?
3    A    No.
4    Q    So you see Jerome and Cedric running.  A little while
5    later you see Jerome, right?
6    A    Yes.
7    Q    Tell us what happens next?
8    A    Then after awhile once they cleared the building I seen
9    the police running down the same path I just pointed out.  I
10   stand off the gate and more than likely I believe they were
11   chasing my friend.  I ran to alert Cedric Smalls and Andrew
12   Smalls inside the building 8107, Lindsey Johnson's house.
13   Q    Now, you said Andrew Smalls was inside Lindsey Johnson's
14   house?
15   A    Normally we hang out.
16        THE COURT:  I'm sorry.  You said you knew where
17   Andrew Smalls was?
18        THE WITNESS:  We normally hang out there, Lindsey
19   Johnson's.
20        THE COURT:  Did you see him?
21        THE WITNESS:  They was in the window.
22        THE COURT:  Where did you see him?
23        THE WITNESS:  In front of the building and I could
24   see Lindsey Johnson's windows from where I'm standing.
25        THE COURT:  You could see whose window?

1      THE WITNESS:  Lindsey Johnson.
2      THE COURT:  What did you observe?
3      THE WITNESS:  Just seen movement.  I knew he was up
4  there.
5      THE COURT:  How did you know he was up there?  Did
6  you see him or not?
7      THE WITNESS:  I knew he was in the window.  I saw him
8  in the window when I was hanging out outside with my
9  girlfriend.
10     THE COURT:  You saw Mr. Johnson?
11     THE WITNESS:  Yes.
12 Q   You said you lived in 810S?
13 A   Yes.
14 Q   What apartment number?
15 A   Three A.
16 Q   After you see Jerome and Cedric run -- you see Jerome
17 run, you then see the police?
18 A   Yes.
19 Q   Tell us what you did next?
20 A   Then I ran in the building to alert Andrew that his
21 brother is being chased by the police.
22 Q   Did you go to Mr. Johnson's apartment?
23 A   Yes, I did.
24 Q   And --
25 A   I knocked the first time and no one answered.  Then I

1  hear the police come running up the stairs.  I hear the
2  walkie-talkie, so I move towards three F.
3  Q   When you say you moved toward three F, what do you mean?
4  A   I ran to a different apartment, like a blind spot
5  apartment.
6  Q   When you say blind spot, what do you mean?
7  A   So they would not be able to see me.
8  Q   So the police would not see you?
9  A   Yes.
10 Q   Did the police see you?
11 A   No.
12 Q   What did the police do?
13 A   They just opened the door and they said they went up and
14 they kept going up.
15 Q   So the police opened the door to the third floor?
16 A   Yes.
17 Q   But they did not enter the third floor?
18 A   Yes.
19 Q   They continued to go upstairs?
20 A   Yes.
21 Q   Now the police continue to go upstairs, you're on the
22 third floor, what did you do next?
23 A   I run back to Lindsey Johnson's apartment, knocking on
24 the door.
25 Q   Does anyone answer the door?

1  A   Yes.
2  Q   Tell the jury who answered the door?
3  A   I can't recall who answered, but I seen Andrew Smalls and
4  I told him that his brother is being chased by the police and
5  they ran upstairs.
6  Q   And did Mr. Smalls say anything to you back?
7  A   No.
8  Q   What did Andrew Smalls do after you told him his brothers
9  were being chased?
10 A   I ran out the door.
11 Q   Mr. Davis, when you first saw Andrew Smalls that night
12 and the door opened to Lindsey Johnson's apartment, tell the
13 jury what he was wearing.
14 A   He was wearing Miskeen, my brother's hoodie, the name of
15 the brand.  The hoodie is gray?
16 Q   You said it was your brother's hoodie?
17 A   Yes, my younger brother.
18 Q   Do you know how Andrew got your brother's hoodie?
19 A   He used to live with us.  He wear the clothes too.
20 Q   You just told us earlier that you saw Andrew run out of
21 the apartment, right?
22 A   Yes.
23 Q   Did Andrew put on a jacket before he went out of the
24 apartment?
25 A   No.  It was like May.  He was not really wearing no

1  jackets.
2  Q   After you told Andrew his brothers were being chased you
3  said he ran out of the apartment?
4  A   Yes.
5  Q   Where did he run?
6  A   He ran to the other staircase and I ran down one.
7  Q   You saw him go --
8  A   The different staircase.
9  Q   There's two staircases?
10 A   Yes, towards the back one.
11 Q   Did you see where Andrew went when you got to the
12 stairwell?
13 A   No.  I assumed he went upstairs.  I told him his brother
14 is running.
15     THE COURT:  I'm sorry.  This is not clear.
16     He ran out of the apartment.  What did you observe
17 him do when he ran out of the apartment?
18     THE WITNESS:  He ran to one staircase and I went
19 down one.
20     THE COURT:  He ran to a staircase?
21     THE WITNESS:  Yes, towards the back door stairs.
22     THE COURT:  Which staircase would that be, A or B?
23     THE WITNESS:  B.
24 Q   You went to staircase A?
25 A   Yes.

1    Q    So now Andrew --
2         THE COURT:  Could you see whether he went up or down
3    at that staircase?
4         THE WITNESS:  No.
5         THE COURT:  You don't know which direction he ran
6    in?
7         THE WITNESS:  No.  I assumed that he went up.
8         THE COURT:  Don't assume anything.
9         THE WITNESS:  Okay.
10   Q    Now Andrew has gone to the stairwell.  He's out of your
11   sight.  What do you do next?
12   A    I went back downstairs and out of the building.
13   Q    Where did you go?
14   A    There's a circle that's in between the two buildings,
15   like a circle like right here.  And I stand on the circle and
16   was waiting to see what was going on with my friends.
17   Q    So now you are in that circle, you are outside, what do
18   you see next?
19   A    Next I see Cedric and Jerome come out of the building and
20   Jerome Nelson come out of the building in handcuffs.
21   Q    Did you observe anything else?
22   A    I just heard loud shouting in the building after.
23   Q    When you say you heard loud shouting in the building,
24   what do you mean?
25   A    Like arguing.

1    Q    Do you know who was arguing?
2    A    I believe it was Andrew and the police officers because
3    he came out with his face bloody.
4         MS. FUDIM:  Objection.
5         THE COURT:  I'll sustain the objection.
6         MS. FUDIM:  Move to strike.
7         THE COURT:  I'll strike the response.
8    Q    Did you hear an argument going on in the lobby?
9    A    Yes.
10   Q    After you heard that argument, did you see Andrew Smalls
11   come out in handcuffs?
12   A    Yes.
13   Q    After you heard the argument in the lobby did you see
14   Andrew Smalls bloody?
15   A    Yes.
16   Q    Now, Mr. Davis, at the time you heard the argument where
17   was Ronnie Smalls?
18   A    He was already sitting in the police car.
19   Q    Where was Cedric Smalls when you heard the argument in
20   the lobby?
21   A    He was already sitting in the police car.
22   Q    And then after that you saw Andrew come out with the
23   police?
24   A    Yes.
25   Q    When you saw Andrew come out of the lobby what was he

1    wearing?
2    A    He had on my brother's Miskeen gray sweatshirt.
3    Q    When he came out of the lobby with the police where were
4    you?
5    A    I was still standing on the circle.
6    Q    And at any point in time did they put Andrew in a police
7    car?
8    A    Yes.
9    Q    What happened after that?
10   A    They drove off.
11   Q    Were you arrested that night?
12   A    No.
13   Q    Thank you, Mr. Davis.
14        MR. MEEHAN:  I have nothing further.
15   CROSS-EXAMINATION
16   BY MS. FUDIM:
17   Q    Good morning, Mr. Davis.
18   A    Good morning.
19   Q    You're good friends with plaintiff Andrew Smalls,
20   correct?
21   A    Yes.
22   Q    In fact, you consider him to be like a brother to you, is
23   that accurate?
24   A    Yes.
25   Q    You've known him for over 20 years?

1    A    Correct.
2    Q    So you are here to testify today to help him get some
3    money, isn't that right?
4         MR. MEEHAN: Objection, your Honor.
5    A    No.
6         THE COURT:  I'll allow the answer to stand.
7    Q    Now, you gave testimony at a deposition in connection
8    with this lawsuit, correct?
9    A    Yes.
10   Q    That was on May 10 of 2017?
11   A    I believe it was two years ago I think.
12   Q    I'm going to put up on the monitor for you what I
13   represent is the first page of the transcript of your
14   deposition.  Take a look at that.  Let me know if you have any
15   reason to doubt that the date that's indicated is the date on
16   which you gave deposition testimony?
17   A    I believe it's probably correct.  I know it was in May.
18   Q    Thank you, sir.
19        THE COURT:  May of what year?
20        MS. FUDIM:  2017.
21        THE COURT:  I was asking the witness.
22        MS. FUDIM:  I apologize.  I was looking down.  I'm
23   sorry.
24        THE COURT:  Was that right, May of 2017?
25        THE WITNESS:  I believe so.  May, I thought it was

1    two years ago.  I know it was in May.  I'm not sure if it was

2    two years ago or last year.

3    Q    Do you have any reason, sir, to doubt that the court

4    reporter at the deposition accurately indicated the year that

5    the deposition took place?

6    A    I'm not sure if it was last year or the year before.

7    Q    Prior to giving your deposition testimony you met with

8    plaintiff's attorneys at the time, is that accurate?

9    A    Excuse me.  Can you repeat that?

10   Q    Prior to giving that testimony at the deposition you met

11   with attorneys who were representing Mr. Smalls at the time,

12   is that correct?

13   A    Yes.

14   Q    And you met with them twice actually, correct?

15   A    Yes.

16   Q    And one of them was a few days before the deposition?

17   A    Yes.

18   Q    And the first time that you met with those attorneys

19   Jerome Nelson was also present, is that correct?

20   A    Yes.

21   Q    And when you appeared for your deposition and you were

22   asked questions at your deposition you were actually

23   represented at that time by those attorneys who were also

24   representing Mr. Smalls, is that correct?

25   A    I don't see the attorney that was there.

1    Q    It was a different attorney but it was an attorney who

2    was representing Mr. Smalls, correct?

3    A    Correct.

4    Q    He was also representing you, is that correct?

5    A    Yes.

6    Q    Now, on May 20 of 2006 you lived at the Hammels Houses?

7    A    Yes.

8    Q    And you live at building 8810?

9    A    Yes.

10   Q    That night you were sitting outside of building 8103?

11   A    Yes.

12   Q    You claim while you were sitting out there you see Ronnie

13   Smalls, Cedric Smalls and Jerome Nelson run by you?

14   A    Yes.

15   Q    And you saw the police chasing them?

16   A    Yes.

17   Q    Now, you didn't know why they were being chased, right?

18   A    No, not to my knowledge.

19   Q    You didn't know if they had committed a crime?

20   A    Yes.

21   Q    And you claim that Andrew Smalls was not with them?

22   A    Yes.

23   Q    So according to your story when you saw the police

24   chasing Jerome, Cedric and Jerome, even throw you had no idea

25   why they were being chased, you decided you needed to go warn

1    Andrew, is that accurate?

2    A    Yes.

3    Q    So you ran into one of the buildings?

4    A    I ran into 8105.

5    Q    On direct examination I believe you have mistakenly said

6    8103.  So the record is clear, you ran in 8105?

7    A    Yes.

8         MR. MEEHAN:  Objection, mischaracterization.

9         THE COURT:  What building did you run into?

10        THE WITNESS:  I ran in 8105.

11        THE COURT:  Is that the same building you saw the

12   Smalls brothers run into?

13        THE WITNESS:  Yes.

14        THE COURT:  Is that the same building where

15   Mr. Johnson's apartment is?

16        THE WITNESS:  Yes.

17   Q    Where was Mr. Johnson's apartment in that building?

18   A    Apartment three E.

19   Q    That would be on the third floor?

20   A    Yes.

21   Q    You entered the building after Jerome, Cedric and Jerome,

22   but before the police?

23   A    Yes.

24   Q    Now, you actually hadn't seen plaintiff that day, had

25   you?

1    A    Who?

2    Q    Mr. Smalls, Andrew Smalls, prior to that moment, you

3    hadn't seen him that day, had you?

4    A    Yes.  I seen him throughout the day.

5    Q    It's your testimony in this courtroom that you had seen

6    Mr. Smalls earlier that day.

7    A    Yes.  I seen him.  He lived at the house.

8    Q    Okay.  It's your testimony that you had seen him earlier

9    that day because he lived at your house; is that your

10   testimony?

11   A    I seen him throughout the day, yes.

12   Q    At your deposition you were under oath, sir, is that

13   correct?

14   A    Yes.

15   Q    And you would agree with me that your recollection of

16   events was probably better at the time that your deposition as

17   taken rather than now?

18   A    Can you rephrase it?

19   Q    Your recollection, your memory of the events that took

20   place would have been better several years ago than they would

21   be right now; is that fair to say?

22   A    Not really.  I understand still.  I know what's going on.

23   I know what happened.

24   Q    You were asked this question and gave this answer at your

25   deposition, referring the court and opposing counsel to page

1  25, lines six to eight and I previously gave the court about a
2  one inch binder that contains nonparty deposition transcripts.
3  The court should have it.
4       "QUESTION:  Had you seen Andrew Smalls at any point
5  earlier that day?
6       "ANSWER:  I can't remember.
7       "QUESTION:  Andrew Smalls in 2006 was living where
8  if you know?
9       "ANSWER:  Off and on from his grandma and my mom."
10 A   Yes.
11 Q   That was your testimony?
12 A   Yes.
13 Q   Now, plaintiff's grandmother, she didn't live in Hammels
14 Houses, correct?
15 A   Across the street.
16 Q   That was at 760 Shore Front Parkway?
17 A   Yes.
18 Q   You claim you somehow knew to go to Lindsey Johnson's
19 apartment to find Mr. Smalls, is that correct?
20 A   Yes.
21 Q   You told a us a few moments ago the reason you knew to go
22 there because you looked up at 1:00 o'clock in the morning and
23 saw Mr. Smalls in the window; is that what you said?
24 A   I didn't tell you I looked up at 1:00 o'clock in the
25 morning.

1  Q   You looked up and saw him in the window?
2  A   He would be there.  I seen him in the window.  The
3  windows be wide open and I could see in the windows from where
4  I was standing.
5  Q   I want to make sure we're all on the same page.
6  A   Okay.
7  Q   When was it that you saw Mr. Smalls, the plaintiff,
8  through the window in Mr. Johnson's apartment?
9  A   I can't recall the time, but I seen him up there.
10 Q   Was it that day?  Was it on May 19, May 20?
11 A   Yes, that day.
12 Q   Is that the reason that you are claiming now you knew to
13 go to Mr. Johnson's apartment because at some point you had
14 seen him in the window?
15 A   No.  He normally hangs there.  So I know he would be
16 there.
17 Q   The reason you knew to go there because he usually hangs
18 out there, not because you saw him through the window?
19      MR. MEEHAN:  Objection, your Honor.
20      THE COURT:  Overruled.
21 A   I seen him and I know he always hang there.
22 Q   I'm trying to figure out if seeing him through the window
23 is part of your reason.
24      MR. MEEHAN:  Objection.
25      THE COURT:  Overruled.

1  Q   Part of your reason for knowing to go to Mr. Johnson's
2  apartment?
3  A   Can you repeat that?
4  Q   I'm trying to figure out whether part of your reason for
5  going to Mr. Johnson's apartment to look for Mr. Smalls
6  because you had seen him through the window?
7  A   No.
8  Q   That has nothing to do with this?
9  A   Not really.
10 Q   In fact, you never mentioned anything about seeing him
11 through the window when you were asked questions at your
12 deposition about whether you had seen him earlier that day; is
13 that correct?
14 A   Can you repeat that?
15 Q   You never stated anything at your deposition about seeing
16 Mr. Smalls through Mr. Johnson's window when you were asked
17 questions about how you knew to go to Mr. Johnson's apartment
18 or if you had seen Mr. Smalls earlier that day?
19 A   I can't recall.  I don't remember being asked that
20 question.
21 Q   Mr. Davis, you were asked the question which I just read
22 a moment ago, had you seen Andrew Smalls at any point earlier
23 that day and your answer was I can't remember.  That is
24 correct?
25 A   Yes.

1  Q   Back in 2017 you couldn't remember if you had seen
2  Mr. Smalls earlier that day but now in 2019 you recall that
3  you saw him through a window, is that accurate?
4  A   I had seen him through the window.
5  Q   When you were hanging out outside that night, it was
6  nighttime, is that correct?
7  A   Yes.
8  Q   You don't remember what time it was?
9  A   No.
10 Q   It was dark though, right?
11 A   Yes.
12 Q   And Mr. Johnson was on the third floor?
13 A   Yes.
14 Q   And you were standing on the ground, fair to say?
15 A   Yes.
16 Q   And looking up it's your claim to this jury that you saw
17 Mr. Smalls?
18 A   It's not a far look up.  The lights is on.
19 Q   That's a yes?
20 A   Can you repeat the question, so I can answer it
21 correctly?
22 Q   The answer to my question that you saw through the window
23 in the dark is a yes?
24 A   I didn't say I saw him through the window in the dark.  I
25 knew he was up there and I saw him in the window.

```
 1  Q   You didn't call him on your phone, right?
 2  A   No.
 3  Q   Did you have a cellphone back in 2006?
 4  A   More than likely, yes.
 5  Q   Did Andrew Smalls have a cellphone back in 2006?
 6  A   I can't remember.  I don't know.  He really wasn't into
 7  phones.
 8  Q   Did Lindsey Johnson have a cellphone back in 2006?
 9  A   I can't recall.  I can't remember if he had a phone.
10  Q   Did he have a ground line phone?
11  A   Probably so.  I don't know.  I never was calling him.
12  Q   Would you agree with me he probably had some sort of
13  phone, whether it was a ground line or cellphone?
14          MR. MEEHAN:  Objection.
15          THE COURT:  I will sustain the objection.
16  Q   You didn't try to call Mr. Johnson, right?
17  A   I didn't have his phone number, no.
18  Q   Now, you ran up to Mr. Johnson's apartment, right?
19  A   Yes.
20  Q   You took the stairs?
21  A   Yes.
22  Q   And you ran up the same stairs that Jerome, Cedric and
23  Jerome ran up?
24  A   I don't know what stairs they ran up.  I know they ran up
25  the stairs.
```

```
 1  Q   The reason you know you ran up the same staircase as
 2  them, you actually heard them running in front of you, is that
 3  correct?
 4  A   They was further up.
 5  Q   I'm going to read from your deposition, sir.  Let me
 6  first clarify:  Is it your testimony in this court that you
 7  are not sure whether or not you ran up the same stairs as
 8  Cedric, Cedric and Jerome?
 9  A   Excuse me.
10  Q   Is it your testimony that you're not sure if you were
11  running up the same staircase as Cedric, Cedric and Jerome?
12  A   Yes.  I'm not sure.  I know people was running up.  I'm
13  not sure who was running up.
14  Q   My question is about the stairwell.  Were they in the
15  same stairwell as you?
16  A   I don't know who was in which stairwell.  There's two
17  stairwells.
18  Q   I am going to read from page 26, lines twelve to 23:
19      "QUESTION:  When you were going up the stairs to
20  apartment three E, did you see Cedric or Ronnie Smalls?
21      "ANSWER:  They were ahead of me.  I heard them
22  running up the stairs.
23      "QUESTION:  You were able to hear them?
24      "ANSWER:  Yes.
25      "QUESTION:  What about Jerome Nelson, were you able
```

```
 1  to see or hear him?
 2      "ANSWER:  I assumed he was doing the same.
 3      "QUESTION:  You heard footsteps?
 4          MR. MEEHAN:  Your Honor, not inconsistent.
 5          MS. FUDIM:  I have not finished reading.
 6          THE COURT:  Where are you?
 7          MS. FUDIM:  Page 26, lines twelve through 23.
 8          THE COURT:  The deposition --
 9          MS. FUDIM:  Of Mr. Davis' deposition transcript,
10  your Honor.  The second one in the binder, your Honor.
11          THE COURT:  I don't have that.
12      (Pause.)
13          MS. FUDIM:  We have another one we can give you, if
14  you can't find that binder.
15      (Pause.)
16          THE COURT:   I'm sorry.  Again, what page are you
17  referring to?
18          MS. FUDIM:  26, your Honor, lines 12 to 23.
19      (Pause.)
20          THE COURT:  I'm not sure what's inconsistent.
21          MS. FUDIM:  Your Honor, the witness testified that
22  he didn't know whether they were ahead of him running up the
23  same stairs.  I believe this testimony contradicts that.
24  Specifically, line 14, your Honor.
25          THE COURT:  All right.  I'll allow you to read it.
```

```
 1  Q   "QUESTION:  When you were going up the stairs to
 2  apartment three E did you see Cedric or Ronnie Smalls?
 3      "ANSWER:  They were ahead of me.  I heard them
 4  running up the stairs."  You answered that question,
 5  Mr. Davis?
 6  A   Yes.  I said I heard people running up the stairs.  I did
 7  not see them.
 8  Q   Now, you get to Mr. Johnson's door and you knock, right,
 9  bang on the door?
10  A   Yes.
11  Q   And just so we're clear, you're not Jerome Nelson,
12  correct?
13  A   No.
14  Q   And someone opens the door at Mr. Johnson's apartment?
15  A   Not on the first knock, no.
16  Q   On the second knock or eventually someone owns the door?
17  A   Yes.
18  Q   You can't recall who that was, is that correct?
19  A   Yes.
20  Q   And you also can't recall who was in the apartment,
21  correct?
22  A   There was a few people.  I seen Andrew Smalls and Lindsey
23  Johnson.
24  Q   There were a few other people as well?
25  A   Yes.
```

1  Q   You knew Lindsey Johnson was there because you saw him?

2  A   Yes.

3  Q   You saw him.  Presumably, he saw you, correct?

4  A   Yes.

5  Q   And you don't recall where in the apartment Mr. Smalls

6  was, correct?

7  A   No.  Open the door and there's like people right in.

8  Q   He was right in front of you somewhere?

9  A   Yes.

10 Q   And you claim you told Mr. Smalls that the police were

11 chasing his brother up the stairs, right?

12 A   Correct.

13 Q   You claim when you told plaintiff this he ran out of the

14 apartment, right?

15 A   Yes.

16 Q   You told us he didn't take a jacket because it was May

17 and so it was not cold enough for a jacket; do you recall

18 that?

19 A   I said he was not wearing jacket in May.

20 Q   Presumably the reason you weren't wearing jackets in May

21 because you weren't cold?

22 A   It was okay.  I believe so.

23 Q   Is it fair to say with the Hammels Houses, they are like

24 a block or two from the ocean, right?

25 A   Yes.

1  Q   Pretty windy over there?

2  A   Yes.  We used to it.  We lived there all our life.

3      MS. FUDIM:  I would like to put into evidence

4  Plaintiff's Exhibit 36, which is local meteorological data for

5  that area for the month of May in 2006?

6      MR. MEEHAN:  No objection.

7      THE COURT:  All right.  36 will be received.

8  Plaintiff's Exhibit 36.

9      (So marked.)

10 Q   This was nighttime, right?  Mr. Davis, this happened late

11 at night?

12 A   Yes.

13 Q   And it was the nighttime --

14     MR. MEEHAN:  Your Honor, I would ask that a clean

15 copy be shown to the jury.  There's markings on this.

16     MS. FUDIM:  If they want to give me their unmarked

17 copy, I represent that I circled the numbers so it would be

18 visual in a line.

19     THE COURT:  The circles that appears on your

20 document were notations that you made?

21     MS. FUDIM:  Yes, five seconds ago so I could point

22 the witness.

23     THE COURT:  Okay.

24 Q   That night would have been between the night of the 19

25 and the 20, sir?

1  A   Yes.

2      MR. MEEHAN:  I would ask that she circle them as

3  well.

4      MS. FUDIM:  Your Honor, I'm asking the questions.

5  If counsel wants to come up and make a record.

6      THE COURT:  Just go ahead.  These are numbers that

7  you circled and you're directing his attention to?

8      MS. FUDIM:  Yes, your Honor.

9      THE COURT:  There were no circles on the original

10 document?

11     MS. FUDIM:  That is correct.

12     THE COURT:  These are numbers you want to question

13 the witness about?

14     MS. FUDIM:  Yes.  Because there's long lines and I

15 wanted to direct his attention.

16 Q   The night we were talking about would have been the night

17 between the 19 and the 20, sir?

18 A   Yes.

19 Q   And the temperatures on the 19 and the 20, the minimum,

20 which you would agree typically you hit minimum temperatures

21 in the evening and maximum temperatures during the day, sir?

22     MR. MEEHAN:  Objection.

23 A   Excuse me.

24 Q   Would it be fair to say that generally you hit maximum

25 temperatures during the day and minimum temperatures during

1  the evening?

2  A   I can't recall.  I'm not a weather man.

3  Q   That's something that is foreign to you?

4      MR. MEEHAN:  Objection.

5      THE COURT:  Sustained.

6  Q   Would you agree with me the minimum temperatures at night

7  and this is at JFK International Airport, do you see that,

8  sir?

9  A   Yes.

10 Q   And we just said it's usually a little bit colder by the

11 Hammels Houses because it's by the ocean?

12     MR. MEEHAN:  Objection.

13 A   No.  JFK is around the ocean.

14 Q   You think they are about the same temperatures?

15 A   No.  I don't believe so.

16 Q   Can we agree that the minimum temperature for that night

17 were 51 to 52 degrees; do you see that?

18 A   I seen what you are saying.  I can't tell you that.

19 Q   Now, you told the court a minute ago -- the judge asked

20 you if you saw whether Mr. Smalls ran up or down the stairs

21 and you told the judge you didn't see that; do you recall

22 that?

23 A   I said -- no, I didn't see that he ran.  I don't know

24 which ran.  I don't know if he ran up or down.  I don't know.

25 Q   I'm going to read testimony from your deposition and I'm

1  going to draw the court's attention and opposing counsel to
2  page 29, lines 13 to 15:
3          "QUESTION:  What exactly did you say after the door
4  opened?
5          "ANSWER:  I said the police is chasing your
6  brothers.  I ran upstairs and I ran down and left the
7  building."
8  A   No.  I told him that the police was chasing his brothers
9  up the stairs.  I assumed he would run up the stairs to see
10 what's going on.
11 Q   Sir, that's not what you said at your deposition, was it?
12 A   I said I believe he ran up the stairs.
13 Q   Sir, you didn't say I believe he ran up the stairs.  I
14 just read your testimony word for word.  You said he ran
15 upstairs, is that correct?
16 A   Yes. =
17         MR. MEEHAN:  Your Honor, for sake of completion, we
18 would ask that counsel read page 30, lines 15 through 22.
19         MS. FUDIM:  I have no problem with that.
20         THE COURT:  Go ahead.
21 Q   "QUESTION:  Where did you go after you made the
22 statement I ran back downstairs and out of the building?  Did
23 Andrew Smalls come with you at that time?
24         I can't remember.
25         When you turned around and went back down the stairs

1  did you see what Andrew Smalls was doing at that time?
2          "ANSWER:  No."
3          That was your testimony, sir?
4  A   Yes.
5  Q   While you were running down the stairs you didn't see
6  Andrew Smalls, did you?
7  A   No.
8  Q   You claim you have no idea how much time passed between
9  when you went into 8105 and when you exited the building,
10 correct?
11 A   Yes.  It happened quick, so I can't remember.
12 Q   At your deposition you agreed that it could have been as
13 much as half an hour?
14 A   No.  I never agreed on that.
15 Q   You never agreed to that?
16 A   No.
17 Q   Referring the court and opposing counsel to page 43,
18 lines 14 to 25:
19         "QUESTION:  I just want to know how long it was
20 from when you first entered 8105 to when you left 8105 again.
21         "ANSWER:  It happened fast.  I can't give you a
22 time.
23         "QUESTION:  When you stay that, do you mean a
24 couple of minutes?
25         "ANSWER:  I can't remember.

1          "QUESTION:  It could have been as much as half an
2  hour?  You don't know?
3          "ANSWER:  I can't remember."
4          MR. MEEHAN:  Your Honor, there's nothing
5  inconsistent about that.
6          THE COURT:  I'll sustain the objection.
7          MS. FUDIM:  Your Honor, I ask if he ever agreed to
8  that, that it could have been as much as a half hour.
9          THE COURT:  No.  I don't think that establishes an
10 agreement.
11 Q   Now, once you went outside, sir, you went back over to
12 where you had been before in 8103?
13 A   The circle, yes, in between.
14 Q   While you were there you claim you saw Andrew Smalls,
15 Ronnie Smalls, Cedric Smalls and Jerome all come out in
16 handcuffs, correct?
17 A   No.  I seen Ronnie Smalls, Cedric Smalls, Jerome Nelson
18 come out in handcuffs.  Then after awhile Andrew came out.
19 Q   You are claiming that today you remember the order in
20 which they came out?
21 A   I don't remember the order.  I just know who came out.
22 Q   It's your testimony that Ronnie Smalls, Cedric and Jerome
23 came out before plaintiff?
24 A   It's not in the order.  I just gave you the names.
25 Q   Would you agree with me you have no idea the order in

1  which they came out?
2  A   I don't know the order, no.
3  Q   Now, we've established that Mr. Smalls, Andrew Smalls is
4  like a brother to you, right?
5  A   Yes.
6  Q   You never asked him about why he was arrested, is that
7  correct?
8  A   At that time I was going through my own phase.  I was
9  expecting a son that year.  I was busy, getting ready for
10 taking care and saving money up for my family.
11 Q   So that's a no?
12 A   I did not ask him.  I didn't really ask him.  My brother
13 was doing all that.
14 Q   In fact, even in 2017 when your deposition was taken, as
15 of that time, you claim you still had no idea why plaintiff
16 had been arrested, is that correct?
17 A   No.  Because he was not charged with nothing at the time.
18 Q   It's your belief in 2017 he had never been charged with
19 anything?
20         MR. MEEHAN:  Objection, your Honor.
21         THE COURT:  Overruled.
22 Q   You can answer, sir.
23 A   After the fact that I found out that he was charged.
24 Q   At your deposition you were asked this question and gave
25 this answer, sir, and this is in 2017, referring the court and

1  opposing counsel to page 40, lines 1 to 4:

2       "QUESTION:  You have no idea to this day if he was

3  charged with possession of a firearm?

4       "ANSWER:  I don't know.  I was busy, I was having

5  my son that year."  Is that correct?

6  A    Yes.

7  Q    Now, you also never asked Jerome why he was running,

8  right?

9  A    I didn't really know.  I spoke to them briefly on the

10 phone when they called.  I was working.

11 Q    That's a no, you never asked Jerome why he was running,

12 right?

13 A    I can't remember at the time, no.

14 Q    If you can't remember, let's see if this refreshes your

15 recollection, referring the court to page 43, lines six to

16 eight:

17      "QUESTION:  Did you ever speak to Ronnie Smalls

18 about why he was running?

19      "ANSWER:  No."  That was your testimony?

20 A    Yes, I believe so, yes.

21 Q    You also never asked Cedric why he was running, correct?

22 A    No.

23 Q    They were also like brothers to you, Cedric and Jerome,

24 right?

25 A    Yes.

1  Q    And you also never asked Jerome Nelson why he was

2  arrested, correct?

3  A    No.

4  Q    Now, you claim you saw Andrew in Lindsey Johnson's

5  apartment while Cedric, Ronnie Smalls and Jerome were running

6  from the police, right?

7  A    Yes.

8       MR. MEEHAN:  Objection, mischaracterization.

9       THE COURT:  I am sorry.  I couldn't hear the

10 question.  Can you read back the question?

11      MS. FUDIM:  You claim you saw Andrew in Lindsey

12 Johnson's apartment while Cedric, Ronnie Smalls and Jerome

13 were running from the police?

14      MR. MEEHAN:  Objection.

15      THE COURT:  I don't think that question is clear.

16 Q    You claim you saw Andrew in Lindsey Johnson's apartment

17 moments after you saw Cedric, Ronnie Smalls and Jerome being

18 chased by the police, is that correct?

19      MR. MEEHAN:  Objection, mischaracterization.  He

20 testified at some point earlier that night he saw the lights

21 on when they were out there.

22      THE COURT:  No.  Overruled.

23 Q    Is that correct, sir, you claim that you saw Mr. Smalls

24 in Lindsey Johnson's apartment moments after you saw Cedric,

25 Ronnie Smalls and Jerome being chased by police?

1  A    No, I didn't tell you that.

2  Q    You didn't see Andrew in Lindsey Johnson's apartment?

3  A    Yes, I seen him.

4       MR. MEEHAN:  Objection, your Honor.

5       THE COURT:  I'll sustain the objection to the form

6  of that question.

7       What is the time?  You indicate -- I'm trying to get

8  the time frame straight.  You said that you saw Cedric and

9  Ronnie Smalls running together, correct?

10      THE WITNESS:  Yes.

11      THE COURT:  When did you then go to see Andrew?  At

12 what point in time did you go to Johnson's apartment to see

13 Andrew in connection with when you saw them running in the

14 building?

15      THE WITNESS:  After Jerome ran in the building

16 that's when I went.

17      THE COURT:  How long after?

18      THE WITNESS:  I can't recall.  It was like after I

19 seen him and I seen the police, that's when I ran.

20      THE COURT:  Had the police come into the building

21 before you came into the building?

22      THE WITNESS:  No.

23      THE COURT:  If I get the time frame straight, you

24 see Ronnie Smalls and Cedric running into the building?

25      THE WITNESS:  Yes.

1       THE COURT:  You've seen the police chasing them?

2       THE WITNESS:  Yes.

3       THE COURT:  Before the police go into the building

4  you go into the building to Johnson's apartment?

5       THE WITNESS:  Yes.

6       THE COURT:  Okay.

7  BY MS. FUDIM:

8  Q    So I just want to clarify some of the questions the just

9  judge just asked you.  It's your testimony that you actually

10 beat the police into the building?

11 A    Correct.

12 Q    And you never testified at plaintiff's criminal trial,

13 correct?

14      MR. MEEHAN:  Objection, your Honor.

15      THE COURT:  Overruled.

16 A    No.

17 Q    And you were never planning to testify at plaintiff's

18 criminal trial, is that correct?

19      MR. MEEHAN:  Objection.  Can we approach on this

20 issue?

21      THE COURT:  Ladies and gentlemen, we'll take a

22 morning recess.

23      (Jury excused.)

24      THE COURT:  All right.  You can step out for five

25 minutes.

1    THE WITNESS:  Can I drink some water?

2    THE COURT:  Sure.  You can take the water out with

3  you.

4    (Witness excused.)

5    THE COURT:  I'm sorry.  What's the basis of the

6  objection?

7    MR. MEEHAN:  Yes, your Honor.  So she's getting into

8  who the plaintiff's criminal attorney at the time wanted or

9  intended to call.  It's completely irrelevant to this case.

10  He would have no idea whether or not he's being subpoenaed for

11  the criminal trial.  If he did or didn't has nothing to do

12  with him.  She's trying to impeach Mr. Smalls through him

13  essentially by saying he didn't want to call him at his

14  criminal trial when it has nothing to do with Andrew Smalls.

15    MS. FUDIM:  Your Honor, if I may, the witness

16  testified at his deposition that he was never contacted to

17  testify at the trial.  Presumably he would know if he was

18  subpoenaed or not.  He specifically testified that he never

19  spoke to Mr. Smalls's criminal defense attorney and that the

20  plaintiff never asked him to testify and at the time he was

21  speaking to the plaintiff regularly while he was incarcerated

22  and at no point in time was he ever asked to testify by anyone

23  at the criminal trial.  That's highly relevant since our

24  version of events is this testimony is all fabricated for the

25  purposes of the civil suit.  Clearly if this had been true one

1  would expect that alibis would be testified to at the criminal

2  trial.

3    MR. MEEHAN:  Because it was testified to at the

4  deposition doesn't mean it's relevant for the trial.  It's the

5  whole purpose of the deposition.  What basis is there for

6  Ms. Fudim to be arguing because you weren't subpoenaed at the

7  criminal trial, therefore, we know you're lying.  That doesn't

8  make any sense.  There's a whole attorney issue here that

9  she's trying to get over.  It has nothing to do with

10  Mr. Smalls.  Mr. Smalls wouldn't contact Mr. Davis and say

11  please, testify at my criminal trial.  That would be the

12  criminal defense attorney.

13    MS. FUDIM:  One could safely assume that, that a

14  criminal defense attorney who didn't call any alibi witnesses

15  in a case where there's clearly multiple alibis is either

16  incompetent and essentially there could be a motion for

17  ineffective assistance of counsel or that attorney was never

18  told there were alibi witnesses, which is a fair insinuation

19  here.  It's clearly relevant.  I spoke about the fact what he

20  testified to at the deposition.  Counsel made an argument that

21  this witness wouldn't know if he was subpoenaed and I

22  responded that he would.  Because he testified at his

23  deposition that he was never contacted by the criminal defense

24  attorney.  I have about three more questions and I'm done.  I

25  believe the questions are fair game.  They can redirect and

1  clarify whatever they want.  They can't act surprised that

2  this was beyond the pale, that they could not imagine that we

3  would want to elicit that witnesses for the first time are

4  claiming an alibi at a criminal trial and never testified at

5  the criminal trial and were never contacted to testify.

6    MR. FRANCOLLA:  This came up with Lindsey Johnson

7  yesterday.  There were questions about how he wanted to

8  testify.  This issue is out there.

9    MR. NORINSBERG:  Judge, if I can clarify?  First of

10  all, we know from reading the trial transcript in the criminal

11  trial Mr. Johnson was physically present in court.  It's a

12  strategic decision for whatever reason.  We believe the reason

13  is there's a motion in limine made with regard to certain

14  issues.  The judge ruled against defense counsel on that

15  motion and he made a strategic decision that he didn't want to

16  call these witnesses.  We know, we can actually show you in

17  the record, Lindsey Johnson was physically present.  This

18  notion we brought people in to fabricate a case now for the

19  civil trial is completely wrong.  They have the same

20  transcript which have.

21    THE COURT:  What does that have to do with this

22  witness?

23    MR. NORINSBERG:  It's the same concept.  It all goes

24  to strategy by defense counsel, whatever reasons there were

25  for calling somebody or not shouldn't be used do impugn this

1  witness' credibility or Andrew Smalls's.  He relies on counsel

2  to make those decisions.  This witness is not even connected

3  to that issue.  To use it to try to attack him and also to

4  attack Andrew Smalls indirectly is an improper argument.

5    MS. FUDIM:  With respect to Lindsey Johnson --

6    THE COURT:  There's nothing about Lindsey Johnson.

7    MS. FUDIM:  That was my point.  It has nothing to do

8  with this witness.

9    THE COURT:  That was a entirely separate issue.

10    MS. FUDIM:  That was the point I was going to make.

11  This witness was never contacted.  He was not sitting in court

12  waiting anywhere.  He was never contacted.  That was his

13  testimony.  It's relevant.  The jury can make of it what they

14  will and counsel can argue whatever they want.

15    MR. MEEHAN:  It's essentially attacking the work

16  product of the criminal defense attorney.

17    MS. FUDIM:  Your Honor, they have the criminal

18  defense attorneys on their witness list.

19    THE COURT:  There's no basis to conclude here that a

20  decision was made by the criminal defense attorney for some

21  sort of the strategic reason not to call him.  There's no

22  basis to believe that.  He comes and he tells his story and

23  he'll say that no one -- that Mr. Smalls didn't contact him

24  and no one else contacted him about testifying in the criminal

25  case.

1    MR. NORINSBERG:  To draw with an inference, what
2  conclusion?  That's the problem with it.  What sort of
3  argument does that make relevant to whether or not these
4  officers fabricated evidence in this case?

5    THE COURT:  The question is whether this witness'
6  story is now fabricated.  That's what the issue is, this
7  witness coming up with this story now for the purposes of this
8  trial.

9    MR. NORINSBERG:  I understand.  Earlier defense
10  counsel represented this is going to be an overall theme of
11  defense in this case, everybody came in and fabricated their
12  claims.  When as an officer of the court that I can show it to
13  you it's not true.  I had he eluded to Lindsey Johnson before
14  because it's part of this global defense that they are making
15  that this is a brand new concocted theory.

16    THE COURT:  How can you represent that as an
17  officer of the court?

18    MR. NORINSBERG:  It's in the transcript.  I can show
19  it to you.

20    THE COURT:  What was in the transcript?

21    MR. NORINSBERG:  Lindsey Johnson --

22    THE COURT:  I'm not talking about Lindsey Johnson.

23    MR. NORINSBERG:  It's relevant because they can't in
24  good faith make that argument that it's a brand new fabricated
25  claim when they know for a fact at least one of the witnesses

1  we heard from was present in the courthouse.  His presence was
2  noted.

3    MS. FUDIM:  That has to do only with Lindsey Johnson
4  and they could have asked the question of Mr. Johnson were you
5  present in the courthouse and they didn't ask that question.
6  His testimony is over.  We are talking about a different
7  witness who is not in the courthouse and never contacted.  I
8  don't understand why one witness has anything to do with
9  another witness whose testimony is over and apparently they
10  didn't elicit the testimony they wanted.

11    MR. MEEHAN:  You're trying to impeach him about the
12  fact that his attorney never contacted him.  It's a circular
13  argument that you are trying to get through showing he's a
14  liar but it has nothing to do with him.  If he's not
15  contacted, what affirmative fabrication is he making?  How can
16  you then say that he is fabricating something because he was
17  never contacted by an attorney?

18    MS. FUDIM:  Your Honor, each party can make
19  arguments.  These are facts.  We are not eliciting arguments.
20  We are eliciting facts.

21    THE COURT:  All right.  I'll consider.

22    (Recess taken.)

23    (In open court; jury not present.)

24    THE COURT:  Is everyone here?

25    I don't think that the questions about whether he

1  testified at that trial or was asked to testify at that trial
2  are relevant impeachment of this witness.  It may be that some
3  inquiry could be made of the plaintiff.  We will have to
4  address  that when we come to it.  I don't think it is
5  appropriate impeachment of this witness.  So I'll sustain the
6  objection to those questions to this witness.

7    MR. MEEHAN:  Let me get Mr. Davis, your Honor.

8    MS. FUDIM:  Your Honor, if Mr. Davis can step in the
9  hall for 30 seconds?

10    THE COURT:  Okay.

11    MS. FUDIM:  Concerning questions, based on what your
12  Honor's ruling is,  that will be asked of the plaintiff,
13  depending on plaintiff's answer, we may or may not need to
14  recall this witness to impeach the testimony of the plaintiff.
15  I don't know what this witness' plans are for the rest of the
16  day.  We would need him to stand by.

17    THE COURT:  The jury is coming out.

18    (Jury present.)

19    THE COURT:  Please be seated.

20    Bring the witness back in, please.

21    (William Davis present.)

22    THE COURT:  All right.

23  CROSS-EXAMINATION

24  BY MS. FUDIM:  (Continued.)

25  Q  Are you aware, Mr. Davis, that Mr. Smalls was

1  incarcerated for some period of time awaiting trial, correct?

2  A  I know he was in.  I know he was in Rikers.

3  Q  During that period of time you spoke to him on phone
4  regularly, right?

5  A  Yes.  I spoke to him when he called.

6  Q  The microphone is off.

7  A  I was speaking to him, yes.

8  Q  You were speaking to him regularly, right?

9  A  I was speaking to him.

10  Q  You were speaking to him regularly, correct?

11  A  I was speaking to him, yes, when he called.

12    THE COURT:  How often was that?

13    THE WITNESS:  He's calling my brother a lot.  I
14  spoke to him when he was calling.

15    THE COURT:  Your brother?

16    THE WITNESS:  He was calling my brother a lot.

17    THE COURT:  Did he also speak to him?

18    THE WITNESS:  I spoke to him briefly.  He called
19  directly.

20    THE COURT:  How often would you say that was, once a
21  week, twice a week?

22    THE WITNESS:  Probably like twice or three times.
23  I believe so.  We don't get that much phone calls.

24  Q  At your deposition, sir, referring the court and opposing
25  counsel to page 34, lines 20 to 21 -- back up to line 17 for

1  context:
2         "QUESTION:   Did you speak to Andrew Smalls over the
3  phone while he was incarcerated following May 20, 2006?
4         "ANSWER:  Yes.
5         "QUESTION:  Is that something" --
6         THE COURT:  I'm sorry.  Where are you reading from?
7         MS. FUDIM:  41, line 20 to 21.
8         MR. MEEHAN:  Objection.
9         MS. FUDIM:  May I finish, your Honor?
10        THE COURT:  Yes.
11 Q      "QUESTION:  Is that something that happened
12 regularly?
13        "ANSWER:  Yes."
14        Now, not withstanding those regular conversation you
15 had with Mr. Smalls, who was like a brother to you, you never
16 knew that the allegation against him was that he handed a gun
17 to his brother Ronnie Smalls, correct?
18 A   No.
19 Q   And prior to coming here to testify today, you spoke
20 with plaintiff's counsel before your testimony, right?
21 A   Can you repeat the question?
22 Q   You prepared to give testimony today by speaking with
23 plaintiff's counsel, correct?
24 A   No.  He just told me to come and tell you guys the truth.
25 I never really met with him too much or spoke with him too

1  much.
2  Q   Before giving your deposition testimony a few years ago
3  you met multiple times with plaintiff's then attorneys,
4  correct?
5  A   Yes.  About two or three times, yes.
6  Q   And your sister was present for of those prep sessions?
7  A   Yes.
8  Q   Nelson was present at one of those prep sessions?
9  A   Yes.
10        MS. FUDIM:  Nothing further, your Honor.
11 REDIRECT EXAMINATION
12 BY MR. MEEHAN:
13 Q   Good morning again, Mr. Davis.
14 A   Yes.
15 Q   You were asked questions by Ms. Fudim regarding the fact
16 that you observed Ronnie Smalls and Cedric running through the
17 path, right?
18 A   Yes.
19 Q   Then you saw Jerome running down the path, right?
20 A   Yes.
21 Q   You did not see Andrew Smalls running down the path,
22 right?
23 A   No.
24 Q   Why did you not see Andrew Smalls running?
25 A   Because he was not outside.

1  Q   You were also asked questions about the May 2006 local
2  climatological data; do you see that?
3  A   Yes.  I can see it.
4  Q   You were specifically asked questions about the date of
5  the May 20, right?
6  A   Yes.
7  Q   And you were asked questions about the minimum
8  temperature on the date of the 20th, right?
9  A   Yes.
10 Q   You weren't asked any questions about the maximum, were
11 you?
12 A   No.
13 Q   It was a nice day on May 20, wasn't it?
14 A   Yes.
15 Q   And the average was 61; do you see that?
16 A   Yes.
17 Q   Now, you were also asked questions about when the group
18 of people came out of the building, correct?
19 A   Yes.
20 Q   And you said that Cedric and Ronnie Smalls and Jerome
21 came out of the building first?
22 A   Yes.
23 Q   And then Andrew came out of the building?
24 A   Correct.
25 Q   So Andrew was not part of the group that came down with

1  Ronnie Smalls, Cedric and Jerome, right?
2  A   No.
3  Q   And Andrew Smalls came down after and got into an
4  argument with the police in the lobby, correct?
5  A   Yes.
6         MR. MEEHAN:  Nothing further.  Thank you very much,
7  Mr. Davis.
8         MS. FUDIM:  Nothing further, your Honor, just the
9  issue that I was starting to say before.
10        THE COURT:  Let me inquire.  Who is your next
11 witness?
12        MR. MEEHAN:  Sabrina Davis.
13        THE COURT:  Where do you live, sir?
14        THE WITNESS:  Now?
15        THE COURT:  Yes.
16        THE WITNESS:  I live in Ozone Park.
17        THE COURT:  Are you available if it would be
18 necessary to ask any further questions of you, later today?
19 This may not come up at all.  Could you be available?
20        THE WITNESS:  Yes.  If I get a certain time because
21 I have kid that comes from daycare.
22        THE COURT:  What time would you be available?
23        THE WITNESS:  Hopefully before 2:00 o'clock.
24        THE COURT:  Would you be available tomorrow
25 morning?

1    THE WITNESS:   No.  I have to get back to work.
2    THE COURT:  You can step down.
3    THE WITNESS:   Thank you.
4    (Witness excused.)
5    THE COURT:  Do you want to call your next witness?
6    MR. MEEHAN:  Actually, your Honor, at this time
7 plaintiff is going to call Jerome Nelson.
8    THE COURT:  Okay.
9    MR. MEEHAN:  I'll get him from outside.
10    (Pause.)
11 JEROME QUINTON NELSON,
12    called as a witness, having been duly
13    sworn, was examined and testified as follows:
14    THE COURT:  State your name, please, for the record.
15    THE WITNESS:  My name is Jerome Nelson, J E R O M E,
16 Quinton, Q U I N T O N, Nelson, N E L S O N.
17    MR. MEEHAN:  May I inquire?
18    THE COURT:  Yes you may.
19 DIRECT EXAMINATION
20 BY MR. MEEHAN:
21 Q    Good morning, Mr. Nelson.
22 A    Good morning.
23 Q    You are here pursuant to a subpoena, correct?
24 A    Yes.
25 Q    Where do you currently live?

1 A    As we speak now?
2 Q    Yes.
3 A    At Edgemere Projects.
4 Q    Where is that?
5 A    Far Rockaway.
6 Q    Mr. Nelson, I would like to direct your attention to May
7 20 of 2006.  Okay?  Did you have an incident with the police
8 that day?
9 A    Yes.
10 Q    Where did this incident take place?
11 A    Hammels Projects.
12 Q    What time of day did this incident take place?
13 A    I believe like at nighttime.  It was dark out.
14 Q    Let's go back to earlier that day.  Which would be May
15 19, that night.  Okay?  Where did you live back in May of
16 2006?
17 A    Hammels Projects, 8202.
18 Q    Who did you live with?
19 A    My mom.
20 Q    How old were you in May of 2006?
21 A    16.
22 Q    Were you in high school?
23 A    Yes.
24 Q    Where did you go to high school?
25 A    Queens School Career Development in Jamaica.

1 Q    So let's get back to that night of May 19.  What were you
2 doing that night?
3 A    Well, I was in front of 8105 with a couple of friends.
4 Q    Who were the friends?
5 A    Well, I was with my friend Javon.
6 Q    Where did Javon live?
7 A    In 8105.
8 Q    Anyone else that you recall you were with that night?
9 A    No.  I was just with him.
10 Q    So you and Javon are hanging out.  You said you are in
11 front of 8105?
12 A    Yes.
13 Q    I'm going to put up on the map of the Hammels Houses,
14 Plaintiff's Exhibit 2 already in evidence.  And right here
15 this is 8105, right?
16 A    Yes.
17 Q    So you are hanging out, tell the jury what happened.
18 A    Well, I was hanging out in front of 8105 and I'm sitting
19 there me and my friend and then I heard a bang.  Once I heard
20 an a bang I started to walk towards my building, thinking it's
21 a gunshot.  So I was on my way to go in the house.  As I'm
22 walking I see Ronnie Smalls and Cedric Smalls hop the gate and
23 runs in the building.  So I didn't pay them no mind.  I kept
24 walking and when I walk ahead toward my building I see
25 officers running toward me with sticks out.  So my thing is

1 ain't nobody behind me, so I turned around and ran myself
2 'cause I was scared.
3 Q    Let me stop you right there.
4    So, you hear a bang, you start walking home?
5 A    Hmm.
6 Q    Then you see -- you said you saw Cedric and Ronnie Smalls
7 running?
8 A    Yes.
9 Q    Did you see Andrew Smalls running with his brothers?
10 A    No.
11 Q    So you said you started walking home?
12 A    Yes.
13 Q    The computer monitor in front of you is a touch screen.
14 Can you describe where you were walking?
15 A    Well, this is 8105 right here.  So I started walking
16 towards my building this way right here.  I got like right
17 here.  It was like a bunch of officers coming towards me.  So
18 I just turned around and ran back to 8105.
19 Q    You said that you saw a bunch of the officers running,
20 did they have anything in their hands?
21 A    Nightsticks, their sticks.
22 Q    When you say nightsticks, you mean like the old wooden
23 ones?
24 A    No, the metal ones.
25 Q    Like they collapsible kind?

1   A    Yes.
2   Q    Describe what the officers were doing with their
3   nightsticks?
4   A    Running towards me.
5   Q    And what did you do when you saw the officers running at
6   you with nightsticks?
7   A    I turned around and ran.
8   Q    Why did you run away?
9   A    Because in that projects when you see police running
10  towards you like that --
11       MS. FUDIM:  Objection.
12       THE COURT:  Overruled.  This goes to state of mind.
13  It's not offered for the truth of the facts that the witness
14  is testifying to.  It's just offered for his state of mind.
15  Q    Please continue.
16  A    Well, in that projects when you see officers like that
17  running toward you my first thing to do is run.  I seen a lot
18  of stuff happen out there with a lot of officers doing stuff
19  to people out there.  In my mind I just ran.  I got scared --
20  because I was scared.
21  Q    You were 16 at the time?
22  A    Yes.
23  Q    So where did you run to?
24  A    Back to 8105.
25  Q    Why did you go to 8105?

1   A    I tried to run to my friend Javon's house.
2   Q    Where did Javon live?
3   A    On the sixth floor.
4   Q    Did you go to Javon's apartment?
5   A    Yes.
6   Q    How did you get there?
7   A    I ran up the steps.
8   Q    Did you go to his apartment?
9   A    I went there but nobody answered the door.
10  Q    Did you knock on the door?
11  A    Yes.
12  Q    So you are knocking on the door and nobody answered?
13  A    Yes.
14  Q    What happens next?
15  A    I runs down stairs to the third floor.
16  Q    Why did you go to the third floor?
17  A    Try to get into my other friend's house, Mr. Johnson.
18  Q    Did you knock on Mr. Johnson's door?
19  A    I knocked twice and left.  It was taking too along.  I
20  ran downstairs to the second floor and I went to my friend
21  Alfred's door and nobody came there and the back door opened
22  to the second floor and that's when a couple of detectives
23  came off the back way and picked me up and just slammed me.
24  Q    I want to stop you there and recap what you said.  From
25  the sixth floor you knocked on Javon's door?

1   A    Yes.
2   Q    He didn't answer?
3   A    Nobody.
4   Q    You then ran down to the third floor?
5   A    Yes.
6   Q    You knocked on Lindsey Johnson's door?
7   A    Yes.
8   Q    He didn't answer?
9   A    Yes.
10  Q    You ran down to the second floor?
11  A    Yes.
12  Q    To Alford's apartment?
13  A    Yes.
14  Q    What apartment was that?
15  A    2 E.
16  Q    You are knocking on Alford's door?
17  A    Hmm.
18  Q    Is that when the police came?
19  A    Yes.
20  Q    Were you physically still knocking when the police came?
21  A    No.  When I heard them coming up the steps I just backed
22  up and that's when they open the book door and grabbed me an
23  picked me up and slammed me on the floor.
24  Q    How many police in that group that grabbed you?  How many
25  were there?

1   A    Three.
2   Q    You said they grabbed you and slammed you on the floor?
3   A    Yes.
4   Q    Describe how they grabbed you?
5   A    By the waist and just picked me up and slammed me and
6   once I was on the floor they put their knees in my back and
7   told me don't F'ng move.
8   Q    Did they handcuff you?
9   A    Once they picked me up.
10  Q    You are still on the second floor?
11  A    Yes.
12  Q    I would like to show you what is already in evidence as
13  Plaintiff's Exhibit 14.  This is your criminal complaint,
14  right?
15       MS. FUDIM:  Objection, your Honor.
16       THE COURT:  Overruled.
17  Q    I'm looking at the bottom of this.
18       MS. FUDIM:  I don't think there has been any
19  foundation that this witness is familiar with this document or
20  not.
21       MR. MEEHAN:  It's a document in evidence.  It's his
22  criminal complaint.
23       THE COURT:  It's in evidence.  He can ask him about
24  whether a statement in that document is accurate or not
25  accurate, which is the whole point of this exercise.

1    MR. MEEHAN:  Yes, it is.

2  Q   Do you see right here where it says deponent states?

3  A   Yes.

4  Q   Deponent states that at the above-mentioned date and time

5  and place of occurrence he observed the defendant Jerome Blank

6  running to the above-mentioned location and was apprehended

7  others, Andrew Smalls, Ronnie Smalls and blank.  Deponent

8  further states that he observed the defendant standing in the

9  middle of the third floor stairwell in the above-mentioned

10  location with his legs spread open and one of his arms on each

11  of the walls of said stairwell in order to prevent the

12  deponent from walking up said stairwell in pursuit of the

13  apprehended others.

14       Do you see that?

15  A   Yes.

16  Q   Do you understand that?

17  A   Yes.

18  Q   Did you block a stairwell in an attempt to permit

19  officers from doing anything?

20  A   No, sir.

21  Q   You were arrested on the second floor, correct?

22  A   Yes.

23  Q   If we've heard testimony in this courtroom that this is

24  all made up, would that sound accurate for you?

25       MS. FUDIM:  Objection.

1       THE COURT:  Sustained.  I will sustain the objection

2  to the question.  Don't answer it.

3  Q   Let's go to the next page, right at the top where it says

4  deponent.  Do you see that?

5  A   Yes.

6  Q   Deponent states that when he observed Police Officer

7  David Teta attempt to place the defendant in handcuffs he

8  observed the defendant flail his arms to prevent being --

9  handcuffed.  Do you see that?

10  A   Yes.

11  Q   Did that happen?

12  A   No.

13  Q   Do you know who Officer David Teta is?

14  A   No.

15  Q   Would you agree that none of the facts in the criminal

16  complaint you were charged with are true?

17       MS. FUDIM:  Objection.

18       THE COURT:  I'll sustain the objection to the form

19  of the question.  He hasn't looked at the entire complaint.

20  Q   So now you're in handcuffs, you are on the second floor,

21  right?  Tell us what you see next.

22  A   I'm on the second floor, that's when they bring Ronnie

23  Smalls and Cedric down.  They take them downstairs first.

24  Then they bring me down behind him so they have all of us in

25  the lobby as of that time.

1  Q   You saw Cedric being brought down in handcuffs?

2  A   Yes.

3  Q   You saw Ronnie being brought down in handcuffs?

4  A   Yes.

5  Q   Did you see Andrew Smalls being brought down in

6  handcuffs?

7  A   No.

8  Q   So now you are brought to the lobby and you are in the

9  lobby with Ronnie Smalls, right?

10  A   Yes.

11  Q   What happens next?

12  A   After that Andrew comes down asking them why you locking

13  my brother up.  As he's asking they say mind you F'ng business

14  and that's when they slammed his head against the wall.

15  Q   Where were you at this point?

16  A   Still in the lobby.

17  Q   Where was Ronnie Smalls at this point?

18  A   We all was in the lobby.

19  Q   So you said that Andrew comes down, he asks why you

20  locking my brothers up?

21  A   Yes.

22  Q   And the officers responded by cursing at him?

23  A   Yes.

24  Q   And then you saw them smash his head into the wall?

25  A   Yes.

1  Q   And you told us that Ronnie Smalls and Cedric had been

2  brought down a few minutes before that?

3  A   Yes.

4       MS. FUDIM:  I object to all the leading questions,

5  your Honor.

6       THE COURT:  Yes.  I'll sustain the objection.

7  Q   After you saw the officers slam Andrew Smalls's head to

8  the wall what happened next?

9  A   They took us three out, took me out of the lobby, took

10  Ronnie Smalls out and took Cedric out and placed us in cars.

11  Q   What happened after that?

12  A   The officer that placed us in the car went right back in

13  the building.

14  Q   After those officers went in the building what happened

15  next?

16  A   After that, basically, we wound up at the precinct.

17  Q   Were you aware of ever what you were charged with that

18  night?

19  A   I think it was trespassing and -- trespassing and I think

20  resisting arrest or something.

21  Q   If we look back at Exhibit 14, were you also charged with

22  obstructing governmental administration?  Does that sound

23  accurate?

24  A   I didn't know that.

25  Q   Tell the jury what happened to every charge against you

## Page 102

1  that night?

2  A   Got dropped.

3  Q   I would like to show you what's in evidence -- let me

4  show you what's been marked in evidence as Defendant's Exhibit

5  Y.  Is this a picture of you?

6  A   Yes.

7  Q   Is this your mug shot on the night of the arrest?

8  A   Yes.

9  Q   All right.  We see right here -- do you see that jacket?

10  A   Yes.

11  Q   Whose jacket is that?

12  A   It's mines.  It's a flight jacket.

13  Q   Thank you, Mr. Nelson.

14         MR. MEEHAN:  I have nothing further.

15  CROSS-EXAMINATION

16  BY MS. FUDIM:

17  Q   Good afternoon, Mr. Nelson.

18  A   Good afternoon.

19  Q   Do you recall that you gave a deposition in connection

20  with this lawsuit?

21  A   Yes.

22  Q   That was a few years ago, right?

23  A   Yes.  I'm just going to put the cover page of this on the

24  screen and ask you if the date of this deposition is about

25  right to you, if this refreshes your recollection as to the

## Page 103

1  essentially the date.  Does that seem like about the dates you

2  were deposed in this case, May 9, 2017, sir?

3  A   Yes.

4  Q   Now, prior to your deposition you actually met with

5  Andrew Smalls the night before your deposition, correct?

6  A   I don't remember.

7  Q   To refresh your recollection I refer counsel and the

8  court to page seven, lines 13 to 15 of your deposition:

9        "QUESTION:  Before coming here --

10        MR. MEEHAN:  I object.  Wait a second, please.

11        (Pause.)

12        MR. MEEHAN:  What number again?

13        MS. FUDIM:  Page seven, lines 13 to 15.

14  Q   "QUESTION:  Before coming here today, when is the

15  last time you saw Andrew Smalls?

16        "ANSWER:  Last night."

17        MR. MEEHAN:  If you can read until line 18.

18        MS. FUDIM:  Your Honor --

19        MR. MEEHAN:  17, for completeness, your Honor.

20        MS. FUDIM:  I don't think that's relevant.  I can

21  read it.

22  Q   Where did you see him?  He was at a friend's house with

23  me.

24        Does that refresh your recollection, sir, that you

25  saw him the night before your deposition?

## Page 104

1  A   Yes.

2  Q   You've known plaintiff for a very long time, correct?

3  A   Yes.

4  Q   About 17 years, 18 years?

5  A   Something like that.

6  Q   When you showed up for your deposition you showed up with

7  the same attorneys who were representing Mr. Smalls in this

8  case at the time, correct?

9  A   Yes.

10  Q   Just to be clear, it's not the people sitting here, it

11  was a different set of attorneys, correct?

12  A   Yes.

13  Q   You met with plaintiff's attorneys three times before

14  that deposition, correct?

15  A   Yes.

16  Q   One of those occasions, Mr. Davis was also there meeting

17  with the attorneys simultaneous to you?

18  A   Yes.

19  Q   On May 20 of 2006 you were living at the Hammels Houses?

20  A   Yes.

21  Q   And you were living in building 8202 I believe you said?

22  A   Yes.

23  Q   And you were hanging out that night in front of 8105?

24  A   Yes.

25  Q   That's a different building?

## Page 105

1  A   Yes.

2  Q   The reason you were hanging out in front of that building

3  was because that was where you girlfriend lived?

4  A   Yes, my baby mother lived there too on the first floor.

5  Q   You were hanging out with a bunch of people?

6  A   Yes, there was a bunch of people out.

7  Q   You went into building 8105 to your girlfriend's house

8  for a little while to spend time with her?

9  A   No.  I never went in there.

10  Q   I'm going to refer the court and opposing counsel to page

11  32, line 14 to 24:

12        "QUESTION:  During the time you were hanging out

13  with the people, did you go inside the building and come back

14  out and continue to hang out?

15        "ANSWER:  Yes.

16        "QUESTION:  When you went into the building was

17  there a particular apartment you were going to?

18        "ANSWER:  The first floor.

19        "QUESTION:  Whose apartment was that?

20        "ANSWER:  My baby mother.

21        "QUESTION:  What's her name?

22        "ANSWER:  Tamaya."

23  A   Yes.

24  Q   Does that refresh your recollection that you went to hang

25  out with her?

1  A     Not hang out.  I probably went in there but not long to
2  hang out.  I don't remember saying that.  It was a long time
3  ago that I said that.
4  Q     Would you agree with me when you gave your deposition two
5  years ago your memory would have been fresher than it is
6  today?
7  A     Yes.
8  Q     And regardless of how long you spent with her, you did go
9  in and spend some time with Tamaya, right?
10 A     Yes.
11 Q     You came back outside at some point though?
12 A     Yes.
13 Q     While you were hanging out outside of 8105 you heard a
14 gunshot, correct?
15 A     Yes.
16 Q     And it sounded like it was coming from the front of the
17 building in Hammels community?
18 A     What you mean in front of the building?
19 Q     Well, by front, I mean the area by building like 8410
20 building, 8416, 8412?
21 A     Like towards the front, yes.
22 Q     And you heard just one shot fired, right?
23 A     Yes.
24 Q     When you heard the one shot you decided I better go home?
25 A     Yes.

1  Q     So you started walking toward your own billing at 8202?
2  A     Yes.
3  Q     And as you're walking toward your building you see Ronnie
4  Smalls and Cedric run by you?
5  A     Yes.
6  Q     And three go into 8105?
7  A     Yes.
8  Q     When they ran by you that was sometime between a few
9  seconds and a minute after you heard the gunshot?
10 A     Yes.
11 Q     So how far had you gotten into your walk home at that
12 time, sir?
13       MS. FUDIM:  Can I have Plaintiff's Exhibit 2 for the
14 witness?
15 Q     Is this what you are looking for, sir?
16 A     Yes.
17 Q     Go ahead.
18 A     So, when I left 8105, I got like right here by like close
19 to like in the building of -- like behind 8105, at the end of
20 the building behind 8105 that's where I got, like right here.
21       THE COURT:  That's when what?
22       THE WITNESS:   That's when the police was running
23 towards me.  The police was by the end of 8202 by my back way
24 and I'm by the end of 8105 and walking towards my building.
25       You hadn't gotten very far at that point?

1  A     Yes.
2  Q     That's because you had just heard this gunshot?
3  A     Yes.
4  Q     So then Cedric and Ronnie Smalls, according to you, they
5  go into 8105, right?
6  A     Yes.
7  Q     At that point you don't have any idea why they are
8  running, right?
9  A     No.
10 Q     You then continue on your way home, you see police
11 officers also running in the same direction that Ronnie Smalls
12 and Cedric had just gone?
13 A     Yes.
14 Q     And you claim they had their nightsticks out?
15 A     Yes.
16 Q     You claim some of them were in plainclothes, correct?
17 A     Yes.
18 Q     Other ones were in uniform, according to you?
19 A     Yes.
20 Q     And when you see the police running towards you, you
21 don't step out of their way, right?
22 A     No.
23 Q     You don't stop, you keep going in the direction that you
24 were heading?
25 A     Yes.

1  Q     You turn around and start running in the same direction
2  that the police were running?
3  A     No, not the same way they was running.  The way Ronnie
4  Smalls ran, that's the way I started running.
5  Q     In the same direction of the people who are being chased
6  by police?
7  A     Yes.
8  Q     And you now run into 8105, right?
9  A     Yes.
10 Q     And isn't it true that the reason you ran into 8105
11 behind Ronnie Smalls and Cedric because you had been with
12 them, sir?
13 A     No.
14 Q     Your claim is that you were merely running in the same
15 direction as them at the same time as them with the police
16 behind you?
17 A     Say that again.  Can you repeat that?
18 Q     It's your testimony that you were coincidentally running
19 in the same direction as them at the same time as them with
20 the police behind you?
21 A     No.
22 Q     When you ran into 8105 were any of the people that you
23 had been hanging out with earlier still sitting outside?
24 A     I wouldn't recall.  I just ran.  I ran in after whoever
25 was in front of that building.

1  Q    One of the people you had been hanging out with earlier
2  you told us was Javon?
3  A    Yes.
4  Q    Was he still outside?
5  A    I did not see him as I ran.
6  Q    Now, when you were running from police you told us you
7  were scared, right?
8  A    Yes.
9  Q    You just heard a gunshot?
10 A    Yes.
11 Q    Now you are being chased?
12 A    Yes.
13 Q    And you want to get inside an apartment because you're
14 scared, right?
15 A    Yes.
16 Q    And your girlfriend she lives on the first floor, right?
17 A    Yes.
18 Q    And we know she was home because you had been in her
19 apartment sometime shortly earlier, correct?
20 A    Yes.
21 Q    Just to be clear, you don't go to the first floor
22 apartment?
23 A    No.
24 Q    You were also friends at that time with a guy named
25 Alford, right?

1  A    Yes.
2  Q    And Alford he lived on the second floor, right?
3  A    Yes.
4  Q    You're scared?
5  A    Yes.
6  Q    You you're running from the police, right?
7  A    Yes.
8  Q    And you didn't stop at Alford's apartment on the second
9  floor either, right?
10 A    No.
11 Q    You are also friends with Lindsey Johnson at that time,
12 right?
13 A    Yes.
14 Q    Mr. Johnson he lives on the third floor, right?
15 A    Yes.
16 Q    But as you're running trying to get into an apartment for
17 safety you don't stop on the third floor either, in
18 Mr. Johnson's apartment, correct?
19 A    No.
20 Q    Instead you chose to go up six flights of the stairs to
21 Javon's apartment, correct?
22 A    Yes.
23 Q    Which stairwell did you run up?
24 A    What stairwell?  The front stairs.
25 Q    Is that A?

1  A    Yes.
2  Q    Now, the building has elevators, right?
3  A    Yes.
4  Q    You didn't take the elevator?
5  A    I didn't have time.  I was scared.  So I just ran
6  straight up to the steps and ran all the way up.
7  Q    And Javon's apartment who you are running to he was not a
8  close friend of yours?
9  A    Yes.  He's a close friend.
10 Q    You didn't hang out with him regularly at that time, did
11 you?
12 A    What do you mean?
13 Q    Well, did you hang out with him regularly, often, sir?
14 A    Yes.
15 Q    Okay.  I'm going to refer the court and opposing counsel
16 to the witness' deposition testimony at page 31, lines 21 to
17 23:
18     "QUESTION:  Around this time in 2006 were you
19 hanging out with him regularly?
20     "ANSWER:  Not regularly.  I'm an in-house person."
21 Was that your testimony, sir?
22 A    Yes.
23 Q    In fact, at your deposition you didn't even know Javon's
24 last name, is that correct?
25 A    Yes.  I know Javon's last name.

1  Q    Referring the court and opposing counsel to page 31,
2  lines 14 to 20:  Well, lines 19 to 20:
3     "QUESTION:  Do you know his last name?
4     "ANSWER:  No."
5     I'll back up so we can see the context.  Let me
6  start at 14, page 31:
7     "QUESTION:  How long have you known Javon?
8     "ANSWER:  Since I moved into Hammels, like when I
9  first moved there.
10    "QUESTION:  So we're talking more than ten years
11 ago?
12    "ANSWER:  Yes.
13    "QUESTION:  Do you know his last name?
14    "ANSWER:  No."
15    That was your testimony, sir?
16 A    I don't remember saying that.  Can you show me it?
17 Q    I don't know if we can get that mark off the screen.
18 There's a prior mark from the prior exhibit.
19    MR. MEEHAN:  I don't believe this should be in front
20 of the jury.  It should be in front of the witness.
21    THE COURT:  It's prior testimony.  It can be in
22 front of the jury.
23 Q    So do you know his last name?
24    "ANSWER:  No."
25    Do you see that, sir?

1  A   Yes.  I see it now.
2  Q   So we're clear, Javon is one of the people you claim you
3  were hanging out with outside the building a few moments
4  earlier?
5  A   Yes.
6  Q   I asked you a few moments ago if he was still there when
7  you were running in and you said you didn't remember?
8  A   No.
9  Q   Javon went upstairs when the gunshot went off, is that
10 correct?
11 A   I don't know.  I walked off.  I left.
12 Q   Referring the court to page 41 of the witness' testimony,
13 lines 12 to 21:
14     "QUESTION:   I think the question I asked earlier
15 was you said at some point Javon left?
16     "ANSWER:  Yes.
17     "QUESTION:  Before you heard what you thought was a
18 gunshot?
19     "ANSWER:  No.  He was there and he went upstairs
20 after he heard it also."
21     MR. MEEHAN:  I object to continuing after also on
22 line 17.
23     MS. FUDIM:  I'm going to read to line 21, your
24 Honor.
25     THE COURT:  Okay.

1  Q   "QUESTION:  Because you believed it may have been a
2  gunshot?
3      "ANSWER:  Yes.
4      "QUESTION:  So Javon went into 8105 at that time?
5      "ANSWER:  Yes."
6      That was your testimony, sir?
7  A   I believe so.
8  Q   And we just established that was just a few seconds
9  earlier because you hadn't gotten that far into your travel to
10 your building after you heard the gunshot, correct?
11 A   Yes.  As I heard that I just straight walked off and when
12 I ran back toward the billing I looked at nobody, just except
13 running.
14 Q   That was not my question, sir.  My question was a little
15 bit different.  That Javon left after you guys heard the
16 gunshot, correct?
17 A   I believe he did.  I don't know if he did when I ran, I
18 don't know.
19 Q   I'm not asking about when you ran.  That was a few
20 moments earlier because you started as soon as you heard that
21 gunshot, right?
22 A   Yes.
23 Q   And now according to you you're banging on Javon's door?
24 A   Yes.
25 Q   Nobody answers?

1  A   Yes, nobody answers.
2  Q   Isn't it true, sir, that you never banged on Javon's
3  door?
4  A   No.  It's true.
5  Q   You also didn't see him on your way up to his apartment,
6  you didn't bump into him in the stairwell, right?
7  A   No.
8  Q   You claim that after Javon didn't answer the door you
9  turned around and went down to Mr. Johnson's apartment on the
10 third floor, sir?
11 A   Yes.
12 Q   Which stairwell is that that you went to Mr. Johnson's on
13 the third floor?
14 A   A.
15 Q   You banged on his door, right?
16 A   Yes.
17 Q   This is still only a minute or two after you heard the
18 gunshot, right, because this is all happening very fast?
19 A   Yes.
20 Q   And nobody answers the door at Lindsey Johnson, right?
21 A   No.
22 Q   No indication anyone is there?
23 A   No.
24 Q   Certainly no evidence that plaintiff is in Mr. Johnson's
25 apartment, right?

1  A   I believe so.  I don't know.
2  Q   Now, you then went down according to you to Alford's
3  apartment on the second floor, sir?
4  A   Yes.
5  Q   And you must have been pretty tired now running up and
6  down the stairs?
7      MR. MEEHAN:  Objection, your Honor.
8      THE COURT:  Overruled.
9  Q   Pretty tired by now?
10 A   Yes.
11 Q   And you're banging on Alford's door?
12 A   Yes.
13 Q   And you claim that at that point a detective you said,
14 some detective, I think you said three detectives came, they
15 grabbed you and they threw you to the ground?
16 A   Yes.
17 Q   You believe they were detectives because they were in
18 plainclothes?
19 A   Yes.
20 Q   You told us that there were three of them, right?
21 A   I believe so.  Really it was a couple of them that was on
22 the staircase A, but staircase B, like three of them came up
23 the staircase B and grabbed me from there.  Some of them was
24 on staircase A, too.  At that point when I was on the second
25 floor.

1  Q   But at least three?

2  A   Yes.

3  Q   Referring the court and opposing counsel to page 51, line

4  3 to 6:

5      "QUESTION:   How many police officers grabbed you or

6  approached you when you were knocking on Alford's door?

7      "ANSWER:   I believe two of them.  One slammed me

8  and put his knee in by back."

9      That was your testimony, sir?

10 A   Yes.

11 Q   Again, these officers, these detectives, you claim were

12 in plainclothes, right?

13 A   Yes.

14 Q   And according to you that's when you see officers

15 bringing Ronnie Smalls and Cedric down the stairs, right?

16 A   Yes.

17     MR. MEEHAN:  Objection, mischaracterization.

18     MS. FUDIM:  May I continue, your Honor?  The witness

19 answered.

20     THE COURT:  Overruled.

21 Q   Now, they were coming down the stairs, which stairwell

22 was that, sir?

23 A   A.

24 Q   And you claim you are in the hallway of the second floor,

25 right?

1  A   Yes.

2  Q   This is where there's like doors to individual people's

3  apartments, right?

4  A   Yes.

5  Q   Isn't it true that there's doors between the hallways and

6  the stairwells?

7  A   This is the stairwell right here, but it's a door on the

8  left side of it though, like a house door, yes.

9  Q   So that --

10 A   But the staircase door was right here in front of me,

11 where I was on the floor when they was locking me up on the

12 second floor.

13 Q   I want to make sure that I understand this.  You were

14 able to see Cedric and Ronnie Smalls being led down the

15 staircase through the door?

16 A   No.  The door was open.

17 Q   The door was open?

18 A   Yes.

19 Q   You claim that these detectives then brought you to the

20 lobby, correct?

21 A   Yes.

22 Q   And according to you that's the first time that you see

23 Mr. Smalls, Andrew, correct?

24 A   Say that again.

25 Q   And according to you that's the first time in the lobby

1  that you see Mr. Smalls?

2  A   Yes.

3  Q   And you claim you saw a detective shove his head against

4  the wall?

5  A   Yes.

6  Q   Again that was one detective?

7  A   I don't remember how many detectives or what.  Somebody

8  slammed his head against the wall and I just seen a bunch of

9  blood on his face and that's when I don't know what detectives

10 took us out the building and that's when they took us out the

11 lobby.

12 Q   I'm going to read two sections.  The first is at page 52,

13 line 25 to page 53, line four:

14     "QUESTION:   Then what happened next?

15     "ANSWER:   As I get into the lobby that's when I saw

16 Andrew.  He was arguing with one of the detectives, why are

17 you locking up my F'ng brother and one of the detectives said

18 shut the fuck up and slammed his head against the wall."

19     "Referring the court if page 55 --

20     MR. MEEHAN:  What's the inconsistency, your Honor?

21 Objection.

22     MS. FUDIM:  Your Honor, may I continue?

23     THE COURT:  What is your proffer to the

24 inconsistency.

25     MS. FUDIM:  The witness said he didn't know if it

1  was one or more detective.  In the deposition he testified to

2  the number.

3      THE COURT:  All right.  Go ahead.

4  Q   Page 55, line 3 to 6:

5      "QUESTION:   So one of the officers had Andrew

6  Smalls' arms behind his back and he appeared to slam his body

7  against the wall while holding on to that arm?

8      "ANSWER:   Yes."

9      THE COURT:  Was that your testimony?

10     THE WITNESS:  Yes.

11 Q   Now, you believed the person to be a detective at the

12 time because you claim he was wearing a bullet proof vest but

13 was otherwise in plainclothes, correct?

14 A   Yes.

15 Q   And the interaction that you claim you saw, you claim was

16 inside the lobby of 8501?

17 A   Yes.

18 Q   You claim it took place inside the lobby, correct?

19 A   In the building, yes.

20 Q   Then you were taken to the precinct, fair to say?

21 A   Yes.

22 Q   And when you get to the precinct you are placed in a cell

23 with plaintiff Ronnie Smalls and Andrew?

24 A   Yes.

25 Q   But you never asked them about why they had been

1  arrested, is that correct?
2  A   No.  I never asked them.
3  Q   Never asked them why they had been running?
4  A   No.
5  Q   And the reason you didn't ask them, sir, was because you
6  knew, isn't that true?
7  A   No.
8  Q   You knew because you were with them, is that correct?
9  A   No.
10 Q   Now, according to you -- withdrawn.
11     You don't recall -- isn't it true that you don't
12 recall independently what it was you were charged with that
13 day?
14 A   No.
15 Q   That's not true?
16 A   Say that again.
17 Q   I know counsel showed you a document that was a criminal
18 court complaint that listed certain charges.  But after
19 looking after that document isn't it true that you have no
20 independent recollection of what you were charged with that
21 day?
22     MR. MEEHAN:  Your Honor, Mr. Nelson testified to two
23 of the three that he independently knew.
24     THE COURT:  He can answer the question.
25 Q   Mr. Nelson.

1  A   Yes.  Can you repeat that though?
2  Q   You know what you were charged with that day?
3  A   Yes.  That day I knew what I was charged with but I
4  didn't know -- they tried to say -- what's the third charge
5  they charged me with?
6  Q   Did you know what your charges were on the date of your
7  deposition?
8  A   Yes.
9  Q   I refer the court and opposing counsel to page 58, lines
10 14 to 17:
11     "QUESTION:  Did you become aware either when you
12 appeared before the judge or at some point before of what the
13 charges were against you?
14     "ANSWER:   I still don't remember my charges from
15 that day."
16     That was your testimony, sir?
17 A   Yes.
18 Q   Now, you told us on direct examination that the charges
19 against you eventually got dismissed, is that right?
20 A   Yes.
21 Q   At your deposition you testified you actually had no idea
22 what happened to your criminal case, is that correct?
23 A   No.
24 Q   Referring the court and opposing counsel to page 59,
25 lines 2 to 5:

1     "QUESTION:  Do you know what ended up happening to
2  your criminal case arising from your arrest on May 20 of 2006?
3     "ANSWER:   It had to have been dismissed because I
4  don't remember."
5     Is that your testimony?
6  A   Yes.
7  Q   So would it be fair to say that you just don't remember
8  what happened, so you are assuming it was dismissed?
9  A   I know it was dismissed because after they dismissed that
10 case I had to pay a 120 dollar fine for that.  I know it was
11 dismissed.  Court fees.
12 Q   You had to ultimately pay some fees in connection with
13 that?
14 A   Yes, 120 dollars.
15 Q   That wasn't something that you said at your deposition,
16 correct?
17 A   No.
18 Q   And at your deposition you didn't remember what happened
19 to that criminal court case, right?
20 A   No.
21 Q   Well, the testimony that we just read where you said it
22 had to have been dismissed because I don't remember, that was
23 your testimony, correct?
24 A   Yes.
25 Q   And you didn't remember because it was not that big a

1  deal to you, is that correct?
2  A   Yes.
3     MR. MEEHAN:  Objection, your Honor.
4     THE COURT:  Overruled.
5  Q   Now, --
6     MS. FUDIM:  Your Honor, can we have a brief sidebar?
7     THE COURT:  Yes.
8     (Sidebar.)
9     MS. FUDIM:  Your Honor, I would want to ask this
10 witness the same questions about the fact that he never
11 testified.
12     THE COURT:  I'll sustain the objections as to those
13 questions.
14     MS. FUDIM:  I wanted to make my record.  I also ask
15 for the same instruction that we might have to recall him.
16 We'll pose the questions to plaintiff the way that your Honor
17 had said it can be impeachment for plaintiff and potentially
18 we can recall the witness depending on the witness' answer.
19     THE COURT:  If you want to recall these witness, I
20 don't have a basis now to direct them to stay here.  I don't
21 know what you want to do.  If you want to give them a subpoena
22 to return tomorrow, you can do that.
23     MS. FUDIM:  We can do that.  We can file a subpoena.
24     THE COURT:  If you want both of these witnesses
25 here tomorrow you should subpoena them.  I can't direct them

1  to come on the supposition that you might want to call them

2  again.

3          MS. FUDIM:  I understand that, your Honor.

4          MR. MEEHAN:  Just briefly on Mr. Nelson.  Mr. Nelson

5  was completely prepared to testified in the criminal trial

6  against the Mr. Smalls.  However at the time of the criminal

7  trial he had a bench warrant.  So he was instructed by the

8  criminal attorney that he shouldn't go to court because he

9  might get arrested for the bench warrant.  He has a valid

10  reason.

11          MS. FUDIM:  Let's elicit that.

12          MR. MEEHAN:  She's trying to impeach him and it has

13  nothing to do with this.

14          THE COURT:  I don't think it's fair.  It impeaches

15  him.  If that is accurate, I don't think it's fair to ask the

16  plaintiff about it either, if that's accurate, if counsel is

17  proffering that's what happened.  It's not fair to inquire

18  about plaintiff.

19          MS. FUDIM:  I don't know that it's accurate.  I know

20  at his deposition this witness says when he told counsel the

21  story that the attorney wanted to call him but ultimately he

22  was instructed by the attorney, which in and of itself it

23  shows some questionable ethics that an attorney advised him

24  not to show up in court in connection -- because he had an

25  open warrant.  That's what this witness said.  There's no

1  other independent evidence that's true.  I have no way knowing

2  that it's true, other than this witness said it.

3          THE COURT:  That's why you don't have a basis to ask

4  because you don't have a good-faith basis to believe that he

5  came in, that he told his lawyer the whole story and that --

6  or that this story had never been told to anybody before and

7  it's just made up.  You don't have a good-faith basis to make

8  that argument.  The only reason this would be relevant is if

9  you could establish that this is the first time he's ever told

10  anybody this story.  But I don't think you have a good-faith

11  basis to go there.

12          MS. FUDIM:  Your Honor, the good-faith basis is that

13  at the criminal trial plaintiff's counsel never served any --

14  defense counsel --

15          THE COURT:  He has an incompetent counsel.

16          MS. FUDIM:  Why never served any alibi notice, not

17  one, I think that's quite telling, your Honor.

18          THE COURT:  I'm not sure what it's telling of.  I'm

19  not sure that it absolutely establishes what you want to

20  argue, which is all of this testimony just came up in

21  connection with the civil case, when we've got proffers that

22  one witness was there ready to testify and we have evidence or

23  proffers that this witness was asked to come, that didn't come

24  because his attorney said something.  I don't think at this

25  point that you have a good-faith basis to inquire, to suggest

1  that they are making all of this stuff up for the civil case.

2          MS. FUDIM:  When Mr. Johnson was on the stand,

3  Ms. Joseph's first question of him -- second question.  First

4  question was are you here pursuant to a subpoena and her

5  second question was have you ever testified in a courtroom

6  before and he answered no.  Can I ask this witness have you

7  ever testified in a courtroom before?

8          MR. MEEHAN:  She's trying to get around -- she is

9  going to make him sound like a --

10          THE COURT:  You're going back to the same thing.

11  You're trying to use all of this to argue that he's just

12  making up all of this now, that he never before ever told

13  anybody this and I don't think you have a good-faith basis to

14  make that argument.

15          MR. NORINSBERG:  I did find the transcript.  I do

16  have it here so the court can see for its own satisfaction.

17  The prosecutor represented Mr. Johnson was in the courtroom

18  during cross-examination of a witness and he objected to that.

19  I can show it to you right now just for the record on this

20  issue.

21          THE COURT:  I don't know why we keep going back to

22  Mr. Johnson.

23          MR. NORINSBERG:  It's about the alibi witnesses.

24  She's saying there were no alibi witnesses.  He was in court

25  ready to testify.  That's why I'm raising it.

1          MS. FUDIM:  They didn't ask Mr. Johnson anything

2  about that on the stand.  We didn't ask that question of

3  Mr. Johnson.

4          THE COURT:  You want to argue that they never told

5  anybody this before, that this is all new, all made up for the

6  civil case and I don't -- it doesn't appear to me that you

7  have a good-faith basis to make that argument.

8          MS. FUDIM:  The good-faith basis, your Honor, is

9  that presumably any if any of this were told to a competent

10  criminal defense attorney --

11          THE COURT:  We don't know whether he was a competent

12  criminal defense attorney.  I don't know the answer to that.

13  There are other problems.  The government has the burden of

14  proof.  There could have been any number of reasons why

15  someone decided not to call them.  So I don't think that it's

16  fair argument for what you are trying to establish here.  I'm

17  not saying you can't make any inquiry.  You might be able to

18  make some inquiry of the plaintiff about this but not this

19  witness.

20          (In open court.)

21          THE COURT:  Ladies and gentlemen, it's time to focus

22  your attention back here.  I know you had to listen to that

23  terrible noise.

24  BY MS. FUDIM:

25  Q      You know who Mr. William Davis is, correct?

1    A    Yes.

2    Q    When you were running up and down the stairs you never

3    saw Mr. Davis in those stairs, right?

4    A    No.

5    Q    And you testified that those detectives in the second

6    floor hallway they threw you to the ground, right?

7    A    Yes.

8    Q    And a you testified that you were basically arrested for

9    no reason, right?

10   A    Yes.

11   Q    And just to be clear, you never filed a lawsuit against

12   any of the police officers, correct?

13        MR. MEEHAN:  Objection, your Honor.

14        THE COURT:  Overruled.  He can answer.

15   A    No.

16   Q    That's not correct or that's correct?

17   A    No.  I did not file a lawsuit.

18        MS. FUDIM:  Thank you, your Honor.  I have nothing

19   further.

20   REDIRECT EXAMINATION

21   BY MR. MEEHAN:

22   Q    Good afternoon, again, Mr. Nelson.

23   A    Good afternoon.

24   Q    On cross-examination counsel asked you questions about

25   the criminal complaint that was shown to you, right?

1    A    Yes.

2    Q    Let's look at that document, again.

3        MS. FUDIM:  Objection, your Honor.  I didn't slow

4    him the criminal complaint.

5        MR. MEEHAN:  He was asked questions about it.

6        MS. FUDIM:  I did not ask any questions about it.

7        THE COURT:  I don't think she asked anything about

8    it.

9        MR. MEEHAN:  She did.  I showed him this document

10   about the criminal charges.  There was a specific line of

11   inquiry regarding this document.

12        MS. FUDIM:  I didn't ask about this document.  I

13   asked if he recalled independently what his criminal charges

14   were and I used the deposition to impeach and he said he did

15   not recall his criminal charges.  I did not ask him about this

16   document, your Honor.

17        THE COURT:  You want to ask him what he knew about

18   his criminal charges?  Is that why you are asking this?

19        MR. MEEHAN:  Yes.

20        THE COURT:  I don't think there were any questions

21   directed specifically to this document.  If you want to use

22   this document to ask him something about what he remembers

23   about criminal charges, all right.  I don't think the defense

24   counsel asked him any questions about this specific document.

25        MR. MEEHAN:  I'll ask briefly about the offenses at

1    the top.

2    Q    So, Mr. Nelson, you were asked questions about that you

3    couldn't recall what charges were filed against you in 2006,

4    correct?

5    A    Yes.

6    Q    But you actually remembered two of the three, didn't you?

7    A    Yes.

8    Q    And the one you couldn't remember was obstructing

9    governmental administration in the second degree?

10   A    Yes.

11        MS. FUDIM:  Objection, your Honor, to leading.

12        THE COURT:  Yes, sustained.

13        MR. MEEHAN:  I'm just asking questions based upon

14   counsel's questions.

15        THE COURT:  That doesn't make it any less leading.

16   Q    Now you were also asked questions about which apartment

17   you ran to, correct?

18   A    Yes.

19   Q    Tell the jury why you ran to Javon's apartment first?

20   A    I ran to Javon's apartment first because his door usually

21   be open.

22   Q    You were asked questions about why you didn't go to your

23   girlfriend's apartment?

24   A    Yes.  'Cause it was happening to fast so my first

25   instinct is to run all the way up to Javon's house.

1    Q    You were 16 at the time, right?

2    A    Yes.

3    Q    So you didn't want to knock on your girlfriend's door at

4    one o'clock in the morning?

5        MS. FUDIM:  Objection.

6        THE COURT:  Sustained.

7    Q    Now, you were also asked questions about whether or not

8    you filed a lawsuit, correct?

9    A    Yes.

10   Q    You didn't spend two years in jail for this, did you?

11   A    No.

12        MS. FUDIM:  Objection.

13        MR. MEEHAN:  Nothing further.

14        THE COURT:  Overruled.

15        Anything further?

16        MS. FUDIM:  No, your Honor.

17        THE COURT:  Okay.

18        Do you want to call your next witness.

19        MR. MEEHAN:  Sure.

20        THE COURT:  You can step down.

21        (Witness excused.)

22   SABRINA DAVIS,

23        called as a witness, having been duly

24        sworn, was examined and testified as follows:

25        THE COURT:  State your name and spell it.  You have a

1  problem hearing?

2          THE WITNESS:   Yes.

3          THE COURT:  Can you make sure you speak into the

4  microphone.

5          MR. MEEHAN:  Yes, your Honor.

6  DIRECT EXAMINATION

7  BY MR. MEEHAN:

8  Q   Good afternoon, MS. Davis.

9  A   Good afternoon.

10  Q   Can you hear me?

11  A   Yes.

12  Q   You are here pursuant to an a subpoena, correct?

13  A   Yes.

14  Q   Where do you currently live?

15  A   3020 Surf Avenue, Brooklyn, New York.

16  Q   I would like to direct your attention back to May of

17  2006, May 20, specifically.  Okay?

18  A   Yes.

19  Q   Did you see an incident with the police that day?

20  A   Yes.

21  Q   Where did that incident take place?

22  A   In the Hammels Houses.

23  Q   Around what time of day?

24  A   It was late at night.

25  Q   Where did you live in May of 2006?

---

1  A   Inside the Hammels Houses, 8101, 78110.

2  Q   Who did you live with?

3  A   My mother and brothers.

4  Q   Can you say the names of your brothers?

5  A   Clarence Davis and William Davis.

6  Q   How old were you in May of 2006?

7  A   24.

8  Q   So let's go to earlier that night, May 19, what were you

9  doing that night?

10  A   I was laying on my bed.

11  Q   And did something draw your attention at that time to a

12  police incident?

13  A   I heard the sirens.  Someone was yelling out my name at

14  the window telling me that Andrew Smalls was being arrested.

15  Q   Do you remember who yelled?

16  A   No.

17  Q   Where were you when you heard this?

18  A   I was in my bedroom.

19  Q   What apartment number was it?

20  A   Two E as in Edward.

21  Q   I would like to show you a map of the Hammels Houses, in

22  evidence as Plaintiff's Exhibit 2.  Can you -- the monitor in

23  front of you is a touch screen.  Can you point to your

24  building?

25  Q   Can you see it?

---

1  Q   Yes.  So that' 8110?

2  A   Yes.

3  Q   So you're in your building on the second floor, correct?

4  A   Yes.

5  Q   Is your window open?

6  A   Yes.

7  Q   You heard someone yell?

8  A   Someone calling me out the window saying that Andrew is

9  being arrested.

10  Q   What did you do when you heard that?

11  A   I got up, threw on my clothes and I rushed out the back

12  door.

13  Q   And when you an arrived downstairs, tell the jury what

14  you saw?

15  A   I saw a bunch of police officers and I seen them taking

16  Andrew out of the building.

17  Q   Let's focus exactly on when you saw them bringing Andrew

18  out of the building.  Where was Ronnie Smalls at this time?

19  A   They was already in the police car.

20  Q   Ronnie Smalls was with already in the police car?

21  A   Yes.

22  Q   Where was Cedric?

23  A   In the police car.

24  Q   Where was Andrew?

25  A   Andrew as being brought out the building.

---

1  Q   Describe how Andrew looked when he was being brought out

2  the building?

3  A   When they brought him out the building his face as

4  bloody.  I don't recall where he was hit in his face but he

5  was bloody.

6  Q   You said he was handcuffed?

7  A   Yes.

8  Q   Let's focus and what Andrew was wearing.  When you first

9  observed Andrew that night, tell the jury what he was wearing?

10  A   He had on a gray hoodie, a Miskeen hoodie.

11          THE COURT:  I am having a hard time hearing.  You

12  said he had a gray hoodie?

13          THE WITNESS:  A Miskeen hoodie.

14          THE COURT:  That's the designer?

15          THE WITNESS:  Yes, the designer.

16  Q   Does that hoodie -- do you have a specific recollection

17  of that hoodie?

18  A   Yes.  I purchased it for my brother.  It's a gray hoodie.

19  Q   The that Andrew was wearing you purchased yourself?

20  A   Yes.

21  Q   And you gave it to your brother Clarence?

22  A   Yes.

23  Q   And Clarence let Andrew borrow it?

24  A   Correct.

25  Q   Did you see what Ronnie Smalls and Cedric were wearing at

1 this time?

2 A   They was already in the cop car.

3 Q   So now you arrived on the scene, you have seen Andrew

4 come out in handcuffs and bloody, tell us what you do next?

5 A   There was a bunch of police officers and I was asking

6 like what happened.  Can I say what they said to me?

7        MR. FRANCOLLA:   I object to this.

8        THE COURT:   I'll sustain the objection.

9 A   Can I tell what they said to me?

10        THE COURT:   No.

11        MR. MEEHAN:   Your Honor, if it's a defendant it

12 would be allowed.  It would be a hearsay exception.

13        MR. FRANCOLLA:   There's no foundation for that.

14        THE COURT:   Why is it --

15        MR. MEEHAN:   It would be a party statement.

16        THE COURT:   That's offered by the other side not by

17 you.

18        MR. MEEHAN:   We are the other side.

19        THE COURT:   No.  You are representing the defendant.

20        MR. MEEHAN:   I'm representing the plaintiff.

21        THE COURT:   I'm sorry.  Are you talking about --

22 this is the statement you are saying made by a party deponent?

23        MR. MEEHAN:   Yes.

24        MR. FRANCOLLA:   No foundation for that, your Honor.

25        THE COURT:   What do you mean there's no foundation?

1        MR. FRANCOLLA:   That it was the parties that are

2 being inquired about in terms of what they said.

3        MR. MEEHAN:   It also goes to the narrative.

4        THE COURT:   Nothing goes to the narrative.  That

5 doesn't mean anything.  Can you establish that it was either

6 -- I think you have to lay a foundation that it's one of the

7 two defendants.  That's the theory under which you are seeking

8 this.

9 BY MR. MEEHAN:

10 Q   Do you know which police officers talked to you?

11 A   No.

12 Q   So you asked the officers why they were locking Andrew

13 up, correct?

14 A   Correct.

15 Q   What happened after that?

16 A   They told me --

17        MR. FRANCOLLA:   Objection.

18        THE COURT:   Sustained.

19 Q   Don't say what they said back because that's hearsay.  So

20 after they spoke to you you are not going to say what it was.

21 What happened next?

22 A   They put him in the cop car.

23 Q   So now Andrew is in a police car?

24 A   Yes.

25 Q   Where is Ronnie Smalls at this point?

1 A   He was already in the police car.

2 Q   And after that what happened?

3 A   I went home.

4 Q   Ms. Davis, thank you very much.

5        MR. MEEHAN:   I have nothing further.

6 CROSS-EXAMINATION

7 BY MR. FRANCOLLA:

8 Q   Good afternoon, Ms. Davis.

9 A   Good afternoon.

10 Q   If you need me to speak up or you don't understand what I

11 say, let me know and I'll correct that.  Okay?

12 A   Okay.

13 Q   Now, you testified on direct examination that you saw

14 Ronnie Smalls and Cedric in a police car, correct?

15 A   Yes.

16 Q   And you saw Andrew brought out and ultimately placed into

17 a police car, correct?

18 A   Yes.

19 Q   You didn't see Jerome Nelson though, right?

20 A   No.

21 Q   Now, you testified that someone brought to your attention

22 that Andrew was being arrested by yelling something to that

23 effect, is that fair?

24 A   Yes.

25 Q   And at that point hearing that you looked out the window,

1 correct?

2 A   Yes.

3 Q   And you could already see police vehicles in front of

4 8105?

5 A   Yes, on the side.

6 Q   On the side.  Okay.  Thank you.

7 A   Yes.

8 Q   What were you wearing that night?

9 A   Sweatpants.

10 Q   Do you remember the brand?

11 A   No.

12 Q   What was the top that you were wearing?

13 A   I don't recall.  A T-shirt.

14        MR. MEEHAN:   Objection, your Honor.

15        THE COURT:   Overruled.

16 Q   Did you purchase the T-shirt?

17 Q   Did I purchase the T-shirt?

18 Q   Presumably you pushed the clothes you were wearing?

19 A   Yes.

20 Q   As you are sitting here today you don't remember what

21 they were?

22 A   I know I had on clothes.

23 Q   You happen to remember specifically what Andrew Smalls

24 was wearing?

25 A   Correct.

1    Q    You gave testimony as part of this lawsuit in what's
2    called a deposition, correct?
3    A    Yes.
4    Q    And that was about May of 2017, is that fair?
5    A    Yes.
6    Q    Prior to giving that testimony you met with lawyers for
7    Mr. Smalls, different from these ones, on two separate
8    occasions, correct?
9    A    Yes.
10   Q    To prepare for your testimony?
11   A    Yes.
12   Q    And when you were there your brother William was present
13   also for one of those preparation sessions, correct?
14   A    He wasn't in the room with me.
15   Q    He was never present inside the room?
16   A    No.
17   Q    I'm going to refer Ms. Davis to her prior testimony.  It
18   should be included in the binder that was given to your Honor
19   earlier today.
20        THE COURT:  I have it.
21   Q    Specifically, page 35 and my intention was to read, with
22   permission, from line 24 on page 35 to the following page,
23   page 36, up to line 16.
24        THE COURT:  You are reading from what, 25 to?
25        MR. FRANCOLLA:  24 on page 35 to 16 on the following

1    page, page 37.
2        MR. MEEHAN:  Your Honor, that's not inconsistent.
3        THE COURT:  I think it's appropriate to read it.
4    Q    Ms. Davis, I am now reading from your deposition
5    transcript.  Were you asked these questions and did you give
6    these answers?
7        "QUESTION:   I believe you were asked when you met
8    with me and James Neville was anyone else around.  Do you
9    remember anyone else being with me and Jim when you came to
10   see us?
11       "ANSWER:    It was you two and my brother came in,
12   William Davis.
13       "QUESTION:    It was just me and Jim Neville and your
14   brother was there?
15       "ANSWER:    He came in, yes.
16       "QUESTION:    Was William Davis present in the room
17   when you were talking about what happened on the date of the
18   incident?
19       "ANSWER:    He was there.
20       "QUESTION:    Was he there for both meetings or just
21   one?
22       "ANSWER:    One.
23       "QUESTION:    Was that the recent meeting that you
24   had about a week ago?
25       "ANSWER:    Yes."

1        Were you asked those questions and did you give
2    those answers?
3    A    I was asked those questions and I was giving answers, but
4    you didn't read to me correctly.
5    Q    What do you mean?
6    A    He wasn't in the room together when we was doing it.
7    Q    I don't mean to cut you off.  Please continue.  I'm
8    sorry.  You were saying something.  You can explain it.
9    A    The only time we was together, when we met up.  We never
10   answered the questions in the room together when the other
11   lawyers was in there.
12   Q    So I understand that.  But are you saying that the
13   testimony I read, your answers were not accurate?
14   A    I didn't say that.
15   Q    Just to be clear, what I read from the deposition
16   transcript was in fact the questions you were asked and the
17   answers you provided, correct?
18   A    Yes.
19       MR. FRANCOLLA:  Your Honor, I may be finished, if I
20   can confer with my colleague.
21       I don't have anything further.  Thank you,
22   Ms. Davis.
23       THE COURT:  Anything further?
24   REDIRECT EXAMINATION
25   BY MR. MEEHAN:

1    Q    Good afternoon, again, Ms. Davis.
2    A    Good afternoon.
3    Q    You were asked questions by counsel about whether or not
4    --
5    A    Can you speak up a little more?
6    Q    You were asked questions by counsel about whether or not
7    your brother was in the room with you with the lawyers?
8    A    Correct.
9    Q    At the time the lawyers were asking you questions on the
10   record, you were alone, right?
11   A    Yes.
12   Q    So that's what you are talking about?
13   A    Yes.
14   Q    When you met with the lawyers beforehand, you were
15   together?
16   A    Yes.  We came together.
17   Q    Thank you.
18       MR. MEEHAN:  Nothing further, your Honor.
19       MR. FRANCOLLA:  I don't have anything.
20       THE COURT:  That you think.  You can step down.
21       (Witness excused.)
22       THE COURT:  Do you want to call your next witness.
23       MR. MEEHAN:  Can we briefly approach, your Honor?
24       (Sidebar.)
25       MR. MEEHAN:  Your Honor, we just do have a couple of

1  questions to raise with the court before the plaintiff takes

2  the stand and since it's 12:45 it may be good to break now and

3  we can answer these questions before we put the plaintiff on

4  the stand.

5          THE COURT:  What do you need to address?

6          MR. MEEHAN:  A couple of things.  Defendant talked

7  about putting in the affirmation regarding Judah Maltz,

8  subject to the redaction.  I don't believe they provided me

9  the redaction.  I want to go over it.  I want to be sure they

10  don't talk about Andrew not testifying at the criminal

11  proceeding or the grand jury.  It's his fifth amendment right

12  to do so.

13          THE COURT:  Why don't you just begin his direct and

14  we can get into this later.

15          MR. MEEHAN:  Yes, your Honor.

16          (In open court.)

17          MR. MEEHAN:  Your Honor, at this time, we call

18  plaintiff Andrew Smalls.

19  ANDREW SMALLS,

20      called as a witness, having been duly

21      sworn, was examined and testified as follows:

22          THE COURT:  State your name for the record.

23          THE WITNESS:  Good morning, my name is Andrew

24  Smalls.

25  DIRECT EXAMINATION

1  BY MR. MEEHAN:

2  Q    Good afternoon, Mr. Smalls.

3  A    Good afternoon.

4  Q    Can you tell the jury what your date of the birth is?

5  A    Yes.  My date of the birth is 12-27-86.

6  Q    How old are you today?

7  A    I'm 32 years of age.

8  Q    Tell the jury where you grew up.

9  A    I grew up in Far Rockaway, Far Rockaway, Queens, in a

10  community called Hammels Houses.

11  Q    Do you have any siblings?

12  A    Yes.

13  Q    How many siblings do you have?

14  A    There's ten of us all together.  My mother and father

15  have ten kids.

16  Q    Do you have any siblings who are no longer living?

17  A    Yes.

18  Q    What are their names?

19  A    Ronnie Smalls and Cedric.

20  Q    What year did Ronnie Smalls pass?

21  A    Ronnie Smalls passed away January 2008.

22  Q    What about Cedric, when did he pass?

23  A    He passed away December 2006.

24  Q    Mr. Smalls, I would like to direct your attention to May

25  20 of 2006.

1  A    Yes.

2  Q    Did you have an incident with the police that day?

3  A    Yes, sir.

4  Q    Where did that incident take place?

5  A    It took place inside Hammels Houses.

6  Q    What time of day did the incident with the police take

7  place?

8  A    Around nighttime, at night.

9  Q    Let's go back to the previous day, May 19.

10  A    Yes.

11  Q    What were you doing that day?

12  A    I was outside.

13  Q    It was an a nice day?

14  A    Nice day out.

15  Q    Did there come a time in which you went to 8105 Rockaway

16  Beach Boulevard?

17  A    Yes.  I probably went through there many times during the

18  day.  I was just outside.  I was around that a day, like we

19  come outside and we hang out in front of 8105.

20  Q    Were you hanging out with anyone in particular?

21  A    Yes.

22  Q    Who?

23  A    I was hanging out with Lindsey Johnson that night inside

24  his apartment.  Throughout the day it could have been any one

25  of my friends.

1  Q    Let's focus on that night.  You said you went to Lindsey

2  Johnson's apartment?

3  A    Yes.

4  Q    What time of day did you go there?

5  A    Sometime that night.  I know it was definitely dark out.

6  Q    So what did you and a Lindsey do that night?

7  A    Just in his house drinking, hanging out, playing cards,

8  doing whatever.

9  Q    Uneventful night?

10  A    Yes, just hanging out.

11  Q    You are in Mr. Johnson's apartment .  I would like to

12  direct your attention to about 1:00 o'clock in the morning.

13  A    Yes.

14  Q    Tell the jury what happened.

15  A    William came running up to the door.  I heard a knock at

16  the door so I go look through the peephole.  I see William

17  through the door.  He tells me my brothers be are being

18  arrested downstairs.  I run out and run downstairs.

19  Q    What brothers did he say were being arrested?

20  A    He didn't mention it.  I got a lot of brothers.  He say

21  brothers, like everybody knows the Smalls Brothers.  It could

22  have been any one of us.

23  Q    He said your brothers are being arrested downstairs?

24  A    Yes.

25  Q    What did you do when you heard that?

A. Smalls - direct - Meehan         150

1  A   I ran downstairs.
2  Q   Mr. Smalls, do you remember what you were wearing when
3  you went outside?
4  A   Yes.  I was wearing gray hoodie, blue jeans and an I had
5  on some black sneakers called Tim Duncan.
6  Q   I'm going to show you an exhibit that's already in
7  evidence, Plaintiff's Exhibit 38.  Do you see this photograph?
8  A   Yes.
9  Q   Is that a photograph of the hooded sweatshirt that you
10 were wearing that night?
11 A   Yes.
12 Q   Were you wearing any type of coat above this hooded
13 sweatshirt?
14 A   No.  It was too hot to wear a jacket and an a coat, a
15 hoodie and a jacket at the same time around.  It was a nice
16 day out.
17 Q   After you left the apartment, where did you go?
18 A   I went downstairs.  I went through the back way, like I
19 ran down the steps.  The first steps is like the back way.  So
20 when you come around you got to come around and you get to the
21 lobby.  So when I come around like before I get to the
22 vestibule of the outside door it's police in there with my
23 brothers like talking to the cops.  I'm trying to act like
24 what happened to my brothers.  I'm being concerned like what
25 happened to my brothers.  You always fuck with us.  I'm trying

Anthony M. Mancuso, CSR    Official Court Reporter


A. Smalls - direct - Meehan         151

1  to find out what's going on.  So we start going back and
2  forth.  One thing led to another, then I was being cuffed.
3  Q   Let me stop you right there.  So you said that you got to
4  the lobby and you saw your brothers?
5  A   Yes.  Like they was outside, right between the lobby,
6  like being taken out of the building, going to the cop car.
7  Q   They were outside the lobby?
8  A   Yes.  Like I can't really explain.  I don't know if you
9  all know how the building is set up.  But it's like the lobby
10 is like part of the front of the building too.  Like I don't
11 know if you understand how a project building is set up.  I
12 can't draw it.  I was in the vestibule of the building like
13 you could say.
14 Q   Can you describe to the jury what your brother Ronnie
15 Smalls was wearing that night?
16 A   I can't tell you for sure what he was wearing.  I can't
17 tell you exactly what he was wearing to be honest.
18 Q   How old was Ronnie Smalls at this time?
19 A   He was older than me.  He a year old than me.  He had to
20 be around 20 years old.
21 Q   You were 19 at this time?
22 A   Yes.  I was 19.
23 Q   And how old was Cedric at this time?
24 A   He was 16.
25 Q   Do you remember what Cedric was wearing?

Anthony M. Mancuso, CSR    Official Court Reporter


A. Smalls - direct - Meehan         152

1  A   Not too sure what he was wearing either.
2  Q   So you see your brothers being in a police car and then
3  you said that you approached the officers, right?
4  A   Yes.
5  Q   And tell the jury what you said to the officers.
6  A   I was like basically being concerned about my brothers,
7  like what's going on.  Why you always fuck with my brothers,
8  harassing them?  What are they being locked up for now?  They
9  start saying a get the fuck back.
10 MR. FRANCOLLA:  Objection, no foundation.
11 THE COURT:  Do you remember what officers you were
12 speaking to?
13 THE WITNESS:  I can't exactly recall which
14 officers.  It was like an altercation between me and these
15 officers verbally like going back and forth.
16 Q   Were the officers cursing back at you?
17 A   Yes.
18 Q   Were the officers yelling back at you?
19 A   Yes.
20 Q   Where was this?
21 A   Right in front of the building.  Like right in front of
22 the building.
23 Q   I'm going to get back that map, Plaintiff's Exhibit 2?
24 THE COURT:  Were you inside the building or outside
25 the building?

Anthony M. Mancuso, CSR    Official Court Reporter


A. Smalls - direct - Meehan         153

1  THE WITNESS:  It was like in between the doorway of
2  the building like.  I'm going to show you right now.  I don't
3  know if you got a picture.  Do you have a picture of the front
4  of the building like I could show the exact building?
5  Q   Yes.  At this time I would like to put Plaintiff's
6  Exhibit 42 into evidence.
7  MR. MEEHAN:  At this time, without the objection of
8  the counsel, I would like to put in becomes's 42 A.  However,
9  I'm concerned that there might have been a mixup with the
10 numbers.  So in an abundance of the caution, I would like to
11 move it in as Plaintiff's Exhibit 51.  Counsel is okay with
12 that.
13 THE COURT:  All right.
14 MR. FRANCOLLA:  No objection.
15 THE COURT:  Exhibit 51 is received.
16 (So marked.)
17 Q   Is this the building?
18 A   Yes.  This is exactly how the building looked.
19 Q   This is a picture of the 8105 Rockaway Beach Boulevard?
20 A   Yes.  The only thing is difference, this door is usually
21 open.  This is slammed back.  If this door was to be slammed
22 back, I was right in between it like the doorway of the lobby
23 and the building and this brick wall is where they slammed my
24 head at.
25 THE COURT:  Were you on the other side of that door

Anthony M. Mancuso, CSR    Official Court Reporter

1  inside?

2          THE WITNESS:  Yes.  That's where the altercation

3  started at.  I tried to break my way out the door to get to my

4  brothers.  And they dragged me outside the door.

5          THE COURT:  So the at the point in time that your

6  head is injured you were outside of the door?

7          THE WITNESS:  Yes.  Outside of the door like right

8  here.  Right in front of the door.  Like the door.  I probably

9  had one leg in and one leg out or something.  I was right

10 there at the door.  That's where it took place at.

11         THE COURT:  Your conversation with the police began

12 inside the door?

13         THE WITNESS:  Yes.  Like inside the doorway.  The

14 whole point was me trying to get to my brothers.

15         THE COURT:  Where are your brothers --

16         THE WITNESS:  Outside.  It's like a cop car on this

17 ramp right here.  They being in cuffs.  My brother is in one

18 car and one of them is walking to another car.  The car was

19 like pulled up right on this ramp.

20         THE COURT:  You saw that?

21         THE WITNESS:  Yes, right here.

22         THE COURT:  You saw one of your brothers inside the

23 cop car and the other one walking with an officer to another

24 cop car?

25         THE WITNESS:  Yes.

1          THE COURT:  That's what you saw?

2          THE WITNESS:  Yes.

3          THE COURT:  After seeing that, is that when your

4  conversation started about what are you doing?

5          THE WITNESS:  Yes.  That started the altercation,

6  exactly.

7  Q   Okay.  So the altercation, tell us about that.

8  A   It's like -- it happened really quick.  Everything

9  happened so fast.  It was like -- I don't want to be too rude.

10 It was just regular police, who the fuck you think you are.

11 Regular conversation.

12         THE COURT:  Just tell us what the conversation was.

13 Don't tell us what something regularly was.

14         THE WITNESS:  Get the fuck out of here.  Get the

15 fuck back.

16 Q   That's what they said?

17 A   That's what they was saying to me.

18 Q   Did they at some point grab you?

19 A   Yes, at some point they grabbed me, put cuffs on me and

20 slammed my head against the wall.  Exactly what happened.

21 Q   Your head has been slammed against the wall?

22 A   Yes.

23 Q   You are handcuffed.  Did you sustain an injury after your

24 head was slammed against the wall?

25 A   Yes.  I still got the injury on my right eye.

1  Q   So I would like to show you Plaintiff's Exhibit 38 again.

2  Okay?

3  A   Yes.

4          MR. MEEHAN:  Can we dim the lights, your Honor?

5          THE COURT:  We'll see if we can get that ironed out

6  over the luncheon recess.  Why don't I excuse you, ladies and

7  gentlemen, for the luncheon recess and we'll resume at

8  2:00 o'clock.

9          (Jury excused.)

10         THE COURT:  All right.  There was an issue that the

11 defendants wanted to raise this morning I think that related

12 to cross-examination of this witness.  Do you want to raise

13 that now?

14         MR. FRANCOLLA:  Two separate issues.  The first was

15 we had talked about the court issuing an instruction regarding

16 the dismissal of Mr. Smalls's charges.  I believe we had

17 discussed that on the first day, on Monday morning.  So the

18 question I think counsel shares was how your Honor intended on

19 reading that, when your Honor intended on reading that.

20         THE COURT:  When do you want it read?

21         MR. FRANCOLLA:  I think for purposes of the jury

22 getting the whole picture I think it should be read during

23 plaintiff's testimony, either before he resumes or it can be

24 before I begin my examination.

25         MR. NORINSBERG:  Wouldn't it be most appropriate

1  after Mr. Meehan elicits that he was convicted and eventually

2  charges were overturned and he was released.  At that point

3  the court gives the instruction.

4          THE COURT:  Can it just be elicited through the

5  direct of how he's going to be directed?  Can you just say

6  were your charges --

7          MR. NORINSBERG:  The point is to have an instruction

8  from the court.  Both sides share this, not to go into what

9  happened on appeal.

10         MR. FRANCOLLA:  The appropriate time when that

11 testimony is elicited your Honor's instruction can be read.

12         THE COURT:  I was going to say something that I read

13 to you before, in effect, that he was convicted, that his

14 conviction was overturned by the Appellate Division, which is

15 a higher court, based upon the claim that -- the

16 constitutional claim that the gun was seized unlawfully and

17 that the court below in no way even addressed -- did not

18 resolve or even address the issues that they have to decide

19 here.

20         MR. NORINSBERG:  Okay.  I thought when you told us

21 on Monday it sounded like you had something written out which

22 sounded agreeable to both sides.

23         THE COURT:  I have it upstairs.  I'll read it to you

24 before I read it to the jury.

25         MR. FRANCOLLA:  The second issue, in the in limine

A. Smalls - direct - Meehan                                    158

1  hearing there was discussion about the extent to which we can
2  inquire of plaintiff's criminal history. The rulings were
3  that, as I recall them, that two felonies were admissible.
4  The assault, obviously absent the possession of a weapon that
5  was wrapped up in that, as well as the recent charge that I
6  believe he's incarcerated on for criminal possession of a
7  forged instrument in the second degree.
8        My understanding is that we can elicit the date of
9  the conviction and the sentence for forged instrument without
10 getting into the facts specifically that he's incarcerated
11 of now.
12       THE COURT: I think that's what was said. That's
13 what I remember ruling.
14       MR. FRANCOLLA: The question that I have, it was
15 not discussed by either side during this back and forth. I
16 think it's clearly a crime that a falls under 609(a)(2( that
17 would allow at least somewhat limited inquiry into what the
18 crime was and the underlying facts, albeit very briefly, since
19 it was possession of a forged instrument.
20       MR. MEEHAN: This has already been litigated. The
21 court made a ruling on that -- the name of the charge and the
22 length of the sentence.
23       MR. FRANCOLLA: If the court needs a citation, I
24 have one. In terms of what I envision, your Honor, my
25 understanding is the possession of a forged instrument had to

A. Smalls - direct - Meehan                                    159

1  do with I think possession of fake or credit cards, from the
2  testimony of the plaintiff. So I just wanted to give the jury
3  at least some context as to what the charge reflects. It's
4  oddly worded.
5        THE COURT: I don't think it comes in under
6  609(a)(2). It says that for any crime regardless of the
7  punishment. That means it doesn't have to be an a felony.
8  The evidence must be admitted if the court determined that
9  establishing the elements of a crime required proving a
10 dishonest act. That you prove through saying that he was in
11 possession of a forged instrument. So I don't know why
12 609(a)(2) is any greater leeway. The purpose of that
13 provision as far as I understand it is it could cover a
14 misdemeanor as opposed to a felony.
15       MR. FRANCOLLA: My understanding, your Honor, is
16 that there could be inquiry as to the act itself, since it
17 does pertain to veracity.
18       THE COURT: This is not an a great time to be
19 raising this, since we went over this already. You have some
20 case that says you can inquire into the details?
21       MR. FRANCOLLA: I have something here. I have to
22 see if it deals with that specific aspect of it.
23       MS. FUDIM: Your Honor, if I can get the exact case
24 probably after lunch. I had a trial in front of Judge Koeltl
25 about six months ago. The charge was also possession of a

A. Smalls - direct - Meehan                                    160

1  forged instrument. He allowed us to just get in that it was a
2  credit card. His ruling that possession of a forged
3  instrument, the average layperson may not know what it was.
4  He allowed us to get in the one extra question and that had to
5  do with possession of card.
6        THE COURT: Did the indictment charge credit cards?
7        MR. FRANCOLLA: I believe we just have the rap sheet
8  which does not elaborate on it. That's from his testimony,
9  being the plaintiff's.
10       MR. MEEHAN: Why does it only come up in the middle
11 of plaintiff's examination, if it came up six months ago? She
12 was the one who wrote the motion in limine. It's not even the
13 eve of trial. This is mid-trial that it's coming up.
14       MR. FRANCOLLA: I raised it this morning. I don't
15 know what that has to do with anything.
16       THE COURT: I'm not inclined to address that now.
17 If you had the indictment and if the indictment said credit
18 card and if he admitted to credit card that a would be one
19 thing. I don't know that and a you can't establish that. I'm
20 not inclined, just based on the rap sheet, to allow that
21 detailed inquiry. Was there something else you needed to
22 address?
23       MR. MEEHAN: Yes, your Honor.
24       Mr. Francolla indicated that he wanted to
25 cross-examine Mr. Smalls on the actual memorandum of law

A. Smalls - direct - Meehan                                    161

1  subject to some redactions and we have not seen them yet.
2        MR. FRANCOLLA: You have not seen them, because the
3  conversation on Monday was, do you want anything redacted.
4  This is what I want. Let me know. I was told that I would be
5  let know if there was anything they wanted redacted since this
6  document may need context for the lawyer who comes the next
7  day. I don't care about redactions for it, whether they are
8  there or not. I did not say I was going to do them for
9  plaintiff's counsel. If they wanted anything redacted they
10 would tell us, subject to what we have already discussed.
11       MR. MEEHAN: I disagree with that.
12       THE COURT: You know what, you guys figure it out
13 over lunch. You spend your lunch hour deciding what you don't
14 want to go in from that document. Okay.
15       MR. MEEHAN: Your Honor, one issue that I brought up
16 at sidebar -- I don't know if you have ruled on yet -- was the
17 failure of the plaintiff himself to testify at the criminal
18 trial.
19       THE COURT: We are not going to go into that?
20       MR. FRANCOLLA: No.
21       (Lunch recess taken.)
22       AFTERNOON SESSION
23 ( In open court; jury not present.)
24       THE COURT: Before you bring the jury out, I just
25 wrote out the instruction that the parties want me to give.

1  What I would propose saying is:  Plaintiff's conviction at the
2  trial court level was reversed by an appellate court based
3  upon a finding that plaintiff's rights under the fourth
4  amendment to the constitution to be free from unreasonable
5  searches and seizures were violated.  That decision did not
6  resolve or even address the issue before you, namely, whether
7  plaintiff has shown by a preponderance of the evidence that
8  the defendants fabricated evidence that he possessed a gun.  I
9  will define for you what preponderance of the evidence means
10  in my jury instructions.
11         MS. FUDIM:  Your Honor, we would object to that one.
12  When we had discussed it other day, the language you had said
13  you were inclined to go with, that the gun had been illegally
14  seized or wrongfully seized.  Based on that we opened on it.
15  This would be confusing to the jury and we would ask that the
16  prior instruction you told us about the gun being wrongfully
17  seized is included in the court's instructions.
18         THE COURT:  I can say based upon a finding that
19  plaintiff's rights under the fourth amendment of the
20  constitution to be free from unreasonable searches and
21  seizures were violated in the seizure of the gun.
22         MR. NORINSBERG:  The way you had it originally, the
23  court had found that the police officers unlawfully seized the
24  gun.  It didn't talk about plaintiff's and his rights and I
25  think that there is an element of confusion.

1         THE COURT:  What do you want?
2         MS. FUDIM:  The way it was the other day you gave it
3  to us is fine with us.
4         MR. NORINSBERG:  It's acceptable to both sides.
5         THE COURT:  So you want me to say that his
6  conviction was reversed based on a finding that the gun was
7  unlawfully seized.
8         MS. FUDIM:  Yes.  There was a second sentence still.
9  No issues that you have to decide here or decided by the
10  appellate court.  Something to that effect.
11         THE COURT:  That's the second part of what I said.
12         MS. FUDIM:  That part should be kept.
13         THE COURT:  So plaintiff's conviction at the trial
14  court level was reversed based on a finding that the gun was
15  unlawfully seized.  That's what everybody is happy with.  The
16  second part that I read it's acceptable to everyone.  That
17  decision did not resolve or even address the issue before you,
18  namely, whether plaintiff has shown by a preponderance of the
19  evidence that the defendant officers fabricated evidence that
20  he possessed the gun.
21         MR. NORINSBERG:  I don't like that last part about
22  injecting the burden of proof or what plaintiff must show.  We
23  can simply say it doesn't address the issues that you have to
24  decide here in this particular case, which I'll instruct you
25  more on when I give my final charge.

1         THE COURT:  What is it, that decision did not
2  resolve or even address the issues before you?
3         MR. NORINSBERG:  Which you will be called upon to
4  decide in this civil action.
5         THE COURT:  Do you have any objection to that?
6         MS. FUDIM:  No, that's fine.
7         THE COURT:  That decision did not resolve or even
8  address.
9         MR. NORINSBERG:  The issues which you will be called
10  upon to decide in this civil action.
11         (Pause.)
12         THE COURT:  Okay.  You want me to give that
13  instruction when, counsel?
14         MR. MEEHAN:  I'm going to get to a part where the
15  charges are dismissed and I'll prompt the court.
16         THE COURT:  Okay, good.
17         MR. FRANCOLLA:  That's fine with us.
18         THE COURT:  Did you resolve the issue about using
19  the photos?
20         MR. FRANCOLLA:  Yes.
21         THE COURT:  I wanted to turn down the lights.
22         MR. MEEHAN:  In order to resolve that, I'll switch
23  to a different photograph that's a little clearer.
24         THE COURT:  That takes care of that.  Okay, we're
25  ready.

1         MR. MEEHAN:  Should the plaintiff take the stand,
2  your Honor.
3         THE COURT:  Yes.
4  Andrew Smalls, resumed.
5         (Jury present.)
6         THE COURT:  All right.  Ladies and gentlemen, please
7  be seated.
8         MR. MEEHAN:  May I inquire, your Honor?
9         THE COURT:  Yes, you may.
10  DIRECT EXAMINATION
11  BY MR. MEEHAN:  (Continued.)
12  Q    Good afternoon, Mr. Smalls.
13  A    Good afternoon.
14  Q    When we broke for lunch we were discussing the injury you
15  stained above your right eye?
16  A    Yes.
17  Q    I would like to show you what has been introduced into
18  evidence as Plaintiff's Exhibit 37.  This is your mug shot
19  from the night of the incident, correct?
20  A    Yes.
21  Q    And if we zoom in, I know it's a little light, but did
22  that show what you received on your eye?
23  A    Yes.
24  Q    Right here?
25         THE COURT:  Is that where the injury was at that

1  point?

2          THE WITNESS:  Yes.

3          THE COURT:  Why don't you touch where the injury

4  was.

5          THE WITNESS:  Right here.

6          THE COURT:  Is above your eye?

7          THE WITNESS:  Above my eye right here.

8  Q    If we go to what has been introduced into evidence as

9  Plaintiff's Exhibit 24, prisoner pedigree card, if we zoom in

10 it says physical slash mental condition.  It says slash to

11 eye?

12 A    Yes.

13 Q    Does that mean laceration of an eye?

14 A    I don't know the doctor's terms for that.

15 Q    Now, you said you were handcuffed, correct?

16 A    Yes.

17 Q    After you were handcuffed what happened?

18 A    I was led to a police car.

19 Q    And after you were led to the police car what happened?

20 A    I was transferred to the precinct, the 100 precinct.

21 Q    How long were you at the precinct?

22 A    For hours, I can't recall how many though.

23 Q    And at the precinct did you receive any treatment for

24 your eye?

25 A    The EMS came to me about my eye.  They wanted me to go to

1  the hospital but I refused.

2  Q    Why did you refuse?

3  A    Because I thought I wasn't going to be in the precinct

4  for that long.  I thought I was only being locked up for

5  resisting arrest or something like that and be let right out

6  and I would take care of it myself.

7  Q    Did there come a time in which you left the one hundred

8  precinct?

9  A    Yes.

10 Q    Where did you go?

11 A    I went to Kew Gardens I believe to central booking.

12 Q    At central booking, did there come a time in which you

13 learned what you were actually being charged with?

14 A    A few hours later like I spoke to a lawyer.  When they

15 take you to central booking and they explain the arrest

16 charges, that's what I found out then.

17 Q    Tell the jury what you learned you were being charged

18 with.

19 A    I was being charged with reckless endangerment, criminal

20 possession of a weapon and trespassing.

21 Q    How did you feel when you learned about the gun charges?

22 A    Like I was confused and shocked.  What the fuck.  Pardon

23 my language, but that's the attitude that I gave off.

24 Q    Mr. Smalls, you were here when the defendants testified,

25 right?

1  A    Yes.

2  Q    Were you ever on the roof on May 20, 2006?

3  A    I was never on the roof.

4  Q    Did you ever pass a gun to anyone?

5  A    I never passed a gun.

6  Q    Did you even hold a gun that night?

7  A    Never seen a gun that night at all.

8  Q    Did anyone pass a gun to you that night?

9  A    No.

10 Q    I would like to show you a photograph that has been

11 introduced in evidence as Plaintiff's Exhibit 45, the

12 photograph of the firearm recovered on the roof.  Do you see

13 that?

14 A    Yes.

15 Q    Have you ever seen this gun before?

16 A    I only time I seen that gun is during trial, during my

17 criminal trial.

18 Q    Were you ever part of any group being chased by police

19 that night?

20 A    No.  I wasn't being chased by anyone that night.

21 Q    When was the first time you saw any police that night?

22 A    When I went to go confront them about my brothers.

23 Q    When was the first time you saw your brothers that night?

24 A    I saw one in the cop car.  They was in police custody.

25 Q    Mr. Smalls, you also heard the defendants say that you

1  were wearing a black jacket that night, right?

2  A    That's not true at all.

3  Q    At any time on May 20, 2006, were you ever wearing a

4  black jacket?

5  A    Never.  That's not true at all.

6  Q    You heard the defendants say that they had you take the

7  black jacket off?

8  A    Yes.  Why would I have on a black jacket and a hoodie

9  like the middle of May?

10 Q    I would like to show you the exhibit we just looked at,

11 37.  This is your mug shot from that night, correct?

12 A    Yes.

13 Q    Tell the jury what you're wearing.

14 A    I'm wearing a gray sweatshirt, gray hoodie.

15 Q    I would like to show you Plaintiff's Exhibit 38, a color

16 mug shot taken by the defendants.  Do you see that?

17 A    Yes.

18 Q    Tell the jury what you are wearing in that picture.

19 A    A gray hoodie sweatshirt.

20 Q    I would like to show you what's in evidence as

21 Plaintiff's Exhibit 44.  This is a photocopy of your prisoner

22 movement slip, fourteen hours after you were arrested, right?

23 A    Yes.

24 Q    And if we zoom in we can see that's from --

25 A    2006.

1  Q    And the time that's about 3:00 o'clock in the afternoon
2  the next day?
3  A    I don't know if that's military time.
4  Q    1500 hours, right?
5  A    Yes.
6  Q    If you minus twelve that's 3:00 o'clock?
7  A    Correct.  I'm not too good with that.
8  Q    If we look at the picture, are you still wearing the
9  exactly same hoodie that you were wearing before?
10 A    Yes.
11 Q    Mr. Smalls, can you tell the jury if there are any photos
12 of you in a black jacket from that night?
13 A    There's no photos.  I never had a black jacket on that
14 night.  That's part of my innocence the whole time.  They know
15 that for a fact I didn't have no black jacket.  They know
16 that.
17 Q    Now, I would like to show you what's been placed in
18 evidence as Plaintiff's Exhibit 5.  This is your criminal
19 complaint, right?
20 A    Yes.
21 Q    So let's go down to where it says deponent.  Do you see
22 that?
23 A    Yes.
24 Q    Okay.  It says they observed the defendants Ronnie Smalls
25 and Andrew Smalls run into the above location and was

1  apprehended with others, Cedric Smalls and Jerome Nelson?
2  A    Yes.
3  Q    Did you ever run in 8105 with anyone?
4  A    I never ran into that building with my brothers that
5  night.
6  Q    How did you get into 8150?
7  A    I was already in the building.  I was in my friend's
8  apartment.
9  Q    If we go an a little further down:  Deponent further
10 states that he observed defendant Ronnie Smalls holding -- I'm
11 sorry.  If we go above that.  Deponent further states that he
12 observed the defendant Ronnie Smalls and the defendant Andrew
13 Smalls running through the seventh floor hallway of the
14 above-mentioned location.  Do you see that?
15 A    Yes.
16 Q    Did you ever run through the seventh floor hallway?
17 A    Not at all.
18 Q    The next one, that he observed the defendant Ronnie
19 Smalls holding a .38 caliber pistol in his hand and also
20 observed him drop a magazine on the ground.  Do you have any
21 idea what Ronnie Smalls did?
22 A    No, not that I am aware of that night.
23 Q    The next one:  Deponent further states that he observed
24 the Ronnie Smalls hand said pistol to Andrew Smalls where both
25 defendants ran on to roof of said building.

1  A    Yes.
2  Q    Did Ronnie ever hand you a firearm?
3  A    No.
4  Q    Did you ever hand Ronnie Smalls a firearm?
5  A    No.
6  Q    Were you with Ronnie Smalls?
7  A    No, not at all, not that night.
8  Q    Now, Mr. Smalls, you told us earlier that you were
9  shocked when you learned you were charged with criminal
10 possession of a weapon, right?
11 A    Yes.
12 Q    Tell the jury what you were feeling as you were being
13 prosecuted for a crime you did not commit?
14 A    I just thought it was going to be resolved, like I
15 thought it was going to get resolved quickly, like shocked.  I
16 can't really explain the feeling, man.  It's undescribable.
17 It's undescribable.
18 Q    Mr. Smalls, as a result of this gun possession charge,
19 did you spend any time in jail?
20 A    Yes.
21 Q    How much time did you spend in jail?
22 A    A little over two years.  I was placed in a maximum
23 security prison.
24 Q    Tell the jury what that was like.
25 A    That was definitely like, being young, being young and

1  locked up with people who was never coming home -- they got
2  life in prison -- for a crime I didn't commit.  It was kind of
3  hard because I didn't have nobody to talk to.  I couldn't even
4  go get help from anybody because they assumed I'm weak or
5  whatever the case may be and most kids my age they usually
6  can't handle it.  They commit suicide.  The only thing that
7  kept me --
8           MR. FRANCOLLA:  Objection, your Honor.
9           THE COURT:  I'll sustain the objection and strike
10 the comment about what most kids do.
11 Q    Mr. Smalls, tell the jury what ultimately what happened
12 to the gun possession charge?
13 A    It was dismissed.
14           MR. MEEHAN:  Your Honor.
15           THE COURT:  Ladies and gentlemen, plaintiff's
16 conviction at the trial court level was reversed by an
17 appellate court based upon a finding that the gun was
18 unlawfully seized.  That decision did not resolve or even
19 address the issues which you will be called upon to decide in
20 this civil action.
21 Q    Now, Mr. Smalls, once those gun charges were dismissed,
22 was that the end of it?
23 A    No.  I still had to go to court for, years later, for
24 criminal trespassing.  They dismissed the charges after a few
25 years.  I had to go to court for criminal trespassing.

1  Q    After all the gun charges were dismissed, you still had
2  the criminal trespass from May 2006?
3  A    Yes.
4  Q    And did you trespass that night?
5  A    No.
6  Q    Why did you not trespass?
7  A    Because I was at a friend's apartment.
8  Q    You were invited?
9  A    Yes.
10 Q    Whatever happened to the trespass charge?
11 A    It got dismissed also.
12 Q    Now, Mr. Smalls, since this incident in 2006 have you had
13 any other criminal convictions?
14 A    Yes.
15 Q    In 2012 you were convicted of an assault?
16 A    Yes. I was convicted. I was not convicted. I pled
17 guilty to assault.
18 Q    And in 2016 you pled guilty to criminal possession of a
19 forged instrument?
20 A    Yes. I pled guilty to that as well. I was not convicted.
21 I pled guilty to it.
22 Q    For the 2012 and 2016 incidents you pled guilty?
23 A    Yes. I pled guilty.
24 Q    For this gun charge you did not plead guilty?
25       MR. FRANCOLLA:  Objection, your Honor.

1        THE COURT:  Overruled.
2  A    No. I went to trial for it.
3  Q    Why did you not plead guilty?
4  A    Because I was innocent. I never possessed a gun at all
5  that night, at all.
6  Q    Now, Mr. Smalls, we've gone through the prosecution,
7  we've gone through everything that happened after your arrest.
8  Let's turn back a little bit before the arrest of May 20. At
9  the time of the incident were you employed?
10 A    No. I was not fully employed. I used to work in my
11 community center like as a tutor.
12 Q    Tell the jury what you used to do working as a tutor?
13 A    I used to help kids with school homework, computer,
14 showing them stuff like that. It started off from a program
15 called Winter Youth. It's like Summer Youth but it's Winter
16 Youth. They placed me in a community center. After my time
17 was up I actually stayed there. I liked the environment. So
18 I started staying there regularly.
19 Q    That was in the Hammels Houses?
20 A    Yes, in the community center.
21 Q    What kind -- did you tutor adults or kids?
22 A    Kids like third grade, fourth grade. They was in public
23 schooling. The school is right across the street. They was
24 from there.
25 Q    After this arrest were you able to continue being a

1  tutor?
2  A    I couldn't continue doing anything. At that point I was
3  still fighting, fighting my case.
4  Q    Now, at the time of the arrest in 2006 did you graduate
5  -- you said you were 19?
6  A    Yes.
7  Q    Had you completed high school?
8  A    No. I stopped going to high school at eleventh grade. I
9  had got my GED when I was in the eleventh grade when I was 17.
10 Q    You had a GED?
11 A    I got my GED in 2004.
12 Q    Did you plan on attending college?
13 A    Yes.
14 Q    Were you able to attend college?
15 A    No.
16 Q    Now, Mr. Smalls, I notice that your hair is in braids
17 today, correct?
18 A    Yes. I started growing my hair back a couple of months
19 ago.
20 Q    At the time of incident what was your hairstyle?
21 A    In braids.
22 Q    At the time of the incident what was Cedric's hairstyle?
23 A    In braids.
24 Q    Have you ever been told you look alike like Cedric?
25 A    Yes, all the time.

1        MR. FRANCOLLA:  Objection.
2        THE COURT:  I'll sustain the objection to the form
3  of that question.
4  Q    You were here when the defendants testified, right?
5  A    Yes.
6  Q    You heard that Officer Teta said that all four of you
7  were transported to central booking at the same time?
8        MR. FRANCOLLA:  Objection. That's not an accurate
9  recitation of the testimony nor is it an appropriate inquiry.
10       THE COURT:  You can ask him was he transported at
11 the same time.
12 Q    So that night Ronnie Smalls, Cedric Smalls, yourself and
13 Jerome Nelson were arrested, correct?
14 A    Yes.
15 Q    Were the four of you transported at the same time?
16       THE COURT:  To where, to the precinct or to central
17 booking? That's different.
18 Q    From the precinct to central booking?
19 A    No. We were -- I don't think we were transferred at the
20 same time.
21 Q    Why do you not think that?
22 A    It was only like me and Ronnie Smalls and Jerome and
23 Cedric. They were 16 years old. They were like underage.
24 Q    They were juveniles?
25 A    Yes. They were juveniles. They were considered

1  adolescents and we was like adults.

2  Q   Did you go through the same system?

3  A   No.  We went through the same central booking.  We don't

4  go to the same holding pens.  It's like two different holding

5  pens.  From 16 to 18 and adults go do a different one.  They

6  were 16 at the time, so they couldn't be in the same pen as

7  us.

8  Q   When you heard the statement that all four of you got all

9  the jackets back at the same time, is that possible?

10 A   That's impossible.  When you are in a precinct --

11     MR. FRANCOLLA:  Objection.

12     THE COURT:  Just tell us what happened that night.

13 A   When you in a precinct, they voucher all your property.

14 If someone says --

15     MR. FRANCOLLA:  I object to his understanding of

16 police practices.

17     THE COURT:  Are you talking about what happened

18 that night?

19     THE WITNESS:  What happened when I go to the

20 precinct.

21     THE COURT:  Not generally when you go to the

22 precinct.  What happened that night?

23 A   Can you repeat the question?

24 Q   Sure.  Were the four of you together when the police

25 returned all of your property?

1      MR. FRANCOLLA:  Objection.  Where?

2  A   They ain't never took our property.  That's what I am

3  trying to tell you.

4  Q   They never took anybody' property?

5  A   They never took anybody's property.

6  Q   Mr. Smalls, please tell the jury why you brought this

7  lawsuit.

8      MR. FRANCOLLA:  Objection.

9      THE COURT:  Yes.  I'm sustain the objection.

10 A   I brought in lawsuit --

11     THE COURT:  No.  I sustained the objection.  Don't

12 answer the question.

13     THE WITNESS:  Sorry about that, ma'am.

14 Q   Mr. Smalls, again, did you have a gun on May 20 of 2006?

15 A   No.

16 Q   Did you participate in any chase?

17 A   No.

18 Q   To your knowledge, did you even know if a chase happened?

19 A   No, not that I know of.

20     MR. MEEHAN:  Thank you, Mr. Smalls, I have nothing

21 further.

22 CROSS-EXAMINATION

23 BY MR. FRANCOLLA:

24 Q   Good afternoon, Mr. Smalls.

25 A   Good afternoon.

1  Q   Now, you testified on direct examination that you did not

2  recall what your brother Ronnie Smalls was wearing on night of

3  your arrest, correct?

4  A   Nope.

5  Q   And the same would apply to your brother Cedric?

6  A   No.  I can't recall exactly that night what they was

7  wearing.

8  Q   But isn't it true that you previously in a letter you

9  wrote indicated that Cedric was wearing an a black jacket that

10 night?

11 A   May I explain why?

12 Q   No.  I'm asking a question.

13 A   Yes.

14 Q   Okay.  Isn't it true that you also wrote in that same

15 letter that your brother Ronnie Smalls was wearing a red

16 hoodie?

17 A   The evidence, after I went through trial and I seen the

18 paperwork.  That's why I wrote my letter.  How could this

19 possibly happen if Ronnie Smalls was wearing this and Cedric

20 was wearing this?  If the paperwork says Cedric was wearing

21 black and Ronnie Smalls was wearing red, and in the picture I

22 was wearing gray, that's why I wrote the letter.

23 Q   The letter was that's not what you recall them wearing,

24 is that your testimony today?

25 A   I recall that after I read the paperwork.

1  Q   To be clear, when you wrote the letter in 2011 you

2  recalled that your brother Cedric was wearing a black jacket,

3  yes or no?

4  A   Yes.  I went through a procedure.  I went to trial and I

5  seen what he was wearing from that experience.  So I wrote my

6  letter after I lost my case and I explained to them how can

7  this be, you can see that I'm innocent, I'm wearing gray and

8  they say I'm wearing black and from the evidence they have

9  they can see Cedric is wearing black.  That's why I wrote the

10 letter to continue to prove my innocence.

11 Q   So, according to your letter, Ronnie Smalls was wearing a

12 red hoodie that night, correct?

13 A   Yes.  According to the paperwork that's what he was

14 wearing.  That's what they got in the paperwork.  I can't

15 recall exactly the same day.  After going over the paperwork

16 what I got convicted of how can I be convicted of something if

17 I never had it on?

18 Q   Did you have any discussions with your attorneys about

19 your testimony in between the lunch break?

20 A   No, not at all.

21 Q   Let me show you a photograph which is Defendant's Exhibit

22 X.  That's your brother Ronnie Smalls, right?

23 A   Yes.

24 Q   We could agree in this picture he's not wearing a red

25 hoodie?

1  A    Exactly.
2  Q    Now, in the letter that you wrote did you make it clear
3  that your recollection -- are you saying in the letter that
4  you wrote is not based on your recollection?
5  A    Yes.  It was not based on my recollection of that night.
6  It was based on what the officers provided in the paperwork
7  that got me wrongfully convicted.
8  Q    Did you make that clear in the letter or are you saying
9  that you said it was because --
10  A    Yes.  I made that clear.  I'm writing this letter because
11  I'm innocent.  You can read the whole letter and show them the
12  whole letter.  I have no problem with that.
13  Q    I appreciate that, Mr. Smalls.  We'll get to that.  In
14  the letter did you say that you were in Lindsey Johnson's
15  apartment?
16  A    I explained in the letter I was innocent.
17  Q    The question was whether you said in that letter you were
18  in Lindsey Johnson's apartment?
19  A    I'm not too sure.  You can show the letter.
20  Q    I'll show you a copy of it to see if it refreshes your
21  recollection as to what you said about it.
22       THE COURT:  You are showing it to him?
23       MR. FRANCOLLA:  Just to the witness to see if it
24  refreshes his recollection.
25  Q    It's easier, Mr. Smalls, I can give you a hard copy.

1  It's easier to read it on this.
2  A    Can I read the whole letter?
3  Q    Of course.  I can hand it to you.
4  A    I can read it from here.  It says Dear Mr. --
5  Q    I'm asking you to read it to yourself and then I'll ask
6  you if it refreshes your recollection.
7       (Pause.)
8  A    You got to go down.
9  Q    Sure.  That should be the rest of first page.  Let me
10  know when you need to go to the second.
11  A    You can go to the second page.
12       (Pause.)
13  A    Yes.  I remember writing that letter clearly.
14  Q    Did you finish reading it?
15  A    I wrote the letter.
16  Q    You wanted to read the entire thing.  I want to make sure
17  you finished it.
18  A    Yes.  I wrote the letter.
19  Q    Having reviewed that letter, does it refresh your
20  recollection as to whether you said you were in Lindsey
21  Johnson's apartment that night?
22  A    No.  I never said that in the letter.
23  Q    Before you gave testimony as part of this lawsuit you
24  actually read Lindsey Johnson's transcript, is that correct?
25  A    No, I didn't.  I never read his transcript.

1  Q    You didn't?
2  A    Never.
3  Q    I'm going to refer --
4       MR. FRANCOLLA:  Your Honor, do you have a copy of
5  Mr. Smalls?  I think it in one of the binder we provided.
6       (Pause.)
7       THE COURT:  Go ahead.
8  Q    I would like to refer your Honor and plaintiff's counsel
9  to Mr. Smalls's deposition transcript, page 80, line 21 to
10  page 81, line two.  Mr. Smalls, were you asked these questions
11  and did you give these answers:
12       "QUESTION:  Before today did you read any
13  documents?
14       "ANSWER:  Yes.
15       "QUESTION:  What did you read?
16       "ANSWER:  I read the disposition of Lindsey's.
17       "QUESTION:  The disposition?
18       "ANSWER:  The disposition.  Sorry.  And I had just
19  been reading the case.
20       Were you asked those questions and did you give
21  those answers?
22  A    Yes, in regards to the case.
23  Q    Okay.  So what I asked you -- I think you said no to --
24  was prior to you giving testimony in this case --
25  A    I never seen --

1       THE COURT:  Wait a minute.
2  A    I never seen --
3       THE COURT:  Excuse me.  Let the questioner finish
4  his question before you start to answer.
5       THE WITNESS:  All right.  I apologize.
6  Q    Okay.
7       Is your testimony today, yes or no, did you read
8  Lindsey Johnson's deposition transcript prior to giving your
9  testimony as part of this lawsuit?
10  A    No.  I never read it.  I never read his disposition.  I
11  never even read my disposition.  That's why I know for a fact
12  I never heard it.  My lawyer asked me if I read my disposition,
13  I said I remember it clearly, I lived it, and that I
14  definitely don't need to read it.
15  Q    The testimony I read to you --
16  A    I was referring to a statement I made during my criminal
17  trial.  That's why he came to testify.  That's what I was
18  assuming or that's probably what I testified to at that time.
19  I never seen the disposition.
20  Q    He didn't testify at your criminal trial?
21  A    He was ready to testify, like my lawyer interviewed him,
22  he had made statements.
23  Q    Now, the sweatshirt you were wearing that day wasn't
24  yours, right?
25  A    No.

1  Q   It was your friend Clarence Davis?

2  A   Yes.

3  Q   You testified on direct examination a little bit about

4  how the temperature was that day?

5  A   Yes.

6  Q   Is your it your contention that it was warm?

7  A   Yes.  It was warm outside.

8  Q   At no point that day were you chilly?

9  A   That's why I went to get the hoodie from Clarence.  I had

10 a T-shirt on and I was chilly.  That's the reason I know I had

11 the hoodie.  I went to get it from Clarence.

12 Q   You within the to get it because --

13 A   It started getting nighttime and it was getting chilly.

14 Q   Now --

15         MR. FRANCOLLA:   Your Honor, may I take one moment

16 to confer with my colleague?

17         THE COURT:   Sure.

18         (Pause.)

19         MR. FRANCOLLA:   Your Honor.

20 Q   At some point, plaintiffs, during your criminal

21 prosecution you were represented by an individual named Judah

22 Maltz, is that correct?

23 A   Yes.

24         MR. FRANCOLLA:   Your Honor, at this time I would

25 like to move into evidence Defendant's Exhibit J.

1          MR. MEEHAN:   No objection.

2          THE COURT:   There's no objection.  J will be

3  received.

4          (So marked.)

5  Q   I'm going to publish it to the jury.  Mr. Smalls, just so

6  we see, on this first page can we agree it's a criminal case

7  against you?

8  A   Yes.

9  Q   And it says here affirmation?

10 A   Yes.

11 Q   And I'll skip to the last page, which is 486 in the

12 right-hand corner.  This document is signed by your attorney

13 at the time?

14 A   Yes.

15 Q   It's dated April 4 of 2007?

16 A   Yes.

17 Q   Now, I want to direct your attention to the page of it

18 that's marked Smalls 484 on the bottom right-hand corner.

19 A   Okay.

20 Q   Now, I'm going to read this sentence here where my finger

21 is.  Can we agree it says:  the defendant maintains he has

22 standing to move for this hearing since the defendant felt

23 compelled to drop the weapon as a result of the unlawful

24 action conducted by the police.

25          Did I ride that accurately?

1  A   Yes, I believe so.

2  Q   Can we agree that according to that statement, you were

3  in possession of a weapon?

4  A   No.  We can't agree to that because I was never in

5  possession of a weapon.

6  Q   Can we agree that your attorney wrote that?

7  A   No, because I was not there when he wrote that and I

8  never even seen that document before.

9  Q   Mr. Maltz was your attorney, right?

10 A   He was, but by the time I went to trial my family had to

11 scrape up money to get me that new layer.  I never really seen

12 him or consulted with him.  That's why we had to fire him and

13 get a new lawyer.

14 Q   I understand you have not seen this.  Can we agree that

15 this sentence here references your feelings, according to the

16 sentence?

17 A   No, that's -- that does not represent my feelings at all.

18 Q   Mr. Smalls, we'll get to whether you agree with the

19 statement.  I'm asking whether it says -- can we agree that

20 statement says "defendant felt?"

21          MR. MEEHAN:   Objection, asked and answered.

22          THE COURT:   Overruled.

23 Q   I'm asking you if that is what it says, defendant felt?

24 A   That's what it says, defendant.  I didn't feel compelled

25 to grab no weapon.

1  Q   Do you have any explanation for how this document

2  references your feelings if you didn't convey them to your

3  lawyer?

4  A   That doesn't reference my feelings at all, sir.

5  Q   The sentence says defendant felt, can we agree on that?

6  A   You said what?

7  Q   The sentence does say defendant felt, right?

8  A   Defendant felt compelled to drop weapon as a result of

9  the unlawful action.  I don't know how he wrote that.  I never

10 spoke to him.  I never seen that document.  That's the reason

11 he got fired.  My family had to get money up to hire an

12 attorney because of things like that probably.

13 Q   To be clear, is your explanation for that statement that

14 your lawyer wrote it falsely?

15 A   That was not my lawyer.  That was a public defender.

16 Q   Someone from Legal Aid?

17 A   Yes.  That's a public defender.

18 Q   Your contention is that that individual wrote a statement

19 that to you is false?

20 A   I don't even know if he wrote it.  There's a lot of false

21 documents going around here.  I was not there when he wrote it

22 or not.  I'm not too sure.  I never seen it either.

23 Q   I'm going to go to another part of it.  This sentence

24 here.  It says the defendant maintains that he did not

25 voluntarily abandon the gun but his act of throwing the gun to

1 the ground was a spontaneous reaction to the sudden and
2 unexpected pursuit by the officers and not an independent act
3 attenuated from unlawful misconduct.
4     A    He had probably mistaken me for somebody else.
5          THE COURT:   Can you wait until there's a question
6 asked?  Do you have a question you want to ask about the
7 sentence you just read?
8     Q    I wanted to make sure I read it accurately.  Can we agree
9 on that?
10    A    Yes.
11    Q    You disagree with the facts asserted in that sentence?
12    A    Yes.
13    Q    To the extent it says that -- to the extent it references
14 your expectation, that's not true?
15    A    I don't know -- that's not even mentioning me.  That's
16 not me explaining the document.  That's not me conversing with
17 my lawyer.  He ran that down.  I don't know what that is.
18    Q    Here I'm going to show you another sentence.  It says:
19 The defendant maintains the police violated his fourth and
20 fourteenth amendment rights when they chased him inside the
21 building located on Rockaway Beach Boulevard.  Did I read that
22 accurately?
23    A    Yes.
24    Q    And according to you that's a false statement?
25    A    Yes.  That's a false statement.

1     Q    Now, here, I'm going to start here, it also says:  The
2 defendant maintains that he is entitled to a suppression
3 hearing to raise issues that the police seized him after an
4 extended chase inside the building and then seized the weapon
5 which they discovered after they caught up with him inside the
6 rooftop of the building.  Did I read that accurately?
7     A    Yes.  You read every word.
8     Q    To the extent that document suggests quite clearly that
9 you were in possession of a weapon and ran from police, those
10 are not true statements?
11    A    That's not true statements at all.  That document I never
12 seen before.  That document I never spoke to my lawyer about
13 and it's an admission that I definitely didn't give.
14    Q    Despite your claim that you never gave that information,
15 we can agree that the lawyer representing you at the time
16 wrote those things?
17    A    I can't agree because I was not there when he wrote it.
18 He was not my lawyer for that long for that very reason
19 because we never talked.
20    Q    Apparently he's also writing false documents for the
21 court on your behalf?
22    A    If that was his job, I don't know.
23    Q    Now, at some point after you were arrested did you speak
24 with your brothers?
25    A    Yes.

1     Q    When was that?
2     A    I spoke to Ronnie Smalls when we was in central booking.
3 We went to the same place.
4     Q    Is Cedric not with you at that time?
5     A    No.  Cedric was never with us.
6     Q    Is the reason for that what you discussed earlier about
7 your understanding that he would go somewhere differently?
8     A    Yes, because he was younger than us.
9          MR. FRANCOLLA:   Your Honor, I would like to refer
10 your Honor and plaintiff's counsel to plaintiff's deposition,
11 page 57, line 20 to 58, line 9.
12         THE COURT:   All right.
13    Q    Mr. Smalls, were you asked these questions and did you
14 give these answers:
15         "QUESTION:   At any point while you were at the
16 precinct for this arrest or at central booking, did you have
17 any conversations with your brothers or with anybody else
18 other than police?
19         "ANSWER:   I only had conversation with my brothers
20 when I got to central booking.
21         "QUESTION:   What did you talk to them about?
22         "ANSWER:   I was just making sure -- I was just
23 happy to see them, making sure they was okay.
24         "QUESTION:   Did you talk to them about what they
25 were being charged with?

1         "ANSWER:   Yes.  They told me they didn't know.
2         "QUESTION:   They didn't know what they were being
3 charged with?
4         "ANSWER:   No."
5         Were you asked those questions and did you give
6 those answers?
7     A    Yes.
8     Q    So according to that testimony you were with both of your
9 brothers, not just Ronnie Smalls?
10    A    That's probably when we go to court.  Of course we go out
11 to court together but they don't hold us in the same pen.
12 He's in the adolescent pen and we in the adult pen.  When we
13 go out to court we go out together.
14    Q    Now, is your claim that when you were at Lindsey
15 Johnson's apartment it was William Davis who knocked on the
16 door, correct?
17    A    Yes.
18    Q    It was not Jerome Nelson?
19    A    No.
20    Q    Did Jerome Nelson while you were there knock on door as
21 far as you know?
22    A    Not that I recall.
23    Q    Now, I think you testified on direct that you were --
24 what you were doing at Mr. Johnson's, apartment, you were
25 hanging out, drinking, whatever?

1  A    Yes.
2  Q    You don't know how long you had been there for?
3  A    No.
4  Q    Now, when you were arrested and taken into custody it
5  wasn't by either of these two defendants, correct?
6  A    I'm not too sure.  I can't remember.  It was a lot of
7  officers.  I can't pinpoint their faces.
8  Q    When you testified in your deposition you had already sat
9  through a criminal trial, correct?
10  A    Yes.
11  Q    And you had seen both of these officers testify, correct?
12  A    Yes.
13  Q    And when you were asked on direct examination by the
14  court whether either of them were involved your answer was no,
15  right?
16  A    What?
17      MR. MEEHAN:  Objection.
18      THE COURT:  Where?
19      MR. FRANCOLLA:  In court on direct examination.
20      THE COURT:  Here.
21  A    They never asked me that.  I never got that question.
22      THE COURT:  Involved in what?
23      MR. FRANCOLLA:  Whether these two individuals, the
24  defendants, were involved in the altercation he described on
25  the first floor of the building.

1      MR. MEEHAN:  That was not a question I asked.
2      THE COURT:  He can answer whether they were or not.
3  A    I'm not too sure.  There was many officers out there that
4  night.  They all look the same to me.
5  Q    Now, it's your claim that these two officers confused you
6  with your brother Cedric?
7  A    Yes, they had to.
8  Q    So it's your claim that your brother Cedric gave the gun
9  to Ronnie Smalls?
10  A    No.  I'm not saying he claimed he gave the gun Ronnie
11  Smalls.  I don't know what happened at that particular time.
12  I don't know if there was a gun involved.  To my knowledge, I
13  think they fabricated the whole story.
14  Q    For everybody?
15  A    Yes.  To be honest, they lied.
16  Q    The radio call that you heard about an everybody running
17  up on roof?
18  A    I don't know about no radio call.  All I know I'm
19  innocent and they made up lies.  That's a fact.  I was not
20  wearing no black.  He know I had on gray and blue.  He know I
21  was not on the roof and I got locked up and that's a fact.
22  Q    So you never discussed with either of your brothers what
23  happened?
24  A    Yes.  I discussed with my brothers what happened.  That's
25  why I believe all of it was made up.  Unfortunately, they died

1  before it came to trial.
2  Q    Now, did you have -- while you were awaiting trial during
3  the period that you were incarcerated, you were in
4  communication with William Davis, correct?
5  A    Not really.  I used to call his brother a lot.  His name
6  is Clarence.  That's like my best friend.  That's the one who
7  I got the sweater from.  I called him and sometimes I speak to
8  William, ask how you are doing.  I really don't speak to him
9  really.  He's not somebody that I would know his number off
10  the top of my head and call him.  I called his brother and I
11  made contact with him through his brother.
12  Q    Your testimony today is that you are not really in
13  communication with William Davis on a regular basis, more with
14  his brother?
15  A    You asked me while I was incarcerated, sir.  You said
16  while I was incarcerated.
17  Q    Is there a difference between the two, when you are in
18  and out?
19  A    Yes, because I could reach out to him myself when I am
20  not incarcerated.
21  Q    Now, you never asked him to testify on your behalf, did
22  you?
23  A    Yes.
24      MR. MEEHAN:  Objection, your Honor.  Who?
25      MR. FRANCOLLA:  William Davis.

1      MR. MEEHAN:  Objection, your Honor.
2  A    Are you talking about my criminal proceedings?  What are
3  you talking about?
4  Q    Yes.
5      MR. MEEHAN:  May we approach on this issue, your
6  Honor?
7      THE COURT:  Yes.  I'll sustain the objection.
8  Q    Now, as you are sitting here today, you don't have any
9  idea of how William Davis happens to know that you were inside
10  of Lindsey Johnson's apartment when you claim he knocked on
11  the door?
12  A    I don't know.  We all hang out in the same area.  We
13  travel with friends.  Like he said, he assumed that I was
14  there.  Nine times out of ten, when you grow up in a
15  community, everybody knew where someone is at.
16  Q    Your brothers Ronnie Smalls and Cedric, it's your
17  testimony that you don't know what they were doing prior to
18  the point that the four of you ended up being arrested?
19  A    Yes, until after.  I know after.  But prior I didn't know
20  what they was up to.
21  Q    And neither of them lived in 8105, right?
22  A    No.
23  Q    And you didn't live in 8105?
24  A    No.
25  Q    According to you you claim you were hanging out in

1    Lindsey Johnson's apartment?

2    A    Yes.

3    Q    And Jerome Nelson didn't live in 8105 either?

4    A    No.

5    Q    So it's your testimony that the four of you

6    coincidentally got arrested in the same building none ever you

7    live in?

8            MR. MEEHAN:  Objection.

9    A    I can explain, your Honor, if it's all right.

10            THE COURT:  I'll sustain an objection to the form

11    of the question.

12            MR. FRANCOLLA:  Your Honor, if I may take a moment

13    to confer with my colleague.

14            (Pause.)

15            MR. FRANCOLLA:  There's one issue that I would ask

16    we briefly address it at sidebar.  I may be finished.

17            (Sidebar.)

18            MR. MEEHAN:  This goes back to the conversation he

19    had with William Davis.  We had left it that we would see,

20    subject to me asking questions to plaintiff, the issue with

21    William Davis, whether he asked him to testify.  Your Honor

22    would weigh in on that.  I don't believe like Mr. Nelson and

23    Mr. Johnson, there is an indication that he was asked to be

24    called, represented, and we can confirm with

25    the transcript, Mr. Davis says that he was never contacted by

1    the plaintiff and while we understand that that may not

2    necessarily be an obligation of plaintiff in this situation, I

3    think the plaintiff is just indicating that he did.

4            THE COURT:  What do you mean he was never contacted

5    by the plaintiff, in what context?

6            MR. MEEHAN:  To testify on his behalf.

7            MS. FUDIM:  The plaintiff just testified that he

8    never -- that he did ask Mr. Davis to testify in his behalf.

9    In his deposition transcript --

10            THE COURT:  I thought we sustained the objection to

11    the inquiry about whether he contacted Mr. Davis about

12    testifying.

13            MR. MEEHAN:  The objection was sustained.

14            THE COURT:  This is the problem.  The whole basis

15    for your going into this is to somehow the argue that this

16    was -- all of this testimony from Davis or the other two, was

17    recently made up and the reason you think you can establish

18    that is because he wasn't called at his trial.  That just

19    takes us into a whole rabbit whole of attorney-client

20    privilege, incompetence of the counsel, of whether counsel

21    made a decision not to call them or to call them.  I just

22    think it is far too confusing and not appropriate for what you

23    are trying to establish, which is that this was all recently

24    made up.  I don't think that you have necessarily a good-faith

25    basis to argue that and the way you are trying to do it

1    because he was not called at his trial, and that is too

2    complicated and will take us down two more days of testimony

3    about whether the lawyer was told.  If you ask him did you

4    tell your lawyer about it, and then that gets into the

5    attorney-client privilege, so it's just a mess and if you had

6    a good-faith basis to tell me that Davis's testimony was made

7    up at the last minute, in between the trial and this, then

8    maybe I would let you go down that road.  You don't.  So we

9    are not going there.

10            (In open court.)

11            MR. FRANCOLLA:  Your Honor, at this time I don't

12    have any further questions.

13            Thank you, Mr. Smalls.

14            THE COURT:  Do you have anything further?

15            MR. MEEHAN:  Yes, your Honor.

16    REDIRECT EXAMINATION

17    BY MR. MEEHAN:

18    Q    Good afternoon again, Mr. Smalls.

19    A    Good afternoon.

20    Q    On cross-examination you were asked questions about

21    paperwork and about the fact that you represented that Ronnie

22    Smalls was in a red hooded sweatshirt, correct?

23    A    Yes.

24    Q    I'm going to show you what's been admitted into evidence

25    as Plaintiff's Exhibit 2.  You said that you were basing that

1    on police paperwork?

2    A    Yes.

3    Q    If you see here it says that Ronnie Smalls was in a red

4    hoodie in the police paperwork?

5    A    Yes.

6    Q    Is that where you are getting that information from?

7    A    Yes.

8    Q    You were also asked questions about a letter you wrote to

9    your attorney?

10    A    Yes.

11    Q    And that letter was published to you but it was not

12    published to the jury, right?

13    A    Yes.

14            MR. MEEHAN:  At this time I would ask that

15    Plaintiff's Exhibit 34 be moved into evidence.

16            MR. FRANCOLLA:  I think I would object to its

17    entirety.  If counsel wants to read in a portion that's fine.

18    My inquiry was fairly limited on it.

19            THE COURT:  Yes.  I'll sustain the objection to the

20    letter coming in.  If there's some part of the letter that you

21    want to bring out that relates to the jackets or clothing,

22    that's fine.

23            MR. MEEHAN:  May I publish that to the jury?

24            THE COURT:  If it relates to the clothing issue, but

25    not the rest of the letter.

1  Q    If we look at the very last paragraph you wrote.  Who is
2  Mr. Megaro?
3  A    That was my lawyer at my arraignment --
4        THE COURT:    I don't know what last paragraph last
5  to do with the issue of the jackets.  Why don't you show the
6  paragraph that you are asking about.  Ask him about the
7  paragraph.
8  Q    Is it on your monitor?
9  A    No, it just went off.
10        THE COURT:  We're just showing it to the witness.
11        MR. MEEHAN:  I don't believe it's on Mr. Smalls's
12  monitor.
13        THE WITNESS:    It's there now.
14  Q    This photograph right here, where it begins with also in
15  the middle, do you see that?
16  A    Yes, also.
17  Q    It says --
18        MR. MEEHAN: At this point it is about the clothing,
19  your Honor, so I would ask that this be published.
20        MR. FRANCOLLA:    If he reads it I don't mind.
21        THE COURT:  Have him read it.
22        MR. FRANCOLLA:  That's fine.
23        MR. MEEHAN:  Your Honor, it was referenced by
24  Mr. Francolla.  It's in plaintiffs's JPTO.  The foundation has
25  been laid.  I ask that it be moved into evidence.  He's the

1  one that drafted the letter.
2        THE COURT:  Who is the one that drafted the letter?
3        MR. MEEHAN:  Mr. Smalls.
4        THE COURT:  You want to put in that one paragraph
5  that says I can help --
6        MR. MEEHAN:  The one after that.
7        THE COURT:  The one after that doesn't relate to the
8  question of the jacket.  If you want to make a reacted copy,
9  if you want to put it in, you can offer that sentence, if you
10  want to make a copy of it.  Why don't you have him read it.
11        MR. MEEHAN:  May I read it, your Honor?
12        THE COURT:  Yes.
13  Q    So you wrote to -- just to back up a bit.  You said
14  Mr. Megaro was a lawyer your family hired?
15  A    Like an appellate lawyer.
16  Q    He's the appellate attorney?
17  A    Yes.
18  Q    The appellate attorney that overturned your conviction?
19  A    Yes.  With respect to Mr. Megaro, also, I don't know if
20  this can help, but the officers testified that I was wearing
21  black jacket.  On the night of the arrest I was wearing gray
22  hoodie.  It's in the pictures that was used during trial.
23  They mistaken me for my brother Cedric.  He was wearing a
24  black jacket.  Ronnie Smalls was wearing red hoodie.  Both
25  died prior to trial.

1  Q    Did you write that to your attorney?
2  A    Yes.
3  Q    Did you maintain your innocence to your attorney?
4  A    Yes.
5  Q    You also were asked questions about a memorandum that was
6  written by your original public defender Judah Maltz, correct?
7  A    Yes.
8  Q    Exhibit J, this is the letter, correct?
9  A    Yes.
10  Q    This is the affirmation, correct?
11  A    Yes.
12  Q    Did you see this prior to it being filed?
13  A    No.
14  Q    Have you ever seen this until today?
15  A    This is my first time seeing it today.
16  Q    Did you have anything to do with the drafting of this
17  document?
18  A    No.
19  Q    Did your lawyer have you review this document prior to
20  filing it?
21  A    No.
22  Q    If we go to the portion that -- subsection D.  Do you see
23  that?
24  A    Yes.
25  Q    The motion for a trial hearing to suppress physical

1  evidence unlawfully seized; do you see that?
2  A    Yes.
3  Q    In the middle thereafter it says that according to the
4  felony complaint, correct?
5  A    Yes.
6  Q    So did that mean that Mr. Maltz was basing this on the
7  officers' version of the felony complaint?
8        MR. FRANCOLLA:    Objection.
9        THE COURT:  I'll sustain the objection.
10  Q    Do you see where it says according to the felony
11  complaint?
12  A    Yes.
13  Q    Now, let's look at that felony complaint, in evidence as
14  Plaintiff's Exhibit 5.  We had gone over this.  Again,
15  starting with deponent further states that he observed
16  defendant Ronnie Smalls and defendant Andrew Smalls running
17  through the seventh floor hallway.  Did that happen?
18  A    Yes.
19  Q    Deponent further states that he observed defendant Ronnie
20  Smalls hand said pistol to defendant Andrew Smalls before both
21  defendants ran onto the roof of said building.  Did that
22  happen?
23  A    No, that never happened.
24  Q    Now, you were also asked questions about the weather that
25  night, right?

1    A    Yes.

2    Q    Let's look at the weather report from that night.  Back

3    to the weather, the climatological data for May 20, 2006.

4    We're going to zoom in to where it says 20.  Do you see that,

5    right?

6    A    Yes.

7    Q    The 69 there indicates the high that day, correct?

8    A    I'm not too sure.

9    Q    If we zoom back out, I know it's complicated, where it

10   says maximum, column two says maximum?

11   A    Yes.

12   Q    Above that it says temperature in Fahrenheit?

13   A    Yes.

14   Q    Does that mean the high that day was 69?

15   A    I never seen a type of report like this.

16   Q    I understand.  Focusing on the 20, right, the high is 69,

17   right?

18   A    I see it.

19   Q    It was almost 70 degrees that day, right?

20   A    Yes.

21   Q    Mr. Smalls, were you in an a black jacket on that night?

22   A    No.

23   A    No.

24   Q    Did you have a gun that night?

25   A    No.

1         MR. MEEHAN:  Nothing further.

2         MR. FRANCOLLA:  Briefly, your Honor.

3    RECROSS-EXAMINATION

4    BY MR. FRANCOLLA:

5    Q    Mr. Smalls, your testimony was that the only reason you

6    said in that letter what Cedric and Ronnie Smalls were wearing

7    was because of what you read in the paperwork?

8    A    Yes, going over the report.  I couldn't say offhand.

9    Q    You don't remember what they were wearing that night?

10   A    I remember what I was wearing.

11   Q    The only reason you know that is because you also saw the

12   paperwork?

13   A    The only reason why I know that because they made a

14   mistake.  I had got that hoodie from my friend Clarence.  He

15   talks about from that date.  I can't even borrow a car from

16   him.  That's why I know they made a mistake.  They know they

17   made a mistake, bottom line.

18   Q    You saw they wrote gray hoodie on the document?

19   A    Yes.  They tried to make a mistake and fix it.  That's

20   after the grand jury, after I explained this numerous times to

21   my attorney that I was wearing a gray hoodie.  They went back

22   and tried to cover it up and tried to write black jacket on

23   that.  That's what they did.  They falsified documents, sir.

24   That's exactly what they did.

25   Q    The document that says gray hoodie with black jacket was

1    changed eight months after the fact?

2    A    Yes.  They changed it for a fact.  That's what they did.

3    Q    You were asked some questions about the basis of the

4    affirmation on the first page of it.  Just to be clear, you

5    are the defendant, right?

6    A    That's a mistake.  With all due respect, I'm not a

7    lawyer.  I don't really know any things about this document

8    right here and I didn't put that in.

9    Q    I'm asking if it says that the sources of this document

10   include conversations had with the defendant; is that correct?

11   A    Yes.  That's what it says.

12        MR. FRANCOLLA:  Nothing further, your Honor.

13        THE COURT:  All right.  Thank you, you can step

14   down.

15        MR. MEEHAN:  I have one brief redirect.

16        THE COURT:  All right.  Go ahead.

17   REDIRECT EXAMINATION

18   BY MR. MEEHAN:

19   Q    Mr. Smalls, you were just asked questions about your

20   pedigree card where the gray hoodie was crossed out and it

21   said black jacket, right?

22   A    Yes.

23   Q    And you don't know when that cross-out happened, right?

24   A    No, not exactly.  I know I definitely for a fact I did

25   not have no black jacket.  I put that on my lawyer.  I never

1    had no black jacket that night.  I had on a gray hoodie and

2    blue jeans.  Both of them officers know that.

3    Q    You would agree at some point that night they crossed out

4    gray hoodie and wrote black jacket?

5    A    Yes, they had to.

6         MR. MEEHAN:  Nothing further.

7         MR. FRANCOLLA:  Very briefly.  One moment.  Nothing

8    further, your Honor.  Thank you.

9         THE COURT:  All right.  You can step down.

10        (Witness excused.)

11        THE COURT:  Do you have another witness.

12        MR. NORINSBERG:  Can we have a sidebar for an a

13   moment?

14        (Sidebar.)

15        MR. NORINSBERG:  We have two witnesses for tomorrow.

16        THE COURT:  You can't get him here.

17        MR. NORINSBERG:  We couldn't.  One is coming up from

18   Florida.  He had to fly up today and the other one he's not

19   available until tomorrow afternoon.  We tried.

20        THE COURT:  You know that doesn't cut it.  Who is

21   not available --

22        MR. NORINSBERG:  Maltz.

23        THE COURT:  You have to get him here.  He has to be

24   here in the morning.

25        MR. NORINSBERG:  Judge, we're perfectly on schedule.

1    We can have the charge conference.

2         THE COURT:  We are not perfectly on schedule.  I
don't want to hold this jury up, sitting here waiting until
tomorrow afternoon.  Mr. Maltz, get him here.  Where is he
having a criminal hearing?

6         MR. MEEHAN:  I believe Queens.  In addition to
criminal defense work he does do some other things.  It might
be a real estate closing.

9         THE COURT:  Do you know what it is?  I don't know
what Mr. Megaro -- in any event, we don't need no keep the
jury while we're talking about this.

12        MR. NORINSBERG:  Maybe putting this over to tomorrow
afternoon and we could get both lawyers for the an afternoon
session.

15        MS. FUDIM:  We would move to preclude Mr. Megaro.
We did not enter the letter into evidence.  We did not ask any
questions about the communication about Mr. Megaro.  The
letter that was put into evidence was by plaintiff's counsel.
Mr. Megaro has nothing to offer.  To the other attorney
there's no objection.

21        MR. NORINSBERG:  Defense counsel repeatedly referred
to the fact in opening the reason why this case was thrown out
on appeal because the story back then was that he had the gun
and he did it on appeal.  Megaro will testify that it s
patently false.  They never represented on the appeal that he

1    had the gun.  It had nothing to do with why the case was won
on appeal, may have had on MAAP testimony of these two
officers.  Solely based on their testimony it was reversed on
appeal.  It had nothing to do with the concession.  What was
opened on by defense counsel is misleading.  This witness is
being brought in to respond to that and clarify the record.  I
have the transcript.

8         MR. MEEHAN:  I was very careful not to make the
connection for the reasons that we had discussed in terms of
it was pending your Honor's instruction about what would come
in.

12        MS. FUDIM:  We said it was based on the gun.  That
was the language you had given us.  Mow he just made an offer
of proof that Mr.  Megaro would be offering testimony as to
the reasons why the appeal was overturned.  I thought the
whole conversation we were having with the stipulation, any
conversation about why the conviction was overturned, would be
limited to the court's instruction.

19        THE COURT:  You need to get your opening statement.
My memory of your opening statement was a little bit broader
than what you are saying that.  If you get the opening
statement and you can indicate -- the problem is there's no
evidence of this in the trial now.

24        MR. NORINSBERG:  There's several references.  This
is one that connects the two together.

1         (Pause.)

2         THE COURT:  There has been no evidence offered in
this case as to anything the appellate attorney relied on or
didn't rely on in going to the court of appeals.  That issue
is in terms of the evidentiary portion of this case is not before
the jury.  The only thing that they have put in is the
statement in the suppression hearing papers.  They didn't
question the plaintiff about it.  They didn't put in any
evidence about it.  I don't know that the answer to something
inappropriate said in an opening statement when there's no
evidence to back up the statement it's to then call somebody
to explain something that should not have been said in an
opening statement.  It may be the appropriate remedy, if it
was said in the opening statement and I have to look at it,
maybe to tell the jury to disregard it.  But we've got a
situation where you want to call Mr. Megaro to testify to
something that has not been put into this trial, except
perhaps by the opening statement, which I'll have to look at.
But there's no evidence of that.  So I'm troubled by if there
was something improper said in opening statement, I'm troubled
by calling a witness to refute something that's not in
evidence and I think the more appropriate remedy would be to
say there was a statement made in opening statement and tell
the jury there's been no proof of that and disregard it.  That
is a more appropriate remedy as opposed to having Megaro come

1    and testify and we're all into what happened in the Court of
Appeals.

3         MR. NORINSBERG:  Judge, this application should have
been made prior to trial.  I spoke to them this morning.  The
witness is flying up here.  They introduced it.

6         THE COURT:  I'm sorry that you are paying for him to
come up.  It has to be what ultimately happens at trial.  You
don't get to call someone to offer irrelevant testimony
because you had to pay for him to get here and they may have
put you in the position of calling him.  Maybe the application
is have them pay for his fare, not to put him on.

12        MS. FUDIM:  When we were in front of your Honor
yesterday and this was discussed counsel represented that Mr.
Megaro was flying up Friday morning.  Thursday morning.  I
misspoke.  You had also said -- we had had a conversation
about if we didn't introduce the letter you said we might not
need to call the witness if it's not brought in, so we did not
put the letter in and apparently they have changed when he was
flying up.  But the conversation we had on the record
yesterday was and what they represented we might not need
to call him if we don't put the letter in.

22        MR. MEEHAN:  They used it for impeachment.  They are
getting the benefit without having to move it in.

24        THE COURT:  I don't want this jury to be sitting
here while we're doing this.  I don't understand why Mr. Maltz

1    can't get here in the morning.

2         MR. NORINSBERG:  I'll get him on the phone.

3         (In open court.)

4         THE COURT:  Ladies and gentlemen, we're going to

5    take an afternoon a recess and then we'll decide how the trial

6    will resume.

7         (Jury excused.)

8         THE COURT:  Call him now to see if you can get him

9    here in the morning.

10        MS. FUDIM:  It's 12:35.  We can call him today and

11   just finish up.

12        (Recess taken.)

13        THE COURT:  Mr. Norinsberg, you have spoken to

14   Mr. Maltz and he's indicated he can be here at 9:30, correct?

15        MR. NORINSBERG:  Yes, your Honor.

16        THE COURT:  At this point in time, what I intend to

17   do is excuse the jury for the evening.  We can discuss

18   Mr. Megaro's testimony one way or the other and discuss jury

19   instructions and so tomorrow we'll complete the case.  Of

20   course I'll expect the parties to be here when we bring the

21   jury back in, please.

22        THE CLERK:  Yes, your Honor.

23        (Jury present.)

24        THE COURT:  Please be seated.

25        Ladies and gentlemen, there are some legal matters

1    we have to take up this afternoon.  The case is almost

2    completed.  We will have two very short witnesses in the

3    morning and then what will happen is the parties will give

4    their summations to you.  Plaintiff will sum up first,

5    followed by defendant and plaintiff, because plaintiff has the

6    burden of proof, they have a brief rebuttal summation and I'll

7    charge you on the law.  While we discuss legal matters I am

8    not having you stay in.  I'm excusing you for the evening.

9    Don't discuss the case with anyone.  We're moving along well.

10   So I will see you in the morning.  Have a nice evening:

11        (Jury excused.)

12        THE COURT:  All right.  Counsel for plaintiffs have

13   shown me a copy of the opening statement and highlighted the

14   portions.  Do you have an a copy?

15        MR. FRANCOLLA:  No.

16        THE COURT:  I have to say I was concerned when I

17   heard defendant's opening statement that you got into things I

18   thought we had agreed before your opening statement were not

19   going to be addressed and, for instance, at page two, it was a

20   sworn legal document filed with the court.  His claim was,

21   well, although I did run while in possession of a gun, the

22   seizure of that gun was improper.  And that argument was

23   successful on appeal and as a result the higher court

24   overturned the conviction, making him a free man.

25        And then page seven, as I highlighted earlier,

1    plaintiff through his criminal defense counsel challenged the

2    manner in which the gun was seized.  That was successful with

3    the lawyer and the conviction was overturned.  And then

4    plaintiff despite being in possession of a loaded gun managed

5    to get his conviction overturned and was rewarded with his

6    freedom.  Now having completely changed his story he's looking

7    to be rewarded with money.

8         This is the complicated nuance problems with all of

9    this.  The defendants are appropriately arguing about that

10   his lawyer filed a document in which he made statements about

11   what the defendant had said.  That's fair game and I had no

12   problem with going into this.  The problem is the reversal on

13   appeal and in really deal with the intricacies of the law.

14   His conviction was overturned based on a review of the

15   suppression hearing testimony.  The plaintiff did not testify

16   at that suppression hearing.  The police officers were the

17   only people who testified at that suppression hearing.  The

18   case was reversed on appeal accepting the police officers'

19   version of what happened and so at least by the time it was on

20   appeal there was no testimony of the plaintiff.  If the

21   plaintiff had testified at the suppression hearing and the

22   court had relied on the plaintiff's testimony, that would have

23   been one thing.  But that's not what's happened, which makes

24   this complicated.

25        I think you are entitled to argue that he made a

1    false statement to pursue suppression or he made an admission

2    to pursue suppression.  But I don't think it's accurate to say

3    that he got his conviction overturned.  And the law is also

4    very confusing.  I don't know what state criminal procedure

5    law is.  But at least in federal court I don't know that he

6    would have had to put in any affidavit or affirmation about

7    having possessed the gun.  I think you could argue based

8    solely on the police account that if you accept the police

9    officers' account of what happened, it was a bad search.  So

10   that's why this is very complicated.  And I think ultimately

11   the reversal of the conviction, based on suppression, was

12   based simply on what the officers testified to at the

13   suppression hearing and not on what a plaintiff had said.

14        So that's why I'm not sure that it's fair to argue

15   that the court of appeals accepted his argument and reversed

16   the conviction and now he's claiming something else.  That's

17   why I think this is particularly ugly in the context of this

18   case.

19        MR. FRANCOLLA:  Just on that note, your Honor.

20   Having heard it, I know it's obviously complicated and the

21   instruction came that morning.  What I attempted to say and I

22   thought I was saying was that the argument that was accepted

23   was that the seizure was improper.  I actually worded it

24   specifically to how your Honor thought you would address the

25   issue after we discussed it.  So I don't think I said and I

1  definitely did not mean to say that the argument -- it was
2  because of his admission.  The argument challenging the
3  seizure of the weapon, without getting into the --
4      THE COURT:  There's nothing technically that would
5  preclude him from arguing that, hey, look, if you accept what
6  the police officers said it's a bad search.  I don't know that
7  -- even if he claims -- the problem is this:  If he got up at
8  a suppression hearing and said to the court, by the way, I
9  didn't possess that gun.  End of story, no standing.  But
10  that's not what happened.  I think that he was entitled to
11  say, take the officers, what they are saying even under their
12  account it's a bad search and then argue -- and then take a
13  position at trial that he didn't possess the gun.  He took the
14  position at trial that he didn't possess the gun, correct?  Of
15  course he did.
16      MR. FRANCOLLA:  Yes.
17      THE COURT:  He wasn't precluded from taking that
18  position at a trial, that he didn't possess the gun based on
19  the suppression.
20      MR. FRANCOLLA:  I understand, your Honor.  I think
21  your recitation of what the attorney could have done is
22  accurate and based on my limited understanding.  But that's
23  not what a did.
24      THE COURT:  I'm not precluding you from arguing that
25  the attorney admissions, that he said these things to his

1  attorney.  You're going to presumably have to impeach the
2  attorney because I imagine the attorney is going to say -- I
3  don't know what he's going to say.  Presumably they are not
4  calling him to say, yes, he told me that.  I think you can
5  argue to the jury that at the time of the suppression hearing
6  in state court he argued through his attorney that he
7  possessed the gun.  Okay.  But I don't think that's the
8  argument that ultimately got his conviction reversed because I
9  think his conviction was reversed based solely on the
10  suppression hearing testimony which didn't include the
11  defendant's position and if I thought legally that he had to
12  have made that admission to get the hearing, maybe that would
13  be something different.  But I don't think he had to.  So I
14  don't think it is accurate to say that he secured -- his
15  conviction was reversed because of what he said.
16      MR. FRANCOLLA:  I didn't think I said that.
17      THE COURT:  You said that he -- well, you say, as I
18  highlight earlier, plaintiff through his criminal defense
19  counsel challenged the manner in which the gun was seized,
20  with the lawyer, and the conviction was overturned.
21      MR. FRANCOLLA:  I --
22      THE COURT:  So what.
23      MR. FRANCOLLA:  That was what I thought was going
24  to be included in the instruction and I don't think that
25  that's -- he made the argument that the seizure was improper

1  and ultimately that was adopted.
2      THE COURT:  What difference does that make unless
3  you are arguing that the defendant -- that that happened
4  because the defendant lied?  I mean that's ultimately where
5  you take it.  That happened because -- that happened because
6  of what the defendant said and now he's changing that story.
7  I'm not sure that the conviction was overturned because of
8  what the defendant said and that is the problem with it,
9  arguing that he got his conviction overturned because of what
10  he said then.  I'm not sure his conviction was overturned
11  necessarily because of what he said then.  I think it's just
12  the way in which you characterize the argument.  But reading
13  this -- what do you envision Mr. Megaro testifying to?
14      MR. NORINSBERG:  To clarify the basis for the appeal
15  was accepting the officers' version as true.  Unlawful,
16  illegal search, it had nothing to do with plaintiff's version.
17  Plaintiff never confessed.  Plaintiff never at any time took
18  the position that he had the gun.  It was based solely on what
19  the officers testified to at the MAAP hearing and the reversal
20  referenced that.  It was actually based on that.
21      In light of the opening statement, why
22  shouldn't he be permitted to say that much?
23      MS. FUDIM:  Your Honor, I think the answer to that
24  is because the basis for the appeal was part of your
25  instruction and the reason we formed an instruction -- the

1  reason that the appeal as overturned.  Any clarification that
2  the court believes is appropriate the court can do through an
3  instruction to the jury.  Therefore, it's carefully worded on
4  both parties' versions of it and we know what the
5  clarification can be.  I have a concern that what Mr. Megaro
6  wrote is going to come out on the stand and is going to go far
7  afield of what one limited proffer was.
8      THE COURT:  You can object if he does that.
9      MS. FUDIM:  It's very hard --
10      THE COURT:  I could presumably -- just hear this out
11  to see if this avoids Mr. Megaro's testimony.  I could
12  presumably instruct the jury that at the suppression hearing
13  the defendant did not testify.  The officers testified.  The
14  Court of Appeals' decision that the gun was unlawfully seized
15  was based on the officers' testimony and not any prior
16  statements of the plaintiff.
17      MS. FUDIM:  I think that would cover it and that
18  that would be appropriate.
19      THE COURT:  Maybe that's the best way to do it.
20      MR. NORINSBERG:  Judge, if I stick to the parameters
21  of what I just laid out in the proffer, we're talking about a
22  15-minute direct testimony.
23      THE COURT:  If you stuck to the parameters you would
24  be talking about two minutes.
25      MR. NORINSBERG:  A little background to the

1 situation.  Essentially staying within those parameters, have
2 a live witness say it to me is an a proper way to rebut a very
3 strong inference that was made and which the transcript bears
4 out, that there was the connection.
5      THE COURT:  Did he represent him at the suppression
6 hearing, Megaro?
7      MR. NORINSBERG:  No.
8      MS. FUDIM:  No.
9      MR. NORINSBERG:  But he's the one that can speak
10 directly to the issue that was raised.  How did this
11 conviction get reversed?  I think right now the impression
12 with the jury, oh, back then he admitted having the gun and he
13 claims it was illegal and that's how he got it reversed.
14 That's not what happened.  All this witness is to respond to
15 that impression which was stated repeatedly to this jury, that
16 this is not what happened and I had nothing to do with him
17 committing anything.  They reversed it based on the officers.
18 From our standpoint a live witness stating that, the actual
19 appellate attorney, it undoes some of the impact of that
20 prejudicial opening.
21      MS. FUDIM:  Your Honor, I think there's a
22 disconnect.  I think what the disconnect is respectfully is
23 that the area of attorney-client communications that has been
24 explored was explored between plaintiff and Mr. Maltz, who was
25 his pretrial attorney in terms of what representations were

1 made to Mr. Maltz that he then conveyed those representations
2 in a written document, subsequent allegedly consistent
3 statements that plaintiff would offer of what he said to his
4 appellate attorney --
5      THE COURT:  No.  I wouldn't allow any statements
6 that he made to his appellate attorney, claiming his
7 innocence.  Those statements would not be permitted.  All the
8 appellate attorney would be able to say is that he appealed
9 his conviction on the suppression record, that the record
10 contained the testimony of the officers, that the plaintiff
11 did not testify at the hearing and the decision to suppress
12 was based solely on the testimony of the officers.  That's all
13 he would be allowed to say.  There's no basis now to have him
14 say, you know, the plaintiff kept telling me I never possessed
15 the gun.  That's not going to come in.
16      MS. FUDIM:  To the extent what the court just said,
17 I agree, the four facts you just said, are the four salient
18 facts that should come out.  I think those four salient facts
19 come out most clearly and fairly if delivered by the court.
20 They do not have confidence that this witness is going to be
21 limited.  Even now Mr. Norinsberg said there's some background
22 we need to get into.  I think those are the four facts that
23 the court is allowing that either the court can ask the
24 witness those four questions or the court can just give that
25 instruction and save us all the time.  That way we know there

1 won't be any objection if the court just gives that
2 instruction.
3      MR. NORINSBERG:  I have tried multiple times
4 pretrial to head up this issue.  We said this was not a
5 relevant issue for the case.  They insisted on it.  They said
6 they were going to introduce this letter.  We then made a
7 decision that we had to counter it.  Now, they didn't
8 introduce the letter, but the inference that was suggested
9 multiple times to the jury is one which we want to counter and
10 the instruction as proposed does not sufficiently counter.
11      THE COURT:  What do you want to bring out?
12      MR. NORINSBERG:  One thing:  Did he ever contest to
13 you?
14      THE COURT:  Absolutely not.  The defendants have not
15 contended that he did.  That's very different from Mr. Maltz.
16 They put in a document where Maltz is in that document
17 suggesting these statements came from the plaintiff.  It is
18 appropriate if that is not correct for you to call Maltz and
19 correct that.  They have not similarly made an allegation with
20 respect to Mr. Megaro, any testimony about what the plaintiff
21 said to Mr. Megaro is self-serving and is hearsay and is not
22 going to come in.
23      MR. NORINSBERG:  Judge, during the cross-examination
24 Mr. Francolla asked the plaintiff to read the entire letter.
25 Did you say anywhere in that letter that you were at Lindsey

1 Johnson's apartment that night and made him read it.  The
2 clear inference being he never told them.  He changing his
3 story now for this trial.  We should not be put in a position
4 to rebut that evidence.  We offered to put the whole letter in
5 so they could see the context.  They objected to that.  Why
6 ask that question?  Why have the plaintiff read the entire
7 thing and say, no, I never talked about my main alibi witness.
8 Now I have a chance to rebut that through a live witness.
9      THE COURT:  Why?  Is the witness going to say yes he
10 did tell me about Johnson?
11      MR. NORINSBERG:  No.
12      THE COURT:  If you wanted to bring out from Megaro
13 that I didn't put it in my letter but, yes, he told me all
14 about that case, that would be one thing.  What does it rebut?
15 That's all I'm going to allow him to testify to.  So if he
16 comes up tomorrow, you want to put it on through him, that's
17 fine.  He's not going to testify that the plaintiff maintained
18 his innocence to him.
19      MR. NORINSBERG:  So the letter itself, is that
20 proper for inquiry for this witness?
21      THE COURT:  Not the content where he claimed --
22 where is the letter?  What exhibit?
23      MR. FRANCOLLA:  I believe it's K, your Honor.  I
24 can give you a copy.
25      THE COURT:  It seems like the proper person to have

1   inquired about the breadth of the letter would have been the
2   plaintiff, not the lawyer.  The plaintiff wrote the letter.
3        MR. FRANCOLLA:  It's not marked.  The letter is K.
4   (Pause.)
5        THE COURT:  The more I read this letter, what the
6   defendant was complaining about -- excuse me -- what the
7   plaintiff was complaining about, he was a defendant at the
8   time, but what the plaintiff was complaining about here were
9   problems with the evidence at his trial.  There would have
0   been no reason to bring up did Davis.  You could have asked
1   him that on cross-examination.
2        MR. MEEHAN:  Regarding Lindsey Johnson?
3        THE COURT:  There would have been no basis to bring
4   up Lindsey Johnson as far as I see it in this letter.  What
5   he's talking about is things that happened at his trial that
6   were wrong.  So I don't know why he would have in this letter
7   raised with his appellate lawyer Lindsey Johnson because
8   Lindsey Johnson wasn't a witness at the trial.  That's
9   something you could have brought out through plaintiff.
0        MR. MEEHAN:  You are getting to the exact issue of
1   why it should have been in evidence, why Mr. Megaro should be
2   commenting on it.  They are using it to impeach him but also
3   not showing it to the jury and they are doing it specifically
4   to make sure Mr. Megaro doesn't come in tomorrow.  They got
5   the benefit of impeaching him with the document and they are

Anthony M. Mancuso, CSR    Official Court Reporter

1   also hoping to get the benefit of not having Megaro come in
2   and rebut their argument.
3        MR. FRANCOLLA:  My recollection of how --
4        THE COURT:  I think Mr. Megaro can be asked
5   questions.  I don't think the letter comes into evidence.
6   Mr. Megaro could be asked questions about the subject matter
7   of the letter.  Was it complaints about what happened at the
8   trial?  And what about Lindsey Davis -- I don't know.
9   Whatever the guy's name is.  Johnson.  You could have asked
10  the plaintiff why he didn't raise anything about that and the
11  answer would have been presumably because he was talking about
12  what went on at the trial and that wasn't something that was
13  in the record of the trial below.
14       MR. NORINSBERG:  The concern is then the impression,
15  what's the impression created?  He changed his story for the
16  civil lawsuit.  Back then when he was fighting his appeal he
17  didn't mention Lindsey Johnson.
18       THE COURT:  That doesn't mean everything else comes
19  into this letter.  You should be able to -- you should have
20  pointed out through the plaintiff that his reason for writing
21  this letter had to do with things that he saw were defects at
22  the trial and that Johnson wasn't a witness at the trial.  So
23  there would be no reason for him to talk about Johnson in the
24  context of this letter.
25       MR. MEEHAN:  Your Honor, I was trying to introduce

Anthony M. Mancuso, CSR    Official Court Reporter

1   it and lay the foundation so we could discuss the letter.
2   When the court sustained the objection and I couldn't
3   introduce it.
4        THE COURT:  You didn't have to introduce it to ask
5   him those questions.
6        MR. MEEHAN:  I asked a couple of foundation
7   questions, such as who is Patrick Megaro and he was the
8   attorney and this and that.  The concern there is when I'm
9   precluded from showing the witness the letter, to then ask
0   questions --
1        THE COURT:  You were not precluded from showing the
2   witness the letter.
3        MR. MEEHAN:  They objected and the court sustained.
4        THE COURT:  You were not precluded him from showing
5   the letter.  I precluded you from admitting portions of the
6   letter into evidence, not from showing him.  If you want to
7   recall plaintiff and ask him that with any question, you can.
8        MR. MEEHAN:  Fine.
9        MR. FRANCOLLA:  I would note I only asked that
0   question I believe as to the plaintiff when I simply wanted to
1   ask about the closing, volunteered who wrote the letter to say
2   he's innocent of the it was after that I said you didn't do
3   that.  I didn't affirmatively intend to do that.  It was in
4   response to him elaborating on a fairly simple question.
5        MR. NORINSBERG:  That last paragraph, he did assert

Anthony M. Mancuso, CSR    Official Court Reporter

1   his innocence.  The way the questioning was left it creates
2   the impression that he didn't make that claim about his
3   innocence and maybe the remedy --
4        THE COURT:  No, it's not.  Nobody made a claim that
5   he didn't assert his innocence in the letter.
6        MR. NORINSBERG:  The impeachment by omission that
7   you never mentioned anything about your star alibi witness,
8   that to me creates the impression that he changed his defense.
9        THE COURT:  All right.  You can have one of two
10  remedies.  You can call the plaintiff and explain, not exactly
11  -- not that he was saying that he was innocent but he was
12  talking about things that happened happen at trial.  Lindsey
13  Johnson didn't happen at trial.  Or I'll strike the question
14  and answer about Lindsey Johnson.
15       MR. NORINSBERG:  I would like the latter remedy.
16       THE COURT:  You got it.
17       MS. FUDIM:  To clarify, your Honor, with regard to
18  Megaro tomorrow, the scope of any testimony would be the four
19  questions that your Honor outlined and nothing further,
20  nothing about conversations with plaintiff.
21       THE COURT:  No, nothing about conversations with
22  plaintiff.
23       THE COURT:  All right.  Let's go over now the
24  charge.
25       First of all, does the plaintiff have objections to

Anthony M. Mancuso, CSR    Official Court Reporter

230

1  the charge or verdict sheet?

2      MR. NORINSBERG:  Very limited, judge.  If I can just

3  pull them out.  I was wondering, I would like to handle the

4  conference with Mr. Meehan and could the plaintiff be excused?

5      THE COURT:  All right.

6      MR. FRANCOLLA:  And the same would apply to the

7  defendants, your Honor.

8      THE COURT:  Yes.

9      MR. FRANCOLLA:  Thank you.

0      THE COURT:  It's all right, with you, Mr. Smalls,

1  it's all right with you that we discuss the jury instructions

2  in your absence?

3      MR. SMALLS:  Yes.

4      (Pause.)

5      THE COURT:  All right.  Are there any objections by

6  plaintiff?

7      MR. NORINSBERG:  On the charges, starting with the

8  charges?

9      THE COURT:  Yes.

0      MR. NORINSBERG:  Just one objection on page 15.  The

1  court makes a reference that the award would not be subject to

2  federal income taxes.  My understanding, judge, that it would

3  be subject to federal income taxes.  The only possible

4  exemption for tax purposes is when there's an a physical

5  injury of the plaintiff.  Everything else would be subject to

Anthony M. Mancuso, CSR    Official Court Reporter

231

1  taxes.  So we would ask that the court delete that reference.

2      THE COURT:  Okay.  Where is that?

3      MR. NORINSBERG:  That's on page 15 and it's right

4  before the punitive damages section.

5      MR. FRANCOLLA:  Respectfully, my understanding was

6  that only punitive damages were taxable and that compensatory

7  damages, to the extent they are making someone whole, would

8  not be.  I think we would be okay if it said you shouldn't

9  consider that or taxation, rather than saying it's not

10 taxable.

11     MS. FUDIM:  I believe as well lost income is

12 taxable.  When you are getting compensation as a result of the

13 lost income, that's taxable.  Compensable damages that are not

14 rooted in lost income are not taxable.

15     MR. NORINSBERG:  That's simply not correct.  We also

16 do a lot of employment work.

17     THE COURT:  What are the nature of the damages that

18 you are seeking?

19     MR. NORINSBERG:  They are compensatory damages and

20 those are fully taxable.  The only way it wouldn't be if there

21 was an a claim of a physical injury that we are seeking

22 compensation for.  We're not.  There's no physical injury

23 alleged in this case.  So if he were to succeed in this trial

24 and win money damages it would be fully taxable.  There's no

25 exception for compensatory damages.  So our request would be

Anthony M. Mancuso, CSR    Official Court Reporter

232

1  to simply delete the sentence and not to delve into this and

2  create an impression with the jury with regard to tax

3  consequences that may not be accurate.

4      MR. FRANCOLLA:  At a minimum it's appropriate to

5  say that they could not consider tax consequences.

6      THE COURT:  Somebody want to give me a case on it

7  and then if they are -- if they are taxable, then I'll take it

8  out.

9      MR. MEEHAN:  Your Honor, in terms of cases, I just

0  know from experience and when I'm dealing with my own client a

1  taxable gain is excluded due to a personal injury.  There's no

2  exclusion for any other kind of compensatory damages.

3      THE COURT:  I know.  I just asked for an a case.

4      MR. MEEHAN:  Where would a case be about that?

5      THE COURT:  Where would a case be about that?

6      MR. MEEHAN:  We'll look for a case.

7      THE COURT:  I'll take it out if you show me a case.

8      MR. NORINSBERG:  We'll find something to put in.

9      THE COURT:  Okay.

0      MR. NORINSBERG:  That was my only objection.

1      THE COURT:  Are there any objections to the verdict

2  sheet?

3      MR. NORINSBERG:  Yes, again, very minor.  No

4  objections to the first question.  The second question, which

5  is the damages question, I just object in this context of

Anthony M. Mancuso, CSR    Official Court Reporter

233

1  again restating the preponderance of the evidence.  It makes

2  sense when we are talking about liability and the plaintiff

3  has to prove his liability claims which are reiterated

4  separately in the context of damages.  Obviously, they are

5  going to be instructed from you on damages --

6      THE COURT:  Doesn't he have to prove damages by a

7  preponderance?

8      MR. NORINSBERG:  Yes.  It seems to me, I have not

9  seen this before, I have only seen this in a context where it

10 is talking about a liability claim.  If the plaintiff were to

11 prevail on liability claim, there's a deprivation of liberty

12 taking place.  As a matter of law and the there's Second

13 Circuit authority.

14     MR. FRANCOLLA:  Kerman vs. The City of New York.  We

15 can pull the cite.  The Second Circuit has expressly stated

16 that it's not an option, once you get past that and there's a

17 liberty deprivation, the jury has to award some form of

18 compensatory damages.

19     MR. NORINSBERG:  So, we have the citation, 347F.3d,

20 93.  I can just read the quote into the reported.  The court

21 says the following:  Similarly, where the plaintiff was

22 indisputably deprived of his liberty and the conduct of the

23 defendant was responsible for the deprivation is found to be

24 unlawful, we have held that plaintiff is entitled to

25 compensatory, not merely nominal damages.

Anthony M. Mancuso, CSR    Official Court Reporter

1    So, the court is saying as a matter of law once you
2  get past that threshold there has to be an award of damages.
3  However large or small it might be is another question.  You
4  have to award damages once you have proven liability on an
5  unfair trial claim.

6    THE COURT:   The question refers to the amount.  The
7  amount has to be established.

8    MR. NORINSBERG:  Again, I know, judge, every court
9  has their own preference in doing things.  This does seem
0  somewhat unusual to me.

1    THE COURT:  Is it wrong?

2    MR. NORINSBERG:  I think so.  If you look at the
3  Second Circuit's case, what if the jury says, okay, the
4  plaintiff hasn't proven the exact amount, but we're not asking
5  for an amount.  But the plaintiff hasn't proven the exact
6  amount and they award zero.  That would be incorrect as a
7  matter of law.

8    THE COURT:  What are you asking, that it just
9  eliminate that plaintiff has proven by a preponderance of
0  evidence?

1    MR. NORINSBERG:  Yes.  That's exactly what I am
2  asking.

3    THE COURT:  You want it to read:  State the amount
4  of the compensatory damages, if any, that plaintiff is
5  entitled to as a result of --

Anthony M. Mancuso, CSR    Official Court Reporter

1    MR. NORINSBERG:  Again, I don't know the if any
2  should be in there either because of Kerman.

3    THE COURT:  What is the cite on Kerman?

4    MR. NORINSBERG:  347F.3d 39.

5    MS. FUDIM:  Your Honor, from our point of view, I
6  agree with counsel, I agree with counsel as to the if any.
7  Under Kerman we would agree that if any can come out.  The
8  preponderance of the evidence is still the standard of proof
9  governing all aspects of the plaintiff's case.  To the extent
10 that they are putting in a number, the preponderance of
11 evidence portion is proper.  There's nothing in Kerman that I
12 think undermines that.

13   MR. NORINSBERG:  Let me clarify.  Now, even though
14 the court did grant our request to be able to ask for monetary
15 damages we're not going to be.  This will be solely in the
16 jury's hand.

17   There's one other quote from Kerman that really
18 addresses this issue and this is at 124 of that opinion:  In
19 contrast where the jury has found a constitutional violation
20 and there's no genuine dispute that the violation resulted in
21 some injury to the plaintiff, the plaintiff is entitled to an
22 award of compensatory damages as a matter of law.

23   THE COURT:  That's the case that says that you
24 shouldn't charge on nominal damages, isn't it?

25   MR. NORINSBERG:  It is.  It's the same context.  It

Anthony M. Mancuso, CSR    Official Court Reporter

1  has the same import for our purposes.

2    THE COURT:  But they have to determine the amount of
3  compensatory damages.

4    MR. NORINSBERG:  Absolutely.  That's for the jury.

5    THE COURT:  I note in the instructions I don't say
6  anything about preponderance of the evidence.  I'll take it
7  under consideration.  That's it.

8    MR. NORINSBERG:  One other thing.  I would request
9  in question three, the punitive damages, that we substitute
0  the word reckless for the word callous.  I think that tracks
1  the charge where there's intentional or reckless disregard of
2  plaintiff's rights.

3    MS. FUDIM:  We have an objection to that.

4    THE COURT:  Okay anything else?

5    MR. NORINSBERG:  No, your Honor.

6    THE COURT:  Defendants.

7    MS. FUDIM:  Yes.  I just see one thing that I think
8  might need to be fixed on page eleven of the charge.  The last
9  sentence of the first full paragraph where it says a person --
0  first it says may suffer, grammatically that's not the point I
1  was raising.  Page eleven of the charge, the last sentence.

2    THE COURT:  A person may suffer a liberty
3  deprivation when he is arrested, faces trial, is convicted or
4  is imprisoned.  I think it should say a person may suffer a
5  liberty deprivation with respect to a fair trial claim when he

Anthony M. Mancuso, CSR    Official Court Reporter

1  faces trial, is convicted or is imprisoned.  Because under a
2  fair trial claim damages begin post-arraignment.  It doesn't
3  include the time arrested and there's no false arrest claim
4  here.  So I think as a technicality, as a matter of law, you
5  have to speak about the liberty deprivation in connection with
6  a fair trial claim which does not include the arrest.

7    THE COURT:  The liberty deprivation is when he faces
8  trial, is convicted.

9    MS. FUDIM:  Or is imprisoned.

10   MR. NORINSBERG:  I have no that concept.  To make it
11 clear, maybe put it at the beginning of the sentence, to say
12 in the context of an a fair trial claim.

13   MS. FUDIM:  That's fine.

14   We have nothing else.

15   THE COURT:  So it would read:  In the context of a
16 fair trial claim a person may suffer a deprivation of liberty
17 when he faces trial, is convicted or is imprisoned.

18   MS. FUDIM:  Yes, your Honor.

19   THE COURT:  Okay.  I'll make that change.  Anything
20 else?  Speak now or forever hold your peace.

21   MS. FUDIM:  The only other issue we have is not with
22 the charge or verdict sheet.  We need to circle back with the
23 issue is with the prints.  We are going to get the transcript
24 from the sidebar at which I think it was yesterday, it may
25 have been the day before, at which you said to them at the

Anthony M. Mancuso, CSR    Official Court Reporter

1  time they had a choice in that moment, they could either have
2  the prior testimony that had just come out be stricken or they
3  could agree if the witness didn't show up as to the prints,
4  you were going to enter the underlying stipulation that was
5  entered into in the criminal court. We're going to get that
6  transcript this evening and we'll provide it to the court by
7  letter this evening or tomorrow.

8        THE COURT: My memory is that it was an either or,
9  that he would accept the stipulation or agree to it being
0  stricken.

1        MS. FUDIM: And at the time he said we agree to the
2  stipulation. So the court did not strike that testimony at
3  that time.

4        THE COURT: You'll have to get it.

5        MS. FUDIM: We're doing so, I'm advising the court
6  we're doing so. It's our position that the stipulation should
7  be entered from the matter below. Also I think a parallel,
8  just to bring it full circle, counsel has argued they should
9  be able to rebut certain ideas brought forth in our opening
0  statement and I would say by the same token plaintiff opened
1  first and they opened regarding the fingerprints didn't match,
2  two prints were taken off the gun and it didn't match our
3  client. We did also open on fingerprint evidence but that was
4  in response to plaintiff's opening on fingerprint evidence.
5  So we should be able to close that out by introducing the

1  lower court -- the stipulation that was entered into in the
2  criminal court which is not prejudicial to anyone. We all
3  know it to be a matter of fact that went into evidence at the
4  criminal trial.

5        MR. NORINSBERG: I'm glad that we have the
6  transcript of the opening, what actually was said.

7        THE COURT: I don't have your opening.

8        MR. NORINSBERG: Right. But the transcript of
9  defense opening of course what he did, he said yes it's true
10 about the two prints. Mr. Norinsberg didn't mention it to
11 you, he didn't tell you that the reason why those three other
12 prints couldn't be analyzed and he went into a whole area that
13 went beyond below and essentially created a false impression
14 that I am trying to hide something. I can find it for you.

15       MS. FUDIM: Your Honor, we would not have opened on
16 prints period if they had not opened on prints. That's the
17 point, your Honor.

18       MR. NORINSBERG: It's very close to the last page.

19       THE COURT: That was in response to your argument
20 about no fingerprints.

21       MR. NORINSBERG: The response is we agree there is
22 no fingerprint evidence and I told the jury, I said five
23 prints were lifted, only two were suitable for comparison.
24 That should have ended his inquiry. Then counsel got up and
25 said what Mr. Norinsberg didn't tell you the reasons why those

1  three, were X, Y and Z. It's not in response. It's going
2  beyond what I said. It really just leads us back to the main
3  issue which is we were given a choice by the court and we
4  wanted a live witness. We tried our best to get a live
5  witness. We were not able to. Now we are choosing the
6  alternate remedy that the court gave.

7        THE COURT: Here is the problem, which is makes this
8  a little messy. The alternative remedy is that I strike any
9  evidence pertaining to a fingerprint report. So there's
0  nothing before the jury about fingerprints, correct?

1        MR. NORINSBERG: No. The alternative remedy is what
2  you suggest, which is the question, which was not objected
3  to, but the answer which was allowed to stand, that answer, so
4  now the court could strike it which is originally what you had
5  suggested.

6        THE COURT: Then what is the record that we have on
7  fingerprints?

8        MR. NORINSBERG: There is no evidence of
9  fingerprints. We do have record of fingerprints being
0  requested. I don't think anyone in this courtroom is
1  contesting that there's no matches to Andrew. I think we all
2  agree with that. When we go to the next level and say why are
3  there no matches, of course what happened after that, that's
4  all hearsay.

5        THE COURT: Why isn't Andrew Smalls prints on the

1  gun? Why isn't that hearsay? There are two different things
2  you can argue. You can presumably want to argue there's no
3  evidence in this case presented by the defendant that Andrew's
4  prints were on that gun. You can't technically make that at
5  the same time. The defendants have not presented any evidence
6  in this case that Andrew Smalls's prints were on that gun.
7  You want to say that they took prints, that there are prints
8  that were suitable for comparison but they were not Andrew.
9  You don't want the appropriate rebuttal to that which would be
10 that the police officers' prints weren't on the gun either and
11 he said he handled it. I just think to have it one-sided like
12 that is not fair. I just don't think it's fair. The best
13 thing for you all to do would be to enter into that
14 stipulation. I think the stipulation is fair.

15       MR. NORINSBERG: We're prepared to make the argument
16 that the court just suggested that defendants have not
17 presented any evidence of Andrew Smalls's fingerprints being
18 on the gun.

19       THE COURT: I'm sure you are happy to make that
20 argument. The problem is the record is a little messy now in
21 that regard.

22       MS. FUDIM: Also, when we had the sidebar, again we
23 will get the minutes from it, when we had the
24 sidebar, the court two days ago, could have been yesterday,
25 the court said at that time you have to make an election now

1  as to whether you want me to strike the testimony that was
2  just given or that you're going to enter into the stipulation.
3  At that time Mr. Meehan said if we can't get a live witness we
4  will enter into the stipulation at which point the court said
5  okay and didn't strike the testimony.  They then elicited
6  additional testimony through another witness, Teta, again,
7  with the same issue with the fingerprints.  They are saying
8  now we would rather, days later, we would rather have that
9  testimony stricken.  When the court was addressing it there
0  was a restriction on it.
1       THE COURT:  I don't remember that.  You have to get
2  the minutes.
3       MS. FUDIM:  We intend to do so.  I think the court
4  is completely right.  What we have been saying it's not fair.
5  You can't unring a bell.  The testimony was offered by
6  plaintiff twice and also defendants have no obligation to put
7  on any evidence.  This is a civil trial.  The burden of proof
8  is solely with at the plaintiff.  For them to take this
9  position of defendants haven't offered any proof that is
0  really also skewing what the burden here is.  The bell can't
1  be unrung.  The stipulation, the fact that counsel's initial
2  preference when we told them about the report, again I brought
3  to their attention that the document that they had in the
4  JPTO, that were the results.  Fingerprint report was
5  incomplete.  I could have said nothing, waited for them to use

Anthony M. Mancuso, CSR   Official Court Reporter

1  it on the stand and found themselves floundering to not have
2  the evidence.  I called them up and told them it's missing
3  this page.  There was this stipulation.  Their initial first
4  preference was that they wanted to enter into the stipulation
5  and we have initially said we want to first see if we can get
6  the report before we discuss a stipulation.
7       THE COURT:  No one would have gotten the full
8  report.
9       MS. FUDIM:  We had all the boxed in latent print
10  from storage in New Jersey and it's no longer there.
11  Aperiently their retention period with respect to print
12  reports is five years.
13       THE COURT:  What doe the record of the trial below
14  show?  Did you have that document in the trial record of the
15  case below?
16       MS. FUDIM:  The record below shows they had the
17  document.  Rather than introducing the document and rather
18  than calling a witness to explain what the document showed
19  that they would forego that, both sides, and instead enter
20  into a stipulation and then the stipulation was read into the
21  record.
22       THE COURT:  Do you have that stipulation?
23       MS. FUDIM:  I do.  We can pull it up on the
24  computer.  It's like five sentences.
25       THE COURT:  Tell me what it says.

Anthony M. Mancuso, CSR   Official Court Reporter

1       MR. NORINSBERG:  There was never any reference about
2  the actual documents down below.  It was simply a stipulation
3  read in lieu of calling Detective Carter.
4       MS. FUDIM:  You have to give me one second and I
5  will find it in an email and I can read it.
6       MR. MEEHAN:  I just want to let you know I found a
7  case regarding the action issue, Johnson 228 F. Supp. 2 B,
8  1218.
9       THE COURT:  What does it say?
0       MR. MEEHAN:  United States Supreme Court has
1  articulated two independent requirements that must be met in
2  order for -- first to exclude amounts of gross income under 42
3  USC section 104(a)(2).  Number one, the taxpayer must have
4  that the underlying cause of action giving rise to the
5  recovery is based upon a tort or tort type rights and, number
6  two, the taxpayer must show that the damages were received on
7  account of the permanent injuries or sickness.  Congress has
8  further amended 26 USC section 104(a)(2) to impose even
9  further restrictions on excludible income making the second
0  prong of the test read:  Personal physical injuries or
1  physical sickness.
2       THE COURT:  So you say this is the only thing not
3  subject to taxes, because this is a tort like action.
4       MR. NORINSBERG:  It's the absence of physical
5  injury.  Again there's no excessive force claim.  No one is

Anthony M. Mancuso, CSR   Official Court Reporter

1  claiming that he had physical injuries that warrant
2  compensation.
3       THE COURT:  Why don't I just take the sentence out
4  altogether.
5       MR. NORINSBERG:  That's why we requested.
6       MS. FUDIM:  We would say that it should not be
7  considered and end at the word considered period.
8       THE COURT:  Unless you come up with a case that says
9  the opposite to what counsel said, I'm just going to take it
10  out.
11       MS. FUDIM:  We'll look this evening.  I found the
12  language of the stipulation which I can read into the record.
13  The People and the defendant Andrew Smalls stipulate that if
14  detective Douglas Carter of the New York City Police
15  Department's forensic division latent print unit was called to
16  the stand he would testify as an expert in the field of latent
17  print identification and testify that on July 27, 2006
18  Detective Carter analyzed the five latent print lifts that
19  Police Officer Charles Feldman of the 100 precinct recovered
20  on May 20, 2006 from the .380 cobra pistol magazine, People's
21  1 in evidence and submitted to the latent print unit for
22  analysis, three of these prints were of no value because they
23  were too smudged to allow any comparison.  Detective Carter
24  cannot say who made these prints.  These three prints were
25  lifted from the right side of the pistol slide.  The left side

Anthony M. Mancuso, CSR   Official Court Reporter

1  of the pistol slide and its magazine, the other two prints
2  were of value, meaning that he could make a comparison of
3  these two prints.  These prints were recovered from the
4  pistol's tang and its magazine.  Detective Carter compared
5  these prints to the fingerprints of the defendant Andrew
6  Smalls, Ronnie Smalls, Cedric Smalls and Jerome Nelson and
7  these prints are not the fingerprints of the defendant Andrew
8  Smalls, Ronnie Smalls, Cedric Smalls and Jerome Nelson.  There
9  was no match to anyone who works for the New York City Police
0  Department or anyone who has been arrested and fingerprinted
1  in New York State.
2          That was the stipulation below.
3          THE COURT:  As of whenever the report was done.
4          MS. FUDIM:  The report is July 27, 2006.
5          THE COURT:  Why can't you agree to that, counsel,
6  since you asked them were prints taken, was there a report
7  done, did Andrew Smalls -- you really want your cake and eat
8  it, too.
9          MR. NORINSBERG:  I'm largely okay with the
0  stipulation, just hearing it read.  The problem that I have
1  with it, when it starts talking about Jerome Nelson who no one
2  has ever said that he was in possession of the gun.  When it
3  starts talking about people in the New York City Police
4  Department, for sure I would want to cross-examine on that.
5  They are actually comparing it with people in the police

Anthony M. Mancuso, CSR    Official Court Reporter

1          department.  That should not be there.  The New York State
2  comparison is irrelevant.  If we were to end the stipulation
3  and just say that plaintiff's prints weren't fond on it and
4  Ronnie Smalls and Cedric Smalls's prints, I would agree.  I'm
5  okay with it.
6          MS. FUDIM:  Your Honor, I think it has to include
7  the fact that the officers' prints also weren't there because
8  he testified that he touched it.  It was part of this
9  stipulation that it was compared to -- obviously there's a
10  data base.
11          THE COURT:  Why don't you leave it with the part
12  that covers the officers.
13          MS. FUDIM:  We can change it to just the officers
14  that's fine.
15          MR. NORINSBERG:  That interjects a whole new concept
16  that the officer' fingerprints could have been on the gun.  It
17  was a tiny point in this trial.  He picked up the gun
18  allegedly and put it in his hat.  To even speculate about that
19  when there's no evidence about that whatsoever to me is going
20  down a whole different field.  There's three defendants.
21  There's two more.  I would like the stipulation from
22  plaintiff's standpoint to read and stop at Andrew Smalls.  The
23  concession is we are also in excluding Cedric Smalls and
24  Ronnie Smalls.  None of their prints are found on it.  That
25  allows them to make an argument that nobody's prints were on

Anthony M. Mancuso, CSR    Official Court Reporter

1  it.  To me that's already enough.  They are getting that, and
2  now to add the other thing that's where I have a problem with
3  it.  We're willing to compromise.  That last bit, if we could
4  cut that out we could have a stipulation.
5          MS. FUDIM:  They are willing to compromise when
6  there's no risk to them.  The stipulation that was entered
7  into at the criminal trial was conceded to by plaintiff's
8  criminal defense attorney at a time when plaintiff's liberty
9  was at issue.  Presumably everyone's interests were the same.
0  This is obviously what the report showed.  The parties entered
1  into it.  It's balanced.  It's fair and it correlates
2  precisely with the evidence that has come in.  They are saying
3  it was a small point that the officer touched the gun too and
4  his prints weren't on it.  That's a small point in his case.
5  It's a point in our case.  He want to neuter our case without
6  having to do the same to his own and that seems unfair when we
7  are looking at what was agreed to by all parties which is both
8  accurate, fair and balanced.  There's nothing in the record to
9  show that anything about this stipulation would have been
0  inaccurate or unfair.  In fact, the fact that plaintiff's
1  criminal trial counsel agreed to it and it was read to the
2  jury is in fact very much evidence that it was accurate and it
3  fair, your Honor.  We don't think that our case should have to
4  be neutered while plaintiff, as the court aptly said, can't
5  have his cake and eat it too.

Anthony M. Mancuso, CSR    Official Court Reporter

1          MR. NORINSBERG:  I just said two minutes ago -- and
2  you heard me correctly.  Counsel didn't.  We agreed to include
3  Ronnie Smalls and Cedric Smalls.  We agreed to that for
4  purposes of the resolving this.
5          THE COURT:  I think you should add the part about
6  people employed by the police department.  Then you can argue
7  that there's no way based on his testimony about how he picked
8  it up, these are prints that were on the top part of the gun,
9  the print officer said if he picked it up in a different way
10  of course his prints wouldn't be on there.
11          MR. NORINSBERG:  It does not say Officer Collins or
12  Teta.  It just says police officers.  It's so far beyond the
13  scope of what it's being an argued for.
14          THE COURT:  That's the only part of the
15  stipulation -- that's apparently what the report said, that
16  was the only part that would cover the police officers.  You
17  don't need to cover everybody else whose ever been arrested.
18  You can take that part out.  That's the only way that she gets
19  in the police officers.
20          MR. NORINSBERG:  I'm sorry.  To me, I want to
21  compromise and I want to get this resolved and I don't like
22  the stipulation at all.  I would rather it not come in.  I'm
23  trying to follow the court's guidance here, the notion of
24  trying to resolve this.  The last part of it is unacceptable
25  to plaintiff.  You start talking about the police officers and

Anthony M. Mancuso, CSR    Official Court Reporter

1 the whole State of New York.

2 THE COURT: I said that the whole State of New York
3 is irrelevant.

4 MS. FUDIM: We don't need that part.

5 THE COURT: I already said we can take that out.

6 MR. NORINSBERG: But the police officer part, to the
7 extent that allows an argument to be made in court without any
8 evidence at all about that the police officers' prints were
9 actually tested and compared side by side, Detectives Collins
0 and Teta looked at it. They found their prints weren't on it.
1 To me it's taking it way beyond the scope of what is
2 acceptable. It's unacceptable to plaintiff.

3 THE COURT: Even if the report indicates that the
4 police officers' fingerprints were --

5 MS. FUDIM: That's literally what it says. If
6 Detective Carter were called to testify he would testify, then
7 everything else is written and then dot dot dot, there was no
8 match to anyone who works for the New York City Police
9 Department. We could say there was no match to Officer
0 Collins, if we want to limit it beyond everyone else in the
1 police department. Clearly the stipulation was that that's
2 what it was. It is relevant. He's saying there's no evidence
3 of it. There is evidence. The same evidence that his prints
4 didn't match anyone in the police department is the exact same
5 evidence that the prints didn't match Mr. Smalls. It's from

Anthony M. Mancuso, CSR   Official Court Reporter

1 the report that we don't have. It's the exact same amount of
2 evidence and that's what's covered in the stipulation.

3 MR. MEEHAN: So this is the issue why we originally
4 wanted to bring Mr. Carter in. Somehow on the fingerprint
5 report there would be listed the comparison of a police
6 officer. I've certainly never seen that on a print report.
7 And our ability to cross Detective Carter on that issue -- so
8 you are telling the jury that we don't have this document,
9 that in the document there was purposeful discussion of police
10 officers and comparison -- that's an issue here. I see what
11 their argument is. It doesn't make sense. From the
12 standpoint of people who have seen print reports before, I
13 have never seen them compare a police officer. You have seen
14 them compare criminal defendants.

15 THE COURT: I see it all the time. All the time.
16 Agents have handled guns. It's routinely that they compared
17 different prints.

18 MR. NORINSBERG: Federal agents maybe. We have been
19 doing these civil rights cases a long time with the police
20 department.

21 THE COURT: Are you saying Detective Carter lied
22 and that's why you don't want it in?

23 MR. NORINSBERG: No. There's no Detective Carter
24 testimony at all. It's what two parties agreed to of facts
25 which may or play not be true because there's no evidence of

Anthony M. Mancuso, CSR   Official Court Reporter

1 it. They agreed that could be told to the jury. Whatever
2 reason that counsel had to agree to that that's fine. We
3 wanted to cross-examine this detective. That's something
4 that's totally out of the norm. When you see a comparison on
5 an a police document they will identify suspects compared with
6 X, Y and Z, prints retrieved from here, here and here. I have
7 never once in any police case ever seen it.

8 THE COURT: Is this what you would prefer that I do
9 the, Mr. Norinsberg, explain to the jury that I have struck
0 from the record any testimony regarding fingerprint reports,
1 the defendants' fingerprints, which will eliminate from this
2 case any argument that his prints were tested against the gun
3 and his prints weren't on the gun.

4 MR. NORINSBERG: No.

5 THE COURT: That's what you have. You want part of
6 the report and not the rest of it. You have to decide what
7 you want. If this was in the report it seems to me that it's
8 fair to have the conclusions repeated by the report, not just
9 the conclusion that you want that Mr. Smalls's prints were not
0 on the gun.

1 MR. NORINSBERG: There was no report ever. We don't
2 see any report. It's not referred to at all.

3 THE COURT: What are you questioning him about?

4 MR. NORINSBERG: A report, a request was made.
5 There's no latent print report that led to that stipulation

Anthony M. Mancuso, CSR   Official Court Reporter

1 that's referred to during the criminal trial. There's no
2 document. That's what I am driving at. It was not in a
3 document. It's simply opposing counsel agreeing to the
4 following facts and read it to the jury.

5 THE COURT: You have some documents.

6 MR. NORINSBERG: We have a request for prints that
7 was made. We don't have an actual analysis. That's usually
8 four or five more pages that go with that.

9 MS. FUDIM: Your Honor, if I may --

10 THE COURT: What document?

11 MS. FUDIM: Give me one second, your Honor. That's
12 what I was going to draw the court's attention to. It is 18,
13 your Honor. And it obviously is either cut off or perhaps
14 there's an a second page and I say perhaps there's a second
15 page because there's a fax header at the top that indicates
16 the number two. So that suggests to me --

17 THE COURT: All I have is one page.

18 MS. FUDIM: That's my point. There was a print
19 report. The only thing that which have -- this is why I said
20 when I was looking through plaintiff' counsel's binder and I
21 looked at this report --

22 THE COURT: This report doesn't say anything.

23 MS. FUDIM: Exactly. So that's what I drew their
24 attention to. I know you have sent us the latent print
25 report. It doesn't have anything in the way of results even

Anthony M. Mancuso, CSR   Official Court Reporter

1  as to your client.  It has nothing.  That was the starting
2  point for us saying let's see if we can obtain the full
3  report.
4      THE COURT:  The record of the trial below does not
5  have a fingerprint report in it?
6      MS. FUDIM:  Instead of a fingerprint report what
7  they did at the trial is they read this stipulation into the
8  record.
9      THE COURT:  There's no physical document.
0      MS. FUDIM:  They did not enter it into evidence.
1      THE COURT:  You have access presumably to whatever
2  records there were in the state court.  This case has been
3  going on since the year 2014.  None of the records in the
4  binder of the state court had the physical report in it.
5      MS. FUDIM:  We don't have any of the exhibits from
6  the state court.  Actually the transcripts that we have from
7  the state court we obtained from plaintiff's criminal defense
8  attorney.  They were introduced in this action by plaintiff.
9  What we obtained was the DA file.  The DA file contains this
0  one page and we have the transcripts.  We have none of the
1  actual exhibits.
2      THE COURT:  You got defense counsel's records?
3      MR. NORINSBERG:  Yes.  We have never seen anything.
4  If we had them we would have used them at trial.  We've never
5  seen them.  I've never seen any record like that.

Anthony M. Mancuso, CSR    Official Court Reporter

1      THE COURT:  The only basis for either one of you
2  knowing what the report said was the stipulation entered into
3  in state court.
4      MS. FUDIM:  Yes.  That is 100 percent correct.  That
5  is the entire basis for everyone's testimony about prints.
6  They keep saying there's no evidence whatsoever about the
7  officers' prints.  That's why I'm stating it's the exact same
8  evidence that exists, however wrong or weak that evidence is,
9  it's the exact same evidence that exists as to whether
10  plaintiff's prints match.  All we have to go on is the
11  stipulation that was entered.  Presumably both sides and the
12  court approved this stipulation.  Everyone below agreed that
13  this was accurate.  That's the nature of what a stipulation
14  is, your Honor.  We can't unring the bell now.  Twice they
15  elicited hearsay statements that is beneficial for them and I
16  don't think the remedy is now days later to strike it and then
17  we're left holding the bag of this insinuation, well, there's
18  no evidence out there about prints.  I really think that's
19  prejudicial, whereas just reading in this stipulation, this is
20  the basis for --
21      THE COURT:  I got it.
22      MS. FUDIM:  Your Honor, thank you.
23      MR. NORINSBERG:  Judge, with that stipulation there
24  are two different forensic experts that were called into that
25  case.  To give it context to explain all the different tests

Anthony M. Mancuso, CSR    Official Court Reporter

1  that were being done, things that we have not heard in this
2  trial.  That's why I feel like it has limited evidentiary
3  value and it should be confined to the three Smalls Brothers.
4  That's the issue in this case, whether the police confused the
5  issue or not.  It's not about whether Officer Collins put his
6  fingerprints on it.  No one is arguing about that or
7  contesting it.  The argument is there was a mistake made and
8  they didn't own it and lied about it.  That's our argument.
9  Their argument is our plaintiff has made up this whole story.
0  He was there and guilty as charged and got lucky on appeal.
1  We could confine the stipulation to the three Smalls Brothers
2  and just call it a day.
3      THE COURT:  Also to the fact that there were other
4  prints on the gun that couldn't be identified.
5      MR. NORINSBERG:  That's fine.  I didn't object to
6  that part.  That's fine.
7      THE COURT:  The fact that there were other prints
8  that can be identified is what you really want in this case.
9      MS. FUDIM:  I think that's a big portion of it.
0      THE COURT:  That is the compromise.  He's going to
1  agree that Cedric and Ronnie Smalls's prints were on there,
2  that there are other latent prints that couldn't be identified
3  on there.  That seems to me to be a fair compromise.
4      MS. FUDIM:  We stand on our submission that the part
5  of the stipulation in relation to the officer --

Anthony M. Mancuso, CSR    Official Court Reporter

1      THE COURT:  You would have a hard time that I could
2  force a lawyer in a case to agree to a stipulation.  I don't
3  know that I have the power to do that.  I have told counsel we
4  can just strike everything there is about fingerprints from
5  the record.
6      MS. FUDIM:  I agree with the court that I don't know
7  that you have the power to enforce a stipulation, other than
8  the fact when you were at sidebar --
9      THE COURT:  You find that and show me that
10  testimony.  But counsel has agreed to probably what you wanted
11  him to agree to at sidebar.  He's already essentially agreed
12  to that, so that's where we'll leave it.
13      MR. MEEHAN:  Are you not agreeing to that?
14      MS. FUDIM:  We're going to obtain the minutes.  If
15  Mr. Meehan represented at the time that he would agree to the
16  state court stipulation, we would stand on our position, your
17  Honor.
18      THE COURT:  You can show me the minutes tomorrow.
19      MS. FUDIM:  Yes, your Honor.
20      THE COURT:  You all have to be prepared to sum up
21  tomorrow.
22      MS. FUDIM:  Yes, your Honor.
23      THE COURT:  Who is summing up for plaintiffs?
24      MR. NORINSBERG:  Mrs. Joseph.
25      THE COURT:  How long would she be?

Anthony M. Mancuso, CSR    Official Court Reporter

1           MR. NORINSBERG:  I honestly couldn't represent to
2 the court.
3           THE COURT:  Are you summing up?
4           MS. FUDIM:  I am.
5           THE COURT:  How long are you going to be?
6           MS. FUDIM:  I'm not sure at this point.  Maybe 40
7 minutes ball park.  I'm guessing an a little.  I don't know
8 yet.
9           THE COURT:   Okay.
0           (Case adjourned to Thursday, May 16, 2019 at 9:30
1 a.m.)
2
3
4
5
6
7
8
9
0
1
2
3
4
5

          Anthony M. Mancuso, CSR   Official Court Reporter

1
2 DIRECT EXAMINATION                                    2
3 CROSS-EXAMINATION                                     9
4 rEDIRECT EXAMINATION                                 39
5 RECROSS-EXAMINATION                                  40
6 WILLIAM LAMONT DAVIS                                 41
7 DIRECT EXAMINATION                                   41
8 CROSS-EXAMINATION                                    52
9 Plaintiff's Exhibit 36                               67
10 REDIRECT EXAMINATION                                87
11 JEROME QUINTON NELSON                               90
12 DIRECT EXAMINATION                                  90
13 CROSS-EXAMINATION                                  102
14 REDIRECT EXAMINATION                               130
15 DIRECT EXAMINATION                                 134
16 CROSS-EXAMINATION                                  140
17 Ms. Davis.                                         144
18 THE COURT:  Anything further?
19 REDIRECT EXAMINATION
20 REDIRECT EXAMINATION                               144
21 ANDREW SMALLS                                      146
22 DIRECT EXAMINATION                                 146
23 Andrew Smalls                                      165
24 DIRECT EXAMINATION                                 165
25 CROSS-EXAMINATION                                  179

          Anthony M. Mancuso, CSR   Official Court Reporter

1 REDIRECT EXAMINATION                                200
2 RECROSS-EXAMINATION                                 207
3 REDIRECT EXAMINATION                                208
4
5
6 Plaintiff's Exhibit 51                              153
7 Defendant's Exhibit J                               186
8
9
0
1
2
3
4
5

          Anthony M. Mancuso, CSR   Official Court Reporter

1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
2
3  - - - - - - - - - - - - - - X
                               :    14-CV-02326
4  ANDREW SMALLS,
5                              :
6                  Plaintiff,:
7          V.                   U.S. Courthouse
                               :
8  POLICE OFFICER RICHARD COLLINS
9  and POLICE OFFICER DAVID TETA,
                               Brooklyn, New York
10
11                             :
12          Defendants.  :
13
                          May 16, 2019
14                        9:30 o'clock a.m.
                               :
15  - - - - - - - - - - - - - - X
16          TRANSCRIPT OF TRIAL
17          BEFORE THE HONORABLE CAROL B. AMON
            UNITED STATES DISTRICT JUDGE and a jury
18
19 APPEARANCES:
20 For the Plaintiff:       JOHN NORINSBERG, ESQ.
                            JOHN MEEHAN, ESQ.
21
22 For the Defendant:       ELISSA FUDIM, ACC
23                          BRIAN FRANCOLLA, ACC
24 Court Reporter:          Anthony M. Mancuso
                            (718) 260-2419
25 Proceedings recorded by mechanical stenography, transcript
   produced by CAT.

          Anthony M. Mancuso, CSR   Official Court Reporter

1     (Trial resumed.)

2     (In open court; jury not present.)

3     MR. NORINSBERG:  John Norinsberg on behalf of the

4  plaintiff.  Good morning.

5     MS. JOSEPH:  Benitta Joseph on behalf of plaintiff.

6     MR. MEEHAN:  John Meehan on behalf of plaintiff.

7     MS. FUDIM:  Elissa Fudim on behalf of defendants.

8     MR. FRANCOLLA:  Brian Francolla on behalf of

9  defendants.

0     THE COURT:  Are we ready to proceed?  Have we

1  resolved the issue about the fingerprints?

2     MR. FRANCOLLA:  We have.  I have a typed out

3  stipulation that the parties have agreed to which I can hand

4  to you.

5     THE COURT:  Do you just want to read the stipulation

6  in your case?

7     MR. NORINSBERG:  Yes.

8     THE COURT:  There's one line crossed out.  Is that

9  crossed out in yours?

0     MR. FRANCOLLA:  Yes.  We agreed to cross it out.

1     THE COURT:  So we're all set.

2     Mr. Norinsberg, I think you said that in your

3  experience you have never seen the phrase preponderance of the

4  evidence in the compensatory damages charge?

5     MR. NORINSBERG:  That's right.

Anthony M. Mancuso, CSR    Official Court Reporter

1     THE COURT:  Do you remember Lenore vs. John Festa?

2     MR. NORINSBERG:  I stand corrected.  Was in that in

3  this courtroom?

4     THE COURT:  Yes.  Do you want to see it?  It says

5  please state of the total amount, if any, of compensatory

6  damages the plaintiff has proved by an a preponderance of the

7  evidence.

8     MR. NORINSBERG:  I like to say I'm more experienced

9  now.

10     THE COURT:  I also saw that preponderance of the

11  evidence was in the Sand jury instructions.  With the consent

12  of the parties, I took out, the if any, but I left the

13  preponderance of the evidence in.  You've got new copies.

14     THE COURT:  We're ready to go.  Are the witnesses

15  here?

16     MR. NORINSBERG:  Yes, your Honor.

17     THE COURT:  We'll bring the jury out.

18     MR. NORINSBERG:  Judge, one question that occurs to

19  me.

20     THE COURT:  The jury is on their way out.

21     MR. NORINSBERG:  Simple.  In terms of summation when

22  Ms. Joseph can reach a point discussing the verdict sheets,

23  she would like to flip the switch so it shows on the Elmo.

24  Everything else will be by power point.  Can we do that?

25     THE COURT:  That's fine.

Anthony M. Mancuso, CSR    Official Court Reporter

Megaro - direct - Norinsberg          4

1     (Jury present.)

2     THE COURT:  Good morning, ladies and gentlemen,

3  please be seated.

4     Counsel.

5     MR. NORINSBERG:  At this time the plaintiff calls

6  Patrick Megaro to the stand.

7  PATRICK MEGARO,

8     called as a witness, having been duly

9     sworn, was examined and testified as follows:

0     THE COURT:  State your name for the record.

1     THE WITNESS:  Good morning, my name is Patrick

2  Michael Megaro, M E G A R O.  Good morning everyone.

3  DIRECT EXAMINATION

4  BY MR. NORINSBERG:

5  Q   Good morning, Mr. Megaro.  Can you tell the members of

6  the jury what is your professional occupation.

7  A   I am an attorney.

8  Q   And do you have any specialty area?

9  A   Yes.  I focus my practice right now primarily on criminal

0  appeals and post-conviction relief.  I also do some criminal

1  defense and some civil rights work.  But I have taken a step

2  back from the trial level practice and just do mostly appeals

3  and post-verdict practice.

4  Q   Did there come a time, Mr. Megaro, when you were retained

5  to file an appeal on behalf of Andrew Smalls?

Anthony M. Mancuso, CSR    Official Court Reporter

Megaro - direct - Norinsberg          5

1  A   Yes.  It was sometime in 2010 I believe.

2  Q   Can you tell the members of the jury what was the main

3  issue that you presented to the higher court in that appeal?

4  A   When you file an appeal you sometimes have more than one

5  issue and you structure your appeal with your strongest issue

6  first usually and then you kind of go down the line so that

7  your strongest issue appears first and then the issues that

8  you think may not be as strong will come second, third,

9  fourth, fifth, so on and so forth.  In this particular case

10  there were three main issues.

11     MR. FRANCOLLA:  Objection.

12     THE COURT:  Yes.

13  Q   If you could focus on main issue.

14  A   The top issue was whether or not Andrew Smalls's fourth

15  amendment rights to be free of an illegal search and a seizure

16  were violated by the misconduct in this case.

17  Q   What was your argument on appeal?

18     MR. FRANCOLLA:  Objection.

19     THE COURT:  Yes.  I'll sustain the objection.  You

20  raised that issue on appeal, correct?

21     THE WITNESS:  Yes, your Honor.

22  Q   What evidence did you base your appeal on?

23  A   When you do an appeal --

24     THE COURT:  The question is what you based it on.

25  There was an a record below, correct?

Anthony M. Mancuso, CSR    Official Court Reporter

1        THE WITNESS:  Yes.
2        THE COURT:  There had been a suppression hearing
3  below?
4        THE WITNESS:  Yes, your Honor.
5        THE COURT:  The officers testified at the
6  suppression hearing?
7        THE WITNESS:  I believe there was one police officer
8  witness that had testified at the suppression hearing.
9        THE COURT:  The defendant in that case is now the
0  plaintiff in this action.  Did he testify at that suppression
1  hearing?
2        THE WITNESS:  No.  Was only I believe Officer
3  Collins.
4        THE COURT:  Was the appeal based on the transcript
5  of the suppression hearing at which Officer Collins testified?
6        THE WITNESS:  That particular issue was based solely
7  on the record of the suppression hearing at which Officer
8  Collins testified, yes.
9        THE COURT:  Did you prevail on an issue on appeal?
0        THE WITNESS:  I did.
1  Q    So apart from Officer Collins' testimony was there any
2  other evidence that you presented on appeal?
3        MR. FRANCOLLA:  Objection.
4  Q    With regard to that issue?
5        THE COURT:  Overruled.  He can answer.

1  A    No.  On an appeal you don't present evidence --
2        THE COURT:  The question is just yes or no.  I know
3  it's terrible for lawyers when they come to court.  They
4  always say they are the worst witnesses.  You can say yes or
5  no to these questions.
6  A    No, I did not present any other evidence.
7        THE COURT:  Ladies and gentlemen, when I said
8  lawyers make the worst witnesses I was joking, because that's
9  the old saw, when you call a lawyer they are always going to
10  say more.  I meant nothing with regard to this witness
11  personally.
12        THE WITNESS:  I'm sorry, your Honor.  I have to
13  agree with you.
14  Q    In this appeal that you filed on behalf of Andrew, did
15  you ever represent to the higher court that Andrew was part of
16  a group of men running?
17  A    Did I make that representation?  No.
18  Q    Did you ever represent that Andrew was in possession of a
19  gun?
20  A    No.
21  Q    Did you ever represent that Andrew tossed a gun?
22  A    No.
23  Q    Did you ever represent that Andrew had any connection
24  whatsoever to this gun apart from what Officer Collins had
25  testified to?

1  A    No.  I argued the exact opposite.
2  Q    Tell us what you mean by that.
3        MR. FRANCOLLA:  Objection.
4        THE COURT:  I'll sustain the objection.
5  Q    Did there come a time where you learned the outcome of
6  the appeal?
7  A    I'm sorry.  Couldn't hear you.
8  Q    Did there come a time when you learned the outcome of the
9  appeal?
0  A    Yes.
1  Q    What was the outcome?
2  A    The appeal -- the conviction for the criminal possession
3  of a weapon charge was reversed and dismissed and the
4  conviction as to the misdemeanor criminal trespass I believe
5  in the third degree was reversed and remanded for a new trial
6  in the Queens count Supreme Court.
7  Q    What is your understanding of the reason why the
8  conviction was reversed on appeal?
9        MR. FRANCOLLA:  Objection.
0        THE COURT:  Yes.  Well, it was based on the finding
1  that there had been a violation of the fourth amendment,
2  correct?
3        THE WITNESS:  That is correct, your Honor.
4  Q    And that violation was based on accepting Officer
5  Collins' testimony as true, correct?

1        MR. FRANCOLLA:  Objection.
2        THE COURT:  Overruled.  He can answer that.
3  A    Yes.  The court ruled that even if the --
4        MR. FRANCOLLA:  Objection.
5        THE COURT:  Forget what the court ruled.  The
6  argument that you made was based on accepting that as true
7  there was a fourth amendment violation, is that correct?
8        THE WITNESS:  Yes, your Honor.
9  Q    To your knowledge, Mr. Megaro, was the decision based in
10  any way on Andrew Smalls's version of events?
11        MR. FRANCOLLA:  Objection.
12        THE COURT:  I'll sustain the objection to that
13  question.
14  Q    Was Andrew Smalls's version of events in this record at
15  all?
16        MR. FRANCOLLA:  Objection.
17        THE COURT:  Can I see you at sidebar?
18        (Sidebar.)
19        THE COURT:  I suggest for your own good you withdraw
20  that question because I imagine the court below would have had
21  the motion that was made in it, I'm supposing that, which has
22  his version of what happened.
23        MR. NORINSBERG:  I could say was it based on his
24  testimony.
25        THE COURT:  You already asked that question.

1    MR. NORINSBERG:  This is my final question.

2    THE COURT:  Your final question is opening a door

3  that I don't think you want to open because that was part of

4  the record on appeal.

5    MR. NORINSBERG:  It says that the version of the

6  events is based on the officer's testimony.

7    THE COURT:  You're talking about -- you asked a

8  question that would open the door to the record before the

9  court, which I precluded, the way you asked that question,

0  which included the Maltz affidavit, I would think.  So why are

1  you asking that question?

2    MR. NORINSBERG:  We'll hear from Mr. Maltz himself.

3  It's not plaintiff's version of events.  It based on the

4  felony complaint.

5    THE COURT:  For you to go down that road opens up

6  the door here.  You've made a perfect record that the appeal

7  was not based on his testimony.  You want to mess that up?

8    MR. NORINSBERG:  I don't want to do anything that is

9  harmful to the client.

0    THE COURT:  You should withdraw that question.

1    MR. NORINSBERG:  I withdraw it and two more

2  questions.

3    THE COURT:  What are your two more questions?

4    MR. NORINSBERG:  That he came up from Florida today

5  and he's been compensated for his travel.

1    THE COURT:  That's fine.

2    (In open court.)

3    MR. NORINSBERG:  I withdraw the question for the

4  record.

5  Q   Mr. Megaro, did you come up from Florida to be here?

6  A   I did.

7  Q   Is that where you live?

8  A   Yes.

9  Q   Apart from your travel expenses, have you received any

10  compensation whatsoever for coming up and testifying today?

11  A   No.

12    MR. NORINSBERG:  Thank you, sir.  Nothing further.

13    MR. FRANCOLLA:  Very brief, your Honor.

14  CROSS-EXAMINATION

15  BY MR. FRANCOLLA:

16  Q   Good morning, Mr. Megaro.

17  A   Good morning.

18  Q   When did you get here?

19  A   Yesterday at around one p.m. I think.

20  Q   How did you get here?

21  A   Jet Blue, Orlando to JFK.

22  Q   What class?

23  A   There's only one class in Jet Blue.

24  Q   Okay.

25    THE COURT:  No extra leg room?

1    THE WITNESS:  I get extra leg room because I fly so

2  often.  As a Mosaic member I get an extra upgrade.  I get an

3  extra six inches.

4  Q   Where did you stay last night?

5  A   A friend's house in North Babylon in Suffolk County.

6  Q   When are you returning back to Florida?

7  A   Probably Saturday.

8    MR. FRANCOLLA:  I have no further questions.  Thank

9  you for your time, sir.

0    THE COURT:  Thank you.

1    THE WITNESS:  Thank you.

2    (Witness excused.)

3    THE CLERK:  Sir, please, raise your right happened.

4  JUDAH MALTZ,

5    called as a witness, having been duly

6    sworn, was examined and testified as follows:

7    THE CLERK:  State your name and spell it.

8    THE WITNESS:  My name is Judah Maltz, M A L T Z, J U

9  D A H.  My office is at 125-10 Queens Boulevard, Kew Gardens

0  New York, suite number 12.

1  DIRECT EXAMINATION

2  BY MR. NORINSBERG:

3  Q   Good morning, Mr. Maltz.

4  A   Good morning.

5  Q   Are you here pursuant to a subpoena?

1  A   Yes, I am.

2  Q   And can you tell us what is your professional occupation?

3  A   I'm an attorney practicing law more than 30 years.

4  Q   And tell us what type of law do you specialize in, sir?

5  A   I specialize in criminal law and I do appeals, appellate

6  practice.

7  Q   Can you tell us a little bit about your work experience?

8  A   Well, I worked for about seven or eight years as a Legal

9  Aid attorney and three years as a Supreme Court judge's law

10  secretary in Queens County and I also have been in private

11  practice and I'm still in private practice.  I do appeals.  I

12  go the apella te division decision and argue cases before the

13  Court of Appeals and I still do cases in lower court.

14  Q   Now are you familiar with what's known as the 18 B panel?

15  A   Yes, I am.

16  Q   What is the 18 B panel?

17  A   That's one of my primary sources of income that I do

18  cases and I'm assigned to case, I'm not retained, but I'm

19  assigned.  I do arraignments on a frequent basis.  I pick up

20  cases when I'm in arraignments, when there's a conflict,

21  whereby multiple defendants are arrested, Legal Aid represents

22  one, I represent the other defendants and I get paid by the

23  City of New York pursuant to New York County law 722

24  subdivision C, 18 B.

25  Q   Directing your attention to May 2006, did there come a

1  time where you were assigned to represent Andrew Smalls?
2  A   Yes.  I represented him.
3  Q   And how long in total did you represent Mr. Smalls from
4  start to finish?
5  A   Well, I remember representing him in arraignments back in
6  2006.  I interviewed him and I represented him in a number of
7  court appearances.  Altogether maybe about five or six months.
8  Q   During that five to six-month period did you ever file
9  any motions on behalf of Mr. Smalls?
0  A   Yes.  Normally, after indictment is filed and a motion --
1  it's called an omnibus which means all motions you want to
2  make must be done at one time unless the court grants you
3  additional time to file additional motions.  The omnibus
4  motion I filed, I filed an omnibus motion asking the court to
5  inspect the grand jury testimony, to dismiss the indictment
6  and I filed motions asking for a suppression hearing.
7  Q   Let's take a look at that.  It has been marked as
8  Defendant's Exhibit J.  Let's just take a look at the top
9  together.  Do you recognize this document, sir?
0  A   Yes.
1  Q   And is this what you were just telling us about?
2  A   Yes.
3  Q   And on the first page you have a motion to dismiss to the
4  indictment?
5  A   Correct.

Anthony M. Mancuso, CSR    Official Court Reporter

1  Q   Did you actually have the grand jury minutes at that
2  time?
3  A   No.
4  Q   What was the purpose of filing a motion to dismiss the
5  indictment?
6  A   Well --
7          MR. FRANCOLLA:  Objection.
8          THE COURT:  The entire document is in evidence, is
9  that right?
10         MR. FRANCOLLA:  That's right.
11         THE COURT:  All right.  I'll allow some limited
12  inquiry.
13  A   Well, I will be not representing my client if I didn't
14  move to have the indictment that he had been indicted for --
15  for the court to inspect the testimony before the grand jury
16  and have it dismissed.  It would be insufficient evidence
17  presented or improper instructions to the grand jury by the
18  district attorney.  So that's a formality.
19  Q   Let's take a look at the section B.  It says motion to
20  transcribe and inspect grand jury minutes.  What was the
21  purpose of this section in your motion?
22  A   Well, we ask the court to review the grand jury
23  testimony.  I have to make a motion and then the district
24  attorney will respond accordingly and provide the court with a
25  copy of the grand jury testimony.

Anthony M. Mancuso, CSR    Official Court Reporter

1  Q   And moving on, if we could go down to section C, it says
2  request for a bill of particulars and a demand for discovery.
3  Let's start with the first part.  What is a bill of
4  particulars?
5  A   A bill of particulars is asking the district attorney to
6  provide me information as to date and time the incident
7  happened, the location where it happened and any witnesses
8  available that were there, the names of police officers, their
9  shield numbers, as much information as possible because in New
0  York discovery laws are not very good.
1          MR. FRANCOLLA:  Objection.
2          THE COURT:  I'll sustain the objection.
3  A   So I'm asking the DA --
4          THE COURT:  I sustained the objection.  You know
5  what that means.  You've been around when people sustain
6  objections.
7          THE WITNESS:  I'm sorry, your Honor.
8  Q   Now, going to the next page where it says pursuant to CPL
9  section 240.20 and then there's a list of things that you are
0  requesting the district attorneys office to provide to you,
1  can you describe what is the purpose this section of your
2  motion?
3  A   It's basically a format I would do on almost all motions,
4  because I have to be careful.  I have to look at the complaint
5  that's filed and each of the charges filed and I would ask for

Anthony M. Mancuso, CSR    Official Court Reporter

1  these items, all written reports and, including diagrams.  All
2  the photograph made in connection with this case, police officer
3  notes.  These are my demands made to the district attorney to
4  provide me so that I could prepare the case for trial.
5  Q   Now, moving down to section D it says motion for a
6  pretrial hearing to suppress physical evidence unlawfully
7  seized from the defendant; do you see that?
8  A   Yes.
9  Q   Can you explain to us, sir, what is a hearing to suppress
10  physical evidence?  What does that mean?
11  A   When an individual is arrested by the police, of course
12  they have to have probable cause.  I make a motion in order to
13  get a hearing to determine if in fact probable cause was
14  provided.  That was the standard or it was a mere hunch by
15  stopping an individual in the street.  So I make a motion.  I
16  do it in all my cases, otherwise I would be ineffective if I
17  didn't.  In this case the allegation was a gun possession.  I
18  filed a motion to suppress the gun that was allegedly seized
19  from my client.
20  Q   So I would like to direct your attention here to this
21  section.  Do you see it says according to the felony complaint
22  Officer Richard Collins of 100 precinct averred that the
23  pistol was recovered on the ground "near the location where
24  the defendant Andrew Smalls was standing."  Why did you write
25  that in there?

Anthony M. Mancuso, CSR    Official Court Reporter

1  A    Because I'm referring to the felony complaint that was
2  filed at the time of arraignment.  At that time I'm involved
3  with Mr. Smalls for a couple of months.  I have not received
4  any reports from the district attorney.  I have not received
5  any discovery, whether a police report, memo book writing or
6  anything like that.  I'm relying upon the felony complaint
7  that's filed by the officer under penalty of perjury to try to
8  get a hearing.
9  Q    The fact that you have here a quote from the felony
10 complaint, that the gun was found 'near the location where
11 defendant Andrew Smalls was standing,' why did you actually
12 quote from the felony complaint?
13 A    Because I'm referring to the felony complaint verbatim.
14 In order to convince the trial judge to grant me a suppression
15 hearing because when I file a motion the district attorney is
16 going to respond to my motion, the papers I raise in my
17 motion.  If I don't allege standing or if I don't allege
18 defendant -- if we make don't make references to the complaint
19 filed, I'm not going to get a hearing.  We could be denied a
20 hearing.
21 Q    The next sentence, looking down here, the defendant moves
22 to suppress physical evidence.  The .380 caliber pistol that
23 was seized in close proximity to where he was arrested by the
24 police.  Do you see that, sir?
25 A    Yes, I do.

1  Q    When you represented that the gun was seized in close
2  proximity to where he was arrested by the police, what did you
3  mean by that?
4  A    I believe I would make that reference to the felony
5  complaint again and I believe I was referring to the felony
6  complaint.  And all information that I had, how he was
7  arrested, where he was arrested and the circumstances that led
8  him to be arrested.
9  Q    Now, I'm moving on.  Let's go to the next sentence.
10 Bottom sentence:  The defendant maintains he has standing to
11 move for this hearing since the defendant felt compelled to
12 drop the weapon as a result of the unlawful action conducted
13 by the police.
14      Let's stop there for a second.  This part that we
15 just read, where is that coming from, sir?
16 A    Again, in order for me to get a suppression hearing I
17 would have to show standing.  Now, if my client was not
18 arrested with anything, I would not be able to ask for a
19 hearing.  I could ask, you know -- you can't ask for
20 suppression of statements or hearing, or physical evidence if
21 nothing was seized or nothing is claim to be seized.  It
22 doesn't mean my client admitted to having it seized.  If it
23 involved serious charges like this gun possession, I moved to
24 show standing, to show that it was alleged that he possessed a
25 weapon and that's what I raised in order to get the hearing.

1  Q    I want to be clear about this, Mr. Maltz.  Did Andrew
2  Smalls ever tell you that he felt compelled to drop a weapon?
3  A    No, he did not.
4  Q    Continuing on with this first paragraph on the next page:
5  The defendant maintains that he did not voluntarily abandon
6  the gun but his act of throwing the gun to the ground was a
7  "spontaneous action to the sudden and unexpected pursuit by
8  the officers" and not an independent act attenuated from
9  unlawful police contact.  See People v. Holmes, 81 New York
10 2d.  1056, (1993) People v. Ramirez, Portoreal, 88 New York
11 2d., 99 (1996).  Do you see that, sir?
12 A    Yes.
13 Q    When you were representing the defendant maintains that
14 he did not voluntarily abandon the gun, but his act of
15 throwing the gun was the spontaneous reaction and you are
16 quoting these cases, what does that mean?
17 A    It means that the court should grant a hearing because
18 the court is the one -- I'm asking for a hearing.  I don't
19 have any facts, all the facts, as to what happened here.  And
20 I'm arguing if the People are alleging that my client had a
21 weapon it was based upon his reaction to the unlawful police
22 behavior.  It was a spontaneous act to the unlawful pursuit by
23 an officer.  Without having all the fact sin my hands, I was
24 being artful, nothing wrong with that.  He is charged with a
25 possessory crime.  I have to get the hearing.  The whole case

1  basically will be a hearing.  After the suppression hearing
2  there will be a trial.  I cited the cases of Holmes and People
3  v. Ramirez, Portoreal, I cited that in order to convince the
4  district attorney and the court to give me a hearing.
5  Q    What do those cases say?  What do you understand them to
6  say?
7  A    Holmes and Portoreal, classic cases of suppression,
8  illegal search and seizure.  Portoreal refers to whether or
9  not the actions of the police inspired the defendant to drop,
10 to do something, or the defendant was minding his own business
11 and not bothering anybody and the police come to him and as a
12 reaction, based upon unlawful misconduct he does something or
13 was the defendant doing something on his own voluntarily,
14 voluntarily relinquishment.  I argued that it was not a
15 voluntary relinquishment, but it was based upon the reaction
16 to the sudden and unexpected pursuit by the officers.  They
17 started first.  They did something which resulted in
18 triggering perhaps dropping a weapon.
19 Q    Did Andrew Smalls ever tell you that he threw the gun
20 because of a spontaneous reaction to the sudden and unexpected
21 movement of the police?
22 A    It's been a long time this case, almost ten years.  But I
23 do not remember him telling me he ever possessed any weapon or
24 he threw it to the ground.  As a matter of fact I represented
25 him early on in arraignment.  He denied the charges and I told

1   him you have to have a hearing and go forward with that and I
2   represented him in the hearing.  But, no, he never admitted to
3   me he possessed the gun.
4   Q   Next paragraph.
5   A   That's my best recollection.
6   Q   Next paragraph:  The defendant maintains the police
7   violated his fourth and fourteenth amendment rights when they
8   chased him inside the building on Rockaway Beach Boulevard.
9   Do you see that, sir?
10  A   Yes.
11  Q   Did Andrew Smalls ever tell you that he was chased by the
12  police and ran into the Rockaway Beach building, that
13  building?
14  A   I don't recall that much.  It's been more than ten years
15  and I was substituted by another attorney.  I do recall that I
16  probably put that down in order to get this hearing.  I don't
17  know if he told me that specifically throws were the facts.
18  Q   But the facts that you knew at that point, where did they
19  come from, sir?
20  A   Those are my words.  My -- I put this motion together
21  completely.
22  Q   Apart from the felony complaint that you told us you had
23  reviewed, was there any other information you had?
24  A   Unfortunately, in New York State procedure, we don't have
25  police reports until I make this demand.  I made this demand

1   for discovery.  The DA is going to give me a response to my
2   motion.  He's going to hopefully give me some paperwork.  Even
3   then I don't get complete discovery of the documents I'm
4   looking for until we have a hearing.  As soon as we get that
5   hearing started, the district attorney would turn over to me
6   what is known as Rosario material, which would be any notes
7   made by the police officers in preparation of the case.  If he
8   testified before the grand jury I'm entitled to his testimony
9   he gave before the grand jury so I could look at it to see if
10  there's any inconsistencies, if the officer made an error when
11  he testified at the hearing.  I don't get a police report
12  until I file this motion.  If I didn't file the motion, I
13  would get nothing.  The case would go right to trial upon
14  indictment, arraignment and -- arraignment and indictment and
15  go right to trial.  I had to put a motion in to get a hearing,
16  discovery and have a hearing.
17  Q   Looking at the last page, is that your signature, sir?
18  A   Yes, it is.
19  Q   Is Andrew Smalls's signature on this document?
20  A   No, it's not.
21  Q   Did you ever show this document to Andrew Smalls before
22  you submitted it to the court?
23  A   No.  I may have given him a copy of my motion.  I'm not
24  sure if I did.  I usually do.  I'm not sure if I did at this
25  time.  But I told him how important it was to get this.

1   Q   Before you submitted it to this court, you did not
2   provide him with a copy, did you sir?
3   A   I don't remember.
4         MR. FRANCOLLA:  Objection.
5         THE COURT:  The answer will stand.
6   Q   Now, you told us earlier you represented Andrew Smalls
7   for a period of approximately five to six months, is that
8   correct?
9   A   Yes.
10  Q   Did you ever visit Andrew Smalls at Rikers Island when he
11  was incarcerated?
12  A   Unfortunately, I don't have my file any more on this
13  case.  When I got relieved by a private attorney, I gave the
14  paperwork to the private lawyer, including some of the my
15  notes, I believe some of my notes.  At the time I may have
16  discarded the file or put it in archives.  I'm a conscientious
17  attorney and I do everything I can for my clients and I may
18  have visited him at Rikers Island or I may have called him in
19  for a video conference.  We have that in the county.  We can
20  call somebody in for a video conference.  This is 2007, more
21  than eleven or twelve years ago, so I don't remember what I
22  did.
23  Q   To the best of your memory, sir, do you have an
24  independent memory of actually going to Rikers Island and
25  talking with Andrew Smalls?

1   A   No.
2   Q   Again, just based on your memory, did Andrew Smalls ever
3   tell you at any time you were representing him that he was
4   part of a group of people running into a building away from
5   the police?
6   A   No.
7   Q   Did Andrew Smalls ever tell you at any time that he
8   possessed a gun?
9   A   No.
10  Q   Did he ever tell you at any time he handed a gun to his
11  brother?
12  A   No.
13  Q   Did Andrew Smalls ever confess to you that he was guilty
14  of having a gun on May 20, 2006?
15  A   No.  These charges are serious --
16        THE COURT:  No is the answer.  You don't need to
17  elaborate.
18        THE WITNESS:  Okay.
19  Q   If Andrew Smalls had told you that he actually had the
20  gun, what steps, if any, as his attorney, would you have
21  taken?
22        MR. FRANCOLLA:  Objection.
23        THE COURT:  Sustained.
24  Q   Did there come a point where your legal representation of
25  Andrew ended?

1  A    Yes.

2  Q    When did it end, sir?

3  A    I'm not specifically certain about the time, the date and

4  time.  But I believe at the time, after the hearing was

5  completed, the case was then sent back to the calendar part

6  and subsequently I was relieved by another attorney.

7  Q    You were relieved after this motion was filed, is that

8  correct?

9  A    Oh, yes, after the hearing was completed.

0  Q    Approximately six months since your representation you

1  were terminate by Andrew?

2  A    Yes, maybe five or six months.

3         MR. NORINSBERG:  Thank you, sir.  Nothing further.

4  CROSS-EXAMINATION

5  BY MR. FRANCOLLA:

6  Q    Good morning, Mr. Maltz.  Excuse me.  I apologize.

7  A    Good morning.

8  Q    You just testified on direct examination that the factual

9  representations in your omnibus motion were based on the

0  felony complaint, is that fair?

1  A    Yes, primarily.

2  Q    I think the question was asked by counsel whether there

3  was anything else other than felony complaint and you said no?

4  A    Right.

5  Q    Right.  And part of the that was because -- go ahead.

Anthony M. Mancuso, CSR    Official Court Reporter

1  A    I did confer with my client.

2  Q    You did?

3  A    Yes.

4  Q    Now, I'm going to show you your affirmation that you had

5  just seen on direct examination.  Just to start with, you make

6  the affirmation under penalty of the perjury, correct?

7  A    Correct.

8  Q    And you mentioned to the jury how I think you said, and

9  correct me if I'm wrong, you have been working as an attorney

10 for 30 years approximately?

11 A    Yes.

12 Q    And you mentioned also how you're a conscientious

13 attorney?

14 A    Correct.

15 Q    And how -- is it fair for me to assume from that as an

16 officer of the court you wouldn't knowingly include false

17 information in a document filed with the court?

18 A    Correct.  I would not do that.

19 Q    You would not, of course.

20        Now, referring to the affirmation, just specifically

21 here, I think you had mentioned it, but the affirmation does

22 state that it's made in part based upon conversations with the

23 defendant, correct?

24 A    Yes.

25 Q    In this case the defendant would have been Andrew Smalls,

Anthony M. Mancuso, CSR    Official Court Reporter

1  correct?

2  A    Yes.

3  Q    And while you don't remember specifically I believe you

4  said your best recollection is that you would have tried to

5  either visit him or video conference with him prior to

6  submitting this affirmation?

7  A    Correct.  I would like to point out that before filing

8  the motion there are other calendar dates.  The case goes from

9  arraignment part to the felony part and after denial,

0  rejecting any plea offer or plea disposition, it goes to the

1  grand jury.  So during that period of time from arraignment to

2  the all purpose parts I conferred with my client.

3  Q    Of course other than just either meeting with him at

4  Rikers Island or communicating with him via some sort of the

5  video conferencing you would have met with him at the various

6  court proceedings prior to the point that you drafted this

7  motion?

8  A    Yes.

9  Q    Now, I'm going to turn to page that's mark Smalls 484 of

0  the exhibit.  Now, directing your attention, sir -- if you

1  need me to focus in on the screen at any point, just let me

2  know.  If you need me to read further, same thing, let me

3  know.  This first sentence that I am pointing to right under

4  the paragraph heading D, can we agree that sentence

5  specifically refers to the indictment?

Anthony M. Mancuso, CSR    Official Court Reporter

1  A    Correct.

2  Q    And you note that in the sentence itself?

3  A    Yes.

4  Q    And then here the second sentence that starts with the

5  words according to the felony complaint, you make crystal

6  clear that is what you are in fact referring to, the arrest of

7  the defendant?

8  A    Correct.

9  Q    You actually include a quotation to make it.  I believe

10 you used the words verbatim from the felony complaint for

11 purposes of the proceeding, correct?

12 A    Correct.

13 Q    You were then asked about the source of the next sentence

14 that I am pointing to that begins with the defendant moves to

15 suppress any of the evidence.  Do you see that?

16 A    Yes.

17 Q    Counsel asked you what the source of this information

18 was.  Correct me if I'm wrong, I think you said I believe it

19 was the felony complaint?

20 A    Yes.

21 Q    Which presumably allows for the fact that because it

22 doesn't state so explicitly you cannot say that as you sit

23 here today it necessarily came from the felony complaint?

24 A    My motion says upon information and belief.  That's the

25 heading in my motion, conversations and everything else.  It

Anthony M. Mancuso, CSR    Official Court Reporter

1  states upon my understanding of the language in the felony
2  complaint, correct.
3  Q    As well as your conversations with your client?
4  A    Yes.
5  Q    And then so that first sentence we can agree doesn't say
6  -- the source of the information is specifically a felony
7  complaint, correct?
8  A    Right.  I did put down in the third line, first
9  paragraph, according to the felony complaint.  I'm still
0  making references to the felony complaint.
1  Q    In that sentence that you just pointed to, correct?
2  A    Yes.
3  Q    You don't mention that phrase here, right?
4  A    I didn't think it was necessary to raise it on every
5  sentence I write.
6  Q    Isn't it true that's the only sentence you write
7  according to the felony complaint and I can show you the
8  entire indictment?
9  A    I was making reference to the felony complaint, my
0  information I obtained by reading the complaint.
1  Q    I see.  So is it fair to assume that the felony complaint
2  does not include anything about Andrew Smalls's feelings?
3  A    About his what?
4         MR. NORINSBERG:  Objection.
5         THE COURT:  Overruled.

1  Q    The felony complaint -- I can hand you a copy if you need
2  to review it.
3  A    I have one.
4  Q    If you would like to take it out, I'm happy if the court
5  allows you to have that.  Your Honor it's Plaintiff's Exhibit
6  29, assuming you're removing the felony complaint for Andrew
7  Smalls and Ronnie Smalls.
8         THE COURT:  Do you have a copy of it?
9         THE WITNESS:  I have a copy of the felony complaint.
10 Q    Can we agree that that complaint does not contain any
11 reference to Mr. Smalls' feelings?
12 A    Feelings?
13 Q    Yes.
14 A    No.
15        THE COURT:  What Exhibit number?
16        MR. FRANCOLLA:  It's Plaintiff's Exhibit 29, your
17 Honor.  I can hand the court a copy.  I have a spare copy.
18        THE COURT:  I have it.  Can I see the document?
19        THE WITNESS:  The document that I have?
20        THE COURT:  The one that you are calling the felony
21 complaint.
22        That's 29?
23        MR. FRANCOLLA:  That was how I had it.
24        THE COURT:  It's not 29 in my book.
25        MR. NORINSBERG:  I think it's 12.  I can

1  double-check.
2         THE WITNESS:  It says defendant's 274.
3         THE COURT:  I don't think it's Exhibit 29.  Exhibit
4  29 is a New York City on line complaint.
5         MR. FRANCOLLA:  My understanding from counsel it's
6  actually 12.  My apologies.
7  Q    To the extent that I was referring to the complaint in
8  the previous questions, Mr. Maltz, I was referring to
9  Plaintiff's Exhibit 12.  Now I think you also said on direct
0  examination that in your practice as a conscientious attorney
1  you would do your best to show your client a copy of this
2  motion prior to filing it?
3  A    This is more than ten years ago.  I am not sure what I
4  did during that period of time.
5  Q    As I sit here today, you don't know whether or not you
6  showed Andrew Smalls this document?
7  A    Correct.
8  Q    I thought you said on direct typically your practice
9  would be, assuming you are able, to show your client this
0  document before you filed it?
1  A    Lately, in the last year or two, I have been making extra
2  copies of my motions to give to clients.  I'm not sure if I
3  did it back then.
4  Q    You were also asked about the specifics of your
5  conversations with Mr. Smalls.  Do you remember that?

1  A    Yes.
2  Q    Without getting -- strike that.
3         Is it fair to say as you sit here today you do not
4  have an independent recollection of your conversations with
5  Mr. Smalls?
6  A    Correct.
7         MR. FRANCOLLA:  Your Honor, can I take one moment to
8  confer with my colleague?
9         (Pause.)
10 Q    Mr. Maltz, I'm now directing your attention back to the
11 screen.  If you look to the right of my finger where it says
12 the defendant maintained police violated his fourth and
13 fourteenth amendment rights when they chased him inside the
14 building located in Rockaway Beach Boulevard.  Do you see
15 that?
16 A    Yes.
17 Q    Now, that sentence doesn't specifically reference the
18 source of the information, does it?
19 A    I'm sorry.
20 Q    That sentence doesn't specifically reference the source
21 of the information?
22 A    Correct, it doesn't.  Again it's upon information and
23 belief and based upon reading the complaint.
24 Q    As well as conversing with your client?
25 A    Yes, maybe even conferring with the district attorneys at

1  times in the courtroom, sure.

2  Q    You didn't mention that though in the affirmation,

3  turning back to the first page, that conferences with the

4  district attorney may have been a basis for the motion?

5  A    I'm bound to consult with the district attorney.  We have

6  calendar calls, to see what's being offered, even though my

7  client is not interested in any way, I gather some facts from

8  the district attorney.  I don't have a lot of facts.  I get

9  some facts from them, what they allege to be the facts.  So I

0  put it together in a motion practice.

1  Q    Now, if you had received information that Mr. Smalls was

2  never chased, would you have made this representation?

3           MR. NORINSBERG:  Objection.

4           THE COURT:  I'll sustain the objection to the

5  question.

6           MR. FRANCOLLA:  One moment, your Honor.  I may have

7  one more question.

8           (Pause.)

9           MR. FRANCOLLA:  Your Honor, I have nothing further

0  for this witness.  Mr. Maltz, thank you for your time.

1           THE COURT:  Anything further?

2           MR. NORINSBERG:  Briefly, your Honor.

3  REDIRECT EXAMINATION

4  BY MR. NORINSBERG:

5  Q    Mr. Maltz, you told us an a few minutes ago that you are

1  bound to consult the DA, is that correct?

2  A    What?

3  Q    Are you bound to consult with the DA?

4  A    Not bound, but I will do that to find out, to get some

5  information.

6  Q    That allows you to get more information about the facts

7  of the case?

8  A    Yes.

9  Q    What about at the arraignment, do you learn anything

10  about the facts of the case at arraignment?

11  A    Well, it all depends upon -- in this particular case I

12  don't remember.  Obviously more than ten years ago, twelve

13  years ago, at times when a defendant is arraigned in the

14  courtroom, he's before the judge, the district attorney is

15  making a bail application asking for a certain type of bail,

16  then the judge may say why are you asking for this type of

17  bail, recommendations, sometimes they bring out facts and I

18  argue contrary to that and bail is set accordingly based upon

19  the information the court has.  The facts are very limited in

20  arraignment.  Nobody -- the district attorney does not reveal

21  any documents or police reports.  So to answer your question,

22  I got some information from the DA.  I'm not sure if this

23  particular DA opened up -- sometimes they do.  And then we

24  have to go to a conference room to see whether or not the case

25  can be disposed of.  So I may glean some information from the

1  DA during that period of time.  Never would they share any

2  police reports with me or documents or memo book entries that

3  the police officers put together.

4  Q    You also referenced during cross-examination that you had

5  a copy of the indictment or you were aware of the indictment,

6  is that correct?

7  A    Yes.  I got a copy of the indictment at the time of the

8  arraignment.

9  Q    That gives you additional facts?

0  A    No.  It's a very broad.  The indictment only alleges the

1  crime and refers to the date -- it doesn't even refer to the

2  location.  It refers to on or about, a date in the County of

3  Queens the defendant unlawfully possessed and each of the

4  charges.  It does not go into the name of the officer or the

5  location or how he possessed it.  Generalized language of the

6  penal law.

7  Q    Just to be clear about what you testified to:

8           MR. FRANCOLLA:  Objection.

9           THE COURT:  I'll sustain the objection.

0  Q    Apart from the felony complaint, apart from discussion

1  with the DA and in the arraignment --

2           THE COURT:  Do you recall that you had discussions

3  with the DA at the arraignment?

4           THE WITNESS:  No.

5           MR. NORINSBERG:  Thank you, sir, nothing further.

1           MR. FRANCOLLA:  I don't have anything.  Thank you

2  again.

3           THE COURT:  All right.  Thank you.

4           MR. NORINSBERG:  Your Honor, may we approach.

5           THE COURT:  Sure.

6           (Sidebar.)

7           MR. NORINSBERG:  I'm prepared to read the

8  stipulation.  After we submitted it to the court, counsel and

9  I agreed on a slight modification.  So originally it said the

10  People and the defendant Andrew Smalls and we have taken that

11  out and said the parties in this lawsuit stipulate.

12           THE COURT:  That's fine.  Yesterday I had indicated

13  that I would strike the testimony --

14           MR. NORINSBERG:  I believe it was on Jerome Nelson,

15  the reference in a letter -- Lindsey Johnson.  I'm sorry.

16           THE COURT:  It was the question and answer to the

17  plaintiff about Lindsey Johnson not being referenced in his

18  letter to appellate counsel.

19           MR. FRANCOLLA:  I don't have a problem with that.

20           THE COURT:  I'll say that the question and answer is

21  directed to be struck.  It would take awhile to go back and

22  get --

23           MR. NORINSBERG:  I withdraw it.  It's not necessary

24  at this time.

25           THE COURT:  You are withdrawing your application?

1      MR. NORINSBERG:  I withdraw the application.

2      MR. FRANCOLLA:  We did not expect to reference that.

3      MS. FUDIM:  We won't sum up on it.

4      MS. JOSEPH:  Can we take a brief bathroom break

5  before summations and also to set up?

6      THE COURT:  Sure.

7      MR. FRANCOLLA:  Once last procedural issue I can

8  make as quick as the court will allow me to.  Upon plaintiff

9  resting we will rest thereafter.  I think we would just for

0  the record make a motion pursuant to Rule 50 that would be

1  quite limited.  I think our grounds would be based on what we

2  consider to be incredible testimony from plaintiff and his

3  witnesses that no reasonable juror could believe it was

4  fabricated in the manner that he claims and as a result

5  judgment as a matter of law should be granted for the

6  defendant.

7      THE COURT:  So you are going to avoid having to come

8  back to the sidebar again -- you are making that motion,

9  correct?

0      MR. FRANCOLLA:  If I can, if the court could allow

1  it.

2      THE COURT:  Do you object to it being made at this

3  point?

4      MR. NORINSBERG:  No objection.  Since we're assuming

5  we rested and you refused and we have no rebuttal evidence and

1  you are making the motion and I have no objection to that

2  motion.

3      THE COURT:  All right.

4      Once all of this happens, I would deny the motion

5  because I don't think that I can make the unusual finding in

6  this case that the testimony is inherently incredible which is

7  what I would have to do to grant that motion.  The motion

8  would be denied.

9      (In open court.)

10      THE COURT:  Okay.

11      MR. NORINSBERG:  Members of the jury, I'm about to

12  read a stipulation that the parties to this lawsuit have

13  entered into with respect to fingerprint evidence.  The

14  parties in this lawsuit stipulate that if detective Douglas

15  Carter of the New York City Police Department forensic

16  division latent print unit was called to the stand he would

17  testify as an expert in the field of latent print

18  identification and testify that on July 27, 2006, Detective

19  Carter analyzed five latent prints lifted, that Police Officer

20  Charles Feldman of the 100 precinct recovered on May 20, 2006

21  from the .380 cobra pistol's magazine and submitted to the

22  latent prints unit for analysis.  Three of these prints were

23  of no value because they were too smudged to allow any

24  comparison.  Detective Carter cannot say who made these

25  prints.  These three prints were lifted from the right side of

1  the pistol block, the left side of the pistol slide and its

2  magazine.  The other two prints were of value, meaning that he

3  could make a comparison of these two prints.  These prints

4  were recovered from the pistol tank and its magazine.

5  Detective Carter compared these prints to the fingerprints of

6  the defendant Andrew Smalls, Ronnie Smalls and Cedric Smalls

7  and these are not the fingerprints of the defendant Andrew

8  Smalls, Ronnie Smalls and Cedric Smalls.

9      That concludes the stipulation, your Honor.

0      THE COURT:  All right.  Thank you.  Does the

1  plaintiff have anything further?

2      MR. NORINSBERG:  No, your Honor.  At this time the

3  plaintiff rests.

4      THE COURT:  Do the defendants have anything further?

5      MR. FRANCOLLA:  Defendants would just adopt the

6  testimony of the two witnesses, our defendants, and subject to

7  that, we would rest as well.

8      THE COURT:  All right.  I take it there's no

9  rebuttal.

0      MR. NORINSBERG:  No rebuttal.

1      THE COURT:  All right.  Ladies and gentlemen, at

2  this we're going to have summations in the case.  Let me just

3  remind you that what the attorneys say in their summations

4  does not itself constitute evidence.  It is always your memory

5  of the evidence that controls.  If you remember the testimony

1  differently than what one of the attorneys may tell you about

2  it, it's your recollection that governs.  They may make

3  reference to what they believe my instructions on the law will

4  be and I have previously given them copies of what I propose

5  to say.  But if you perceive that they say something different

6  about the law than what I read to you in my jury instructions,

7  again, you have to take the law from the court, not from what

8  counsel may say about it.  We're going to take a recess to

9  permit counsel to set up so they can begin their summations.

10      (Jury excused.)

11      THE COURT:  I would ask counsel not to interrupt

12  each other's summation with any objection, unless you feel

13  it's something that's so critical that has to be corrected at

14  the moment.  If you have something that can wait and we can

15  address later, I would ask you to the extent possible not to

16  do that.  I understand something could be said that counsel

17  thinks would have to be remedied immediately.  Make sure

18  you're right about that if you object.  Okay.

19      MS. FUDIM:  Yes, your Honor.

20      THE COURT:  All right.

21      Also, how long do you think you're going to be,

22  Ms. Joseph?

23      MS. JOSEPH:  I would say approximately 40 minutes.

24      THE COURT:  Ms. Fudim.

25      MS. FUDIM:  The same.

42

```
1    THE COURT:  The rebuttal will be about ten minutes.
2    MS. JOSEPH:  Yes.
3    THE COURT:  Okay.
4    THE COURT:  All right.  See you in a few minutes.
5    (Recess taken.)
6
7
8
9
0
1
2
3
4
5
6
7
8
9
0
1
2
3
4
5
```

Anthony M. Mancuso, CSR    Official Court Reporter

Summation - Joseph                                    1

```
1    (In open court; jury not present.)
2    THE COURT:  All right.  Let's bring the jury out.
3    (Jury present.)
4    THE COURT:  All right.  Please be seated.
5    Ms. Joseph.
6    MS. JOSEPH:  Thank you, your Honor.
7         No police officer can use a stack of lies to bring
8    charges against anyone and if they take those lies and they
9    submit it to the DA's office, they have denied an individual
10   their fundamental right to a fair trial and that is exactly
11   what happened in this case.
12        The plaintiff Andrew Smalls was denied his
13   fundamental right to a fair trial when Officer Collins and
14   Detective Teta told lie after lie after lie to the DA's office
15   and they are now responsible for the harm that those lies
16   caused.
17        Now, you have three jobs answering the questions the
18   judge gives you:
19        Make sure everyone carefully follows the law.
20        And be prepared to explain to your fellow jurors why
21   you feel the way you do.
22        And I would like to spend the next 30 to 40 minutes
23   giving you some suggestions on just how to do that.
24        Now, as I said a moment ago, the defendants violated
25   Mr. Smalls's right to a fair trial when they told lie after
```

Anthony M. Mancuso, CSR    Official Court Reporter

Summation - Joseph                                    2

```
1    lie.  Let's examine those lies.  Lie number one:  Collins and
2    Teta were chasing four suspects that day.
3         Now, how do we know this is a lie?  Because the very
4    first moment when this case started on that night a kernel, a
5    kernel of truth escaped from Officer Collins.  He started
6    writing his notes and you'll have this exhibit, it's
7    Plaintiff's Exhibit 41.  But he says, after he heard the
8    gunshot he observed perp one and two, just two, leaving the
9    location.  A funny thing happened on the way to the police
0    station, two became four, two became four and they had to
1    figure out what to do with the other two defendants.  Now they
2    were a little unclear on how to do this.  So as opposed to
3    going to each suspect and saying we're a little confused,
4    they just put them in the story.  But listen to the radio run
5    that night.  These are direct quotes, first communication, we
6    have a guy on the roof.  He says there's two on the roof.  And
7    then right afterwards he goes back and says -- and he
8    clarifies what he says -- we got one stuck in the stairs on
9    the sixth and we got one on the roof armed.  Two suspects,
0    just two.  And over and over again, you hear we got a male on
1    the roof with a gun and we got one stopped on the sixth floor,
2    two suspects.  You have one on the sixth floor in that
3    hallway.  We got a male with a gun on the roof.  We have one
4    stopped on the rooftop.  Over and over again, two suspects.
5         He was asked on cross-examination, you never
```

Anthony M. Mancuso, CSR    Official Court Reporter

Summation - Joseph                                    3

```
1    mentioned four individuals that you were pursuing that day.
2    Now, they are going to have you believe this is just a
3    mistake.  We just left a few people out.  But use your common
4    sense.  The whole purpose of a radio call is to let their
5    brother officers know what to expect.  You're not going to
6    bring people out to a crime scene, especially in a gun case,
7    and leave them a little surprised.  Oh, we forgot to tell you
8    there are actually two guys on the roof.  That's ridiculous.
9    The number of suspects they were chasing was critical
10   information they had to give out to the officers responding to
11   the scene, critical information and in the heat of the moment
12   that's what they kept saying, two suspects.
13        But you know truth will not be denied.  And in this
14   case the irony of all irony is that Jerome Nelson's testimony
15   corroborates what Officer Collins said when that first kernel
16   of truth escaped, when he started writing his notes that
17   evening when he said perps one and two, two suspects.  Now,
18   remember Jerome testified about what happened that day.  He
19   could have been vague and said I saw some guys running.  He
20   could have said, I don't know how many.  He was very specific.
21   It was Cedric and it was Jerome Nelson, two.  What is the
22   likelihood that Collins when he first started writing about
23   this case says two, Jerome Nelson says two, unless in fact it
24   was two?  What is the likelihood that day when they are
25   chasing and they are in the heat of the moment, that they
```

Anthony M. Mancuso, CSR    Official Court Reporter

1   forget to mention other people they are chasing to their
2   fellow officers? It's just not believable. There were two
3   suspects. Two became four and they had to figure out what to
4   do with those other two. Which takes us to lie number two,
5   Jerome Nelson blocked the officers, resisted arrest and was
6   trespassing on May 20 of 2006.
7           Now, we sent spent a lot of time on Jerome Nelson's
8   complaint in this case. But it was to demonstrate what is
9   sometimes -- it's sometimes just hard to fathom that officers
10  would literally make up facts to arrest you. It's not an easy
11  leap. But that's what they did do Jerome Nelson. He was not
12  obstructing the hallway that day. I cross-examined Detective
13  Teta on that. He said it didn't happen. Let's remove that
14  from the complaint. Jerome Nelson didn't resist arrest from
15  Detective Teta that day. Back then he was Officer Teta. He
16  didn't put the handcuffs on him, but that's what the complaint
17  says. Let's delete that. And he knew people in the building.
18  He had friends in the building. He lives a building away.
19  How is that trespassing? Let's delete that.
20          So, what charge was he guilty of that day? It was
21  not obstruction of justice. It was not resisting arrest and
22  it was not trespass. It was not anything. But two became
23  four and they had to figure out what to do with Jerome Nelson
24  and they had a choice. They could have said, you know what,
25  we were focused on the two suspects, these other two came in

1   the story, does anybody know what those other two did?
2   Instead of making that choice, they just started creative
3   writing. What's Jerome Nelson going to do? Who is he? Some
4   16 year old kid. What is he going to do?
5           And what's really scary is when you look at the
6   second page of Officer Collins's notes that day, he was
7   putting together the charges for all of the defendants,
8   including Jerome Nelson, who is perp number four at the top.
9   He wanted to charge him with a felony, for what? Being a
10  scared kid and running away from the police.
11          So when you start to wonder are they capable, yes?
12  They are capable of making up facts to support a charge.
13  That's what they did and that's what they did to Andrew
14  Smalls.
15          Let's look at his complaint. And these are facts
16  that they admit, they admit didn't happen. They admit that
17  Andrew Smalls was not the one that passed the gun. They admit
18  that -- excuse me -- they admit that Ronnie Smalls, that's
19  what is written in the complaint, was not the one that passed
20  the gun. They admit that the magazine wasn't dropped by
21  Ronnie Smalls. They admit all of these things were wrong in
22  the complaint and what's their excuse? I didn't write it. I
23  didn't type it.
24          Well, you know, the funny thing about that excuse is
25  it happens on the very night of this incident.

1           Now, when you have a memory of something, like a
2   cold, hard memory, you know this happened and someone gives
3   you a document and it's not just any old document, it's not
4   your notes, but the document as the officer of the law as one
5   who has to enforce the law, you have to actually swear to tell
6   the truth and your name is in that document and you're telling
7   me all those mistakes are going to be in the document and
8   you're just going to not say anything. You got to be kidding
9   me.
10          But when the information you're providing is a lie,
11  you're not committed to it, not based on a memory. Lies are
12  interchangable, Ron passed the gun. It was near Ron's feet.
13  It doesn't matter. The objective was to make the charge stick
14  because it's not based on a memory and when it's not admitted
15  to a memory. You sign it. What are they going to do? My
16  word against theirs. So what if I mixed them up.
17          Lie number three. And this is the one they really
18  fought us on. Andrew was wearing a black jacket on the night
19  of his arrest. Nice try. What is the evidence that Andrew
20  Smalls was wearing a gray hoodie? Well, we have a Polaroid
21  taken of Andrew that night, a prisoner movement slip with
22  another photo of Andrew, a mug shot of Andrew, all wearing a
23  gray hoodie. We have the testimony of Sabrina Davis who told
24  us Andrew that night was wearing the sweatshirt that I bought
25  my brother Clarence. She recognized that hoodie. We have

1   Andrew's pedigree card. Although they tried to scratch it
2   out, there it is written gray hoodie.
3           Defendants' evidence, their piece of ever fiction
4   that they want to put in front of you that Andrew was wearing
5   a black jacket, what is their evidence? We said so. That's
6   it. We said so. And they said it 100 different ways. They
7   came with a ton of stories about how Andrew was wearing a
8   black jacket. That night they had the power to voucher the
9   jacket, to photograph the jacket, to document that he was
10  wearing a black jacket. They did the exact opposite. They
11  lied about it.
12          And when you examine this lie you see the deliberate
13  nature of the lie. When you look at these pedigree sheets
14  they come up with this credibly sounding explanation, well,
15  you see, you know, when the prisoners are being transported we
16  have to take off their clothes, their laces or outer jacket.
17  I'm not quite sure what the explanation was. Here is what I
18  do know, they know that you wouldn't know any different. So
19  they come up with this explanation. But if that's the case,
20  if the case is that Andrew -- excuse me's -- that all of the
21  defendants had on these outer jackets and these jackets were
22  taken off, why is Andrew's gray hoodie the only article of
23  clothing crossed out? Why?
24          You know what this tells us is that their
25  representation to you, to your face, that Andrew was wearing a

1   black jacket that night is an example of them lying in plain
2   site just telling you to your face a bold face lie that makes
3   absolutely no sense. Because when you look at that document,
4   an official police record, you know nothing about the case,
5   what is the first thing you see? Oh, he was never wearing a
6   gray hoodie. But that's not true. Even with their own story,
7   he had on the gray hoodie, he had on a black jacket, he took
8   off the black jacket. If he took off the black jacket why
9   would you ever cross-out, create the false, fake, totally
0   fabricated impression that he was never wearing the gray
1   hoodie? And they do this with oh straight face and they
2   really believe you'll, but we're smarter than them. We know
3   how things work. We'll put an explanation together. They'll
4   buy it.
5           If you believe Andrew Smalls was not wearing a black
6   jacket, he was not the individual arrested on the roof that
7   night and there is no lie they can tell and there's no story
8   that they can make up to say otherwise.
9           Lie number four: Collins thought Andrew was a black
0   box and stepped on him.
1           Okay. Now, this story has so many layers of just
2   being so incredible. But when you strip it away it makes
3   absolutely no sense. Let's take a step back. That night they
4   are just about to enter onto the roof and they are chasing a
5   man with a gun, one man with a gun as we know from the radio

1   run. And what they want you to believe is they walked out
2   onto the roof with no way of seeing, no sight because they
3   were not using their flashlights and they claim they were not
4   using their flashlights because they want to explain this
5   ridiculous story. But there's a ton of officers on the roof.
6   So how is it possible that they didn't see. They say it with
7   a straight face. They have to slip Andrew into the story.
8   That's how they chose to do it. It makes absolutely no sense.
9           So question: Out of a ton of officers why is
10  Collins the only officer who mistook Andrew for a black box?
11  Again, just picture it that day, a ton of officers out on the
12  roof with their flashlights except these two, because I don't
13  know maybe they have night vision or something. A ton of
14  officers out on the roof. But it's only these two. Question:
15  Out of the ton of officers why is Detective Teta the only
16  officer who backs up Collins's story? A ton of officers.
17  Now, when you think about it, you know officers working
18  together like to joke around with each other. You have a
19  rookie on the roof and he almost steps on somebody. You don't
20  think they are going to joke about it to him if this is true
21  and the moment it happens I mean you are looking for a man
22  with a gun, something moves, you don't think that Collins was
23  going to freak out and all those other officers were going to
24  come running and this would have been one for the books. He
25  could have a line of officers, oh, God, I remember that night,

1   that was crazy. No one. Just these two.
2           Lie number five. Drew and Ronnie Smalls stopped on
3   the seventh floor landing and passed the gun. This one also
4   just defies common sense. Now, this is the photo to the left
5   is an upward view of the stairway. The photo to the right is
6   a downward view of the stairway. Officer Collins said he
7   tripped going up the stairs. Then he says he saw a magazine
8   drop. Then he says the gun passed this place. Although he
9   tried to say when I cross-examining him it may have been
0   off to the corner. The truth is if he saw the gun pass and
1   the magazine drop, the minute he was getting up from him
2   tripping up the stairs and the magazine dropped in the sixth
3   floor stairwell, that's his line of sight. So question for
4   you: Teta and Cedric are right on that landing. How is it
5   Teta doesn't see this gun pass? Better question. How is Teta
6   admits to seeing the magazine drop, which occurred before the
7   gun passed, but doesn't see the gun pass? Again, let's use
8   our common sense. In a high pressure situation. You
9   see a gun magazine drop. Your eyes go quickly to that area.
0   But he claims he doesn't even see these two suspects. There
1   was only one, but he doesn't even see them at the time. They
2   are smarter than you so you won't know the difference.
3           Lie number six. Collins lied about where the gun
4   was recovered. This is a fun one. There's the roof. In one
5   rendition the gun is recovered on the ground next to Andrew

1   Smalls' feet. In another rendition the gun is recovered on
2   a foot above his head. Remember Drew was crouched on the
3   ground. In another rendition the gun is recovered on elevator
4   roof. No, we didn't know it was the elevator roof, even
5   though we called it that. Final version, the gun was
6   recovered on the stairwell roof next to Jerome Nelson. And
7   this is just an example of the mindset people go through when
8   they are just trying to make something stick. It's not about
9   the truth. When it was convenient they wanted the gun closer to
10  Jerome Nelson. When it was convenient, they wanted the gun
11  closer to Drew, completely made up. It shouldn't be that
12  difficult to be able to say where the gun was recovered, a
13  gun, a gun.
14          Lie number seven. Defendants lied about arresting
15  Drew on the roof. Two people were arrested on the roof that
16  day. That's what their pedigree cards say, it was Ronnie
17  Smalls and Cedric Smalls. That's it. And it makes sense.
18  When you listen to the radio runs they indicate that Cedric
19  was stopped on the sixth floor stairwell and then he was taken
20  to the roof. That's what happened. And Andrew Smalls was
21  arrested inside Rockaway Boulevard, 8105, after he came
22  downstairs because he was upset about what happened to his
23  brother. Black and white. But they want to deny this. They
24  want to deny their own police records to justify their lies.
25          Defendants also lied about how Drew was arrested.

1   Officer Collins arrested him.  You as a saw him put the cuffs
2   on him.  Officer Collins says Teta arrested Drew.  I can't
3   speak to that.  That's because neither of them arrested Andrew
4   Smalls.  Andrew Smalls came down to see about his brothers.
5   He got into an altercation with some officers.  It was not
6   Teta or Collins.  How hard is it?  Teta is are rookie cop.
7   How hard is it for them to be absolutely clear.  I remember
8   that was my first gun charge or the first gun charge I was
9   involved with.  I remember exactly who I placed those
0   handcuffs on.  Why is it so hard?  Why does the story keep
1   shifting?  Because they didn't arrest him.
2           Another fact made up.  And they also lie about how
3   Drew was injured.  And why do they do this?  This is a
4   critical lie.  In one rendition they have that Drew was
5   wrestled to the ground by Officer Collins but then Officer
6   Collins at the grand jury said, no, he just put his hands up.
7   In another rendition Detective Teta says I don't know who did
8   this.  I don't know who subdued Drew.  They were together all
9   night.  How does he not know?  Because they both made it up.
0           So I've gone through the lies that they told and
1   these are the lies that move the case.  But we have
2   independent evidence that Andrew Smalls did not do what they
3   accused him of.  Beyond the lies witnesses who came to this
4   courtroom and testified on his behalf we had William Davis,
5   who testified I saw what went down.  I ran to the apartment

1   where I knew that Drew normally hung out.  Lindsey Johnson's
2   apartment.  I knocked on the door and told him they are
3   arresting your brothers.  We have Sabrina Davis.  They did not
4   witness it beforehand but she got notice from someone in the
5   neighborhood that Andrew Smalls was being arrested.  She ran
6   down.  She saw the brothers in the police car.  She saw Drew
7   coming out.  Jerome Nelson.  Who just happened to be in the
8   wrong place at the wrong time.  She told you the two
9   individuals running that day was Jerome Nelson and Cedric not
10  Drew.
11          And then we have Lindsey Johnson and Lindsey Johnson
12  is about as real as it gets.  Him and Drew are boys.  They
13  hung out.  But that night he was not about to get involved.
14  When Drew went downstairs to go see about his brothers,
15  Lindsey Johnson didn't follow him.  Lindsey testified that
16  Drew was hanging out with him, but the moment Drew went
17  downstairs Lindsey stayed in his apartment, looked out the
18  window, did not want to get involved, did not want to get
19  arrested.  All he came here to testify to was the fact that
20  Drew was hanging out with him that night, no more, no less.
21  And he drove up about four to five hours, however long -- or
22  was driven from Virginia to tell you that.  He left his
23  family, he left his job to tell you that.  They all did.
24          Witnesses who corroborate police Officer Collins and
25  Detective Teta's story, they have a whole force behind them.

1   How many witnesses came to corroborate their story?  Collins,
2   right there, and Detective Teta.  So, Andrew Smalls had
3   people.  They have their lives.  They have left Hammels.  They
4   moved on.  They came here because they saw that an injustice
5   was done and they want to just testify to what they remembered
6   happening that evening, nothing less.
7           Another thing that just seals this deal, that Andrew
8   Smalls did not possess any gun that night, not one trace, not
9   one scintilla of forensic evidence connecting Andrew Smalls to
0   that gun, nothing.  Whatever excuses they want to come up with
1   after the fact, not one iota of forensic evidence, no
2   fingerprints, no gunpowder residue, no DNA, no nothing
3   connecting Andrew Smalls to the gun.
4           What is the only thing that connects Andrew Smalls
5   to the gun?  What is the thing that their entire case is built
6   on?  A lie from Officer Collins.  I saw a gun being passed
7   from Drew to his brother Jerome Nelson.  That's it and of
8   course in another document.  That's it.  The gun was not found
9   on him, nothing.  That's it.
0           So, how do they respond?  Fake and phony defenses.
1   Let's just blame everyone else.  Look, the complaint, the
2   complaint, with all those errors, that was the DA's fault.
3   The DA got it wrong, not me.  The DA wrote this complaint says
4   Collins, not me.  Sir, the DA doesn't have to swear to the
5   truth in this complaint, you do, and you did under penalty of

1   perjury.  As an officer of the law you were the one that swore
2   this document was true.  You were the one that had an
3   obligation to read this document and make sure it was
4   accurate.  And then he says I corrected the errors.  I
5   corrected them.  There's no proof, for one, that he corrected
6   the errors right away as he suggests.  There's no physical
7   amended complaint that shows the errors were corrected and
8   then he says he told the DA about the errors eight months
9   later at the grand jury.
10          Another fake and phony defense.  Just blame it on
11  all the officers, not here.  All the other officers they are
12  going to claim they are the ones that fill out the paperwork.
13  They are the ones that got it wrong.  I didn't notice the
14  error on the paperwork although he was the arresting officer.
15  You will see his name, no would think so.  He is on all of the
16  paperwork as the arresting officer.  But he has no obligation
17  to make sure that when he's going to bring these charges
18  forward in our justice system -- he has no obligation to make
19  sure this paperwork is correct as the arresting officer.  I
20  didn't fill this out.  Your name is on it, sir.  Your name is
21  on this paperwork.
22          And they have no idea who did.  Isn't that
23  convenient?  All this paperwork, with all of this information
24  that is completely wrong and they are trying to suggest to you
25  that it's okay that we have no idea who filled out this

1  paperwork, official police records. But you know we've all
2  made mistakes at work. Mistakes are you misspell someone's
3  name. You make a grammatical error. You put too many commas
4  in. You don't put enough commas in. These are mistakes.
5  These are not mistakes. When you look closely at the facts,
6  they all seem to point in one direction, make the gun
7  possession charges stick, make the gun possession charges
8  against Drew stick. The big mistake, the gun passed. How do
9  you mess that one up? That's a mistake, who passed the gun to
0  who. That's not a mistake. That's a lie.
1       Where the gun was recovered. That's not a mistake.
2  That's a lie. How many places can the gun be recovered where
3  you are still saying mistake. Location of Drew's arrest.
4  Your police paperwork says it was inside of Rockaway Beach
5  Boulevard, 8105. That was a mistake. Disregard that. Just
6  look at what I am telling you. Don't look at the paperwork.
7  You can look at the paperwork when I think it's convenient.
8       Only chasing two suspects on radio run. Mistake.
9  We forgot to mention. We wanted to give our fellow officers a
0  surprise when they got in, when they got on the roof and there
1  was someone else there. Was it a prank? It makes no sense.
2  These were not mistakes. They all had an agenda. That's what
3  lies have, an agenda. There were two and then they became
4  four and they had to figure out what to do with those other
5  two and we know they can do it because they did it to Jerome.

1  And another defense, when all else fails, let's just attack
2  the plaintiff. He has a record. Why should you believe him?
3       And it brings us to why this case is important. You
4  know, when we talk about an individual's right to a fair trial
5  and an individual's right to be protected against fake and
6  phony evidence submitted by the police, you will not hear your
7  Honor say, well, you know they have a criminal record. You
8  can let that one slide. It's insulting. You know Drew's made
9  some questionable choices. But one thing he has done is when
10 it happens to him he pled guilty. But this gun case, what was
11 he doing that day, what was he guilty of? You know there's a
12 quote Am I my brother's keeper? That day, that's what he was,
13 his brother's keeper. He heard that his baby brother and his
14 older brother were being arrested. He didn't think. He ran
15 out to find out what was going on. That's what he's guilty
16 of. When he got downstairs he saw them in the cop car. He
17 got emotional. He exchanged some words with the police
18 officers. The officers exchanged some words right back and
19 banged his head against the wall. We have roof of that.
20 That's what he's guilty of. That's it.
21      You know, when you don't have the law on your side,
22 and three don't, and when your case is built on lies, which it
23 is, that's what you do. You attack the plaintiff and maybe
24 you'll get distracted by that. I pray that you don't.
25      So, let's go to the verdict sheet. As I said before

1  you're going to be asked to follow the judge's instructions
2  and you're going to be given a verdict sheet. And the
3  question you're going to be asked is do you find by a
4  preponderance of the evidence that any defendant deprived
5  plaintiff of the right to a fair trial by fabricating
6  evidence? We have established the lies that Officer Collins
7  told. Absolutely, yes. And then Detective Teta. You know,
8  the interesting thing about Detective Teta is although he was
9  the assisting officer that night he really wanted to distance
0  himself from what happened. He knew nothing about the
1  paperwork. He knew nothing, only about what he needed to,
2  only what he had already sworn to. But here's the thing.
3  Collins would not have been able to get away with this lie if
4  Detective Teta had not been willing to go along with this. If
5  Detective Teta that night had said, look, we were focused on
6  those two suspects. We were not chasing four guys. Let's
7  just go to the sergeant, tell him we don't know what to do
8  with these other two. Maybe we just have to cut them loose.
9  We would not be here today. We just wouldn't. But he went
0  along with the lies and he found some new ones to tell you to
1  your face without missing a beat. Detective Teta, absolutely,
2  yes.
3       And this phrase by a preponderance of the evidence,
4  it's just a fancy way lawyers like to say more likely than
5  not. Who do you believe more? It's clear, with all those

1  lies, how can you trust anything that they said?
2       Then question number two deals with compensatory
3  damages. State the amount of compensatory damages the
4  plaintiff has proven by a preponderance of the evidence that
5  he is entitled to.
6       So, state the amount of compensatory damages the
7  plaintiff has proven by a preponderance of the evidence that
8  he's entitled to as a result of being deprived of the right to
9  a fair trial by one or more defendants.
10      And the question I want to ask, it's not an easy
11 question to answer, how bad was the harm? They took away his
12 freedom, his freedom, fundamental right, his freedom. You
13 know he was 19 at the time, technically adult. But he was
14 still a child. I mean anybody who is old enough to know at 19
15 you may think you're grown, but you're not grown, you're a
16 baby. How bad was the harm? I don't know how you frame that,
17 taking away someone's liberty and you know when Andrew Smalls
18 was on the stand and he was asked to describe it he couldn't
19 put it into words, I don't think you can, what it feels like
20 to have your liberty taken from you for something you didn't
21 do. That's got to be crazy. It's got to be maddening, got to
22 be something that stays with you for the rest of your life.
23      How bad was the harm? I don't think you can define
24 it in words. You just think about it and the more you think
25 about it you realizes there are no words.

1      How long did the harm last?  It was over two years.
2  One month, fourteen days.  That's approximately 17,520 hours
3  of your freedom being taken away from you.  Over a million
4  minutes.  You know they say when you are incarcerated time
5  moves extremely slow.  Minute after minute after minute of
6  knowing you're here not because of anything you did, because
7  you had a normal human reaction to hearing that your brothers
8  were in handcuffs.  Drew told you from the witness stand,
9  honestly, I really didn't think that I was going to be in that
0  long.  He thought he just got into a little whatever with the
1  police and he was going to be released the next day.  The next
2  day turned out to be over two years.  How do you quantify
3  that?  I mean, you know, time is something, it doesn't matter
4  how rich you are, it doesn't how smart you are, how beautiful
5  you are, time, we all have to surrender to time.  A minute for
6  me is a minute for you.  That's it and you lose two years of
7  your life, over two years, for a crime you didn't commit, no
8  one can give you those two years back.  No one.
9      So in opening statements opposing counsel went he's
0  here for money.  He's here for money.  Well, those are the
1  rules.  That's all he can ask for.  He can't ask you, members
2  of the jury, give me my two years back.  He can't ask you
3  that.  You can't give that to him.  He can't ask you, members
4  of the jury, can I take these two outside and express myself
5  on them and make them feel what they put me through?  Better

1  yet, can we lock them up?  He can't ask you for that.  That
2  would be illegal.  And we're playing by the rules here and the
3  rules say he is entitled, if you find the defendants liable,
4  to compensation.  So, yes, he's asking for money because
5  that's what the law allows.  Yes.  That's the only thing he
6  can ask for.
7      How much did it interfere with Mr. Smalls's life?
8  Another question to consider.  He told you at that phase in
9  his life 19 he was hanging out a lot.  Here is what he did do.
10  He was starting the right path.  He went to eleventh grade but
11  then he took the initiative and got his GED.  He was in the
12  neighborhood, helping kids, younger kids in the neighborhood,
13  in tutoring them.  He was contributing.  He was starting to do
14  something.
15      He was a baby at 19.  How much does being locked up
16  at that age for over two years for a crime you didn't commit
17  interferes with your life?  Think about where you were at 19.
18  All the doors that were starting to open.  Most kids are in
19  college or just hanging out at 19 or starting their first job
20  or falling in love for the first time.  All that stuff was
21  taken away.  How much?  Honestly, I don't know.  But when you
22  start to think about it, makes your head spin.
23      And then there's the question of punitive damages
24  that you will be asked about on the jury sheet.  And this is
25  not about making Mr. Smalls whole.  This is about sending a

1  message to the defendants that you can't lie when you're
2  bringing charges against someone.  You can't fabricate
3  evidence.  That's again the law.  Officer, you have the power
4  with what you write or what you type to possibly be involved
5  with taking away someone's freedom.  You can't make stuff up.
6  So, punitives are about sending a message to the defendant, to
7  the defendants, that we as a society do not tolerate that.
8      We want to keep our community safe.  And we respect
9  the fact that you help to keep our community safe.  But
0  because we give you so much power you can't abuse that power.
1  You can't start making up facts against someone because it was
2  convenient for you to do so at the time.  We will not stand
3  for that.  We will not stand for that.  And that's what
4  punitive damages are about, sending that message, a bright,
5  clear message, this is unacceptable, unacceptable.
6      We want the people that we put in power to place
7  value on freedom, not so little value that they would start
8  making up facts to justify an arrest, because two became four
9  and they didn't know what to do with the other two.
0      So, I'm going to sit down soon.  But before I do I
1  just want to say the defense is going to come up and they are
2  going to obviously say other things and you're going to have
3  to decide who you believe.  But ask them some questions, some
4  critical questions, that are important in this case.  Ask them
5  what proof do you have that Andrew Smalls was wearing a black

1  jacket that day?  Where is it?  I didn't see it.  So why
2  should we believe you?  Ask them why was it so difficult for
3  you to explain where the gun was recovered?  Why do we have
4  several different versions?  Ask them why is it if you were
5  really chasing four suspects, as the events were unfolding
6  that evening, do we only hear during the chase about two?  Why
7  is it if at least one of you admits that Jerome Nelson's
8  complaint was based on fake facts, he was arrested for anyway?
9  Why is it if you were able of doing that to Jerome Nelson we
10  wouldn't think that you would be capable of doing it to Andrew
11  Smalls?
12      And when they have no answer, because there is none,
13  at least not one that makes sense, I'm going to ask you to
14  find in favor of the plaintiff Andrew Smalls in this case.
15  I'm going to ask you you to hold the defendants accountable.  It's
16  been about 13 years of them denying, lying, coming up with new
17  lies and they have yet to be held accountable.  You have the
18  power to make that happen today in this courtroom.
19      Thank you.
20      THE COURT:  All right.  Ladies and gentlemen, we'll
21  just take a very, very, brief five minutes.
22      (Jury excused.)
23      (Recess taken.)
24      (In open court; jury not present.)
25      THE COURT:  All right.  Let's have the jury come in.

1     (Jury present.)

2     THE COURT:  All right.  Ladies and gentlemen, please

3 be seated.

4     Ms. Fudim.

5     MS. FUDIM:  Thank you, your Honor.

6     May I proceed, your Honor?

7     THE COURT:  Yes, you may.

8     MS. FUDIM:  On May 20, 2006 plaintiff ran from

9 police.  He ran from police in a residential neighborhood with

0 a gun, a loaded gun.  This gun.  He was seen with the gun.  He

1 was caught.  The gun was recovered.  He was indicted and he

2 was convicted by a unanimous jury.

3     More than that he in court papers, through his

4 attorney, who was his agent at the time, he admitted that he

5 ran from police and that he had this gun on May 20 of 2006.

6 And yet incredibly plaintiff is hearing asking you to give him

7 money, to give him money for running through a residential

8 neighborhood with a loaded gun.

9     Now, you see an appellate court threw out the

0 conviction.  The judge told you it's not because any evidence

1 was found to be fabricated -- the issue that you have to

2 decide here in this courtroom -- but because the court

3 determined that the gun was illegally seized.  But now

4 plaintiff wants you to believe that he never ran from police,

5 he never had the gun, he wasn't even there.  Instead he was

1 arrested for no reason and prosecuted as part of an elaborate

2 conspiracy by these officers.  That's the incredible story

3 that he wants you to believe, and not just to believe it but

4 to reward him for his creativity in coming up with this.

5     This is the verdict sheet where you can and should

6 reject plaintiff's outrageous demands.  Now, you only have to

7 answer one question on this verdict sheet, the first question,

8 and I'm going to read it to you:  Do you find by a

9 preponderance of the evidence that any of defendants deprived

10 plaintiff of right to a fair trial by fabricating evidence?

11 Rich Collins, yes or no; David Teta, yes or no.  The answer to

12 those questions is no.

13     Let me tell you two things about this.  The first

14 one is that the burden of proof in this lawsuit, that's at the

15 back table, that's with plaintiff.  And I say that because if

16 any of you are confused, you think maybe the evidence is even,

17 you're not really sure, it's kind of hard to figure it out, we

18 submit that the evidence is compelling, but if anyone is

19 unsure, then the answer to that question is still no because

20 the burden of proof is back there.

21     Now, the second thing I want to tell you about that

22 question, the judge already told you that whatever the

23 appellate court did has nothing to do with these questions

24 that you have to answer.  There's no claim for that in this

25 lawsuit.  Now, once you've answered that first question you

1 don't have to answer any of the other questions on the verdict

2 sheet once you check no.  It all ends with the checking of one

3 box, one word for each defendant and that word is the word no.

4     Now, let's talk about how you get there.  Now, my

5 intention was to start with plaintiff's story.  But it turns

6 out that that's more than one thing.  What do I mean by that?

7 What I mean by that is this:  Throughout this trial

8 plaintiff's attorneys have been telling you that Officer

9 Collins and Detective Teta mixed up their client with Cedric

0 Smalls.  You recall that there was about five hours of

1 testimony when Officer Collins was on the stand and there were

2 question after question about the fact that -- about the fact

3 that it was Cedric who ran from police, not Drew, the fact

4 that it was Cedric on the sixth floor landing, not Drew.

5 Again and again, hour after hour of testimony and questions

6 about the fact that this was a mixup, that there was confusion

7 and that the reason there was confusion because both Cedric

8 and Drew had braids and because there was a confusion about

9 their clothing.  I'm going to get back to the clothing in a

0 minute.

1     But my point now that was plaintiff's counsel's

2 story, their theory about what happened here.  But that's not

3 what the plaintiff told you on the stand.  When my colleague

4 Brian Francolla questioned him he told you the whole thing was

5 fabricated, all fabricated, no chase, no gun, fabricated

1 against me, fabricated against my brothers, total fabrication

2 all the way around.

3     So plaintiff is trying to distance himself from his

4 attorney's theory of the case.  We've heard this is not the

5 first time that he's tried to deny his attorney's

6 representations.  His first attorney, Mr. Maltz represented on

7 plaintiff's behalf at a time when he was his attorney, his

8 counsel, that at a time when he was moving in support of an

9 application to suppress the gun, that plaintiff felt compelled

10 to drop the weapon after these officers chased him inside the

11 building at Rockaway Beach Boulevard and I'm going to come

12 back to that later.

13     One thing to know now interestingly Ms. Joseph

14 didn't make any mention whatsoever in any of her remarks to

15 you about any of the testimony we heard from Mr. Maltz on the

16 stand or that he was even here.  Completely silent as to that

17 and I would submit to you in and ever itself is quite telling.

18 Just like plaintiff is telling you now that he never said that

19 to Mr. Maltz, he actually suggested to us that maybe Mr. Maltz

20 was confusing him with another client.  The truth is that

21 plaintiff will say whatever he has to to get some money from

22 you here this week.

23     Now, let's talk about plaintiff's story, what it is

24 he wants you to believe.  According to plaintiff on May 20 of

25 2006, at about 1:30 in the morning he was minding his own

1  business at his friend Lindsey Johnson's apartment they were
2  drinking together, playing cards.  That was at 8105 of the
3  Hammels Houses.  That's when his good friend William Davis
4  came to the door, showed up to tell him that his brothers were
5  being arrested downstairs.  Let me step aside for a moment and
6  interject this.  Ms. Joseph told you that he was concerned
7  because he had just learned that his baby brother was among
8  the two people who was being arrested downstairs.  But that
9  actually wasn't right because when Mr. Smalls was on the stand
0  he was asked did you know which brother and he said no, I
1  didn't know which brother.  I'm actually one of them and I was
2  never told which brother it was.
3          That was a misstatement.  Apparently, he's told your
4  brothers are being arrested downstairs and with no further
5  information, not knowing which brothers, he runs downstairs to
6  confront police.  He claims he asks some officers why his
7  brothers are being arrested and a group of officers threw him
8  against a wall causing a laceration to head.  And those
9  officers arrested him for no reason and then these officers
0  decided to join the conspiracy and lie about chasing plaintiff
1  outside of 8105, lie about chasing him up the stairs, lie
2  about seeing him pass the gun, lie about seeing him on roof,
3  lie about arresting him on roof, lie about bringing him
4  downstairs in handcuffs and they decided to perpetrate that
5  lie again and again and again for thirteen years.

1          And remember they are not just lying apparently
2  about who the two people were on the roof.  According to
3  counsel they are actually lying about there even being two
4  people arrested on roof because remember plaintiff counsel's
5  theory is that these officers mixed up Cedric and plaintiff.
6  But that theory stops on the sixth floor because then they
7  claim that there was only actually one person on the roof and
8  Cedric was brought up to the roof afterwards and that's why
9  there were two people on the roof and a mention of two people
10 on the roof in the audio.  And they did all this, they made up
11 all these lies, again and again at the grand jury, pretrial
12 hearing, criminal trial, in the depositions, according to
13 counsel, to cover up their mistake of this confusion.
14         Let me say that again.  According to plaintiff's
15 counsel, rather than correct their error of confusing Cedric
16 and plaintiff, they decided to perpetrate a fraud that spans
17 thirteen years against the person they didn't even know.  They
18 didn't know Mr. Smalls.  They had no vendetta against him.
19         And then what's more, which is perhaps the craziest
20 part of this the elaborate scheme, they decided to clearly
21 document their lies by making blatant cross outs in official
22 police paperwork which they then maintained and preserved and
23 readily gave to prosecutors.  Makes no sense, but that's the
24 story the plaintiff's counsel would have you believe.
25         I want to stop right there and talk about the

1  problems with plaintiff's story and there are many.  Now, if
2  everything plaintiff told you were true that his alibi
3  witnesses, his good friends Lindsey Johnson, William Davis,
4  would have been able to clearly say that he was in
5  Mr. Johnson's apartment.  Mr. Davis came to the door.  Then
6  Mr. Davis and Mr. Johnson would be consistent about the core
7  facts of that alibi.  It would be very simple.  They weren't.
8          Let's look at what they said.  Let's start with
9  Lindsey Johnson.  His testimony should have been simple.  If
0  everything that plaintiff is telling you is true he should
1  have come here and said two things.  There were only two facts
2  that were important to get out.  One, plaintiff was in my
3  apartment.  Two, he left when William Davis came to the door.
4  But he messed up that fact he didn't say it was William Davis
5  who came to the door.  When pressed he said it was Jerome
6  Nelson who came to the door and he told us he knew both of
7  these guys since they were kids, I believe he said since
8  kindergarten.  He tried to walk that mistake back.  I always
9  thought it was Jerome Nelson because actually I didn't see who
0  came to the door.  I only heard the voices and I thought it
1  was Jerome Nelson and I obviously was wrong.  There's some
2  problems with that.
3          First of all, if he knew these individuals, these
4  are his good buddies, he's known them since kindergarten, he
5  would know where their houses were presumably.  You can

1  believe that or say maybe not.  What did Mr. Davis have to say
2  about this?  He came in and he told you that he went to
3  Lindsey Johnson's door.  He knocked.  The door gets opened and
4  he conveyed that plaintiff's brothers were being arrested
5  downstairs and that was him who did it.  What did he tell us?
6  He told us he saw Lindsey Johnson was there and I asked him,
7  well, if you can see Lindsey Johnson, did it look like Lindsey
8  Johnson could see you and he said yeah.
9          Now, that wasn't the only problem for plaintiff.  I
10 mean it's a big problem.  It's not the only problem with
11 Mr. Davis's testimony.  He also told us when he got to the
12 door there was a bunch of people there.  Well, that's not what
13 plaintiff told us, not what Mr. Johnson told us.  They both
14 told you they were the only two people there.
15         And yet despite those inconsistencies, which I
16 submit are pretty big, we have not even gotten to what I would
17 contend is the most ridiculous part of Mr. Davis's testimony,
18 how he knew that plaintiff was at Mr. Johnson's apartment
19 because remember, well, back in 2006 we're in May, plaintiff
20 didn't live at the Hammel Houses at that time and according to
21 Mr. Davis, at least at his deposition, he hadn't seen Andrew
22 Smalls that day.  He hadn't spoken to Andrew Smalls that day.
23 So how did he know where Andrew Smalls was?  You remember.  He
24 looked up from across the street at ground level at
25 1:00 o'clock in the morning to Mr. Johnson's third floor

1 apartment and looked inside and saw them there. Them plural.
2 Now, don't take my word for this. The judge is
3 going to tell you that any testimony that you want to hear
4 again you can ask to be read back. Because he tried to walk
5 away from that ridiculous comment when pushed. Don't take my
6 word for how I'm representing it to you. Don't take counsel's
7 word if she tries to come back and represent it in a different
8 way. You can ask for that testimony to be read back and you
9 can see exactly what he said. According to him that's how he
0 knew that's where plaintiff was and I submit to you that
1 that's absolutely absurd.
2 Now, after realizing that plaintiff was in Lindsey
3 Johnson's apartment, Mr. Davis told us he ran into the
4 building behind Cedric, behind Ronnie Smalls and behind
5 Jerome, beating the police, who are supposedly already in
6 pursuit. And he ran straight up to the third floor to
7 Mr. Johnson's apartment where he knocks on the door. You may
8 be wonder being why is it that the officers didn't see
9 Mr. Davis in the hallway. Why is it that Jerome Nelson who
0 was having his own marathon up and down the stairs, which
1 we'll get to in a minute, why is it he didn't see Mr. Davis in
2 the hallway. The reason he didn't satisfy Mr. Davis in the
3 hallway is because Mr. Davis wasn't in the hallway, because
4 Mr. Smalls wasn't in Mr. Johnson's apartment.
5 We're still not done. I apologize. I'm not done

Anthony M. Mancuso, CSR     Official Court Reporter

1 with the problems with Mr. Davis's testimony. Plaintiff told
2 us after Mr. Davis got him he went downstairs to see his
3 brothers and the judge then asked a question. Judge Amon asked
4 Mr. Davis if plaintiff went upstairs or downstairs after
5 leaving Mr. Johnson's apartment and Mr. Davis's answer to the
6 judge was, I didn't see. I don't know.
7 But then I questioned him and we pulled up his
8 deposition and at that point he clearly testified that after
9 Mr. Smalls left Mr. Johnson's apartment he went upstairs to
10 the roof, he being Mr. Smalls, and that Mr. Davis went
11 downstairs and that he never saw Mr. Smalls in the stairwell.
12 The details are wrong and the reason they are wrong
13 is plain. They are wrong because it didn't happen. Nothing
14 the plaintiff told you or Mr. Davis told you was true. Okay.
15 So what about Mr. Nelson? Let's talk about him. His story
16 makes no sense from start to finish. According to Mr. Nelson
17 he was hanging out outside the building of 8105 and that was
18 after he had been visiting his girlfriend who lived on the
19 first floor of that building, spent some time with her, came
20 back out, and now he's with his buddies again outside and he
21 claims that while he's out there that he sees -- he hears a
22 gunshot and that's when he decides he's going to go back to
23 his own building. That's at 8202. He tells us he does that
24 immediately and starts walking back to his own building and
25 tells us he's only walking for about 30 seconds, under a

Anthony M. Mancuso, CSR     Official Court Reporter

1 minute he told us, when he sees Cedric and Ronnie Smalls
2 running by and that they are being chased by police and he
3 claims that he's scared, which, if this was true, totally
4 makes sense. He's just heard a gunshot. Now he sees police
5 running. He tells us he's afraid of the police, Officer
6 Collins, maybe. He's scared. What does he do? He decides to
7 run in the same direction as the people being chased. Does
8 that make any sense to you? And then because he's scared he
9 tells us he wants to seek safety. He wants to get into an
0 apartment which again if you're scared in and of itself that
1 would make sense. You hear a gunshot. You want to get
2 inside, sure.
3 But when he goes inside he goes to his girlfriend's
4 apartment on the first floor. He was just hanging out with
5 her and she hadn't come back out back so he knows she left.
6 He doesn't go to his buddy and friend's apartment on the
7 second floor. No. Does he to Lindsey Johnson's apartment on
8 the third floor to seek safety? No. He decides he's going to
9 run up six flights of stairs instead to his friend Javon's
0 apartment.
1 Now, let's talk about Javon for one second.
2 Plaintiff told us the only person he could remember hanging
3 out with outside was Javon. Never mind the fact we heard from
4 Mr. Davis, whose supposedly one of his good buddies, he's also
5 hanging out outside right across the courtyard. Fine. The

Anthony M. Mancuso, CSR     Official Court Reporter

1 only person he remembers hanging out with is Javon. I asked
2 him when did Javon go home. He said I don't know. You said
3 sit for a deposition, maybe his memory was better then, sure.
4 We read from the deposition. He said Javon went home at the
5 same time as me. We heard the gunshot and we both decided to
6 go home. And Javon lived in the sixth floor of that building.
7 Now, we're 30 seconds to a minute after the gunshot.
8 He's only started his way home, turns around, running
9 apparently fast enough that he's beating the police and he
10 runs upstairs to Johnson's apartment who just a moment earlier
11 has gone home. When he went Johnson's apartment and bangs on
12 the door, nobody is there. So then he decides, okay, nobody
13 is there so I'm going to run downstairs, stairwell A,
14 everybody is in stairwell A. Runs downstairs and goes to
15 Lindsey Johnson's apartment on the third floor and bangs on
16 the door.
17 Now, if everything everyone is saying is true,
18 plaintiff's story is true, we're about a minute after the
19 gunshot right now and supposedly that's where plaintiff was
20 hanging out, he's in Lindsey Johnson's apartment, that's where
21 he is, and after plaintiff leaves even after Mr. Davis comes
22 to the door, Lindsey Johnson told us he stayed in the
23 apartment. He went back to the sofa. But supposedly when
24 Mr. Nelson's is banging on the door nobody is home. I asked
25 him was there any evidence that anyone was there. No evidence

Anthony M. Mancuso, CSR     Official Court Reporter

1 that plaintiff was there. So then he decides, according to
2 his testimony, that at that point he's going to go
3 downstairs to Alford's apartment. He bangs on the door to
4 Alford's apartment on the second floor. He claims that there
5 are three plainclothes detectives that arrested him or two
6 plainclothes detectives, if you want to go with his deposition
7 testimony. Then he tells us that he gets brought to the lobby
8 where inside, inside the lobby, he sees a single
9 plainclothes detective and he told us he knew it was a
10 detective because he recognized that the person was just
11 wearing plainclothes, not a uniform, while he saw the same
12 plainclothes detective grab Andrew Smalls and shove his head
13 against the wall.
14       But that's not what plaintiff told us. According to
15 plaintiff his head was shoved against the wall by a group of
16 officers and he told us those officers were in uniform and the
17 judge was very clear when she asked him where did that happen
18 and there was a photograph that was on the screen and she
19 asked him multiple questions about show us on this photograph
20 where your head was hit against the wall and he showed us it
21 was outside. He said again I had one foot still in the
22 vestibule but it was outside that my head was hit against the
23 wall. Not what Mr. Nelson told you. Mr. Nelson's story
24 doesn't make sense. Mr. Davis's story doesn't make sense.
25 Mr. Johnson's story doesn't make sense. Plaintiff's story

1 doesn't make sense and they certainly don't make sense
2 together, which is actually striking considering the fact that
3 these are all four good friends who prepared multiple times
4 for their depositions with plaintiff's prior attorneys,
5 Mr. Nelson and Mr. Davis actually told us they prepared
6 together at the same time for their depositions and the
7 plaintiff actually reviewed Mr. Johnson's deposition testimony
8 before he sat for his own deposition. Well, excuse me. Let
9 me stand corrected. He denied that when he was on the stand
10 and my colleague Mr. Francolla was questioning him. But when
11 we read his deposition testimony word he admitted
12 that he reviewed -- I think he used the word deposition of
13 Mr. Johnson prior to sitting for his deposition and the
14 question was asked by deposition what do you mean and he said,
15 yes, I mean the deposition. We also heard that. Mr.
16 Francolla reads very well and that was his testimony.
17       Now, let's talk about what actually happened. Let's
18 step back and let's talk about what actually happened. It's
19 May 20, 2006. On that evening Officer Collins, Detective
20 Teta, Officer Cabrera and Officer Alvarado, all rookies at the
21 time were work being at the Hammel Houses. It's the end of
22 their tour, almost 1:30 in the morning and they are in this
23 rec room meeting up. They are inside and they hear a gunshot.
24 Detective Teta is by the window, so he looks outside and he
25 sees a group of five people, four men, one woman. They go

1 outside. They see the same group of people there, no one else
2 in sight. They don't try to arrest anyone at that time. They
3 admit at that point in time they definitely don't have enough
4 to do anything with these individuals, but they are police
5 officers, so they investigate. So they start to follow them.
6 And they are following them at first walking, not immediately
7 running, just walking and they see the woman turn around, sees
8 them, turns and then she says something, we don't know what
9 she says, but she says something.
10       At that point the men take off running. So the
11 officers give chase. They run into the building of 8105.
12 Officer Collins told you during that point in time he never
13 lost sight of the group. They run in. They put over the
14 radio the address of where he's at. You can hear that. You
15 can replay that just like you can see all the exhibits, have
16 any testimony read back, you can play the audio for yourself
17 when you are back there. So they run into the first
18 stairwell, which is stairwell A, and they start running up the
19 flight of the stairs. One flight, two flights, three flights
20 and at the third flight Jerome Nelson just stops.
21       Now, is he actively going like this to block? No,
22 he wasn't. Detective Teta told us he just kind of stopped but
23 by stopping in the middle of the hallway he was effectively
24 blocking the officers and Officer Collins pushes past him,
25 Detective Teta pushes past him and he ends up getting arrested

1 by Cabrera and Alvarado.
2       Now, then they go to the other stairwell. They
3 cross over to stairwell B. They run up to the sixth floor and
4 when they get to the sixth floor that's when Davis is kind of
5 startled. Counsel made a big deal with him that he couldn't
6 remember siting here today 13 years later how did he grab him.
7 Was it by his shoulder, his waist, by your right hand, left
8 hand. He told us what he remembered, that he grabbed him,
9 throws him back, Detective Teta takes possession of the Cedric
10 and arrests him and places him in handcuffs.
11       They continue up or I shouldn't say they, Officer
12 Collins continues up. And that's when he trips. He told us
13 about that moment because time seems to stand still. He's a
14 rookie officer. His gun is holstered. He looks up and sees
15 plaintiff remove a gun, a gun from his pants. He knows he's
16 defenseless. He's scared and he's concerned. Mr. Smalls
17 could shoot. He doesn't shoot. He hands the gun to his
18 brother Ronnie Smalls. When he does so the gun's magazine
19 falls to the floor and the two brothers run up to the roof
20 after. Officer Collins is concerned for his safety and radios
21 for backup.
22       I'm going to talk about that radio call in a minute.
23 I know Ms. Joseph sent spent a lot of time on it. I want to
24 talk about something else, how Detective Teta didn't see that
25 and it can't possibly be true if he didn't see it. Two points

1  about that.  First all Detective Teta told us he was dealing
2  Cedric.  He as a person he's just arrested.  He's not
3  specifically looking right there.  He's looking at his
4  colleague who is on his hands and knees on the stairwell.
5  Second point, if this was all an elaborate conspiracy, a lie,
6  because she told us that Officer Collins could never get away
7  with this -- she said he could never get away with this if
8  Detective Teta didn't back him up.
9          So why isn't Detective Teta backing him up?
0  Wouldn't it have been easier then for Detective Teta to say,
1  yeah, I saw it too.  Certainly if they were going to lie that
2  would be the lie to make of all the lies because he kept
3  saying no one else was there to corroborate what Officer
4  Collins is saying.  Wouldn't that be a whole lot easier, if
5  Detective Teta were willing to lie a little wouldn't Teta at
6  least make the lie that would make this all easier and say,
7  yes, I saw the gun hand off.  He didn't say that.  He told you
8  the truth.  No.  I didn't see that.
9          Now, let's talk about the radio because we heard
0  about that and Ms. Joseph put it up on the screen for you to
1  look at.  When I talk about that let's talk about what Officer
2  Collins said.  You hear him on the radio, panting from running
3  up seven flights of the stairs and he radios that he's got two
4  more on the roof and then one with a gun.  Now, plaintiff's
5  counsel wants you to be able to believe there was only one

1  person on the roof.  But then why does Officer Collins say two
2  on the roof.  It's one of the first things he says.  Granted
3  he does say thereafter one armed.  We'll get to that.  But he
4  says two on the roof.  It's about the 58 second mark.  When
5  you go back and you can replay the audio yourself if you want
6  to.  I know we had to listen to about ten minutes of it here.
7  It is right around 58 seconds.  If you want to skim over you
8  can listen to it.  If you believe plaintiff's counsel that
9  there was only one on the roof, if that's what you believe,
10 then the next thing, logically, you have to believe that
11 that's the moment when this conspiracy starts.  It doesn't
12 start when they get back to the precinct and mistakes are made
13 on paperwork that they then decide, you know, shit, excuse my
14 language, we made these mistakes, now we better cover this up.
15 If you believe that there's only one person on the roof and
16 Officer Collins is lying when he says two on the roof, then
17 that's the moment the conspiracy starts, before there's any
18 wrong paperwork, before there's any incentive to cover up
19 wrong paperwork.  That would have to be the moment.
20          It's not.  Officer Collins told you why he said what
21 he said.  He told us why he then said one armed on the roof.
22 Because there was only one armed on the roof.  He told us that
23 it's important to convey to other officers how many people
24 with weapons are on the roof.  He only saw one weapon.  He
25 only knew one person on the roof who was armed.

1          Now, the dispatcher says a number of times one on
2  the roof, one armed on the roof.  There were questions asked
3  of the Officer Collins you never corrected that.  Honestly
4  after I put my transmission out I was not listening to what
5  she was saying back.  At that point I'm concerned for my
6  colleague's safety.  He has Cedric on the sixth floor
7  stairwell.  I'm trying to stand in the middle of the hallway
8  to make sure these guys don't come back down the other
9  stairwell.  I'm waiting for backup.  He's up on the roof
0  actually doing police work.  He's not sitting there listening
1  to the radio correcting every transmission that went over the
2  radio.
3          So backup arrives.  And Officer Collins and
4  Detective Teta go up on the roof and they see Ronnie Smalls
5  lying on top of what we now all know to be the stairwell roof,
6  but back then they thought it was the elevator roof and I
7  would submit to you it's really a matter of just semantics.
8  And that roof is about ten feet high.  Mrs. Joseph showed you
9  a picture of it and I think there was some testimony from
0  Officer Collins that it was approximately ten feet.  Yet if
1  you believe that Ronnie Smalls was alone on the roof, that
2  there was never a second person, and that there was no debris
3  on the roof, again, plaintiff's counsel had a problem with the
4  idea that there would be boxes on the roof.  There were
5  questions about you've never seen box on the roof.  Have you

1  seen a box?  If you believe there's no box on the roof, no
2  debris and only one person on the roof, the obvious question,
3  with this ten foot roof, how did Ronnie Smalls get up there by
4  himself.  Officers Collins couldn't do it.  Ronnie Smalls's
5  arrest report is in evidence.  You'll see it says he's five
6  foot nine which is the same height that Officer Collins told
7  us he is.  How did Ronnie Smalls get up there by himself?  He
8  didn't.  Presumably, what happened is Mr. Smalls boosted him
9  up and then once he boosted up his brother, there was no one
10 to boost him and he hid and he hid in the darkest spot on
11 roof, in the corner.
12          Now, Officer Collins is out there.  He knows he
13 needs something to boast him up.  He sees there's no way I'm
14 going to get up by myself.  There's no way to put your hand in
15 and boost yourself up.  He sees what's a box or some other
16 form of debris and goes to step on it and it turns out to be
17 Mr. Smalls and he jumps up and then he's taken to the ground.
18 I know counsel has a problem with the fact that he can't both
19 raise his hand and then subsequently resist arrest because one
20 was mentioned in the grand jury and the other wasn't.
21 Remember we saw the length of the grand jury and trial
22 testimony.  I believe Officer Collins told us one was about 19
23 pages and other was 218 pages.  Mr. Smalls puts up his hand
24 and then he's arrested and taken to the ground.  What is the
25 ground made of?  Mr. Collins told us it is made of gravel and

1 sea shells, sea shells that are being dropped by the birds to
2 crack open. Sharp, sharp objects. His face lands on the
3 ground. He gets cut not against a flat wall. If he's thrown
4 against a flat surface he would get a bruise, but not a cut.
5 The cut is from sharp objects like the sea shells on the top
6 of the roof.
7         Now, after he's arrested Officer Collins -- after
8 Mr. Smalls is arrested Officer Collins continues to try to get
9 help to leverage himself up onto the roof. Once he's on the
0 roof, he sees other side Ronnie Smalls sort of coming down and
1 he's coming up. There were all this semantic questions about
2 were you standing on the roof and how much of your body was on
3 the roof. All this minutia that you used another word to
4 describe it in prior . If he was on the roof, no difficulty
5 getting on the roof. He explained that. I was not all the
6 way on the roof. I had gotten myself up and Ronnie Smalls was
7 coming down the other side and that's where he sees the gun
8 laying on the roof. Counsel wants you to believe that there
9 somehow has been testimony that the gun was in three different
0 places. On the ground of the roof, that it was one foot in
1 the air above Andrew, that it was also on top of the stairwell
2 roof. There was not different testimony. The fact that he's
3 saying it was on the roof because there's a document that says
4 the gun was found on the roof. He didn't separately say the
5 stairwell roof or elevator roof. He was not differentiating

1 about those two. When he said it was one foot away he
2 explained what he meant. It was one foot away from him but
3 ten feet up. Obviously it was not floating in mid-air.
4 Ronnie Smalls gets arrested and after that we heard that
5 Detective Teta then searches Andrew Smalls and he told us when
6 he searched him I found that he had some money on him and
7 that's something that officers have to make note of. You
8 can't be taking people's money when you arrest them. You have
9 to give it back. You can do a search to make sure there's no
10 additional weapons. He does that. He says I found money on
11 him. Ms. Joseph was questioning him. She tried to trick him.
12 She said isn't it true when the prisoner pedigree card was
13 filled out at the precinct it showed no funds for Andrew
14 Smalls and it's proof you confused him with someone else. She
15 put the prisoner pedigree card on the Elmo and pointed out the
16 zero funds. But Detective Teta was quick. He said, no, no.
17 That's not Drew's prisoner pedigree card, that is Cedric's.
18 She didn't then say, oh, my mistake, let's put Drew's on and
19 see what says. We did when my colleague re-examined Detective
20 Teta and we put Andrew's on the screen we saw what it says,
21 forty dollars, consistent with what the detective said that
22 there was money there.
23         That's a trick. It's a trick that counsel uses and
24 there were a lot of tricks that counsel used. I want to talk
25 about some of them. You recall that numerous times

1 plaintiff's counsel would read testimony into the record.
2 They would read only a few lines. That would give off one
3 impression like maybe the witness lied or got a detail wrong.
4 Then we would to stand up and say actually we think in
5 fairness you have to read five or six more lines because that
6 qualifies the prior answer and on a number of occasions the
7 court agreed with us and additional testimony was read in and
8 when it was it gave the complete picture.
9         While we're on the subject of testimony, you know I
0 want to emphasize this for you: Over the past thirteen years
1 Officer Collins has testified about this event five times
2 under oath. He testified at the grand jury, at pretrial
3 hearing, at trial, at a deposition and in this courtroom.
4 Five times over thirteen years he talked about the same
5 incident. Plaintiff's counsel wants to treat his prior
6 testimony like a script that he was supposed to have
7 memorized, like he was supposed to have spoken about this
8 incident every single time using the exact same words, every
9 time over thirteen years. Now, were there words that he used
0 that were different? Were there small inconsistencies? Yes,
1 there were. Because you know what, over the past thirteen
2 years this is not the only case that Officer Collins has
3 worked. About the little things, about the big things he was
4 always consistent at all of the times he testified. Who
5 handed who the gun? Drew handed it to Ronnie Smalls. Always

1 consistent about that.
2         Now, other tricks that you might have seen. Yelling
3 at the officers. Saying yes or no officer. And not giving
4 the officer an opportunity to explain his answer, to allow a
5 misimpression to percolate, to corrode for four or five hours
6 until I got to have the opportunity to go back and correct
7 some of those misimpressions and I want to give you an example
8 of what I'm talking about.
9         For example, we saw this document. Plaintiff's
10 Exhibit 37 in evidence and it's a mug shot pedigree. There
11 were questions asked of Officer Collins isn't it true, yes or
12 no, officer, that you put down the top charge as resisting
13 arrest because that was the most serious thing that you had
14 seen plaintiff do? He said no. When he started to try to
15 explain, counsel cut him off. He said yes or no, officer,
16 that's what it says. Officer Collins never fought him. He
17 said yes. And that misimpression stood there for hours. Just
18 out in the open sat there until I got to go back up and
19 questioned the witness and gave him an opportunity to explain
20 and say what did you mean by that. He said, well, where it
21 says top charge on a mug shot pedigree card we don't fill that
22 in at all. It's computer generated and if an individual is
23 resisting arrest on this document that always comes up as the
24 top charge and he explained why. He said because this is a
25 document that's used for transport purposes, for the

1  transporting officers who are going to be bringing the
2  prisoner from the precinct to central booking or potentially
3  then from central booking to Rikers.  Because it's used for
4  transport of the things these officers need to know if this
5  was an individual who was resisting arrest.  He explained, no.
6  I always indicated that the top charge was criminal possession
7  of a weapon and then I showed him the arrest report for
8  plaintiffs which is Plaintiff's Exhibit 4.  So you can look at
9  that and he told us the arrest report was actually filled out
10 prior to when the mug shot pedigree is generated and see on
11 there the top clarify in fact is criminal possession of a
12 weapon.

13          Now, there were other examples about this as well.
14 Remember when counsel asked Officer Collins if any officer was
15 injured during the incident and he said I wasn't injured and I
16 don't know of any other officer being injured and on the
17 screen they placed an arrest report, typewritten arrest
18 report, for Ronnie Smalls and there was a box on it that was
19 checked that said officer injured and there was a check mark
20 and he said, well, I didn't write that up.  When Ms. Joseph
21 took issue with the fact that he got up there and said there
22 were documents he didn't write he told you who did.  He said
23 it's Sergeant Hennessy and if you go to the document and flip
24 to the second page it actually will say report prepared by and
25 you'll see the name and it says Sergeant Hennessy.  He said he

1  must have filled that in one.  He filled out a report, a
2  handwritten version of the same documents.  I did my documents
3  by hand.  I handed them in by hand and someone else typed them
4  in, so there must have been a mistake.  Counsel asked with
5  incredulity, we're posed to believe that someone else just
6  conveniently entered this information wrong, officer?  He
7  said, yeah, I guess so.  That is a misimpression that sat for
8  hours.  Then I got back up and we put into evidence, not
9  plaintiff's counsel, we put into evidence the actual scratch
10 handwritten report that the officer filled out.  What did it
11 show?  It showed exactly what Officer Collins said that where
12 the box was for officer injured, he had checked no.  So, yes,
13 apparently someone did in fact enter it wrong.

14          That was not the only document that we saw like
15 that.  About the complaint report, plaintiff's counsel showed
16 them the typewritten complaint report.  Again he said I did it
17 by hand.  Sergeant Hennessy entered it into the computer.  If
18 there's a mistake in it I can't speak to that.  I did the
19 handwritten one.  Again we had to put the handwritten one into
20 evidence.  When you look at it there are differences, person
21 one, person two, person three, perp four, who is who is
22 different, if you compare the two side by side.  You'll see
23 that there are differences.  But the numbers that are in the
24 handwritten complaint report as to who did what correspond
25 exactly with Officer Collins's handwritten notes and they

1  correspond exactly to the various pedigree cards.  So
2  everything that he did on those reports that's right and
3  that's not to say he didn't make mistakes anywhere, he
4  certainly did.  We concede that.  But as to that document
5  there weren't any.

6          Now, I want to talk about, for a second, about the
7  prison pedigree cards.  One of the things that Ms. Joseph
8  mentioned was that the one for Cedric says he was arrested on
9  the rooftop and that confirms either that there was confusion
10 between Cedric and plaintiff, I don't know, or that somehow
11 only one person was arrested on rooftop.  Not clear.  That's
12 what it says and that's wrong.  This is one of those tricks
13 ascending beyond examination into summation which is the
14 testimony that Officer Collins gave was that he actually
15 didn't fill this section out.  He didn't fill this out at all.
16 It was not him.  These cards are actually filled out by the
17 physical officer who escorts the prisoner into the precinct
18 and it's filled out at the desk.  Numbers were put on at the
19 time in terms of when they came in the door.  When he was
20 later ascribing to each of the four individuals a perp number
21 as to what individual did in the complaint report.  He wanted
22 to make sure it was consistent with these prisoner pedigree
23 cards for organizational purposes.  He scratched out the
24 numbers.  If this were an elaborate conspiracy presumably he
25 would have gotten a blank form and redone it.  He wouldn't be

1  submitting to the prosecutors the very evidence of his
2  conspiracy.

3          We also heard about Exhibit 24, the black jacket and
4  the gray hoodie and the word roof and the fact that he crossed
5  out gray hoodie and circled black jacket that must mean this
6  was an elaborate lie.  First of all, I am pretty sure you all
7  know this.  Someone can be wearing both a gray hoodie and a
8  black jacket and can take off the black jacket.  In fact, the
9  officer and the detective told us that mug shot pedigrees are
10 never taken with jackets.  It can obscure the side of the
11 face.  Officer Collins said it could be both.  He circled
12 black jacket because that's what he saw the individual in.  He
13 wrote now, gray hoodie.  Why did he cross it out?  Who knows?
14 If this were going to be an elaborate scheme, a cover-up, a
15 lie, why not just write down, you are at the precinct, you see
16 what they are wearing, they are right in front ever you, why
17 not write down what they are actually wearing because you know
18 that's what they are going to be photographed in?  Why make up
19 different clothes?  Why make the lie harder for yourself?
20 Even if you did see him running in a black jacket before, you
21 denied you saw him running in a gray hoodie because that's
22 what the guy is wearing.  That's not what they did.  We heard
23 when they go into the precinct the jackets come off because
24 they have strings that can be cut off.  And the sweatshirts
25 are given back to them and when they go to be transported the

1  jacket are given back.  And they can put on anyone else's
2  clothing.  Nobody monitors, one is hot or cold and they
3  switch.  Plaintiff's counsel wants you to believe that no one
4  could have been cold because it was a beautiful May day, 61
5  degrees.  We showed you the forecast.  The minimum temperature
6  day was 51 degrees.  I couldn't get plaintiff to admit that
7  generally maximum temperatures are reached during the day and
8  minimum temperatures are reached at night.  This was
9  1:00 o'clock in the morning.  I don't think I have to say
10 anything more about that to you.  I think that point is pretty
11 obvious to now, the black jacket, how do we know if that's
12 what plaintiff was actually wearing when he ran?  Detective
13 Teta told us he noted it at the time.  And the reason he noted
14 it because he had the jacket and continues to have the jacket,
15 not the same one, he said he rebought it.  He continues to
16 have the jacket to this day.
17         Now, they want you to believe -- what do they want
18 you to believe?  Officers Collins and Detective Teta mixed up
19 the men, that plaintiff wasn't the one that handed the gun to
20 Ronnie Smalls, that he was the one who received the gun from
21 Ronnie Smalls like it says in the criminal court complaint or
22 that the officers confused plaintiff with Cedric like
23 plaintiff wrote in his letter to his attorney Mr. Megaro.  But
24 that's not the plaintiff's story.  His story, plaintiff's
25 story, is not you confused me with one of the other guys.  My

1  role was different.  I had a different role in this.  I was
2  not that guy.  I was that guy.  His story is I wasn't there
3  period.  So if he was not there period and actually plaintiff
4  is telling you the whole thing was made up even as to his
5  brothers, then plaintiff counsel's argument about the mixup it
6  doesn't get them anywhere.
7         Now, look we're certainly not denying that there
8  were paper work errors, specifically a number of errors in the
9  criminal court complaint and Ms. Joseph said like this is
10 important, like they have an obligation to get this right.
11 You know what, she's right.  It should be right.  It should.
12 Was it careless?  Absolutely.  Absolutely.  And you know
13 Officer Collins explained this was his first felony arrest,
14 first time he's doing all of these documents.  He's a rookie
15 officer.  He just saw a gun, the first gun he has seen other
16 than his own or his partners'.  He's been up over 24 hours.
17 He didn't write this document.  You know what, he did sign it.
18 Should he have read it?  Yes.  Should he have read it
19 carefully?  Absolutely.  Absolutely, he should have.  But he
20 didn't.  He made a mistake.
21         The judge, though, is going to instruct you on the
22 law.  And she is going to tell you that paperwork errors or a
23 mere mistake or mistakes by a police officer in making a
24 written record is not a basis for finding a constitutional
25 violation.

1         Now, what about this document?  Counsel wants to
2  focus on the scratch out at the top.  Why was it scratched
3  out?  Officer Collins told us originally he was grouping the
4  four suspects, the four perps, into two groups.  One and two
5  who you saw had the gun and three and four who didn't have the
6  gun and their role was more has blockers.  When he started
7  writing this out he was talking about the first two.  Then he
8  realized, wait, no.  When you do a criminal court complaint it
9  actually needs to contain everybody.  So he started again and
10 mentioned all four.  If there were going to be the hot ticket
11 item that blows up this whole conspiracy, presumably Officer
12 Collins would have at least started on a new piece of paper.
13 He wouldn't have preserved the paper and then handed it in.
14         Now, other tricks.  Plaintiff's counsel wants you to
15 believe that plaintiff's fingerprints, the fact that they were
16 not found on this gun is clear evidence of the fact that
17 plaintiff never touched this gun.  You know that Ronnie Smalls
18 and Cedric, their prints weren't on gun either.  At least one
19 version or alternate theory we heard from plaintiff's table
20 over there is that there was some confusion.  Maybe it was
21 Ronnie Smalls who had the gun running from police.  His prints
22 weren't on the gun.  We heard in the stipulation that was read
23 by Mr. Norinsberg that there were three prints on the gun that
24 were unsuitable for comparison because they were too smudged.
25 What does the preponderance evidence tell us?  Absolutely

1  nothing.
2         What we do know about the gun is that it tested
3  operable, means that it works and that it was missing exactly
4  one bullet.  The one shot, the one shot that they heard fired.
5         The paperwork errors, the lack of fingerprints on
6  the gun, the clothes depicted in the photos, those are not the
7  smoking guns that plaintiff's counsel wants you to believe
8  they are.  The only smoking gun in this case is the one that
9  Andrew Smalls fired, and ran through a residential
10 neighborhood with.  That is the only smoking gun in this case.
11         Ladies and gentlemen, this case is about
12 credibility, the credibility of Officer Collins and Detective
13 Teta who had no reason to lie and frame a guy they didn't even
14 know.  And the credibility of plaintiff, who not only has been
15 previously convicted for a crime of dishonesty, possession of
16 a forged instrument -- by the way, Ms. Joseph spoke about that
17 and said we were emphasizing that.  Have that testimony read
18 back.  We didn't ask a single question about that.
19 Plaintiff's counsel elicited that from their client.  This is
20 the first time we said anything about that in response to what
21 she said in her summation.
22         But keep in mind plaintiff also admitted through his
23 attorney to having the gun on May 20, 2006 in connection with
24 a motion, an omnibus motion counsel told us submitted to a
25 court of law.  Now, let me say that part again because it's

1  interesting, really. Mr. Maltz was their witness. We didn't
2  call him. We didn't call any witnesses. That was their
3  witness and yet in her summation Ms. Joseph didn't talk about
4  his testimony at all. She actually didn't talk about
5  plaintiff's testimony at all either. She certainly didn't
6  talk about Mr. Maltz s testimony. It's kind of clear why, if
7  you were in the courtroom.
8          . Mr. Maltz submitted in connection with an
9  application to have this gun suppressed, he wrote, the
10  defendant, who at the time was Mr. Smalls, maintained he has
11 standing to move for this hearing, since the defendant felt,
12 felt, compelled to drop the weapon as a result of the unlawful
13 action conducted by the police. A paragraph later. The
14 defendant maintains the police violated his fourth and
15 fourteenth amendment rights when they chased him inside the
16 building located in Rockaway Beach Boulevard.
17         Now, he tried to tell you -- and I think he was an
18 honest guy on the stand -- he tried to tell you that these
19 statements were made based upon the criminal court complaint.
20 And he admitted he didn't have a great memory of this. This
21 was 2006, 2007. He's a competent criminal defense lawyer.
22 He's had lots of cases since then, but these statements would
23 have been based on the criminal court complaint. There's a
24 couple of problems with that. If you pull up the criminal
25 court complaint -- you are going to have it in evidence. The

1  first thing is this idea of the chase. They chased him inside
2  the building. That's not in the criminal court complaint. He
3  told us he didn't have any other police documents at that
4  time. By this same omnibus motion he was making the
5  application to get the other police documents because he told
6  us he didn't have them. Then Mr. Norinsberg tried to say that
7  was obviously from the indictment. You got more information
8  from the indictment, right? He said, no, actually an
9  indictment doesn't contain more information. It just has the
10 charge and the address of where that arrest took place. So,
11 no, he says, well, you spoke to the DA, right? He said, well,
12 yeah, I mean probably. But when asked by the judge do you
13 actually have an independent recollection of speaking to the
14 DA he said, no. In fact, at this beginning of his affirmation
15 when he listed all the sources of the information upon which
16 this application was based, he lists several different things.
17 The DA is not listed. So that's not in the criminal court
18 complaint.
19         Additionally their idea of tossing the gun, throwing
20 the gun to the ground, that's not in the criminal court
21 complaint either. Plaintiff told you on the stand that he
22 never spoke to Mrs. Maltz, never had any communications with
23 him. Mr. Maltz told you I'm a conscientious lawyer. Of
24 course I had conversations with my client. I would have seen
25 him at several court appearances, would have had conversations

1  at the arraignment. I generally either video conference or
2  will visit a client at Rikers. Certainly he told you I'm not
3  filing court papers without ever having spoken to my client.
4  The idea is simply ridiculous. You have the word felt. If
5  you look at the criminal court complaint there's absolutely
6  nothing in the criminal court complaint about plaintiff's
7  feelings. He was asked questions did plaintiff ever tell you
8  he had the gun? Did plaintiff ever tell you he was chased?
9  And he said no. But then he also told you he doesn't have any
10 independent recollection of what plaintiff said. He says I
11 would have definitely spoken to him. Thirteen years later,
12 no, I don't recall and I no longer maintain my file.
13         But now thirteen years later plaintiff is telling
14 you a totally different story, not that he ran from police,
15 not that he was chased, not that he had the gun, not that he
16 threw the gun as a result of that chase, but he is telling you
17 I was never chased. I never had the gun. I wasn't even
18 there. The whole thing is made up. I was framed. It's a
19 conspiracy. And oh, yeah, according to him, it was a framed
20 conspiracy as to my brothers too.
21         You can't trust anything the plaintiff tells you.
22 The truth here is simple. Officer Collins and Detective Teta
23 heard a gunshot. They saw plaintiff with a gun. They
24 recovered a gun. It was missing one bullet and there was
25 evidence of one shot having been fired. Plaintiff was

1  indicted and he was convicted by a unanimous jury. He got the
2  conviction overturned because an appellate court found that
3  the seizure of the gun was improper and he got lucky. But now
4  he's trying to press that luck, rolling the dice again to see
5  if he can get some money. And you shouldn't give him any.
6  And that's why the answer on the verdict sheet is no to
7  question one. No to liability for Officer Collins. No to
8  liability for Detective Teta.
9          Now, after I sit down, Ms. Joseph is going to have
10 the opportunity to come up here and speak to you again. She's
11 a good speaker. She is good at her job. But when she speaks
12 to you I want you to ask yourselves what I would say if given
13 the chance to respond and I think when you do that you will
14 come to the only appropriate verdict in this case, a verdict
15 of no liability for Officer Collins and Detective Teta.
16         Thank you.
17         THE COURT: Ms. Joseph.
18         MS. JOSEPH: May I proceed, your Honor?
19         THE COURT: Yes.
20         MS. JOSEPH: Opposing counsel just spent a lot of
21 time talking about tricks. Okay, let's talk about tricks.
22 One of the tricks that the defendant likes to use in cases
23 like this, raise the bar really, really high. It wasn't an
24 elaborate conspiracy because the only way they are asking you
25 to find the officers accountable is that you have to believe

1  it was some elaborate conspiracy.  Well, just so we're clear:
2  I do not for one second think there was an elaborate
3  conspiracy.  This was about two defendants, that's it, and the
4  wrong choices they made that evening.  It was not an elaborate
5  conspiracy.  There was no sergeant involved.  There were no
6  other officers involved.  There's no one here in this
7  courtroom to support any of the lies they have told you.  No,
8  it was not a he elaborate conspiracy.  But that's the trick,
9  if you want to talk about tricks, they like to use to distract
10 you and take you off into never, neverland where you will
11 never return and they'll never be held accountable for
12 anything that they did.
13       Let's talk about what happened in this case and what
14 these two defendants did.  Opposing counsel asked you why, why
15 would they do this to Andrew Smalls?  We offered a reason.
16 Two became four.  They had to figure out what to do with the
17 other two.  But make no mistake, they did it and we know they
18 are capable because they did it to Jerome.  One of the reasons
19 we spent so much time on Jerome Nelson's case wasn't just to
20 talk about the injustice done to Jerome but was to give you an
21 example of what they are capable of when it's just the two of
22 them making up facts.  Excuse me.  Did Jerome ever stand with
23 his legs spread open in the hallway obstructing you guys from
24 running up the stairwell that day?  As is written in this
25 complaint, did that ever happen, officer?  No.  That's a made

1  up fact.  They don't have anything personal against Jerome.
2  They don't know Jerome.  They couldn't care less about Jerome.
3  This was not about Jerome and Drew.  This was about choices
4  they made that day because they could.  It shows you what they
5  are capable of.
6       They wrote, deponent, which is Officer Collins,
7  states that when he observed Police Officer Teta attempt to
8  place handcuffs on defendant he observed the defendant flail
9  his arms to prevent being handcuffed.  They used that lie to
10 charge this 16 years old kid with resisting arrest, a made up
11 fact.  Who placed the handcuffs on Jerome?  If it was not
12 either of these two, how could he have observed it?  They have
13 nothing personal against Jerome.  It's a made up fact.  Yes.
14 They always want to turn it into a personal vendetta.  That's
15 the scary part about what happened here.  It was not a
16 personal vendetta.  It was just a choice they had to make.
17       Two became four.  What do we do with these other
18 two?  Do we release them because they didn't do anything?  Or
19 do we find some charges to make them stick?  Unfortunately,
20 for Andrew Smalls they chose option number two.  You know it's
21 so funny opposing counsel went to town on the plaintiff's
22 witnesses that came in here to testify because their stories
23 had to match up perfectly.  These people, most of them who
24 were kids when this happened, came and told you the best of
25 what they could remember.  But when it comes to their

1  officers, oh, no, no, no, they don't have to remember things
2  exactly.  They don't have to remember things exactly.  They
3  don't have to tell the truth.  When they submit a document
4  that they swear to tell the truth under oath, they don't even
5  have to read it.  So, officers with the power to write
6  documents, submit evidence to a prosecutor that could put
7  people in jail, they don't have to read it.  They don't have
8  the check it.  They don't have to make sure it's true, just
9  submit it.  Kids who are remembering to the best of their
10 ability what happened on a particular day, oh, no.  Did he
11 knock on the door?  Did he not knock on the door?  It's a
12 conspiracy.
13       That's the conspiracy they are trying to sell you.
14 It was not a conspiracy.  None of this is a conspiracy.
15 People testify to the best of their ability.  That's fine.
16 These officers they were doing their job.  They were not on a
17 social engagement.  They were doing their job.  They are being
18 paid to do this.  This is not an option.  This is not an a
19 privilege.  This is not a vacation for them.  They were out
20 doing their job.  The paperwork, it's their job.  The
21 paperwork isn't for kicks.  That's how you document what's
22 happened.  That's how you make sure things are consistent.
23       It's so interesting counsel highlights a mistake I
24 made about a pedigree sheet and I let it go.  But every other
25 pedigree sheet they don't even want to bring up.  Whether

1  Andrew Smalls had money or not she wants to spend time on
2  that, as though we're trying to trick you, when on that same
3  pedigree sheet which she refused to show you that Drew was
4  arrested inside of the RBB.  Why ignore that fact?  Why ignore
5  the fact on Cedric's pedigree sheet, their paperwork.  That's
6  how we got Cedric was on the roof.  This was not our
7  conspiracy.  This was not us making up facts to you.  In their
8  own paperwork they said Cedric Smalls was arrested on the
9  roof.  But they want you to ignore that.  Cedric Smalls being
10 arrested on the roof came from their police documents, their
11 official paperwork.  It's not our theory.  That's what they
12 wrote.  They don't want to bring any of that up.
13       It's not, you know, at the end of the day we all
14 agreed on one thing.  If Andrew Smalls was not wearing a black
15 jacket that evening, he's not the guy they arrested on the
16 roof.  Just pure clarity.  Detective Teta agreed with that.
17 And they have come up with every single story under the sun to
18 explain why Andrew Smalls is actually in a gray hoodie and
19 they have no evidence that he was wearing a black jacket.
20       The newest thing they just came up with is there's
21 this procedure now when you take a mug shot you're not
22 supposed to wear a black jacket.  Members of the jury, I don't
23 know what to tell you.  Take a look at Plaintiff's Exhibit 's
24 46 A.  There we have Jerome Nelson wearing the black jacket
25 Detective Teta claims belonged to him.  So right off cuff,

1  right for you another new unsubstantiated, completely untrue
2  claim.  Somehow there is this procedure that you cannot take a
3  mug shot in a black jacket.  This is the very same black
4  jacket Detective Teta claimed that he owned, just tossed it to
5  you because you know what, how are you going to know?  How are
6  you going to know?  They do this so quickly.  If Andrew Smalls
7  was not wearing a black jacket that evening, that was not the
8  individual arrested on the roof and no matter how many tales
9  they spin they cannot get away from this and, again, I don't
10 think it was an elaborate conspiracy.  I think it was clumsy.
11 I think it was hubris.  I think it was arrogance to think you
12 can lie on these children and not be held accountable.  That's
13 what they did.  That's what they did with Jerome and on Andrew
14 Smalls pedigree sheet they lied some more.  They represented
15 he's not wearing the gray hoodie and you've seen it countless
16 times in this case he was and they write in black jacket and
17 that's along with their self-serving testimony is the only
18 evidence that that ever happened, just make it up.
19        Again, it is disturbing to think that they would do
20 that.  It's disturbing to think that they wouldn't be smart
21 enough to think a few steps ahead and say this looks
22 suspicious.  But, you know, when you're dealing with people
23 that you deem to be maybe less than you, maybe powerless, I
24 don't know, maybe you think you can get away with this sort of
25 thing.  Andrew Smalls is not going to have some high-priced

1  attorney represent him picking this apart, his criminal case,
2  living in Hammel Projects.  I'll do what I want and I will
3  come to court and I will spin every tail I can think of to
4  make you believe that he was wearing a black jacket.  Members
5  of the jury, he was wearing a black jacket.  Just look at him.
6  Don't look at the photos.  Don't look at the pedigree sheet.
7  Don't look at all the opportunity I could have had to document
8  this phantom black jacket, just look at my lips and the
9  constant changing claims, again, new procedure, when you take
10 a mug shot you cannot wear a jacket.  But yet we have Jerome
11 Nelson in a black jacket.  They spun that one out there real
12 quick.
13        As far as Andrew Smalls's public defender Mr. Maltz
14 who did the best he could to represent Andrew Smalls, all I
15 have to say is if he didn't assert Andrew Smalls's rights
16 under the fourth amendment, they would have gotten away with
17 everything.  Andrew Smalls would have stayed convicted and he
18 would have never had the trial that he should have had in the
19 first place.
20        You know, they set this thing in motion with their
21 lies.  There were two suspects that day that they were
22 chasing, not four.  But they chose to expand it and then they
23 chose to stick some charges against these kids to justify
24 it.  Now, they want to attack how Andrew Smalls fought to get
25 his freedom back.  So, someone comes and crushes you and

1  drowns you and you're going to stand by and say ah, ah, ah, I
2  have a problem with the way you did that.
3        You know, his public defender did the best he could
4  and that's all I can say about him.  But let's make something
5  clear.  What they were not able to do is tell you that Andrew
6  Smalls from his own mouth ever said that he was in possession
7  of a gun that day.  What they were not able to do is tell you
8  that Andrew Smalls decided I'm going to plead guilty to this
9  charge that I didn't commit.  What they were not able to tell
10 you or show you I should say is that Andrew Smalls wrote on
11 any document ever for the past thirteen years, yeah, I had the
12 gun.  What they were not able to bring in this courtroom was
13 any recording saying Andrew Smalls had the gun, any letter
14 that he wrote to anyone saying that he had the gun because he
15 maintained his innocence and I think in this particular case,
16 again, how it all happened, he was coming down to see about
17 his brothers.  He thought this was just going to be a
18 disagreement with the police.  Over two years later in jail.
19 That's reprehensible.
20        They don't want you to look at the truth and they
21 certainly don't want you looking at their paperwork.  Their
22 defense is we can make as many mistakes as we want and we can
23 make up as many facts as we want, unless you believe it's some
24 elaborate conspiracy, then you can't find in Andrew Smalls's
25 favor and that is simply not true.  More likely than not, was

1  he wearing a black jacket that day?  Think about it.  More
2  likely than not.  Come on.  Because they said so.  No.  Those
3  days got to be over because it says so.  That's what they put
4  in Jerome Nelson's complaint because we said so.  It turned
5  out to be false.  Because we said so is not proof.  The
6  photos, the pedigree sheets, the witness statements, that is
7  evidence.  Again, Andrew Smalls was not wearing a black jacket
8  that day.  He was not the individual they arrested on the
9  roof.  And there's no lie, there is no tail that they can spin
10 that can say otherwise and believe me they tried.
11        I ask that you find in favor of the plaintiff.
12        THE COURT:  All right, ladies and gentlemen, I'm
13 going to exclusive you for the luncheon recess.  Try and be
14 back by two so we can start.
15        I'll let you go now and we'll have my instructions
16 after lunch.
17        (Jury excused.)
18        THE COURT:  See you at two.
19        MS. FUDIM:  One issue.  Ms. Joseph in her closing
20 spoke extensively about the fact that we did not bring in any
21 officers that were on the roof.  We ask that a missing witness
22 charge be added to the instructions that all potential
23 witnesses are available to both parties.
24        THE COURT:  That's not a missing witness charge.
25        MS. FUDIM:  Maybe I have the terminology wrong.  I

1  have seen in prior charges, all potential witnesses are
2  equally available.
3          THE COURT:  Do you want to find an instruction that
4  you would like me to give?
5          MS. FUDIM:  Yes.  I'll find one over the luncheon
  recess and ask that it be given.
6
7          THE COURT:  All right.  I'll look at it.
8          (Lunch recess. )
9
0
1
2
3
4
5
6
7
8
9
0
1
2
3
4
5

1          AFTERNOON SESSION.
2          (In open court; jury not present.)
3          THE COURT:  All right.  Did you have some additional
4  instruction that you wanted the court to give?
5          MS. FUDIM:  I can read it.
6          THE COURT:  You don't have a copy of it.
7          MS. FUDIM:  I don't have a printer.  It's just one
8  paragraph.  It's from a charge that was given in a case in
9  front of Judge Koeltl in the Southern District called Kelvin
10  Santana vs.  The City of New York and here is the language:
11  There are several persons whom you have heard reference to in
12  the course of the trial but who did not appear here to
13  testify.  I instruct you that each party had an equal
14  opportunity or lack of opportunity to call any of these
15  witnesses.  Therefore, you should not draw any inferences or
16  reach any conclusions as to what they would have testified to
17  had they been called.  Their absence should not affect your
18  judgment in any way.
19          THE COURT:  What is the introduction?  Give me the
20  first sentence again.
21          MS. FUDIM:  There are several persons whom you have
22  heard references to in the course of the trial, but who did
23  not appear here to testify.
24          THE COURT:  Does it then begin with I instruct you?
25          MS. FUDIM:  I instruct you that each party had an

1  equal opportunity --
2          THE COURT:  All right.
3          So it would read:  There are several persons who
4  whom you have heard reference to during the course of the
5  trial but who did not appear here to testify.  I instruct you
6  that each party had an equal opportunity or lack of
7  opportunity to call any of these witnesses.  Therefore, you
8  should not draw any inferences or reach any conclusions as to
9  what they would have testified -- to what they would have
0  testified had they been called.  Their absence should not
1  affect your judgment in any way.
2          MS. FUDIM:  Yes, your Honor.
3          THE COURT:  So you are requesting that instruction?
4          MS. FUDIM:  Yes, your Honor.
5          THE COURT:  All right.
6          There's also another instruction that I will have to
7  give and it deals with the audio run.  The audio run, we don't
8  have equipment for them to listen to that in the jury room.
9  So I'm going to tell them we'll send in all an exhibits with
0  the exception of the audio run and if they want to hear it
1  they should just send me a note and they can come back out
2  here and I'll play it.
3          Have you gotten your exhibits together?
4          MR. FRANCOLLA:  Doing it right now, your Honor.
5          THE COURT:  Because I'm going to require that you

1  each get your exhibits together, that you examine each other's
2  exhibits before they go back to the jury room so that everyone
3  is on the same page, that everything that is going back is in
4  evidence.
5          (Pause.)
6          (Jury present.)
7          THE COURT:  All right.  Please be seated.
8          Ladies and gentlemen of the jury, now that you have
9  heard all the evidence in the case, as well as the arguments
10  of lawyers, it is my duty to give you instructions as to the
11  law applicable in this case.  My instructions will be in three
12  parts.  First, I'll give you instructions regarding the
13  general rules that define and govern the duties of a jury in a
14  civil case such as this.  Second, I will instruct you on the
15  legal elements of plaintiff's claim; and, third, I will give
16  you some general rules regarding your deliberations.
17          Let me start by restating our respective roles as
18  the judge and jury.  Your duty as I mentioned in my opening
19  statements is to find the facts from all the evidence in this
20  case.  You are the sole judges of the facts and it is for you
21  and you alone to determine what weight to give to the
22  evidence, to resolve such conflicts as may have appeared in
23  the evidence and to draw such inferences as you deem to be
24  reasonable and warranted from the evidence.  My job is to
25  instruct you on the law.  It is your duty to follow the law as

1   I state it and to apply the law to the facts as you find them
2   from the evidence presented.  You should not be concerned
3   about the wisdom of any rule of law that I state regardless of
4   any opinion that you may have about what the law may be or
5   should be.  It would be a violation of your oaths as jurors to
6   base your verdict upon any other view of the law other than
7   that which I give to you in these instructions.

8           If any of the lawyers has stated a legal principle
9   that differs from any that I state to you in my instructions
0   you must be guided solely by what I instruct you about the law
1   and you should not single out any instruction alone as stating
2   the law.  You should consider these instructions as a whole
3   when you retire to deliberate in the jury room.  In charging
4   you on the applicable law let me be clear:  I am expressing no
5   opinion about how you should decide the facts of this case.
6   Nothing that I have said or done in the course of the trial
7   should be taken by you as expressing any opinion about the
8   facts.

9           On occasion I may have asked a question of a
0   witness.  You should attach no special significance to these
1   because they were asked by the court.  It is your function,
2   not mine, to determine the facts.  Under your oaths as jurors
3   you must be guided solely by the evidence presented during the
4   trial without regard to the consequences of your decision.
5   You must perform your duties as jurors without bias or

1   prejudice as to any party.  The law does not permit you to be
2   governed by sympathy, prejudice or public opinion.  All
3   parties expect that you will carefully and impartially
4   consider all the evidence, follow the law as it is now being
5   given to you and reach a just verdict regardless of
6   consequences.  All persons and entities are equal before the
7   law.

8           Now, the plaintiff Andrew Smalls has brought claims
9   against two defendants, Richard Collins and David Teta.  In
10  reaching your verdict you are to consider whether the
11  plaintiff has satisfied his burden of proof with respect to
12  each of the defendants individually.  That is, you could find
13  that the plaintiff has proven his case by a preponderance of
14  the evidence with respect to one defendant but not with
15  respect to the other.  Your verdict as to each defendant must
16  be determined separately with respect to that defendant solely
17  on the evidence or lack of evidence presented against that
18  defendant.

19          Your verdict in this case must be based only on the
20  evidence.  The evidence upon which you are to decide the facts
21  of this case comes in several forms.  First, the sworn
22  testimony of witnesses both on direct and cross-examination
23  and regardless of who called the witness.  Second, exhibits
24  that have been received in evidence by the court.  Third, any
25  fact the court may have instructed on you accept as true.

1   Fourth, any facts as to which all the parties have stipulated
2   you must consider those facts as true.

3           Now, certain things are not evidence and must be
4   disregarded by you in deciding the facts.  Arguments, remarks,
5   questions and objections by attorneys are not evidence.
6   Anything said or done by the court is not evidence.  Obviously
7   anything you may have seen or heard outside the courtroom is
8   not evidence.  Any evidence ordered stricken by the court must
9   be entirely disregarded by you in your deliberations.

0           There are generally speaking two types of evidence
1   from which you may properly determine the facts, direct
2   evidence and circumstantial evidence.  You may use both types
3   of evidence in reaching your verdict in this case.  The law
4   makes no distinction between direct and circumstantial
5   evidence.  Instead it requires simply that you base your
6   verdict on a reasonable assessment of all the evidence in the
7   case.

8           Direct evidence is testimony from a witness about
9   something he or she knows by virtue of his or her own senses,
0   something he or she has seen, felt, touched, tasted or heard.
1   The other type of evidence, circumstantial evidence, is a
2   proof of a chain of circumstances that point to the existence
3   or nonexistence of certain facts.

4           Now, a simple example would be the following:  You
5   come to court on a day when the weather is clear and dry.

1   After some hours in the courtroom a person enters through the
2   rear door wearing a raincoat and shaking a wet umbrella.
3   Without ever having looked outside you might infer from these
4   circumstances that while you were sitting in court it had
5   rained outdoors.  In a trial you are permitted to draw from
6   the facts as you find them to have been proved such reasonable
7   inferences as would be justified in light of your experience,
8   inferences or deductions or conclusions that reason and common
9   sense lead you the jury to draw from the facts that have been
10  established by the evidence in the case.  You your use your
11  common sense in drawing inferences, however, you are not
12  permitted to engage in mere guesswork or speculation.

13          Now, there are several persons whom you have heard
14  reference to during the course of the trial but who did not
15  appear here to testify.  I instruct you that each party had an
16  equal opportunity or lack of opportunity to call any of these
17  witnesses.  Therefore, you should not draw any inferences or
18  reach any conclusions as to what they would have testified had
19  they been called.  Their absence should not affect your
20  judgment in any way.

21          Now, in deciding what the facts are in this case you
22  must consider all the evidence that has been offered.  In
23  doing this you must decide which testimony to believe and
24  which testimony not to believe.  You are the sole judges of
25  the credibility of the witnesses and the weight their

1  testimony deserves.  You should carefully scrutinize all of
2  the testimony given, the circumstances under which each
3  witness testified and every matter in evidence that tends to
4  show whether a witness is worthy of belief.  Your decision
5  whether or not to believe a witness may depend on how that
6  witness addressed you.  Consider each witness' appearance,
7  conduct, intelligence, motive, state of mind, demeanor and
8  manner on the stand.  Was the witness candid and forthright?
9  Did the witness seem as if he or she was hiding something or
0  being evasive or suspect in some way?  How did the way the
1  witness testified on direct examination compare with how the
2  witness testified on cross-examination?  Was the witness
3  consistent in his or her testimony or did the witness
4  contradict himself or herself?  Did the witness appear to know
5  what he or she was talking about and strike you as someone
6  trying to report his or her knowledge accurately?
7           In addition, you may consider whether a witness had
8  any possible bias, any relationship to a party, any motive to
9  testify falsely or any possible interest in the outcome of the
0  case?  Such a bias or relationship does not necessarily make
1  the witness unworthy of belief.  They are just simply factors
2  you may consider.  Inconsistencies or discrepancies in the
3  testimony of a witness or between the testimony of different
4  witnesses may or may not cause you to discredit such
5  testimony.  In weighing the effect of such a discrepancy you

Anthony M. Mancuso, CSR    Official Court Reporter

1  should consider whether it pertains to a matter of importance
2  or to an unimportant detail and whether that discrepancy
3  results from an innocent error or an intentional falsehood.
4  If you find that any witness has willfully testified falsely
5  as to any material fact, the law permits you to disregard
6  completely the entire testimony of that witness upon the
7  principle that one who testified falsely about one material
8  fact is quite likely to testify falsely about everything.  You
9  are not required, however, to consider such a witness as
10 totally unworthy of belief.  You may accept so much of the
11 testimony as you deem true and disregard what you feel is
12 false.
13          By these processes which I've just described you the
14 jury, as the sole judges of the facts determine which of the
15 witnesses you will believe and what testimony you accept and
16 what weight you will give to it.
17          Now, the plaintiff Andrew Smalls has testified
18 before you as have the defendants, Richard Collins and David
19 Teta.  As parties to the action both plaintiff and defendants
20 are known as interested witnesses.  An interested witness is
21 not necessarily less believable than a disinterested witness.
22 The fact that each is interested in the outcome of the case
23 does not mean that he has not told the truth.  It is for you
24 to decide from the demeanor of the witness on the stand and
25 such other tests as your experience dictates whether or not

Anthony M. Mancuso, CSR    Official Court Reporter

1  the testimony has been influenced intentionally or
2  unintentionally by his interest in the outcome of the case.
3  You may, if you consider it proper, under all the
4  circumstances not believe the testimony of such a witness even
5  though it is not otherwise challenged or contradicted.
6  However, you are not required to reject the testimony of such
7  a witness and may accept all or such part of his testimony as
8  you find reliable and reject such part as you find unworthy of
9  acceptance.
0           Now, you have heard testimony from law enforcement
1  officers.  The fact that a witness may be employed by the
2  government as a law enforcement official does not mean that
3  his testimony is deserving of more or less consideration or
4  greater or lesser weight than that of an ordinary witness.  It
5  is for you to decide after weighing all the evidence and in
6  light of the instructions I've given you about the factors
7  relevant to determining the credibility of any witness whether
8  to accept the testimony of a law enforcement witness and what
9  weight if any it deserves.
0           Now, let me talk about the burden of proof.  In a
1  civil action such as this the burden of proof is on the
2  plaintiff Andrew Smalls to prove every essential element of
3  his claim by proof -- excuse me -- by a preponderance of the
4  evidence.  Proof beyond a reasonable doubt is a criminal case.
5  The burden here, as I've said, is by a preponderance of the

Anthony M. Mancuso, CSR    Official Court Reporter

1  evidence.  If the proof fails to establish any essential
2  element of the plaintiff's claim by a preponderance of the
3  evidence the jury should find for the defendants.
4           Now, to establish something by a preponderance of
5  the evidence means to prove that it is more likely so than
6  not.  In other words, a preponderance of the evidence means
7  such evidence that when considered and compared with the
8  evidence opposed to it produces in your minds the belief that
9  what is sought to be proved is more likely to be true than not
10 true.  A preponderance of the evidence means the greater
11 weight of the evidence.  The greater weight of the evidence
12 does not mean the greater number of witnesses or greater
13 length of time taken by either side, but which witnesses and
14 evidence appeal to your mind as being most accurate and
15 trustworthy.  If you find that the credible evidence on a
16 given issue is in balance or evenly decided by the parties or
17 that the evidence produced by the party having the burden of
18 proof is outweighed by the evidence against his claim, then
19 you must decide the issue against the party having the burden
20 of proof.  That is because the party bearing the burden must
21 prove more than simple equality of the evidence.  He must
22 prove the element at issue by a preponderance of the evidence.
23 On the other hand, the party with the burden of proof need
24 prove no more than a preponderance.  So as long as you find
25 the scales tip, however slightly, in favor of that party, that

Anthony M. Mancuso, CSR    Official Court Reporter

1  what he claims is more likely true than not true, then the
2  element will have been proved by a preponderance of the
3  evidence.
4        Now, some of you have heard of proof beyond a
5  reasonable doubt, which is the proper standard of proof in a
6  criminal trial.  That's what I said a moment ago when I
7  misspoke.  However, a plaintiff in a civil case does not have
8  that requirement and, therefore, you should put that burden of
9  proof out of your minds.
0        I will now turn to the second part of this charge
1  and instruct you on the legal elements of plaintiff's claim.
2        In this case plaintiff Andrew Smalls, whom I refer
3  to simply as the plaintiff from now on, brings his claim under
4  or statute known as Section 1983 of Title 42 of the United
5  States Code.  Section 1983 states in relevant part:  Every
6  person who under color of any statute, ordinance, regulation,
7  custom or usage of any state or territory, subjects or causes
8  to be subjected any citizen of the United States to the
9  deprivation of any rights, privileges or immunities, secured
0  by the constitution and laws, shall be liable to that party
1  injured in an action at law.
2        So, section 1983 creates a federal remedy for
3  persons who have been deprived by state officials of the
4  rights, privileges and immunities secured by the United States
5  Constitution and federal statutes.

1        In order to prove a claim under Section 1983 the
2  plaintiff must establish by a preponderance of the evidence
3  each of the following elements:  First, that the conduct
4  complained of was committed by a person acting under color of
5  state law;
6        Second, that this conduct deprived the plaintiff of
7  rights, privileges and immunities secured by the constitution
8  or laws of the United States; and
9        Third, that the defendants' acts were the proximate
0  cause of the injuries and consequent damages sustained by the
1  plaintiff
2        If you find that the plaintiff has proven all three
3  elements by a preponderance of the evidence with respect to a
4  particular defendant you should find that defendant liable.
5  If you find the plaintiff has not proven any one of these
6  elements with respect to a particular defendant you are
7  considering then you must find that defendant not liable and
8  return a verdict for him
9        Remember that the case as to each of these
0  individual defendants must be considered separately.  The fact
1  that you find one of the defendants is or is not liable does
2  not determine your verdict as to the other defendant
3        Now, I'm going to explain to you a little bit more
4  about the three elements that I have just mentioned
5        First, under color of state law.  In this case it is

1  not disputed that at the time of the events the defendants
2  were acting in their official capacity as New York City Police
3  Officers and, therefore, were acting under color of state law.
4  Accordingly, you need not consider whether this first element
5  of a section 1983 claim is established in this case.  The
6  parties agree that it is
7        Now, the second element that has to be established
8  is the deprivation of a constitutional right.  In order for
9  the plaintiff to establish the second element he must show the
0  following by a preponderance of the evidence:  First, that the
1  defendants committed the acts alleged by the plaintiff;
2  second, that those acts caused the plaintiff to suffer the
3  loss of a constitutional right; third, that in performing the
4  acts alleged defendant did so intentionally or recklessly
5        Again, you must consider the evidence against each
6  defendant individually.  Each defendant is entitled to a fair,
7  separate and individual consideration without regard to your
8  decision as to the other defendant
9        I will now review the constitutional violation
0  claims by the plaintiff and instruct you on the law with
1  regard to the alleged violation.  There is one alleged
2  constitutional violation at issue in this case and that is
3  that the defendant officers deprived plaintiff of his right to
4  a fair trial by fabricating evidence against him that he
5  possessed a firearm.  I will now instruct you on the governing

1  law.  The first thing for you to determine is whether the
2  defendants committed the acts alleged by plaintiff.  If you
3  find that the plaintiff failed to prove by a preponderance of
4  the evidence that the defendants committed the acts as alleged
5  by plaintiff, you must find in favor of the defendants.  If
6  you determine that a defendant committed the acts as alleged
7  by plaintiff, you must next determine whether that act caused
8  plaintiff to suffer the loss of a constitutional right.  Under
9  the constitution every person has the right to a fair trial.
0  In this case plaintiff alleges that he was deprived of his
1  right to a fair trial because defendants fabricated evidence
2  against him.
3        To prove a violation of this right plaintiff must
4  prove by a preponderance of the evidence each of the following
5  elements:  First, that defendants fabricated evidence; second,
6  that the evidence was likely to influence the jury's verdict;
7  third that the defendants forwarded the evidence to
8  prosecutors and or the grand jury and, fourth, the defendant
9  suffered a deprivation of liberty as a result.  Evidence is
0  fabricated if it's false.  A document is false if it is untrue
1  when made and was known to be untrue when made by the person
2  making it or causing it to be made.  Fabricated evidence
3  includes an officer's false accounts of his own observations
4  of alleged criminal activity which led to an arrest.
5        Paperwork errors or mere mistakes, a mere mistake or

1  mistakes, by a police officer in making a written record is
2  not a basis for finding a constitutional violation.
3  Similarly, an officer's opinions, conclusions or qualitative
4  assessments are not a basis for finding a constitutional
5  violation
6          The manufacture of false evidence in and of itself
7  does not impair anyone's liberty.  In order to find for
8  plaintiff you must find that the alleged fabrication was both
9  material, that is likely to influence a jury's decision, and
0  the proximate cause of the injury to plaintiff's liberty
1  interest, i.e., that he suffered a deprivation of liberty as a
2  result of the alleged fabrication of evidence.  In the context
3  of a fair trial claim a person may suffer a liberty
4  deprivation when he faces trial, is convicted or is
5  imprisoned.  If you find that the plaintiff has met his burden
6  of establishing by a preponderance of the evidence that he
7  suffered the loss of any constitutional rights as a result of
8  some action or action of one of the defendants, then you must
9  determine whether the plaintiff has shown that those
0  defendants acted intentionally or recklessly by depriving him
1  of that right or rights.
2          An act is intentional if it is done knowingly, that
3  is, if it is done voluntarily or deliberately and not because
4  of mistake, accident or negligence.  An act is done recklessly
5  if it is done in conscious disregard of its known probable

1  consequences.  As a matter of law, it is not necessary to find
2  that any of the defendants had a specific intent to deprive
3  the plaintiff of his constitutional rights.  Rather, the
4  defendants need only to have intended to commit that
5  particular act or acts that resulted in a violation of
6  plaintiff's constitutional rights
7          If you find that the defendants were acting
8  intentionally or recklessly in committing the acts then that
9  standard is met.  To reiterate, you need not find that the
10  defendants intentionally violated plaintiff's constitutional
11  rights but simply that the defendants intended to commit the
12  acts which resulted in the alleged constitutional violation in
13  order to satisfy this requirement.
14          To summarize, plaintiff has alleged a 1983 claim,
15  which means that he must prove three elements all by a
16  preponderance of the evidence.  I have discussed two of these
17  elements with you so far.  First, that each of the defendants
18  took some action against him under color of state law, which
19  the parties agree is established in this case.  Second, that
20  those actions deprived him of a federal right.  Remember to
21  prove the second element plaintiff must prove again by a
22  preponderance of the evidence that first the defendants
23  committed the alleged act; second, that the defendants' action
24  deprived plaintiff of a federal right; and, third that the
25  defendant or defendants acted intentionally or recklessly.

1          I will now talk to you about the last element which
2  is what we call proximate cause.  If you find that the
3  plaintiff has proven that he has been deprived of one of the
4  federal rights that I have just described, the plaintiff must
5  then establish the last element of the claim under Section
6  1983.  That is, he must prove by a preponderance of the
7  evidence that defendants' acts were a proximate cause of any
8  injuries that he sustained.  I will now explain what proximate
9  cause is.  Proximate cause means that there must be a
0  sufficient causal connection between the act of a defendant
1  and any injury or damage sustained by the plaintiff.  An act
2  is a proximate cause if it was a substantial factor in
3  bringing about or actually causing the alleged injury, that
4  is, if the injury or damage was a reasonably foreseeable
5  consequence of the defendants' act.  If an injury was a direct
6  result of or a reasonably probable consequence of a
7  defendant's act, it was approximately caused by such act.  In
8  other words, if a defendant's act had such an effect in
9  producing an injury that reasonable persons would regard it as
0  being the cause of that injury, then the act is a proximate
1  cause.
2          In order to recover damages for any injury plaintiff
3  must show by a preponderance of the evidence that such injury
4  would not have occurred without the conduct of the defendants.
5  A proximate cause need not always be the nearest cause either

1  in time or space.  In addition, there may be more than one
2  proximate cause of an injury.  Many factors for the conduct of
3  two or more people may operate at the same time either
4  independently or together to cause an injury
5          If you find that plaintiff has proven by a
6  preponderance of the evidence the elements of one or more of
7  his 1983 claims, you must also determine the damages to which
8  the plaintiff is entitled.  You should not infer that the
9  plaintiff is entitled to damages merely because I'm
10  instructing you on how to award damages.
11          You must decide liability first.  I'm instructing
12  you on damages only so that you will have guidance, should you
13  decide that the plaintiff is entitled to recovery.  The burden
14  of proving damages rests with the plaintiff.  In this case,
15  the parties have stipulated that plaintiff served a total of
16  two years, one month and fourteen days in jail as a result of
17  being charged with the criminal possession of a gun.
18          Now, before I define the types of damages you may
19  award I want to discuss how you should address the fact that
20  in this case there are multiple defendants.  You must be
21  careful to impose any damages that you may award on the claims
22  solely upon the defendant or defendants who you find liable on
23  that claim.  Although there are two defendants in this case it
24  does not follow that if one is liable the other is liable as
25  well.  Each defendant is entitled to fair, separate and

1   individual consideration of the case without regard to your
2   decision as to the other defendants.  If you find that only
3   one defendant is responsible for a particular injury, then you
4   must impose damages for that injury only upon that defendant
5           Nevertheless, you might find that more than one
6   defendant is liable for a particular injury.  If two or more
7   persons unite in an intentional act that violates another
8   person's rights then all of those persons are jointly liable
9   for the act of each of them.  The law does not require the
0   injured party to establish how much of the injury done by each
1   particular defendant you find liable.  Thus, if you find that
2   the defendants who you find to be liable acted jointly, then
3   you may treat them jointly for the purposes of deciding
4   damages.  If you decide that more than one defendant is
5   jointly liable on the claim, then you may simply determine the
6   overall amount of damages for which they are liable without
7   breaking the figure down into individual percentages
8           Now, the purpose of the law of damages is to award
9   as far as possible just and fair compensation for the loss, if
0   any, which resulted from the defendants' violation of the
1   plaintiff's rights.  If you find that the defendants are
2   liable on plaintiff's claim, as I've explained it, then you
3   must award the plaintiff sufficient damages to compensate him
4   for any injury approximately caused by defendant's conduct.
5   These are known as compensatory damages.  Compensatory damages

1   seek to make the plaintiff whole, that is, to compensate him
2   for damage suffered.  A prevailing plaintiff is entitled to
3   compensatory damages for pain and suffering, mental anguish,
4   shock and discomfort that he suffered because of the
5   defendants' conduct.
6           I remind you that you may award compensatory damages
7   only for injuries that a plaintiff proves were approximately
8   caused by a defendant's allegedly wrongful conduct, that is,
9   you may not simply award damages for any injury suffered by
10  the plaintiff.  You must award damages only for those injuries
11  that are the approximate result of a defendant's violation of
12  the plaintiff's rights.  The damages you award must be fair
13  and reasonable, neither inadequate or excessive.  You should
14  not award compensatory damages for speculative injuries but
15  only for those injuries that the plaintiff has actually
16  suffered or is reasonably likely to suffer in the near future.
17  Compensatory damages must not be based on speculation or
18  sympathy but on the evidence presented at trial
19          In awarding compensatory damages, if you decide to
20  award them, you must be guided by dispassionate common sense.
21  Computing damages may be difficult but you must not let that
22  difficulty lead you to engage in arbitrary guesswork.  On the
23  other hand, the law does not require a plaintiff to prove the
24  amount of his damages with mathematical precision but only
25  with as much definiteness and accuracy as the circumstances

1   permit.  In all instances you are to use sound discretion in
2   fixing an award of damages, drawing reasonable inferences
3   where you deem appropriate from the facts and circumstances
4   and evidence.
5           If you award any damages to the plaintiff you should
6   not take into consideration the fees that the plaintiff may
7   have to pay to his attorneys.  Whether or not you award
8   plaintiff compensatory damages, you may also in your
9   discretion make an award for punitive damages.  Punitive
0   damages are awarded in the discretion of the jury to punish a
1   defendant for extreme or outrageous conduct, or to deter or
2   prevent a defendant and others like him from committing such
3   conduct in the future
4           You may award the plaintiff punitive damages if you
5   find that the acts of a defendant were done maliciously or
6   wantonly.  An act is malicious if it is prompted by ill will
7   or spite toward the injured person.  An act is wanton if done
8   with a reckless or callous disregard for the rights of the
9   injured person.  The plaintiff has the burden of proving by a
0   preponderance of the evidence that a defendant acted
1   maliciously or wantonly with regard to the plaintiff's rights.
2   If you find by a preponderance of the evidence that a
3   defendant acted with malicious intent to violate the
4   plaintiff's rights or unlawfully injure him or if you find
5   that a defendant acted with a callous or reckless disregard of

1   the plaintiff's rights then you may award punitive damages.
2   An award of punitive damages, however, is discretionary.  That
3   is, if you find that the legal requirements for punitive
4   damages are satisfied, then you may decide to award punitive
5   damages or you may not decide to award them.  In making this
6   decision you should consider the underlying purpose of
7   punitive damages.  Punitive damages are awarded in the jury's
8   discretion to punish a defendant for outrageous conduct or to
9   deter him and others like him from performing similar conduct
10  in the future.  Thus, in deciding whether to award punitive
11  damages you can consider whether the defendant may be
12  adequately punished by an award of compensatory damages only
13  or whether the conduct is so extreme or outrageous that
14  compensatory damages are inadequate to punish the wrongful
15  conduct.
16          You should also consider whether compensatory
17  damages standing alone are likely to deter or prevent the
18  defendant from similar wrongful conduct in the future, if in
19  fact wrongful, or whether punitive damages are necessary to
20  provide deterrence.  Finally, you should consider whether
21  punitive damages are likely to deter or prevent other persons
22  from performing wrongful acts similar to those the defendant
23  may have committed.
24          If you decide to award punitive damages, these same
25  purposes should be kept in mind as you determine the

1  appropriate sum of money to be awarded as punitive damage,
2  that is, in fixing the sum to be awarded you should consider
3  the degree to which the defendant should be punished for his
4  wrongful facts and the degree to which an award of one sum or
5  another will deter the defendant or persons like him from
6  committing wrongful acts in the future.

7        Well, I have now outlined for you the rules of law
8  applicable to this case and the procedures by which you should
9  weigh the evidence and determine the facts.  In a few minutes
0  you will retire to the jury room for your deliberation.  I
1  want to now give you some general instructions regarding your
2  deliberations.  Keep in mind that nothing I have said in these
3  instructions is intended to suggest to you in any way what I
4  think your verdict should be.  That is entirely for you to
5  decide.

6        By way of a reminder, I charge you once again that
7  it is your responsibility to judge the facts in this case from
8  the evidence presented during the trial and to apply the law
9  as I've given I it to you.  Remember also that your verdict
0  must be based solely on the evidence in this case and the law
1  I have given to you and on nothing else.
2        Now, in order for your deliberation to proceed in an
3  orderly fashion you must have a foreperson.  Now the custom in
4  this courthouse is that Juror No. One acts as the foreperson.
5  If however Juror No. One does not wish to serve as foreperson,

1  when you go to the jury room to begin considering the evidence
2  in this case, I suggest that you first elect another member of
3  the jury to act as your foreperson.  In order that your
4  deliberations may proceed in an orderly fashion you must have
5  a foreperson, but of course his or her vote is not entitled to
6  any greater weight than any other juror.  It is very important
7  that you not communicate with anyone outside the jury room
8  about your deliberations or about anything else touching on
9  this case.  There is only one exception to this rule.  If it
10 becomes necessary during your deliberations to communicate
11 with me, you may send me a note through the marshals signed by
12 the foreperson.  No member of the jury should attempt to
13 communicate with the court except by a signed writing and I
14 will never communicate with any member of the jury on any
15 subject touching on the merits of this case other than in
16 writing or orally here in open court.
17       Your recollection of the evidence governs, no one
18 else's.  I will send in all the exhibits received in evidence
19 for you to have during your deliberations, with the exception
20 of that radio run.  If you wish to hear the radio run, just
21 send me a note and I'll bring you back in court to listen to
22 it.  If you wish to have any portion of the testimony
23 repeated, you may simply indicate that in a note.  I will also
24 provide you with a copy of my jury instructions.  You must
25 consider the instructions as a whole and not single out any

1  one instruction as stating the law.  If you need further
2  instructions on any point send me a note.  You know, your
3  function is to reach a fair conclusion from the law and the
4  evidence and it's an important one.  You've verdict must be
5  unanimous.  That means you must all agree.  When you are in
6  the jury room listen to each other and discuss the evidence
7  and issues in the case among yourselves.  It is the duty of
8  each of you as jurors to consult with one another and to
9  deliberate with a view to reaching an agreement on a verdict,
0  if you can do so without violating your individual judgments
1  and your conscience, although you should not surrender the
2  your conscientious conviction of what the truth is and the
3  weight and effect of the evidence and although each of you
4  must decide the case for yourselves and not merely acquiesce
5  in the conclusion of your fellow jurors, you should examine
6  the issues and the evidence before you with candor and
7  frankness and with proper deference to and regard of the
8  opinions of each other.
9        Remember in your deliberations the dispute between
0  these parties is for them no passing matter.  They and the
1  court rely upon you to give full and conscientious
2  deliberation and consideration to the issues and evidence
3  before you.  When you have reached a verdict send me a note
4  signed by your foreperson that you have reached a verdict.  Do
5  not indicate what the verdict is.  In no communication with

1  the court should you give a numerical count of where the jury
2  stand in its deliberations.
3        I have prepared a verdict sheet for you to use in
4  recording your decision and I'm going to have my law clerk
5  hand you copies of that so we can just go over the verdict
6  sheet.  This is to assist you in rendering a verdict.  There's
7  just a little introduction that says your verdict in this case
8  will be determined by your answers to the following questions.
9  Make sure that you read the questions and notes carefully
10 because they explain the order in which the questions should
11 be answered and which questions may be skipped.  Your general
12 verdict and your answers to the special questions must be
13 unanimous.
14       So, the first question is:  Do you find by a
15 preponderance of the evidence that any of the defendants
16 deprived plaintiff of the right to a fair trial by fabricating
17 evidence?
18       If your answer is no to both Mr. Collins and
19 Mr. Teta, that is the end of your deliberations.  If it is yes
20 to either Mr. Collins or Mr. Teta, then you have to go to
21 question number two.  Question number two says and this is --
22 the first question is the liability question -- if you find
23 liability as to either Collins or Teta then you go to question
24 two and that is:  State the amount of compensatory damage the
25 plaintiff has proven by a preponderance of the evidence that

1   he is entitled to as a result of being deprived of a right to
2   fair trial by one or more defendants.  In that case, that is
3   the damage question.
4           Then you proceed from that question to question
5   three and question three deals with the law that I gave you
6   about punitive damages and that is asking whether you find
7   either defendant acted with malicious intent to violate
8   plaintiff's rights or with reckless disregard of plaintiff's
9   rights such that plaintiff is entitled to punitive damages.
0           If you answer yes to a given defendant then you
1   would go to question four, which would ask you about the
2   amount of punitive damages with regard to that defendant.  If
3   you answer no to both, then obviously you don't go to question
4   four.
5           Let me just talk to the parties at sidebar for a
6   moment.  You can pass the verdict sheets in.
7           (Sidebar.)
8           THE COURT:  Are there any objections to the charge
9   from the plaintiff?
0           MR. NORINSBERG:  No, your Honor.
1           THE COURT:  Any objections from the defendant?
2           MS. FUDIM:  No, your Honor.
3           THE COURT:  You might note in a couple of places I
4   made editorial changes as I was going along, like claim as
5   opposed to claims, that sort of thing.  I'll make those minor

1   changes when it is sent back to the jury.
2           You have your exhibits together?
3           MR. FRANCOLLA:  Yes.
4           THE COURT:  Have you looked at them?
5           MR. FRANCOLLA:  Yes, your Honor.
6           (In open court.)
7           THE COURT:  All right.  Ladies and gentlemen, what
8   we are going to do is we're going to get together all of the
9   exhibits for you and I will send them back once they are
10  together and the instructions and give you a copy of the
11  verdict sheet as well.  But I'm now going to excuse you to
12  begin your deliberations.  So you can begin your deliberations
13  now and we'll get that material together for you and send them
14  in.  Excuse me.
15          (Marshal sworn.)
16          THE COURT:  All right.  I'll ask the marshal to
17  escort the jurors back to the jury room.
18          Thank you.
19          (The jury retired to begin their deliberations at
20  3:00 p.m.)
21          THE COURT:  All right.  So I'll ask the parties to
22  get their exhibits together and to give them to my courtroom
23  deputy for the purposes of giving them to the marshal to give
24  to the jury.  I'll assume, if I don't hear anything from you,
25  that you have -- I want you to look at each other's exhibits.

1   I don't want there to be any question.  I'll assume if
2   exhibits are given to the jury that whole process has taken
3   place.
4           (Court in recess, way waiting the verdict of the
5   jury.)
6           (In open court; jury not present.)
7           THE COURT:  All right.  We have the jury's note.  It
8   says we want to hear the radio transmission between Police
9   Officer Collins and the dispatcher.  Do you have that ready to
0   go?
1           MR. FRANCOLLA:  Yes, your Honor.
2           THE COURT:  How long is it?
3           MR. FRANCOLLA:  Eleven minutes.
4           (The jury entered the courtroom with a question at
5   3:30 p.m.)
6           THE COURT:  Please be seated.
7           We have your note that we want to hear the radio
8   transmission between Police Officer Collins and the
9   dispatcher.  We're prepared to play that.  I think it's about
0   how many minutes?
1           MR. NORINSBERG:  Eleven minutes.
2           THE COURT:  As you know, there was some dead space.
3   We'll have to listen to that as well.
4           Play it, please.
5           (Tape plays.)

1           (Tape stops.)
2           MR. NORINSBERG:  That concludes he audio, your
3   Honor.
4           THE COURT:  Ladies and gentlemen, you are excused to
5   continue your deliberations.
6           (The jury retired to continue their deliberations.)
7           (Court in recess, awaiting the verdict of the
8   jury.)
9           (In open court; jury not present.)
10          THE COURT:  We have two notes from the jury, copies
11  of which have been given to the parties.  The jury wants a
12  series of questions answered, but they want to reconvene
13  tomorrow to do that.  They want a readback of William Davis,
14  Jerome they put C, Lindsey Johnson, Andrew's pedigree card.
15  Those are what they want.
16          MR. NORINSBERG:  With respect to the last one, they
17  located the card.  Inadvertently it was not put in with the
18  exhibits and that can be furnished to them now.  It was an
19  oversight.
20          THE COURT:  Okay.
21          THE CLERK:  Shall I do that now?
22          THE COURT:  Bring the jury in.
23          (Jury present.)
24          THE COURT:  Ladies and gentlemen, be seated for a
25  moment.  I have your question for the testimony of William

100

1  Davis, Jerome you wrote C, Lindsey Johnson, Andrew's pedigree
2  card.  That was meant to be sent back to you.  That
3  inadvertedly was not put in the pile.  We'll get all of this
4  material for you and begin promptly at 9:30 tomorrow morning
5  with the readback of the testimony.  We'll also get the card
6  to you.  So I'm to excuse you with the admonition not to
7  discuss in case with anyone.  Indeed, don't begin discussing
8  it among yourselves until everybody is back in the jury room.
9  So it's very important to have all eight of you there before
0  anybody continues the discussion and, as I say, first thing
1  we'll bring you out and read the testimony back.  So you are
2  excused for the evening.  Have a nice evening.
3         A JUROR:  Do you want the documents, to leave them
4  here or in the jury room?
5         THE COURT:  In the jury room.  We'll lock the jury
6  room door.
7         (Jury excused.)
8         THE COURT:  Just be here at 9:30 sharp and we'll
9  start with the readbacks.  The court reporter is going to have
0  to read it back from his notes because no one ordered the
1  transcript.
2         See you then.
3         (Case adjourned to Friday, May 17, 2019 at 9:30
4  a.m.)
5

Anthony M. Mancuso, CSR    Official Court Reporter

---

1

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

 3  - - - - - - - - - - - - - - - X
                                  :   14-CV-02326
 4  ANDREW SMALLS,

 5                                :

 6                    Plaintiff,  :

 7        V.                      :   U.S. Courthouse
                                      Brooklyn, New York
 8  POLICE OFFICER RICHARD COLLINS :
    and POLICE OFFICER DAVID TETA,

10              Defendants.       :

11                                :   May 17, 2019
                                  :   9:30 o'clock a.m.
12                                :

13  - - - - - - - - - - - - - - - X

14             TRANSCRIPT OF TRIAL
               BEFORE THE HONORABLE CAROL B. AMON
15             UNITED STATES DISTRICT JUDGE and a jury

16
    APPEARANCES:
17
    For the Plaintiff:          JOHN NORINSBERG, ESQ.
18                               JOHN MEEHN, ESQ.
                                 BENITTA JOSEPH, ESQ.
19

20
    For the Defendants:         ELISSA FUDIM, ACC
21                               BRIAN FRANCOLLA, ACC

22
    Court Reporter:             Anthony M. Mancuso
23                               (718) 260-2419

24
    Proceedings recorded by mechanical stenography,
25  transcript produced by CAT.
```

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

---

2

1         (Trial resumed.)
2         (In open court; jury not present.)
3         MR. NORINSBERG:  John Norinsberg on behalf
4  of plaintiff.
5         MS. JOSEPH:  Benitta Joseph on behalf of
6  plaintiff.
7         MR. MEEHAN:  Good morning, your Honor, John
8  Meehan and behalf of the plaintiff.
9         MS. FUDIM:  Elissa Fudim on behalf of
10  defendants.
11         MR. FRANCOLLA:  Brian Francolla on behalf of
12  the defendants.
13         THE COURT:  Please be seated.  Have we given
14  the pedigree card to the jury yet?
15         THE CLERK:  I have not given them anything
16  yet.  I was given that document yesterday.  I have not
17  given anything to the jury.
18         THE COURT:  Give the exhibits to the jury
19  and bring them out, too.
20         (Jury present.)
21         THE COURT:  Ladies and gentlemen, please, be
22  seated.  Ms. Holley returned to you the exhibits.  Now
23  included in those exhibits is the pedigree card for
24  Andrew Smalls.  We're now going to begin with the
25  readback of the testimony that you have requested.

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

---

3

1  First, it is testimony of William Davis and the court
2  reporter will read it back.
3         (Record read.)
4         THE COURT:  We're going to now turn to the
5  testimony of Jerome Nelson.
6         (Record read.)
7         THE COURT:  We'll take a five-minute break,
8  members of the jury.
9         (Recess taken.)
10         (In open court; jury not present.)
11         THE COURT:  All right.  Let's ask the jury
12  to come in.
13         (Jury present.)
14         THE COURT:  All right.  Please, be seated.
15  We'll continue with the reading of the testimony.
16         (Record read.)
17         THE COURT:  All right.  Ladies and
18  gentlemen, you are excused to resume your deliberations.
19         (The jury excused.)
20         (Court in recess, awaiting the verdict of
21  the jury.)
22         (In open court; jury not present.)
23         THE COURT:  All right.  We have a note,
24  Court Exhibit six.  Where were the perp pictures taken,
25  precinct, central booking, Rikers Island?  Please

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

4

1    indicate on each picture.

2         Can we reach an agreement?  Don't write

3    anything on the exhibit.

4         MR. MEEHAN:  We are doing it on a post-it.

5         MR. NORINSBERG:  We reached an agreement on

6    everything and we are putting post-its on each one.

7         THE COURT:  We can do it that way I guess.

8    Send in books with the post-it note on it.

9         MR. NORINSBERG:  Yes, your Honor.

10        MS. FUDIM:  Is it possible to look up when

11   one exhibit was entered into evidence, what the question

12   and answer was?

13        THE COURT:  Yes, it is.

14        MS. FUDIM:  There is one photograph we don't

15   think the testimony ever came out with the answer to

16   that question.  To provide an answer would be providing

17   information that actually didn't come out at trial.

18        THE COURT:  What's the exhibit number?

19        MS. FUDIM:  48, your Honor.

20        MR. FRANCOLLA:  I guess we know where the

21   photo was taken.  We're not sure if that was in the

22   record.

23        MR. MEEHAN:  Why can't we just stipulate?

24        THE COURT:  I don't have 48 in my book.  So

25   that doesn't help me.

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

---

5

1         (Pause.)

2         THE COURT:  I have that it came into

3    evidence early.  My law clerk's notes reflected it came

4    in on the first day of trial.  Did anyone ever refer to

5    it again?

6         MR. MEEHAN:  Yes, there was also --

7         MR. NORINSBERG:  The second day I followed

8    up on Polaroid photographs.  I did go back when I read

9    the arrest report for Cedric and then I matched the

10   arrest report number with the number on here.  That was

11   the second day.

12        THE COURT:  Can I see the exhibit?

13   Well, this is the mug shot, right?

14        MS. FUDIM:  Yes.

15        THE COURT:  Wasn't there testimony that all

16   of mug shots were done at central booking?

17        MR. FRANCOLLA:  That was my recollection.

18   That was more general as opposed to specific.

19        MR. NORINSBERG:  I questioned him judge.

20        THE COURT:  Does everyone agree it was

21   central booking?

22        MS. FUDIM:  Yes.

23        MR. NORINSBERG:  Most likely it is.  I think

24   the issue we got caught up with, when I asked him that

25   question, he said something to the effect of I don't

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

---

6

1    know where that came from.

2         THE COURT:  What is your proposal?  What is

3    the plaintiff's proposal?

4         MR. NORINSBERG:  We have language worked out

5    with counsel that was acceptable to us that there was no

6    testimony as to where it came from, where it was taken.

7         THE COURT:  Does everyone agree to that?

8         MS. FUDIM:  We just want it to be accurate

9    and that was my recollection, but I'm not sure if that's

10   right or not because my colleague's recollection is

11   different.  Whatever it is I think it should be

12   accurate, whatever the testimony was.  I thought there

13   was no testimony on it but my colleague thought the

14   testimony was more general that all the mug shots were

15   taken at central booking and I don't know as to when.

16   My memory is slightly different.  I don't know which is

17   right.

18        THE COURT:  What do the parties want to do?

19        (Pause.)

20        THE COURT:  Why don't we do this:  Why don't

21   we send the other exhibits back.  I'll bring them out

22   and say we put post-its on each of the exhibits.

23   There's one exhibit that we're looking through the

24   record to determine what precisely, if anything, was

25   said about where that exhibit was taken.  It will take

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

---

7

1    awhile to search that.

2         MR. NORINSBERG:  That makes sense.

3         MS. FUDIM:  Fine.  We put post-its on the

4    others.  We can give them to the court.  I guess the

5    city is saving money for the taxpayers of New York by

6    not ordering the transcript.

7         MR. FRANCOLLA:  Yes.  Unless we have to we

8    don't get authorized as much as we like it.

9         (Jury present.)

10        THE COURT:  Please, be seated for a moment.

11   Ladies and gentlemen I have your note.  It says where

12   were the perp pictures taken, precinct, cental booking,

13   Rikers Island?  Please, indicate on each picture.  So

14   the parties have agreed to what the testimony was with

15   respect to three of the pictures and so for Exhibit 38

16   they put on a yellow post-it.  It says precinct.

17   Exhibit 46 A, Jerome Nelson.  It says central booking.

18   Exhibit 47, picture of Ronnie Smalls, they put central

19   booking.

20        With respect to Plaintiff's Exhibit 48,

21   which is the picture of Cedric Smalls, the parties are

22   having the court reporter check the record to see if

23   there was testimony -- we can't admit new evidence into

24   the trial now -- to see if there was specifically

25   testimony about where that was taken.  So we're going to

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

8

```
1  have to look through the record.  We don't have a
2  transcript.  So the court reporter has to look through
3  all his notes to find this.  It may take a little bit of
4  time.  I want you to know why we were waiting on Exhibit
5  48.  We'll give you the other exhibits with the post-its
6  to the marshal to give to you and we'll try and find
7  that other information out as soon as we can.  All
8  right.  You are excused.
9          (Jury excused.)
10         (In open court; jury not present.)
11         THE COURT:  All right.  Did we find the
12 testimony related to where the picture was taken?  It was at
13         THE REPORTER:  Yes, your Honor.  It was at
14 the precinct.
15         MS. FUDIM:  We think that's factually wrong.
16 We would want to see the testimony.  The answer central
17 booking we were not sure if it came into evidence.  We
18 want to look at that to see that.
19         (Recess.)
20         (In open court; jury not present.)
21         THE COURT:  I'll tell you what the reference
22 is in the transcript and I'll show it to the parties.
23 Do we need the plaintiff to be brought up for this?
24         MR. NORINSBERG:  No, your Honor.
25         THE COURT:  I'll let you all look at it.  I
```

9

```
1  don't think it said.  It just says I show you 48.  That
2  is a mug shot photo of Cedric, right?  Yes.  And then it
3  goes on to you also took Polaroids that night.  It says
4  did you take the mug shots?  No, I didn't.  So I believe
5  I'm reading from the testimony of Collins.
6          MR. MEEHAN:  Is that the from the first day
7  or second day?
8          THE COURT:  It's May 14, the second day.  I
9  think the answer is that specifically with respect to 48
10 there wasn't testimony as to where it was taken.  But
11 you all can look at the pages.
12         (Pause.)
13         MR. NORINSBERG:  Your Honor, we think that
14 this is from the second day and that on the first day I
15 had actually asked about this photo.  So I don't think
16 we're looking at the right part of the transcript.
17         THE COURT:  I do have a note -- which day do
18 you have it going into evidence?
19         THE LAW CLERK:  The 13th.  That's the day
20 before.
21         THE COURT:  You have it going into evidence
22 on the 13th, correct?
23         THE LAW CLERK:  I think so.
24         MR. NORINSBERG:  When it's referred to here,
25 I'm not referring that the parties have stipulated and
```

10

```
1  offered it.  It implies it had been offered in before
2  this testimony as part of the first day and it would
3  have been very early in the cross-examination.
4          MS. FUDIM:  Your examination?
5          MR. NORINSBERG:  Yes, my examination.
6          THE COURT:  I have it coming in right after
7  a mention of 26, 32 and 33.
8          MR. NORINSBERG:  That's the first day.
9          THE COURT:  It is mentioned there.  That's
10 the first day.
11         (Recess. )
12         (In open court; jury not present.)
13         THE COURT:  The court reporter has provided
14 me with the other testimony about Exhibit 48 and the
15 parties can look at it but I don't think this
16 establishes where the photograph was taken because the
17 witness himself didn't know and there was a long
18 colloquy about haven't you stipulated to this exhibit,
19 but the repeated question to the witness about where it
20 was taken or the circumstances, the witness didn't know.
21         MR. NORINSBERG:  Would it be fruitful to
22 perhaps read that question and answer rather than
23 summarize it and bring the jury back and read the question
24 and answer.
25         THE COURT:   What question and answer?
```

11

```
1          MR. NORINSBERG:  If I was asking Officer
2  Collins about this photo and there's a question and then
3  there's an answer or two questions and answers, just
4  read that to the jury and that will answer that
5  question.
6          THE COURT:  It doesn't answer the question.
7          MR. NORINSBERG:  If the answer is I don't
8  know then that's the evidence that's in the record.
9  There's nothing that we should say otherwise.
10         THE COURT:  Look at this.  The parties can
11 look over this testimony.  If you want something read
12 back, it could be -- the question is:  Is the photograph
13 taken by the police department, New York City Police
14 Department, on the night of the arrest?  Correct.  You
15 object.  Ms. Fudim objected.  Do you know one way or the
16 other when this photograph was taken or who took it?
17 The answer was no.
18         MR. NORINSBERG:  That should be read to the
19 jury.
20         MS. FUDIM:  If that was read to the jury,
21 but I know on my examination I asked him about
22 photographs taken at the precinct and there was
23 testimony that at the precinct they don't take side
24 photos.  So I would then want that general testimony
25 read in combination with it and of course that would
```

1  require the court reporter to go find that and he's been
2  coming up and down and I feel sadly about that.  For
3  completeness, we would want that additional testimony.
4          MR. NORINSBERG:  I have no objection.
5          THE COURT:  What testimony do you want and
6  from what witness?
7          MS. FUDIM:  From Collins on
8  cross-examination.  I asked him a question about the mug
9  shot photos and there was a question about how do you
10  know where this one was taken.  It may have been about a
11  different one and he said, well, we don't take side
12  photos at the precinct.  I think in fairness we would
13  have to read that in as well since this is exclusively a
14  side photo.  He is saying he doesn't know where or when
15  it was taken.
16          THE COURT:  It would be on your
17  cross-examination of Detective Collins.
18          MR. NORINSBERG:  I thought counsel was
19  saying that with regard to Exhibit 48 she elicited
20  testimony.  If it's just generic testimony, I don't
21  think that's responsive to their question.  I
22  misunderstood.  I thought she was talking about 48.
23          MS. FUDIM:  I don't know which exhibit I
24  asked it about.  I remember generally asking the
25  question about the side photos and I can't say what

1  exhibit I was holding when I asked him about it.  I
2  don't know the answer to that.
3          THE COURT:  Can we go back to square one?
4  Why can't we just stick to what we were original going
5  to say, which there was no testimony as to where it was
6  taken.
7          MR. NORINSBERG:  That's fine.
8          MS. FUDIM:  Given what you just read, that's
9  fine.
10          THE COURT:  Okay.
11          I'll send it back with the little post-it,
12  there was no testimony as to where this one was taken.
13          (Court in recess, awaiting the verdict of
14  the jury.)
15          (In open court; jury not present.)
16          THE COURT:  All right.  We have a note from
17  the jury that says:  We are unable to reach a unanimous
18  decision for both defendants.  We don't believe we'll
19  reach one.
20          I tell you what I propose to do and then you
21  can comment on it.  I plan to reread to them from page
22  18 of the jury instructions beginning when you are in
23  the jury room to the end of that paragraph, which is a
24  paragraph that deals with trying to reach agreement,
25  making your own decisions, listening to other people,

1  that part of the jury instructions.
2          MR. NORINSBERG:  I would request, judge,
3  that we read an Allen charge to the jury.
4          THE COURT:   I don't think it's quite ready
5  for an Allen charge.  If I get another similar note to
6  this I will read the full blown Allen charge.  This is
7  sort of the modified version of the Allen charge.  If we
8  get a similar note I will read that to them.
9          MR. NORINSBERG:  It's also unclear from the
10  note did they reach a verdict with respect to one
11  defendant.  It's unclear the way it's worded.
12          THE COURT:  Do the parties want me to ask
13  that question?
14          MR. NORINSBERG:  They could send another
15  note out just indicating whether they meant to say for
16  each defendant they were unable to reach a verdict.
17          MS. FUDIM:  I think from our point of view,
18  if you are going to read a portion of the instruction,
19  it doesn't matter which they meant at this point in
20  time.
21          MR. NORINSBERG:  My only concern would be --
22          THE COURT:  It would only then go on to
23  whether the parties want to take a partial verdict or
24  not.
25          MR. NORINSBERG:  Right.

1          MS. FUDIM:  We would want an Allen charge
2  prior to that decision.
3          THE COURT:  Well, I think maybe what I will
4  do at this time is just read this portion.  I think
5  maybe that's the best thing to do and not complicate it
6  any further.  I have the parties' agreement to do that?
7          MR. NORINSBERG:  Yes, your Honor .
8          MS. FUDIM:  Yes, your Honor.
9          THE COURT:  Okay.
10          (Jury present.)
11          THE COURT:  All right.  Ladies and
12  gentlemen, please be seated for a moment.
13          I have your note that says that you are
14  unable to reach a unanimous decision for both
15  defendants.  We don't believe we'll reach one.
16          What I want to do is read you a portion --
17  to remind you -- a portion of my jury instructions.
18  I'll reread it to you and then I'll ask that you
19  continue your deliberations.
20          What I had charged you earlier and I'll
21  remind you of it again is that when you are in the jury
22  room listen to each other and discuss the evidence and
23  issues in the case among yourselves.  It is the duty of
24  each of you as jurors to consult with one another and to
25  deliberate with a view to reaching agreement on a

1  verdict, if you can do so without violating your

2  individual judgment and your conscience.  Although you

3  should not surrender your conscientious convictions of

4  what the truth is and the weight and effect of the

5  evidence and although each of you must decide the case

6  for yourselves and not merely acquiesce in the

7  conclusion of your fellow jurors, you should examine the

8  issues and the evidence before you with candor and

9  frankness and with proper deference to and regard for

10  the opinions of each other.  Remember in your

11  deliberations that this dispute between the parties is

12  for them no passing matter.  They and the court rely

13  upon you to give full and conscientious deliberation and

14  consideration to the issues and the evidence before you.

15          So, having reminded you of that portion of

16  my instructions, I would request that you return to the

17  jury room and continue your deliberations.

18          Thank you.

19          (Jury excused.)

20          MR. NORINSBERG:  That photo that they had

21  asked for, we had taken care of it with a note.  I don't

22  remember how we resolved that.

23          MS. FUDIM:  The judge sent it in.

24          MR. NORINSBERG:  Okay.

25          THE COURT:  What happened was, just to be

1  clear on the record, the photograph we put a little

2  post-it note on it that said that there's no testimony

3  as to where the photograph was taken or something to

4  that effect.  That's not exactly what it said.  When we

5  get it back I can put it on the record.

6          THE CLERK:  I believe you put it on the

7  record earlier.

8          THE COURT:  I think I did.

9          (Court in recess, awaiting the verdict of

10  the jury.)

11          (In open court; jury not present.)

12          THE COURT:  We have another note.  We are

13  unable to reach a unanimous decision.  What I intend to

14  do is to tell the jury that I know they are tired.  It's

15  been a long day.  I'm going to excuse them for the

16  evening and I'm going to ask them to come back on Monday

17  and tell them that I have another instruction to give

18  them.

19          MR. NORINSBERG:  Perfect.

20          THE COURT:  That's what we are doing.  On

21  Monday morning all of you have to be in Judge Dearie's

22  courtroom and Ms. Holley will help you tonight.

23  Everything has to be transferred over there because I

24  start a criminal case on Monday in this courtroom.  So I

25  will meet you all there and do the Allen charge.  If we

1  can get here earlier, it would be better.  I don't know

2  if the plaintiff can be brought in earlier.

3          THE MARSHAL:  We are usually here by 8:30.

4          THE COURT:  In that case 9:00 o'clock.  We

5  will start the case at 9:00 o'clock and we'll begin in

6  Judge Dearie's courtroom and I will read them the Allen

7  charge and then back to deliberate and then back here.

8  That's how we plan to proceed.

9          I'll bring the jury out.

10          (Jury present.)

11          THE COURT:  All right. , ladies and

12  gentlemen.  Please be seated for a moment.  I have your

13  note that says we are unable to reach a unanimous

14  decision.  Let me tell you what I'm going to do.  I know

15  this has been a very long day and I do not doubt for a

16  moment that you have been working very, very hard on

17  this case.  It has been a long day.  You've not been

18  deliberating that long, although I'm sure it seems like

19  a long time.  What I am going to do at this point is

20  excuse you for the evening and for the weekend.  I will

21  ask you not to discuss the case of course with anyone.

22  I'm going to ask you to return at 9:00 o'clock on Monday

23  and I have another instruction at that time that I will

24  give you that may assist you.

25          So I'm going to excuse you for the evening

1  now.  Obviously, don't discuss the case with anyone.

2  It's important that we have all eight of you back here

3  at 9:00 o'clock and the reason we have to start earlier

4  is I have another trial starting Monday morning.  So I

5  will having to make sure that I instruct you first

6  before I begin the second trial.

7          Have a nice weekend.

8          (Jury excused.)

9          THE COURT:  Maybe you all want to get your

10  things over to the other courtroom.  Don't leave right

11  away.  You may want to give them a chance to clear out

12  so you don't run into anyone.

13          I will see you all at 9:00 o'clock in Judge

14  Dearie's courtroom.

15          (Case adjourned to Monday, May 20, 2019, at

16  9:00 a.m.)

17

18

19

20

21

22

23

24

25

PRISONER PEDIGREE CARD
PD 244-092 (7-03)

DATE 5/8 0/06 CMD. 100
LOG PAGE        TIME OF ARRIVAL AT CMD.

| A/O RANK | NAME (Last, First, M.I.) | | CMD. | SQD. |
|---|---|---|---|---|
| Po | Collins, Richard | | 100 | FT4 |

READ TO PERPETRATOR:   "IT IS A CRIME TO KNOWINGLY MISREPRESENT YOUR ACTUAL NAME, DATE OF BIRTH OR ADDRESS TO A POLICE OFFICER" (FALSE PERSONATION P.L. 190.23 B MISDEMEANOR)

| DEFENDANT'S NAME: (Last, First, M.I.) | | D.O.B. | AGE | SEX | RACE |
|---|---|---|---|---|---|
| Smalls, Andrew | | 12/27/86 | 19 | M | B |

DEFENDANT'S ADDRESS:
7600 Shr Front Pkwy        11 ?        APT. #

LOCATION OF ARREST:
2502 RBB 81-05

PRIMARY CHARGE: CPW

OTHER CHARGES:

PROPERTY-TYPE & AMOUNT:

| DEPENDENTS UNCARED FOR? ☐ YES ☑ NO   ☐ ADULT ☐ CHILD | WNAM CHECK RESULTS: | WARRANT HIT ☐ YES ☐ NO | INVESTIGATION CARD (WANT CARD) HIT ☐ YES ☐ NO |
|---|---|---|---|

| PERSONAL PROP. REMOVED? ☐ YES ☑ NO | TYPE: | | AMOUNT: | DET. SQD. NTFD.? ☐ YES ☐ NO |
|---|---|---|---|---|

SUPERVISOR VERIFYING ARREST: (Rank, Last Name, First, M.I.) - TAX #
Sgt Owen

| | DET. NAME: | SHIELD # |
|---|---|---|

| TIME OF ARREST: 0124 | FUNDS: 40 | FUNDS RET: 40 | PHYSICAL / MENTAL CONDITION: Lac to Eye |
|---|---|---|---|

| MEDICAL ATT. REQUESTED? ☐ YES ☑ NO | R.M.A.? ☐ YES ☑ NO | ANY DISABILITIES? ☐ YES ☐ NO |
|---|---|---|

**REMOVE THE PRISONER'S BELT AND SHOE LACES  —  SAFEGUARD YOUR WEAPON!**



now Gray Hoodie

(Black jacket) Roos

**DEF 32**



# NEW YORK CITY POLICE DEPARTMENT

## *Mugshot Pedigree*



NAME:  **SMALLS ANDREW**

| | |
|---|---|
| NYSID#: | **05361971J** |
| Arrest #: | **Q06628376** |
| Arrest Date#: | **05-20-2006** |
| Top Charge: | **PL 2053000: RESISTING ARREST** |
| Date of Birth: | **12-27-1986** |
| Age at Offense: | **19** |
| Social Security #: | **0** |
| PCT of Arrest: | **100 PRECINCT** |
| Source: | **LIVE** |



## PHYSICAL DESCRIPTION

| | |
|---|---|
| Race: | **BLACK** |
| SEX: | **MALE** |
| Height: | **510** |
| Weight: | **150** |
| Hair Length: | **NORMAL** |
| HAIR COLOR: | **BLACK** |
| Hair Type: | **STRAIGHT** |
| Complexion: | **CLEAR** |
| Eye Color: | **BROWN** |

Scars, Marks Tattoos:
Desc:
Location:
Bodyside:

Alias 1:
Alias 2:
Alias 3:
Alias 4:



DEF-000927

SUPREME COURT OF THE STATE OF NEW YORK,
COUNTY OF QUEENS : CRIMINAL TERM PART K-3

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE PEOPLE OF THE STATE OF NEW YORK,

            -against-                        AFFIRMATION

ANDREW SMALLS,                        IND. NO. 221/2007

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK ) S.S.:
COUNTY OF QUEENS )

     I, JUDAH MALTZ, ESQ., hereby subscribe and affirm the following

to be true under the penalty of perjury:

     I am the attorney assigned to represent the defendant and I am fully

familiar with the facts and proceedings had herein to date.

     This Affirmation is made upon information and belief, the sources

thereof being official court papers, conversations had with the defendant, the

file maintained in my office and the proceedings heretofore held herein.

     The defendant is charged in the indictment, inter alia, with the crimes of

Criminal Possession of a Weapon in the Second Degree; and Criminal Possession of a

Weapon in the Third Degree (2 counts).

    A.   MOTION TO DISMISS INDICTMENT-LEGALLY INSUFFICIENT
        EVIDENCE WAS PRESENTED BEFORE THE GRAND JURY

     It is respectfully submitted that the indictment is defective in that it fails to

contain legally sufficient evidence to connect the defendant to all of these crimes

charged in the indictment. Additionally, it fails to apprise the defendant of the conduct

alleged in the accusation. See, N.Y. Const., Art. 1,  Section 6. New York case law demands more specificity than the mere recital of the Penal Law.

Counsel further maintains that it is impossible from reading the indictment to know exactly  what the defendant is charged with in order to adequately prepare his defense in this matter. Additionally, the indictment fails to set forth non-hearsay information supporting the elements of the crimes charged and as a result the indictment must be dismissed.

### B.   MOTION TO TRANSCRIBE AND INSPECT GRAND JURY MINUTES

It is submitted that the evidence presented before the Grand Jury was legally insufficient and inadequate as a matter of law and therefore such evidence should result in the dismissal of the  indictment. Counsel requests this Court to review the Grand Jury minutes and dismiss all or some of the counts in the indictment.

### C. REQUEST FOR A BILL OF PARTICULARS AND A DEMAND FOR DISCOVERY

If counsel is to be adequately prepared to meet the charges against his client it is necessary for him to be informed of the items set forth in this branch of the motion. Counsel maintains that this information is necessary to the defense and is within the control and knowledge of the District Attorney and cannot be obtained from any other source.

Additionally, the release of property vouchers, police reports and other scientific test results prior to commencement of hearings and trial, will enable counsel to discuss these matters with his client and may result in a smoother disposition of the case.

The defendant requests the Court to issue an ORDER directing the District

Attorney to furnish the defendant and his attorney with a written statement specifying

the following:

1. With respect to each charge contained in the indictment, state (1) if the prosecution intends to prove that the defendant acted as an accomplice, then set forth that conduct:

(a) of the defendant which constitutes the basis for his alleged accessorial liability; and
(b) of each other person which constitutes the basis for accessorial liability.

2. State the exact time, date and location where the alleged incident occurred.

3. State whether or not the defendant made any oral or written statements to the police or the District Attorney's office during or after the commission of these crimes. If so, state whether these statements were made to a police officer or any government agent . State the exact date and time when he made such statements . Also, state whether he made the statements during his "pedigree" interview. If yes, provide counsel with a copy of the statements or a notice regarding said statements.

<u>PURSUANT TO C.P.L. SECTION 240.20</u>

Demand is made that you supply or make available the following:

1. All written reports or documents including diagrams, fingerprint reports, or

other scientific testing conducted in relationship to the case. Include, if applicable, all

911 tapes or other recordings prepared in this case.

2. All photographs made in connection to this action made by a public servant

or made by a person whom the District Attorney intends to call as a witness at trial.

3. A copy of all police officers' notes, memo book entries, etc.

4. A copy of all police vouchers regarding evidence evidence seized from the

defendant or his co-defendant and or from the crime scene.

5. Anything required to be disclosed prior to trial of the defendant by the

prosecution such as all evidence within the custody or knowledge of the District

Attorney's office which is favorable to the defendant or required by <u>Brady v. Maryland</u>,

373 U.S. 83; and <u>United States v. Agurs</u>, 426 U.S. 97; Furthermore, counsel requests

all evidence within the custody or knowledge of the District Attorney's office which

might tend to impeach the credibility of all witnesses that the prosecution intends to call

as witnesses. See, <u>Giglio v. United States</u>, 405 U.S. 150.

<u>MOTION FOR DISCOVERY, C.P.L. SECTION 240.20</u>

Defendant moves pursuant to Criminal Procedure Law, Section 240.20 par.

1 (c), for an Order of Discovery with respect to information that is material to the

preparation of the defense and which is reasonable. New York has been part of the

movement towards liberal discovery in order to arrive at a negotiable settlement or

to lessen surprise at trial.

The defendant finds such discovery is necessary in order to properly prepare

this case for trial.

D. <u>MOTION FOR A PRE-TRIAL HEARING TO SUPPRESS PHYSICAL
EVIDENCE UNLAWFULLY SEIZED FROM THE DEFENDANT</u>

The indictment charges both defendants with the unlawful possession of a loaded

38 caliber revolver found on the roof of the building located at 81-05 Rockaway Beach

Boulevard, in Queens County. According to the Felony Complaint, Officer Richard

Collins of the 100th Precinct avers that the pistol was recovered on the ground "near

the location where the defendant Andrew Smalls was standing".

The defendant moves to suppress physical evidence unlawfully- the .38

caliber pistol that was seized in close proximity to where he was seized by the

police. The defendant maintains he has standing to move for this hearing since the

the defendant felt compelled to drop the weapon as a result of the unlawful action

conducted by the police. The defendant maintains that he did not voluntarily abandon

the  gun but his act of throwing the gun to the ground was a "spontaneous reaction to the

sudden and unexpected pursuit by the officers'" and not an independent act attenuated

from the unlawful police conduct. See, People v. Holmes, 81 N.Y.2d 1056  (1993).

People v. Ramirez-Portoreal,  88N.Y. 2d 99 (1996).

The defendant maintains the police violated his Fourth and Fourteenth Amendment

rights when they chased him inside the building located in Rockaway Beach Boulevard.

The police lacked probable cause or knowledge that he was engaged in criminal activity.

The defendant's act of dropping the weapon to the ground did not constitute a knowing

or voluntary waiver . The law is clear, where the relinquishment of property or disclaimer

of ownership to property  may be attributed to coercive  police conduct or  precipitated by

unlawful police action, then the evidence may be deemed not abandoned . Consequently,

the evidence would be ordered suppressed as the "fruit" of the unlawful police conduct.

People v. Ramirez, (supra). In Ramirez,  the Court of Appeals recognized the defendant

still may have maintained his right to privacy to a piece of luggage  found on the

overhead  bus luggage compartment  even though he disclaimed ownership  when he

was confronted by the police as to the contents of the luggage.

The defendant maintains that he is entitled to a suppression hearing to raise issue

that the police seized him  after an extended chase inside the building and then

seized the weapon which they discovered after they caught up with him inside the rooftop

of the building. . The defendant maintains the police lacked probable cause to seize

him and secure the weapon as evidence.

This motion to suppress is made pursuant to the Fourth and Fourteenth

Amendments to the United States Constitution, and Article 1, of the New York

Constitution, and Section 710.20(1) of the Criminal Procedure Law.

The defendant maintains his right to privacy was violated by the police

illegal intrusion. . Under the circumstances, he moves for a pre-trial hearing to

to suppress all evidence unlawful seized. For the reasons stated herein, defendant

requests a <u>MAPP</u> Hearing be held prior to trial.

### E. <u>LEAVE TO MAKE FURTHER MOTIONS</u>

I have attempted to state all the relief to which I believe the defendant

is entitled to in this Omnibus Motion. The defendant may wish to file additional

motions such as the right to move to sever his case from his co-defendant.

WHEREFORE, affirmant respectfully requests this Court to grant relief

sought herein and all other relief which this Court may deem just and proper.

Dated: Queens, New York
        April 4, 2007

MR. JUDAH MALTZ, ESQ.

COURT EXHIBIT

2

d+f

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  MAY 2 2 2019  ★

------------------------------------------------------x

ANDREW SMALLS,

BROOKLYN OFFICE

         Plaintiff,

    -against-

      **VERDICT SHEET**
      14-CV-2326 (CBA)(RML)

POLICE OFFICER RICHARD COLLINS
and POLICE OFFICER DAVID TETA,

         Defendants.

------------------------------------------------------x

**AMON, United States District Judge:**

      Your verdict in this case will be determined by your answers to the following questions. Make sure that you read the questions and notes carefully because they explain the order in which the questions should be answered and which questions may be skipped. Your general verdict and your answers to the special questions must be unanimous.

**Question 1**

Do you find by a preponderance of the evidence that any defendants deprived plaintiff of the right to a fair trial by fabricating evidence?

      a.  Richard Collins

          YES ✓         NO _____

      b.  David Teta

          YES ✓         NO _____

*If you answered YES for any defendants in Question 1, proceed to Question 2. If you answered NO as to all defendants in Question 1, your deliberations are finished. Please report your verdict.*

1

**Question 2**

State the amount of compensatory damages that plaintiff has proven by a preponderance of the evidence that he is entitled to as a result of being deprived of the right to a fair trial by one or more defendants.

AMOUNT $ ___60,000_____

*Please proceed to Question 3.*

**Question 3**

Do you find that any defendants acted with malicious intent to violate plaintiff's rights, or with reckless disregard of plaintiff's rights, such that plaintiff is entitled to punitive damages?

    a.  Richard Collins

        YES _____        NO __✓____

    b.  David Teta

        YES _____        NO __✓____

*If you answered YES for any defendants in Question 3, please proceed to Question 4.*

**Question 4**

If you answered YES to any defendants in Question 3, please write the amount of punitive damages against each defendant on the lines below.

    a.  Richard Collins

        AMOUNT $ _____

    b.  David Teta

        AMOUNT $ _____

*When you have completed the above, please date and sign the form and report your verdict.*

SIGNATURE OF THE FOREPERSON
Dated: 5/20/19

2

## Page 1

```
                                                    1
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2
     ------------------------------x
 3                                    14-CV-2326(CBA)
     ANDREW SMALLS,
 4                                    United States Courthouse
              Plaintiff,              Brooklyn, New York
 5
          - versus -                  March 5, 2020
 6                                    2:00 p.m.
     CITY OF NEW YORK, et al.,
 7
              Defendants.
 8
     ------------------------------x
 9
          TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
10          BEFORE THE HONORABLE CAROL B. AMON
              UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES

13   Attorney for Plaintiff: LAW OFFICE OF JON L. NORISBERG
                             225 Broadway
14                           Suite 2700
                             New York, New York 10007
15                           BY:  JOHN JOSEPH MEEHAN, ESQ.

16
     Attorney for Defendant: NEW YORK CITY LAW DEPARTMENT
17                           100 Church Street
                             New York, New York 10007-2601
18                           BY:  ELISSA PAULETTE FUDIM, ESQ.

19

20   Court Reporter:         LINDA D. DANELCZYK, RPR, CSR, CCR
21                           Phone:  718-613-2330
                             Fax:    718-804-2712
22                           Email:  LindaDan226@gmail.com

23

24

25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
```

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

## Page 2

```
                      PROCEEDINGS                    2
 1        (In open court.)

 2        (All rise)

 3        THE COURTROOM DEPUTY:  14-CV-2326, Smalls versus

 4   Collins and Teta, on for oral argument.

 5        THE COURT:  All right, will the parties state their

 6   appearances, please.

 7        MR. MEEHAN:  Good afternoon, Your Honor.  John

 8   Meehan on behalf of Andrew Smalls.

 9        THE COURT:  Good afternoon.

10        MS. FUDIM:  Good afternoon, Your Honor.  Elissa

11   Fudim from Corporation Counsel on behalf of the defendants.

12        THE COURT:  All right, good afternoon.

13        There are two motions here.  Let me take up first

14   the defendant's motion.

15        Ms. Fudim, do you want to be heard on your motion?

16        And everyone can be seated.  You can speak into the

17   microphones.  It's easier.

18        MS. FUDIM:  Yes, Your Honor.

19        I'm going to try not to repeat anything that is in

20   my papers.  I'm going to assume the Court's familiarity with

21   those papers.

22        But I would add that there have been developments in

23   the case law since the time that these papers were submitted

24   and would just briefly point the Court's attention to some of

25   those decisions.  I expect the Court is probably aware of
```

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

## Page 3

```
                      PROCEEDINGS                    3
 1   them, but I will, for the record, just point them out.

 2        So obviously the first issue that we're dealing with

 3   in terms of the analysis under *McDonough* is whether *McDonough*

 4   imposes a favorable termination requirement, or a threshold,

 5   or a prerequisite, however, whichever word you use, I believe

 6   it's semantics, whether it imposes that upon a claim for

 7   denial of right to fair trial.

 8        Our position was it did.  That's still our position.

 9   And I believe that our position has become stronger since this

10   motion was briefed.

11        Looking at the number of cases that have been

12   decided, the first one that I'm going --

13        THE COURT:  Well, do you take the position that

14   *McDonough* actually says that or that only a rational reading

15   of *McDonough* would lead that to the conclusion?

16        *McDonough* doesn't technically hold that, correct?

17        MS. FUDIM:  Well, I think there's a difference

18   between what it holds and what it says.

19        What it holds has to do with the statute of

20   limitations, but, yes, I do think it says that, as opposed to

21   merely a secondary reading, which is only rational reading of

22   it, I would say that it does say that.

23        THE COURT:  It does what?

24        MS. FUDIM:  Say that favorable termination is a

25   pre-requirement to bringing a claim for fair trial.  Yes, I
```

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

## Page 4

```
                      PROCEEDINGS                    4
 1   would say that it says that.

 2        In terms of the additional cases that I would point

 3   the Court to, since I was looking at this issue in the eight,

 4   nine months since *McDonough* was decided, the first case that I

 5   would point to would be *Miller versus Terrillion*, I'm not sure

 6   if I'm pronouncing it --

 7        THE COURT:  Is that Judge Vitaliano's case?

 8        MS. FUDIM:  That is Judge Vitaliano's case, which to

 9   date has been the most thorough analysis.

10        THE COURT:  Counsel, are you familiar with that?

11        MR. MEEHAN:  I just got a copy of that.

12        THE COURT:  I didn't know if it was brought to your

13   attention before.

14        MS. FUDIM:  I have a copy for the Court.

15        THE COURT:  No, I have it.

16        MS. FUDIM:  Okay.  So the first case would be

17   Judge Vitaliano's decision which found that favorable

18   termination is required if the claim alleges the deprivation

19   of liberty as a result of fabricated evidence.

20        He also found, in the same decision, which goes to

21   the next point but I think is relevant here because it's the

22   same decision, that standard for favorable termination is the

23   same in a fair trial and malicious prosecution context.

24        The second case that I will point to, and I can

25   speak at more lengths to any of these, but just to start with
```

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

### PROCEEDINGS — 5

1 an overview at the macro level, the second case that I would
2 draw the Court's attention to would be *Goldring v Donawa*,
3 G-O-L-D-R-I-N-G v D-O-N-A-W-A.
4       THE COURT:  Judge Matsumoto's case.
5       MS. FUDIM:  That's Judge Matsumoto's decision, which
6 Judge Matsumoto held that where a plaintiff had pleaded guilty
7 to one of the charge crimes --
8       THE COURT REPORTER:  I'm sorry, can you slow down?
9       MS. FUDIM:  I was going to give opposing counsel a
10 copy before but, yes, I do have a copy for -- and the Court as
11 well.
12       THE COURT:  No, I have it.
13       MS. FUDIM:  And in that case, Judge Matsumoto held
14 that where plaintiff had pleaded guilty to one of the charged
15 crimes, he had not received a favorable termination under
16 Second Circuit case law and therefore cannot maintain a claim
17 basing an unfair trial claim.
18       The next case that I would point to -- it really
19 wasn't an expansive at all, I bring it up only because in the
20 latest submission that was a letter submission that
21 plaintiff's counsel submitted in this case after briefing,
22 plaintiff's counsel referred to the *Wellner* decision, which
23 was a decision by Judge Koeltl, *Wellner*, W-E-L-L-N-E-R, in
24 which plaintiff took the position that Judge Koeltl found that
25 favorable termination was not an element or a prerequisite to

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

### PROCEEDINGS — 6

1 the claim.
2       We responded to that letter and articulated why that
3 was not the holding that Judge Koeltl came to, so I won't
4 reiterate that since it's a submission that the Court had.
5       I would only add that since the time of those letter
6 submissions, Judge Koeltl had second occasion to look at this
7 issue, and that was in a case called *Breton v City of New*
8 *York*, B-R-E-T-O-N v City of New York, that was issued after
9 the *Wellner* case.
10       Again, it is not a lengthy discussion of the issues
11 because he found that favorable termination was present.  But
12 when he listed the elements of a fair trial claim, he listed
13 the traditional elements and then added a footnote.
14       And for the footnote, he added -- stated that the
15 claims cannot be brought absent favorable termination.
16       THE COURT:  Which footnote is that in that opinion?
17       MS. FUDIM:  I did not write down which footnote it
18 is, I'm sorry, that's not one of the ones I printed since it
19 wasn't a very lengthy discussion, but it is in a footnote.
20       Let me see -- I might have another note here that
21 lists it.
22       THE LAW CLERK:  It's Note 2, Judge.
23       THE COURT:  Note 2?
24       MS. FUDIM:  Does the Court have it?
25       THE COURT:  I think so.

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

### PROCEEDINGS — 7

1       MS. FUDIM:  Okay.
2       THE COURT:  It says in Note 2:
3       The Supreme Court recently held that a claim for the
4 denial of a fair trial based on fabricated evidence does not
5 accrue until the criminal proceedings terminate in favor of
6 the plaintiff.
7       Then it goes:  As explained above, plaintiff had
8 sufficiently alleged that the criminal proceedings terminated
9 in his favor.
10       MS. FUDIM:  Yes.  It's footnote --
11       THE COURT:  2.
12       MS. FUDIM:  Yes, I do have it in my notes.  Yes,
13 footnote 2 is the one that I'm referring to.
14       And, again, it wasn't really a lengthy discussion
15 because it did find that there was favorable termination.
16       But I think when we talk about favorable
17 termination, whether it's a prerequisite, whether it's an
18 element, whether it's a hurdle that must be overcome prior to
19 bringing suit, these are all synonyms for one another, and
20 it's a question of semantics.
21       And so that footnote, I would submit by
22 Judge Koeltl, likewise establishes that he was not seeking to
23 hold as a holding in *Wellner* that there is no such
24 requirement.
25       The next case that I would point to is one of Your

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

### PROCEEDINGS — 8

1 Honor's own, which I'm sure, quite obviously, the Court is
2 familiar with it.
3       THE COURT:  Don't count on it.
4       MS. FUDIM:  I'm referring to the trial in *Hines*
5 where this Court included both in the jury charge and on the
6 verdict sheet a question -- on the verdict sheet a question
7 about whether favorable termination was established, and an
8 instruction in the jury charge about favorable termination.
9       THE COURT:  Well, I did that really as a precaution
10 in order to have an answer by the jury to that question were
11 it determined by the Second Circuit that that was an element.
12       And I think it was -- I asked that question after
13 they had made the finding on the fair trial claim.  I asked it
14 as a subsidiary question in the event that the Circuit were to
15 clearly impose that requirement, then we would know the answer
16 to that in *Hines* as opposed to having to retry the case to get
17 the jury's answer to the question.
18       MS. FUDIM:  Yes, and I assumed that that was
19 obviously the Court's placeholder of keeping the issue open to
20 avoid a retrial.
21       But I was merely drawing your attention to it
22 because I think if we're going to have a discussion and have a
23 complete record of the body of cases where judges have
24 looked at it, it's part of that.
25       There was also an oral statement by, I believe it

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

## Page 9

1  was Judge Brodie, it's not a written decision, but follows the
2  *Miller* decision by Judge Vitaliano in which Judge Brodie --
3  yes, Judge Brodie had an appearance on another case and didn't
4  issue a decision regarding this issue but did note that the
5  decision by Judge Vitaliano was the most persuasive of the
6  opinions on this issue.
7      So I think that that really is the starting point
8  for --
9      THE COURT:  Was that case appealed?
10     MS. FUDIM:  The *Miller* case?
11     I'm not aware of that, but I don't want to say that
12  and be misspoken.
13     THE COURT:  Does either party know whether this
14  issue is in any case before the Second Circuit now?
15     MR. MEEHAN:  I am not aware.  She would have the
16  better -- more information on this since they're generally
17  involved in those cases.
18     MS. FUDIM:  I'm fairly confident that the answer to
19  that question is no.  Because I think that I particularly
20  would have been alerted to the fact where that not case
21  because of the pendency of this case and the fact that I think
22  it's generally well known in the office with which I have been
23  working with, and so I'm not aware of any appeal.  But I'm not
24  aware of what I'm not aware of.  So I don't want to make an
25  affirmative statement to the Court.

## Page 10

1      So I think as to the first element of:  Does
2  *McDonough* add favorable termination as an element for a
3  prerequisite or a hurdle that has to be overcome, the answer
4  is yes.
5      Moving to the next point, which is:  What does it
6  mean for a termination to be favorable?  Our position is still
7  the same, that in the Second Circuit, meaning established by
8  *Lanning*, and that that is an affirmative indication of
9  innocence.
10     Again, looking at *Miller*, Judge Vitaliano's
11  decision, he also notes that that is the logical conclusion to
12  be drawn, that it is the same definition, that there's no
13  reason -- that there's simply no reason for assuming favorable
14  termination means one thing in the context of a fair trial
15  claim and it means something else in the context of a
16  malicious prosecution claim.
17     As to the last element, the fact that there was no
18  favorable termination here, I think there's a couple of points
19  to be made.
20     I think factually it's interesting and relevant that
21  after *Lanning* was decided, the plaintiff withdraw his
22  malicious prosecution claim, besides acknowledging that there
23  was no favorable termination here.
24     So a favorable termination does, in fact, mean the
25  same thing in the context of a fair trial claim and a

## Page 11

1  malicious prosecution claim as it appears it does, I think the
2  plaintiff testified he conceded that.
3      Putting that aside, suppression of evidence has never
4  been -- even before *Lanning* was decided, it's never been the
5  case that that is a favorable termination, and it's still not
6  the case post-*Lanning*, although there are still only two
7  decisions that I'm aware of that have specifically looked at
8  that post-*Lanning*, the same two decisions that were in our
9  papers which we briefed.
10     Plaintiff's counsel's opposed certain arguments.  We
11  replied, so I won't reiterate that.  Again, I'm assuming the
12  Court's familiarity with our papers, but I'm not aware of
13  additional decisions on that point and the same cases
14  afterwards -- excuse me, the same cases before *Lanning* that
15  spoke to supression which are in our papers.
16     THE COURT:  But I take it, though, although you say
17  that that's not a favorable termination, arguably in some
18  circumstances are perhaps different from those here, it could
19  be a favorable termination?
20     MS. FUDIM:  I don't know the answer to that.  And I
21  don't know that I can take -- I mean a position outside of the
22  circumstances here.
23     Could there be a situation where the supression of
24  evidence could be favorable?  I mean certainly in *Brown versus*
25  *City of New York*, the court took the position that there could

## Page 12

1  be such a situation and it has to be analyzed on a
2  case-by-case basis, and that certainly may be right.
3      THE COURT:  But here you're saying it was suppressed
4  based on a finding of the trial judge, or was it the appellate
5  judge, I forget?
6      MS. FUDIM:  It's the Appellate Division, Your
7  Honor --
8      THE COURT:  It's the Appellate Division decision
9  that there was no reasonable basis to stop the individual.
10     MS. FUDIM:  Yes.  And actually the sentence, the
11  actual sentence that the court comes to, in which it vacates
12  the conviction, said:  The defendant's act of parting with the
13  gun was a spontaneous reaction to the sudden and unexpected
14  pursuit by the officers as opposed to an independent act
15  involving a calculated risk attenuated from the underlying
16  police conduct, accordingly, we reversed the judgment.
17     So right in the notion where it's saying we're
18  reversing the judgment, the Appellate Division is saying the
19  defendant's act parting with the gun.
20     So any subsequent determination that this was
21  favorable, that this was an affirmative indication of
22  innocence is directly in conflict with the basis of the
23  Appellate Court's decision.
24     And looking back to *McDonough*, one of the concerns
25  the Supreme Court had is that it did not want inconsistencies

## PROCEEDINGS 13

1 between decisions of the courts.

2 And that is clearly an inconsistency. I don't think

3 that there this is any footing on which to argue that this

4 dismissal of this sentence affirmatively indicated innocence.

5 And I think that the best acknowledgement of that is

6 the fact that all along in this case the plaintiff had the

7 malicious prosecution claim, but once *Lanning* was decided, at

8 that point the plaintiff dismissed his mal pros claim, and

9 when the mal pros claim was briefed before Judge Vitaliano,

10 Judge Vitaliano did find that the mal pros claim was

11 continued, that there was favorable termination. But

12 *Judge Vitaliano* specifically stated that that decision was

13 based on the fact that the standard was inconsistent with

14 innocence, and that if the standard were something else, that

15 would not be his decision. So I think we have all the pieces

16 here and the lines can very easily be drawn.

17 The last point which I would briefly address is

18 obviously the standing of the defendants to make this motion.

19 Again, I don't have anything really to add from our

20 papers. I think our papers address the issue. We moved under

21 Rule 50(b), Rule 60(b), and Rule 54(b).

22 I think Rule 54(b) has the clearest path because

23 it's based upon the Court's inherent authority to reconsider

24 or modify any decision at any time before the entry of final

25 judgment.

## PROCEEDINGS 14

1 Here there is not a final judgment. Finality of

2 judgment was divested by plaintiff's filing of the Rule 59

3 motion.

4 And plaintiff actually ignored Rule 54 in their

5 opposition, and I think for good reason, because the inherent

6 authority of the court is so broad and so amorphous that it

7 really does allow the court to act where justice requires, and

8 this is one of those instances.

9 With respect to Rule 60(b), we relied upon the four

10 factor test set forth in *Sargent*.

11 THE COURT: It does say there needs to be a final

12 judgment in Rule 60?

13 MS. FUDIM: Yes. I was just going to say that, yes.

14 For Rule 60 you have to have a final judgment. So

15 my point is —

16 THE COURT: We don't have that.

17 MS. FUDIM: Our position is that that does not

18 exist.

19 But I was going to say to the extent that plaintiff

20 would argue that there is a final judgment by the fact that

21 judgment was entered, and I think that's wrong by virtue of

22 the fact that the finality of the judgment was divested by the

23 filing under Rule 59.

24 But to the extent that there were some basis to say

25 that this is final because a judgment was entered in the

## PROCEEDINGS 15

1 Rule 59 motion, addressing only the damages and not the

2 liability, somehow that there is still a final judgment as to

3 liability, well, then you have Rule 60(b) where you've got the

4 *Sargent* factors, which do apply here.

5 Plaintiff argues that they don't apply because

6 *Sargent* wasn't a 60(b) case.

7 We cited to the *Stevens* case in our papers that did

8 find that the *Sargent* test can still be applied to some 60(b)

9 analyses where there is not obvious neglect or lack of

10 diligence. And here there was not any neglect or lack of

11 diligence, and we moved the day after *McDonough* was decided.

12 There was no obviously way to move prior to that.

13 Lastly, we moved under —

14 THE COURT: How many days was that after the jury's

15 verdict?

16 MS. FUDIM: I don't know. I'd have to look back. I

17 don't recall.

18 THE COURT: Shortly over a month; wasn't it?

19 MS. FUDIM: Yeah, it was very shortly over a month.

20 We're not talking about a long period of time. It was

21 certainly beyond 28 days, but I can't say the exact number

22 without looking at the specific days. I think we're looking

23 at about five weeks.

24 THE COURT: You made another argument that you had

25 made an oral motion at the end of the case that you were

## PROCEEDINGS 16

1 relying on that argument partly.

2 Have you ordered the transcript to support that?

3 MS. FUDIM: No, that was with respect to the 50(b)

4 motion, which I think we said that to the extent that the

5 court needs to rely on Rule 50(b), you know, we could obtain

6 that.

7 Our position has always been that you don't really

8 need to get there because Rule 54 is expansive enough and

9 there was a final judgment and, you know, from our assessment

10 so you really can start and end at 54(b) so we don't need —

11 THE COURT: There is a final judgment you said?

12 MR. MEEHAN: There is not. I misspoke. Thank you

13 for the correction. I misspoke.

14 That there was not a final judgment. It was

15 divested by virtue of the plaintiff's filing of the Rule 59

16 motion.

17 So we don't really think you need to get to 50(b).

18 If we did, it is my recollection — at the present time I

19 should say I have no recollection because it's been so long,

20 but at that time that I wrote the papers it was my

21 recollection that we had put in, you know, some sort of one-

22 to two-sentence, three-sentence statement at the end of the

23 case regarding preserving —

24 THE COURT: Well, in the absence of your providing

25 that, I don't know how I even address the Rule 50(b) motion?

PROCEEDINGS                          17

1     MS. FUDIM:  I mean I think that we can certainly
2   order it.  Our position was that Rule 54 allows --
3        THE COURT:  If you want to allow on Rule 54, fine.
4   But don't ask me to sort of halfway rely on Rule 50(b).
5        I mean if you want that to be considered, I mean you
6   would have to provide the transcript.
7        MS. FUDIM:  Okay.
8        THE COURT:  Otherwise if your position today in
9   court is you're just relying on that, we're just talking about
10  Rule 54(b), then fine, I'll do that.
11       So what is your position?
12       MS. FUDIM:  Can I consult one person before I --
13  before I bind the Law Department to what my thought is?
14       THE COURT:  Sure.
15       MS. FUDIM:  Can I do so right now?
16       THE COURT:  Go ahead.
17       (Pause.)
18       MS. FUDIM:  We would just ask to have a week to two
19  weeks to order the transcript.  If my memory has faulted me at
20  the time of the papers and it wasn't there, we would withdraw
21  the Rule 50(b) argument.
22       THE COURT:  So this was made at the conclusion of
23  the trial if it is made, correct?
24       MS. FUDIM:  Correct.
25       THE COURT:  You don't think you can get the

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                          18

1   transcript before?
2        MS. FUDIM:  I mean I think we -- yeah, we can
3   probably get it within a week, I just have to put in the
4   request.
5        THE COURT:  All right.  So I won't resolve the case
6   until you complete that process.
7        But is there anything else you wanted to add before
8   I turn to counsel?
9        MS. FUDIM:  No, I believe that that addresses all
10  the points I was going to make.
11       Thank you, Your Honor.
12       THE COURT:  Okay.
13       Mr. Meehan.
14       MR. MEEHAN:  Thank you, Your Honor.
15       Let's first address the last thing we spoke about.
16       In the same way that Ms. Fudim's arguing that my
17  motion divested the power for her to make the motion under 54,
18  she's -- her power to file the motion was divested after 28
19  days.  *McDonough* was not --
20       THE COURT:  You completely lost me there.
21       Are you taking the position that it was a final
22  judgment -- when the court entered the judgment, that that was
23  a final judgment and any rules that we rely on has to be a
24  rule that related to a final judgment?  Is that your opinion?
25       MR. MEEHAN:  It is my opinion.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                          19

1     But if Ms. Fudim is going to argue that by my filing
2   of my posttrial motion that that is no longer a final judgment
3   because the court has a pending motion, then I would just say
4   that --
5        THE COURT:  Well, do you agree with that or not?
6        MR. MEEHAN:  You know, I would -- I would say
7   that -- that it would not -- I'm just thinking about this.
8        THE COURT:  You can say, "yes".  It's all right to
9   give it up.
10       MR. MEEHAN:  Yes, I think that my filing of the
11  motion would say that this is not a final judgment at this
12  point because we are requesting a trial on damages.
13       THE COURT:  Okay.
14       MR. MEEHAN:  But I think what's more important here,
15  when you look at the standing for the defendant to file this
16  motion after that 28-day period, it's under Rule 6, and it's
17  Second Circuit law that the 28-day rule is a jurisdictional
18  requirement and it cannot be waived.  The case name is
19  *Weissman*, W-E-I-S-S-M-A-N, v *Dawn*, 214 F.3d 224, Second
20  Circuit, 2000.
21       So once that 28th day hits, you can't make this
22  motion any more.
23       THE COURT:  Even though the basis for the motion was
24  not apparent within the 28 days?
25       MR. MEEHAN:  I think that even -- that actually

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                          20

1   undercuts the defendant's argument.  Because within the time
2   period during the jurisdictional requirement that argument
3   could not have been made.
4        So I think there's a threshold issue regarding when
5   *McDonough* came down that had an adverse effect on the
6   defendant's ability to retroactively --
7        THE COURT:  Well, what if I granted your motion for
8   a new trial on damages?  Now we're back to starting all over
9   again.
10       MR. MEEHAN:  We really wouldn't be starting all
11  over, we would be on liability, because the jury said there
12  was a finding that the defendant intentionally fabricated
13  evidence and plaintiff suffered a deprivation of liberty as a
14  result.
15       To get back to what Ms. Fudim's argument was first
16  regarding whether or not the favorable termination is now an
17  element of fair trial.  It's clear that the Supreme Court did
18  not explicitly add an element to this claim.
19       THE COURT:  Before you go there --
20       MR. MEEHAN:  Sure.
21       THE COURT:  -- let's just stick with the ability to
22  make the motion.
23       MR. MEEHAN:  Sure.
24       THE COURT:  You didn't address the claim for the
25  defendants that they didn't make the motion under Rule 54(b).

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

## Page 21

1  You didn't challenge that.

2  MR. MEEHAN: Well, I -- the court's inherent power

3  is a broad and as, Ms. Fudim says, an amorphous category

4  involved.

5  But when the power to make the motion is divested,

6  why should the court -- I guess the better way to look at it,

7  is why is justice so required?

8  What about the Supreme Court's decision later makes

9  the interest of justice to go back and amend the jury's

10  finding when at that time, even assuming arguendo, that the

11  element had been added at a later date, why would that give

12  the court the power to simply wipe away the jury's finding?

13  So I think that it's the jurisdictional

14  requirement --

15  THE COURT: Because they never made the finding.

16  And if counsel was right, it's the finding that has to be

17  made, it seems that that particular thing I guess doesn't go

18  to the jury.

19  MR. MEEHAN: So counsel is not saying that finding

20  has to be made. Counsel is saying that the court can make

21  that finding and throw the case out. It's two very -- two

22  significant distinctions.

23  She's not asking for a new trial on liability, she's

24  saying that the favorable termination element should be

25  retroactively applied, and then the court should throw the

## Page 22

1  case out because we cannot establish favorable termination.

2  THE COURT: It would be like summary judgment.

3  MR. MEEHAN: It would be like summary judgment.

4  She's asking the court to go back --

5  THE COURT: And you would agree that on summary

6  judgment that it is possible for the Court, if it were an

7  element, that the Court could find on summary judgment that

8  the elements had not been met or the requirements had not been

9  met based on undisputed facts.

10  I don't know here that we -- that as to this

11  particular element, assuming it is an element or a

12  requirement, that there are any facts disputed about its

13  applicability such that it could not have been decided on a

14  summary judgment or would have had to have gone to the jury.

15  MR. MEEHAN: No, from my experience doing these

16  cases, I think favorable termination element is almost always

17  decided by the court.

18  However, as the Court just indicated, in an

19  abundance of caution in the *Hines* case, which I have no

20  familiarity except for what I've heard in this oral argument,

21  it was a factual issue that was sent to the jury.

22  So is this an element that is now becoming a factual

23  issue is the question I don't know the answer to, and I don't

24  know that there's been any case law anywhere.

25  THE COURT: But there's no disputed facts about

## Page 23

1  whether this was a favorable termination or not.

2  MR. MEEHAN: So we haven't gotten there yet

3  because -- and I think that goes to the second point of

4  Ms. Fudim's argument as to what is a favorable termination.

5  Even if you're saying that the Supreme Court has now

6  said favorable termination is now part -- you know, and the

7  semantics argument, I think it's not semantics, it's a very

8  important, very important distinction here.

9  When you look at *McDonough*, what *McDonough* was

10  saying is that the *Heck* version of favorable termination, the

11  procedural bar that if you're convicted or you're in, you

12  can't file that lawsuit, you have to wait until the appeal

13  is -- the process is extinguished, almost like a grievance

14  process, before you can file a lawsuit. That's what the

15  Supreme Court said in *McDonough*.

16  And specifically when you look at *Heck*, and they lay

17  out what is considered a favorable termination, of which

18  vacating a conviction on appeal is specifically enumerated,

19  favorable termination under *Heck*.

20  So whether or not it's an element or it's the

21  procedural bar as defined under *Heck* is very important to this

22  analysis. And it's something that the Supreme Court in

23  thinking out the *McDonough* decision, if they wanted to apply a

24  new element, it would have explicitly said so.

25  There is no creation of a new element by omission

## Page 24

1  and by inference. In fact, they specifically have a footnote

2  in *McDonough*, I believe footnote number 7 or 10, specifically

3  states that we are not -- we do not have occasion to address

4  what is considered a favorable element for the purposes of

5  fair trial nor -- nor would we, we're going to do so later.

6  So for the City's argument --

7  THE COURT: Cowards.

8  MR. MEEHAN: Pardon?

9  THE COURT: Cowards.

10  MR. MEEHAN: It would have helped. Because as the

11  Court is saying, this has created a lot of issues in a lot of

12  cases in this area.

13  One thing that the Supreme Court certainly didn't do

14  is say, A, what favorable termination would be in the context

15  of a fair trial, but it also didn't explicitly say that we're

16  going to adopt the *Heck* rules either.

17  So for the Court to retroactively disturb the jury's

18  finding on liability to impose a new element that wasn't there

19  at the time, and then one step further make a determination

20  and that says that the favorable termination was not satisfied

21  is just such a leap of logic from one case that doesn't

22  specifically talk about this issue and specifically tells the

23  reader that we're not addressing this issue.

24  THE COURT: Do you suggest -- when the Second

25  Circuit announced the *Lanning*, I guess, opinion -- I'm

1  mispronouncing the case -- that it has to be affirmative
2  evidence of innocence, was that solely in the malicious
3  prosecution context and not in any discussion of *Heck*, and are
4  you saying that *Heck* has a different favorable termination
5  analysis than the *Lanning* case has?
6          MR. MEEHAN:  In reading these cases and working on
7  these motions, I look at it like there's a favorable
8  termination is a term of art that is used in two different
9  contexts.
10         For malicious prosecution, in the same way that
11 probable cause is not a defense in fair trial, but it is a
12 defense in malicious prosecution, that is the distinction in
13 this case.
14         Malicious prosecution is a process claim that
15 results from the prosecutor -- from the police prosecuting the
16 plaintiff, right?
17         The whole purpose of the fair trial claim is to go
18 for the actual fabrication of evidence.
19         *So why would what happens in the case have anything*
20 *to do with the concrete fabrication of evidence?*  That's why
21 there are two independent causes of action.  And that is why
22 one can -- one can go foul and one can be dismissed and you
23 can proceed with the other at trial.
24         They're not completely the exact same, and they do
25 not rise and fall together.  So for --

1          THE COURT:  But, you know, think this through for a
2  moment.
3          MR. MEEHAN:  Sure.
4          THE COURT:  Because we're worried about civil cases
5  interfering with criminal cases, for instance.
6          So there is a criminal conviction, and the person is
7  found guilty of the offense.  They then make a fabrication,
8  they claim simply a fabrication of evidence claim.  Why
9  doesn't -- why wouldn't that impugn that conviction, which was
10 the whole part of the *Heck* cases that you can't have a
11 collateral attack on a criminal conviction by bringing the
12 civil case?
13         MR. MEEHAN:  Because *Heck* would bar the claim until
14 that conviction is overturned, and of the specifically
15 delineated ways *Heck* considers a favorable termination, one of
16 which is the exact way that the Smalls --
17         THE COURT:  But you're saying to me that a fair
18 trial claim does not have a requirement that there be a
19 favorable termination.
20         So if that's the case and that's your argument, then
21 if someone is convicted, you can still bring your fair trial
22 under the fabrication of evidence.
23         MR. MEEHAN:  I see what the Court's saying.
24 However, there is a procedural bar on all 1983 cases that the
25 Supreme Court said under *Heck*.

1          So I think the specific cause of action is, you
2  know, it doesn't matter, because on any case under 1983,
3  whether criminal or conviction is barred.
4          THE COURT:  Not necessarily.
5          MR. MEEHAN:  In the context of a force, excessive
6  force is time barred by a conviction.
7          So I think by the Supreme Court explicitly declining
8  to enumerate what it considers a favorable termination in the
9  context of fair trial, I think the Court has to look at the
10 favorable termination, the enumerated reasons under *Heck*, not
11 under *Lanning*, because *Lanning* only applies to malicious
12 prosecution, getting back to the Court's original question, is
13 that -- does that apply to fair trial or malicious
14 prosecution, I would argue that it only applies to malicious
15 prosecution because that's a delineated element of the claim.
16         THE COURT:  Okay, do you want to be heard briefly on
17 your motion?
18         MR. MEEHAN:  I sure do, Your Honor.
19         MS. FUDIM:  Can I just respond to a couple of points
20 before we switch motions?
21         THE COURT:  Okay.
22         MS. FUDIM:  Briefly -- I think the Court can move on
23 from this point but I want my argument to be on the record as
24 well, with respect to the -- I think it was the *Weissman* case
25 that plaintiff has cited.

1          THE COURT:  The which case?
2          MS. FUDIM:  I think he called it *Weissman*.  It
3  was -- it's in his papers as well, *Weissman v Dawn Joy*
4  *Fashions* that he mentioned a few moments ago about the 28-day
5  procedural bar.
6          *Weissman*, even if plaintiff admits in his opposition
7  papers, applies to Rule 50(b) and (d), 52(b), 59(b), (d) and
8  (e) and 60(b).  It does not apply to Rule 54.  So I just want
9  to make sure that that's clear for the record.
10         The next point I wanted to make was plaintiff's
11 counsel said why is justice still required under Rule 54.  And
12 I want to answer that question.
13         Before this case went to trial, *McDonough* was
14 outstanding.  It was pending.  We understood that *McDonough*
15 was going to address the favorable -- the statute of
16 limitations issue.
17         And that could have been an issue.  Had the court
18 gone the other way and said, no, we agree with the Second
19 Circuit statute of limitation runs when a claim accrues,
20 rather, when a plaintiff noticed the fabricated evidence is
21 being used against him, that obviously would have prevented a
22 procedural bar in this case.
23         That was something I raised with the Court, and we
24 wanted to wait for that decision because, you know, one side
25 of the equation could have been that the law in the Second

PROCEEDINGS 29

1 Circuit was upheld.

2 There were obviously reasons to also think that

3 maybe the *Second Circuit* wouldn't be upheld, which Your Honor

4 believed, I suppose, was the likely outcome were correct,

5 obviously the Supreme Court overruled the Second Circuit.

6 But had this Court said, you know what, let's wait,

7 let's see what *McDonough* holds on statute of limitations

8 before we proceed on this trial and then have the Supreme

9 Court issue its decision on *McDonough*, as it's written, would

10 this case have still gone to trial?

11 And if the answer to that question is no, then

12 justice so requires. Because we were really close in terms of

13 time, in terms of when this case went to trial, and when

14 *McDonough* was decided.

15 And if the answer to that question is no, this case

16 would not have gone to trial because the parties would have

17 had additional briefing on this issue in terms of what

18 constitutes favorable termination and all the issues we

19 discussed here, if the Court's resolution is no, I'm not

20 sending this case to the jury, then that should be

21 distinguishable.

22 The next point I just want to clarify that there was

23 one point and plaintiff may have just misspoken, so I just the

24 want to make the record clear.

25 There was one point when Mr. Meehan was speaking

---

PROCEEDINGS 30

1 that he said that in *McDonough* they do not lay out -- that

2 they lay out, excuse me, what constitutes a favorable

3 termination. He may have said --

4 MR. MEEHAN: They do not.

5 MS. FUDIM: They do not, okay.

6 So I wanted to make sure that the record is clear, I

7 think we can all agree that in footnote 10, the Supreme Court

8 was quite clear that it did not have occasion to address what

9 constitutes a favorable termination, and they specifically say

10 that, you know, they're not doing so. But I think that

11 they're exemplary somewhat of plaintiff's counsel's analysis

12 of two different elements.

13 Because the fact that the Court tells the reader,

14 we're specifically not addressing this, that point is what

15 constitutes a favorable termination, not whether or not it is,

16 in fact, a requirement for the claim. Because as to that

17 requirement, that would be the requirement for the claim the

18 court was clear, and so there's a delineation between those

19 two points.

20 Counsel said something about what is fair about

21 malicious prosecution being a process claim. We would submit

22 that there was a fair trial claim based on fabrication of

23 evidence is also a process claim.

24 And the -- one more point I wanted to make. Oh,

25 yes. One other point that I wanted to make is that in terms

---

PROCEEDINGS 31

1 of, you know, the Court's hypothetical about conviction and

2 can the person then file, you know, they -- a fabrication of

3 evidence claim. I think in that case obviously that they can.

4 And there are black-and-white cases, and this is, I

5 think comes also from Judge Vitaliano's analysis, that an

6 acquittal is necessarily a favorable termination, and a plea

7 of guilty, or a conviction is quite necessarily not a

8 favorable termination. And then there's a whole host of gray

9 area. And in that case it had to do with an ACD analysis that

10 Judge Vitaliano looked at.

11 But here, because we're also in one of those areas

12 where it's not, you know, a conviction that was never tested,

13 it's not an acquittal that was never tested, it's vacating a

14 judgment based on a technical finding regarding suppression of

15 evidence, or in a situation where you have to look at the

16 underlying facts.

17 And obviously it's the second element now or I

18 should say the third, whether or not this was a favorable

19 termination, and then based on the decision of the Appellate

20 Division, I think it's clear that it was not, because in the

21 very sentence in which they reversed the conviction they note

22 that plaintiff had a gun.

23 So those are the points I wanted to clarify for the

24 record.

25 THE COURT: All right. Thank you.

---

PROCEEDINGS 32

1 MR. MEEHAN: If I can briefly address a couple of

2 those, Your Honor.

3 If we turn to the case that I think Ms. Fudim is

4 relying the most on right now, *Miller*, Judge Vitaliano's case,

5 on page 4, Judge Vitaliano explicitly says, the favorable

6 termination is not an element of a fair trial claim. It's,

7 quote, clearly, comma, then, the majority did not go as far as

8 to impose wholesale a favorable termination requirement on all

9 fair trial claims, the answer to the question is no.

10 Judge Vitaliano has already said it.

11 Getting to what Ms. Fudim is talking about right

12 now, the evidence that the firearm that was suppressed. That

13 is the exact same evidence that Mr. Smalls is saying was

14 fabricated. That's the evidence that was thrown out.

15 So it's not just a simple technicality that he got

16 off. This is the exact evidence we're saying the police

17 officers made up, that he did not have a gun and he did not

18 throw a gun.

19 THE COURT: But the finding of the Appellate

20 Division is that they didn't have a reasonable basis to stop

21 him but believe that he, in fact, did have the gun, and a jury

22 prior to that determination found that he had the gun. So

23 that's not a finding that he didn't have the gun anywhere.

24 MR. MEEHAN: So --

25 THE COURT: Indeed, the two findings, both the

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

PROCEEDINGS 33

1   jury's and the Appellate Division, are to the contrary, that
2   he had the gun.
3           MR. MEEHAN:  So we're going to go back a couple of
4   motions in this case to Ms. Fudim's collateral estoppel
5   argument.  And that's why we had the attorney, if the Court
6   recalls, come, because Judah Maltz, through his initial
7   affidavit cut-and-paste that he dropped the gun spontaneous
8   utterance was part of the standard omnibus motion, and that
9   was part of the record.
10          But Mr. Smalls himself had -- certainly had never --
11  didn't testify at the grand jury, didn't testify at the trial,
12  and never said that he had the gun.  So the Appellate Division
13  argument was based solely on that Maltz omnibus motion.
14          So the jury did have a chance to make a finding
15  whether or not that evidence was fabricated, it was this jury
16  that found it was.
17          THE COURT:  So the other jury found that he
18  possessed the gun.  And this jury could have find not that he
19  didn't -- I mean, there are a number of things that they could
20  have found were fabricated, but they didn't necessarily have
21  to find that he didn't have the gun.
22          MR. MEEHAN:  But for the defendants to rely on
23  that -- you know, they had a chance to object.  They had a
24  chance to give special interrogatories as to which evidence
25  was fabricated.  They waived that.  It's a general verdict

PROCEEDINGS 34

1   rule.
2           The jury found that there was fabricated evidence
3   and plaintiff spent two years, one month and 14 days in jail
4   as a result of that fabricated evidence.
5           So this is --
6           THE COURT:  You're not arguing that that jury
7   finding meant that the jury found he didn't have the gun.
8           MR. MEEHAN:  The jury's finding means that evidence
9   was fabricated.
10          Had the defendants objected or suggested special
11  interrogatories that parsed out the evidence, then we would
12  have an answer to that and we don't.
13          THE COURT:  All right.  Are you saying that in
14  ruling on this I have to assume that the jury found -- this
15  jury found that he possessed the gun?
16          MR. MEEHAN:  No, I think for purpose of this we have
17  to say the jury found that he did not possess the gun.
18  Because --
19          THE COURT:  I'm sorry, I meant to say the opposite.
20          MR. MEEHAN:  That's the evidence that was the crux
21  of plaintiff's entire case.
22          Going back to Ms. Fudim's argument about justice so
23  requiring and we have to look at the timing of this.  That is
24  not true.  There's been a jury finding.  The jury has found
25  that this evidence was intentionally fabricated by these

PROCEEDINGS 35

1   police officers.
2           So the Court should afford -- should not actively
3   seek to disturb that finding, it should do so only if justice
4   so requires.  And justice so requires is not simply look at
5   the timing, Judge.  Justice also means not disturbing this
6   jury's finding.
7           They found that he intentionally fabricated -- that
8   the officers, both Collins and Teta, fabricated this evidence.
9           With that, I would to turn to my motion.
10          MS. FUDIM:  I'm sorry, I have to respond to two
11  points, Your Honor.  I'll be brief, very brief.
12          First of all, counsel mentioned that the decision of
13  the Appellate Court finding that he had the gun is the exact
14  evidence that they were challenging was claiming was
15  fabricated in the trial in this case.
16          In the first instance they were claiming that a lot
17  of things were fabricated, but, included among that, was the
18  gun.  And that is precisely why this action could not have
19  proceeded because it was upon the exact same piece of evidence
20  that the court found he had it.
21          Forget about how the court got there, what arguments
22  were made.  The Appellate Division found that he had the gun
23  in reaching its conclusion.  And so that is precisely why you
24  can't have a separate action, a civil action, that challenges
25  factually that finding.

PROCEEDINGS 36

1           Point two, and we'll get to this I think when we
2   discuss plaintiff's counsel's motion, is that of course the
3   finding of the jury does not necessitate this Court to find as
4   a factual finding that plaintiff did not have the gun.  We'll
5   discuss that more, I assume in counsel's motion.
6           One final point I did want to make, and it had to do
7   with the decision of Judge Vitaliano's quote that counsel read
8   saying that he did not find that *McDonough* had a favorable
9   termination requirement.
10          What he said was that there was not finding in
11  *McDonough* of an across-the-board wholesale finding of
12  favorable termination.
13          And that's the same position we took in our papers.
14  In fact, in our papers, we pointed out, I believe it's our
15  reply papers, that the court acknowledged that it could image
16  a case of fabricated evidence claim that would not have a
17  favorable termination requirement; i.e., one that did not
18  allege a liberty deprivation occasioned by criminal
19  proceedings, but that was not the nature of the *McDonough*
20  claim.  And that's at page 12 of *McDonough*.
21          So we too acknowledge that there could, in theory,
22  be fabricated evidence claims that do not have a favorable
23  termination requirement, because you have to get there.  The
24  court said that.
25          The court said it could imagine such a scenario, but

## Page 37

1  just that that was not the type of claim alleged by

2  Mr. *McDonough*.  It's not the type of claim alleged by the

3  plaintiff, Mr. Smalls, in this case.

4      THE COURT:  Okay, you want to go to your argument on

5  the damages?

6      MR. MEEHAN:  I know Ms. Fudim and I can go all

7  day --

8      THE COURT:  I'm sure you can.

9      MR. MEEHAN:  I have a sur, sur, sur-reply.

10     THE COURT:  Is it under one sentence?

11     MR. MEEHAN:  It's under two sentences.

12     THE COURT:  All right.

13     MR. MEEHAN:  An element is an element is an element.

14  An element is not something that's sometimes in a cause of

15  action and sometimes not.  And if the City's conceding that

16  sometimes it would be a favorable termination, then that's

17  that, there is no favorable termination element.

18     Secondly, the argument that Ms. Smalls is making

19  regarding the case should have never gone to a jury because of

20  the Appellate Division's finding, the Court granted leave for

21  them to file an exceeding late summary judgment on this issue.

22  The Court ruled against them.

23     They also made this exact same issue in the motions

24  *in limine*, which the Court did not grant, so now this is a

25  third bite at the exact same argument that the case shouldn't

## Page 38

1  have gone to a jury because of the finding.

2      THE COURT:  No, I think the argument was that it

3  shouldn't go to the jury based on an admission.

4      MR. MEEHAN:  The judicial admission.  But the

5  judicial admission was the same as what the Circuit -- what

6  the Department based their decision on.

7      THE COURT:  I thought that the argument was more

8  that his lawyer, had he made the statement, it was an

9  admission of an agent, and that should go to the jury.  And

10  after we hashed that all out, I think I determined no.

11     But that's different from what you're saying.

12     MR. MEEHAN:  It's not because it's the same basis as

13  to why the Department put that in the record.  Because that

14  was part of the record, and that's why it's in the decision

15  because of the fact that the only people to have given

16  testimony at the trial were Collins and Teta.  So the

17  plaintiff's version of events was not there for the Department

18  to rely upon when they were drafting their opinion, if that

19  makes sense.

20     THE COURT:  They had a whole jury trial.  They had

21  all the testimony that had gone on at trial.

22     MR. MEEHAN:  The only two people who testified at

23  the jury trial were Collins and Teta.

24     None of the witnesses that we had the jury -- if the

25  Court recalls, we had someone come up from North Carolina --

## Page 39

1      THE COURT:  I guess I'm not understanding your point

2  about that.

3      MR. MEEHAN:  The record was a confined universe that

4  this jury heard a lot more than the Department.  That's what

5  I'm saying.

6      There was a suppression hearing and trial in which

7  Collins and Teta testified at the suppression hearing, and they

8  testified at the trial.

9      The plaintiff, invoking his rights, did not testify

10  at any level.  And for whatever reason, defense counsel did

11  not call any witnesses.  So the entire criminal trial, the two

12  officers saying their version of events.

13     There was nothing -- the only plaintiff version of

14  events in the appellate record was the omnibus motion that

15  Judah Maltz made.  That was the basis of the summary judgment

16  motion and motion *in limine*.

17     Does that make sense?

18     THE COURT:  Sort of.

19     Okay, let's move on to the other motion that you

20  have.

21     MR. MEEHAN:  Okay.

22     So the parties have stipulated that plaintiff

23  suffered a deprivation of two years, one month and 14 days.

24  After the jury trial, the jury awarded $60,000, which is

25  $30,000 a year.

## Page 40

1      When you look at what the Second Circuit has held

2  as -- sorry, let me get to switch my notes here.

3      THE COURT:  What's the standard?  Is it shock the

4  conscious?

5      MR. MEEHAN:  Grossly inadequate and shock to the

6  conscious would be the standard.  And in this respect, $30,000

7  off the standard of 1 million is 3 percent.  It is grossly

8  inadequate.

9      THE COURT:  Off the standard?  What standard?

10     MR. MEEHAN:  The standard of 1 million that is the

11  general rule set out in *Restivo* and in a litany of other

12  cases.

13     THE COURT:  How is that a general rule?

14     You mean there was no remittitur on those cases

15  where that much -- how is that possibly a general rule as to

16  what is appropriate?

17     MR. MEEHAN:  So I think there's two ways to look at

18  it.  What has been affirmed and what -- when it's gone over,

19  what it's been reduced to.

20     And in that the case law is clear.  And if you go to

21  *Restivo versus County of Nassau*, quote:

22     The figure of 1 million per year is not a definitive

23  rule, it would depend upon the particular facts of the case,

24  nonetheless federal courts have affirmed damage awards of

25  1 million per year in similar cases involving periods of

## Page 41

1   incarceration.

2           So I'm not going to call it a general rule, but in

3   these kinds of cases when the City settles, for example, the

4   Central Park jogger case, the City came to the number of

5   $1 million a year.  In fact, I have another case --

6           THE COURT:  When was that case, by the way?

7           MR. MEEHAN:  The Central Park jogger case?

8           THE COURT:  It was settled under this current

    administration, correct?

10          MR. MEEHAN:  Yes, Your Honor.

11          THE COURT:  It wasn't settled under --

12          MS. FUDIM:  No, it was this administration.

13          MR. MEEHAN:  So when you look at -- it's hard to say

14  this because obviously additur is --

15          THE COURT:  Okay, so --

16          MR. MEEHAN:  -- unconstitutional under the Seventh

17  Amendment.

18          So we only have two categories to look at:  What is

19  affirmed, and when something goes over, what the court has

20  affirmed and what it reduces to.

21          So it's not like these cases when someone's been in

22  jail for two years, they don't get reduced into the 10,000,

23  20,000, $30,000 range, they get reduced to a million when they

24  go over a million.

25          So that's -- so we have two categories to look at.

## Page 42

1   And in both of those categories it was affirmed at a million,

2   and it's remitted to a million.  And that's where we're

3   getting the general rule, so to speak.

4           THE COURT:  But I just thought you told me that you

5   can't have an additur if it was unconstitutional under the

6   Seventh Amendment.

7           Doesn't that mean you can't add money to the jury's

    verdict?

9           MR. MEEHAN:  Yes, the court would have to award a

10  new trial on damages.  That's why we're moving for a new trial

11  on damages.

12          If this verdict were in state court --

13          THE COURT:  That's true for remittitur as well.  If

14  the court comes up with a number but if the parties don't like

15  it, they get a new trial.  So what's the difference?

16          MR. MEEHAN:  I think in this context the court

17  couldn't have suggested a number.  The court would have just

18  have a new trial on damages.

19          THE COURT:  And there is case law that supports

20  having a new trial on damages when the damages are, in your

21  view, too low?

22          MR. MEEHAN:  Yes.  Yes.  And I have those in my

23  papers.  *Graham v City of New York*.  *Clinton v Brown*.  *Tisdel*

24  *v Barder*.  *Liriano v Hobart*.  Just a couple that I'm citing to

25  in my papers.

## Page 43

1           The City makes an argument in their opposition to

2   this that is rank speculation as to -- back to what we were

3   talking about earlier, what they found and how long they

4   awarded money for, and maybe he would have been in longer, or

5   he would have been in for something else.  That's all

6   speculation.  None of that was determined by the jury.

7           Again, the City would have had a chance to add

8   special interrogatories.  They failed to ask for them.  They

9   failed to address the verdict sheet.

10          THE COURT:  Well, what was appropriate for them to

11  consider on the issue once they found the fabricated, what was

12  appropriate for them to consider?

13          Was there any evidence introduced about who he was

14  or is there any evidence -- let me ask the defendant this.

15          Is there any evidence that you rely on to suggest

16  that somehow they decided this individual didn't deserve more

17  than 30,000 a year?  Anything in the record?

18          MS. FUDIM:  No, I mean I think that the point that

19  you said -- I think the point that, you know, Mr. Meehan is

20  making is that it's speculative to decide -- you know, to

21  figure out what they relied upon is one that we agree on, it

22  is speculative.

23          I mean if he wants the court to find that they

24  necessarily found that the gun was fabricated and that, you

25  know, a host of other things.  And our point is precisely --

## Page 44

1   I'm not urging upon the court to find that it was something

2   smaller or that they found based on any of the facts.

3           And my point is the same one he's making in this

4   small area in that, yes, it would be complete and utter

5   speculation for us to say why the jury came to that number in

6   terms of what piece of evidence they believed was fabricated.

7   We don't know what piece of evidence they believe were

8   fabricated.

9           THE COURT:  Let me ask the question.

10          Once they find that evidence was fabricated,

11  assuming it was even something small, does that -- should that

12  really affect the amount of damages that someone suffers for

13  the two years they're in prison?

14          In other words, once they found that fabricated

15  evidence leads to the deprivation of liberty, does the jury

16  appropriately consider, well, it was just a fabrication of

17  evidence so we'll give him less money for the years spent

18  incarcerated?

19          MS. FUDIM:  The answer's yes, but it's not based on

20  the fact that I think they're focusing on.

21          It's based on the fact that a jury can find that

22  evidence was fabricated, that that evidence was material, and

23  that that evidence was part of the evidence that led to the

24  guilty verdict but still believe that the plaintiff was

25  actually guilty of the underlying crime based on other

## Page 45

1 evidence that was also submitted or find, for example, like in

2 this case that, okay, we think the clothing was fabricated.

3 And we think that the change of the notation of the

4 clothing is something that was material, because we think it's

5 something that the underlying jury probably relied on and

6 probably assisted them in coming to their conclusion as to

7 deprivation of liberty.

8 But we also think that he probably was there and

9 probably had the gun, or we think it was fabricated that he

10 was the person who handed off the gun. We think that there

11 was really a mixup between which brother was which.

12 THE COURT: So you say those are all -- would all be

13 appropriate considerations in determining how much damages he

14 was entitled to for being in prison for two years? The fact

15 that he -- assuming they found that there was a material

16 fabrication that led to his conviction, but they found that he

17 had the gun, is that a basis to get smaller verdicts on the

18 two counts?

19 MS. FUDIM: Yes, and there's a case in my papers

20 where it talks about the fact that the court -- that you can

21 consider whether or not the jury -- you know, whether or not

22 the jury could have still believed that the person was, in

23 fact, guilty. It is one -- not the sole factor, but it is a

24 factor. I have to look for the case.

25 THE COURT: Do you dispute that case law? Can a

## Page 46

1 jury properly consider that?

2 MR. MEEHAN: Well, I think in a context like this

3 when the parties have stipulated the exact time, when we said

4 the deprivation of liberty was two years, one month, 14 days,

5 I think the jury, when they said, your evidence was

6 fabricated, he suffered a deprivation of liberty as a result

7 of that fabrication, I think they have to award two years, one

8 month and 14 days based on the stipulation.

9 THE COURT: So they can't consider -- well, the

10 stipulation is only how much time he spent.

11 They can consider that, in our view, he had the gun

12 and we don't want to give him that much, the guy who possessed

13 a gun, okay, he gets off because we think that they fabricated

14 some evidence that may have led to his conviction, but, hey,

15 this guy had a gun?

16 MR. MEEHAN: I think now we're getting into the

17 realm of the general verdict, Your Honor.

18 THE COURT: No, but I'm just saying. That deals

19 with whether something's grossly inadequate, shocks the

20 conscious, all of that.

21 If that was a possible basis for them to consider

22 damages, are you saying they couldn't give lower damages on

23 that ground?

24 MR. MEEHAN: They certainly could give lower

25 damages, but I think it's that the wholesale 97 percent

## Page 47

1 reduction from the norm is what we're saying is grossly

2 inadequate.

3 You know, a jury's free to award a range. And I

4 think when you look at a more traditional physical injury kind

5 of case, where there is a range or a realm, it would fall so

6 much below that that the new trial on damages would be

7 warranted.

8 On a case where somebody's hit by a bus and had five

9 surgeries, if the jury were to award 15, $20,000 and the

10 court's looking back on the case law and finding what a spinal

11 injury is worth or what a knee replacement is worth, I think

12 that would be more analogous to the analysis that the court

13 needs to make.

14 And that is why we, you know, getting outside the

15 realm of speculation, we should just be focusing on what's the

16 number, is it grossly inadequate, and does it shock the

17 conscious.

18 THE COURT: All right, let me just, now that I've

19 heard -- I don't know if you want to say anything.

20 MS. FUDIM: Yes, I would, Your Honor.

21 I have a few points I'd like to make about that.

22 THE COURT: Okay. Quickly.

23 MS. FUDIM: The first is that plaintiff's counsel

24 said there's two categories that we can look at, judgments

25 that are affirmed and judgments that are remitted.

## Page 48

1 But there is a third category that he ignores, and

2 that's verdicts, period, verdicts by a jury that are not

3 challenged still provide a category of what reasonable juries

4 find to be reasonable.

5 Now we cited some cases in our opposition, and in

6 reply, plaintiff's counsel brushes them off and says those are

7 all jury verdict searches, those are not challenged, those

8 aren't court decisions.

9 But that doesn't matter. The analysis we're

10 undertaking is what could a reasonable jury value time at.

11 One of the basic things we should be looking at are what

12 reasonable juries have done in other cases. Because certainly

13 the majority of cases don't get challenged so you have a much

14 smaller sample size when you're looking, and you can't have

15 half a verdict, so that entire category would be missing.

16 When you look at that category, I'm not going repeat

17 what's in my papers again, I'm confident the Court has read

18 them, but I do want to address one recent verdict that came

19 up, because I think it is relevant.

20 There was a trial in a case called *Tarrell McIlwain

21 v City of New York*, it was in front of Judge Woods. The jury

22 reached a verdict on December 17th of 2019. It was a fair

23 trial claim as well as a false arrest claim. Plaintiff was

24 incarcerated for seven and a half months.

25 As to the fabrication of evidence claim, which is

PROCEEDINGS 49

1  attributable to the time that he was in custody, they awarded
2  $15,000 for compensatory damages.
3        And I brought a copy of the verdict sheet for
4  opposing counsel and the Court, because I think -- may I?
5        (Proffering.)
6        MS. FUDIM:  Here we have a case, and there were
7  punitives in this case, and there was time -- there was money
8  awarded for the false arrest piece, which is obviously the
9  time that the individual spent in custody before arraignment.
10       But taking out the punitive, which is different, and
11 taking out the time in custody prior to arraignment, which was
12 attributable to false arrest, as to the seven and a half
13 months in custody, this jury awarded $15,000, which is right
14 in line with what the jury in this case did.
15       And we have other cases that we cited in our papers
16 that the verdict that this jury reached was certainly not
17 unprecedented.
18       I also want to point out that there is only one case
19 in the entire country, and I think it was out of the Seventh
20 Circuit, plaintiff's counsel cited it in their papers, where a
21 court awarded what they are looking for here, which is a new
22 trial on damages when you're dealing with time in custody
23 because of a deprivation of liberty.
24       And there's only one case in this Second Circuit
25 where a motion for this relief has been made, forget about

PROCEEDINGS 50

1  which way the decision went, one case where this kind of
2  application has been made.
3        It was in Crews.  That case is in our papers.  It
4  was heard by Judge Bianco out -- who was in Central Islip and
5  is now seated at the Circuit, and he's the judge who went
6  through all the different factors that you have to consider.
7        You have to look at the totality of the
8  circumstances.  What evidence was before the jury.  And really
9  the whole focus has to be on the facts of the case.  And
10 interestingly, in plaintiff's papers, there's no focus on the
11 facts of the case.  The entire focus is on this mathematical
12 ratio for time to day which is just --
13       THE COURT:  You're not suggesting, though, that
14 legally I couldn't grant a new trial for additional damages?
15       MS. FUDIM:  Absolutely not.  I'm not saying that
16 legally you can't.  I'm saying it's legally unwarranted and
17 there's no precedent for doing so in a case like this.
18       I also want to address, for the record, a couple of
19 points that were made by counsel in their reply papers, which
20 we did not have an opportunity to file a sur-reply under the
21 Court's rules, so I just wanted to make these points.
22       There was one case that counsel sought to
23 distinguish that we had written a brief on.  On page 5 of his
24 reply brief, there's a case called *Ricchio versus State of New*
25 *York.*  It was a jury verdict.

PROCEEDINGS 51

1        And one of the ways in which counsel sought to
2  distinguish it was, it wasn't a wrongful conviction case, as
3  such it is clearly distinguishable from the case here.
4        And I'm willing to concede that perhaps he's right,
5  but that goes back to the argument that I made that all of the
6  cases that he cited were cases that weren't wrongful
7  conviction cases, they were personal injury cases where --
8  bodily injury cases where there were injuries, and so that's
9  one point I wanted to make.
10       The next one, there's a point he makes on page 6 of
11 his reply which criticizes the Special Federal Litigation
12 Division of the New York State Law Department for what he
13 categorized as -- what's the word I'm looking for --
14 hypothetical argument.  That we are challenging counsel on
15 this idea that you can't just come up with like an hourly rate
16 or a daily rate and then multiply it to get to your finished
17 product of what someone's time in custody is worth.  But in
18 the *Graham* case, we talked about what one hour in custody is
19 worth.
20       And the point that has to be made was that in
21 *Graham*, plaintiff's time in custody was one hour.  So there
22 was no way to talk about that case, other than what an hour is
23 worth, because that's the amount of time that plaintiff was in
24 custody.  So it's really not a fair point to put a change of
25 policy there.

PROCEEDINGS 52

1        The next point I wanted to make, and I don't really
2  think it's a big point, but I do want to clean up the record.
3        On page 8 of their reply there's a discussion by
4  plaintiff's counsel that the jury necessarily found that
5  defendants either acted intentionally or recklessly in
6  fabricating evidence and thus our suggestions to the contrary
7  must be rejected.
8        I think the way we wrote our papers was quite clear,
9  which is to make it clear for the record.  We weren't
10 suggesting that there was some basis for saying that the
11 officers didn't act recklessly or intentionally, we were
12 saying that in plaintiff's moving papers he said the jury
13 found that the officers intentionally fabricated evidence.
14       And the point we made I think was not a huge one,
15 but it was just saying, no, we actually don't know whether the
16 jury found that the conduct was intentional on the one hand or
17 reckless on the other because it only has to be either one to
18 come to the judgment.  And that was the point we were making.
19 We weren't suggesting that it was neither reckless nor
20 intentional, and I wanted to make that clear.
21       As to the -- and I think I sort of spoke to this
22 already, but as to this point of a general verdict, you know,
23 we didn't seek special interrogatories.  Plaintiff's counsel
24 didn't seek special interrogatories.  And I think I will agree
25 with him that you can't speculate as to specifically what the

## Page 53

1  jury based it on, all you can look at are these are the

2  panoply of options, and because we don't know, we can't say,

3  as plaintiff's counsel is trying to get the Court to say, that

4  they found the gun was fabricated.  That was the point that we

5  were making.

6  I think I have one more point and then I'm done.

7  No, same point, I'm done.

8  THE COURT:  Okay.  Let me just ask the practical

9  question.

10  Does either side consider cutting your losses and

11  just letting the jury's verdict stand?

12  MR. MEEHAN:  You know, I haven't -- we haven't had a

13  discussion in a long time about trying to just cut and run, so

14  to speak, in defending this claim.  Maybe I'll -- I can always

15  talk to my office.  My office is always amenable to resolving

16  cases without any further work being done by the Court or by

17  the parties.

18  I think initially when we saw that number, it's just

19  something that -- it's shockingly low and that's why we are

20  making the argument we're making.  We think it sets a

21  dangerous precedent for people who spent years in jail.

22  We know, just through the grapevine of other cases,

23  that based on this case, the City likes to now say a year in

24  jail is only worth $30,000 when they start negotiating with

25  plaintiff's attorneys.

## Page 54

1  THE COURT:  Then you've always got the come back of

2  what they settled the next case for.

3  MR. MEEHAN:  That's true, Your Honor, and if I can

4  just briefly address --

5  THE COURT:  But let me -- I mean, there's no sense

6  in even taking this further.  I don't know whether you think

7  it would be helpful to have a discussion with counsel about

8  that before I resolve it.

9  I mean, I'd be happy to resolve it and it would have

10  to be -- that's my job, but I don't want to do that if the

11  parties, you know, even after I write a hundred-page decision

12  decide they prefer this doesn't go to the Second Circuit and

13  we'll just take our verdict anyway.

14  So that's the only reason I'm asking that question.

15  MS. FUDIM:  From our point of view, that decision

16  gets me at so many levels above my head that I can't speak to

17  that.

18  I mean, I think we can -- we said that we would

19  supplement with a letter within a week, once we get the

20  transcript as to the 50(b) point.  And I think in the time we

21  do that in the interim I can, you know, ask questions of my

22  office and I can have conversations with Mr. Meehan.  But

23  that's definitely not a decision that I would be authorized to

24  make.

25  THE COURT:  I mean, I'm just suggesting that you

## Page 55

1  discuss it, and if you both reject it, fine.

2  But I'm just wondering, you know, there are tough

3  legal issues on one side, and then to counsel both people

4  perhaps thinking that the better part of valor would be just

5  to accept the verdict and move on.

6  From the City's standpoint, it's not a high verdict.

7  From the plaintiff's standpoint, $60,000 is better than

8  nothing if the case gets, you know -- and I'm not previewing

9  anything about, you know, what I'm going to decide.  I'm going

10  to obviously study all the cases carefully that you've raised,

11  but I mean that's just obviously what the balance is, 60,000

12  is not a lot of money, and for the plaintiff it's better than

13  nothing, so...

14  And as I say, my only thought would be that after --

15  you know, I wouldn't want the situation to be that after we've

16  resolved this and gone through all the oral argument and a

17  lengthy opinion that someone decides to settle this rather

18  than take it to the Circuit.

19  I think it would be a good idea, whichever way the

20  opinion goes, for someone to take this to Circuit, because we

21  need clearly the Circuit's guidance on this.  I think it would

22  be very helpful to have Circuit guidance on this.

23  I don't know that people looked at other circuits in

24  determining how this issue has been resolved?  I don't know

25  that I found much in other circuits.

## Page 56

1  MR. MEEHAN:  This morning I Shepardized *McDonough*

2  and, you know, there were some cases outside of the Circuit.

3  But I didn't find anything instructive enough to really, you

4  know, printout and include in today's oral argument.

5  THE COURT:  And I haven't found any that I found

6  terribly helpful.

7  But in any event, again, this is entirely up to

8  either one of you, whether you even want to think about this.

9  I'm just raising it on the theory that if you do are going to

10  think about it, that you think about it now as opposed to

11  thinking about it later.

12  MR. MEEHAN:  I have to admit what Ms. Fudim says

13  makes a lot of sense.  Maybe in a letter she writes

14  supplementing.  We can inform the Court what -- you know,

15  whether or not we think it's -- we can get this resolved.

16  Maybe a posttrial mediation.  I've never done one

17  with the City before, but maybe that's something that --

18  THE COURT:  You know, let me tell you how the case

19  gets settled, if it gets settled.

20  If the case gets settled, in my view, I mean

21  assuming I were a mediator, and obviously in this context it's

22  hard for me to talk kind of settlement, but I think it's

23  obviously the logical settlement of this case would be to

24  accept the jury's verdict and move on.

25  I mean, I don't see this case settling for -- the

PROCEEDINGS                                    57

1   City giving any more money.  And I don't see you -- from your

2   perspective, I wouldn't see you saying, okay, we'll settle at

3   $10,000.  I mean, you're not going to do that either.  So I'm

4   just -- I'm talking practically.

5          So I think what you would be looking at to settle

6   this is if you we take the jury's verdict and run with it.

7   That's -- I mean, I don't think you should be asking for more

8   money to settle it, because they have a very strong argument

9   and, you know, obviously it's probably worth it for you to

10  role the dice rather than, I imagine, then take less than

11  60,000, but I don't know that.

12         So there's a thought.  And, again, there's no

13  pressure on either one of you to settle it.  I just think

14  maybe you ought to at least think about it before we proceed

15  further.

16         So maybe you ought to think about it in the next

17  week and let me know.

18         MS. FUDIM:  Okay.

19         MR. MEEHAN:  Very well, Your Honor.

20         THE COURT:  Thank you.

21         MR. MEEHAN:  Thank you.

22         (Pause.)

23         THE COURT:  Let me just reiterate that that decision

24  is just a practical resolution that the Court throws out

25  there.  It's not as if I'm prejudging anything or telling you

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    58

1   how I'm going to rule one way or the other.  I'm just raising

2   that as a practical matter.  So I don't want you to think

3   that.

4          MS. FUDIM:  Thank you.

5

6          (Whereupon, the matter was concluded.)

7

8                    *    *    *    *    *

9

10

11  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

12

13    s/ Linda D. Danelczyk              March 14, 2020

14    LINDA D. DANELCZYK                  DATE

15

16

17

18

19

20

21

22

23

24

25

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
ANDREW SMALLS,

              Plaintiff,

    -against-

POLICE OFFICER RICHARD COLLINS
and POLICE OFFICER DAVID TETA,

              Defendants.
---------------------------------------------------------x

<u>NOT FOR PUBLICATION</u>
**MEMORANDUM & ORDER**
14-CV-02326 (CBA)(RML)

**AMON, United States District Judge:**

      On May 20, 2019, a jury found Defendants Richard Collins and David Teta liable for violating Plaintiff Andrew Smalls's fair trial rights by fabricating evidence and awarded him $60,000 in compensatory damages. (ECF Docket Entry ("D.E.") # 130.) Before the Court are post-trial motions by both parties. Smalls moves pursuant to Rule 59 for a new trial on damages, arguing that the jury's award of $60,000 for more than two years of incarceration was grossly inadequate. (D.E. ## 132, 134.) Defendants move, pursuant to Rules 50(b), 60(b), 54(b) and the Court's inherent power, for an order vacating the judgment and granting judgment in favor of Defendants as a matter of law in light of the Supreme Court's post-verdict decision in <u>McDonough v. Smith</u>, 139 S. Ct. 2149 (2019). (D.E. # 135.) Defendants argue that <u>McDonough</u> holds that favorable termination is a condition precedent to a fair-trial claim based on fabricated evidence and that Smalls did not, and could not, establish favorable termination at trial. (D.E. # 135-1 ("Defs. Mem.") at 6–15.)

      For the reasons explained below, the Court vacates the jury verdict and enters judgment as a matter of law in favor of Defendants. Smalls's motion for a new trial on damages is denied as moot.

1

**BACKGROUND**

On May 12, 2008, in New York Supreme Court, Queens County, Smalls was convicted of criminal possession of a weapon in the second degree, criminal possession of a weapon in the third degree, and criminal trespass in the third degree. People v. Smalls, 922 N.Y.S.2d 461, 462 (2d Dep't 2011). On April 26, 2011, the Appellate Division reversed the judgment of conviction and dismissed the two counts of the indictment charging Smalls with criminal possession, holding that his motion to suppress physical evidence should have been granted. Id. at 462–63. The Appellate Division reasoned that because neither Smalls nor the others in his group "engaged in suspicious behavior immediately after the [gun]shot was heard or during the three-block walk away from the general location of the gunshot, the police lacked reasonable suspicion when they pursued the four males after they fled." Id. at 463. The Appellate Division further stated that Smalls's "act of parting with the gun" was a "spontaneous reaction to th[is] sudden and unexpected pursuit by the officers." Id. In other words, the officers lacked reasonable suspicion to pursue Smalls; therefore, the firearm should have been suppressed as the fruit of the poisonous tree. As the parties stipulated at trial in the instant action, Smalls served twenty-five months and fourteen days in jail as a result of being charged with criminal possession. (D.E. # 128 ("Jury Instr.") at 13.)

On April 10, 2014, Smalls filed this action pursuant to 42 U.S.C. § 1983 alleging claims for malicious prosecution and denial of the right to a fair trial. (D.E. # 1.) Following the Second Circuit's decision in Lanning v. City of Glens Falls, which held that "a plaintiff asserting a malicious prosecution claim under § 1983 must . . . show that the underlying criminal proceeding ended in a manner that affirmatively indicates his innocence," 908 F.3d 19, 22 (2d Cir. 2018), Smalls agreed to voluntarily dismiss his malicious-prosecution claim, (D.E. # 89 at 6 n.2). The parties proceeded to trial solely on the claim that Officers Collins and Teta deprived Smalls of his

right to a fair trial by fabricating evidence against him suggesting that he possessed a firearm. (<u>See</u> Jury Instr. at 10–11.)

Based on the law in the Second Circuit as it then existed, the Court permitted Smalls's fair-trial claim to proceed to trial, in May of 2019, (<u>see</u> D.E. ## 121–27), and the jury returned a verdict for Smalls, (<u>see</u> D.E. # 130 ("Clerk's Judgment")). The jury found both Defendants liable and awarded Smalls $60,000 in compensatory damages. (<u>Id.</u>; D.E. # 129.) Shortly thereafter, on June 18, 2019, Smalls timely moved for a new trial on damages, pursuant to Federal Rule of Civil Procedure 59. (D.E. # 132.) On June 20, 2019, the Supreme Court issued its decision in <u>McDonough</u>, reversing the Second Circuit, and Defendants filed the instant motions on the following day. (D.E. # 135.)

<p align="center">**STANDARD OF REVIEW**</p>

Defendants move pursuant to Rule 54(b) of the Federal Rules of Civil Procedure and invoke the Court's inherent power. Federal Rule of Civil Procedure 54(b) provides, in relevant part:

> any order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and responsibilities.

Fed. R. Civ. P. 54(b).

"The Court has authority under Fed. R. Civ. P. 54(b), as well as the inherent power of the court, to reconsider a prior decision at any time before the entry of final judgment." <u>Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2, Bd. of Comm'rs</u>, 982 F. Supp.2d 225, 230 (E.D.N.Y. 2013) (quoting <u>Richman v. W.L. Gore & Assocs.</u>, 988 F. Supp. 753, 755 (S.D.N.Y. 1997)). A judgment is not final if a motion under Rule 50(b), 52(b), or 59 has been timely filed. <u>Weyant v. Okst</u>, 198 F.3d 311, 315 (2d Cir. 1999). Here, as Smalls conceded at oral argument,

final judgment has not been entered in this case because his timely Rule 59 motion divested the judgment of finality.

"The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) (internal quotation marks omitted); accord In re Ski Train Fire, 224 F.R.D. 543, 548 (S.D.N.Y. 2004).  Courts in this Circuit have granted motions for reconsideration when there has been an intervening change in controlling law, such as the issuance of a relevant United States Supreme Court decision.  In Berman v. New York State Public Employee Federation, for example, the district court granted plaintiff's motion for reconsideration of its prior decision after the Supreme Court overruled a case that had been central to the prior decision.  2019 WL 1472582, *2–3 (E.D.N.Y. Mar. 31, 2019).  See also Filler v. Hanvit Bank, 2003 WL 21729978, at *1 (S.D.N.Y. July 23, 2003) (vacating prior orders where a recent Supreme Court decision altered the outcome); Richman, 988 F. Supp. at 758–59 (modifying a prior decision where a Supreme Court decision constituted an intervening change in controlling law).  Smalls offers no meaningful reason why Rule 54(b) does not apply in this case.  Because Defendants' motion is properly brought under Rule 54(b), the Court need not address the applicability of the other rules relied upon by the Defendants.

## DISCUSSION

### I.   Defendants' Motions Are Properly Brought Under Rule 54(b)

For the reasons discussed herein, the Court holds that the Supreme Court's decision in McDonough constitutes an intervening change in controlling law warranting reconsideration of its prior orders.  More specifically, had the Supreme Court issued its ruling in McDonough prior to

trial, this Court would have dismissed Smalls's fair-trial claims because he could not have established favorable termination at trial.

## II.   Favorable Termination Requirement

Here, Defendants argue that an intervening change in controlling law occurred in June 2019, when the Supreme Court issued its decision in McDonough, 139 S. Ct. 2149. McDonough held that the statute of limitations on a fair-trial claim based on fabricated evidence does not begin to run until "the criminal proceeding has ended in the [accused's] favor, or a resulting conviction has been invalidated within the meaning of Heck[ v. Humphrey, 512 U.S. 477, 486–87 (1994)]." 139 S. Ct. at 2158.

Although the issue presented in McDonough was the accrual date of a fair-trial claim under 28 U.S.C. § 1983, the opinion's reasoning strongly suggests that the Supreme Court would hold that favorable termination is a requirement of a fair-trial claim, at least in cases in which the plaintiff alleges a deprivation of liberty resulting from the use of fabricated evidence in a criminal proceeding.   In particular, the Supreme Court observed that McDonough's fair-trial claim "implicates the same concerns" as those that animate the favorable-termination requirement in the malicious-prosecution context—namely, the risk of parallel litigation and conflicting judgments, and the possibility of collateral attacks on criminal judgments through civil litigation. Id. at 2156–57. Accordingly, the Court reasoned that "it makes sense to adopt the same rule"—i.e., favorable termination—for McDonough's fair-trial claim. Id. at 2157. Although the Supreme Court noted that "[o]ne could imagine a fabricated-evidence claim that does not allege that the violation's consequence was a liberty deprivation occasioned by the criminal proceedings themselves," and therefore may not require favorable termination to be satisfied, those were not the circumstances in McDonough's case. Id. at 2160. In other words, although the Court did not necessarily impose

5

a favorable termination requirement on all fair-trial claims, the Court strongly suggests that favorable termination is a requirement for fair-trial claims like McDonough's—and like Smalls's—that allege a deprivation of liberty resulting from the use of fabricated evidence in a criminal proceeding.

In addition to the Court's reasoning, considerable dicta in McDonough supports this interpretation of the opinion.  See id. at 2154–55 ("The statute of limitations for a fabricated-evidence claim like McDonough's does not begin to run until the criminal proceedings against the defendant (i.e., the § 1983 plaintiff) have terminated in his favor."), at 2156 ("McDonough could not bring his fabricated-evidence claim under § 1983 prior to favorable termination of his prosecution."), at 2159 ("McDonough therefore had a complete and present cause of action for the loss of his liberty only once the criminal proceedings against him terminated in his favor."), at 2160 ("Heck explains why favorable termination is both relevant and required for a claim [like McDonough's fair-trial claim] analogous to malicious prosecution that would impugn a conviction . . . .").

Given its recency, few courts in this Circuit have had occasion to consider whether McDonough should be construed as imposing a favorable termination requirement for § 1983 fair-trial claims, at least in cases in which the plaintiff has suffered a deprivation of liberty as a result of the use of fabricated evidence in a criminal proceeding.  Those that have, however, have held or at least suggested that it should be construed as imposing such a requirement.  See Miller v. Terrillion, 16-cv-52 (ENV) (RLM), 2020 WL 549356, at *4 (E.D.N.Y. Jan. 30, 2020) ("[Plaintiff] alleges that the criminal proceedings against him were founded upon fabricated evidence. Inescapably, such [an] allegation falls within McDonough's holding, and, consequently, his fair trial claim has not accrued unless and until his criminal proceedings terminated in his favor.");

Goldring v. Donawa, 16-cv-5651 (KAM) (LB), 2019 WL 4535507, at *4 (E.D.N.Y. Sept. 19,
2019) ("The Supreme Court has held that a plaintiff '[cannot] bring his fabricated-evidence claim
under § 1983 prior to favorable termination of his prosecution[,]' at which time the claim
accrues. . . . As explained above, plaintiff has not received a favorable termination under Second
Circuit case law and, therefore, cannot maintain a § 1983 action for an unfair trial.") (first and
second alterations in original) (citations omitted); Breton v. City of New York, 404 F. Supp. 3d
799, 815 n.2 (S.D.N.Y. 2019) ("The Supreme Court recently held that a claim for the denial of a
fair trial based on fabricated evidence does not accrue until the criminal proceedings terminate in
favor of the plaintiff. As explained above, the plaintiff has sufficiently alleged that the criminal
proceeding terminated in his favor.") (internal citation omitted); McKenzie v. City of New York,
17-cv-4899 (PAE), 2019 WL 3288267, at *16 (S.D.N.Y. July 22, 2019) ("Section 1983 claims for
fabrication of evidence cannot be brought 'prior to favorable termination of [a plaintiff's]
prosecution.'" (alteration in original) (quoting McDonough, 139 S. Ct. at 2156)).

Smalls's arguments that McDonough should be construed otherwise are unpersuasive.
First, Smalls points out that the McDonough Court focused solely on the date of accrual for a
fabricated-evidence claim under § 1983, and "made clear that it was not deciding the issue of what
constitutes a 'favorable termination' . . . for all fabricated evidence claims, but rather, only for the
fabricated evidence claim before it." (Pl. Opp'n at 5–6 (emphasis in original).) Smalls quotes the
following language from McDonough:

> Because McDonough's acquittal was unquestionably a favorable termination, we
> have no occasion to address the broader range of ways a criminal prosecution (as
> opposed to a conviction) might end favorably to the accused. Cf. Heck, 512 U. S.,
> at 486–487. To the extent Smith argues that the law in this area should take account
> of prosecutors' broad discretion over such matters as the terms on which pleas will
> be offered or whether charges will be dropped, those arguments more properly bear
> on the question whether a given resolution should be understood as favorable or
> not. Such considerations might call for a context-specific and more capacious

7

understanding of what constitutes "favorable" termination for purposes of a § 1983 false-evidence claim, but that is not the question before us.

(Id. (quoting McDonough, 588 U.S. at 14 n.10) (emphasis supplied by Smalls).)

Smalls is correct that the McDonough Court observed that it had "no occasion to address the broader range of ways a criminal prosecution (as opposed to a conviction) might end favorably to the accused." McDonough, 577 U.S. at 14 n.10. This was because in McDonough, the petitioner was acquitted and there was therefore no question that the prosecution had terminated in his favor. However, simply because the McDonough Court did not address the broader range of ways that favorable termination could be satisfied, other than via acquittal, does not suggest that it did not intend to make favorable termination a requirement. Indeed, implicit in the language quoted by Smalls is that favorable termination is a requirement; the relevant inquiry is simply whether the manner in which Smalls's proceedings terminated was favorable.

Smalls next argues that the term "favorable termination" in McDonough "does not refer to an element of a Section 1983 claim" but rather "refers to the accrual rule set forth in Heck v. Humphrey." (Pl. Opp'n at 6–7.) Put another way, Smalls argues that "favorable termination," as used in McDonough, is "a procedural bar that must be removed before a Section 1983 claim can be filed," rather than an "element" of the claim. (Id. at 7.) However, whether "favorable termination" is conceived of as a requirement of a fair-trial claim or as a "procedural bar that must be removed" before the claim can be asserted is immaterial if Smalls cannot satisfy or remove it. (For the reasons discussed in section III, infra, he cannot.)

Finally, in a letter supplementing his briefing, Smalls informs the Court that the Honorable John G. Koeltl specifically addressed the argument raised by Defendants in this action, in Wellner v. City of New York, et. al., 393 F. Supp. 3d 388, 390 (S.D.N.Y. 2019), reconsideration denied, 16-cv-7032 (JGK), 2019 WL 5538064 (S.D.N.Y. Oct. 25, 2019). (D.E. # 142 ("Pl. Supp.").)

8

According to Smalls, Wellner "held that McDonough does not add a favorable termination element, and a fair trial claim can even proceed 'despite the existence of some conviction.'" (Id. (emphasis in original).)  In support of this characterization, Smalls quotes the following language from Wellner:

> The defendants next argue that the recent Supreme Court decision McDonough v. Smith, 139 S. Ct. 2149 (2019), adds an element to a claim for the denial of the right to fair trial—namely, that the prosecution against the accused must end in the accused's favor. . . .  McDonough, however, offered no occasion to determine whether a plaintiff could pursue a fabricated evidence claim despite the existence of some conviction.  The Supreme Court was clear on this issue.

(Id. (quoting Wellner, 393 F. Supp. 3d at 396–97).[1])

Smalls is correct to point out that Wellner acknowledges that a fair-trial claim based on fabricated evidence can proceed, post-McDonough, despite the existence of some conviction, under certain circumstances.  However, Smalls errs in his assertion that Wellner "held that McDonough does not add a favorable termination element." (Pl. Supp. (emphasis omitted).)  It did not.  Given the apparent misunderstanding, it is worth reviewing the relevant facts and reasoning of Wellner in greater detail.

First, the plaintiff in Wellner had no criminal conviction.  Rather, she was initially charged with four misdemeanors and reached an agreement to plead guilty only to the offense of disorderly conduct—specifically, obstructing pedestrian traffic—which is not considered a crime.  Wellner, 393 F. Supp. 3d at 396.  Second, the allegedly fabricated evidence applied only to her misdemeanor charges, which were dropped, not to the disorderly conduct offense to which she pleaded guilty. Id. at 397.  In light of these circumstances, the court held that Wellner's conviction—a non-criminal conviction that was not the subject of her fair-trial fabricated-evidence claim—did not

---

[1] Smalls slightly misquotes Wellner: the word "however" in Smalls's quotation, above, is in fact "therefore" in the Wellner decision.  See Wellner, 393 F. Supp. at 397.

preclude her from bringing said fabricated-evidence claim. The court reasoned that her fair-trial claim "in no way seeks to recover damages, in violation of Heck, for a wrongful conviction or resulting imprisonment," and is a "paradigm case where her claim does not question the validity of her conviction for the 'offense' of disorderly conduct." Id. In contrast to Wellner, Smalls does seek to recover damages for his imprisonment for criminal charges, and it is those criminal charges that are the subject of his fabricated-evidence claims.

Finally, contrary to Smalls's assertion, Wellner did not hold that McDonough "does not add a favorable termination element." Rather, the court was clear that Wellner's fair-trial claim, related to her dropped misdemeanor charges, "only accrued under McDonough when her prosecution was terminated." Id. In short, Smalls misconstrues Wellner's holding and reasoning as it pertains to McDonough.[2]

In sum, because (1) the Supreme Court strongly suggests in McDonough that favorable termination is a condition precedent to a fair-trial claim, at least in cases, as here, in which the plaintiff has suffered a deprivation of liberty as a result of the use of fabricated evidence in a criminal proceeding; (2) multiple courts in this Circuit have construed it as imposing such a requirement; and (3) Smalls's arguments that it should not be construed as such are unpersuasive; the Court holds that, post-McDonough, Smalls must be able to establish favorable termination in order to bring his fair-trial claims.

_____

[2] In a more recent decision, Judge Koeltl once again suggests that favorable termination is a requirement of a fair-trial claim based on fabricated evidence. More specifically, in a ruling on defendants' motion for judgment on the pleadings, he found that plaintiff had sufficiently alleged that this requirement was satisfied. Breton, 404 F. Supp. 3d at 815 n.2 ("The Supreme Court recently held that a claim for the denial of a fair trial based on fabricated evidence does not accrue until the criminal proceedings terminate in favor of the plaintiff. . . . [T]he plaintiff has sufficiently alleged that the criminal proceeding terminated in his favor.").

10

### III.    Smalls Cannot Satisfy Favorable Termination

The Court next turns to whether Smalls did, or could have, satisfied this requirement at trial. For the reasons set forth below, the Court holds that Smalls could not have done so.

A. Favorable Termination Standard

The first question is what standard applies. Defendants assert that, post-McDonough, the favorable termination standard for purposes of a fair-trial claim is the same as that for a malicious-prosecution claim—namely, as set forth by the Second Circuit in Lanning, the plaintiff must demonstrate that "the underlying criminal proceeding ended in a manner that affirmatively indicates [plaintiff's] innocence." (Defs. Mem. at 2 (quoting Lanning, 908 F.3d at 22); see also id. at 9 ("[T]he definition of favorable termination for purposes of a fair trial claim should be identical to the definition of favorable termination for purposes of common law malicious prosecution . . . .").) Smalls argues that, assuming arguendo that McDonough imposes a favorable termination requirement, his prosecution ended favorably—although it is not altogether clear from his papers what standard he asserts should apply.

The Second Circuit has not yet addressed this question.[3] However, multiple courts in this Circuit appear to assume that, post-McDonough, the standard for favorable termination in the context of a fair-trial claim is the same as that for a malicious-prosecution claim. In Goldring, for example, the plaintiff brought both malicious-prosecution and fair-trial claims. 2019 WL 4535507. The district court found that plaintiff had not received a favorable termination affirmatively indicating his innocence, and accordingly granted defendants' motion for summary judgment on plaintiff's malicious-prosecution claim. Id. at *3–4. After noting that the Supreme Court in McDonough had analogized McDonough's fair-trial claim to a malicious-prosecution

---

[3] This is, of course, because prior to the Supreme Court's decision in McDonough, the Second Circuit had held that favorable termination was not a condition precedent to a fair-trial claim. See McDonough, 898 F.3d at 265.

11

claim, the court reasoned that because plaintiff had not established favorable termination for purposes of his malicious-prosecution claim, he "therefore[] cannot maintain a § 1983 action for an unfair trial," either. Id. Other courts have employed similar reasoning. See Hincapie v. City of New York, 18-cv-3432 (PAC), 2020 WL 362705, at *4–8 (S.D.N.Y. Jan. 22, 2020) (holding that plaintiff had adequately alleged favorable termination for purposes of his malicious-prosecution claim and then rejecting defendant's argument that McDonough barred the plaintiff's fair-trial claim, reasoning that "the Court has already determined that [plaintiff] has adequately alleged a favorable termination (see supra); and it need not decide the issue again"); Breton, 404 F. Supp. 3d at 815 n.2 (rejecting defendants' motion to dismiss plaintiff's fair-trial claim and reasoning, in part, that because the court had found favorable termination for purposes of plaintiff's malicious-prosecution claim, the plaintiff had "sufficiently alleged that the criminal proceeding terminated in his favor" for purposes of his fair-trial claim, as well); but see Ross v. City of New York, 17-cv-3505 (PKC) (SMG), 2019 WL 4805147, at *8 (E.D.N.Y. Sept. 30, 2019) (holding that, although an adjournment in contemplation of dismissal ("ACD") has not been considered a favorable termination in this Circuit in the context of malicious-prosecution claims, an ACD did not preclude the plaintiff's fair-trial claim); Colon v. City of Rochester, 17-cv-6160L, 2019 WL 6629276, at *15–16 (W.D.N.Y. Dec. 6, 2019) (citing Ross and holding that, because the charges against plaintiffs were either dismissed outright or resolved through an ACD, plaintiffs' fair-trial claims were not precluded).

Finally, McDonough itself analogizes extensively to common-law malicious prosecution, in its analysis of McDonough's fair-trial claims. See, e.g., 139 S. Ct. at 2156–57 ("McDonough is correct that malicious prosecution is the most analogous common-law tort here. . . . We follow the analogy where it leads: McDonough could not bring his fabricated-evidence claim under

12

§ 1983 prior to favorable termination of his prosecution. . . . Because a civil claim such as McDonough's, asserting that fabricated evidence was used to pursue a criminal judgment, implicates the same concerns, it makes sense to adopt the same rule.").

The McDonough Court did indicate, however, that the "question whether a given resolution should be understood as favorable or not" in the context of a fabricated-evidence claim "might call for a context-specific and more capacious understanding of what constitutes 'favorable' termination." Id. at 2160 n.10. In particular, "the question whether a given resolution should be understood as favorable or not," for purposes of a § 1983 fabricated-evidence claim, might properly "take account of prosecutors' broad discretion" over the circumstances under which a prosecution is terminated, such as "the terms on which pleas will be offered or whether charges will be dropped." Id. Smalls's case did not involve such exercising of prosecutorial discretion through guilty pleas or dropped charges, however. For all of the above reasons, the Court assumes that the standard for assessing favorable termination for purposes of Small's fair-trial claim in this case is the same as that for malicious prosecution.

B. Smalls Cannot Satisfy Favorable Termination Here

The relevant circumstances of Smalls's criminal prosecution and its termination are as follows. Smalls was indicted, tried, and convicted by a jury in New York Supreme Court, Queens County, of criminal trespass and criminal possession of a weapon in the second and third degrees. The Appellate Division vacated the possession convictions on the ground that the gun recovered should have been suppressed at the Mapp hearing, and it remitted to the Supreme Court for a new trial on the criminal trespass charge. See Smalls, 922 N.Y.S.2d at 462–63. The Appellate Division reasoned that because neither Smalls nor the others in his group "engaged in suspicious behavior immediately after the [gun]shot was heard or during the three-block walk away from the general

13

location of the gunshot, the police lacked reasonable suspicion when they pursued the four males after they fled." Id. at 463. In other words, the officers lacked reasonable suspicion to follow Smalls; therefore, the firearm should have been suppressed as the fruit of the poisonous tree. On remand, the trial court dismissed the remaining criminal trespass charge because the officers' observations of Smalls's entry into and presence in the building were similarly suppressed. People v. Smalls, Ind. 221/2007, Slip. Op., at *12 (Sup. Ct., Queens Co., Oct. 5, 2012).

Based on the above circumstances and applying the standard for favorable termination set forth in Lanning, the Court holds that Smalls did not, and could not, establish favorable termination at trial. First, as Defendants correctly point out, a number of analogous cases in this Circuit have found that the termination of a criminal prosecution was not favorable when it was based on suppression of evidence. See Gonzalez v. City of Schenectady, 728 F.3d 149, 162 (2d Cir. 2013) (affirming a district court's order dismissing plaintiff's malicious-prosecution claim where plaintiff's conviction was reversed by the Appellate Division based on evidence that should have been suppressed, and reasoning that "the officers found crack cocaine in [the plaintiff's] rectum, eliminating any doubt that [the plaintiff] was, in fact, guilty of at least criminal possession of a controlled substance."); Beaudry v. McKnight, 2:17-cv-23, 2019 WL 1296628 at *11 (D. Vt. Mar. 21, 2019) ("[D]ismissal for lack of evidence following a successful suppression motion is not a 'favorable termination.'"); Graham v. City of N.Y., 16-cv-4613 (NGG) (CLP), 2018 WL 1157818, at *6 (E.D.N.Y. Mar. 2, 2018) ("[T]he reversal of Plaintiff's conviction was due to a determination by the appellate court that the evidence leading to his conviction should have been suppressed. . . . [T]his reversal was based on 'technical error at the trial level,' something that cannot support a favorable termination."); Harris v. City of N.Y., 15-CV-6467 (MKB), 2017 WL 59081 at *4 (E.D.N.Y. Jan. 4, 2017) ("[A] dismissal . . . because evidence is suppressed, particularly when the

evidence was suppressed on appeal, is not a favorable termination."); Peters v. City of N.Y., 14-cv-1361 (ERK), 2015 WL 3971342, at *2 (E.D.N.Y. June 30, 2015) ("[T]he claim for malicious prosecution fails because the charges against [the plaintiff] were dismissed as a result of the suppression of the evidence found on [the plaintiff's] person and in his apartment."); see also Defs. Mem. at 12–13 & n.9 (citing cases, including in other Circuits, in which a dismissal based upon suppression of evidence was held not to be a favorable termination).

As Defendants acknowledge, however, the district court in Blount v. City of New York declined to categorically rule that a dismissal based on the suppression of evidence can never be a favorable termination.  15-cv-5599 (PKC) (JO), 2019 WL 1050994, at *2–4 (E.D.N.Y. Mar. 5, 2019).  Rather, the court held that it needed to look into the nature of the suppression to determine whether the particular facts affirmatively indicated the plaintiff's innocence. Id. at *3.  In doing so, the court found that the circumstances of the suppression did indeed affirmatively indicate the plaintiff's innocence, for one of his arrests.  Id. at *3–4.  The evidence for this arrest was suppressed after the state court found that the sole witness at the suppression hearing, the arresting detective, lacked credibility, and further found that the record in the case was "completely devoid of any information or evidence tending to support, even by reasonable inference, the detective[']s conclusion that he observed defendant engage in conduct associated with the 'telltale signs' of a drug transaction." Id. (citations omitted).  The district court concluded that, "[b]ased on the reasons given by the state court in its suppression order, coupled with the fact that Plaintiff has maintained his innocence of all charges throughout the prosecution and subsequent civil proceedings, the Court finds that affirmative indications of innocence exist surrounding the dismissal of the prosecution stemming from Plaintiff's . . . arrest." Id. at *4.  Accordingly, the court held that the prosecution was terminated in plaintiff's favor. Id.  In short, the court held that

in those circumstances, dismissal of the prosecution after the suppression of evidence did affirmatively indicate the plaintiff's innocence. Id.[4]

Unlike in Blount, the circumstances of the suppression of evidence in Smalls's case did not indicate his innocence of gun possession. Here it bears noting that the jury below in convicting Smalls of criminal possession of a weapon in the second and third degrees found that he possessed the gun.[5] Smalls, 922 N.Y.S.2d at 462. The reasoning of the Appellate Division's decision did not undermine that factual finding; in fact, it assumed he did possess the gun in describing, for example, Smalls's "act of parting with the gun" upon pursuit by the officers. Id. at 463. Rather, the court decided that the gun should be suppressed because the officers lacked reasonable suspicion to follow Smalls. Therefore, here, the circumstances of the suppression of evidence, which led to the termination of Smalls's underlying prosecution, did not "affirmatively indicate his innocence." Accordingly, Smalls could not establish favorable termination in this case.

## CONCLUSION

For the reasons set forth above, the Court grants Defendants' motions, vacates the jury

---

[4] Blount includes as part of its analysis a discussion of the Court's previous decision in this action, granting and denying in part Defendants' motion to dismiss. 2019 WL 1050994, at *3 (citing Smalls v. City of New York, 181 F. Supp. 3d 178 (E.D.N.Y. 2016)). Blount characterizes this prior decision as follows: "the court found a favorable termination where the plaintiff's conviction for weapon possession was reversed based on the failure to suppress improperly obtained evidence." Id. at *3. Critically, however, the Court ruled on Defendants' motion to dismiss prior to the Second Circuit's decision in Lanning (and, of course, prior to the Supreme Court's decision in McDonough). The Honorable Eric N. Vitaliano, to whom this case was then assigned, stated that it was essential to his holding that the standard for favorable termination did not require that the termination of the prosecution "affirmatively demonstrate the accused's innocence." Smalls, 181 F. Supp. 3d at 188. Lanning clarified that affirmative indications of innocence was in fact the appropriate standard. See Lanning, 908 F.3d at 28 (citing, e.g., Gonzalez, 728 F.3d at 162). And indeed, shortly after the standard was clarified in Lanning, Smalls voluntarily dismissed his malicious-prosecution claim. (D.E. # 89 at 6 n.2 (stating that "[b]ased upon the Second Circuit's recent decision in Lanning[]," Smalls would "voluntarily dismiss his malicious prosecution claim").)

[5] In his opposition brief, Smalls asserts that a jury "specifically found that [he] did not possess the firearm." (Pl. Opp'n at 9.) Smalls apparently refers to the jury's finding, in the instant federal action, that Defendants had fabricated evidence. The jury did not, however, "specifically f[i]nd that [Smalls] did not possess the firearm," as he contends. Rather, the jury found that Defendants had fabricated evidence, and it is unclear which piece of evidence they believed was fabricated. At trial, Smalls argued, inter alia, that Defendants fabricated evidence concerning what Smalls was wearing, where he was arrested, and where the gun was recovered. In any event, the finding by the jury in the instant action is not relevant to the inquiry into whether the underlying criminal proceeding terminated in Smalls's favor.

16

verdict, and enters judgment as a matter of law in favor of Defendants.  Plaintiff's motion for a new trial on damages is denied as moot.  The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

Dated: March 13, 2020
Brooklyn, New York

s/Carol Bagley Amon
_____
Carol Bagley Amon
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ANDREW SMALLS,

                                              JUDGMENT

                      Plaintiffs,                  14-CV-02326 (CBA)(RML)

      v.

POLICE OFFICER RICHARD COLLINS and
POLICE OFFICER DAVID TETA,

                      Defendants.
---------------------------------------------------------------X
      A Memorandum and Order of the Honorable Carol Bagley Amon, United States District

Judge, having been filed on March 16, 2020, granting Defendants' motions; vacating the jury

verdict; entering judgment as a matter of law in favor of Defendants; and denying Plaintiff's

motion for a new trial on damages as moot; it is

      ORDERED and ADJUDGED that Defendants' motions are granted; that the jury verdict

is vacated; that judgment is entered as a matter of law in favor of Defendants; and that Plaintiff's

motion for a new trial on damages is denied as moot.

Dated: Brooklyn, New York                   Douglas C. Palmer
       March 16, 2020                     Clerk of Court

                                    By:    */s/Jalitza Poveda*
                                        Deputy Clerk

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ANDREW SMALLS,

                        Plaintiff,                                    **NOTICE OF APPEAL**

        -against-                                            14 Civ. 02326 (CBA) (RML)

THE CITY OF NEW YORK, et. al.,

                        Defendants.
--------------------------------------------------------X

**PLEASE TAKE NOTICE** that plaintiff hereby appeals to the United States Court of

Appeals for the Second of Circuit, from the Judgment entered by the Clerk of the Court on March

16, 2020, pursuant to the Order of the Honorable Carol Bagley Amon, dated March 13, 2020,

setting aside the jury's verdict in favor of Plaintiff, and entering judgment as a matter of law in

favor of Defendants.   A copy of Judge Amon's decision is annexed hereto as Exhibit A.

        Plaintiff is appealing all aspects of the Court's rulings on Defendant's post-trial motion to

set aside the jury's verdict pursuant to Rules 50(b), 60(b) and 54(b).

Dated: New York, New York
        March 27, 2020

                                                Jon L. Norinsberg, Esq.
                                                Jon L. Norinsberg, Esq., PLLC
                                                225 Broadway, Ste. 2700
                                                New York, New York 10007
                                                (212) 791-5396